# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                 No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

---

[1] In its Sealed Memorandum Opinion and Order, filed October 11, 2016 (Doc. 728)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to

**THIS MATTER** comes before the Court on: (i) the Defendants' Brief Regarding "Protective Orders" for Materials Obtained from Sources Other Than the Government, filed March 8, 2016 (Doc. 302)("Protective Order Brief"); (ii) Defendant Daniel Sanchez's Reply Regarding Court's Ability to Subject Materials Obtained Independently of This Court's Process to Court's Protective Order (Doc. 313), filed March 15, 2016 (Doc. 315)("Sanchez' Protective Order Reply"); (iii) the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or Any Other Case, filed April 1, 2016 (Doc. 358)("United States' Notice"); (iv) Motion for Order Directing the United States to Comply with Fundamental Due Process, filed March 28, 2016 (Doc. 342)("Due Process Motion"); (v) Motion to Suspend Scheduling Order (Doc. 250), Request for Status Conference and Ex Parte CJA Conference with the District Court, filed May 18, 2016 (Doc. 535)(Motion to Suspend"); and (vi) the Defendants' Opposed Joint Motion for Reconsideration of the Protective Order, filed May 23, 2016 (Doc. 541)("Motion for Reconsideration"). The Court held a hearing on June 2, 2016. As became evident at the hearing, many of the issues raised by the motions and briefing had significant overlap. At their core, the issues are: (i) whether the Court should amend the Protective Order, filed March 14, 2016 (Doc. 313)("Protective Order"), that the Honorable Kenneth Gonzales, United States District Judge for the District of New Mexico, issued before his recusal; (ii) how the Court is going to treat any other motions to reconsider -- based on Judge Gonzales' conflict of interest -- the orders that Judge Gonzales issued before his recusal; (iii) how the Court is going to manage the parties'

---

protect confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

public, ex parte, and sealed filings; and (iv) what amendments might need to be made to the scheduling order following the case's transition to the Court.

The primary issue is whether the Court should amend the Protective Order that Judge Gonzales issued when he presided over this case. The Court will reconsider and modify the Protective Order, because it too broadly limits the Defendants' access to discovery materials, and because it places too heavy a burden on the Defendants and their counsel. The Court will order most discovery materials to be uploaded onto the Defendants' tablets. The Court will, however, still restrict the Defendants' access to ex parte and sealed pleadings. The Court will thus grant in part and deny in part the Motion for Reconsideration, which disposes of the Motion for Reconsideration, and the requests in the Protective Order Brief and in Sanchez' Protective Order Reply.

The next issue -- how the Court will treat motions to reconsider orders that Judge Gonzalez issued before his recusal -- was resolved at the hearing by a compromise between the Court and the parties. This issue, raised primarily by the United States' Notice and the Defendant's Response to Doc. No. 358 -- the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 4, 2016 (Doc. 360)("Response to United States' Notice") -- relates to orders that Judge Gonzalez issued when he potentially had a conflict. To avoid relitigating the substantive rulings that Judge Gonzalez issued in the case's early stages, and to take reconsideration of the conflict-related matters instead as they might individually arise, the Court proposed that the Defendants' lawyers -- should they raise a Motion for Reconsideration of Judge Gonzales' rulings -- would not need to satisfy the high standards that are generally incumbent on filing a motion to reconsider if the Court would need to decide if

Judge Gonzales had a conflict when he entered the order.  The parties agreed, and that compromise -- to the extent that there is a motion in the United States' Notice or the Response to United States' Notice -- disposes of the United States' Notice.

A compromise at the hearing resolved the third issue, related to the public, ex parte, and sealed nature of the various documents filed thus far in this case.  Different case management practices in Las Cruces, New Mexico -- where the case originated -- can generally explain the issue that Defendants' Due Process Motion primarily raises.  The Court explained the nature of the document filings that the Court uses in Albuquerque, New Mexico, fall into three categories -- public, ex parte, and sealed -- and the Court would thus order strict compliance with those filing categories.  Adherence with the filing categories is of further importance given the requirements of the Court's amendments to the Protective Order.  This compromise and directive disposes of the Defendants' Due Process Motion.

The last issue, raised primarily by the Defendants' Motion to Suspend, was generally moot by the time of the hearing, because some of the requests made by the Motion to Suspend, regarding a status conference and ex parte CJA[2] conference with the Court, were addressed by the Court setting them, and the only item on the scheduling order that the Court foresaw issues surrounding was the trial date.  Because the Court recognized that the trial could be continued as was necessary in the future, it chose not to grant the Motion to Suspend.  The Court thus denies the Motion to Suspend.

## **FACTUAL BACKGROUND**

The Court takes its facts from the United States' Redacted Superseding Indictment, filed April 21, 2016 (Doc. 368)("Superseding Indictment"), and from DA Drops Charges Against

---

[2]Referring to the Criminal Justice Act, 18 U.S.C. §§ 3006 to 3006A.

Inmates Accused Of Murder, Released November 25, 2015, Sun-News Report, filed March 15, 2016 (Doc. 315-1)("Exhibit 1").[3]  This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  See Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taken them hostage.  See Superseding Indictment at 3.  During the riot, thirty-three inmates were killed, and over two hundred were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as five hundred members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  See Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding

_____

[3]Defendant Sanchez attached the article as Exhibit 1 to Sanchez' Protective Order Reply.

Indictment at 4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] include[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."  Superseding Indictment at 4-5.  In order to show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Superseding Indictment at 7.  The relevant facts giving rise to the instant case are as follows.

In March of 2014, a Doña Ana County grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, a fellow inmate of Montoya and Armenta during their incarceration at the Southern New Mexico Correctional Facility state prison.  See Exhibit 1 at 1.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See Exhibit 1 at 1.  That grand jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii)

tampering with evidence; and (iv) two counts of conspiracy.  See Exhibit 1 at 1.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See Exhibit 1 at 1.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  Exhibit 1 at 1.

The United States of America now brings this case against thirty Defendants, charging them with a total of fifteen counts.  See Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Superseding Indictment at 6-31.  Defendants A.A. Garcia, G. Archuleta, B. Clark, M. Rodriguez, A.R. Baca, R. Martinez, R.P. Martinez, and D. Sanchez are the alleged leaders of the enterprise.  See Superseding Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1); (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation

of 21 U.S.C. §§ 841 and 846.  Superseding Indictment at 9.  In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the indictment provides that on March 26, 2001, DeLeon, J. Gallegos, Troup, Lujan, and B. Garcia allegedly murdered "F.C."  Superseding Indictment at 9.  On the same day, Lujan, B. Garcia, E. Martinez, Patterson, and Chavez allegedly murdered "R.G."  Superseding Indictment at 12.  On June 17, 2007, Alonso, Troup, A.A. Garcia, Clark, and Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, J. Gallegos and A. Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 18. On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21.  On March 7, 2014, Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Superseding Indictment at 27.  And, starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Baca, R.P. Martinez and R. Martinez allegedly conspired to murder "D.S."  Superseding Indictment at 28.  During the same period of time, Baca, R.P. Martinez, R. Martinez and C. Garcia allegedly conspired to murder "G.M."  Superseding indictment at 28.  On November 29, 2015, C. Garcia, a convicted felon, is alleged to have unlawfully possessed a firearm.  See Superseding Indictment at 29.  On the same day, C. Garcia, a convicted felon, is alleged to have knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Superseding Indictment at 29.

As well, on March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. Then, between February 1, 2016, until February 27, 2016, J. Gallegos, Gonzalez, Rivera, Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G." Superseding Indictment at 30. The final count alleges that on February 27, 2016, J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Superseding Indictment at 31.

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)). See Indictment at 1. The Defendants are all allegedly members, prospects, or otherwise associated with SNM, which constituted an enterprise as defined in Title 18, United States Code, § 1959(b)(2). See Indictment at 2.

On April 21, 2016, the United States sealed a Superseding Indictment[4] after another grand jury instead indicted thirty Defendants -- twenty-four of whom were Defendants in the original Indictment. See United States' Redacted Superseding Indictment at 1, filed April 21, 2016 (Doc. 368)("Superseding Indictment"). In addition to the new Defendants, the Superseding Indictment also contains new charges under modified count numbers. See Superseding Indictment at 9-31. The Superseding Indictment contains fifteen counts for: (i) the Murder of

---

[4]The Court describes in detail the counts set forth by the Superseding Indictment, rather than the Indictment. The United States Attorney's Office filed the Superseding Indictment after Judge Gonzales issued the Protective Order, but before the Defendants filed the Motion for Reconsideration.

F.C. ("Count 1"); (ii) the Murder of R.G. ("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4"); (v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time the Defendants filed the Motion for Reconsideration, and at the time the Court held its June 2, 2016, hearing, some of the Defendants were death penalty eligible.  See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants).

Judge Gonzales initially presided over the case until it was reassigned to the Court on March 30, 2016.  See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351).  The Court will first address the procedural background under Judge Gonzales' presiding role, before turning to the procedure once Judge Browning became the presiding Judge.

     **1.**     **The Proceedings Before Judge Gonzales.**

On February 5, 2016, the United States filed a motion requesting a protective order.  See United States' Sealed Motion for Protective Order at 1, filed February 5, 2016 (Doc. 260)("Motion for Protective Order").  In its Motion for Protective Order, the United States cited to rule 16(d) of the Federal Rules of Criminal Procedure to request that the Court restrict "the

defendants' handling and use of the discovery in this case."  Motion for Protective Order at 2. The United States requested: (i) that Judge Gonzales bar the Defendants and their counsel from using discovery materials except to prepare for this case, impeach witnesses, refresh a witness' recollection or test a witness' credibility; (ii) that only the Defendants' counsel, personnel that the Defendants' counsel or the United States regularly employ, or Court staff involved in the proceedings may have access to discovery materials; (iii) that the Defendants' counsel not disclose to any third-party, unrelated to the case, the content of any nonpublic-record materials that they receive from the United States; (iv) that the Court bar the Defendants' counsel from copying any discovery materials and disseminating it to the Defendants; (v) that any of Defendants' counsel, who might later withdraw, will provide discovery materials to new counsel; and (vi) that the protective order's provisions must remain in effect until further order of the Court, and that the parties should have an opportunity to be heard if a modification is necessary. See Motion for Protective Order at 2-3.

       On February 8, 2016, Judge Gonzales issued an order providing the Defendants with an opportunity to respond to the United States' request for a protective order and requesting that the United States supplement its Motion for Protective Order.  See Court's Order on the United States' Sealed Motion for Protective Order, filed February 8, 2016 (Doc. 279)("Court's Order on Motion for Protective Order").  Judge Gonzales, concerned about the United States' broad request, asked that the United States supplement its motion "by specifying the kinds of information or categories of information it seeks to protect by order of the Court."  Court's Order on Motion for Protective Order at 1.  The United States filed a Sealed Supplement to the Sealed Motion for Protective Order, filed February 12, 2016 (Doc. 280)("Supplement to Motion for Protective Order").  In its Supplement to Motion for Protective Order, the United States specified

the nature of the discovery materials it anticipates to produce and explained the need for the Court to issue a protective order.  See Supplement to Motion for Protective Order at 2-3.  The United States reiterated its concern that, historically, SNM members have threatened to kill, or have indeed killed, cooperating witnesses.  See Supplement to Motion for Protective Order at 3.  Additionally, the United States stated that Defendant Anthony Ray Baca was recorded having a conversation during which "he put out hits on people who were not following orders and who were not in good standing with SNM," and specifically "green-lit" a co-defendant whom he suspected was cooperating with the authorities.  Supplement to Motion for Protective Order at 3.

On February 17, 2016, the Defendants filed a memorandum in opposition to the Motion for Protective Order.  See Defendants' Joint Opposition To Government's Sealed Motion For Proposed Protective Order, filed February 17, 2016 (Doc. 281)("Defendants' Memo").  In the Defendants' Memo, the Defendants argued that the United States did not demonstrate good cause to support its Motion for Protective Order.  See Defendants' Memo at 5.  They also contended that such an order would place too heavy a burden on the Defendants' counsel.  See Defendants' Memo at 7.

