# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                      No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed January 3, 2017 (Doc. 809)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Specific Discovery, filed May 23, 2016 (Doc. 539)("First Motion for Specific Discovery"); (ii) the Defendants' Motion to Compel Discovery, filed September 1, 2016 (Doc. 668)("Motion to Compel"); and (iii) the Defendants' Motion for Specific Discovery, filed September 8, 2016 (Doc. 678)("Second Motion for Specific Discovery"). The Court held a hearing on October 4, 2016. The primary issues are: (i) whether the United States must produce specific items of discovery related to Counts 1 and 2 of the United States' Redacted Superseding Indictment, filed April 21, 2016 (Doc. 368)("Superseding Indictment"); (ii) whether the Plaintiff United States of America must produce specific items of discovery related to Counts 6 and 7 of the Superseding Indictment; and (iii) whether the Plaintiff United States of America must produce specific items of discovery related to Count 3 of the Superseding Indictment. At the hearing, the Court addressed each specific discovery request and made specific rulings with respect to the requested discovery. Accordingly, the Court will: (i) grant in part and deny in part the First Motion for Specific Discovery; (ii) grant in part and deny in part the Motion to Compel; and (iii) grant in part and deny in part the Second Motion for Specific Discovery.

## FACTUAL BACKGROUND

The Court takes its facts from the Superseding Indictment. The facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753)("MOO"). See United States of America v. Angel DeLeon, No. CR.

---

confidential information within the Sealed MOO before the Court files a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

15-4268 JB, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background is largely the United States' version of events and also recognizes that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members.  See Superseding Indictment at 2.  SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Superseding Indictment at 2.  SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Superseding Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 were injured.  See Superseding Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Superseding Indictment at 3.  SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members."  Superseding Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their

communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Superseding Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Superseding Indictment at 4. If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power. See Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Superseding Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others." Superseding Indictment at 4-5. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Superseding Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Superseding Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Superseding Indictment at 7. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation. See United States v. Garcia, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States' Garcia Response")). The relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("SNMCF") state prison. <u>See</u> MOO at 6. The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. <u>See</u> MOO at 6. That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. <u>See</u> MOO at 6-7. The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015. <u>See</u> MOO at 7. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." MOO at 7.

The United States now brings this case against thirty Defendants, charging them with a total of fifteen counts. <u>See</u> Superseding Indictment at 1. All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Superseding Indictment at 6-31. Defendants Arturo Arnulfo Garcia, Gerald Archuleta, Benjamin Clark, Mario Rodriguez, Anthony Ray Baca, Robert Martinez, Roy Paul Martinez, and Daniel Sanchez are the alleged leaders of the enterprise. <u>See</u> Superseding

Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant;" and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Superseding Indictment at 9.  In all, the indictment alleges fifteen different counts against the various Defendants.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 18.  On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B.  See Superseding Indictment at 19.  In March 2014, Defendants Jerry Armenta, Montoya, Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M."  Superseding Indictment at 20-21. On March 7, 2014, Defendants Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Superseding Indictment at 27.  Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S."  Superseding Indictment at 28.  During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M."  Superseding indictment at 28.  On November 29, 2015, Defendant C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Superseding Indictment at 29.  On the same day, Defendant C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Superseding Indictment at 29.

On March 17, 2015, Defendant J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Superseding Indictment at 30.  From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, Santos Gonzalez, Paul Rivera, Shauna Gutierrez "and others known and unknown to the grand jury," allegedly conspired to murder "J.G."  Superseding Indictment at 30.  The final count alleges that, on February 27, 2016, Defendants J. Gallegos, Gonzalez, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Superseding Indictment at 31.

For fuller context, there are four cases before the Court related to SNM's alleged criminal activity.  In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. §

1962(d).  See United States v. Baca, No. CR 16-1613, Sealed Indictment, filed April 21, 2016

(Doc. 1).  There is also a prosecution of one Defendant for drug crimes, see United States v.

Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged

conduct constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see

United States v. Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the

crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and

U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to

Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).  See

Indictment at 1.  The Defendants are all allegedly members, prospects, or otherwise associated

with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term.  See

Indictment at 2.

On April 21, 2016, a grand jury in a Superseding Indictment indicted thirty Defendants --

twenty-four of whom were Defendants in the original Indictment.  See Superseding Indictment at

1.  In addition to the new Defendants, the Superseding Indictment also contains new charges

under modified count numbers.  See Superseding Indictment at 9-31.  The Superseding

Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G.

("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4");

(v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the

Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily

Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to

Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and

Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15").  See Superseding Indictment at 9-31.  At the time of the Superseding Indictment, some of the Defendants were death-penalty eligible.  See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants).

The Defendants have filed the First Motion for Specific Discovery, the Second Motion for Specific Discovery, and the Motion to Compel.  The motions, in turn, relate to items of discovery relating to: (i) Counts 1 and 2 of the Superseding Indictment -- regarding the murders of F.C. and R.G.; (ii) Count 3 of the Superseding Indictment -- regarding the murder of F.S.; and (iii) Counts 6 and 7 of the Superseding Indictment -- regarding the conspiracy to murder, and murder, of J.M.

### 1. **First Motion for Specific Discovery.**

The First Motion for Specific Discovery "addresses specific discovery requests as they relate to the defense of Counts 1 and 2."  First Motion for Specific Discovery at 1.  J. Gallegos, Troup, B. Garcia, Chavez, and Montoya filed the First Motion for Specific Discovery, see First Motion for Specific Discovery at 1, and Lujan objects to the First Motion for Specific Discovery, see Addendum to Motion for Specific Discovery at 1, filed May 27, 2016 (Doc. 560).  With respect to those Counts, the First Motion for Specific Discovery provides that:

> The government's theory is that the two murders, which occurred on the same day in 2001, were orchestrated by defendant Billy Garcia.  The government's theory is that Garcia was the "shot caller" for the SNM gang for the period of time encompassing Counts 1 and 2 of the indictment. . . .  The discovery in this case casts Mr. Garcia as the leader of SNM in 2001 and the government asserts that Mr. Garcia ordered and orchestrated the murder of both victims by ordering

> Leonard Lujan to arrange for the murders.  The government's theory is that Luan then arranged for two teams to carry out the murders of F.C. on March 26, 2001 with one set of complicitors and the murder of R.G. on the same day with a second set of complicitors.

First Motion for Specific Discovery at 3.

The First Motion for Specific Discovery then recounts the "known details concerning the two homicides."  First Motion for Specific Discovery at 4.  Regarding R.G., the First Motion for Specific Discovery provides that the murder occurred at Southern New Mexico Correctional Facility in the Ocean-One-Yellow housing unit, within which there were thirteen inmates; the Superseding Indictment charges three of these inmates.  See First Motion for Specific Discovery at 4.  Further, according to the First Motion for Specific Discovery, there was DNA found on the shoelace used to strangle R.G. that was "consistent with the DNA profile of inmate Martin Chacon who is not indicted in this case."  First Motion for Specific Discovery at 4.  Informants have both inculpated the indicted Defendants, and also exculpated them by identifying other potential participants in the killing.  See First Motion for Specific Discovery at 4.  The First Motion for Specific Discovery then contends that "no physical evidence links the indicted defendants to the murder of R.G. . . .  [T]he government bases its theory that the defendants are guilty on the potential testimony of inmate Leonard Lujan (who is currently charged as a co-defendant)."  First Motion for Specific Discovery at 5.  As to why R.G. was murdered, the First Motion for Specific Discovery explains that the United States' theory is that he had formerly been a "member of the Los Carnales prison gang."  First Motion for Specific Discovery at 5.

Regarding F.C.'s murder, the First Motion for Specific Discovery provides that the murder occurred at the Southern New Mexico Correctional Facility in the Paul-One-Green housing unit, within which there were at least thirteen inmates; the Superseding Indictment charges three of these inmates.  See First Motion for Specific Discovery at 5.  The First Motion

- 10 -

for Specific Discovery explains that there is DNA evidence and informant witnesses that have both inculpated the indicted Defendants, and also exculpated them by identifying other potential participants in the killing.  See First Motion for Specific Discovery at 5.  According to the First Motion for Specific Discovery, "the government bases its theory that the indicted defendants are guilty of this murder on the potential testimony of two inmates, co-defendant Leonard Lujan . . . and Lawrence Torres."  First Motion for Specific Discovery at 5-6.

With respect to Counts 1 and 2, F.C. and R.G.'s murders, the First Motion for Specific Discovery provides that the "discovery . . . to date . . . comprises 1284 pages and a single audio file. . . .  [T]he two homicides were being investigated by the New Mexico State Police.  On November 2, 2001, the District Attorney for the Third Judicial District formally declined to prosecute anyone for the two murders."  First Motion for Specific Discovery at 6.  The First Motion for Specific Discovery then recounts that there have been multiple federal investigations of SNM: (i) case number 281D-AQ-62017 (Sindicato Nuevo Mexico New Mexico-Based Prison Gang Criminal Enterprise); (ii) case number 2450-AQ-63435 (Operation Tar Pit); and (iii) the present investigation, case number 281D-AQ-6239655 (Operation Atonement; Syndicato de Nuevo Mexico; Violent Prison Gang).  See First Motion for Specific Discovery at 6-7.  The First Motion for Specific Discovery then turns to its specific discovery requests.

The specific discovery requests in the First Motion for Specific Discovery are: (i) the Federal Bureau of Investigation's ("FBI") investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related investigations relating to Counts 1 and 2; (ii) New Mexico Corrections Department Security Threat Intelligence Unit ("STIU") files on all inmates at Southern New Mexico on March 26, 2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility; (iii) criminal history, impeachment materials, and

STIU files for Lujan and any other cooperating informant witness; (iv) penitentiary packs[2] for R.G. and F.C., and all inmates housed in the Ocean-One-Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan and Lawrence Torres; (v) all files, including intelligence materials, concerning SNM, and listing suspected and confirmed members and their activities from the time period that SNM was formed up to the last date that the Superseding Indictment alleges, February 27, 2016; (vi) all files on the Los Carnales prison gang listing suspected and confirmed members, and their activities, specifically including such files on R.G.; (vii) Security Threat Group investigation files for SNM from 1985 to 2016; (viii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system; (ix) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population; (x) the list of inmates in the facility who may have been free to move amongst pods; (xi) the list of inmates residing in the Department of Corrections, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001; (xii) the penitentiary pack for Frederico Munoz; (xiii) log books for the three months before and after March 25, 2001; (xiv) the United States' DNA analyst's notes, electropherograms,[3] and graphs; (xv) copies of the inmate's flyer, otherwise known as their Wanted for Escape/Master Record Entry; and (xvi) the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates. See First Motion for Specific Discovery at 7-11.

---

[2]These "pen packs" apparently contain information concerning particular inmates which the prison system uses so that inmates are not housed with persons to whom they may pose a danger.

[3]"An electropherogram is a plot of results from an analysis done by electrophoresis automatic sequencing. An electropherogram shows a sequence of data that is produced by an automated DNA sequencing machine. Electropherograms may be used for deriving results from . . . DNA sequencing . . . ." Electropherogram, International Society of Genetic Genealogy Wiki, https://isogg.org/wiki/Electropherogram/en. (last accessed Dec. 17, 2016).

In support of its discovery requests, the First Motion for Specific Discovery argues that rule 16 of the Federal Rules of Criminal Procedure, Kyles v. Whitley, 514 U.S. 419, 437 (1995), Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), "and other authorities cited herein," counsel the Court to rule in favor of the motion.  First Motion for Specific Discovery at 11-12.  The First Motion for Specific Discovery requests an order directing the "government to make inquiry as required by *Kyles* and to disclose all of the information described . . . .  This motion seeks discovery of specific information set forth above, all of which is necessary for effective preparation of pretrial motions as well as trial."  First Motion for Specific Discovery at 12.

The First Motion for Specific Discovery then outlines what, in its view, is the United States' disclosure obligation for this case.  See First Motion for Specific Discovery at 12.  First, the First Motion for Specific Discovery argues, is the requirement under the Due Process Clause of the United States Constitution that "the government . . . disclose information favorable to the accused that is material to either guilt or punishment."  First Motion for Specific Discovery at 12 (citing Brady v. Maryland, 373 U.S. at 87).  According to the First Motion for Specific Discovery, that obligation has been extended to "evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory."  First Motion for Specific Discovery at 12 (citing United States v. Rivas, 26 F. Supp. 3d 1082, 1105 (D.N.M. 2014)(Browning, J.)).

The First Motion for Specific Discovery then provides that "the government's discovery obligations do not require the accused to request disclosure of favorable evidence, although such disclosure is specifically requested here."  First Motion for Specific Discovery at 13.  Relying on Kyles v. Whitley, the First Motion for Specific Discovery explains that "regardless of request,

favorable evidence is material, and constitutional error results from its suppression by the government if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." First Motion for Specific Discovery at 13 (internal quotation marks omitted). Accordingly, under Brady v. Maryland, the First Motion for Specific Discovery explains that "due process is violated whenever the government suppresses evidence favorable to the defendant, irrespective of the good faith or bad faith of the prosecution." First Motion for Specific Discovery at 14 (internal quotation marks omitted).

Additionally, the First Motion for Specific Discovery contends that the "prosecution has a duty to search files maintained by other government agencies," meaning that "a prosecutor may have a duty to search files maintained by other governmental agencies closely aligned with the prosecution where there is some reasonable prospect or notice of finding exculpatory evidence." First Motion for Specific Discovery at 15 (citing United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992))(internal quotation marks omitted). Thus, the United States, the First Motion for Specific Discovery argues, has the obligation to investigate the files of any and all governmental agencies and entities connected to this case for exculpatory evidence favorable to the Defendants. See First Motion for Specific Discovery at 16. The First Motion for Specific Discovery next tackles the potential "material to guilt or to punishment" limitation for disclosure under Brady v. Maryland and argues that the "materiality prong is only functional in an appellate context, and it should not be applied in a pretrial application . . . ." First Motion for Specific Discovery at 17 (citing United States v. Carter, 313 F. Supp. 2d 921, 924 (E.D. Wis. 2004)(Adelman, J.)("This standard was developed in the context of appellate consideration of the effect of non-disclosure")). Thus, the First Motion for Specific Discovery points to United States

v. Sudikoff, 36 F. Supp. 2d 1196 (C.D. Cal. 1999)(Pregerson, J.), for the proposition that "the standard should simply be whether the evidence is favorable to the accused, i.e., whether it relates to guilt or punishment and tends to bolster the defendant's case or impeach prosecution witnesses."  First Motion for Specific Discovery (citing United States v. Sudikoff, 36 F. Supp. 2d at 1199).  The First Motion for Specific Discovery concludes by imploring the Court to "use its inherent power to order the requested discovery," and to "control its docket to ensure that cases before the court are handled efficiently and fairly, as well as" in accordance with "Rule 16 of the Federal Rules of Civil Procedure and" Brady v. Maryland.  First Motion for Specific Discovery at 24.

> **2.    First Motion for Specific Discovery Response.**

The United States responded to the First Motion for Specific Discovery with the United States' Response in Opposition to Defendants' Motion for Specific Discovery [Doc. 539], filed July 5, 2016 (Doc. 613)("First Motion for Specific Discovery Response").  See First Motion for Specific Discovery Response at 1.  In the First Motion for Specific Discovery Response, the United States argues that the request is for "a broad range of discovery to which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitles them. Importantly, the Discovery Motion requests materials unrelated to the criminal case against them and intelligence materials that would harm the United States' and others' interests and safety if disclosed."  First Motion for Specific Discovery Response at 1.  According to the First Motion for Specific Discovery Response, "these requests . . . are nothing more than fishing expeditions." First Motion for Specific Discovery Response at 1.  The First Motion for Specific Discovery Response then recaps the case's factual and procedural background, before addressing its

arguments against disclosure of some of the sixteen items of discovery that the First Motion for Specific Discovery seeks.  See First Motion for Specific Discovery Response at 1-4.

The First Motion for Specific Discovery Response first cites United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, at *5 (D.N.M. 2016)(Browning, J.), for the proposition that "[a]lthough rule 16's language is permissive, it does not authorize a blanket request to see the prosecution's file, and a defendant may not use the rule to engage in a fishing expedition."  First Motion for Specific Discovery Response at 4 (internal quotation marks omitted).  Thus, the First Motion for Specific Discovery Response argues that rule 16 does not "require the Government to discover information that it does not have," including that "information from third parties."  First Motion for Specific Discovery Response at 4-5.  The First Motion for Specific Discovery Response then emphasizes that only material information must be disclosed under rule 16, and that materiality is a prerequisite under both rule 16 and the Due Process Clause.  See First Motion for Specific Discovery Response at 5 (citing United States v. Hykes, 2016 WL 1730125, at *6).  Regarding the timing of their obligatory disclosures, the First Motion for Specific Discovery Response then explains how obligations vary, and that, nevertheless, it is still too early in this case to disclose much of what the First Motion for Specific Discovery seeks.  See First Motion for Specific Discovery Response at 6.