On March 3, 2016, Judge Gonzales held a hearing to address four motions, one of which was the Motion for Protective Order.  See Clerk's Minutes before the Honorable Kenneth J. Gonzales, filed March 3, 2014 (Doc. 297)("Clerk's Minutes 1").  At the hearing, Defendants' counsel first objected to their clients being improperly excluded from the hearing, citing issues of due process and the notion that the Defendants' presence would help the attorney-client relationship.  See Clerk's Minutes 1 at 2-3.  And, because some Defendants had waived their appearance, while others had not, Troup's counsel argued that the Court should unseal the hearing.  See Clerk's Minutes 1 at 3.  Judge Gonzales then took up the United States' Motion for

Protective Order and the Defendants' arguments.  See Clerk's Minutes 1 at 4.  The United States argued that it had good cause to request a protective order based on the arguments it submitted in its request for a protective order.  See Clerk's Minutes 1 at 4.  E. Martinez' counsel objected to the Defendants not being present at a hearing regarding a fact-based protective order.  See Clerk's Minutes 1 at 4.  The United States Attorney then updated the parties on the status of discovery disclosure, stating that it had received some discovery from the FBI, but that it had not yet been sent.  See Clerk's Minutes 1 at 5.  Judge Gonzales asked the United States about the amount of discovery, and the United States answered that it anticipated producing a minimum of 10,000 pages.  See Clerk's Minutes 1 at 5.  Judge Gonzales expressed his concern that the Defendants' counsel would have to take thousands of items back if everything fell under the protective order's scope.  See Clerk's Minutes 1 at 5.  The United States then, for the first time, proposed to have the Department of Corrections provide the Defendants with tablets so they could review discovery materials on their own, thus avoiding "creat[ing] a paper trail."  Clerk's Minutes 1 at 5.  The United States stated that there had been two attempted murders of a witness just that week, tied to a Defendant in the case, emphasizing the need for Judge Gonzales to regulate the Defendants' access to discovery.  See Clerk's Minutes 1 at 5.  The Defendants' counsel agreed with the United States' tablet proposal -- provided that the Defendants could protect their tablets with passwords.  See Clerk's Minutes 1 at 6.

Judge Gonzales held that the United States had shown good cause to support its request for a protective order.  See Clerk's Minutes 1 at 6.  The United States argued that cooperator statements should not go on the tablets.  See Clerk's Minutes 1 at 6.  Judge Gonzales noted that, if the United States' main concern was the Defendants having paper copies of discovery materials, the tablets would put that fear at rest.  See Clerk's Minutes 1 at 6.  The United States

argued that sentiment was not fully accurate.  See Clerk's Minutes 1 at 6.  Judge Gonzales then proposed to keep "confidential materials" -- the Defendants' post-arrest statements, eyewitness statements, cooperating Defendants, confidential government sources regarding the Defendants, photographs, audio/video recordings identifying witnesses -- undisclosed, while everything would be turned over in tablets.  See Clerk's Minutes 1 at 7.  Judge Gonzales then granted the United States' Motion for Protective Order on the terms he had just described and he specified that the United States should disclose all of its discovery, whether it can go onto the tablets or not.  See Clerk's Minutes 1 at 7.  Judge Gonzales explained that, going forward, if the parties thought that an item should not be uploaded onto the tablets, and if they could not agree, they could file an ex-parte motion for in camera review.  See Clerk's Minutes 1 at 8.  Judge Gonzales further held that any information that had been disclosed in the state case would be subject to the protective order.  See Clerk's Minutes 1 at 8.  Judge Gonzales stated that the documents in the federal case and in the state case are identical.  See Clerk's Minutes 1 at 9.  Ultimately, Judge Gonzales concluded that he would set aside the issue of the state documents, and he requested that the parties submit briefs on the state disclosures.  See Clerk's Minutes 1 at 9-10.

### a.    **Defendants' Protective Order Brief.**

On March 8, 2016, the Defendants filed the Protective Order Brief, to further educate the Court on the legality of the United States' requested protective order.  See Protective Order Brief at 1.  In their Protective Order Brief, the Defendants stated that they did not find any case law supporting the United States' request for a protective order.  See Brief at 2.  The Defendants asserted that the only support that they had found regarding the legality of the Motion for Protective Order was Rule 16, which, they contended, states that a party can move for a protective order if it believes discovery should be protected.  See Protective Order Brief at 2.

- 14 -

The Defendants advanced that, although courts can issue protective orders when the moving party shows good cause, protective orders "do not cover information obtained outside the discovery process." Protective Order Brief at 2. The Defendants referred the Court to "a recent District of Colorado case," where the court held that "[a] protective order, of course, prevents only the disclosure of information obtained solely as the result of court sanctioned discovery." Protective Order Brief at 2 (quoting Landco Equity Partners, LLC v. City of Colo. Springs, 259 F.R.D. 510, 512-13 (D. Colo. 2009)(Hegarty, M.J.). The Defendants further cited to Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984), where the Supreme Court of the United States of America held that a "protective order prevents a party from disseminating only that information obtained through use of the discovery process." Protective Order Brief at 3 (quoting Seattle Times Co. v. Rhinehart, 467 U.S. at 34). The Defendants also stated that there were "no legal grounds on which defense counsel can be barred from using that information," and that some of the confidential material that the United States seeks to include in its protective order is already in some of the Defendants' hands. Protective Order Brief at 3. The Defendants concluded that including this material in the protective order would be unfair to the Defendants who had not yet had a chance to review the material and that it would limit the ability of the Defendants' counsel to represent effectively their clients under the Sixth Amendment to the Constitution of the United States of America. See Protective Order Brief at 3.

### b.    Judge Gonzales' Protective Order.

On March 14, 2016, without a further hearing, Judge Gonzales granted the United States' request for a protective order. See Protective Order at 1. The Protective Order states, in full:

> The Court having been advised that all counsel agree to the provision set forth herein, and the Court having considered the pleadings and oral arguments of the parties, hereby grants the United States' Sealed Motion for Protective Order

(Doc. 260) and enters the following protective order pursuant to Rule 16(d) of the Federal Rules of Criminal Procedure.

For purposes of this protective order, the term "Confidential Material" is defined as follows: (1) any defendant's post-arrest statement; (2) statements by eyewitnesses, cooperating witnesses, and confidential government sources regarding the crimes charged in these cases; and (3) photographs and/or audio/video recordings that would identify such persons or the content of the statements in (1) or (2), above.

**Discovery materials shall be disclosed to defense counsel immediately and no later than the previously set deadline of March 25, 2016.** The government shall have a continuing duty to disclose following that date. Any disclosure of discovery material in the above-referenced cases shall be subject to the following restrictions:

1. All discovery material may be reproduced and provided to the following persons: defense counsel, attorneys for the United States of America, any paralegal, secretarial, or clerical personnel regularly employed by counsel for the United States or defendants in preparation of these proceedings, including, but not limited to, associate attorneys, law enforcement and defense investigators, expert witnesses, mitigation specialists, and Court personnel and stenographic reporters necessarily involved in these proceedings.

2. All discovery material may be disclosed to and viewed by a defendant in the presence of and under the direct supervision of his counsel of record or staff, or another individual described in paragraph 1 of this Order. Absent further order of the Court, the defendants are not to be provided paper copies of any discovery materials.

3. As soon as practicable, but in no event later than April 4, 2016, the government is to provide each defendant with a password protected tablet or laptop computer, or its substantial equivalent ("Computer") suitable for the purposes described herein. The government discovery materials not designated as Confidential Material shall be loaded onto the Computers by the designated Discovery Coordinator,[5] who shall also update these Computers at regular intervals to include all government discovery materials not designated as

---

[5]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel. See Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order"). Judge Gonzales held a hearing on January 20, 2016, with all parties present. See Discovery Coordinator Appointment Order at 1. The Court found that appointing Mr. Aoki is justified given the complexity of this case and the thousands of pages of discovery documents. See Discovery Coordinator Appointment Order at 2.

Confidential Material. These Computers shall be accessible to the defendants in their cells and during legal visits. The defendants may display the contents of their Computers only to those individuals described in paragraph 1 of this order. The password for each Computer shall be set by the defendant and his counsel and shall not be disclosed to counsel for the government, United States Marshals, or corrections officers. Once provided to a defendant, the Computer and the materials and any markings thereon will be protected by the attorney/client privilege. Corrections officials may periodically ask the defendants to unlock the Computers and scan the devices for contraband and damage. Corrections officials shall not read or otherwise examine the content of the Computers. At the conclusion of the case, the Discovery Coordinator shall provide defense counsel with an electronic copy of the entire contents of their client's Computer. Thereafter, all materials on the Computer shall be deleted by the Discovery Coordinator, who shall then return the Computers to the New Mexico Department of Corrections.

4. Nothing contained herein shall preclude the government, defendants or their counsel, or their respective assistants from conducting an investigation of the facts of this case on behalf of the government or defendants, including interviewing witnesses, showing witness statements contained in the Confidential Material to witnesses and asking witnesses about the content of such statements.

5. Should either party seek to add or subtract discovery material from the category of Confidential Material, as defined herein, the party seeking the addition or subtraction shall notify and confer with all other parties of the exact discovery materials it seeks to add or subtract from the category of Confidential Material and the reason(s) it believes such materials should be added or subtracted. The parties shall make all reasonable efforts to limit the volume of discovery materials designated as Confidential Material. In the event the government and defense counsel arrive at an impasse as to the designation of particular discovery materials, the party seeking to add to or subtract from the category of Confidential Material may file an application with the Court seeking its proposed modification. Any such application shall set forth the party's showing of good cause for the requested modification and be served on the Court and all parties. The opposing party will be given 14 days to respond to the application, unless there is an emergency or exigent situation, which shall be stated in the application. If necessary, the Court will request additional briefing and/or schedule a hearing regarding any modification to the Confidential Material category prior to issuing a ruling.

6. A copy of this order must be provided to any individual working for or with the defense before providing that individual with access to any discovery material. Counsel for the defendants shall maintain a record of all persons to whom access to the discovery material has been provided.

7.   Should counsel withdraw or cease to participate in these cases, any discovery material and any copies derived therefrom shall be provided to new counsel once the substitution is ordered by the Court.

8.   All discovery material disclosed by the government in this matter shall be used solely in connection with these proceedings, or any related appellate proceedings and collateral review, and not for any other purpose, including any other litigation or proceeding.

9.   The provisions of this order shall remain in effect until further order of this Court.

Protective Order at 1-4.

### c.    Daniel Sanchez' Protective Order Reply.

On March 15, 2016, Defendant Daniel Sanchez filed Sanchez' Protective Order Reply, further objecting to the United States' Motion for Protective Order.  See Sanchez' Protective Order Reply at 1.  Sanchez first explained that at least three co-Defendants were prosecuted in State court in Doña Ana County.  See Sanchez' Protective Order Reply at 2.  He also stated that counsel for Armenta told the Court that he and other counsel had received discovery materials from the Doña Ana County's District Attorney's Office, in connection with the prior state prosecution.  See Sanchez' Protective Order Reply at 2.  According to Sanchez, these discovery materials were not subject to a protective order, and were disseminated to other individuals, but no one knows exactly how many Defendants received the materials.  See Sanchez' Protective Order Reply at 2.  Sanchez advanced that rule 16 "does not empower the Court to protect materials obtained outside of the Court's discovery process."  Sanchez' Protective Order Reply at 3.  Sanchez states that rule 16 regulates "Discovery and Inspection."  Sanchez' Protective Order Reply at 3.  He advances, however, that rule 16(d) grants courts the discretion to issue protective orders, but courts "do not have the general authority to order the non-dissemination of documents obtained outside its judicial process."  Sanchez' Protective Order Reply at 3 (quoting

<u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. at 37).  Sanchez then cited to several civil cases in which courts have excluded materials that had been gathered independently of the judicial process from some protective orders' portions.  <u>See</u> Sanchez' Protective Order Reply at 4 (citing <u>Bridge C.A.T. Scan Assoc. v. Technicare Corp.</u>, 710 F.2d 940, 944-46 (2d Cir. 1983); <u>Int'l Prods. Corp. v. Koons</u>, 325 F.2d 403, 407-408 (2d Cir. 1963)).  Sanchez concluded that the co-Defendants who received the state materials received them "outside of this court's discovery process" and that the Court therefore lacks the authority to "regulate the dissemination of materials obtained outside of the discovery process."  Sanchez' Protective Order Reply at 4. Sanchez requested that the Court not include the State materials in its protective order.  <u>See</u> Sanchez' Protective Order Reply at 5.