Accordingly, the First Motion for Specific Discovery Response then turns to each of the specific discovery requests to which it objects, applying the standard from United States v. Hykes: "[t]he United States therefore opposes Defendants' Discovery Motion to the extent that most of their requests are sending the United States on a fishing expedition without any demonstration that the requested files contain information in any way relevant to their defense."  First Motion for Specific Discovery Response at 7.  The United States maintains that, after

United States v. Hykes, the Defendants must provide a "good faith basis for the requested discovery," and that here the requests are overbroad and have not made the specific request needed to authorize discovery under that case. First Motion for Specific Discovery Response at 7-8.

Regarding the Defendants' request for the federal investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related investigations relating to Counts 1 and 2 -- F.C. and R.G.'s murders -- the First Motion for Specific Discovery Response explains that disclosure of the investigation relating to the present prosecution is not yet obligatory, because "we're in the preguilty plea phase in which the obligations to disclose Brady, Giglio, and Jencks material hasn't yet arisen." First Motion for Specific Discovery Response at 8. The United States

> concedes, however, that the Defendants in this request demonstrate that the first two investigation files may contain information that may be material to preparing their defense. . . . If Defendants identify which of the two federal investigations they contend specifically involve the investigation of the murders alleged in Counts 1 and 2, then the Government agrees to request these files from the proper agency.

First Motion for Specific Discovery Response at 8-9.

Turning to the First Motion for Specific Discovery's request for the New Mexico Corrections Department's STIU files on all inmates at Southern New Mexico on March 26, 2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes. See First Motion for Specific Discovery Response at 9-10. The First Motion for Specific Discovery Response argues that this request for "all" inmates and incidents is a "quintessential fishing expedition" lacking any specific foundation for their individual materiality. First Motion for Specific Discovery Response at 9-10.

With respect to the First Motion for Specific Discovery's request for criminal history, impeachment materials, and STIU files for Lujan and any other cooperating informant witness, the United States objects primarily because of a blanket concern for the safety of confidential informants, whom SNM has a history of targeting.  See First Motion for Specific Discovery Response at 10-11.  The First Motion for Specific Discovery Response further concedes that, at some point, the identities of the confidential informants and of all cooperating witnesses will need to be disclosed, but "that obligation hasn't arisen yet."  First Motion for Specific Discovery Response at 11.

Next, addressing the Defendants' request for R.G. and F.C.'s pen packs, and for all pen packs for inmates housed in the Ocean-One-Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan and Torres, the First Motion for Specific Discovery Response explains that the New Mexico Corrections Department does not maintain or store pen packs.  See First Motion for Specific Discovery Response at 11.  Instead, the pen packs are created by reference to public record, and, accordingly, the First Motion for Specific Discovery Response objects to this discovery request.  See First Motion for Specific Discovery Response at 11.

The First Motion for Specific Discovery also request any and all files, including intelligence materials, concerning SNM, and listing suspected and confirmed members, and their activities, from the time period that SNM was formed, up to the last date alleged in the Superseding Indictment, February 27, 2016, to which the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes.  See First Motion for Specific Discovery Response at 12.  The First Motion for Specific Discovery Response maintains that this request for "any and all" lacks specificity and foundation, and is thus a fishing expedition.  First Motion

for Specific Discovery Response at 12.  The United States further provides that the New Mexico

Corrections Department has indicated that most of these records have been destroyed.  <u>See</u> First

Motion for Specific Discovery Response at 12 n.1.

     Regarding both the First Motion for Specific Discovery's request for all files on the Los

Carnales prison gang listing suspected and confirmed members and their activities, specifically

including such files on R.G., and the First Motion for Specific Discovery's request for Security

Threat Group investigation files for SNM from 1985 to 2016, the First Motion for Specific

Discovery Response objects pursuant to <u>United States v. Hykes</u>.  <u>See</u> First Motion for Specific

Discovery Response at 12-13.  The First Motion for Specific Discovery Response maintains that

the requests are overly broad and lack a foundation for materiality.  <u>See</u> First Motion for Specific

Discovery Response at 12-13.  Additionally, the United States argues that -- to the extent any of

these files still exist -- they may contain sensitive material that ought be shielded from disclosure

in the interest of safety.  <u>See</u> First Motion for Specific Discovery Response at 12-13.

    The First Motion for Specific Discovery Response then addresses the request for the

threat-separation listings for F.C. and R.G.'s housing in the penitentiary system, and admits that

the First Motion for Specific Discovery has made the case that "these separate listings may be

relevant to the Defendants' defense, as they contend that the prisons maintain a list that identifies

other inmates who pose a risk of harm to F.C. and R.G., the victims in this case."  First Motion

for Specific Discovery Response at 13 (internal quotation marks omitted).  The First Motion for

Specific Discovery Response does not thereby object to the request and indicates that the United

States will request the listings from the New Mexico Corrections Department.  <u>See</u> First Motion

for Specific Discovery Response at 13.  Accordingly, the First Motion for Specific Discovery

Response likewise does not object to the First Motion for Specific Discovery's request for the

administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population, and indicates that the United States will also request those waivers. See First Motion for Specific Discovery Response at 13-14.

With respect to the First Motion for Specific Discovery's request for the list of inmates in the facility that may have been free to move amongst pods, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes. See First Motion for Specific Discovery Response at 14. The First Motion for Specific Discovery Response maintains that the request is overbroad, and lacks specificity as to facility and time period, making it a fishing expedition. See First Motion for Specific Discovery Response at 14.

Regarding the First Motion for Specific Discovery's request for the list of inmates residing in the Department of Corrections, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001, the First Motion for Specific Discovery Response objects pursuant to United States v. Hykes. See First Motion for Specific Discovery Response at 15. Essentially, the First Motion for Specific Discovery Response argues that the request lacks foundation as to materiality, and is merely a fishing expedition into a large pool of "possible witnesses or alternate suspects," with the requested list likely having already been destroyed. First Motion for Specific Discovery Response at 15. The United States counsels the Defendants, however, that it would comply with a specific request for a specific suspect's files. See First Motion for Specific Discovery Response at 15.

Then addressing the First Motion for Specific Discovery's request for the pen pack for Munoz, the First Motion for Specific Discovery Response objects, because the "United States' obligation to disclose impeachment materials has not yet arisen." First Motion for Specific Discovery Response at 16. The First Motion for Specific Discovery Response thereafter

provides that, regarding the request for the log books for the three months before and after March 25, 2001, the New Mexico Corrections Department has destroyed the requested material. <u>See</u> First Motion for Specific Discovery Response at 16.

Turning to the First Motion for Specific Discovery's request for the United States' DNA analyst's notes, electropherograms, and graphs, the First Motion for Specific Discovery Response objects that rule 16 does not render such raw data discoverable. <u>See</u> First Motion for Specific Discovery Response at 16. The First Motion for Specific Discovery Response nonetheless indicates that the United States will comply with the request to the extent the information is in the United States' "possession, custody, or control." First Motion for Specific Discovery Response at 16.

With respect to the First Motion for Specific Discovery's request for copies of the inmate's flyer, otherwise known as their Wanted for Escape/Master Record Entry, the First Motion for Specific Discovery Response objects pursuant to <u>United States v. Hykes</u>, to the extent that the request relates to any other inmates beside F.C. or R.G. <u>See</u> First Motion for Specific Discovery Response at 16-17. The First Motion for Specific Discovery Response then indicates that it does not object to the disclosure of the flyers for F.C. and R.G., and will disclose as much should the New Mexico Corrections Department comply. <u>See</u> First Motion for Specific Discovery Response at 17.

Last, in response to the First Motion for Specific Discovery's request for the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates, the First Motion for Specific Discovery Response indicates that the United States has requested such a "Master Roster," but

that the New Mexico Corrections Department does not know to what the First Motion for Specific Discovery refers.  See First Motion for Specific Discovery Response at 17.

### 3.  **First Motion for Specific Discovery Reply.**

The Defendants who filed the First Motion for Specific Discovery supported their motion with the Reply to United States' Response in Opposition to Defendants' Motion for Specific Discovery, filed July 25, 2016 (Doc. 632)("First Motion for Specific Discovery Reply").  The First Motion for Specific Discovery Reply first explains:

> On June 30, 2016, the government sent a letter to the defense proposing an agreement for the resolution of the discovery motion.  In the letter the government proposed to provide some, but not all, of the discovery requested in return for withdrawal       of       the       motion       for       specific       discovery . . . .   The government did not commit to a date by which the agreed upon materials would be provided.  The government requested a further extension to July 12, 2016 for the defense to consider matters but also requested a response within 24 hours.

First Motion for Specific Discovery Reply at 2.  Then, according to the First Motion for Specific Discovery Reply, defense counsel requested to see the documents before agreeing to withdraw their motion, but the United States did not agree and instead filed their First Motion for Specific Discovery Response.  See First Motion for Specific Discovery Reply at 2-3.  The First Motion for Specific Discovery Reply then argues that,

> as a general matter, the government appears to be mistaken in its analysis of its constitutional obligations.   The duty to review files or material in the government's possession does not turn on the specificity of a defense request. . . . [I]t has been the government's obligations since . . . the indictments . . . to learn of the existence of all related files in the possession of the government, review such files, and disclose exculpatory material.

First Motion for Specific Discovery Reply at 3.

Accordingly, the First Motion for Specific Discovery Reply replies to some of the United States' responses to the Defendants' discovery requests.  Looking first at the request for the

federal investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435, and any other related investigations relating to Counts 1 and 2 -- F.C. and R.G.'s murders -- to which the United States responded it would disclose the earlier investigations to the extent that the Defendants named in Counts 1 and 2 indicate which entailed investigation of Counts 1 and 2; the First Motion for Specific Discovery Reply argues that both investigations fall under the United States' concession.  See First Motion for Specific Discovery Reply at 3-4.  The First Motion for Specific Discovery Reply also maintains that the obligation to disclose the material under this request has existed since the time of the indictment.  See First Motion for Specific Discovery Reply at 3-4.

Turning to the request for criminal history, impeachment materials, and STIU files for Lujan and any other cooperating informant witness, the First Motion for Specific Discovery Reply takes issue with the United States' objection "that the defense has failed to demonstrate any facts, which would indicate they are potential alternate suspects."  First Motion for Specific Discovery Reply at 4.  The First Motion for Specific Discovery Reply thus argues that "Lujan admitted to orchestrating the murders alleged in Counts One and Two," and, "[a]s far as the remaining informants they have all admitted to being SNM members during the times alleged in the indictment."  First Motion for Specific Discovery Reply at 4.  Accordingly, the First Motion for Specific Discovery Reply argues that given the "government's theory of prosecution [that] all such SNM members were part of an . . . enterprise responsible for the murders . . . [,] under the government's theory each of the informants are part of the organized criminal activity."  First Motion for Specific Discovery Reply at 4-5.

Regarding the request for threat-separation listings for F.C. and R.G.'s housing in the penitentiary system, and the request for administrative segregation waivers that F.C. or R.G.

signed authorizing their housing in general population, the First Motion for Specific Discovery Reply acknowledges that the United States has agreed to their disclosure, but has not as of yet made the disclosure.  See First Motion for Specific Discovery Reply at 5.  Thus, the First Motion for Specific Discovery Reply requests that the Court order their disclosure.  See First Motion for Specific Discovery Reply at 5.

With respect to the request for the list of inmates in the facility who may have been free to move amongst pods, and the request for the list of inmates residing in the Corrections Department, Penitentiary of New Mexico-North Facility between January 1, 2001, and March 26, 2001, the First Motion for Specific Discovery Reply replies to the United States' objection that the requests "do not specify a facility or even a time period."  First Motion for Specific Discovery Reply at 5.  The First Motion for Specific Discovery Reply thus provides that it is "requesting a list for the dates of March 25 and 26, 2001 for the Southern New Mexico Correctional Facility.  This is not a fishing expedition . . . ."  First Motion for Specific Discovery Reply at 5.

Addressing the request for the United States' DNA analyst's notes, electropherograms, and graphs, the First Motion for Specific Discovery Reply acknowledges that the United States has agreed to their disclosure, but has not as of yet disclosed them.  See First Motion for Specific Discovery Reply at 5.  Thus, the First Motion for Specific Discovery Reply requests the Court order their disclosure.  See First Motion for Specific Discovery Reply at 5.

The First Motion for Specific Discovery Reply then makes the global request that, in the instances where the United States has agreed to disclosure, the Court order such disclosure within a ten-day timeframe.  See First Motion for Specific Discovery Reply at 6.  The First Motion for Specific Discovery Reply specifically argues that, while much of the requested

material is indeed "impeachment material, which they need not disclose at this time," because of the case's complex nature, it will be impractical to wait until "some short period of time before trial" for the eventual disclosure. First Motion for Specific Discovery Reply at 6. The First Motion for Specific Discovery Reply then concludes with a request for a discovery conference. See First Motion for Specific Discovery Reply at 7.

     **4.     <u>Motion to Compel</u>.**

On September 1, 2016, Montoya filed the Motion to Compel, making specific discovery requests related to the Superseding Indictment's Counts 6 and 7, pertaining to J.M.'s murder. <u>See</u> Motion to Compel at 1. Rodriguez, T. Martinez, Sanchez, Baca, Herrera, and Perez join the Motion to Compel. <u>See</u> Motion to Compel at 1. The Motion to Compel argues that the United States' "case is based almost entirely on the statements of co-defendant Jerry Armenta. Jerry Armenta was an inmate at SNMCF who has admitted, and can be seen on camera, repeatedly stabbing [J.M.]. Mr. Armenta has admitted that his implication of others was done in hopes of improving his own dire legal situation." Motion to Compel at 1-2.

The Motion to Compel thus requests that the United States provide discovery in the form of: (i) the statements of all of the Defendants whom the New Mexico State Police and the prison's STIU interviewed following the murder of J.M.; (ii) video footage from two neighboring pods; (iii) Southern New Mexico and STIU's procedures, log books, and master roster for inmates housed in unit 1A, for the six months before and one month after March 7, 2014; and (iv) impeachment materials and STIU file for Armenta and any other cooperating witness. <u>See</u> Motion to Compel at 2-3. According to the Motion to Compel, the "Prosecution has these materials and due process requires that they be given to the Accused so that they can fairly investigate and defend cases where each is facing life in prison." Motion to Compel at 4.

In support of their discovery requests, the Motion to Compel relies on the United States' duty to review files of the agencies involved in the investigation of this case, and disclose information favorable to all Defendants, pursuant to Kyles v. Whitley, 514 U.S. at 437. The Motion to Compel also references rule 16 and the United States' obligations under the Due Process Clause, and argues that "the standard of the trial court should simply be whether the evidence is favorable to the accused." Motion to Compel at 4 (citing United States v. Sudikoff, 36 F. Supp. 2d at 1196). In conclusion, the Motion to Compel reiterates the case's complexity and again requests this discovery.

    **5.**    **Motion to Compel Response.**

The United States responded to the Motion to Compel with the United States' Response in Opposition to Defendants' Motion to Compel Discovery [Doc. 668], filed September 30, 2016 (Doc. 710)("Motion to Compel Response"). The Motion to Compel Response begins by arguing that "the Discovery Motion advocates for a broad scope of discovery that the Court already concluded . . . [i]s inconsistent with" Brady v. Maryland, 373 U.S. at 87. Motion to Compel Response at 1. Accordingly, the Motion to Compel Response argues, some of the requests are nothing more than fishing expeditions. See Motion to Compel Response at 1. After recapping the case's factual and procedural history, and remaking the arguments that the United States made in its First Motion for Specific Discovery Response regarding the appropriate disclosure standards, the Motion to Compel Response then turns to the specific requests for discovery in the Motion to Compel. See Motion to Compel Response at 3-7 (arguing, generally, that the Court, in United States v. Hykes, 2016 WL 1730125, at *6, rejected the broader pretrial discovery standard announced in United States v. Sudikoff, 36 F. Supp. 2d at 1196).