### d.    Judge Gonzales' Potential Conflict and Reassignment of the Case to the Court.

On March 23, 2016, the Defendants filed a Motion For Briefing Schedule on Issue of Recusal, filed March 23, 2016 (Doc. 326)("Motion On Recusal Briefing Schedule").  See Motion On Recusal Briefing Schedule at 1.  On March 25, 2016, Judge Gonzales filed a letter addressed to the parties discussing his potential conflict in this case.  <u>See</u> Letter from Judge Gonzales to Counsel of Record, filed March 25, 2016 (Doc. 338)("Gonzales' Letter").  In his letter, Judge Gonzales wrote, in relevant part:

> It was reported to me and defense counsel at the March 22, 2016, hearing that the investigation that resulted in the instant three indictments began in spring 2015, approximately 2.5 years after I was sworn in as district judge.  It also was suggested at the hearing that the investigation may have extended back to 2014, and that the FBI may have made inquiries into SNM in 2005 or 2006.  Moreover, Mr. Castle mentioned a United States Attorney press release from October/November 2010 that references SNM.
>
> Based on all that was discussed on March 22, I recall participating in a meeting with the FBI and USAO leadership while an Assistant United States Attorney (approximately 2009/2010), and before I became the United States

Attorney. Meetings such as this are common between prosecutors and law enforcement agencies to determine whether any investigative steps are warranted. The topic of this meeting was prison gangs in New Mexico, including SNM. I do not recall any names of targeted gang members that were mentioned, however. Nor do I recall whether the result of the meeting was to open an active investigation either before or after I became the United States Attorney.

Gonzales' Letter at 1.

>2.     **The Proceedings Before the Court.**

On March 28, 2016, Judge Gonzales granted the Defendants' Motion on Recusal Briefing Schedule in his Order Granting Briefing Schedule on Issue of Recusal, filed March 28, 2016 (Doc. 346). Judge Gonzales, in effect, recused himself, because two days after granting the Motion on Recusal Briefing Schedule, the case was assigned to the Court on March 30, 2016. See Notice, filed March 30, 2016 (Doc. 351). The Court now describes the proceedings before the Court since reassignment.

>a.     **The United States' Protective Order Response.**

On the same day that the Court began to preside over this case, the United States responded to the Defendants' Protective Order Brief and Sanchez' Protective Order Reply. See The United States' Response to Defendants' Brief Regarding "Protective Orders" for Materials Obtained From Sources Other Than the Government and Defendant Daniel Sanchez's Reply Regarding Court's Ability to Subject Materials Obtained Independently of the Court's Process to Court's Protective Order, filed March 15, 2016 (Docs. 354, 355)("Response 1").[6] In Response 1,

-----

[6]The Court filed the United States' Response under two separate documents. The first document was filed as the United States' Response to the Defendants' Brief (Doc. 354), and the second was filed as the United States' Reply to Sanchez's Supplemental Brief (Doc. 355). Both documents are one and the same, entitled United States' Response To Defendants' Brief Regarding "Protective Orders" For Materials Obtained From Sources Other Than The Government And Defendant Daniel Sanchez's Reply Regarding Court's Ability To Subject Materials Obtained Independently Of The Court's Process To Court's Protective Order, and this Memorandum Opinion and Order will refer to it as Response 1.

- 20 -

the United States first gave the Court some background on the Defendants and the counts with which each one has been charged.  See Response 1 at 1-2.  The United States explains that two counts refer to state murder charges that the Third Judicial District Attorney's Office of New Mexico brought against three of the Defendants.  See Response 1 at 3-4.  According to the United States, although the Third Judicial District Attorney's Office later dismissed the charges, the state sent discovery relating to the state case.  See Response 1 at 4.  The United States rejected the Defendants' position that "items they received from sources other than the United States not be part of the protective order this Court entered."  Response 1 at 4.  The United States explained that it based its request for a protective order on rule 16 which gives courts the discretion to deny, restrict, or defer discovery if good cause exists.  See Response 1 at 4.  The United States quoted United States of America v. Smith, 985 F. Supp. 2d 506 (S.D.N.Y. 2013)(Karas, J.), advancing that good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury."  Response 1 at 5 (quoting United States v. Smith, 985 F. Supp. 2d at 523).  The United States further cites to United States v. Smith for the proposition that protective orders do not eliminate the First Amendment to the Constitution of the United States of America, but rather, confine its scrutiny, "including defendants' right to disseminate the discovery material, to the framework of rule 16(d)'s good cause requirement."  Response 1 at 5 (quoting United States v. Smith, 985 F. Supp. 2d at 523).  The United States asserted that the Court should then apply a balancing test, weighing the hazard to others against the prejudice to the Defendants.  See Response 1 at 5.  The United States contended that the Defendants relied on civil cases that discuss rule 26 of the Federal Rules of Civil Procedure, which does not apply in the criminal context.  See Response 1 at 6.  The United States advanced that it had already established good cause in its Supplement to Motion for Protective Order,

where it explained SNM's pattern of retaliation after the gang receives information on cooperating witnesses. See Response 1 at 6. The United States therefore asks that the Court issue a protective order covering the "materials currently in the possession of both defense counsel and their clients, [or a]t a minimum . . . that the defendants who currently possess these materials be prohibited from further disseminating them." Response 1 at 6.

### b.     Due Process Motion.

On that same day -- March 28, 2016 -- Defendants filed their Due Process Motion. See Due Process Motion at 1. The Due Process Motion essentially alleges that "[t]he United States has violated this Court's rules and in so doing deprived the Defendants of fundamental due process. Due Process Motion at 1. The United States has filed pleadings in this case 'under seal' without providing notice to all parties and without obtaining the approval of the Court." Due Process Motion at 2. And, on a related note, the Due Process Motion alleges that the United States has not appropriately made various ex parte documents available to all of the Defendants. See Due Process Motion at 4. In sum, "[w]ithout compliance with the applicable rules, and without compliance with established precedent, the defendants' Sixth Amendment right to the assistance of effective counsel and their Fifth Amendment right to due process are thwarted." Due Process Motion at 6-7. The United States did not respond.

### c.     United States' Notice.

On April 1, 2016, the United States filed its United States' Notice to address the issue of when the New Mexico United States' Attorney's office had become involved in the prosecution of the instant SNM Defendants. See United States' Notice at 1. The purpose of the United States' Notice was to ascertain whether Judge Gonzales might face a conflict when trying the case. See United States' Notice at 1. Ultimately, "[t]he USAO determined that then AUSA

Kenneth Gonzales was assigned as co-counsel from June 19, 2009[,] to February 23, 2010, to an investigation opened by the USAO in 2008 under the name of Gerald Archuleta.  The USAO declined prosecution in 2015, prior to when the investigation was opened by the FBI and USAO that led to the instant cases."  United States' Notice at 2.  There was one letter addressed to Judge Gonzales in that investigation, but the United States provided that the issue of his involvement "was largely moot" given the case's reassignment.  United States Notice at 2.

### 1.    <u>Defendants' Response to the United States' Notice</u>.

In response, some Defendants filed a Response to Doc. No 358-United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in this Case or any Other Case, filed April 14, 2016 (Doc. 360)("Response to the United States' Notice").  In the Response to the United States' Notice the Defendants largely rehashed their arguments made in the Motion on Recusal Briefing Schedule – those arguments being, essentially, that "the conduct that's alleged in these cases extends into the Court's time at the U.S. Attorney's Office."  Response to the United States' Notice at 2.  Although Judge Gonzales had already recused himself by the time the Response to the United States' Notice was filed, Defendants disagree that the issue is "moot."  Response to the United States' Notice at 5.  Such is so, the Defendants argue, because Judge Gonzales had made various substantive rulings that could still implicate a conflict given his involvement in the 2009 investigation.  <u>See</u> Response to the United States' Notice at 5.  And, despite the disclosures made in the United States' Notice, the Defendants argue that a more extensive inquiry ought to be undergone.  <u>See</u> Response to the United States' Notice at 13.

###    d.    Motion to Suspend Scheduling Order.

According to the Motion to Suspend Scheduling Order, filed on May 18, 2016, "[d]ue to the superseding indictment, new defendants and counsel, and the new related racketeering case, the current deadlines in the Scheduling Order (Doc. 250) are unworkable." Motion to Suspend Scheduling Order at 5. As such, "Defense counsel respectfully request a Status Conference to discuss matters involving discovery, the Scheduling Order, the Protective Order, and other case related matters. In addition, joint defense counsel also request[s] an Ex Parte CJA Conference to discuss outstanding CJA matters." Motion to Suspend Scheduling Order at 5. The United States did not respond.

###    e.    The Defendants' Motion for Reconsideration.

On May 23, 2016, sixteen of the Defendants[7] filed a motion asking the Court to reconsider the Protective Order that Judge Gonzales issued in this case. See Motion for Reconsideration at 1. Defendant Leonard Lujan opposes the relief the Motion for Reconsideration requests. See Motion for Reconsideration at 3. Defendant Ruben Hernandez does not join the Motion for Reconsideration. See Motion for Reconsideration at 3. Defendants Eugene Martinez, Roy Paul Martinez, Benjamin Clark, and Paul Rivera take no position. See Motion for Reconsideration at 3. Defendants Allen Patterson, Mauricio Varela, Robert Martinez, and Andrew Gallegos have not responded to approve or disapprove of the filing of the Motion for Reconsideration. See Motion for Reconsideration at 3.

The sixteen Defendants that filed the Motion for Reconsideration ask the Court to "reconsider the protective order and modify [it] to permit the defendants to possess all discovery

---

[7]Defendants J. Gallegos, Troup, B. Garcia, Chavez, Alonso, A.A. Garcia, Montoya, T. Martinez, Sanchez, Archuleta, Villegas, Baca, C. Garcia, Perez, Herrera, and Gonzales filed the Motion for Reconsideration jointly.

on their tablet computers." Motion for Reconsideration at 3. The Defendants contend that Judge Gonzales issued the Protective Order after he held a hearing during which some Defendants were absent. See Motion for Reconsideration at 2. At the time, the Defendants advance, Judge Gonzales had a "potential conflict of interest," because he worked at the United States Attorney's Office "during the time that crimes charged in this indictment were investigated by federal law enforcement authorities." Motion for Reconsideration at 2. The Defendants then mention the April 21, 2016, grand jury's Superseding Indictment adding more Defendants, many of whom were death eligible. See Motion for Reconsideration at 4. In sum, the Defendants initially contend that the Protective Order affects the newly added Defendants, yet they did not have an opportunity to be heard at the March 3, 2016, hearing. See Motion for Reconsideration at 4.