Regarding the Motion to Compel's request for the statements of all of the Defendants that New Mexico State Police and the prison's STIU interviewed following J.M.'s murder, the Motion to Compel Response explains that the United States has, on March 25, 2016, already disclosed the requested information.  See Motion to Compel Response at 8.  Similarly, with respect to the request for the video footage from two neighboring pods, the Motion to Compel Response explains that the United States disclosed the video from J.M.'s pod on March 14, 2016, and that, after asking the New Mexico Corrections Department about the video for the neighboring pod, that video does not exist.  See Motion to Compel Response at 8.

Then turning to the Motion to Compel's request for Southern New Mexico and STIU's procedures, log books, and master roster for inmates housed in unit 1A, for the six months before and one month after March 7, 2014, the Motion to Compel Response objects, pursuant to United States v. Hykes, to discovery of "SNMCF's procedures for monitoring inmates in housing unit 1A."  Motion to Compel Response at 8.  The Motion to Compel Response argues that the Defendants have not provided a factual basis for the request, or identified how it is favorable and material to their defense, and that the request is thus a fishing expedition.  See Motion to Compel Response at 8-9.  The Motion to Compel Response also opposes discovery of the log books that the Motion to Compel seeks because, the United States argues, the Motion to Compel has not alleged how "seven months[] total" of log books may contain information helpful to their defense or otherwise "material to their guilt or punishment."  Motion to Compel Response at 10.  Last, concerning this request, the Motion to Compel Response argues that a "master roster" does not exist.  Motion to Compel Response at 10.

Regarding the Motion to Compel's request for the impeachment materials and the STIU file for Armenta and for any other cooperating witness, the Motion to Compel Response provides

that such discovery is not appropriate at this time.  See Motion to Compel Response at 11.  The Motion to Compel Response thus objects to this discovery request.  See Motion to Compel Response at 11.

### 6.     Second Motion for Specific Discovery.

Troup, B. Garcia, Alonso, A.A. Garcia, and Perez filed the Second Motion for Specific Discovery, which relates to Count 3 of the Superseding Indictment.  See Second Motion for Specific Discovery at 1-2.  Count 3 regards the murder of inmate F.S., a known informant, who was housed at Southern New Mexico in the "1-A/Blue unit, cell 113."  Second Motion for Specific Discovery at 2.  Administrative proceedings, following the murder, were brought against Troup, Alonso, Clark, A.A. Garcia, R. Hernandez, and four other inmates who are not Defendants in this case.  See Second Motion for Specific Discovery at 2-3.  The Second Motion for Specific Discovery then makes specific discovery requests of the United States.  See Second Motion for Specific Discovery at 3.  These requests are for: (i) unredacted copies of all documents provided in discovery; (ii) all documents in the files bearing case number 281-AQ-62017, as well as all documents in related federal investigations of SNM; (iii) STIU files on all inmates who were at Southern New Mexico on June 16, 2007; (iv) criminal history, impeachment materials, and STIU files for any cooperating informant witness; (v) penitentiary packs for F.S., and all inmates housed in Blue Pod on June 17, 2007; (vi) any and all files, including intelligence materials, concerning SNM and listing suspected and confirmed SNM members and their activities from the time period that SNM was formed to the last date alleged in the Superseding Indictment, February 27, 2016; (vii) any and all files on Los Carnales listing suspected and confirmed members and their activities, specifically including such files for F.S.; (viii) Security Threat Group investigation files for the entire SNM from 1985 until 2016; (ix)

separation listings by the prison system for F.S.; (x) Administrative Segregation waivers that F.S. signed; (xi) the listing of inmates at Southern New Mexico that may have been free to move amongst pods; (xii) log books for the three months before and after June 17, 2007; (xiii) the United States' DNA analyst's notes, electropherograms and graphs; (xiv) copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry; (xv) the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates; (xvi) any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate or affiliate of SNM; and (xvii) any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations.  See Second Motion for Specific Discovery at 3-7.

    In support of the discovery requests, the Second Motion for Specific Discovery argues that rule 16 of the Federal Rules of Criminal Procedure, Kyles v. Whitley, 514 U.S. at 437, Brady v. Maryland, Giglio v. United States, "and other authorities cited herein," counsel the Court to rule in favor of the motion.  Second Motion for Specific Discovery at 7-8.  The Second Motion for Specific Discovery, then, provides the exact same legal arguments that were made in support of the discovery requests in the First Motion for Specific Discovery.  See Second Motion for Specific Discovery at 8-17.  See also First Motion for Specific Discovery at 11-27.  Because the Court has already detailed those arguments regarding the disclosure standard that the Second Motion for Specific Discovery Defendants propose, supra in the procedural background section for the First Motion for Specific Discovery, the Court will not again describe the arguments, as

they use the exact same wording.  <u>See</u> Second Motion for Specific Discovery at 8-17.  The Second Motion for Specific Discovery concludes, with the exact same wording from the First Motion for Specific Discovery's conclusion, by imploring the Court to "use its inherent power to order the requested discovery," and to "control its docket to ensure that cases before the court are handled efficiently and fairly, as well as" in accordance with "Rule 16 of the Federal Rules of Civil Procedure and" <u>Brady v. Maryland</u>.  Second Motion for Specific Discovery at 16.

       **7.**      **<u>Second Motion for Specific Discovery Response</u>.**

       The United States responded to the Second Motion for Specific Discovery with the United States' Response in Opposition to Defendants' Motion for Specific Discovery [Doc. 678], filed September 22, 2016 (Doc. 694)("Second Motion for Specific Discovery Response").  As it did in the First Motion for Specific Discovery Response, the United States, in the Second Motion for Specific Discovery Response, argues that the requests are for a broad range of discovery to which neither the Federal Rules of Criminal Procedure nor the United States Constitution entitles them.  <u>See</u> Second Motion for Specific Discovery Response at 1.  Accordingly, the Second Motion for Specific Discovery Response characterizes most of the Second Motion for Specific Discovery's requests as being part of a fishing expedition that the law does not authorize.  <u>See</u> Second Motion for Specific Discovery Response at 1.

       After a brief recap of the factual allegations underlying Count 3, the Second Motion for Specific Discovery Response then reiterates its arguments relating to the standard for discovery. <u>See</u> Second Motion for Specific Discovery Response at 2-5. As the Second Motion for Specific Discovery did, the United States makes much of the same legal argument that it makes in its briefing for the First Motion for Specific Discovery.  <u>See</u> Second Motion for Specific Discovery Response at 3-8.  In essence, the United States relies on <u>United States v. Hykes</u>, whereas the

Second Motion for Specific Discovery relies on United States v. Sudikoff, and the Second Motion for Specific Discovery Response thus argues that "to show that certain materials should be disclosed, the Defendants must demonstrate specific facts that support that the requested discovery may contain material information." Second Motion for Specific Discovery Response at 7. The Second Motion for Specific Discovery Response then takes the Defendants' requests in turn. See Second Motion for Specific Discovery Response at 8-16.

Regarding the Second Motion for Specific Discovery's first request for unredacted copies of all documents provided in discovery, the Second Motion for Specific Discovery Response opposes that request out of concern for the safety of "alleged co-conspirators, who are frequently ear-witnesses and/or eye-witnesses," particularly where SNM is concerned. See Second Motion for Specific Discovery Response at 8-9. Further, the Second Motion for Specific Discovery Response contends that "Defendants here have not come forth with any clear explanation or specific information they seek that may show that the testimony of the CI could be highly significant to the United States' charges and their defenses." Second Motion for Specific Discovery Response at 8-9 (internal quotation marks and alterations omitted). The United States, accordingly, objects to the Second Motion for Specific Discovery's "generic" request. Second Motion for Specific Discovery Response at 9.

With respect to the Second Motion for Specific Discovery's request for all documents in the files bearing the case number 281-AQ-62017, as well as all documents in related federal investigations of SNM, the Second Motion for Specific Discovery Response incorporates its response to the similar discovery request that the First Motion for Specific Discovery makes -- that being that, to the extent that any Defendant makes a specific showing that Count 3 is addressed in related federal investigations, they may have that discovery; but, as it pertains to

case number 281-AQ-62017, it is still too early in the prosecution for disclosure. See Second Motion for Specific Discovery Response at 9. The Second Motion for Specific Discovery Response then makes a blanket argument that this request, as well of many of those that follow, are overly broad and require specific facts supporting the requests for documents in these broader files contain information to which the Second Motion for Specific Discovery Defendants are entitled. See Second Motion for Specific Discovery Response at 10.

Then turning to the Second Motion for Specific Discovery's request for STIU files on all inmates who were at Southern New Mexico on June 16, 2007, the Second Motion for Specific Discovery Response reiterates its opposition to such a request in the First Motion for Specific Discovery Response, characterizing the requests as overly broad and as a fishing expedition. See Second Motion for Specific Discovery Response at 10. The United States thus opposes this request. See Second Motion for Specific Discovery Response at 10.

The United States then incorporates its responses from the First Motion for Specific Discovery Response, and addresses the Second Motion for Specific Discovery's requests for criminal history, impeachment materials, and STIU files for any cooperating informant witness, and for pen packs for F.S. and for all inmates housed in Blue Pod on June 17, 2007. See Second Motion for Specific Discovery Response at 11. Accordingly, the United States opposes the request for criminal history, impeachment materials, and STIU files for any cooperating informant witness, because of a blanket concern for the safety of confidential informants, whom SNM has a history of targeting; and opposes disclosing pen packs for F.S. and for all inmates housed in Blue Pod on June 17, 2007, because, these packs are created by information on the public record. See Second Motion for Specific Discovery Response at 11.

Regarding the Second Motion for Specific Discovery's requests for any and all files, including intelligence materials, concerning SNM listing suspected and confirmed members, and their activities, from the time period that SNM was formed to the last date the Superseding Indictment alleges, February 27, 2016, and for any and all files on Los Carnales listing suspected and confirmed members and their activities, specifically including such files for F.S., the Second Motion for Specific Discovery Response argues that the United States has already responded to the same requests in the First Motion for Specific Discovery Response and, accordingly, continues to oppose the requests. See Second Motion for Specific Discovery Response at 11-12. The United States explains that the requests are nothing more than an overly broad fishing expedition and that the Second Motion for Specific Discovery has not demonstrated that there is anything specific amongst those files which may be material to the defense. See Second Motion for Specific Discovery Response at 11-12.

Turning to the Second Motion for Specific Discovery's request for Security Threat Group investigation files for the entire SNM from 1985 to 2016, the Second Motion for Specific Discovery Response argues that the request -- like the majority of the Second Motion for Specific Discovery's requests -- is overly broad, and fails to explain how the broad swath of files contains information that is material and favorable to them. See Second Motion for Specific Discovery Response at 12. The United States also argues that the information contained in these files may be sensitive and, in the interest of safety, further opposes the request. See Second Motion for Specific Discovery Response at 12.

With respect to the Second Motion for Specific Discovery's requests for separation listings by the prison system for F.S. and for Administrative Segregation waivers that F.S. signed, the Second Motion for Specific Discovery Response indicates that the United States will

comply with the requests.  See Second Motion for Specific Discovery Response at 12-13. Accordingly, to the extent the items of discovery exist, the United States agrees, if possible, to obtain them and disclose them.  See Second Motion for Specific Discovery Response at 13.

Regarding the Second Motion for Specific Discovery's request for the listing of inmates at Southern New Mexico that may have been free to move amongst pods, the Second Motion for Specific Discovery Response maintains that such a request is overly broad in light of United States v. Hykes.  See Second Motion for Specific Discovery Response at 13-14.  Accordingly, the United States opposes the request.  See Second Motion for Specific Discovery Response at 13-14.

Next, addressing the Second Motion for Specific Discovery's request for log books for the three months before and after June 17, 2007, the Second Motion for Specific Discovery Response maintains that the log books from this time period have been destroyed.  See Second Motion for Specific Discovery Response at 14.  The Second Motion for Specific Discovery Response goes on to provide, however, that the log books from the day of the murder are being, or have been, disclosed.  See Second Motion for Specific Discovery Response at 14.

The Second Motion for Specific Discovery Response then indicates that, with respect to the request for the United States' DNA analyst's notes, electropherograms and graphs, the United States will comply and produce the information.  See Second Motion for Specific Discovery Response at 14.  Regarding the Defendants' request for copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry, the Second Motion for Specific Discovery Response similarly indicates that it will comply with the request as it specifically pertains to F.S.  See Second Motion for Specific Discovery Response at 14-15.  With respect to the Second Motion for Specific Discovery's request for the Security Threat Group

"Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates, the United States, as it did in the First Motion for Specific Discovery Response, maintains that such an item does not exist. <u>See</u> Second Motion for Specific Discovery Response at 15.

Last, turning to the Second Motion for Specific Discovery's requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM, and for any and all documents in the United States' possession relating to the philosophy, practices, and activities of SNM in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations -- the Second Motion for Specific Discovery Response once more argues that such requests are overbroad fishing expeditions which have not specifically shown how any information contained within might be favorable or material to their defense. <u>See</u> Second Motion for Specific Discovery Response at 15-16. Accordingly, the Second Motion for Specific Discovery Response opposes the requests in light of <u>United States v. Hykes,</u> and then concludes.

### 8.  <u>Second Motion for Specific Discovery Reply</u>.

Troup replied to the Second Motion for Specific Discovery Response with Edward Troup's Reply to United States' Response in Opposition to Defendants' Motion for Specific Discovery (Doc. 694), filed September 30, 2016 (Doc. 712)("Second Motion for Specific Discovery Reply"). With respect to the legal argument, the Second Motion for Specific Discovery Reply seeks to explain that

> [t]he burden of materiality under Rule 16 is not high. The materiality standard under Rule 16 normally is not a heavy burden; rather, evidence is material as long

as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.

Second Motion for Specific Discovery Reply at 4.  Additionally, with respect to United States v. Hykes, in particular, the Second Motion for Specific Discovery Reply asks that, "for the purpose of this complex case, the Court should revisit its prior rulings declining to apply a prospective materiality analysis for *Brady* information."  Second Motion for Specific Discovery Reply at 5.

The Second Motion for Specific Discovery Reply then turns to each of the specific requests for discovery.  For the request for unredacted copies of all documents provided in discovery, the Second Motion for Specific Discovery Reply argues that Troup has not been demonstrated as a danger and that thus the "government's vague assertions about witness safety should fall on deaf ears."  Second Motion for Specific Discovery Reply at 11.  The Second Motion for Specific Discovery Reply thus stands by this request.  See Second Motion for Specific Discovery Reply at 11.  Regarding the request for all documents in the files bearing case number 281-AQ-62017, as well as all documents in related federal investigations of SNM, the Second Motion for Specific Discovery Reply argues that "[t]here were many years of investigation prior to the opening" of the prosecution leading to the charges in this case, and that, "[s]urely, there is information in the previous investigations that is material to the preparation of Mr. Troup's defense, especially where the indictment is so broad and far-ranging."  Second Motion for Specific Discovery Reply at 11-13.  Accordingly, the Second Motion for Specific Discovery Reply maintains that "[r]ight now there are certain things that Mr. Troup knows the government possesses even if he does not know the exact contents."  Second Motion for Specific Discovery Reply at 13.

With respect to the request for STIU files on all inmates who were at Southern New Mexico on June 16, 2007, the Second Motion for Specific Discovery Reply argues that this is not a fishing expedition, as the United States characterizes it, because, it relates to a single day -- that being the day of the murder.  See Second Motion for Specific Discovery Reply at 11-13.  With respect to the request for criminal history, impeachment materials, and STIU files for any cooperating informant witness, the Second Motion for Specific Discovery Reply argues that these requests are not a fishing expedition, because the information sought is "the government's case. . . .  [T]he only evidence against Mr. Troup appears to be the statements of cooperating government informants."  Second Motion for Specific Discovery Reply at 14.  Accordingly, the Second Motion for Specific Discovery Reply argues: "Where the government's case rests on the credibility of informants, it is essential that the government disclose information about those informants in a timely manner . . . ."  Second Motion for Specific Discovery Reply at 14-15.

Turning to the request for pen packs for F.S., and for all inmates housed in Blue Pod on June 17, 2007, the Second Motion for Specific Discovery Reply argues that the United States has the information, it is material to the defense's preparation, and that, thus, it must be disclosed.  See Second Motion for Specific Discovery Reply at 16.  Thus, according to the Second Motion for Specific Discovery Defendants, the United States' objection to this request, that being that it is public record, amounts to gamesmanship.  See Second Motion for Specific Discovery Reply at 16.  Regarding the request for any and all files, including intelligence materials, concerning SNM listing suspected and confirmed members, and their activities, from the time period that SNM was formed to the last date the Superseding Indictment alleges, February 27, 2016, to which the United States objects on overbreadth grounds, the Second Motion for Specific Discovery Reply argues that the breadth of the request simply matches the Superseding

Indictment's breadth.  See Second Motion for Specific Discovery Reply at 16-18 ("Mr. Troup does not seek to send the government fishing for anything.  He wants it to produce what he knows it has.").  For the request for any and all files on Los Carnales listing suspected and confirmed members, and their activities, specifically including such files for F.S., the Second Motion for Specific Discovery Reply argues that the Superseding Indictment specifically references gang wars, making this information likely to aid Troup in identifying alternate specifics.  See Second Motion for Specific Discovery Reply at 18.