The Defendants further argue that the Protective Order is too broad. See Motion for Reconsideration at 4. According to the Defendants, the United States supported its request for an all-encompassing protective order by, among other things, the fact that, "in the past, members of the Syndicato de Nuevo Mexico ("SNM") have threatened gang members who have cooperated with law enforcement based on discovery paperwork [and] that the motive for some of the murders alleged in the Indictment [involve a] decedent's cooperation with law enforcement." Motion for Reconsideration at 5. To explain, the Defendants next provide a detailed timeline of the events and argue that the United States changed its strategy regarding the Protective Order after seeing that the Court was not inclined to prohibit the Defendants from possessing any discovery. See Motion for Reconsideration at 7. The Defendants contend that the United States then, "for the first time, raised the possibility of providing discovery to the defendants in electronic form on tablet computers each defendant could individually access in their respective

custodial settings."   Motion for Reconsideration at 7.  According to the Defendants, the United States' main concern, then, seems to be creating a paper trail.  See Motion for Reconsideration at 7.  The Defendants contend, however, that the Protective Order is too broad, because "the final Protective Order maintained the omission of certain 'Confidential Materials' from the tablet computers provided to the defendants."  Motion for Reconsideration at 7-8.

The Defendants further assert that the Court should issue a new protective order, because Judge Gonzales -- who issued the Protective Order -- had a potential conflict of interest in working on this case, and that conflict was likely why the recent case was reassigned to Judge Browning.   See Motion for Reconsideration at 8.   As such, the Defendants reiterate their concerns that Judge Gonzales in effect recused himself because of his potential conflict of interest and that the Court should therefore consider amending the Protective Order.  See Motion for Reconsideration at 9.

The Defendants next raise a number of practical difficulties under the Protective Order that they ask the Court to take into consideration in deciding whether to amend it.  See Motion for Reconsideration at 9.  The Defendants assert that the first difficulty is that the United States is "over-using" the "Confidential Material" designation.   Motion for Reconsideration at 9.  According to the Defendants, in the Protective Order, discovery materials are divided into two categories: general discovery and confidential material.  See Motion for Reconsideration at 9.  Regarding that categorization, Defendants now assert that the United States has included many more items under the "Confidential Material" designation than comports with the definition of confidential material in the Protective Order.   See Motion for Reconsideration at 10.   The Defendants further contend that the United States did not comply with the protocol described in the Protective Order, which requires all parties to confer if the United States wishes to exclude

more material from the tablets.  See Motion for Reconsideration at 10.  See also Amy E. Jacks'

affidavit, Cori A. Harbour-Valdez' affidavit, and James Castle's affidavit, filed May 23, 2016

(Doc. 541-2,[8] Doc. 541-3,[9] and Doc. 541-4).[10]  Counsel for the Defendants have asked for these

materials to be reclassified as general discovery, because if this material remains classified as

confidential, then litigation will be burdensome, because the Defendants will have access only to

that information in the presence of their counsel in custody.  See Motion for Reconsideration at

10-11.

The second difficulty that the Defendants identify is the delay in the production of the

tablets.  See Motion for Reconsideration at 11.  The Defendants argue that they have not yet

received the tablets, and that the additional Defendants who were later added under the

Superseding Indictment may have to wait even longer.  See Motion for Reconsideration at 11.

---

[8]Jacks stated in her affidavit that she had received discovery from the United States regarding her client, Sanchez.  See Amy E. Jacks' affidavit at 1.  Some of it related to the state charge of "Murder of J.M."  See Amy E. Jacks' affidavit at 1.  She contended that, out of hundreds of pages, only four pages documenting a cooperating inmate's interview and the recordings of interviews with five inmates complied with the Protective Order's definition of confidential.  See Amy E. Jacks' affidavit at 2-3.  She asserted that the United States had not discussed with her the need to designate additional materials as confidential, like the Protective Order required.  See Amy E. Jacks' affidavit at 3.

[9]Harbour-Valdez submitted an affidavit stating that discovery relating to F.S.' alleged homicide contained 171 pages of non-confidential materials and 127 pages of confidential materials.  See Cori A. Harbour-Valdez' affidavit at 1.  She gave a detailed list of dozens of pages of materials that, she argued, was improperly classified as confidential.  See Cori A. Harbour-Valdez' affidavit at 1-3.  The only materials complying with the Protective Order's definition of confidential materials, she contended, amounted to fewer than 50 pages.  See Cori A. Harbour-Valdez' affidavit at 3-4.

[10]Jim Castle submitted an affidavit stating that he had received materials regarding F.C.'s and R.G.'s homicides.  See Jim Castle's affidavit at 1.  Castle contended that 238 pages regarding J.M.'s homicide were not confidential, whereas 489 pages were designated as confidential.  See Jim Castle's affidavit at 1.  Of that confidential material, he further contended, dozens of pages did not comport with the Protective Order's definition of confidential material.  See Jim Castle's affidavit at 1-2.  He argued that the United States had also improperly classified dozens of pages relating to R.G.'s murder as confidential.  See Jim Castle's affidavit at 2-3.

This, the Defendants insist, means that they are not therefore all equal in terms of access to discovery.  See Motion for Reconsideration at 11.

A third difficulty that the Defendants identify is an increased demand on funding under the CJA.  See Motion for Reconsideration at 11.  According to the Defendants, until the tablets are available, defense attorneys are having to "utilize valuable attorney-client time, and with it extensive CJA resources, simply being present while defendants review all discovery."  Motion for Reconsideration at 11.  The Defendants argue that they will need to use double the amount of CJA funds -- for counsel's time to review the materials and for their time to review them with the Defendants, because counsel must meet with their clients to review discovery items.  See Motion for Reconsideration at 12.

The Defendants therefore assert that good cause exists at law to reconsider the Protective Order's terms.  See Motion for Reconsideration at 12.  The Defendants first maintain that parties in criminal cases can seek reconsideration of orders.  See Motion for Reconsideration at 13 (citing United States v. Randall, 666 F.3d 1238 (10th Cir. 2011)(Baldock, J.)).  They then refer the Court to rule 59(e) of the Federal Rules of Civil Procedure, which establishes the conditions under which a motion to reconsider are warranted.  See Motion for Reconsideration at 13.  The Defendants cite five factors that, they argue, support reconsideration in this case: (i) the Defendants did not attend the proceedings where Judge Gonzales established the Protective Order's terms; (ii) Judge Gonzales had a potential conflict of interest when he issued the Protective Order; (iii) Judge Gonzales clearly erred by ordering that confidential materials be omitted from the tablets, when the United States' arguments related to paper discovery; (iv) the United States' categorization of confidential materials being overly broad and against protocol;

and (v) the newly added Defendants did not have an opportunity to be heard before the Court issued the Protective Order.  See Motion for Reconsideration at 13-14.

With respect to their absence from the proceedings where Judge Gonzales heard the parties' arguments on the Protective Order's terms, the Defendants essentially argue that their exclusion from the hearing constitutes a violation of their rights under the Fifth Amendment to the Constitution of the United States.  See Motion for Reconsideration at 14.  They contend that the "Defendants are guaranteed the right to be present at any proceeding critical to the outcome of the prosecution if [their] presence would contribute to the overall fairness of the process." Motion for Reconsideration at 14 (citing Kentucky v. Stincer, 482 U.S. 730, 745 (1987), and Faretta v. California, 422 U.S. 806, 819 n.15 (1975)).  The Defendants then cite to rule 43 of the Federal Rules of Criminal Procedure, which addresses when a defendant's presence may not be required.  See Motion for Reconsideration at 14-15.

The Defendants also argue that their absence from the hearing is a violation of their rights under the Sixth Amendment to the Constitution of the United States, because the Protective Order burdens counsel in a way that prevents them from providing constitutionally appropriate assistance to the Defendants.  See Motion for Reconsideration at 15.  They argue that the Court should be particularly sensitive to this issue, because this case involves death penalty eligible Defendants.  See Motion for Reconsideration at 16.

The Defendants then reiterate their concern about Judge Gonzales' potential conflict of interest when he presided over this case and issued the Protective Order.  See Motion for Reconsideration at 16.  They note that, after the parties inquired about Judge Gonzales' potential conflict of interest, the case was reassigned to the Court.  See Motion for Reconsideration at 16. The Defendants advance that "the subsequent removal of the case from Judge Gonzales provides

an adequate basis for this Court to reexamine and reconsider the protective order." Motion for Reconsideration at 17. The Defendants contend that Judge Gonzales' potential conflict of interest is problematic because the Protective Order potentially includes biased terms that affect death-eligible Defendants. See Motion for Reconsideration at 17.

The Defendants next address the alleged existence of clear error in ordering materials to be omitted from the tablets based on the United States' arguments relating to paper discovery. See Motion for Reconsideration at 17. The United States' main showing of good cause was leaving paper behind,[11] but now because they have tablets, the Defendants argue that the United States' good cause no longer applies to electronic discovery materials. See Motion for Reconsideration at 17. The Defendants thus remind the Court that rule 16(d)(1) gives the Court discretion to issue a protective order upon a showing of good cause. See Motion for Reconsideration at 17. They contend that the United States, however, still asks, without good cause, that the Protective Order requires the presence of the Defendants' counsel to access the electronic version of some documents. See Motion for Reconsideration at 18-19.

The Defendants next address their fourth concern: that the United States' categorization of confidential materials is overly broad and does not follow protocol. See Motion for Reconsideration at 19. The argument is that "the government has improperly expanded the materials designated as confidential material without conferring with defense counsel or seeking a modification of the Protective Order as required by the Order itself." Motion for Reconsideration at 19. The Defendants thus contend that no confidential material will be placed

---

[11]The Defendants contend that the United States argued that "possession of paper copies of materials such as cooperator statements by defendants could potentially be used to 'prove' that an individual violated a code of ethics within the penal system, and that could then provide a basis for violence to be inflicted upon that individual." Motion for Reconsideration at 18.

on the tablets, and that defense counsel will spend time during client visits to "review and re-review each page of Confidential Material with the defendants."  Motion for Reconsideration at 19.  As such, the Defendants maintain that the United States' overly broad categorization of materials as confidential material impedes defense counsel's ability to efficiently review such material, thus limiting the Defendants' access to discovery.  See Motion for Reconsideration at 19.  The current Protective Order is thereby unworkable, because the United States is "[s]ubstantially ignoring the definition of Confidential Material and the procedural guidelines governing the designation of additional Confidential Material."  Motion for Reconsideration at 20.

Lastly, the Defendants address their concern that the six newly added Defendants -- Herrera, Perez, A. Gallegos, Gonzalez, Rivera, and Gutierrez -- did not have an opportunity to be heard before Judge Gonzales issued the Protective Order.  See Motion for Reconsideration at 21.  They advance that, because six Defendants were not parties to this case before Judge Gonzales entered the Protective Order, "[h]olding [them] to the requirements of the Order, without affording each a right to be heard, does not comport with due process."  Motion for Reconsideration at 21.  The Defendants thus contend that the Court should reconsider the Protective Order and give the newly added Defendants the opportunity to be heard.  See Motion for Reconsideration at 21.

## 1.    United States' Response to the Motion for Reconsideration.

On June 1, 2016, the United States responded to the Defendants' Motion for Reconsideration.  See The United States' Sealed Response to Defendants' Opposed Joint Motion for Reconsideration of Protective Order (Doc. 541), filed June 1, 2016 (Doc. 566)("Response 2").  After giving the Court the same background information that it gave in Response 1, the

United States reminds the Court of the timeline under which the Court issued its Protective Order.  See Response 2 at 4.  It then provides a chart summarizing the names of all of the Defendants and the counts charged, including the six Defendants added in the April 21, 2016, Superseding Indictment.  See Response 2 at 5-8.