Regarding the request for Security Threat Group investigation files for the entire SNM from 1985 until 2016, the Second Motion for Specific Discovery Reply takes issue with the United States' objection for overbreadth and also for sensitivity, providing that, "[t]o the extent that specific [safety] concerns do exist[], the government can certainly explain that information and seek another more specific protective order."  Second Motion for Specific Discovery Reply at 19.  Next, even though the United States agreed to comply with the requests for separation listings by the prison system for F.S., and for Administrative Segregation waivers that F.S. signed, the Second Motion for Specific Discovery Reply details its displeasure with the United States' choice to hedge its agreement by saying "only if NMCD agrees to allow the United States to obtain the listing."  Second Motion for Specific Discovery Reply at 19-21.  In support, the Second Motion for Specific Discovery Reply argues that "[t]here can be no doubt that this was and is a joint investigation between state and federal authorities.  There can also be no question that the government has access to all documents in NMCD possession, custody, or control."  Second Motion for Specific Discovery Reply at 19-21.

With respect to the request for the listing of inmates at Southern New Mexico who may have been free to move amongst pods, the Second Motion for Specific Discovery Reply

recognizes its overbreadth and instead now specifically requests this information only for Southern New Mexico on July 16 and 17, 2007.  See Second Motion for Specific Discovery Reply at 21.  Regarding the request for copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry, which the Second Motion for Specific Discovery Reply acknowledges the United States will disclose as to F.S., the Second Motion for Specific Discovery Reply further indicates that the Defendants seek these flyers for all inmates at SNMCF on July 16 and 17, 2007.  See Second Motion for Specific Discovery Reply at 21-23. The Defendants also argue that the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates -- which the United States alleges does not exist -- exists.  See Second Motion for Specific Discovery Reply at 23-24.  It exists, Troup argues, because "an NMCD employee provided the SNM organization with . . . 2) Master roster . . . ."  Second Motion for Specific Discovery Reply at 24 (citing Full Investigation entry for Case 281D-AQ-54711-302 (dated September 25, 2001), filed September 20, 2016 (Doc. 712-4)).  Last, regarding the requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM, and any and all documents in the United States' possession relating to the philosophy, practices, and activities of SNM in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations -- the Second Motion for Specific Discovery Reply maintains that the information is material, and in the United States' possession, custody, and control -- i.e., it must be disclosed.  See Second Motion for Specific Discovery Reply at 24-25.

- 39 -

9.     **The October 4, 2016, Hearing**.

The Court held a hearing on October 4, 2016.  See Transcript of Hearing, taken October 4, 2016 (Doc. 743)("Tr.").   The Court began with argument on the Motion to Compel, specifically the Motion to Compel's request for the statements of all the Defendants whom the New Mexico State Police and the prison's STIU interviewed following J.M.'s murder.  See Tr. at 13:6-11 (Strickland).   Despite acknowledging that the United States has indicated that it has disclosed that information, the Motion to Compel Defendants argued that neither Mr. Aoki -- the discovery coordinator who receives discovery and distributes it to Defendants on tablets -- nor they, had received all of the requested interviews.  See Tr. at 1:1-15:09 (Strickland).  The United States then indicated that it would try to send them again, and the Court ordered it be done within fourteen days.  See Tr. at 15:10-16:3 (Beck, Court).   Argument then turned to the request for video footage from two neighboring pods; the Motion to Compel Defendants indicated that they had received video footage for the pod where the murder occurred, but then requested once more that the United States check with the STIU and with the state police to ensure that the video from the neighboring pod does not exist.  See Tr. at 16:18-23 (Strickland).  The United States agreed, and the Court ordered that it check with the FBI, the STIU, and the state police.  See Tr. at 17:1-8 (Beck, Court).

The Motion to Compel Defendants then explained the background giving rise to their request for the impeachment materials and STIU file for Armenta, and any other cooperating witness, which is that, essentially, Armenta -- a witness linking the Motion to Compel Defendants to this jail-homicide -- had given a number of inconsistent stories surrounding the homicide of J.M. underlying Counts 6 and 7.  See Tr. at 17:9-18:16 (Strickland).  In response, the United States argued that the United States is "aware of its obligations . . . with regard to . . .

impeachment material," and that it is "open and agreeable to producing the Jencks and impeachment material two weeks before trial, even though our obligation is not to do so until trial." See Tr. at 18:21-19:18 (Beck). The United States then explained that its ability to uncover STIU's files is less so than the Defendants would have the Court believe, because, while they have a close relationship with the New Mexico Corrections Department, the STIU is a distinct entity within the Department. See Tr. at 19:25-21:24 (Beck). The United States also indicated that "NMCD has been very good about getting the requested information. So I think with regard to files, like STIU files, that may contain some information about the defendants or other inmates, I think if we called on the phone they would work with us to get their hands on it." Tr. at 21:25-22:6 (Beck). Accordingly, the Court ruled that STIU's files were in the possession, custody, and control of the United States, and that the Court was not "going to require any Jencks material to be produced before the 14 days," but that "I am going to require early Brady review of these materials by the Government. . . . You've got to produce the Brady material promptly, immediately." Tr. at 23:2-19 (Court). The Motion to Compel Defendants responded to the Court's ruling by indicating that "I'm only moving under Rule 16 at this point. . . . Brady and Jencks aren't the only ways to get impeachment materials. . . . [A]nd 14 days before trial is totally insufficient." Tr. at 24:2-8 (Strickland). The Court commiserated, and encouraged the United States to disclose "as soon as it can," "[b]ut I'm not going to order them to do it more than they have on Jencks material." Tr. at 25:24-26:2 (Court). Further, the Court provided, "if it's Brady material, if it's DNA and those sort of things, and they fall into the Brady category -- I'm talking about just Jencks material you can wait on." Tr. at 26:3-26:12 (Court). The Motion to Compel Defendants last addressed a discovery request for the DNA analysis, notes, electropherograms, and notes -- which they argued includes the hard data -- to which the United

States responded that they had produced everything but also indicated that they would "go back and see if the DNA was in there. And if it wasn't we will go back to the State and ask for that." Tr. at 29:3-13 (Beck).

The parties then argued about the extent to which the United States Attorney's Office had possession, custody, and control of the information that the various state agencies investigating this case have. See Tr. at 25:24-26:2 (Beck, Strickland, Court). The Court addressed the Motion to Compel Defendants and stated that it was not inclined to "think that the State Police's files are in the United States' possession, custody, or control. So I think they made a representation they've turned over everything that they have. But if you don't think that they've gotten everything, you're going to have to go to the State Police." Tr. at 32:25-33:8 (Court). The Motion to Compel Defendants then turned the argument to the request for the procedures, log books, and master roster from Southern New Mexico and STIU for inmates housed in unit 1A for the six months before and one month after March 7, 2014. See Tr. at 33:9-16 (Strickland, Court). The Court inquired why the Motion to Compel Defendants needed seven months, and the Motion to Compel Defendants replied that the homicide victim had "ongoing disputes," and that they thus wanted to review the log books to "potentially develop other motives . . . and potentially other suspects." Tr. at 33:17-35:3 (Strickland). The Court compromised and ordered that the United States produce the log books for three weeks before and three days after the incident, denying the request "without prejudice" in case those produced log books show something that might require further production. Tr. at 36:12-25 (Court). The Court similarly ordered production of the New Mexico Corrections Department procedures, i.e., the procedures regarding how the log books are put together, for that same time period, assuming that the New Mexico Corrections Department complies with the United States' rule 17 subpoena. See Tr. at

37:21-40:6 (Court).  Regarding the "master roster" the Court requested that the parties "look and see if there is anything that gives any sort of indication that they were having an ongoing dispute, and I think that should be produced. . . .  If it doesn't exist, tell Ms. Strickland that you did the review and could not find any support in whatever this master roster is, and indicate that it didn't produce any information that is relevant."  Tr. at 39:21-41:6 (Court).

Turning next to the First Motion for Specific Discovery, the First Motion for Specific Discovery Defendants first indicated that they were all adopting the others' arguments unless they specifically objected.  See Tr. at 44:23-45:5 (Castle).  The First Motion for Specific Discovery Defendants then argued:

> The way I look at it is really three layers of disclosure.  At its base we have what the due process clause requires, either in the Brady, Giglio, Kyles progeny.  The next layer, which is broader, which is Rule 16.  And then, finally, there is a third layer, which we haven't talked about today, which is -- but I think the Court has exercised -- which is disclosure to the Court in its supervisory power can order, because it's appropriate for the particular case. . . .  [I]f the Court in its discretion orders disclosure in a particular area today, then we don't even need to address the Rule 16 and Brady issues, because it's a broader concept.  And this is not -- the Court doesn't need to exercise its discretion in an ordinary criminal case, because Rule 16, Brady pretty much protect everybody in your ordinary criminal case.  But this is not the ordinary criminal case.  This is a case that -- it probably is the largest criminal prosecution in the history of this district, and probably one of the largest criminal prosecutions in this country at this time.  And the reason that's important is because, when we look at a prosecutor in a normal criminal case, it's fairly easy for them to identify what is Brady material, what is Giglio material, what is Rule 16 material.

Tr. at 46:11-47:17 (Castle).  Here, however, the First Motion for Specific Discovery Defendants argued, the United States has thus far "not been that good at analyzing" the potential defenses, and thus "think that the Court should, in this extraordinary situation, order more discovery than it would otherwise."  Tr. at 47:18-48:23 (Castle).  Further, the First Motion for Specific Discovery Defendants also indicated that the two-weeks-before trial date, when the United States intends to disclose impeachment materials and the like, is not going to be sufficient.  See Tr. at 50:10-19

(Castle).  Speaking generally, the First Motion for Specific Discovery Defendants reiterated their contention that "the investigating agencies are . . . under the umbrella of the prosecution," because the relevant "governmental agenc[ies are] closely aligned with the prosecution."  Tr. at 52:10-25 (Castle).  In support, the Defendants discussed how the "New Mexico Department of Corrections investigated, and so did the State. . . .  So I would suggest that if there is a case where we look to see whether the New Mexico Corrections Department or these local law enforcement agencies are closely aligned with the prosecution, this is the case."  Tr. at 55:3-56:1 (Castle).

At this point, the First Motion for Specific Discovery Defendants began argument that "urg[ed] the Court to consider using a different standard" with respect to the application of "Sudikoff" instead of the Court's allegedly sea-changing decision in United States v. Hykes for criminal discovery matters.  Tr. at 59:11-19 (Castle).  Essentially, the Defendants argue that

> the Brady materiality standard is not useful in this context. . . .  And so we're encouraging the Court to use a different standard.  And I believe the possible exculpatory standard taken by . . . the Sudikoff case, works so that a prosecutor doesn't have to guess what the effect of that piece of evidence is going to be at trial that hasn't occurred in the context of a defense that they haven't seen.  It allows a prosecutor a much cleaner line, which is to look at particular evidence and say, is it possibly exculpatory?  Is there a chance that this is going to be something that would be of value to the defense?  Then you provide it.

Tr. at 59:23-61:17 (Castle).  Accordingly, with respect to the "last prong of Brady," materiality, the First Motion for Specific Discovery Defendants argued that "there is a difference between what needs to be disclosed under the Due Process Clause, and what will result in a reversal under the Due Process Clause."  Tr. at 62:1-13 (Castle).

The Court then addressed this discussion of its decision in United States v. Hykes, providing:

I'm not sure that Hykes . . . [i]s really a sea change in the way I've done things. I think Hykes is a little bit of a reaction to Kozinski's opinion, or article. It's a reaction to what Pregerson has done in the [c]entral [d]istrict. I think it was probably good that it was done in another case without all the pressure of this. I guess, probably, I'm not inclined to reconsider it. It seems to me those guys have a particular view of Brady violations that I don't quite share. And they're throwing out a lot of law to get there, is sort of my thoughts on that. And so I'm going to take a fresh look at it. You have my word on that. But that was some work I did over the summer, so it's fairly fresh on my mind. So I'm not likely to reconsider it. But, at the same time, I think what you see is, in the other opinions, you know, I take a fairly liberal view of rule 16, take a fairly liberal view of Brady, fairly liberal view of Jencks material, both in my in camera reviews and working with the U.S. Attorney's Office here. So if that's of guidance to anybody, that's the way I see myself.

Tr. at 65:17-66:19 (Court).

The United States then argued, and conceded that "this is a joint investigation" with either of the "STIU, NMCD, or the FBI." Tr. at 67:1-14 (Beck). The United States then "pointed the Court to its decision in Hykes," in particular "Footnote 12 at page 19 to 20," which, in the United States' words, reads: "The Court consistently stated that it cannot require the United States to get documents from third parties or to seek documents that refuse access to the United States." Tr. at 67:15-23 (Beck). The United States also argued that "[i]n Hykes I think the Court takes a little bit more nuanced of a position . . . in requiring some sort of factual demonstration that requested materials contain information that is properly discoverable under rule 16, or properly disclosed under Brady." Tr. at 69:18-23 (Beck). Regarding United States v. Hykes, the United States intimated that,

in that case, it was -- I understand it was a motion to disclose Giglio material. . . . the defendant came forth with known excessive force cases that three BCSO officers, who were involved in arrest of that defendant, had been in. So I submit to the Court that . . . it's vastly different to come and ask for 600 STIU files and everything in there, versus asking for three personnel files and pointing to specific facts.

Tr. at 70:1-11 (Beck).

The First Motion for Specific Discovery Defendants then took up argument once more, and, after pressing that this prosecution's size is primarily a consequence of the span of years the Superseding Indictment charges, addressed their specific discovery requests. See Tr. at 71:22-72:1 (Castle). With respect to the First Motion for Specific Discovery's first request, for a prior interview of Lujan, coming before August 8, 2007, the United States agreed to produce the statements from that prior interview if they were able to find it. See Tr. at 73:2-75:11 (Castle, Beck). The United States also reiterated that it would produce everything that the Court orders at the hearing within fourteen days, whenever possible. See Tr. at 75:17-24 (Beck). For anything related to production of DNA, however, the United States indicated that -- because that request entails production of DNA results and hard data underlying those results, it may take longer, if it is even feasible. See Tr. at 76:21-77:6 (Beck). The United States also indicated that, again, it is going to be at the State of New Mexico's whims for these DNA reports and that it may not get the hard data. See Tr. at 76:21-77:6 (Beck). The Court ruled that the United States would need to try what it could, and if it could not get everything related to the DNA, get what it could and alert Mr. Castle. See Tr. at 77:10-16 (Court).

The parties next turned to the First Motion for Specific Discovery's request regarding discovery from the previous FBI investigation files related to SNM. See Tr. at 78:2-22 (Castle). The United States indicated that it had, for the more recent investigations, complied and produced the materials; yet, for the "significantly older" files, the United States indicated that it would go back and review them for Rule 16 and Brady obligations, using the Court's "liberal Rule 16 and Brady eyes." Tr. at 78:25-79:11 (Beck, Court). The First Motion for Specific Discovery Defendants then limited their admittedly broad request for all STIU files for inmates at Southern New Mexico, instead requesting just those for those inmates in the relevant cell

blocks whom the United States had indicated were suspects in the alleged murders.  See Tr. at 79:14-24 (Castle).  The United States agreed and indicated, to the extent STIU would produce the materials, it would "review these with your Honor's liberal standard in mind and produce Rule 16 materials."  Tr. at 81:25-82:11 (Beck).  Still at issue was the request for Lujan's STIU file, which the United States intended to treat like the rest of the STIU files, because, unlike what the First Motion for Specific Discovery Defendants are asserting, Lujan is not a cooperating government witness.  See Tr. at 82:23-83:9 (Beck).  The Court then reiterated the order to additionally look at Lujan's STIU file for Brady and rule 16 information.  See Tr. at 85:3-4 (Court).