The United States argues that "the original issues and reasoning for the Confidential Materials still exist, and the reasons are now more important than ever."  Response 2 at 9.  The United States first contends that Judge Gonzales' potential conflict of interest did not impact the Protective Order and that the United States established good cause for the Protective Order.  See Response 2 at 10.  The United States maintains that a "majority of the defendants" agreed to the Protective Order's provisions during the March 3, 2016, hearing.  Response 2 at 10.  Further, the United States contends that it had established good cause, which is why Judge Gonzales issued the Protective Order.  See Response 2 at 10.  And, the United States maintains that, given the recent developments, "more information has come to light which further establishes good cause."  Response 2 at 10.  The United States adds that the new counts added by the Superseding Indictment establish good cause for a protective order, because they are particularly violent crimes and the incident involves alleged retaliation for cooperating with the authorities.[12]  See Response 2 at 11.  It also provides that in April, 2016 law enforcement learned of a "hit" allegedly placed on a Defendant after Anthony Baca's attorney showed him discovery paperwork.  Response 2 at 11.

Next, the United States argues that it has not expanded the definition of confidential materials, because "the majority of the documents that the defense objects to as outside the

---

[12]J.G. was attacked and left for dead, allegedly because he was cooperating with the authorities.  See Sealed Response at 11.  According to the United States, J.G. testified that, before losing consciousness, he heard his attackers tell him that they "were there on behalf of Joe Gallegos."  Sealed Response at 11.

protective order are statements and interviews of inmates and correctional officers.  The United

States asserts these statements, and summaries of these statements, fall into the category of 'eye-

witness statements.'"  Response 2 at 12.  The United States insists that the Defendants' argument

regarding the need for a new protective order because of the added Defendants is not valid,

because these new Defendants "have not presented any additional issues that have not already

been considered and litigated."  Response 2 at 12.

Finally, the United States advances that "courts ordinarily apply the same standards as

those used in civil cases when addressing motions to reconsider."  Response 2 at 13 (quoting

United States v. Harmon, 871 F. Supp. 2d 1125, 1143 (D.N.M. 2012)(Browning, J.), aff'd by

United States v. Harmon, 742 F.3d 451 (10th Cir. 2014)).  The United States advances that rule

59(e) of the Federal Rules of Civil Procedure, therefore, applies.  See Response 2 at 13.

According to the United States, rule 59(e) allows motions to reconsider when: (i) there has been

an intervening change in the controlling law; (ii) there is newly discovered evidence which was

previously unavailable; or (iii) it is necessary to correct clear error or prevent manifest injustice.

See Sealed Response at 13 (quoting Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th

Cir. 2000)).  The United States advances that, because "a motion to reconsider 'is not an

opportunity to rehash arguments previously addressed or to advance new arguments that could

have been raised in prior briefing,'" the Court should deny the Motion for Reconsideration.

Response 2 at 13 (quoting Servants of Paraclete v. Does, 204 F.3d at 1012).

f.      **The June 2, 2016, Hearing**.

The Court held a hearing on the Motion for Reconsideration on June 2, 2016.  See Transcript of Hearing (taken June 3, 2016)("Tr.").[13]  The Court also addressed and resolved the issues raised by Defendants' Protection Order Brief; Sanchez' Protective Order Reply; the United States' Notice; the Due Process Motion; and the Motion to Suspend the Scheduling Order.  The Court first expressed its thoughts on the Motion for Reconsideration.  See Tr. at 12:1-5 (Court).  The Court stated that it seemed that the United States' main reason for requesting a Protective Order was its concern about the Defendants leaving a paper trail in the prisons.  See Tr. at 12:9-11 (Court).  Yet, that fear would no longer be an issue with non-confidential discovery, because the parties agreed that the Defendants could use tablets to review discovery materials.  See Tr. at 12:11-13 (Court).  The Court advanced that the main dispute before it "seemed to be the designation of confidential information, and whether A) there should be designation, and B) if there are designations of confidential information, . . . that the Government is construing that too broadly."  Tr. at 12:13-19 (Court).  Accordingly, the Court stated that it seemed that the Defendants' counsel should be free to show everything to their clients.  See Tr. at 12:19-22 (Court).  It then expressed its concern that the confidential designation of some discovery materials constitutes a substantial inconvenience to the Defendants.  See Tr. at 13:6-7 (Court).

The Court likewise expressed concern about the Defendants not being able to access confidential materials on their tablets, because the Defendants' counsel had to "take large amounts of documents" to custodial facilities to show their clients confidential material that was

_____

[13]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

not uploaded onto the tablets. Tr. at 13:7-11 (Court). This precaution, the Court noted, was observed to preserve "safety to people that may be mentioned in the documents," and once the Defendants saw these documents, the Court deemed the safety benefit "fairly marginal and minimal" in comparison to the inconvenience to defense counsel. Tr. at 13:1-6 (Court). The Court further noted that, out of a total of about 5,000 documents already produced, only 600 were on the tablets. See Tr. at 13:8-11 (Court). In total, the United States anticipated getting a total of 10,000 documents. See Tr. at 13:9-11 (Court). The Court stated that, because most documents were confidential, "the tablets are not serving as the host for the great bulk of the materials," and the Defendants' counsel should be able to adequately review all documents with their client. Tr. at 13:13-19 (Court). Still, the Court was concerned about the Defendants' counsel needing time to review thousands of documents, one at a time, with their clients. See Tr. at 13:23-25 (Court). The Court therefore proposed that all documents, including confidential documents, be put onto the tablets, so the Defendants' counsel would not be forced "to bring large stacks of documents and go through them one at a [time]." Tr. at 13:20-25 (Court). The Court explained that, after balancing witnesses' safety and inconvenience to the Defendants' counsel, it concluded that the "safety is outweighed considerably by the inconvenience to defense counsel." Tr. at 14:6-9 (Court).

The Court then addressed the issue of the discovery materials that the Las Cruces District Attorney's Office disseminated to some Defendants, regarding the state case. See Tr. at 14:9-13 (Court). The Court stated that, if technologically possible and in coordination with the discovery coordinator, it would support the Defendants' counsel leaving the relevant documents with their clients by uploading them onto the tablets. See Tr. at 14: 13-25 (Court). The Court explained that, this way, nobody would leave paper in the prisons. See Tr. at 15:3-4 (Court).

The Defendants then responded that they agreed with the Court's proposal, but they were concerned that uploading information onto the tablets would be a logistically difficult task, given that the discovery coordinator is in Seattle, Washington, and they would have to send the tablets there every time they receive discovery materials from their investigators or other parties.  See Tr. at 15:18-16:4 (Benjamin).[14]   The Court proposed that, because most of the discovery was likely going to come from the United States, the Defendants' counsel could bring the remaining, non-government discovery in paper form to custodial facilities and then take it with them when they leave so they would not leave a paper trail.  See Tr. at 16:5-17 (Court).  The Defendants agreed with the Court's proposal and explained that Russ Aoki -- the Discovery Coordinator -- had already received tablets for the Defendants under the original Indictment, and that he had uploaded documents onto them.  See Tr. at 16:19-18:7 (Benjamin, Blackburn).  The Defendants added that they instructed Aoki to keep the tablets, awaiting the Court's decision regarding which documents could be uploaded, before shipping them to New Mexico, because of cost concerns.  See Tr. at 18:7-15 (Blackburn).  The Defendants then stated that the Defendants added under the Superseding Indictment had not yet received the tablets, which puts these Defendants in an unfair position in comparison to the other Defendants.  See Tr. at 18:17-19:6 (Blackburn).  They added that, because the Defendants would not have Internet access, they would be able to only read information already uploaded onto the tablets.  See Tr. at 19:7-13 (Blackburn).

Montoya stated that he and several other Defendants had received and read "discovery materials and information obtained by defense counsel from other sources" relating to the State

---

[14]The process to upload discovery materials onto the tablets is logistically complex: the party having the new discovery sends the new information to Mr. Aoki.  The Defendants' counsel gets their clients' tablets from the prisons, then sends the tablet to Mr. Aoki so he can upload the new material onto the tablet.  Mr. Aoki then sends the newly updated tablet back to the Defendants' counsel.

prosecution, before that case was dismissed.   Tr. at 20:4-12 (Hammond).   Montoya thus explained that his counsel and others had received "a great deal of information" relating to the state case -- "both information obtained in the course of discovery in that case and information obtained by defense counsel from other sources for the state trial which was about to commence in Las Cruces at the time that it was dismissed." Tr. at 20:4-12 (Hammond).  The Defendants advanced that they were "prepared to have that information put on tablets" to avoid leaving paper in the prisons. Tr. at 20:15-22 (Hammond).  The Defendants contended that they were in agreement with the tablet as an accommodation, but that "the Protective Order itself issued under Rule 16 [was] not a basis for doing that." Tr. at 20:20-24 (Hammond).  The Defendants argued that the government did not have the power, under the protective order, to prevent them from having access to information obtained from other sources.  See Tr. at 21: 1-5 (Hammond).

T. Martinez expressed his concern regarding the papers already disseminated, and asked the Court to request the parties "to retrieve those papers as they have been in the correctional facilities."  Tr. at 21:24-22:6 (Almanza).  The Court stated that it was not inclined to instruct people to retrieve papers already disseminated, but that, going forward, the Defendants' counsel could bring paper materials into the correctional facilities, but they would have to take them with them.  See Tr. at 22:7-17 (Court).  Lujan did not agree that the "statements made by a defendant should be put on the tablets." Tr. at 23:1-5 (Clark).  Lujan argued that "Rule 16 provides that a defendant can have access to his own statement, but not necessarily a co-defendant's statement." Tr. at 23:6-8 (Clark).  He further asserted that any statement that he made should not be used against any other Defendant, unless he was to testify in their prosecution, which he refused to do. See Tr. at 23:8-18 (Clark).  Making such statements available to all Defendants on their tablets, he argued, would pose a safety concern.  See Tr. at 23:18-25 (Clark).  For these reasons, Lujan

asked the Court to refashion the protective order to exclude co-Defendants' statements from the tablets, unless these statements become relevant evidence to the charges against each individual Defendant. See Tr. at 24:10-23 (Clark). The Court asked how many Defendants agreed with this proposed provision and noted that only four agreed. See Tr. at 25:2-7 (Court). The Court observed that all other Defendants wanted all statements to be available on the tablets. See Tr. at 25:7-10 (Court). Garcia raised the issue of the United States disclosing some documents containing older statements that have not been redacted and might contain the identities of cooperating co-Defendants, thereby putting them in danger. See Tr. at 26:13-23 (Sirignano). He argued that, while all recent statements should be made available to all Defendants on the tablets, older statements should be redacted to protect witnesses' identity. See Tr. at 26:19-27:3 (Sirignano).

The Court explained that it would rewrite the protective order using a bright-line rule, allowing the Defendants to load information, including medical records, onto the tablets if they wished to do so. See Tr. at 27:19-25 (Court). The Court reiterated that, any time counsel walks into a correctional facility with papers from any source -- including information related to the state case -- counsel should walk out with those papers, and they could then decide to have the information contained in the papers uploaded to the tablet. See Tr. at 28:12-24 (Court). The Court stated that the Defendants could segregate their information on the tablet so that the United States would not have access to it. See Tr. at 29:7-10 (Court). The Court warned the Defendants, however, to be judicious about asking for exceptions to this agreement, because this case involves thirty Defendants and any order will be unworkable if parties start asking for "individual deals." Tr. at 29:22-30:7 (Court). As such, the Court emphasized that all thirty Defendants would need to compromise to make the Protective Order workable, and thereby

abide by its terms without asking for "individual deals" unless they absolutely had to have them. Tr. at 29:22-30:7 (Court).

Gonzales then raised the issue of the motions filed in this case not being made available to the Defendants.  See Tr. at 32:17-20 (Johnson).  He asserted that these pleadings, such as the Motion for Reconsideration, were made available to the public, and for purposes of due process, they should be made available to the Defendants.  See Tr. at 32:20-33:3 (Johnson).