The parties then noted that the United States had complied with the First Motion for Specific Discovery's requests for the seperatee listing for the murder victims, the victim's segregation waivers, and a wanted-for-escape master record entry, or soon would be complying. See Tr. at 85:20-87:3 (Castle).  The discussion then turned to the request for the log books, which the United States argued had been destroyed pursuant to administrative protocol, and the First Motion for Specific Discovery Defendants changed their request to being when precisely those log books were destroyed given the fact that SNM has been under investigation, as of at least 2007, making it odd that the relevant log books had not been preserved.  See Tr. at 89:9-16 (Castle).  The United States agreed to inquire as to the destruction's date.  See Tr. at 89:19-22 (Beck).

The First Motion for Specific Discovery Defendants then pressed the issue of pen packs, at which point the United States indicated that "we've conceded that we will provide the victims' pen packs.  We'll also provide all of the defendants' pen packs," thereby addressing this discovery request.  Tr. at 91:11-13 (Beck).  The United States further took the opportunity to

remind the Court that its contention was that "there is a difference, from our standpoint . . . between documents involved in this investigation and STIU files outside of this investigation." Tr. at 93:12-22 (Beck).  The First Motion for Specific Discovery Defendants next addressed their request in the First Motion for Specific Discovery relating to any and all files, including intelligence materials, for SNM.  See Tr. at 94:2-19 (Castle). The Court, upon hearing the parties' arguments relating to the numerous federal and state investigation files covering SNM, ruled that for the state investigation files, with there potentially being up to "600," the United States will take those "one at a time."  Tr. at 107:18-108:4 (Court).  That ruling means, the Court indicated, that where it is brought to the United States' attention that one of those files is of importance to the defense, it would investigate and produce the files to the First Motion for Specific Discovery Defendants.  See Tr. at 107:18-108:4 (Court).  For the federal investigations, however, the United States stated: "[T]hey're saying they know of five.  They're going to do the Brady and Rule 16 review of those files. . . .  And then we have a little bit of dynamic process to go with the state files."  Tr. at 108:13-17 (Court).  Further, with respect to how closely the United States needs to look at these files, the Court reminded the United States that it "takes a human being sitting there putting their feet in the defense lawyers' shoes and saying, 'Could I use this?'"  Tr. at 111:2-18 (Court).

The First Motion for Specific Discovery Defendants then turned to their last request of the First Request for Specific Discovery, which is for the list of inmates at the PNM North facility between January 1, 2001, and March 26, 2001.  See Tr. at 111:21-25 (Castle).  The United States contested this request, however, and indicated that it was only willing to produce names for the day of the murder, March 26, 2001, so the First Motion for Specific Discovery Defendants may have a list of alternate suspects.  See Tr. at 112:1-12 (Beck).  The First Motion

for Specific Discovery Defendants indicated that part of the reason for their response's breadth was because there had been a meeting "in 2001[;] while in the custody of New Mexico Corrections Department, Frederico Munoz attended a meeting with SNM gang leaders, in which hits were placed on the two victims in this case."  Tr. at 113:8-19 (Castle).  The Court, accordingly, ordered that "we find out the date of the meeting, and back it up two weeks.  And then it will be the list of the inmates two weeks before that meeting, up to March 26."  Tr. at 116:1-5 (Court).  After some further discussion, the Court pushed the discovery to three days after the March 26 murder, and ordered that the United States would have "30 days" on this production. Tr. at 118:2-7 (Court).

The Court then took argument from the other First Motion for Specific Discovery Defendants that had joined the First Motion for Specific Discovery.  See Tr. at 120:13-15 (Court).  Troup requested that the United States produce a pen pack for an alternate suspect in one of the murders named "Lawrence Torrez."  Tr. at 121:21-25 (Harbour-Valdez).  The Court ordered the United States to include that pen pack in its disclosures.  See Tr. at 122:6-7 (Court). Baca then explained to the Court that it would be prudent for the United States, when it is doing its discovery review, to consider that one of the theories for the Defendants "banding together" might be that they needed protection from the deplorable conditions in the New Mexico prison system which had led to an outburst of "intergang warfare."  Tr. at 122:1-124:13 (Lowry).  Perez then requested that the Court adjust some of its discovery rulings for the First Motion for Specific Discovery -- which relates to Counts 1 and 2 of the Superseding Indictment, the murder of F.C. and R.G -- and apply them to its rulings on the Motion to Compel -- which relates to Counts 6 and 7 of the Superseding Indictment, the conspiracy to murder and murder of J.M.  See Tr. at 125:6-11 (Villa).  The Court agreed to order the United States to review STIU files in the

same manner as it had already ruled, order the United States to produce the pen packs for the victim in Counts 6 and 7, and order the United States to produce the list of inmates' names in Southern New Mexico's pods 1A and 1B two weeks before, and three days after, the murder of J.M. underlying Counts 6 and 7. See Tr. at 125:25-130:16 (Court, Villa). Baca then requested, and the Court ordered, that the United States produce the list of inmates housed at PNM North on the date of the murder underlying Counts 6 and 7. See Tr. at 132:24-133:7 (Court, Lowry). The Court then concluded the argument on the First Motion for Specific Discovery and turned to the Second Motion for Specific Discovery. See Tr. at 133:22-25 (Court).

The first request that the Second Motion for Specific Discovery Defendants addressed during argument on the Second Motion for Specific Discovery was unredacted copies of all documents produced to date. See Tr. at 141:6-14 (Burke). After the United States indicated that any redaction related to the identity of a confidential informant or cooperator, and that the Court would need to "take these one at a time and make the showing . . . that's necessary for the Court to order disclosure," Tr. at 142:21-24 (Court), the Second Motion for Specific Discovery Defendants dropped the request, leaving it for another day, see Tr. at 143:2-4 (Burke). The parties next addressed the Second Motion for Specific Discovery's request for STIU files for all inmates at Southern New Mexico on June 16, 2007. See Tr. at 145:1-5 (Burke). The United States clarified what the Court had ordered, and what the United States was going to do, with the STIU file requests:

> [W]e've agreed to review the STIU files for the defendants. And we've agreed to review the STIU files for the list of suspects that were identified by Mr. Castle in the first specific discovery motion. We've agreed to review the STIU files for the suspects I believe Mr. Villa will point out to us from the second discovery motion [sic]. . . . So that same thing would go here. We will still review the defendants' STIU files . . . but we have not been provided any information on other suspects, and we have not agreed to review the STIU files on all inmates who are on SNM CF on June 16, 2007."

Tr. at 145:6-21 (Beck).  The Court decided not the change its rulings and denied the Second

Motion for Specific Discovery Defendants' requests.  See Tr. at 146:3-4 (Court).

The United States then addressed the Second Motion for Specific Discovery's request for

pen packs for all inmates "housed in the blue pod on June 17," see Tr. at 141:14-19 (Burke),

arguing that "the way that we've been viewing it is that, like the STIU files, if the defendant or

the defendants have specific suspects they believe, we would request of New Mexico Corrections

Department, if those exist, that they turn them over," Tr. at 147:1-11 (Beck).  The Court agreed.

See Tr. at 147:16-19 (Court).  The Second Motion for Specific Discovery Defendants next

argued in favor of their request in the Second Motion for Specific Discovery for the New Mexico

Corrections' Department's "guidelines for assessing, classifying, and validating an inmate,"

which would help the Second Motion for Specific Discovery Defendants understand how

inmates were classified as SNM.  Tr. at 148:7-15 (Burke).  The United States objected to this

request, because, first, "I don't think we have custody or control over those specific regulations

and guidelines, as opposed to actual files," and second, the request "does not fall under Rule 16."

Tr. at 149:1-13 (Beck).  According to the Second Motion for Specific Discovery Defendants,

"they shouldn't be permitted to testify that so and so is a member of a gang if they're not willing

to tell us what the criteria is for membership."  Tr. at 149:13-17 (Burke).  The Court concluded

that, "if you're going to have corrections people come in and say Mr. Baca is a member of the

SNM gang, then I guess I do think you should produce something that indicates how they make

that determination."  Tr. at 150:6-10 (Court).  The Court also concluded that "if . . . you're going

to have an expert do it . . . then I would be inclined to deny the request.  So at the present time

I'll deny the request."  Tr. at 150:11-19 (Court).

The next Second Motion for Specific Discovery request is the master roster, which a confidential source stated exists and is in the possession of one "Geraldine Martinez," and which the United States maintained they had requested from the New Mexico Department of Corrections, but to no avail.  Tr. at 152:8-155:2 (Beck, Burke).  The Court ruled that "if the representation at the present time is the Government cannot locate this document, then I have to deny the request.  I would like the Government to poke around a little bit more."  Tr. at 155:3-6 (Court).  The Court also stated "why don't we also try to have the FBI locate Geraldine Martinez, and put that document in front of her . . . ."  Tr. at 155:16-21 (Court).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE
## IN CRIMINAL CASES

In Brady v. Maryland, the Supreme Court of the United States explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87 ("Brady").  In Giglio v. United States, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153 ("Giglio"); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different.'"  Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at

682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose

exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414

F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose

exculpatory evidence clearly supporting a claim of innocence even without request.").  On the

other hand, "[i]t is well settled that there is no affirmative duty upon the government to take

action to discover information which it does not possess."  United States v. Badonie, 2005 WL

2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor

does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005

WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the

Constitution of the United States of America require the United States to disclose certain

evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one

source that imposes such a duty on the United States.  The Due Process Clause of the United

States Constitution is another source imposing a duty to disclose on the United States.

### LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government must
permit the defendant to inspect and to copy or photograph books, papers,
documents, data, photographs, tangible objects, buildings or places, or copies or
portions of any of these items, if the item is within the government's possession,
custody, or control and:

    **(i)**    the item is material to preparing the defense;

    **(ii)**    the government intends to use the item it its case-in-chief at
trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate the United States to "take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1). In <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d at 122. In <u>United States v. Delia</u>, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." <u>United States v. Delia</u>, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16. <u>United States v. Wicker</u>, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> > **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> >
> > **(B)** grant a continuance;
> >
> > **(C)** prohibit that party from introducing the undisclosed evidence; or
> >
> > **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

<u>United States v. Charley</u>, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting <u>United States v. Gonzales</u>, 164 F.3d 1285, 1292 (10th Cir. 1999)). In <u>United</u>

States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction." 455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)). The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies." 455 F.3d at 1131.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's

request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

###### 1.    Material Exculpatory Evidence Under Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have no obligation to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.). This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

2.     __Timing of the Disclosure Under__ **Brady.**

"The obligation of the prosecution to disclose evidence under <u>Brady</u> can vary depending on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), <u>aff'd by</u> 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>."  United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.  See <u>United</u>

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that

are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[4]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day

---

[4]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Johnson and United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

> jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. <u>See United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression

hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"    United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted).    Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie.    See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").    The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."    United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).    The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes.    United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court issued its United States v. Ruiz decision, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.    See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "*Brady* rests on the idea that due process is violated when the withheld

evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine

a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir.

2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir.

2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion

to suppress stage is an open question")).  Although the United States Courts of Appeals have

split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must

disclose impeachment evidence before a suppression hearing in light of the Supreme Court's

conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment

evidence before the entry of a guilty plea."  United States v. Harmon, 871 F. Supp. 2d at 1151.

The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the

United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the
> Court believes that the Tenth Circuit would extend the holding of United States v.
> Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the
> guilty-plea process from a trial applies equally to a comparison of the
> suppression-hearing process and a trial.  The Court believes that both the Tenth
> Circuit and the Supreme Court would recognize that impeachment evidence need
> not be disclosed before a suppression hearing.  In United States v. Ruiz, the
> Supreme Court recognized that "impeachment information is special in relation to
> the *fairness of a trial*, not in respect to whether a plea is voluntary."  United States
> v. Ruiz, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f
> course, the more information the defendant has, the more aware he is of the likely
> consequences of a plea, waiver, or decision, and the wiser that decision will likely
> be," but concluded that "the Constitution does not require the prosecutor to share
> all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632
> . . . .  Likewise, "the more information the defendant has, the more" likely he will
> be able to successfully suppress a particular piece of evidence, but "the
> Constitution does not require the prosecutor to share all useful information with
> the defendant."  United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, Brady

does not require the United States to disclose impeachment evidence before suppression

hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

### 3.    Evidence Must Be in the United States' Possession.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'"  United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

### LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant

statements or reports in its possession of government witnesses touching the subject matter of

their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an
> accused also has the duty to see that justice is done, it is unconscionable to allow
> it to undertake prosecution and then invoke its governmental privileges to deprive
> the accused of anything which might be material to his defense.

353 U.S. at 671. Congress later codified the Jencks v. United States in 18 U.S.C. § 3500. See

United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18

U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United

States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)**    In any criminal prosecution brought by the United States, no statement or
report in the possession of the United States which was made by a
Government witness or prospective Government witness (other than the
defendant) shall be the subject of subpoena, discovery, or inspection until
said witness has testified on direct examination in the trial of the case.

**(b)**    After a witness called by the United States has testified on direct
examination, the court shall, on motion of the defendant, order the United
States to produce any statement (as hereinafter defined) of the witness in
the possession of the United States which relates to the subject matter as to
which the witness has testified. If the entire contents of any such
statement relate to the subject matter of the testimony of the witness, the
court shall order it to be delivered directly to the defendant for his
examination and use.

18 U.S.C. §§ 3500(a)-(b). "The Jencks Act requires the government to disclose to criminal

defendants any statement made by a government witness that is 'in the possession of the United

States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232

(D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)). The Jencks Act "manifests the

general statutory aim to restrict the use of such statements to impeachment." Palermo v. United

States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government

files from unwarranted disclosure but also to allow defendants materials usable for the purposes

of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo

v. United States, 360 U.S. at 352).

>    The Jencks Act defines statements as:

>    **(1)**    a written statement made by said witness and signed or otherwise adopted
>            or approved by him;

>    **(2)**    a stenographic, mechanical, electrical, or other recording, or a
>            transcription thereof, which is a substantially verbatim recital of an oral
>            statement made by said witness and recorded contemporaneously with the
>            making of such oral statement; or

>    **(3)**    a statement, however taken or recorded, or a transcription thereof, if any,
>            made by said witness to a grand jury.

18 U.S.C. § 3500(e).

>    The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act

if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir.

1993).  At least one district court within the Tenth circuit has distinguished interview notes from

reports that "embody only the agent's epitomization, interpretation, or impression of an

interview," finding that the latter are not producible under the Jencks Act. United States v.

Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In United States v. Lujan, the

Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act, when a

defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes

contained exculpatory evidence not included in any formal interview report provided to the

defense."  530 F. Supp. 2d at 1266.  Judge Brack held that, "[b]ecause the contents of rough

interview notes may in some cases be subject to disclosure and because the potential

impeachment value of the notes may not become evident until trial," the United States must,

under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.). To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes. See 984 F.2d at 1085-86. Once the defendant makes a prima facie

showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant. No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86). The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview. See No. CR 05-801 JB, Order at 1-2. The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial. See United States v. Goxcon-Chagal, 2012 WL 3249473, at *2, *6 (D.N.M. 2012)(Browning, J.). In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial. See 760 F. Supp. 2d at 1164, 1167.

## THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a state jury convicted Debra Milke of murdering her four-year-old son, Christopher. See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013). The state judge sentenced her to death. See Milke v. Ryan, 711 F.3d at 998. The Honorable Alex Kozinski, Chief Judge for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr." 711 F.3d at 1000. At the trial, Saldate testified that Milke confessed to the murder; Milke vehemently protested her innocence and denied

confessing.  See 711 F.3d at 1000.  With no other witnesses, the state judge and jury believed

Saldate.  See Milke v. Ryan, 711 F.3d 998.  They were unaware, however, of one fact that might

have changed their minds:  Saldate had a "long history of lying under oath and other

misconduct."  711 F.3d at 1000-01.  Specifically, Saldate had lied to a grand jury or a judge in

four cases, requiring state judges to throw out indictments or confessions.  See 711 F.3d at 1004.

In another four cases, "judges threw out confessions or vacated convictions because Saldate had

violated suspects' Miranda and other constitutional rights during interrogations, often

egregiously."  Milke v. Ryan, 711 F.3d at 1004.  Finally, Saldate's personnel file documented a

five-day suspension "for taking sexual liberties with a motorist he stopped and then lying to his

supervisors about it."  711 F.3d at 1011.  The file revealed that his "supervisors had caught him

in a lie and concluded that his credibility was compromised."   711 F.3d at 1006, 1012

(describing the report as showing that "Saldate has no compunction about lying during the course

of his official duties" and that he has "a willingness to abuse his authority to get what he wants").