The United States opposed the Defendants' access to the pleadings, because these relate to "sensitive issues," and because the parties have attached some confidential reports to their pleadings, and the Defendants having access to these attached materials would defeat the tablets' purpose.  Tr. at 34:9-24 (Armijo).  The United States contended that making some other motions available to the Defendants would not be an issue -- as long as these do not have sensitive materials attached -- but in the spirit of creating a bright-line rule, asserted that the Defendants should not have access to any of the motions.  See Tr. at 34:24-35:4 (Armijo).  The United States further asserted that the protective order should not be reconsidered, opposing the Motion for Reconsideration in whole.  See Tr. at 35:5-7 (Armijo).  It argued that the Defendants should not be "having a second bite at the apple" and that the latest developments in the case require confidentiality, now more than ever.  Tr. at 35:7-10 (Armijo).  The United States further asserted that giving the Defendants tablets still posed a threat to cooperators' safety, because the Defendants will have a lot of time to stare at the tablets, read the documents and remember the number of an exhibit containing cooperating witness information and tell each other to read that exhibit on the tablet, and send out a hit on cooperators.  See Tr. at 35:15-21 (Armijo).  Still, the United States conceded that although the Defendants could do the same while reviewing documents with counsel, it would be harder for them to do so if they did not have the documents.

See Tr. at 35:24-36:3 (Armijo).  The United States argued that the Defendants would have hours to review the information on the tablets, and because they could still communicate, this scenario would constitute a safety concern.  See Tr. at 36:4-11 (Armijo).

Next, blaming its broad classification of confidential materials on the way Judge Gonzales wrote the Protective Order, the United States addressed the issue of its understanding of confidential materials and eyewitness statements.  See Tr. at 36:11-13 (Armijo).  The United States explained that it construed "eyewitness statement one way," and the Defendants understood that to mean cooperator statements only.  See Tr. at 36:13-19 (Armijo).  The United States further stated that it would "work on fine tuning what goes on and what stays off the tablet," so that it can more capably comply with the categorizations of discovery provided by the Protective Order.  Tr. at 36:19-21 (Armijo).

The Court explained that, although it understood the risks and dangers, its main concern was to determine "whether the marginal increase in safety offsets that tremendous inconvenience and inefficiency, which [the Court] think[s] goes to effective representation."  Tr. at 37:2-12 (Court).  The United States reiterated its position that the tablets did not offset the safety risk, and then addressed the state prosecution documents.  See Tr. at 37:13-15 (Armijo).  The United States agreed with the Court that the protective order should set a bright-line rule regarding the documents and that it should prohibit Defendants' counsel from leaving any paper copies at the detention facilities.  See Tr. at 39:4-9 (Beck).  It disagreed with the Defendants, however, "that rule 16 would not cover these [state case] documents."  Tr. at 38:10-13 (Beck).  The United States stated that it thought the argument was "aside for now" and argued that, if the Court were to draw a bright-line rule, it should not "allow some documents to get into the Defendants' possession and some documents not," calling such a scenario a "slippery slope."  Tr. at 38:15-18

(Beck).  The United States reiterated its concerns regarding the Defendants having access to any paper documents, including pleadings.  See Tr. at 39:4-9 (Beck).  The Court suggested allowing non-sealed pleadings to be made available to the Defendants on their tablets and requiring the Defendants' counsel to take copies of the sealed pleadings to the correctional facilities to review these with them under supervision.  See Tr. at 39:22-40:9 (Court).  The parties agreed to the Court's proposal.  See Tr. at 40:12-41:17 (Cooper)(Johnson)(Beck).  The Court explained that, unless the parties raised new issues, it intended to make publicly filed motions available to the Defendants on their tablets, and it would ask the Defendants to draft a new protective order, send it to the United States, and then send it to the Court for approval.  See Tr. at 42:17-43:7 (Court). The United States and the Court then briefly discussed the logistics of the tablets and the Discovery Coordinator's involvement in the process of uploading documents onto the tablets. See Tr. at 43:8-44:7 (Armijo, Court).  The Court concluded that the United States could do some "selective disclosures" of cooperator statements if it desired and send individual cooperator statements directly to the Defendants' counsel, who would then have to take these to prison to review them with their clients and then take these back with them.  Tr. at 44:8-21 (Court).

In conclusion, the Court adopted the aforementioned discussion and compromise to modify the Protective Order, and then ordered the Defendants to draft a new Protective Order which incorporated the agreed upon modifications.  See Tr. 46:1-7 (Court).

The Court then addressed the Defendants' Protective Order Brief.  See Tr. at 49:10-12 (Court).  The Court explained that the parties had already addressed most of the issues related to the Protective Order Brief, in its consideration of the Motion for Reconsideration, and that those issues would be resolved by the forthcoming amended Protective Order.  See Tr. at 49:12-15 (Court).  Accordingly, the Court explained that the Defendants did not have to share with the

United States materials from sources other than the United States, unless pursuant to an order. See Tr. at 49:17-20 (Court).   The Court reiterated that defense counsel could show these documents to their clients in prison, either by uploading them onto the tablets, or by taking paper copies of these documents to the prison, then taking these papers back with them so that no papers would be left in the prison.   See Tr. at 49:17-23 (Court).   In tandem, the Court then addressed Sanchez' Protective Order Reply.   See Tr. at 49:23-50:2 (Court).   In that regard, the Court concluded that all of the parties had similarly come to an agreement resolving all of the issues that deserved review in Sanchez' Protective Order Reply.   See Tr. at 50:3-7 (Court).

Next, the Court addressed the United States' Notice, and suggested that, if all the parties agreed, the Court would "reconsider any rulings [entered earlier] in the case," and that it would not "put the defense lawyers in the position of having to satisfy the high standards for motions to reconsider."   Tr. at 53:25-54:5 (Court).   The Court explained that the United States Court of Appeals for the Tenth Circuit set forth factors in Servants of Paraclete v. Does, 204 F.3d 1005 (10th Cir. 2000),[15] and that courts will often consider those factors when analyzing whether to reconsider a motion -- imposing a heavy burden for the moving party to overcome.   The Court explained that it was not excited or inclined to consider whether Judge Gonzales had a conflict of interest in this case, and, with the parties' agreement not to "reconsider everything just for the sake of reconsidering it," the Court would, in exchange for not addressing Judge Gonzales' conflict situation, not apply the usual stringent factors needed to reconsider earlier rulings when it was asked to reconsider a specific order that Judge Gonzales had entered -- much the same way it had treated the Motion for Reconsideration of the Protective Order.   Tr. at 54:2-21

---

[15]In that case, the Tenth Circuit set forth factors that courts should analyze when determining whether to grant a motion to reconsider judgments.   See Servants of the Paraclete v. Does, 204 F.3d at 1012.

(Court).  The Defendants and the United States agreed to the Court's proposal, resolving the United States' Notice, and the Court chose to dismiss the motion without prejudice.  See Tr. at 54:22-56:10 (Castle, Armijo).

The Court also addressed the Defendants' Due Process Motion, which related to the nature of the filings before the Court.  See Tr. at 57:1-59:14 (Court).  The Court explained that the filings were to be done in accordance with three -- and only three -- categories, and ex parte filings were to be kept to a minimum.  See Tr. at 57:2-18 (Court).  The parties agreed that this compromise, and adherence to the rules moving forward, would resolve the issues raised by the Due Process Motion.  See Tr. at 64:2-6 (Court).

Lastly, in relevant part, the Court addressed the Motion to Suspend the Scheduling Order.  See Tr. at 64:7-65:22 (Court).  Essentially, because the Court had already set a status conference and an ex parte CJA conference with the District Court, it concluded that the Motion to Suspend the Scheduling Order only raised one salient issue -- that being the trial date.  See Tr. at 64:7-65:22 (Court).  Because the trial could be continued as is necessary, the Court concluded that the Motion to Suspend the Scheduling Order was effectively moot, and thereby denied it.  See Tr. at 64:7-65:22 (Court).

g.    **The Proposed Protective Order.**

On June 16, 2016, the parties jointly sent the Court a Proposed Protective Order in accordance with the discussions at the hearing.  See Proposed Protective Order, filed June 16, 2016 (Doc. 589)("Modified Protective Order").  In the Modified Protective Order, unlike in Judge Gonzales's Protective Order, there is no reference to confidential materials.  See Protective Order at 1-5.  Some provisions remained unchanged, but the parties agreed to several significant changes.  See Modified Protective Order at 1-5.  First, the Modified Protective Order

provided for the United States to make all of its discovery materials available for upload onto the Defendants' tablets: "All government discovery materials will be uploaded onto the Computers by the designated Discovery Coordinator, who will update these Computers at regular intervals as additional government discovery materials are disclosed."  Modified Protective Order at 2.  If the Defendants' counsel wishes to provide "Defense Materials" to their clients, the Modified Protective Order requires the Defendants' counsel to upload the "Defense Materials" onto their clients' tablets, and that the attorney-client privilege and the work product doctrine will protect the content of the documents.  Modified Protective order at 4.  The Defendants may review and possess paper copies of publicly filed pleadings, but they may not possess paper copies of documents filed ex parte or sealed.  See Modified Protective Order at 4.  The Defendants may review copies of such restricted pleadings under the supervision of counsel, as long as counsel takes the papers out of the prison with them.  See Modified Protective Order at 4.  Finally, the parties agreed that the Defendants' counsel "shall make all reasonable efforts to recover all paper copies of discovery from this case or prior State prosecutions, all paper copies of Defense Materials, and all paper copies of ex parte or sealed pleadings currently in the possession of any Defendant."  Modified Protective Order at 4.  The Modified Protective Order also contained some provisions regarding the protocol the parties should follow if they wish to provide a Defendant with paper copies or to seek modification of the Modified Protective Order.  See Modified Protective Order at 4-5.  The last four provisions of the Modified Protective Order are the same as the last four in Judge Gonzales's Protective Order.  See Protective Order at 3-4; Proposed Protective Order at 5.

It is worth noting that, initially, the sixteen Defendants who jointly filed the Motion for Reconsideration wanted the Court "to permit the defendants to possess all discovery on their

tablet computers."    Motion for Reconsideration at 3.    Lujan opposed that relief, while E.

Martinez, R.P. Martinez, Clark, and Rivera took no position on the matter, and Patterson, Varela,

R. Martinez and A. Gallegos had not indicated whether they agreed or disagreed with the relief

that the sixteen filing Defendants sought.    See Motion for Reconsideration at 3.    Only one

Defendant -- Lujan -- explicitly opposed the Motion for Reconsideration's relief.    See Motion for

Reconsideration at 3.    The United States, at all times, remained opposed to the reconsideration

altogether, because "the original issues and reasoning for the 'Confidential Materials' still exist."

Response 2 at 9.    The United States still complied with the Courts' order by ensuring that the

Modified Protective Order, as it was drafted by Defendants, accurately reflected what the Court

stated at the hearing.

　　　　The Court adopted the parties' proposed protective order on June 16, 2016.    See Modified

Protective Order at 1.    The Court crossed out the word "Proposed" in the title of the document

and signed off on the Order.    Modified Protective Order at 1, 5.    The Court chose to use the

Modified Protective Order's proposed language as a basis for the section regarding the correction

officers' role in inspecting the Defendants' tablets.    See Modified Protective Order at 3.    The

Court rewrote the Modified Protective Order's section to allow the officers to periodically ask

the Defendants to unlock their tablets so that they can scan them for contraband.    See Modified

Protective Order at 3.    The Court specified that correction officers "shall not read or otherwise

examine the content of the Computers."    Modified Protective Order at 3.

## LAW REGARDING RULE 16

　　　　Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

> **(E) Documents and Objects.**  Upon a defendant's request, the government must
> permit the defendant to inspect and to copy or photograph books, papers,
> documents, data, photographs, tangible objects, buildings or places, or copies or

portions of any of these items, if the item is within the government's possession, custody, or control and:

> **(i)** the item is material to preparing the defense;
>
> **(ii)** the government intends to use the item it its case-in-chief at trial; or
>
> **(iii)** the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M., Aug. 29, 2005)(Browning, J.)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant

significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations omitted)(citations omitted)(internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1). In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122. In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or

**(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061(10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING MOTIONS TO RECONSIDER

Motions to reconsider in civil cases fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight][16] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion

---

[16]Former rule 59 used to provide for a ten-day period after entry of judgment to file motions to reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

> Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.  See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).  While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The case law for the civil side can inform when a motion to consider is appropriate in a criminal case.  See United States v. Christy, 739 F.3d at 534, 539-40 (10th Cir. 2014); United States v. Huff, 782 F.3d at 1223-24.