The information about Saldate's misconduct was in the hands of the party responsible for

ensuring that justice is achieved -- the state.  Unfortunately, however, the state did not disclose

this information, despite its requirements under Brady and Giglio.  See Milke v. Ryan, 711 F.3d

at 1005 (describing how the state did not mention the evidence, even though an important

question in Milke's case was whether Saldate ignored Milke's request for an attorney).  "This

error resulted in a 'one-sided presentation of evidence' and 'impeded [the jury's] ability to fully

and fairly assess the credibility of both [Milke] and Saldate."  Milke v. Ryan, 711 F.3d at 1005

(alterations in the original).  More than that problem, however, the error resulted in Milke's death

sentence and imprisonment on death row for twenty-two years.  See Milke v. Ryan, 711 F.3d at 1001.[5]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant Brady violations.  See Daniel S. Medwed, Brady's Bunch of Flaws, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  See United States v. Stevens, 2009 WL 6525926 (D.D.C. 2009)(Sullivan, J.).  See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in In re Special Proceedings, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").  Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  See

_____

[5]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  See Arizona: No Retrial for Woman Freed from Death Row, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.  The Arizona Court of Appeals described the "long course of Brady/Giglio violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  Milke v. Mroz, 339 P.3d 659, 665-66, 668 (Ariz. Ct. App. 2014).

Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012),          http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case.    Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents.  See Stevens Report at 12.  United States Attorney General Eric Holder moved to vacate Stevens' conviction.  See Jerry Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March 15, 2012).  The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory."  Mark Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount of power in criminal prosecutions, often more than the jury.  See Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold more power "than jurors because most cases don't go to trial").  They are the ones with access to the evidence, both inculpatory and exculpatory.  They can disclose it easier than anyone else can.  See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015), http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.   As one illustration, in Milke v. Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours sifting through court records."  711 F.3d at 1018.  The team worked eight hours a day for three and a half months searching through the clerk of court's officers for Saldate's name in every criminal case file from 1982 to 1990.  See 711 F.3d at 1018.  It took another researcher another

month to review motions and transcripts from each of those cases to find examples of Saldate's misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at 1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial.   Although Brady and Giglio require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify.  This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants.  Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic.   And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial.   There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28, 2012)("Hearing").   The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.  See Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office

Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations.  Later in January, 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.  See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of Brady violations abroad in the land.  Only judges can put a stop to it."[6]  United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the

---

[6]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see an epidemic of Brady violations.  The Assistant United States Attorneys appear to take their duties very seriously.

"epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013),            available            at            http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf.  The reason that there was little action on his charge may have been that neither he nor anyone else has done what needs to be done to substantiate his claim with empirical data.  Nonetheless, he proposed some additional reforms, such as requiring open-file discovery.  See Kozinski, supra, at xxvi-vii.  North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense.  See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . . In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age, Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012).  Chief Judge Kozinski contends that effectively deterring Brady and Giglio violations means that

prosecutorial offices across the country must establish firm open-file policies to ensure compliance.[7]  See Kozinski, supra, at xxviii.

---

[7]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to the Assistant United States Attorney in this case -- operate under an open-file policy.  See United States v. Hykes, Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States.").  Despite the Assistant United States Attorney's contention in that case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy.  See United States v. Rodella, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'").  The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise."  United States v. Rodella, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.  In United States v. Roybal, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.  See 2014 WL 4748136, at *1.  The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.  See 2014 WL 4748136, at *4.  Again in United States v. Folse, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.  See United States v. Folse, No. CR 14-2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . .  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- i.e. the appearance of justice.  The nation may not be well served when a defendant is left

While these reforms may indeed decrease the number of Brady and Giglio violations that occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico.  First, while the Court must rely heavily on the prosecutors to do their job under Brady and Giglio, the Court does more than rely solely on the prosecutors to comply with their obligations.  See Kozinski, supra, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence).  The District of New Mexico Magistrate Judges enter orders at the beginning of cases directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert

---

> wondering whether things would have been different if the United States had disclosed all of the information that it possessed.  By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, i.e., through sharp practices, and not through the pursuit of truth and justice.  This perception undermines the pillars of our criminal justice system.  The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose.  The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt.  That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

United States v. Rodella, 2015 WL 711931, at *39.  It appears that the United States has finally abandoned its representations that it has an open-file policy.

witness opinions, and all relevant material that <u>Brady</u> and <u>Giglio</u> require.  If courts do not enter

an order requiring prosecutors to comply with <u>Brady</u> and <u>Giglio</u>, the court lacks the power to

sanction attorneys, because those attorneys will not have violated any court-imposed obligations.

<u>See</u> Henry F. Schuelke III, <u>supra</u>, at 507-510.  By entering such orders, the Court can hold

prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide <u>Brady</u> and <u>Giglio</u> material, courts can name the offending

prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam

M. Gershowitz, <u>Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct</u>,

42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to

encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that

non-compliance can expose them to embarrassment in front of their friends and colleagues.  <u>See</u>

Jenia Iontcheva Turner, <u>Policing International Prosecutors</u>, 45 N.Y.U. J. Int'l L. & Pol. 175, 229

(2012)("The court's judgment condemning particular actions of prosecutors as unlawful can

serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by

a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and

criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may,

depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges

engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  <u>See</u>

Jason Kreag, <u>The Brady Colloquy</u>, 67 Stan. L. Rev. Online 47 (2014); Kozinski, <u>supra</u>, at xxxiv

(endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, <u>Don't Ask, Must</u>

<u>Tell -- And Other Combinations</u>, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that

trial judges routinely ask a series of questions such as:

1.  Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2.  Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3.  Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4.  Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5.  Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary, but also somewhat impractical for district judges that see hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases

than any other federal district in the country,[8] and more criminal cases than most courts in the country, the Court has developed professional relationships with the Assistant United States Attorneys who appear before it on a regular basis. See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation). Asking Assistant United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court. See Radley Balko, Judge Says Prosecutors Should Follow Law. Prosecutors Revolt., Wash. Post. (March 7, 2014), http://www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he said he would do as a matter of course). Kreag concedes that "some prosecutors might be insulted by having to answer these or similar questions from the court, believing that the questions themselves amount

---

[8]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country. See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2015 and 2016, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables ("Criminal Filings"). In the 12-Month Period ending March 21, 2016, alone, 4,641 criminal cases were filed in the District of New Mexico. See Criminal Filings at 1. Only Arizona, with 5,349, and Texas' Southern and Western Districts, with 6,128 and 5,899, respectively, saw more criminal filings. See Criminal Filings at 1. In comparison, 115 criminal cases were filed in the District of Rhode Island, 170 were filed in Vermont, 135 were filed in the Northern District of Mississippi, 141 were filed in the Western District of Wisconsin, and 89 were filed in the Eastern District of Oklahoma. See Criminal Filings at 1.

to an accusation."  Kreag, supra, at 56.  The Court agrees with this assessment.  The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues, and what has been produced, heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[9]  The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and Brady obligations" by holding a hearing or pretrial conference, and asking about discovery issues, without running through a standardized and potentially insulting checklist.  Kreag, supra, at 54.  Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation.  Like the colloquy, it also personalizes the prosecutor's decision not to disclose.  A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision, and that they are responsible for providing an explanation for that non-disclosure.  Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material.  This

---

[9]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does.  See Kozinski, supra; Kreag, supra.  The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts.  A formal colloquy is not always practical in this context.

accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb Brady and Giglio violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under Brady and Giglio, the system is in trouble.  The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  United States v. Harry, 2013 WL 684671, at *1 (D.N.M. 2013)(Browning, J.).  As explained above, some courts -- including the Court -- have concluded that an officer's interview notes are "statement[s]" that

the Jencks Act requires the United States to disclose. 18 U.S.C. § 3500. See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act). Officers then maintain these notes pursuant to various standards and protocols. See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500). Officers then use their notes as the basis for their reports. When officers write their reports, however, they may exclude certain information that does not help the prosecution. These reports are then placed in a prosecutor's file, but the notes are not. To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the United States' witness testifies at trial. This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence. The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that

their reports reflect their notes and accurately summarize the events leading to an arrest.  Even if

some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266,

cases are randomly assigned to different judges.  The threat of being assigned to a judge who

requires disclosure may incentivize officers to include all exculpatory and impeachment

evidence in their formal report.  Additionally, even if a prosecutor's file omits the officer's notes,

courts must require prosecutors to disclose exculpatory information in officers' notes under

Brady.  See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors

to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL

1103876, at *5 (D.N.M. 2011)(Browning, J.)("The Due Process Clause of the Constitution

requires the United States to disclose information favorable to the accused that is material to

either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the

"belated disclosure of impeachment or exculpatory information favorable to the accused violates

due process when an earlier disclosure would have created a reasonable doubt of guilt").

### LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY

The government has a privilege "to withhold from disclosure the identity of persons who

furnish information of violations of law to officers charged with enforcement of that law."

Roviaro v. United States, 353 U.S. 53, 59 (1957).  "The purpose of the privilege is the

furtherance and protection of the public interest in effective law enforcement.  The privilege

recognizes the obligation of citizens to communicate their knowledge of the commission of

crimes to law-enforcement officials and, by preserving their anonymity, encourages them to

perform that obligation."  Roviaro v. United States, 353 U.S. at 59.  "Anonymity of informants

encourages communications to law enforcement officers."  Usery v. Local Union 720, Laborers'

Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir. 1977).  Cf. United States v.

Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161, 1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply information about an informer to a defendant when the informer merely provides the initial introduction.").

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro v. United States, 353 U.S. at 60-61. The Supreme Court in Roviaro v. United States stated that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide. See 353 U.S. at 64. When an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required. Roviaro v. United States, 353 U.S. at 65. The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors." Roviaro v. United States, 353 U.S. at 62. In Roviaro v. United States, for example, the informant "helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64. The Supreme Court found that the district court's failure to order disclosure of the informant's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error. 353 U.S. at 64-65.

"The Tenth Circuit's take on this analysis is well-known." United States v. Padilla, 2010 WL 4337819, at *7 (D.N.M. 2010)(Browning, J.). The Tenth Circuit's take on the analysis

places the burden on the defendant to show that the informant's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure.  A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See United States v. McKenzie, 2010 WL 597971, at **3-4 (D.N.M. 2010)(Browning, J.)(quoting United States v. Sinclair, 109 F.3d at 1538).  "[T]he defendant must present more than mere speculation about the possible usefulness of an informant's testimony."  United States v. Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure[, but d]isclosure of an informant is not required . . . where the information sought from the informer would be merely cumulative, or where the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted).  See United States v. Moralez, 908 F.2d at 567.

The Court has required the United States to disclose a CI's identity where the CI "was integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was not a mere bystander."  United States v. Aguilar, 2010 WL 2977708, at *5 (D.N.M. 2010)(Browning, J.).  In United States v. Aguilar, the defendant, Aguilar, was one of three defendants charged with a conspiracy to traffic in cocaine, stemming from a transaction between

his two co-defendants and a government CI.  See 2010 WL 2977708, at *1.  In relation to the

first factor that the Supreme Court identified in Roviaro v. United States -- the crime charged --

the Court noted that "the crimes charged in this case are relatively egregious -- conspiracy,

possession with intent to distribute cocaine, and possessing a gun while committing the other

crimes."  2010 WL 2977708, at *6.  As to the second and third Roviaro v. United States factors -

- the possible defenses and the possible significance of the informer's testimony -- it appeared

that the defendant intended to argue that he did not know his alleged co-conspirator possessed

cocaine or that the drug transaction was going to occur, and the Court found that, given the CI

was present during the crime, the CI's testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be
> in a unique position to testify to what conversations, if any, occurred in the car
> and whether Aguilar took part in them.  After the four individuals arrived at the
> [CI]'s residence, again, the [CI] would be in a unique position to testify whether it
> appeared that Aguilar had any idea that the bag Mirabal retrieved from the car
> contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s
> residence, the [CI] was able to observe Aguilar's demeanor and whether he
> actively participated in the drug transaction.  The [CI] could testify as to where
> Aguilar was and what he did while the [CI] made the alleged drug transaction
> with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant

information which no other witness could, because Aguilar's "alleged co-conspirators might try

to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer,

might tend to be biased toward the United States."  2010 WL 2977708, at *6.  The Court thus

granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010

WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity
> of the CI to anyone -- except the defense investigator she retains in this case --
> unless and until she seeks further leave of the Court.  Any information that the
> United States provides to Ms. Johnson regarding the CI may be discussed only
> with the investigator and the Assistant United States Attorneys who disclosed it.

Finally, any information the United States provides must be returned once this case is closed. These requirements should minimize the danger, if any, to the CI and perhaps permit law-enforcement to use him in a covert capacity again in the future, if they so desire.

2010 WL 2977708, at *6. See also United States v. Rivas, 26 F. Supp. 3d 1082 (D.N.M. 2014)(Browning, J.).

## RELEVANT LAW REGARDING CIVIL DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents. See Fed. R. Civ. P. 34. Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

**(1)**    to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

**(A)**    any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

**(B)**    any designated tangible things; or

**(2)**    to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marrietta Corp., 50 F.3d 1511,

1520 (10th Cir. 1995); <u>Sanchez v. Matta</u>, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning,

J.)("The federal courts have held that the scope of discovery should be broadly and liberally

construed to achieve the full disclosure of all potentially relevant information.").  The federal

discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the

relevant facts gathered by both parties is essential to proper litigation."  <u>Hickman v. Taylor</u>, 329

U.S. 495, 507 (1947).  As a result of this policy, rule 26 "contemplates discovery into any matter

that bears on or that reasonably could lead to other matter that could bear on any issue that is or

may be raised in a case."  <u>Anaya v. CBS Broad., Inc.</u>, 251 F.R.D. 645, 649-50 (D.N.M.

2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing

expedition' in the hope of supporting his claim."  <u>McGee v. Hayes</u>, 43 F. App'x 214, 217 (10th

Cir. 2002)(unpublished).[10]  "'Discovery . . . is not intended to be a fishing expedition, but rather

is meant to allow the parties to flesh out allegations for which they initially have at least a

modicum of objective support.'"  <u>Rivera v. DJO, LLC</u>, 2012 WL 3860744, at *1 (D.N.M.

2012)(Browning, J.)(quoting <u>Tottenham v. Trans World Gaming Corp.</u>, 2002 WL 1967023, at *2

(S.D.N.Y. 2002)(Knapp, J.)).  <u>See</u> <u>Hardrick v. Legal Servs. Corp.</u>, 96 F.R.D. 617, 618 (D.D.C.

1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery

---

[10]<u>McGee v. Hayes</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that <u>McGee v. Hayes</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."  Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue."  Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (N.D. Ill. 1998).  Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery."  Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000.  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity

and location of persons having knowledge of any discoverable matter.  For good
cause, the court may order discovery of any matter relevant to the subject matter
involved in the action.  Relevant ~~The~~ information ~~sought~~ need not be admissible
at the trial if discovery the ~~information sought~~ appears reasonably calculated to
lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory

committee's notes make clear was a housekeeping amendment to clarify that inadmissible

evidence must still be relevant to be discoverable -- the 2000 amendments have two effects:

(i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts

into the process in the entirely new second sentence.

  In 1978, the Committee published for comment a proposed amendment,
suggested by the Section of Litigation of the American Bar Association, to refine
the scope of discovery by deleting the "subject matter" language.  This proposal
was withdrawn, and the Committee has since then made other changes in the
discovery rules to address concerns about overbroad discovery.  Concerns about
costs and delay of discovery have persisted nonetheless, and other bar groups
have repeatedly renewed similar proposals for amendment to this subdivision to
delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in
1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as
a means of reducing litigation expense without interfering with fair case
resolutions.  Discovery and Disclosure Practice, supra, at 44-45 (1997).  The
Committee has heard that in some instances, particularly cases involving large
quantities of discovery, parties seek to justify discovery requests that sweep far
beyond the claims and defenses of the parties on the ground that they nevertheless
have a bearing on the "subject matter" involved in the action.