### 1.     Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant."  Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)).   In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal
> representatives from a final judgment, order, or proceeding for the following
> reasons:
>
> > (1)    mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2)    newly discovered evidence that, with reasonable diligence,
> > could not have been discovered in time to move for a new
> > trial under Rule 59(b);
> >
> > (3)    fraud (whether previously called intrinsic or extrinsic),
> > misrepresentation, or misconduct by an opposing party;
> >
> > (4)    the judgment is void;
> >
> > (5)    the judgment has been satisfied, released or discharged; it is
> > based on an earlier judgment that has been reversed or
> > vacated; or applying it prospectively is no longer equitable;
> > or
> >
> > (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are appropriate vehicles to reargue an issue previously addressed by the court
> when the motion merely advances new arguments, or supporting facts which were
> available at the time of the original motion. . . .  Grounds warranting a motion to
> reconsider include (1) an intervening change in the controlling law, (2) new
> evidence previously unavailable, and (3) the need to correct clear error or prevent
> manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.   "[A] motion for reconsideration is

appropriate where the court has misapprehended the facts, a party's position, or the controlling

law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.   A district court has considerable

discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 James Wm. Moore, Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572,

577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted). The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore, supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does

not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 (quoting Ackermann v. United States, 340 U.S. 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."  Pierce v. Cook & Co., 518 F.2d at 723.  However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6).  Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2.    Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that neither the Federal Rules of Civil

Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in <u>Servants of the Paraclete v. Does</u>, which refers to rule 59(e) motions in civil cases -- "motion[s] to alter or amend a <u>judgment</u>" -- as "motions to reconsider,"[17] compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis added); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1005.

Final judgments are different from interlocutory orders. <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>.")(emphasis added). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of a

---

[17]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored <u>Servants of the Paraclete v. Does</u>, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. 204 F.3d at 1005. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within 28 days of the entry of judgment, which the <u>Servants of the Paraclete v. Does</u> standard governs; and (iii) motions to reconsider a judgment made more than 28 days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.

The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that

rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling

was on a criminal suppression motion, class certification motion, or preliminary injunction,[18] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability

---

[18]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law: "**Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to 28 days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the Motion for Protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all,

if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.

Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

Finally, the Tenth Circuit has applied the law regarding motions to reconsider in civil cases to the criminal context. See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d at 1223-24. The Tenth Circuit relies on civil cases for the principles that govern motions to reconsider in the criminal context. See United States v. Christy, 739 F.3d at 539 (applying the standard set forth in Servants of the Paraclete v. Does in the criminal context); United States v. Huff, 782 F.3d at 1224 (same). In United States v. Christy, the Tenth Circuit explained:

> Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them. A district court should have the opportunity to correct alleged errors in its dispositions.
>
> A motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law. Specific grounds include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest

injustice."  A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.

739 F.3d at 539 (internal citations omitted).  The Tenth Circuit similarly applied the Servants of the Paraclete v. Does standard in determining whether the district court had properly granted a motion to reconsider its decision to suppress in the criminal context in United States v. Huff, explaining:

> We have held that a motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  Specific situations where circumstances may warrant reconsideration include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  *Id.*  "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994).  We have specifically held that "[a] motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier."  *United States v. Christy*, 739 F.3d at 539 (10th Cir. 2014).

782 F.3d at 1224.  The Court will thus use the same test that it has developed for motions to reconsider in the civil context for motions to reconsider in criminal cases.  See Anderson Living Trust v. WPX Energy Prod., LLC, 312 F.R.D. 620, 642-49 (D.N.M. 2015)(Browning, J.).

## ANALYSIS

The Court will grant in part and deny in part the Motion for Reconsideration.  Pursuant to its agreement with the parties at the June 2, 2016, hearing on the Motion for Reconsideration, the Court will not strictly apply the usual three-factor test that guides motions to reconsider.  The usual test that the Court applies for motions to reconsider interlocutory orders is the one which the Court elaborated in United States v. Loera, 2016 WL 1730357.[19]  The Court will instead

---

[19]In United States v. Loera, the Court explained that the factors courts should consider when determining whether to reconsider an interlocutory order, are: (i) "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider

analyze the Protective Order's terms to determine if, on the merits, it is an appropriate, fair, and workable order for the parties pursuant to the agreement at the hearing.  Because the Court concludes that it should modify the Protective Order in the manner discussed at the hearing, it thus grants in part and denies in part the Motion for Reconsideration, and accordingly grants in part and denies in part the requests in the Defendants' Protective Order Brief and in Sanchez' Protective Order Reply.

Second, the Court denies without prejudice the requests in the United States' Notice, and the requests in the Defendants' Response to the United States' Notice, by having struck a compromise with all of the parties that the high standard for bringing a motion for reconsideration will be relaxed where the issue underlying such a motion involves Judge Gonzales potentially having a conflict when he entered orders.  Instead of relitigating all of the issues on which Judge Gonzales ruled because he potentially had a conflict, the Court instead will take those issues as they may arise in accordance with its ruling at the June 2, 2016, hearing.

The Court also brokered a compromise at the hearing regarding the nature of the filings in this case going forward, thereby denying the Defendants' Due Process Motion.  By denying the Defendants' Due Process Motion, the Court brokered a deal with the parties that all filings will be done in accordance with a public, sealed, and ex parte categorization for the rest of the litigation.

---

challenges," 2016 WL 1730357, at *23; (ii) "the case's overall progress and posture, the Motion for Reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling," 2016 WL 1730357, at *24; and (iii) "the Servants of the Paraclete v. Does grounds," 2016 WL 1730357, at *33.

Last, because the issues were generally moot, the Court denied the Defendants' Motion to Suspend the Scheduling Order. The only item left to be considered on the Scheduling Order was the trial date, which the Court concludes can be continued as might become necessary.

## I.     THE COURT WILL EXERCISE ITS DISCRETION IN DETERMINING WHETHER TO RECONSIDER THE PROTECTIVE ORDER.

The Federal Rules of Criminal Procedure "do not expressly recognize a motion to reconsider." United States v. Christy, 810 F. Supp. 2d at 1249.[20] Rule 16(d)(1) addresses, however, the circumstances under which courts may modify an order related to regulating discovery: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). Courts thus have discretion to regulate discovery. In United States v. Harmon, the Court held that "[a] district court has considerable discretion in ruling on a motion to reconsider." United States v. Harmon, 871 F. Supp. 2d at 1144. "In the criminal context, however, courts ordinarily apply the same standards as those used in civil cases when addressing motions to reconsider." United States v. Harmon, 871 F. Supp. 2d at 1143. In United States v. Loera, No. CR 13-1876, 2016 WL 1730357, at *18 (D.N.M. 2016)(Browning, J.), the Court noted: "Courts may treat motions for reconsideration as a [Federal Rules of Civil Procedure] rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment." The Court distinguished, however,

---

[20]In United States v. Christy, the defendant moved to suppress evidence and statements, which the Court granted. See 810 F. Supp. 2d at 1282. Later, the United States filed a motion to reconsider the suppression order and to reopen a suppression hearing. See United States v. Christy 810 F. Supp. 2d at 1222. The Court granted in part the motion to reconsider, holding that it would reopen the suppression hearing and that it would reconsider its memorandum opinion and order, because it had not ruled on the inevitable discovery issue. See United States v. Christy, 810 F. Supp. 2d at 1282. The defendant appealed, and the Tenth Circuit affirmed the Court's ruling, holding: "[T]he district court acted well within its discretion in granting the motion to reconsider . . . in order to rule on an issue it mistakenly overlooked. The district court was plainly aware of the appropriate grounds for a motion to reconsider." United States v. Christy, 739 F.3d at 539.

motions to reconsider under rule 59(e) and rule 60(b) of the Federal Rules of Civil Procedure, from motions to reconsider interlocutory orders.  See United States v. Loera, 2016 WL 1730357, at *18-21.  The Court stated: "[F]inal judgments are different from interlocutory orders."  United States v. Loera, 2016 WL 1730357, at *21.

In the context of an interlocutory order, the Court analyzes motions to reconsider differently from motions to reconsider final judgments, depending on three factors that the Court listed in United States v. Loera: (i) "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges,"  2016 WL 1730357, at *23; (ii) "the case's overall progress and posture, the Motion for Reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling,"  2016 WL 1730357, at *24; and (iii) "the Servants of the Paraclete v. Does grounds,"[21] 2016 WL 1730357, at *24.  Here, the Court must determine whether to reconsider the Protective Order that Judge Gonzales issued in this case.  See Motion for Reconsideration at 1; Protective Order at 1.  An interlocutory order is "[a]n order that relates to some intermediate matter in the case; any order other than a final order."  Interlocutory Order, Black's Law Dictionary, at 1207 (9th ed. 2008).  The Protective Order at issue, therefore, is an interlocutory order and not an entry of judgment.

---

[21]As the Court explained in this Memorandum Opinion and Order's Law Regarding Motions to Reconsider Section, the Servants of the Paraclete v. Does grounds include: (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the court erred.  See United States v. Loera, 2016 WL 1730357, at *33.

Accordingly, the Court would normally, routinely apply the three factors that it set forth in United States v. Loera.  See 2016 WL 1730357, at *23-24.  At the hearing on the Motion for Reconsideration, however, the Court ruled, in part, that, if the parties would not insist that the Court decide whether Judge Gonzales had a conflict when he entered the Protective Order, it would not use the requirements in United States v. Loera to decide whether the Protective Order, or any other order that Judge Gonzales entered, should be set aside because he may have had a conflict.  The parties agreed that the Court did not have to decide whether Judge Gonzales had a conflict and that in its discretion it would decide such motions to reconsider on the merits without applying the strict requirements of United States v. Loera.  Consistent with this oral ruling, the Court will decide on the merits whether the Protective Order is working for the parties and whether it is achieving what it sought to accomplish, without consideration of the factors the Court described in United States v. Loera.   In this case, the Protective Order warrants modification given its unworkable nature -- for all of the parties -- and its insurance of only a minimal benefit regarding the Defendants' safety, as balanced against the great expense of Defendants' counsel, as well as the case's reassignment and inherent complexity.  See United States v. Harmon, 871 F. Supp. 2d at 1144 ("A district court has considerable discretion in ruling on a motion to reconsider.").

## II.     **THE COURT WILL MODIFY THE PROTECTIVE ORDER**.

The Court agrees with the Defendants that the Discovery Coordinator should upload what Judge Gonzales' Protective Order calls "Confidential Material" onto the tablets to allow the Defendants to prepare adequately for trial.   Protective Order at 1.   See Motion for Reconsideration at 12.   The Court will limit, however, the Defendants' access to some documents.  In most cases, protective orders concern whether an informant's identity should be

disclosed to the defendants, for fear of retaliation.  See, e.g., United States v. Aranda-Daiz, No. CR 12-2686 JB, 2014 WL 59868 (D.N.M. 2014)(Browning, J.); United States v. Barbeito, No. CR 09-0222, 2009 WL 3645063 (S.D.W. Va. 2009)(Johnston, J.).  Here, under the current Protective Order, the Defendants already have access to alleged cooperators' identities, because they can review "Confidential Materials" with their counsel in prison.  Protective Order at 2. The Court must determine whether it should continue to allow the Defendants to review such "Confidential Material" only in person and with counsel present, or whether it should allow the Discovery Coordinator to upload such "Confidential Material" onto the tablets that the Defendants already use to review non-confidential information.