  The amendments proposed for subdivision (b)(1) include one element of
these earlier proposals but also differ from these proposals in significant ways.
The similarity is that the amendments describe the scope of party-controlled
discovery in terms of matter relevant to the claim or defense of any party.  The
court, however, retains authority to order discovery of any matter relevant to the
subject matter involved in the action for good cause.  The amendment is designed
to involve the court more actively in regulating the breadth of sweeping or
contentious discovery.  The Committee has been informed repeatedly by lawyers
that involvement of the court in managing discovery is an important method of
controlling problems of inappropriately broad discovery.  Increasing the
availability of judicial officers to resolve discovery disputes and increasing court
management of discovery were both strongly endorsed by the attorneys surveyed
by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at
44. Under the amended provisions, if there is an objection that discovery goes

beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard.  Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.  Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance. The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing. It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept. One might then say that old rule 26(b)(1)'s relevant discovery provision was toothless. It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys,

resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, etc.  The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible.  When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit

broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## ANALYSIS

The Court will grant in part and deny in part (i) the Motion to Compel; (ii) the First Motion for Specific Discovery; and (iii) the Second Motion for Specific Discovery. To recap, the Motion to Compel -- pertaining to Counts 6 and 7, J.M.'s murder -- requests that the United States provide discovery in the form of: (i) the statements of all of the Defendants whom the New Mexico State Police and the prison's STIU interviewed following J.M.'s murder; (ii) video footage from two neighboring pods; (iii) Southern New Mexico and STIU's procedures, log books, and master roster for inmates housed in unit 1A, for the six months before and one month after March 7, 2014; and (iv) impeachment materials and STIU file for Armenta and any other cooperating witness. See Motion to Compel at 2-3. The First Motion for Specific Discovery -- pertaining to Counts 1 and 2, F.C. and R.G.'s murders -- requests: (i) the FBI's investigations under case numbers 281D-AQ-62017, 281D-AQ-59388, 2540-AQ-63435 and any other related investigations relating to Counts 1 and 2; (ii) New Mexico Corrections Department Security Threat Intelligence Unit ("STIU") files on all inmates at Southern New Mexico on March 26, 2001, and all incidents from the earliest date that either R.G. or F.C. arrived at the facility; (iii) criminal history, impeachment materials, and STIU files for Lujan and any other cooperating informant witness; (iv) pen packs for R.G. and F.C., and all inmates housed in the Ocean-One-Yellow pod and the Paul-One-Green pod on March 26, 2001, including the pen packs for Lujan and Torres; (v) all files, including intelligence materials, concerning SNM, and listing suspected and confirmed members and their activities from the time period that SNM was formed up to the

last date that the Superseding Indictment alleges, February 27, 2016; (vi) all files on the Los

Carnales prison gang listing suspected and confirmed members, and their activities, specifically

including such files on R.G.; (vii) Security Threat Group investigation files for SNM from 1985

to 2016; (viii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system;

(ix) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in

general population; (x) the list of inmates in the facility who may have been free to move

amongst pods; (xi) the list of inmates residing in the Department of Corrections, Penitentiary of

New Mexico-North Facility between January 1, 2001, and March 26, 2001; (xii) the pen pack for

Munoz; (xiii) log books for the three months before and after March 25, 2001; (xiv) the United

States' DNA analyst's notes, electropherograms, and graphs; (xv) copies of the inmate's flyer,

otherwise known as their Wanted for Escape/Master Record Entry; and (xvi) the Security Threat

Group "Master Roster," containing confidential lists related to Security Threat Groups

concerning which inmates have information about other inmates.  See First Motion for Specific

Discovery at 7-11.  The Second Motion for Specific Discovery -- pertaining to Count 3, the

murder of F.S. -- requests: (i) unredacted copies of all documents provided in discovery; (ii) all

documents in the files bearing case number 281-AQ-62017, as well as all documents in related

federal investigations of SNM; (iii) STIU files on all inmates who were at Southern New Mexico

on June 16, 2007; (iv) criminal history, impeachment materials, and STIU files for any

cooperating informant witness; (v) penitentiary packs for F.S., and all inmates housed in Blue

Pod on June 17, 2007; (vi) any and all files, including intelligence materials, concerning SNM

and listing suspected and confirmed SNM members and their activities from the time period that

SNM was formed to the last date alleged in the Superseding Indictment, February 27, 2016; (vii)

any and all files on Los Carnales listing suspected and confirmed members and their activities,

specifically including such files for F.S.; (viii) Security Threat Group investigation files for the entire SNM from 1985 until 2016; (ix) separation listings by the prison system for F.S.; (x) Administrative Segregation waivers that F.S. signed; (xi) the listing of inmates at Southern New Mexico that may have been free to move amongst pods; (xii) log books for the three months before and after June 17, 2007; (xiii) the United States' DNA analyst's notes, electropherograms and graphs; (xiv) copies of the inmate F.S.'s flyer, otherwise known as their Wanted for Escape/Master Record Entry; (xv) the Security Threat Group "Master Roster," containing confidential lists related to Security Threat Groups concerning which inmates have information about other inmates; (xvi) any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and (xvii) any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations.  See Second Motion for Specific Discovery at 3-7.

At the hearing, where the United States had not otherwise already complied or compromised with the moving Defendants' requests, the Court either gave a general, categorical ruling which addressed broad categories of the Defendants' various requests or else ruled on each of the motions' specific discovery requests.  The United States was then given fourteen days to comply with the Court's individual orders, unless it otherwise noted.  The Court made its rulings on these discovery requests for the reasons that follow.

## I.    THE COURT WILL ADHERE TO ITS HOLDING IN <u>UNITED STATES V. HYKES</u>.

The Court first comments on its holding in <u>United States v. Hykes</u>, 2016 WL 1630125, which appears to be the source of some of the contention amongst the parties, particularly with respect to its treatment of <u>United States v. Sudikoff</u>.   <u>United States v. Hykes</u> concerned a defendant's motion filed pursuant to <u>Giglio</u>, requesting that the United States "disclose certain pertinent information pertaining to [police officers testifying at his suppression hearing] as the information is relevant to impeachment."   <u>United States v. Hykes</u>, 2016 WL 1730125, at *2 (internal quotation marks and citations omitted).   The Defendant in <u>United States v. Hykes</u> argued that

> the Supreme Court's <u>Giglio</u> decision requires the government to disclose evidence affecting a government witness' credibility.  [Hykes] states that he "has a good faith basis to believe that the internal personnel files of some o[r] all of these officers contain information that may potentially be properly used for impeachment."  Hykes asserts that "witnesses have revealed that the information relied upon by officers to arrest Mr. Hykes was false.  [Hykes] contends that this false information led the arresting officers to arrest him, beat him, and search him without warrants.  [Hykes] states that, because the Court will determine whether Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical import for this Court's ultimate decision Hykes reasons that the officers' personnel files will reveal whether the officers are trustworthy.  Hykes argues that credibility information is especially relevant in this case, where the only witnesses against him are police officers, so "anything that goes to their credibility is exculpatory and admissible."

2016 WL 1730125, at **2-3 (citations omitted).   The United States contested the discovery request for the officers' personnel files in <u>United States v. Hykes</u>, because

> the government's review and determination is controlling unless the defense provides grounds to believe there is impeachment information in the items to which the defense seeks access. . . .  Hykes must "make a particularized showing of what information he was seeking or how it would be material" rather than making broad discovery demands.

2016 WL 1730125, at *4 (citations omitted).

Accordingly, the Court held in <u>United States v. Hykes</u> that

> Hykes is not sending the United States on a fishing expedition. Hykes demonstrates that the officers' personnel files may contain impeachment evidence. As support, Hykes points to the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes.

2016 WL 1730125, at *20. Cf. United States v. Lafayette, 983 F.2d 1102 (D.C. Cir. 1993)(affirming the denial of the appellants' request for an officer's personnel file, because "nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever"); United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"). The Court then reiterated that Hykes had requested specific information contained within the personnel files and that thus "the United States must search the personnel files of the testifying officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes specifically requests in his Giglio Motion." 2016 WL 1730125, at *20.

As the Court stated at the hearing, see Tr. at 65:17-66:19 (Court), in its analysis of this discovery request in United States v. Hykes, the Court did not deviate from its general philosophy regarding the administration of discovery under Giglio, Brady, the Jencks Act, and rule 16. Instead, the Court in United States v. Hykes merely maintained that

> if the United States uncovers any such exculpatory material, it must produce any material evidence in time for its effective use at trial. See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law.").

United States v. Hykes, 2016 WL 1730125, at **19-20. Where the Defendant demonstrated that there was particular impeachment material in the officers' personnel files, the Court ordered the

United States to review the files for the requested information in accordance with its continuing

discovery and disclosure obligations.  United States v. Hykes, 2016 WL 1730125, at **20-21.

The Defendants, in the Motion to Compel, First Motion for Specific Discovery, and

Second Motion Discovery, have "urg[ed] the Court to consider using a different standard" with

respect to the application of "Sudikoff," instead of the Court's allegedly sea-changing[11] decision

in United States v. Hykes, for criminal discovery matters.  Tr. at 59:11-19 (Castle).  Essentially,

as the Defendants First Motion for Specific Discovery argue,

> the Brady materiality standard is not useful in this context. . . .  And so we're
> encouraging the Court to use a different standard.  And I believe the possible
> exculpatory standard taken by . . . the Sudikoff case, works so that a prosecutor
> doesn't have to guess what the effect of that piece of evidence is going to be at
> trial that hasn't occurred in the context of a defense that they haven't seen.  It
> allows a prosecutor a much cleaner line, which is to look at particular evidence
> and say, is it possibly exculpatory?  Is there a chance that this is going to be
> something that would be of value to the defense?  Then you provide it.

Tr. at 59:23-61:17 (Castle).  Accordingly, with respect to the "last prong of Brady," materiality,

the Defendants argue that "there is a difference between what needs to be disclosed under the

Due Process Clause, and what will result in a reversal under the Due Process Clause."  Tr. at

62:1-13 (Castle).  The First Motion for Specific Discovery Defendants assert that this standard,

that Judge Pregerson announced in 1999 in United States v. Sudikoff, 36 F. Supp. 2d at 1196,

stands for the proposition that "the standard should simply be whether the evidence is favorable

to the accused, i.e., whether it relates to guilt or punishment and tends to bolster the defendant's

case or impeach prosecution witnesses."  First Motion for Specific Discovery (citing United

States v. Sudikoff, 36 F. Supp. 2d at 1199).  The Court disagrees.  Judge Pregerson, it appears,

---

[11]Indeed, by United States v. Hykes, the Court decided not to make "sea-changes" to the
longstanding laws of criminal discovery announced by Brady, Giglio, and the Jencks Act.  See
United States v. Hykes, 2016 WL 1730125, at **19-20.

was a civil lawyer in private practice in the years before he took the bench.[12] There is no doubt that using a standard that derives from the Federal Rules of Civil Procedure would be easier to administer. But, criminal discovery is not civil discovery. The Supreme Court and the Tenth Circuit repeatedly make this point. District Courts are not free to make up new standards that they think are better or easier to apply. See, e.g., United States v. Hopkins, 427 U.S. 123, 125 (1976)("[C]ourts should refrain from legislating by judicial fiat.")(citation omitted). District judges cannot be lazy and make their tasks easier than the Supreme Court and the Tenth Circuit require.

Ultimately, the Defendants invite the Court to endorse Judge Pregerson's opinion in United States v. Sudikoff, and abandon its own 2016 opinion in United States v. Hykes for a number of reasons. First, the Defendants suggest that this case is one of the most complex in which they have ever been involved. See, e.g., Second Motion for Specific Discovery Reply at 5. The suggestion is that, because the case is so large and so complex, spanning many years and many violent crimes, the Court should adopt different rules for it. The Court disagrees. Getting a handle on a case this large is like eating an elephant; one has to do it one bite at a time. The Court will need to do one confidential informant at a time; one redaction at a time; and one document at a time. The Defendants will need to make the showing under rule 16, Brady, and Giglio one informant, one redaction, and one document at a time. There are no shortcuts. The Defendants are trying to hit a homerun by getting the Court to lower the standard. The Defendants cannot do that. Criminal discovery is hard work. The Defendants will have to make the necessary showing. The Court will have to take the time to allow the Defendants to make the showing. And the United States will have to defend its nonproduction in detail. There is no

---

[12]See Dean D. Pregerson, Biographical Directory of Federal Judges, available at http://www.fjc.gov/public/home.nsf/hisj (last accessed Dec. 28, 2016).

other choice.  But the prospect of hard work does not counsel that the Court should change the standard or standards.

In United States v. Hykes the Court explained that "Judges have several . . . tools at their disposal . . . and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico."  United States v. Hykes, 2016 WL 1730125, at **19-20. Those tools range from relying "heavily on the prosecutors to do their job under Brady and Giglio," having the Magistrate Judges enter "orders at the beginning of [a] case directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that Brady and Giglio require," and "when prosecutors hide Brady and Giglio material, [naming] the offending prosecutors in their judicial opinions."  United States v. Hykes, 2016 WL 1730125, at **19-20.  The Court, to accomplish the goals that a formal colloquy with the parties might accomplish, will extract "assurances at a pretrial hearing that the United States has complied with its duty.  Merely holding a hearing or a pretrial conference where the [assistant] United States Attorney knows that he or she must answer to the Court about discovery issues and what has been produced heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court."  United States v. Hykes, 2016 WL 1730125, at **19-20.  Accordingly, the Court will not stray from the principles it has used to manage criminal discovery in the past, and recently memorialized in United States v. Hykes. Under rule 16, at

> a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item it its

case-in-chief at trial; or (iii)  the item was obtained from or belongs to the
defendant.

Fed. R. Crim. P. 16(a)(1)(E).  The United States must also disclose to the Defendants any
evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad
faith of the prosecution," Brady, 373 U.S. at 87, and that disclosure obligation includes evidence
that is useful to the defense in impeaching government witnesses, even if the evidence is not
inherently exculpatory, see Giglio, 405 U.S. at 153.  See also United States v. Roybal, 46 F.
Supp. 3d 1127, 1166 (D.N.M. 2014)(Browning, J.)(stating that the United States must put itself
in the shoes of Defendant's counsel, and be certain that items they do not wish to disclose "do
not contain exculpatory or impeachment material," because "[i]n the end, the burden remains on
the United States to know its case and comply scrupulously with Brady").  The Jencks Act
requires the United States to disclose to criminal defendants any statement that a United States
witness made and which is "in the possession of the United States" once that witness has
testified.  See 18 U.S.C. § 3500.  The Court can be compliant, as it has been, in applying these
standards, and still achieve the goals of Congress and Due Process, without inventing new
standards.

     The Court, in United States v. Hykes, also addressed the salient issue of what materials
are within the United States' possession, custody, and control.  In relevant part, the Court stated

> The Court has consistently stated that it cannot require the United States to go get
> documents from third parties or to seek documents [from entities] that refuse
> access to the United States.   See . . . ("And like I said and I've said this in the
> past, I don't want to require the Government to do any more than the law requires.
> So I'm trying to toe that line"); United States v. Rivas, 26 F. Supp. 3d 1082, 1105
> (D.N.M. 2014)(Browning, J.)("A prosecutor does not have a duty . . . to obtain
> evidence from third parties."); United States v. Badonie, 2005 WL 2312480, at *2
> (D.N.M. Aug. 29, 2005)(Browning, J.)("It is well settled that there is no
> affirmative duty upon the government to take action to discover information
> which it does not possess.").  Here, however, the United States has such access to
> [Bernalillo County Sheriff Office]'s personnel files, even if the BCSO still has

custody or possession of them.  See United States v. Padilla, 2011 WL 1103876, at *7 (D.N.M. March 14, 2011)(Browning, J.)("[A] prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."); id. ("A prosecutor must disclose information of which it has knowledge and access."); United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)(stating that a prosecutor may have a duty to search files maintained by other "governmental agencies closely aligned with the prosecution" when there is "some reasonable prospect or notice of finding exculpatory evidence").  The Court wants to ensure that the United States is the one determining that no Brady or Giglio material exists rather than the BCSO. . . .

United States v. Hykes, 2016 WL 1730125, at **19-20 n.12.  In this case, the United States concedes that "this is a joint investigation" of SNM with either of the "STIU, NMCD, or the FBI."  Tr. at 67:1-14 (Beck).  Accordingly, while the United States does not have an affirmative duty to seek out and produce information that it does not possess, the situation at hand is markedly different.  "[A] prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."  Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d at 1037).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'"  United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d at 1503).  Given the United States' concession, the United States thus has a duty to search the files that the governmental agencies closely aligned with this prosecution maintain, where there is a reasonable prospect of finding exculpatory evidence -- those agencies being, at the least, New Mexico Corrections Department, including STIU, and of course, the FBI.  Other governmental agencies, however, the Court concludes are not involved in the United States' joint investigation of SNM -- in particular, the New Mexico State Police.  See Tr. at 32:25-33:8 (Court)(giving the

inclination that the Court did not "think that the State Police's files are in the United States' possession, custody, or control. So I think they made a representation they've turned over everything that they have. But if you don't think that they've gotten everything, you're going to have to go to the State Police"). Accordingly, unless and until the Defendants demonstrate that the New Mexico State Police are closely involved in a particular aspect of this prosecution, the Court will not require the United States' wholesale review of that third-party's files. See United States v. Hykes, 2016 WL 1730125, at **19-20 n.12.