In United States v. Barbeito, the Honorable Thomas E. Johnston, United States District Judge for the Southern District of West Virginia, granted a motion requesting a protective order, because he concluded that the confidential informant's identity should be kept secret, given the concrete risks of retaliation.  See 2009 WL 3645063, at *1.  In that case, however, the focus of the court's analysis was on the court's and counsel's "real practical control over [the documents'] dissemination."  2009 WL 3645063, at *1.  The district court thus noted: "[T]he danger is certainly compounded when written discovery materials identifying informants are floating about in the community, and perhaps worse yet, on the internet."  2009 WL 3645063, at *1.  Based on his concern about the defendants having access to paper materials, Judge Johnston granted the protective order and held that sensitive materials should not be left in paper form in the hands of defendants who might disseminate them.  See 2009 WL 3645063, at *1.

In United States v. Garcia, 406 F. Supp. 2d 304 (S.D.N.Y. 2005)(Lynch, J.), the Honorable Gerard E. Lynch, United States District Judge for the Southern District of New York,

discussed the need for a case-by-case analysis of protective orders regarding discovery when retaliation is a valid concern.  See 406 F. Supp. 2d at 306.  Judge Lynch stated:

> [T]he wide dissemination of statements by cooperating witnesses who are regarded as "snitches" or "rats" by their criminal associates, and who often must serve their own sentences in close proximity to other prisoners, poses obvious dangers.  It is not enough to say, as the defendants argue in this case, that the damage is done by the mere disclosure that a witness has cooperated with the authorities.  Hard evidence of the witness's betrayal can facilitate retaliation or intimidation of the witness.  It is therefore appropriate, in a case where such retaliation may be feared, to restrict the circulation of such material.

United States v. Garcia, 406 F. Supp. 2d at 306.  Judge Lynch further stated: "Defendants have a right to participate in their defense.  Moreover, defense counsel need to be able to consult with their clients about the nature of the prosecution's expected proof."  406 F. Supp. 2d at 304.  Judge Lynch stated: "Often, the defendants alone possess information that may be critical in refuting the Government's evidence, or in discrediting expected prosecution witnesses.  Defense counsel must thus be free to communicate freely with their clients, and to discuss with them the anticipated testimony against them."  406 F. Supp. 2d at 305.

In United States v. Aranda-Daiz, defendant Aranda-Daiz filed a motion for the court to modify a protective order.  See 2014 WL 59868, at *1.  The Court had issued a protective order requiring disclosure of a confidential informant's identity to Aranda-Daiz' counsel, but not to Aranda-Daiz.  See 2014 WL 59868, at *1.  The Court granted the motion to modify the protective order, holding that Aranda-Daiz should be able to learn the confidential informant's identity, because "[t]he Court should not . . . construct a firewall between Aranda-Daiz and his counsel that would separate Aranda-Daiz from information that is important to his constitutional right of a 'meaningful opportunity to present a complete defense.'"  United States v. Aranda-Daiz, 2014 WL 59868, at *13 (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

Here, under the current Protective Order, the Court is faced with a unique situation: the Defendants have very limited access to confidential materials that the United States will use against them, and the Defendants' counsel are significantly burdened by having to meet with their clients at custodial facilities to review confidential materials with them in person.  Given the United States' liberal designation of documents as confidential, it appears that most of the documents will be confidential.  The prospect of having a lawyer go page by page of nearly 10,000 documents supports that it will require counsel to be at the prison many, many hours.  If counsel can go through 20-25 pages an hour, which may be optimistic, it will take 400-500 hours them each to review all of the documents with their clients.  The Protective Order provides for tablets for the Defendants to review non-confidential discovery materials.  See Protective Order at 2.  The Defendants are able to use the tablets "in their cells and during legal visits."  Protective Order at 2.  The Protective Order also provides, however, for a designation of specific documents as "Confidential Material" -- "(1) any defendant's post-arrest statement; (2) statements by eyewitnesses, cooperating witnesses, and confidential government sources regarding the crimes charged in these cases; and (3) photograph and/or audio/video recordings that would identify such persons or the content of the statements in (1) or (2), above."  Protective Order at 1.  While the Discovery Coordinator can upload non-confidential material onto the tablets, confidential material "may be disclosed to and viewed by a defendant in the presence of and under the direct supervision of his counsel. . . .  Absent further order of the Court, the defendants are not to be provided paper copies of any discovery materials."  Protective Order at 2.

The use of tablets mitigates the Court's concerns about the Defendants disseminating paper documents and subsequently engaging in retaliation.  Here, unlike in United States v. Barbeito, the Defendants have tablets -- lacking Internet access -- onto which discovery materials

can be uploaded, thus removing the danger of papers circulating in the prison.  See Protective Order at 2.  If the United States uploads all of its discovery materials onto the Defendants' tablets -- both non-confidential and confidential materials -- the Defendants will be able to review that information without leaving behind a paper trail.  This scenario will decrease the risk -- not eliminate the risk -- that the Defendants will disseminate sensitive information.

As in United States v. Aranda-Daiz, the Court is concerned about the Defendants' ability to adequately prepare for trial.  The Court is concerned about the Protective Order constructing a "firewall" between the Defendants and their counsel that would effectively "separate them from information that is important to their constitutional right of a 'meaningful opportunity to present a defense.'"  2014 WL 59868, at *14 (quoting Crane v. Kentucky, 476 U.S. at 690).  The current document review will take a long time, if it can be done at all.  The death-penalty eligible Defendants have two counsel, many from out of state.  It is unrealistic to require learned counsel, many with national practices, and local counsel, with many other clients, to camp out at the detention center for days at a time, reviewing a page at a time.  Under the current Protective Order, defense counsel are having to visit custodial facilities in person to review confidential papers with their clients.  Moreover, the current Protective Order is overly burdensome for defense counsel and for the Defendants, who are allowed to review the materials that will be used against them only while they are under counsel's supervision.  Because the Court must avoid constructing a firewall between the Defendants and their counsel, and because the risk of leaving a paper trail does not exist with tablets, the Court orders the United States to have the Discovery Coordinator upload all of its discovery onto the tablets.  This process will allow the Defendants to adequately review the documents on their own time and then discuss them with

the Defendants' counsel, who will then be better able to use the time they spend with their clients.

The United States conceded at the hearing that its biggest concern is that the Defendants have a lot of time on their hands and that they will study these documents, memorize them, and tell other SNM gang members what they have learned, thus putting at risk cooperators and informants.  See Tr. at 39:4-9 (Beck).  The Court shares this concern.  The problem is that the risk substantially exists under the current order.  The Defendants are smart and can probably remember the names when they read them with their counsel.  The marginal increase in safety -- by intentionally making it more difficult for the Defendants to read the documents -- does not justify the extreme burden the current order is imposing on the Defendants and their counsel.

In its modified protective order, the Court will dispose of the Confidential Material designation altogether.  If, for any reason, materials are only available in paper form -- such as some defense discovery -- the Court will order defense counsel to take these papers with them to custodial facilities, and they will ensure that no paper discovery is left with the Defendants.  Out of concern for witnesses' safety, the Court must ensure that no one leaves a paper trail, to prevent dissemination of sensitive documents.  The Court will allow the Defendants to review and retain the publicly-filed pleadings in paper form, because everyone may have access to these. The Court concludes, however, that the Defendants' access to sealed pleadings should be limited. Such pleadings will therefore not be available on the Defendants' tablets.  Instead, the Defendants' counsel may review sealed pleadings with their clients only in paper form.  The Defendants' counsel will not give any paper copies to the Defendants, and they will ensure they take the papers with them when they leave the prison.  Finally, the Court orders that corrections

officer should inspect the tablets -- without reading their content -- to make sure they are used solely for the purpose of reading information.

### III.    THE COURT WILL RELAX THE BURDEN OF PROOF NEEDED TO BRING A MOTION FOR RECONSIDERATION IN THIS CASE AS IT RELATES TO JUDGE GONZALES' POTENTIAL CONFLICT.

With respect to the United States' Notice, the Court concludes that it will not run the parties through the usual ringer of satisfying the three factors that the Court normally considers in ruling on a motion to reconsider an interlocutory order. See Tr. at 53:25-54:5 (Court). The parties agreed to the Court not deciding whether Judge Gonzales had a potential conflict and to the Court treating the orders that Judge Gonzales entered as its own. See Tr. at 54:22-56:10 (Castle, Armijo). In exchange, should a situation arise where Defendants move to reconsider another of Judge Gonzales' previous substantive orders because of a potential conflict, the Court will treat the motion on the merits -- was it a good order or not -- without strictly applying the movant's high burden of proof for motions to reconsider. See Tr. at 54:22-56:10 (Castle, Armijo). Accordingly, the Court denies without prejudice the United States' Notice and the requests in the Response to the United States' Notice, with other Judge Gonzales orders to be considered on an individual basis as might be necessary later in the case. See Tr. at 55:7-15 (Court).

### IV.    THE COURT'S RULINGS AT THE HEARING MOOT DEFENDANTS' DUE PROCESS MOTION AND THE DEFENDANTS' MOTION TO SUSPEND THE SCHEDULING ORDER.

A court has broad discretion in managing its docket. See Clinton v. Jones, 520 U.S. 681, 706 (1997)(citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)). At the hearing, the Court made a bright-line rule for the nature of the filings in this case moving forward. All filings will be public, ex parte, or sealed -- there will be no other category, and ex parte filings will need to

be kept to an absolute minimum.  See Tr. at 60: 22-25 (Court).  The Court's ruling resolves the Defendants' Due Process Motion, which merely sought to make sure the filings comported with the rules.  See Tr. at 63:12-17 (Chambers).

In a related sense, the Court concludes that the only potential issue that the Motion to Suspend the Scheduling Order raises is the trial date.  The other requests in the Motion to Suspend the Scheduling Order -- an ex parte CJA conference and a status conference -- were set when the Court held the hearing.  See Tr. at 68:2-18 (Court).  Because the trial can be continued as necessary, the Court denies the Motion to Suspend the Scheduling Order.  See Tr. at 68:19-69:12 (Court).

**IT IS ORDERED** that: (i) the Defendants' Opposed Joint Motion for Reconsideration of the Protective Order, filed May 23, 2016 (Doc. 541), is granted in part and denied in part -- the Court will issue a new Protective Order containing the terms upon which the parties agreed during the June 2, 2016, hearing and in the Proposed Protective Order they filed on June 16, 2016; (ii) Defendants' Brief Regarding "Protective Orders" for Materials Obtained from Sources Other Than the Government, filed March 8, 2016 (Doc. 302), is granted in part and denied in part; (iii) Defendant Daniel Sanchez's Reply Regarding Court's Ability to Subject Materials Obtained Independently of This Court's Process to Court's Protective Order (Doc. 313), filed March 15, 2016 (Doc. 315), is granted in part and denied in part; (iv) the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 1, 2016 (Doc. 358), and the requests in the Response to Doc. No. 358 -- the United States' Notice Regarding when the New Mexico United States Attorney's Office First Became Involved in Prosecuting the Defendants in This Case or any Other Case, filed April 4, 2016 (Doc. 360), are denied without

prejudice; (v) the Motion for Order Directing the United States to Comply with Fundamental Due Process, filed March 28, 2016 (Doc. 342), is denied in part; and (vi) the Motion to Suspend Scheduling Order (Doc. 250), Request for Status Conference and Ex Parte CJA Conference with the District Court, filed May 18, 2016 (Doc. 535), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

   *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, PC
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, PC
El Paso, Texas

> *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

> *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Robert R. Cooper Law Firm, PC
Albuquerque, New Mexico

> *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

> *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

> *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

    *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

--and--

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

    *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

--and--

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, PA
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

--and--

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

--and--

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

--and--

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, PC
Albuquerque, New Mexico

--and--

Christopher W. Adams
Charleston, South Carolina

     *Attorney for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

--and--

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*