The concept of "possession, custody, or control" is not unique to criminal discovery; civil discovery has the same concept. See, e.g., Fed. R. Civ. Pro. 34(A). The Court has always used a pragmatic, functional test of that phrase. See United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. 572, 587-92 (D.N.M. 2015)(Browning, J.). If the attorney responding to the requests for production can pick up the telephone and get the information from a third-party, the documents are effectively in the responding party's "control." United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. at 590. Here, the Court asked the AUSA if he had that level of access to New Mexico Corrections Department and STIU files, to which he responded: "NMCD has been very good about getting the requested information. So I think with regard to files, like STIU files, that may contain some information about the defendants or other inmates, I think if we called on the phone they would work with us to get their hands on it." Tr. at 21:25-22:6 (Beck). This response is not surgery and, indeed, any other response would be surgery. This entire federal investigation appears to have begun when SNM allegedly threatened to kill the New Mexico Secretary of Corrections. See United States' Garcia Response at 1. Here, it is not surgery and it is natural that the AUSAs on this case can call the New Mexico Corrections Department and get what they want. The New Mexico Corrections

Department is jumping at the chance to help the prosecution. Under these circumstances, the Court can confidently say that the New Mexico Corrections Department's records, under the unique facts of this case, are under the AUSA's control.

In so holding, the Court addresses a variety of the discovery requests in the Motion to Compel, the First Motion for Specific Discovery, and the Second Motion for Specific Discovery, by simply maintaining the standards -- regarding scope of disclosure and review of third-party files -- that it reaffirmed in United States v. Hykes. Taking one-by-one the requests that are thus resolved after this clarification, the Court thereby concludes that, regarding the Motion to Compel's request for impeachment materials and STIU file for Armenta, a witness in the murder of J.M. which underlies Counts 6 and 7, these STIU files are in the United States' possession, custody, and control, and orders that, while the Court is not "going to require any Jencks material to be produced before the 14 days," it is going to "require early Brady review of these materials by the Government. . . . You've got to produce the Brady material promptly, immediately." Tr. at 23:2-19 (Court). Similarly, where the Motion to Compel is requesting the procedures, log books, and master roster from Southern New Mexico and STIU for inmates housed in unit 1A for the six months before and one month after March 7, 2014, the Court, upon learning that the homicide victim in Counts 6 and 7 may have had "ongoing disputes," and that thus the log books could help to "potentially develop other motives . . . and potentially other suspects," Tr. at 33:17-35:3 (Strickland), will order that the United States produce the log books for three weeks before and three days after the incident, thus denying the request "without prejudice" in case the produced log books consequently necessitate further production, Tr. at 36:12-25 (Court). The Court will also order production of the New Mexico Corrections Department procedures, i.e., the procedures regarding how the log books are put together, for that same time period. See Tr. at

37:21-40:6 (Court). Regarding the Motion to Compel's request for video footage from the pod neighboring the pod where J.M. was murdered, the United States agreed to make a second check with the FBI, STIU, and even the New Mexico State Police -- in case they might somehow have it -- because, while the United States had recovered the footage from the pod where the murder occurred, it had not yet been able to locate footage from the neighboring pod. See Tr. at 17:1-8 (Beck, Court). The Court thus orders the United States to make that second look, because the footage from the neighboring pod could be exculpatory. See Tr. at 17:1-8 (Beck, Court). If the film shows someone else did it, that evidence could be some of the most exculpatory.

Turning next to the First Motion for Specific Discovery's request regarding discovery from previous FBI investigation files related to SNM, which the United States indicated that it had, for the more recent investigations, produced materials, but still had not produced the materials from the "significantly older" files, the United States must now go back and review those files for Rule 16 and Brady obligations, using the Court's "liberal Rule 16 and Brady eyes." Tr. at 78:25-79:11 (Beck, Court). Regarding the First Motion for Specific Discovery Defendants' limited request in the First Motion for Specific Discovery for all STIU files for inmates at Southern New Mexico in the relevant cell blocks that the United States considers suspects in the alleged murders, the Court similarly orders that the United States "review these with [the Court's] liberal standard in mind and produce Rule 16 materials." Tr. at 81:25-82:11 (Beck). Still at issue is the specific request for Lujan's STIU file, which the United States explained it intended to treat like the rest of the STIU files, because, unlike what the First Motion for Specific Discovery Defendants were asserting, Lujan is not a cooperating government witness. See Tr. at 82:23-83:9 (Beck). The Court thus also orders that the United States look at Lujan's STIU file for Brady and rule 16 information, because it is under its possession and

control.  See Tr. at 85:3-4 (Court).  That order applies to all Defendants in the case, regarding

their STIU files and related information, as well as for the victims and alternative suspects.

Similarly, the Court's decision not to reconsider United States v. Hykes results in an

order that, for the First Motion for Specific Discovery's request for any and all files, including

intelligence materials, for SNM, of which there were potentially "600," the United States needs

to take those "one at a time," meaning that, where it is brought to the United States' attention by

a Defendant that a particular file is of importance to the defense, they must investigate and

produce that file.[13]    See Tr. at 107:18-108:4 (Court).   For the files related to the FBI

investigations, however, the Court reiterates its order: "[T]hey're saying they know of five.

They're going to do the Brady and Rule 16 review of those files. . . .  And then we have a little

bit of dynamic process to go with the state files."  Tr. at 108:13-17 (Court).  With respect to how

closely the United States needs to look at these files, the Court reminds the United States that it

"takes a human being sitting there putting their feet in the defense lawyers' shoes and saying,

'Could I use this?,'" in order to comply with the Court's explicit discovery standards that the

Court reaffirmed in United States v. Hykes.  See Tr. at 111:2-18 (Court).  The Court also orders

the United States to review STIU files for the victim in Counts 3, 6 and 7, in just the same

---

[13]At the hearing, the United States indicated that it was searching for requested
documents with word and name searches.  See Tr. at 109:15-24 (Beck).  The Court expressed
concern about that approach and suggested that it thought the United States might need to be
looking closely at each document with its rule 16, Brady, and Giglio glasses on.  See Tr. at
111:2-18 (Court).  It was concerned that a word search might not be able to do that review
without somehow looking at the documents.  See Tr. at 111:2-18 (Court).  The Court is aware
that there are modern search engines that use algorithms and that these search engines and
software can be more accurate than human review.  The Court does not wish to preclude the use
of modern search technology.  If the United States can be open with the Defendants about how it
is doing the search, and the parties can agree on the search protocol, the Court will be alright
with the approach.  And if the parties cannot agree on a search protocol making use of modern
search software, the United States may re-approach the Court, and the Court will take a look at
the subject and consider it in a fully informed context.

manner as it has ordered the United States to review the files relating to Counts 1 and 2 underlying the First Motion for Specific Discovery.  See Tr. at 125:25-130:16 (Court, Villa); Tr. at 146:3-4 (Court).

The Court's conclusion to maintain its reliance on the logic of United States v. Hykes also dictates its order regarding the First Motion for Specific Discovery's request for the list of inmates at the PNM North facility between January 1, 2001, and March 26, 2001.  The First Motion for Specific Discovery Defendants made that request because there had been a meeting "in 2001[;] while in the custody of New Mexico Corrections Department, Frederico Munoz attended a meeting with SNM gang leaders, in which hits were placed on the two victims in this case."  Tr. at 113:8-19 (Castle).  The Court orders that "we find out the date of the meeting, and back it up two weeks.  And then it will be the list of the inmates two weeks before that meeting," until three days after the March 26, 2001, murder.  Tr. at 116:1-118:7 (Court)(giving the United States thirty days to make this investigation and production).  The Court also orders the United States to produce the list of inmate's names in Southern New Mexico's pods 1A and 1B two weeks before and three days after J.M.'s murder (the murder underlying Counts 6 and 7), and, similarly, at Baca's request, orders the United States to produce the list of inmates housed at PNM North on the date of the murder underlying Counts 6 and 7.  See Tr. at 132:24-133:7 (Court, Lowry).  The Court is of the opinion that the aforementioned discovery orders require the United States to ensure it has made Brady and Giglio disclosures of all potentially exculpatory information under its custody and control.

United States v. Hykes further guides the Court's rulings regarding the Second Motion for Specific Discovery's requests, particularly concerning the requests that regard STIU files.  As

the United States provided at the hearing, the United States has agreed to adhere to the Court's orders:

> [W]e've agreed to review the STIU files for the defendants.  And we've agreed to review the STIU files for the list of suspects that were identified by Mr. Castle in the first specific discovery motion.  We've agreed to review the STIU files for the suspects I believe Mr. Villa will point out to us from the second discovery motion [sic]. . . .  So that same thing would go here.  We will still review the defendants' STIU files. . . .

Tr. at 145:6-21 (Beck).  The Court similarly, now, orders that the pen packs each of the motions requests should be treated in the same manner as the STIU files -- thus, the United States, having indicated that "the way that we've been viewing [pen packs] is that, like the STIU files, if the defendant or the defendants have specific suspects they believe, we would request of New Mexico Corrections Department, if those exist, that they turn them over."  Tr. at 147:1-11 (Beck).  The Court thus orders that the United States must undergo such work for all pen packs that the three motions requests.  See Tr. at 147:16-19 (Court).

The Court also notes, at this time, that DNA information can be exculpatory material under Brady, and, thus, in tandem with the United States' agreement to disclose any relevant DNA materials from the related state investigations of SNM, the Court will order that the DNA information requested by each of the three motions be disclosed.  See Tr. at 29:3-13 (Beck). Because the Court understands that the United States is at the State of New Mexico's whims with respect to recovery of DNA hard data in state investigations, the Court orders, more generally, that the United States do whatever it can to obtain those requested materials and keep the Defendants in the loop with what they are finding.  See Tr. at 77:10-16 (Court).

Regarding the production of a "Master Roster" -- as each of the Motion to Compel, First Motion for Specific Discovery, and Second Motion for Specific Discovery request -- the Court, pursuant to United States v. Hykes, orders that, "if the representation at the present time is the

Government cannot locate this document, then I have to deny the request.  I would like the Government to poke around a little bit more," Tr. at 155:3-6 (Court), because, such a document's contents might implicate <u>Brady</u> obligations.  The Court will now turn to the more specific, nuanced requests each of the motions makes which the Court's general conclusions do not adequately resolve -- and also the requests that the United States has decided not to contest.

## II.    THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN THE MOTION TO COMPEL.

The Motion to Compel, in addition to those requests already resolved, requests that the United States provide discovery of the statements of all of the Defendants whom the New Mexico State Police and the prison's STIU interviewed following the murder of J.M.  <u>See</u> Motion to Compel at 2-3.  The United States indicated at the hearing that it had already complied with this request, and thus no dispute exists.  Accordingly, to the extent that the requested information is still not in the Motion to Compel Defendants' possession, the Court now orders that the United States follow through with the production.  <u>See</u> Tr. at 15:10-16:3 (Beck, Court).

## III.    THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN THE FIRST MOTION FOR SPECIFIC DISCOVERY.

The remaining specific discovery requests in the First Motion for Specific Discovery are: (i) all files on the Los Carnales prison gang listing suspected and confirmed members, and their activities, specifically including such files on R.G.; (ii) threat-separation listings for F.C. and R.G.'s housing in the penitentiary system; (iii) administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population; and (x) the list of inmates in the facility who may have been free to move amongst pods.  <u>See</u> First Motion for Specific Discovery at 7-11.  As the Court ruled with respect to the STIU files for all the Defendants in this case, it will similarly rule for the request for files on the Los Carnales prison gang.  Where the

Defendants alert the United States to a particular suspect or victim involved in the SNM prosecution that is connected to the Los Carnales gang, then the United States will need to make an investigation into that suspect or victim's file, and disclose the relevant <u>Brady</u> materials. <u>See</u> Tr. at 102:18-23 (Court). The Court, similarly, will not order wholesale disclosure of a list of inmates who are free to move amongst pods -- there being too many, and the First Motion for Specific Discovery Defendants, as of yet, not having indicated any alternative suspects with such a status who might have committed the alleged murders. <u>See</u> Tr. at 102:18-23 (Court). Last, regarding threat-separation listings for F.C. and R.G.'s housing in the penitentiary system and administrative segregation waivers that F.C. or R.G. signed authorizing their housing in general population, the Court will order the United States to disclose those materials in accordance with their agreement in the First Motion for Specific Discovery Response. <u>See</u> First Motion for Specific Discovery Response at 13-14. To the extent that the United States has not yet complied, the Court orders the production within fourteen days.

IV.    **THE COURT GRANTS IN PART AND DENIES IN PART THE REQUESTS IN THE SECOND MOTION FOR SPECIFIC DISCOVERY.**

The remaining requests that the Second Motion for Specific Discovery makes are: (i) unredacted copies of all documents provided in discovery; (iii) separation listings by the prison system for F.S.; (iv) Administrative Segregation waivers that F.S. signed; (v) any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and (vi) any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations. <u>See</u> Second Motion for Specific Discovery at 3-7.

Regarding the request for unredacted discovery, the Second Motion for Specific Discovery chose to rescind the request because, as the Court was indicating, the redacted information was related to the identities of confidential informants and was better left for a different motion on a different day.  See Tr. at 143:2-4 (Burke).  The Defendants realized that they had not come close to making the showing that would be needed to secure the identity of a confidential informant. Regarding the request for separation listings by the prison system for F.S. and Administrative Segregation waivers that F.S. signed, the Court will order the United States to disclose those materials in accordance with their agreement in the Second Motion for Specific Discovery Response.  See Second Motion for Specific Discovery Response at 12-13.  To the extent that the United States has not yet complied, the Court orders the production within fourteen days.

Regarding the requests for any and all documents relating to the New Mexico Corrections Department's guidelines for assessing, classifying, and validating an inmate as a gang member, associate, or affiliate and, more particularly, a member, associate, or affiliate of SNM; and for any and all documents in the United States' possession relating to SNM's philosophy, practices, and activities in the New Mexico Corrections Department -- such as constitutions or bylaws, membership protocol, and alleged gang-related disciplinary violations, the Court will deny those requests at the present time.  At the hearing, the United States objected to the requests because, in part, it did not have custody or control "over those specific regulations and guidelines, as opposed to actual files."  Tr. at 149:1-13 (Beck).  The Court, however, considered the most salient factor pertaining to this request to be whether an expert would be testifying as to these aspects of gang membership -- and which the requested material appeared to be aimed -- and "if you're going to have corrections people come in and say Mr. Baca is a member of the SNM gang, then I guess I do think you should produce something that indicates how they make that

determination," Tr. at 150:6-10 (Court), and "if . . . you're going to have an expert do it . . . then I would be inclined to deny the request.  So at the present time I'll deny the request," Tr. at 150:11-19 (Court).  The United States stated it would <u>not</u> be Corrections people identifying SNM members, but instead a "gang expert."  Tr. at 149:21-150:5 (Beck).  On that response, the Court has a hard time saying that this request should be granted.  The Court thus denies these requests without prejudice to the Defendants raising their requests if they can show that the materials will be relevant should the United States decide to rely on Corrections people to identify SNM members.

**IT IS ORDERED** that: (i) the discovery requests in the Defendants' Motion for Specific Discovery, filed May 23, 2016 (Doc. 539), are granted in part and denied in part; (ii) the discovery requests in the Defendants' Motion to Compel Discovery, filed September 1, 2016 (Doc. 668), are granted in part and denied in part; and (iii) the discovery requests in the Defendants' Motion for Specific Discovery, filed September 8, 2016 (Doc. 678), are granted in part and denied in part.  In sum, under these circumstances, the Court concludes that the New Mexico Corrections Department's records, under the unique facts of this case, are under the AUSA's control.  Further, by concluding not to stray from the discovery standards it applied in its 2016 opinion <u>United States v. Hykes</u>, the Court resolves a variety of the discovery requests in the Motion to Compel, the First Motion for Specific Discovery, and the Second Motion for Specific Discovery, by simply maintaining the aforementioned standards -- regarding scope of disclosure and review of third-party files -- which were reaffirmed in <u>United States v. Hykes</u>. The Court, accordingly, orders the United States' production of the specific items outlined above in fourteen days, absent a ruling otherwise allowing the United States more time to comply.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

       *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

       *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

      *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

      *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

      *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

      *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

     *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

> *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

> *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

> *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

> *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

> *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

> *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

   *Attorney for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

   *Attorney for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

   *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

   *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

   *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*