# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                          No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed April 12, 2017 (Doc. 1091)("Sealed

**THIS MATTER** comes before the Court on a Competency Hearing held on March 20, 2017, and March 21, 2017. See Transcript of Hearing, taken March 20, 2017 ("Tr."); Transcript of Hearing, taken March 21, 2017 ("2 Tr.").[2] The primary issue is whether Defendant Eugene Martinez is mentally competent to stand trial. The Court finds that E. Martinez has not established, by a preponderance of the evidence, that he is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings or to assist in his defense. The Court, accordingly, concludes that the preponderance of the evidence does not suggest E. Martinez is mentally incompetent to stand trial.

## FACTUAL BACKGROUND

The Court makes the following findings of fact. The Court first makes findings that pertain to E. Martinez' childhood and development, as well as his educational, medical, and legal history that preceded E. Martinez' present criminal charges. The Court's findings of fact, where possible, will proceed chronologically. The Court provides a more comprehensive factual and procedural background regarding E. Martinez' current charges after it has made its findings pertaining to E. Martinez' early life. The Court makes its findings based upon its review of the report that Bureau of Prisons Forensic Psychologist Dr. Lesli Johnson, Ph.D., completed, see

---

MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court files a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The Court incorporates herein the proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

[2]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final versions may have slightly different page and/or line numbers.

Forensic Evaluation (signed June 14, 2016), filed June 20, 2016 (Doc. 596)("Johnson Report"), a more specific neuropsychological evaluation that Dr. Eric Westfried, Ph.D., completed, see Forensic Neuropsychological Competence to Stand Trial Evaluation at 1 (signed February 27, 2017), filed March 3, 2017 (Doc. 938)("Westfried Report"), and the testimony at the Competency Hearing that the Court held on March 20-21, 2017.

      **1.**       <u>**Findings of Fact Regarding E. Martinez' Pre-Indictment Life.**</u>

      1.       E. Martinez was born on June 23, 1978, in Albuquerque, New Mexico. <u>See, e.g.,</u> Johnson Report at 4; Westfried Report at 1.

      2.       He was the youngest born, having one older brother. <u>See</u> Johnson Report at 4; Westfried Report at 4.

      3.       E. Martinez had no known prenatal deficiencies, but was potentially born premature. <u>See</u> Johnson Report at 5.

      4.       He took a long time to be able to use the bathroom, to talk, and to walk. <u>See</u> Johnson Report at 5.

      5.       As a child, E. Martinez was hit in the head several times. <u>See</u> Johnson Report at 5.

      6.       He would get sick. <u>See</u> Westfried Report at 5.

      7.       He is blind in one eye. <u>See</u> Westfried Report at 5.

      8.       He bounced between homes until his parents divorced when he was seven or eight years old. <u>See</u> Johnson Report at 5; Westfried Report at 4.

      9.       E. Martinez always had clothes and food as a child, and he also lived in a clean house. <u>See</u> Johnson Report at 5.

10.     He had poor relationships with his family, would get into trouble, and do "little dumb stuff." Johnson Report at 5.

11.     He was on a lot of drugs.  See Johnson Report at 5.

12.     He was always on drugs, sniffed paint, and sniffed rubber cement.  See Johnson Report at 5.

13.     He had car wrecks, and one time he hit a dumpster truck and flew from the back seat.  See Westfried Report at 5.

14.     E. Martinez' father was abusive to both him and his brother, as well as to his mother.  See Johnson Report at 4, 6; Westfried Report at 4.

15.     E. Martinez would hide at different family members' homes to escape the violence, as E. Martinez' father would "hit [the three of them] with whatever he had in his hand." Johnson Report at 6.  See Westfried Report at 4.

16.     Often, E. Martinez' father would stand at their back door in the back, and yell for him and his brother, and then tell them to "get out," and he would kick or hit them with his steel toed boots, boards, and even a wrench.  Johnson Report at 6.  See Westfried Report at 4.

17.     E. Martinez' father "never missed."  Johnson Report at 6.

18.     E. Martinez' father acted normal around other people, but, when he was drunk, he would get mean and abusive.  See Johnson Report at 6.

19.     E. Martinez' father one time beat his mother, causing E. Martinez to preemptively protect himself by dressing in five layers of clothes, only to have his father tell him to take off his clothes for a beating.  See Johnson Report at 6.

20.     When his parents were together, and his father would start being abusive, his mother would call family to take them away.  See Johnson Report at 4-5.

21.     E. Martinez' mother would "come over in the middle of the night or crying and scared to death saying he threatened to kill [her], he threatened to shoot [her], threatened to kill the kids if [she] ever went to the police then he would definitely carry out his threats, and she would never want to cooperate had it ever gone beyond that she reported it to the police."  Tr. at 13:8-14 (Frank Ortiz).

22.     E. Martinez' mother would often hide with her kids at the house of Frank Ortiz, a family member, and even E. Martinez -- alone -- was a frequent visitor, and Ortiz "did everything [h]e could to be foster parents . . . to show him what normal life would be like."  Tr. at 15:23-16:19 (Ortiz).

23.     "[W]hen [Ortiz] would go over and visit, there was usually argument going on in the yard, screaming and yelling, a very violent family."  Tr. at 12:1-10 (Ortiz).

24.     "On occasions when [Ortiz] would run across [E. Martinez' father] in the immediate area, he always had a scowl on his face, an angry individual, had that persona."  Tr. at 12:1-10 (Ortiz).

25.     E. Martinez would often be "over at [Ortiz'] house with visible injuries from brutally [being beaten], and crying, huddling, scared from death threats, and that sort of thing."  Tr. at 12:15-18 (Ortiz).

26.     E. Martinez' father would also throw E. Martinez out of the car, and then drive away -- only to stop the car, let E. Martinez catch the car and think that he could get back in the car, and then speed away again.  See Westfried Report at 8.

27.     During E. Martinez' childhood, he witnessed various dark events.  See Johnson Report at 6; Westfried Report at 4; Tr. at 13:23-14:25 (Ortiz).

28.     At one time, someone in the neighborhood killed E. Martinez' uncle and then put his body in E. Martinez' backyard on top of the train tracks.  <u>See</u> Johnson Report at 6; Westfried Report at 4.

29.     E. Martinez' father told him to go and recover the body.  <u>See</u> Johnson Report at 6.

30.     E. Martinez saw "crows eating [his] uncle's body."  Westfried Report at 4.

31.     His father and mother then got guns, and with E. Martinez in the vehicle's back seat, went to the home of the person whom E. Martinez' father suspected had killed the uncle. <u>See</u> Johnson Report at 6; Westfried Report at 4.

32.     E. Martinez' father exited the vehicle, knocked on the door, and shot "the man, the girl, and maybe the mom."  Johnson Report at 6.

33.     Following his parents' divorce, E. Martinez lived with his mother.  <u>See</u> Johnson Report at 5.

34.     E. Martinez was frequently left in the family home alone, or with his brother, and his mother only occasionally checked on him to fill the refrigerator with food.  <u>See</u> Johnson Report at 4-5; Westfried Report at 4.

35.     E. Martinez' brother would stay with his girlfriend across the street, however, and attend to E. Martinez if he needed something.  <u>See</u> Johnson Report at 5; Westfried Report at 4.

36.     E. Martinez' brother would do the same things as his father, however, with respect to beating him.  <u>See</u> Johnson Report at 6.

37.     As he aged, E. Martinez' brother became violent and angry like his father.  <u>See</u> Tr. at 13:23-14:25 (Ortiz).

38.    E. Martinez' mother remarried a few years after the divorce, and E. Martinez then lived with his mother and stepfather.  See Johnson Report at 4-5; Westfried Report at 4; Tr. at 17:6-18:23 (Ortiz).

39.    E. Martinez did not have a good relationship with the stepfather.  See Johnson Report at 5; Tr. at 17:6-18:23 (Ortiz).

40.    When E. Martinez' mother remarried, although the stepfather was cordial with E. Martinez, E. Martinez would often be kicked out of the stepfather's home, because he would frequently get in trouble.  See Tr. at 17:6-18:23 (Ortiz).

41.    When E. Martinez was a young child he would play and interact with Ortiz' three daughters.  See Tr. at 8:9-18 (Ortiz).

42.    The children also all attended the same schools, although E. Martinez was in the Special Education programs.  See Tr. at 9:11-10:5 (Ortiz).

43.    He "repeated kindergarten and went to special ed. . . .  They said I had a something speech difficult.  That's why in special ed.  I was in there for a lot of things: They said I didn't behave or understand . . . I had to ride a little bus, kids with helmets and chin guards."  Johnson Report at 5.

44.    E. Martinez started drinking alcohol in the third grade, when he was "probably seven, six, even maybe younger;" during the happy times when his father was not abusing the family, he would "give [E. Martinez] beer . . . [and E. Martinez] would take beers during a party and sometimes [E. Martinez' father] would give it to [E. Martinez]."  Westfried Report at 8.  See Johnson Report at 8.

45.    He has been smoking weed and sniffing glue since he was in the third grade.  See Johnson Report at 5.

46.    Although E. Martinez did not enjoy drinking beer, he would drink it, "because [he] didn't want [his] father to get mad."  Westfried Report at 8.

47.    E. Martinez began drinking on a regular basis when he was "[e]ight, nine, ten." Westfried Report at 8.

48.    "Martinez would drink whiskey till [he] blacked out."  Westfried Report at 8.

49.    "One time [E. Martinez went to] the hospital to pump [the whiskey] out . . . [and E. Martinez s]aid [he] had poison."  Westfried Report at 8.

50.    E. Martinez went to school drunk many times.  See Johnson Report at 8.

51.    Around the same time, in third grade, E. Martinez began "huffing rubber cement and paint," and he would huff "all day" for most of the time between third and sixth grade. Johnson Report at 8.  See Westfried Report at 9.

52.    He would put the glue in a sandwich bag, so it would last all day.  See Johnson Report at 8.

53.    E. Martinez started smoking marijuana around sometime between his fifth birthday and third grade, and once he had begun he would smoke "every day after school." Westfried Report at 8.  See Johnson Report at 8.

54.    Marijuana usage was a mainstay for E. Martinez' childhood and adolescence.  See Westfried Report at 8; Johnson Report at 8.

55.    E. Martinez began using cocaine around his eighth birthday, and heroin around his fourteenth birthday.  See Westfried Report at 8; Johnson Report at 9.

56.    E. Martinez would spend money daily to buy heroin, and has gone through withdrawals eight or nine times -- but he would always use again, because "it would make [him] forget about everything [and b]e happy."  Westfried Report at 8.  See Johnson Report at 9.

57.    E. Martinez also tried meth, LSD, and mushrooms.  See Westfried Report at 9; Johnson Report at 9.

58.    E. Martinez was admitted to Kaseman Presbyterian Hospital in Albuquerque after having reported "hallucinating or seeing things," and he stayed there for "maybe three and a half months because [he] kept hearing stuff while [he] was in the hospital."  Johnson Report at 9.

59.    E. Martinez "entered there at approximately age 7."  Tr. at 46:15-22 (Westfried).

60.    "Essentially children's psychiatric hospital is the last stop in the state of New Mexico for children as opposed to adoles[cents]."  Tr. at 46:15-22 (Westfried).

61.    Further, "[i]f you have gone there, that is a brand of being severely disturbed as a child."  Tr. at 47:3-5 (Westfried).

62.    The highest level of education E. Martinez completed was the sixth grade, however, he attended a year at Del Norte High School in Albuquerque.  See Johnson Report at 7; Westfried Report at 5; Tr. at 9:25 (Ortiz).

63.    Nonetheless, E. Martinez' educational experience was marred with bad "grades and attendance," suspensions, and expulsions.  Johnson Report at 7; Westfried Report at 5.

64.    E. Martinez would "fight[] with kids and talk[] back to the teacher."  Johnson Report at 7.

65.    From the time he was young E. Martinez was playing with Ortiz' kids in elementary school, he was very childlike, which is normal, but as he progressed into the time when he was more of a teenager and became an adult he sort of stayed at that same level.  See Tr. at 19:15-20:17 (Ortiz).

66.    He seemed like he could not comprehend everything, so every time Ortiz would visit him in jail or would be around him, he was constantly asking what is happening to him,

could Ortiz explain it to him, and displaying an inability to comprehend his actions and what was happening in the court system.  See Tr. at 19:15-20:17 (Ortiz).

67.    E. Martinez "seemed to be very confused so [Ortiz] was constantly explaining to him all the things that were going on in his life."  Tr. at 19:15-20:17 (Ortiz).

68.    As E. Martinez aged, he became isolated in family gatherings and would "kind of just sit by himself and if [Ortiz] did . . . have occasion to chat with [E. Martinez] it was very simple talking," and was not "about his plans for the future or anything it was just basically how are you doing, fine, just very basic conversation, nothing that was beyond planning or some other, someone who had any sort of intellectual life who had been reading or thinking about other things beyond just simple actions."  Tr. at 19:15-20:17 (Ortiz).

69.    Throughout E. Martinez' childhood, he spent time in juvenile detention, adolescent treatment centers, adult jail, and prison.  See Westfried Report at 9.

70.    E. Martinez was placed into foster care, around age nine or ten, after a neighbor apparently reported that he had been living alone, see Johnson Report at 5, and his teacher had taken him home to live with her and her husband, see Westfried Report 4.

71.    E. Martinez lived, approximately, in four to seven foster homes, and frequently ran away when he witnessed activity that he found unsettling, such as fighting and sexual assault by the other foster kids.  See Johnson Report at 5; Westfried Report at 4.

72.    [REDACTED] while he was in foster care.  See Westfried Report at 4; Johnson Report at 7.

73.    [REDACTED] E. Martinez before he began living in foster care.  See Johnson Report at 7; Westfried Report at 4.

74.    [REDACTED] abuse "occurred almost every day."  Johnson Report at 5.

75.     One Cousin "got [E. Martinez] stoned on weed," and the abuse [REDACTED]. Johnson Report at 5.

76.     [REDACTED] as a result, the abuse occurred only once a week or every couple of weeks.  Johnson Report at 5.

77.     [REDACTED] abusive behavior [REDACTED] stopped when E. Martinez ceased going [REDACTED] following his parents' divorce.  See Johnson Report at 5.

78.     E. Martinez had problems in foster care, so he began living at La Nueva Vida Group Home in Santa Fe.  See Westfried Report at 4.  Cf. Johnson Report at 10 (stating this was E. Martinez' last psychiatric hospitalization).  E. Martinez then ran away from, La Nueva Vida Group Home.  See Westfried Report at 4.

79.     Regardless of the chronology, E. Martinez reported being prescribed medications as a result of his hallucinations and fear.  See Johnson Report at 10.

80.     E. Martinez' father and brother were both murdered as a result of the same incident.  See Johnson Report at 6.

81.     E. Martinez -- who had run away from La Nueva Vida Group Home, see Westfried Report at 4 -- was at a bar or liquor store with his father and brother, where they bought beer.  See Johnson Report at 6; Tr. at 13:23-14:25 (Ortiz).

82.     When they walked out of the establishment to the car, another van pulled up, and the occupants engaged E. Martinez' brother in an argument.  See Johnson Report at 6.

83.     One of the van's occupants ultimately got out of the vehicle and began fighting E. Martinez' brother, with E. Martinez' brother getting the better of the fight, only to have the van's driver exit the vehicle and shoot E. Martinez' brother "six times in the back of the head." Johnson Report at 6.

84.     Upon the shooting, E. Martinez' father exited the vehicle with a knife and joined the fray, only to be shot "six times in the face." Johnson Report at 6.

85.     The assailants saw E. Martinez, but left him alone. See Johnson Report at 6.

86.     After his father's and brother's murders, E. Martinez "was numb," and he was then placed at the Sequoyah Adolescent Treatment Center for one and a half years. See Westfried Report at 4; Johnson Report at 9-10.

87.     It was upon witnessing the murders he reported that he was placed at Sequoyah. See Westfried Report at 4.

88.     The Sequoyah Center was the destination for "severely mentally ill" juveniles going through the criminal system in New Mexico. Tr. at 47:6-47:21 (Westfried).

89.     Accordingly, E. Martinez "had been during his childhood and adolescence in the facilities of New Mexico that are pretty much designated for the most severely emotional[ly] disturbed minors." Tr. at 47:18-21 (Westfried).

90.     While at the Sequoyah Center, the doctors did memory and communicative testing, and a "communicative evaluation . . . at Sequoia when he was 17 years old [done] by a speech pathologist . . . [led to a] diagnose[s of] a severe language disorder." Tr. at 55:10-20 (Westfried).

91.     E. Martinez was prescribed Prozac and other medication, participated in individual and group therapy, and was further diagnosed with "paranoid and schizophrenic, anxiety, PTSD, and, um, depression." Johnson Report at 10.

92.     E. Martinez reported a criminal history of robbery, stabbing a guy in the arm, and heroin distribution. See Westfried Report at 9.

93.    E. Martinez reported being arrested "maybe four times," the first being when his father and brother were murdered, after which he was placed in juvenile detention for six months and then transferred to the Sequoyah Center.  Johnson Report at 12.

94.    E. Martinez was arrested again at about age fourteen for "stealing or robbery." Johnson Report at 12.  See Westfried Report at 9.

95.    He was placed in juvenile detention for "about a year."  Johnson Report at 12.

96.    While at the juvenile detention center, he received incident reports for approximately three assaults and was transferred to "adult jail" for "about a year," where he received incident reports for two fights.  Johnson Report at 12.

97.    E. Martinez was then transferred to a New Mexico state prison where he remained until age 26.  See Johnson Report at 12.

98.    Upon release, in 2011 or 2012, E. Martinez was arrested for drug trafficking heroin.  See Johnson Report at 12.

99.    He spent "a couple months in jail," and "saw doctors for evaluations."  Johnson Report at 12.

100.    E. Martinez "was found not competent and not dangerous and that case, as well as other cases that were joined, were dismissed without prejudice."  Johnson Report at 12.  See Westfried Report at 9.

101.    Dr. James Harrington, Ph.D.'s, February 4, 2014, report resulted in a diagnosis of intellectual disability of moderate severity and a conclusion that E. Martinez' cognitive deficits "impairs his ability to comprehend" the legal proceedings.  Westfried Report at 9.  These conclusions predicated the finding of incompetency.  Westfried Report at 9.

102.     E. Martinez tested at the fifth percentile in reading (Standard Score = 76), and at the first percentile in spelling (Standard Score = 65), and arithmetic  (Standard Score = 63).  See Johnson Report at 13.

103.      E. Martinez was referred for a communication evaluation, in which E. Martinez' Full Scale IQ was 80 (Low Average), and he earned a Standard Score of 56 on a problem-solving test.  See Johnson Report at 13.

104.     The diagnostic impression of the communication evaluation was "specific learning disabled in oral language," and he advised E. Martinez be seen by a speech/language pathologist.  Johnson Report at 13.

105.     Dr. Harrington conducted a clinical and forensic interview, and administered the Montreal Cognitive Assessment (MOCA), the Trail Making Test Parts A and B, and the Wechsler Adult Intelligence Scale-Ill (WAIS-Ill).  See Johnson Report at 13.

106.     Dr. Harrington's diagnostic impression included moderate intellectual disability, and Dr. Harrington opined that E. Martinez was not competent to proceed to adjudication, plead guilty, or stand trial.  See Johnson Report at 13.

107.     Dr. Harrington indicated that E. Martinez' "mental disorder, intellectual disability, directly impacts and impairs his ability to comprehend the adversarial process in which he is involved, to have the capacity to follow proceedings, and knowingly and intelligently assist his attorney in his own defense."  Johnson Report at 13.

108.     Dr. Harrington further indicated it was unlikely E. Martinez could be restored to competency.  See Johnson Report at 13.

109.     E. Martinez' formal criminal history is as follows:

Prior arrests included: auto burglary and conspiracy to commit auto burglary (02/13/1994; disposition unknown); failure to comply with conditions of

probation; aggravated burglary with a deadly weapon, probation violation (10/02/1996; disposition unknown); probation violation (06/13/1997; parole): aggravated assault with a deadly weapon, prisoner in custody of deadly weapon (07/21/1997; disposition unknown); two counts of bringing contraband into jail (10/02/1997; disposition unknown); two counts of possession of a deadly weapon-shank-by a prisoner (05/06/1998; seven years); parole violation, armed robbery, possession of a deadly weapon (07/24/2002; seven years, unable to associate disposition with charge); stolen property offenses, burglary/breaking and entering (06/15/2010; disposition unknown); robbery, aggravated assault, aggravated battery, conspiracy (02/17/2011; disposition unknown); two counts of K90Z other offenses (09/28/2011; disposition unknown); drug/narcotic violation (03/07/2012; disposition unknown): K90Z other offenses (05/08/2012; disposition unknown); two counts of drug/narcotic violation (06/23/2012; disposition unknown); two counts of K90Z other offenses (07/16/2012; disposition unknown); two counts of burglary/breaking and entering, possession of burglary tools (09/27/2012; disposition unknown); K90Z other offenses (12/12/2012; disposition unknown); two counts of K90Z other offenses (01/03/2013; disposition unknown); and two counts of K90Z other offenses (02/19/2013; disposition unknown).

Johnson Report at 13.

110.    For the last thirteen years E. Martinez has lived in a home, with his wife, on the northeast side of the Sandia Mountains.  See Westfried Report at 2.

111.    He attends to his chickens, cat, and dog, and works on his drawings and artwork. See Westfried Report at 2-3.

### 2.    <u>The Procedural and Factual Background Surrounding the Indictment</u>.

112.    To provide context for its consideration of the E. Martinez' Competency Hearing, the Court provides a recitation of the relevant background facts from the Redacted Second Superseding Indictment, filed March 9, 2017 (Doc. 949)("Second Superseding Indictment"). The Court does not set forth these particular facts as findings or the truth, except where it indicates differently in its "findings of fact."  The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

113.    This case deals with crimes the Syndicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") allegedly committed through its members, prospects, and associates.  See Second Superseding Indictment at 2.

114.    SNM, through its members, prospects, and associates, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Second Superseding Indictment at 2.

115.    SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Second Superseding Indictment at 3.  The Second Superseding Indictment names thirty SNM members, prospects, and associates, including E. Martinez, who have allegedly engaged in Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, and makes sixteen counts based on SNM's relevant conduct. See Second Superseding Indictment at 1.

116.    The Court has already, on numerous occasions, provided a detailed explanation of the charges and the history of the multiple investigations and indictments, see Redacted Indictment, filed December 1, 2015 (Doc. 2)("Indictment"); Redacted Superseding Indictment, filed April 21, 2016 (Doc. 368)("Superseding Indictment"), giving rise to this case, see United States of America v. Angel DeLeon, et al., No. CR. 15-4268 JB, 2016 WL 3124632 (D.N.M. May 27, 2016)(Browning, J.).

117.    The Second Superseding Indictment, entered on March 9, 2017, added to the Superseding Indictment a count for witness tampering in violation of 18 U.S.C. § 1512.  See Second Superseding Indictment at 1.

118.    For fuller context, there are four cases before the Court related to SNM's alleged criminal activity.  The Honorable Ken Gonzales, District Judge for the United States District of New Mexico, initially presided over these cases until they were reassigned to the Court on March 30, 2016.  See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351).

119.    In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.), Plaintiff United States of America names twelve defendants, all alleged SNM members, prospects, or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).  See United States v. Baca, No. CR 16-1613, Redacted Superseding Indictment at 1, filed March 9, 2017 (Doc. 372).

120.    There is also a prosecution of one Defendant for drug crimes, see United States v. Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct, as is alleged in the present case, constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States v. Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

121.    The facts that specifically pertain to E. Martinez' prosecution are as follows:

On or about March 26, 2001, in Dona Ana County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity, . . . EUGENE MARTINEZ, a.k.a. "Little Guero," . . . did unlawfully, knowingly, and intentionally murder R.G., in violation of NMSA 1978, Sections 30-2-1 and 30-1-13.  All in violation of 18 U.S.C. §§ 1959(a)(l) and 2.

Second Superseding Indictment at 10 (providing the allegations underlying Count 2, the murder of R.G.).

122. On March 14, 2016, Judge Gonzales ordered E. Martinez, pursuant to 18 U.S.C. §§ 4241(a), (b); 427(b), be "committed to the custody of the Attorney General for placement in a suitable facility designated by the Federal Bureau of Prisons (BOP) to undergo examination by a licensed certified psychologist." Amended Order for an Evaluation to Determine Competency, filed March 24, 2016 (Doc. 336)("Competency Order").

123. The Competency Order, coming

[b]ased on the representations of defense counsel, [indicating that] there is reasonable cause to believe that the Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense,

specifically ordered that a BOP

psychologist . . . prepare a report pursuant to 18 U.S.C. § 4247(c), which shall include:

1. the defendant's history and present symptoms;

2. a description of any psychological, psychiatric or medical tests employed and the results of any such tests;

3. the examiner's findings and the examiner's opinions as to diagnosis and prognosis; and

4. the examiner's clinical assessment as to whether the defendant is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense.

Competency Order at 1-2.

124. BOP Forensic Psychologist Dr. Lesli Johnson, Ph.D., completed the report which was filed in this case on June 20, 2016. See Johnson Report.

125. E. Martinez took issue with the Johnson Report, however, so E. Martinez' defense counsel referred E. Martinez to another forensic evaluator, Dr. William Foote, who then

subsequently referred E. Martinez to Dr. Eric Westfried, Ph.D., for a more specific neuropsychological evaluation.  See Westfried Report at 1.

126.    The Court then held a Competency Hearing on March 20-21, 2017, and told the parties it would issue findings of fact and conclusions of law in support of its conclusion that E. Martinez was competent to stand trial.

127.    The remainder of the Court's findings of fact regarding E. Martinez' mental health and competency are as follows.

**3.    Findings of Fact Regarding E. Martinez' Post-Indictment Mental Competency.**

128.    E. Martinez underwent an approximately 60-day long competency evaluation at the Metropolitan Detention Center in Los Angeles, California.  See Johnson Report at 1.

129.    The evaluation included a self-report biography interview, from which, in part, the Court has identified and made salient findings of fact.  See Johnson Report at 3-14.

130.    Dr. Johnson monitored and analyzed E. Martinez' telephone calls and emails as part of the evaluation.  See Johnson Report at 3.

131.    E. Martinez' telephone calls indicate an understanding of the legal process and court proceedings, because he made several "references to communicating with his lawyer regarding his case," and indicated "an understanding of how to contact his attorney and the necessity to contact counsel to discuss his case, as well as a willingness to work with his attorney."   Johnson Report at 14-25 (including telephone calls where E. Martinez discussed being found incompetent in a previous proceeding, and telephone calls where E. Martinez demonstrated an understanding of the severity of the charges, "Man I don't wanna go to prison for the rest of my life, or-or [sic] death penalty, or anything like that for something I didn't do," and "I don't know why they got me here, but I know it's serious;" E. Martinez also discussed

urinalysis and prison politics, as well as consciously refraining from discussing certain topics over the telephone).

132.    When speaking with his wife, E. Martinez discussed his counsel, questioned the quality of his counsel, opined whether his counsel will be helpful to him during this case, and further asked how he obtained his counsel.  See Johnson Report at 14.

133.    E. Martinez also discussed his competency evaluation and "specifically indicated he was in downtown Los Angeles, at a federal jail, for an evaluation."  Johnson Report at 14.

134.    Regarding competency, E. Martinez exhibited an understanding of the term over the course of his telephone conversations, "discussed being found incompetent during a prior evaluation," and inquired whether this competency evaluation would also result in his release. Johnson Report at 14.

135.    At one point, E. Martinez corrected his wife's statement regarding a finding that he was "competent," asking her if instead she meant "incompetent," suggesting a more nuanced understanding of the legal process.  Johnson Report at 14.

136.    E. Martinez sent email messages to his wife, and although he often obtained the help of other inmates to use the computer, he was observed using the computer on his own as well.  See Johnson Report at 14.

137.    "Overall, through the course of listening to the telephone  conversations  and reviewing e-mail correspondence,  there was  no indication Mr. Martinez was suffering from any form of  involuntary  interference  with  mental functioning  or  any  level of  intellectual disability."  Johnson Report at 15.

138.    E. Martinez "demonstrated an intact ability to maintain hygiene, develop social relationships, and adhere to the regulations of a correctional environment."  Johnson Report at 15.

139.    "He did not discuss or appear to experience active symptoms of a major mental illness, or significant cognitive impairment."  Johnson Report at 15.

140.    E. Martinez' BOP evaluation consisted of both behavioral and day-to-day observations, as well as testing for various cognitive abilities.  See Johnson Report at 14-16.

141.    E. Martinez was tested for "intellectual functioning," "academic achievement," "malingering," and "personality functioning."  Johnson Report at 18-20.

142.    E. Martinez' intellectual functioning testing comprised of an administration of the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") test, which is a measure of overall cognitive ability and yields a Full Scale Intelligence Quotient ("FSIQ"), and four index scores, including the Verbal Comprehension Index ("VCI"), Perceptual Reasoning Index ("PRI"), Processing Speed Index ("PSI"), and Working Memory Index ("WMI").   Johnson Report at 18.

143.    E. Martinez scored in the "Extremely Low" range for every category, on a scale that ranges from "Extremely Low to Very Superior."  Johnson Report at 18-19.

144.    E. Martinez' performance on the WAIS-IV indicated that he was functioning in the Extremely Low range of intelligence and indicated significant limitations in "verbal comprehension, perceptual reasoning, working memory and processing speed," all limitations that were not expected given his behavioral observations.  Johnson Report at 19.

145.    E. Martinez' intellectual functioning limitations as demonstrated by the testing were not consistent with his "general conversation and observed behavior on the unit," and his

"cognitive test results are not consistent with his academic history, even though he was in special education." Johnson Report at 19.

146.    The cognitive functioning results were also well below those of previous evaluations, "in 1995 (FSIQ = 80) and 2013 (FSIQ = 53)." Johnson Report at 19.

147.    E. Martinez' academic achievement testing consisted of an administration of the Wide Range Achievement Test, Fourth Edition ("WRAT-4"), which "measures the basic education skills of word reading, sentences comprehension, spelling, and arithmetic." Johnson Report at 19.

148.    The WRAT-4 test measures "fundamental academic skills and includes four subtests: Word Reading, Sentence Comprehension, Spelling, and Math Computation," as well as "a Reading Composite score, which produces a highly reliable and comprehensive measure of reading achievement." Johnson Report at 19.

149.    Ultimately, the WRAT-4 measures "fundamental academic skills necessary for effective learning, communication, and thinking and can be valuable for identifying potential learning, behavioral, or vocational difficulties." Johnson Report at 19.

150.    E. Martinez scored poorly in every category; his "Word Reading achievement fell within the Lower Extreme range and fell into a second grade level (2.3)." Johnson Report at 19.

151.    "[E. Martinez'] Sentence Comprehension fell within the Lower Extreme range and first grade level (1.3)." Johnson Report at 19.

152.    "[E. Martinez'] Spelling fell within the Lower Extreme range and Kindergarten grade level (K.8)." Johnson Report at 19.

153.    "[E. Martinez'] Math Computation fell within the Lower Extreme range and first grade level (1.9)." Johnson Report at 19.

154.    These scores, however, are higher than would be expected based on E. Martinez' "performance on measures of intellectual functioning." Johnson Report at 19.

155.    E. Martinez' malingering testing first consisted of an administration of the Test of Memory Malingering ("TOMM"), which assesses "test-taking approach, level of effort, and potential for feigning memory deficits." Johnson Report at 19.

156.    "The TOMM is a 50-item recognition test for adults and includes two learning trials and an optional retention trial (which is administered to individuals who score below expectation on the second learning trial)," and entails showing the subject "50 target pictures of common objects for three seconds each," and then "50 recognition panels containing one of the previously presented target pictures and a new picture," and asking the subject to select the picture which was depicted in the first trial. Johnson Report at 19.

157.    "Martinez obtained a score of 23 on Trial 1 and a score of 25 on Trial 2, and a 24 on the Retention Trial." Johnson Report at 19.

158.    "These scores fell below expectation and indicated a likelihood of malingering." Johnson Report at 19.

159.    "His scores on the TOMM raised concerns that he was not putting forth his best effort." Johnson Report at 19.

160.    Regarding malingering, E. Martinez also took the "Miller Forensic Assessment of Symptoms test ('M-FAST'), which is a structured interview designed to detect malingering of psychiatric illness." Johnson Report at 20.

161.    A total score is obtained, which provides an "estimation of the likelihood that an examinee is malingering psychopathology," with a total score of 6 or more being "highly suggestive of malingering." Johnson Report at 20.

162.   E. Martinez received a total score of eleven out of a possible twenty-five, meaning that, overall, E. Martinez' scores on the M-FAST suggest that he was "likely exaggerating or feigning symptoms of mental illness." Johnson Report at 20.

163.   Regarding personality functioning, E. Martinez took the Personality Assessment Inventory ("PAI"), which is "a self-administered, objective test of personality and psychopathology designed to provide information on critical variables that are central in treatment planning and evaluation." Johnson Report at 20.

164.   "It provides a number of validity indices intended to assess factors that could distort test results (i.e. carelessness, reading difficulties, confusion, defensiveness, exaggeration, or malingering)." Johnson Report at 20.

165.   E. Martinez' scores indicated that, "although he responded in a consistent manner, he did not attend to item content, and attempted to portray himself in an especially negative manner." Johnson Report at 20.

166.   "Therefore, his test results were deemed invalid, and his PAI clinical profile could not be interpreted further." Johnson Report at 20.

167.   Further, individuals with similar intellectual functioning scores as E. Martinez on the WAIS-IV "would likely not have the ability to respond in a consistent manner as" E. Martinez did, because it would be "expected individuals with a genuine FSIQ of 44 would likely have difficulty simply following along the answer sheet and answering each item in a timely manner, as needed during [an] audio administration" of the test. Johnson Report at 20.

168.   E. Martinez also took a series of examinations to ascertain his understanding of criminal charges and court proceedings, as well as his ability to assist counsel. See Johnson Report at 26.

169.    "A legally focused interview was attempted with Mr. Martinez utilizing the Revised Competency Assessment Instrument ('RCAI')."  Johnson Report at 26.

170.    "Though the RCAI was initiated with Mr. Martinez, it was discontinued, as he reported he did not know any of the answers related to legal questions and was uncooperative during the interview."  Johnson Report at 26.

171.    Before the RCAI was discontinued, E. Martinez was incapable of differentiating between a misdemeanor or felony, or identifying with what he had been charged.  See Johnson Report at 26.

172.    E. Martinez was then administered the Inventory of Legal Knowledge ("ILK"), "a test designed to assess response styles of defendants undergoing competency evaluations."  Johnson Report at 20.

173.    "The test is not meant to assess competency, but rather as one part of an assessment of a defendant's approach to testing."  Johnson Report at 26.

174.    "The ILK uses simple language in true-or-false items concerning the legal process."  Johnson Report at 26-27.

175.    "The ILK includes items about charges, pleas, sanctions, defendants' rights, and courtroom procedures as well as items focusing on the roles of the judge, prosecutor, defense attorney, and witnesses."  Johnson Report at 26-27.

176.    "The ILK is not a test of adjudicative competence."  Johnson Report at 26-27.

177.    "It is solely a measure of response style; more specifically, it is a measure of a defendant's approach to inquiries about his or her legal knowledge."  Johnson Report at 26-27.

178.    E. Martinez scored an 11/61, "well below what he should have achieved by random chance," meaning E. Martinez' score on the ILK "therefore provided strong evidence

that he was intentionally choosing the incorrect responses so as to falsely portray deficiencies in his understanding of the legal process." Johnson Report at 27.

179.    E. Martinez was next administered the "Competence Assessment for Standing Trial for Defendants with Mental Retardation ('CAST-MR'), which is a 50-Item, multiple choice, clinical interview designed . . . to assist in determining whether or not an adult defendant with an intellectual disability is competent to stand trial with regard to a current legal proceeding." Johnson Report at 27.

180.    E. Martinez "obtained an overall score of 14.5 (29% correct), which placed him well below the range of those with a diagnosis of mental retardation found incompetent to stand trial (mean score of 25.6)." Johnson Report at 27.

181.    During the administration of the CAST-MR, E. Martinez "was able to provide answers regarding his actual arrest, but only minimal answers regarding the specific charge or what the charge means." Johnson Report at 27.

182.    "He was unable to provide accurate answers regarding the timeline or involvement of others in the alleged offense [and] appeared to minimally understand the seriousness of the charge." Johnson Report at 27.

183.    E. Martinez "was unable to accurately respond to the question 'What does your lawyer do.'" Johnson Report at 27.

184.    "However, during a phone call with his wife, he asked questions about the quality of his attorney, demonstrating an innate understanding of the term." Johnson Report at 27.

185.    E. Martinez, however, also "demonstrated poor understanding of skills to assist defense." Johnson Report at 27.

186.    E. Martinez was presented with hypothetical scenarios, where he answered that "he would tell the police he committed the crime," but then that "he would refuse to talk to the police, if they asked him to sign something he did not understand."  Johnson Report at 27.

187.    E. Martinez indicated that he would "inform his attorney of any criminal activity or wrongdoing on his part," and that he "would not believe another inmate who advised him to change his story for a lesser sentence."  Johnson Report at 27.

188.    E. Martinez does not present with "signs or symptoms of a major mental disorder, such as an affective disorder (e.g., Bipolar Disorder), or psychotic disorder (e.g., Schizophrenia)."  Johnson Report at 28.  Cf. Westfried Report, passim.

189.    E. Martinez has a substance abuse disorder.  See Johnson Report at 23-25.  Cf. Westfried Report, passim.

190.    E. Martinez suffered numerous events in his life that would suggest the possibility of a diagnosis of Post-Traumatic Stress Disorder ("PTSD"), but E. Martinez did not adequately cooperate with Dr. Johnson to make that diagnosis.  See Johnson Report at 25; Tr. at 154:4-9 (Johnson).

191.    E. Martinez did not cooperate with his evaluation by Dr. Johnson at MDC.  See Tr. at 154:17-18 (Johnson).

192.    "Martinez may suffer from some cognitive delays," Tr. at 154:13-14 (Johnson), but Dr. Johnson did not garner test results which would allow her to "adequately assess genuine cognitive delays," Tr. at 154:17-18 (Johnson).

193.    E. Martinez "made up stuff."  Tr. at 78:17-80:2 (Westfried).

194.    "[H]e did more than shutting down."  Tr. at 78:17-80:2 (Westfried).

195.    "[H]e was uncooperative, and he produced nonsense."    Tr. at 78:17-80:2 (Westfried).

196.    "Now, why he produced nonsense.  Was it malingering at some point?  Possibly.  That's certainly a definite possibility."  Tr. at 78:17-80:2 (Westfried).

197.    "On the other hand, is it him just getting anxious and defending himself in whatever way he can come up with . . . [t]hat's another possibility."    Tr. at 78:17-80:2 (Westfried).

198.    Regarding the actual test results Dr. Johnson obtained, it was "junk data . . . so there is a junk result."  Tr. at 80:20-81:1 (Westfried).  See Westfried Report at 8.

199.    E. Martinez has a demonstrated ability to properly care for himself, as evidenced by his behavior on the housing unit at MDC under Dr. Johnson's supervision.  See Johnson Report at 25; Westfried Report at 9.

200.    "While limited, he interacted well with peers and his grooming, hygiene and the sanitation of his living quarters were appropriate . . . ."  Johnson Report at 25.

201.    "Martinez' scores on the intelligence test [thus] appear to be an underrepresentation of his abilities as less than 1% of the population falls in the same range of intellectual functioning" as E. Martinez' scores indicate, and "[i]ndividuals who score in the extremely low range, coupled with difficulty completing daily tasks such as grooming, eating, talking, and socializing, are often diagnosed with a Severe Intellectual Disability."  Johnson Report at 25.

202.    "A person with these scores can usually be found in a residential care facility, as they are often unable to care for themselves or manage daily tasks."  Johnson Report at 25.

203.    "Based on his demonstrated ability to care for himself and frequently interact with high-functioning inmates on his housing unit, his performance is more suggestive of an attempt to appear more impaired than he actually is."  Johnson Report at 25.

204.    E. Martinez' conduct while in custody is not entirely consistent with that of other inmates having competency issues in the criminal justice system.  See Tr. at 133:13-135:18 (Anderson).

205.    Because E. Martinez did not cooperate with Dr. Johnson's battery of tests, E. Martinez' counsel sought further neuropsychological evaluation from Dr. Westfried.  See Westfried Report at 1-2.

206.    Dr. Westfried conducted "12 hours of face-to-face interviewing and neuropsychological testing."  Westfried Report at 9.

207.    "In general he was cooperative, as indicated by his attentiveness during test procedures and responsiveness during interviews."  Westfried Report at 9.

208.    "However, there were times he went off on lengthy tangents, especially regarding his fear."  Westfried Report at 9.

209.    "Additionally, he frequently spoke in a child like manner . . . ."  Westfried Report at 9.

210.    E. Martinez initially sought Dr. Foote's evaluation, but Dr. Foote -- had "ran into a brick wall, when it came to assessing [] Martinez's language functions and his cognitive functioning," apparently necessitating a more "thorough neuropsychological evaluation." Tr. at 48:1-11 (Westfried).

211.    In this case, upon receipt of Dr. Foote's testing data, Dr. Westfried explained that "[he] did not do the complete neuropsychological evaluation [him]self . . . [Dr. Westfried] did

about half the testing . . . [s]o this was different than the usual process for [Dr. Westfried]."  Tr. at 48:15-22 (Westfried).

212.    Dr. Westfried, however, "repeat[ed] the whole background history" process, and "[i]t was not clear he really comprehend[ed] what [Dr. Westfried] was doing," but, because E. Martinez cooperated, they continued.  Tr. at 48:15-49:5 (Westfried).

213.    Dr. Westfried also explained that he was aware of E. Martinez' alleged gang activity and discussed how prisoners involved with gangs would generally be "cautious about talking about gang activities."  Tr. at 50:1-25 (Westfried).

214.    Further, regarding gang affiliation, Dr. Westfried noted that that E. Martinez exhibited signs of fearfulness, and would get so anxious he would shut down, which is different from other gang affiliates with whom he has worked, who generally do not express fear.  See Tr. at 51:8-24 (Westfried).

215.    Dr. Westfried then emphasized that E. Martinez' "life history is one of chaos and violence," and he has been in and out of psychiatric treatment hospitals his whole childhood.  Tr. at 56:17-25 (Westfried).

216.    "[E.] Martinez was administered a neuropsychological test battery including measures of overall intellectual functioning, reading ability, language functions, attention/concentration, memory functions, and problem solving abilities as a means of assessing his current cognitive functioning as it pertains to his capacity to proceed on his charges." Westfried Report at 11.

217.    "Part of the data reported . . . were obtained by Dr. William Foote . . . ." Westfried Report at 11.

218.    "Subsequent to Dr. Foote identifying potential language deficits, [Dr. Westfried] focused on language functions, as well as additional measurement of auditory-verbal memory and executive functioning."  Westfried Report at 11.

219.    Regarding intellectual functioning, E. Martinez was first given the "Wechsler Adult Intelligence Scale-Fourth Edition ('WAIS-IV') as a measure of his overall intellectual functioning by Dr. Foote."  Westfried Report at 11.

220.    "He obtained a Full Scale IQ score of 65 (extremely low range, 1st percentile), and a General Ability Index score of 68 (extremely low range, 2nd percentile)."  Westfried Report at 11.

221.    "There was no significant difference between those two scores, suggesting he was functioning at his usual level."  Westfried Report at 11.

222.    "His Factor Index scores were as follows: Verbal Comprehension = 58 (extremely low range, 0.3rd percentile); Perceptual Reasoning = 81 (low average range, 10th percentile); Working Memory = 74 (borderline range, 4th percentile); Processing Speed = 65 (extremely low range, 1st percentile)."  Westfried Report at 11.

223.    E. Martinez "demonstrated significant relative strengths on the Digit Span subtest (16th percentile), a measure of auditory-verbal attention, and on the Visual Puzzles subtest (37th percentile), a measure of processing speed and visuospatial construction."  Westfried Report at 11.

224.    "He also scored at the 37th percentile on the Letter-Number Sequencing subtest, a measure of working memory involving the ability to concentrate and manipulate information on which he is concentrating."  Westfried Report at 11.

225.    "Despite his obtaining an acceptable score on the reliable Digit Span measure, an indicator of effort and motivation, Mr. Martinez's overall profile was suspect for intermittent problems with effort."  Westfried Report at 11.

226.    "On previous administrations of the [WAIS-IV] [E. Martinez] had scored even lower: Metropolitan Detention Center Forensic Evaluation, report date 6/14/16 Full Scale IQ score of 44; Competency to Stand Trial Evaluation, dated 2/4/14 Full Scale IQ score of 53; Communication Evaluation, dated 12/19/95 referencing Wechsler Intelligence Scale for Children-III administered 8/24/95 Full Scale IQ score of 80."  Westfried Report at 11 (emphasis added).

227.    E. Martinez was also administered "the Reading subtests of the [WRAT-4] [and] obtained a Word Reading subtest score at the 0.3rd percentile, placing him at the 1.9 grade equivalent."  Westfried Report at 12.

228.    "His Sentence Comprehension subtest score was at the 0.lst percentile, placing him at less than kindergarten level, with an overall reading composite percentile rank of 0.2."  Westfried Report at 12.

229.    E. Martinez had been "administered the [WRAT-4] by Dr. Foote, and previously by Dr. Harrington in 2014, as well as at the Metropolitan Detention Center BOP facility in 2016."  Westfried Report at 12.

230.    "His scores were slightly higher on other administrations of the Wide Range Achievement Test-Fourth Edition, but not significantly different."  Westfried Report at 12.  See Johnson Report at 19.

231.    E. Martinez was also administered the "Boston Diagnostic Aphasia Examination" which is "a thorough measure of language functions," on which E. Martinez' "speech characteristics were normal for volume, voice, and rate."  Westfried Report at 12.

232.    "He demonstrated some, but not consistent, difficulty with articulatory agility and grammatical form, as well as auditory comprehension."  Westfried Report at 12.

233.    "There were no compelling signs of severe deficits."  Westfried Report at 12.

234.    "His scores that were particularly low involved word reading, repetition of words, and a measure referred to as complex ideation material in which the person is required to demonstrate comprehension of what has been read to them."  Westfried Report at 12.

235.    "Otherwise, his scores on measures of fluency, auditory comprehension, naming, oral reading, repetition, reading comprehension, and writing were low, but not indicative of formal deficits."  Westfried Report at 12.

236.    On a measure of command naming, the Boston Naming Test, he scored in the mild to moderate impairment range."  Westfried Report at 12.

237.    E. Martinez' attention and concentration was also tested, and he scored in a range from moderately impaired to average.  See Westfried Report at 12.

238.    E. Martinez was administered "a measure of sustained attention, the Digit Vigilance Test, [and] scored in the moderately impaired range for how long it took him to complete the test, and in the mildly impaired range for how many errors made."  Westfried Report at 12.

239.    "On the Trail Making Test Part A administered by Dr. Foote, a similar measure of processing speed and visual attention, he scored in the mildly to moderately impaired range."  Westfried Report at 12.

240.    "On untimed measures of auditory-verbal attention he scored in the low average to mildly impaired range."  Westfried Report at 12.

241.    "On the Digit Span subtest of the WAIS-IV, a measure of verbal attention and concentration, he scored in the low average range."  Westfried Report at 12.

242.    "On Trial 1 of the California Verbal Learning Test, he also scored in the low average range, and in the mildly impaired on Trial B."  Westfried Report at 12.

243.    "His immediate memory score on the Wechsler Memory Scale-Fourth Edition, a summary measure of untimed visual and auditory verbal attention/concentration subtests, was in the low average range."  Westfried Report at 12.

244.    Regarding E. Martinez' memory functions, on "an extensive measure of memory functions, the Wechsler Memory Scale-Fourth Edition, he obtained the following Factor Index scores: Auditory Memory = 87 (low average range, 19th percentile); Visual Memory = 101 (average range, 53rd percentile); Visual Working Memory = 83 (low average range, 13th percentile); Immediate Memory = 89 (low average range, 23rd percentile); Delayed Memory = 96 (average range, 39th percentile)."  Westfried Report at 12.

245.    "There was a consistent pattern of his obtaining greater score on delay than on immediate recall."  Westfried Report at 12.

246.    "There was also consistent statistically significant contrast between his scores for memory and those obtained on the WAIS-IV, the measure of overall intellectual ability."  Westfried Report at 12.

247.    "His General Ability Index score from the WAIS-IV was lower than each of his Memory Factor Index scores with only one exception (Perceptual Reasoning Index being similar to Visual Working Memory Index score)."  Westfried Report at 12.

248. E. Martinez was also administered the "California Verbal Learning Test-Second Edition as a measure of auditory-verbal learning memory and delayed recall . . . [and] demonstrated a learning curve in the moderately impaired range." Westfried Report at 13.

249. "His learning characteristics were notable for extremely high-level recall from the primacy region and extremely low level recall from the middle region." Westfried Report at 13.

250. "His Total Recall Discriminability was impaired and he had a highly significant number of intrusions." Westfried Report at 13.

251. "He benefited little from cued recognition." Westfried Report at 13.

252. "On an embedded measure of effort and motivation, the words he recalled were accurate, but he only recalled half of them." Westfried Report at 13.

253. "He denied recollection for the other half." Westfried Report at 13.

254. Regarding E. Martinez' executive functioning, E. Martinez was introduced to "measures of planning/organization, problem solving, flexibility of conceptualization, initiation/inhibition, and overall integration of functional cognitive domains (sensory-motor, attention/concentration, language, visuospatial, and memory)." Westfried Report at 13.

255. "On a timed measure of initiation/inhibition and verbal problem solving, the Controlled Oral Word Association Test, he scored in the mild to moderately impaired range." Westfried Report at 13.

256. "On the Trail Making Test Part B, a timed measure of sequential problem solving, he scored in the mildly impaired range." Westfried Report at 13.

257. E. Martinez was also subject to "formal freestanding measures of dissimulation of effort and motivation [and o]n a screening measure, the Rey 15-Item Test his score (14/15) was associated with adequate effort and motivation." Westfried Report at 13.

258.    "He was also administered the Validity Indicator Profile, a more thorough measure of effort and motivation." Westfried Report at 13.

259.    "On the nonverbal subtest he obtained a score categorized as valid/compliant, indicating likely adequate effort and motivation." Westfried Report at 13.

260.    "Similarly, on embedded measures of the WAIS-IV administered by Dr. Foote and the CVLT-II administered by [Dr. Westfried] his scores indicated adequate effort and motivation, with one exception." Westfried Report at 13.

261.    "On one of the five measures administered by Dr. Foote, the Word Choice Test, he obtained a score indicating likely random responding." Westfried Report at 13.

262.    These results contrast "the forensic evaluation completed at the Metropolitan Detention Center of BOP by Dr. Lesli Johnson," which "indicates probabl[e] lack of cooperation." Westfried Report at 13.

263.    Regarding Dr. Johnson's evaluation, in addition to E. Martinez "appearing to have randomly responded on the Test of Memory Malingering administered at the Metropolitan Detention Center he appeared to have lacked adequate effort on other screening measures for dissimulation and embedded measures on the [WAIS-IV]." Westfried Report at 13.

264.    "It is also likely his variability of scores on the WAIS-IV administered by Dr. Foote involved his becoming distracted or otherwise making an inadequate effort." Westfried Report at 13.

265.    "Also, given he obtained a Full Scale IQ score of 80 in 1995, and much lower scores for Dr. Harrington in 2013 without having sustained a neurological insult, suggests he made an inadequate effort for Dr. Harrington." Westfried Report at 13.

266.    Regarding the testing that E. Martinez did while an adolescent at the Sequoyah Center with a speech pathologist, "on a test having to do with problem solving . . . he obtained a standard score of 56."  Tr. at 58:13-59:13 (Westfried).  See Sequoyah Report, filed March 20, 2017 (Defendant's Hearing Exhibit B).

267.    "Now, when [Dr. Westfried] says a standard score, that's when [the psychology profession] say[s] 100 is average on an IQ test that too is a standard score."  Tr. at 58:13-59:13 (Westfried).  See Sequoyah Report, filed March 20, 2017 (Defendant's Hearing Exhibit B).

268.    "So a 56 is the same as when [the psychology profession] say[s] beneath 70 is intellectual disability."  Tr. at 58:13-59:13 (Westfried).  See Sequoyah Report, filed March 20, 2017 (Defense Exhibit B).

269.    "A 56 similarly is extremely low in the impaired range."  Tr. at 58:13-59:13 (Westfried)(emphasis added).  See Sequoyah Report, filed March 20, 2017 (Defense Exhibit B).

270.    "And that in contrast with an overall level of intellectual ability on the Wechsler scales, on which he'd gotten 80 at the time, indicates there was some basic cognitive functioning that is intact, but once you start bring together and integrating attention and memory, problem solving . . . it did not come together for him."  Tr. at 58:13-59:13 (Westfried).  See Sequoyah Report, filed March 20, 2017 (Defense Exhibit B).

271.    In light of his own results, in comparison with those of Dr. Foote and Dr. Johnson, and in part in comparison with the Sequoyah Report and the evaluation by Dr. Harrington for state criminal proceedings, Dr. Westfried diagnosed E. Martinez as meeting "the criteria for diagnoses of a language disorder, mild neurocognitive disorder, and a generalized anxiety disorder with a rule out for [PTSD]."  Westfried Report at 14.  See Tr. at 55:3-11 (Couleur, Westfried).

272.    Regarding Dr. Westfried's language disorder diagnosis, "the vocabulary subtest of the Wechsler scales [i]s the most highly predictive factor associated with competence to proceed." Tr. at 59:21-60:10 (Westfried).

273.    "[E. Martinez] would have great difficulty tracking what is being said here [in court], one because his processing speed is slow; two, because his language abilities are so low that the language used in the courtroom is way above his capacity in terms of his language use." Tr. at 59:21-60:10 (Westfried).

274.    Regarding Dr. Westfried's diagnosis of a "mild neurocognitive disorder," which differs from a language disorder, "[a]s [Dr. Westfried] just went over in the communication disorder done in Sequoia when he was 17[;] in a neuropsychological evaluation [Dr. Westfried] look[ed] at frontal lob[e] functions[,] for example[,] which are somewhat involved in language but are quite distinct in other ways, so [Dr. Westfried] found that he had impaired level scores for process . . . speed and for his ability to problem solve what[ the psychology profession calls] executive functioning, frontal lob[e] functions[.]" Tr. at 60:19-61:12 (Westfried).

275.    "[T]hose things are distinct from planning functions per se, and based on how he did on that testing and his history [and i]t was [Dr. Westfried's] conclusion he had a mild neurocognitive disorder." Tr. at 60:19-61:12 (Westfried).

276.    "He's had head injuries." Tr. at 60:19-61:12 (Westfried).

277.    "He began huffing solvent inhalants at a young age, and did it almost daily for years, according to him[, which is] very noxious to brain development." Tr. at 60:19-61:12 (Westfried).

278.    "And [the psychology profession] also know[s] that when children are exposed to trauma, especially repeatedly without any sort of mitigating intervention, that that affects brain structure and development as well."  Tr. at 60:19-61:12 (Westfried).

279.    Regarding the anxiety disorder, Dr. Westfried considered the anxiety disorder "the icing on the cake," in that, while both his language disorder and slow processing speed would make it difficult for E. Martinez to sit in a trial, the anxiety would make it untenable.  See Tr. at 66:25-67:5 (Couleur, Westfried).

280.    Without the anxiety disorder, Dr. Westfried still concluded that E. Martinez would be "stuck in the gray area still[, because] when measured . . . when he was 17 on that test having to do with problem solving, his abilities in that area are extremely low," and his language disorder and cognitive disorders would not improve with treatment or time.  Tr. at 67:17-21 (Couleur, Westfried).

281.    Dr. Westfried explained that "[he] suspect[s] the brain damage he has is permanent in nature, [and] the anxiety limits his functioning even further, so . . . if he were to have effective treatment of anxiety, then he'd probably function somewhat cognitively."  Tr. at 67:23-69:2 (Westfried).

282.    E. Martinez is currently taking medications for anxiety and depression.  See Westfried Report at 18.

283.    Dr. Westfried concluded that E. Martinez was competent to, at the least, enter a guilty plea, stating: "It's more complicated than I would like.  My opinion is that he's probably capable of making his way through a plea agreement and sentencing . . . [b]ecause that process is slow [and y]ou can spend time with him, the Court can move slowly, can check in with him that he's getting what's going on."  Tr. at 66:2-24 (Westfried).

284. "The problem becomes a protracted in length trial, where his ability to track what is happening in the courtroom, and assist in his defense[-- Dr. Westfried does not] think he has the capability of doing that cognitively." Tr. at 66:2-24 (Westfried)

285. The anxiety, and the language and the cognitive problems all combine in a way that when [Dr. Westfried] get[s] anxious and [he is] usually anxious for example when [he] come[s] up here to testify at first, but [he] know[s] [he has] done this so many times, and th[u]s [he is] capable and good enough . . . for this, so [his] anxiety subsides." Tr. at 66:2-24 (Westfried).

286. "That's not how it is for him." Tr. at 66:2-24 (Westfried).

287. "For him the anxiety climbs and gets more intense as he goes." Tr. at 66:2-24 (Westfried).

288. "And that is a further inhibitor of his capacity to think about what is going on around him." Tr. at 66:2-24 (Westfried).

289. "He's so focused on his anxious discomfort and distress that further makes an obstacle to his listening and comprehending and appreciating what's happening." Tr. at 66:2-24 (Westfried).

290. Dr. Westfried agreed that E. Martinez did not cooperate with Dr. Johnson, but rebuked her diagnosis that he was malingering. See Tr. at 75:4-7.

291. Malingering is, according to "the diagnostic and statistical manual, put out by the American Psychiatric Association, their definition of it is where somebody falsely presents symptoms for another purpose." Tr. at 73:7-15 (Westfried).

292.    "So when Dr. Johnson diagnos[e]s malingering what she's saying is he's faking having mental and cognitive problems for the purpose of getting out of a legal situation."  Tr. at 73:7-15 (Westfried).

293.    "That's what it means when Dr. Johnson said as she does in her report that's his diagnosis."  Tr. at 73:7-15 (Westfried).

294.    A lack of cooperation is distinct from malingering, because:  "People will fail to cooperate for many different reasons, and Dr. Johnson was quick to make an attribution that it's for purposes of avoiding legal prosecution."  Tr. at 73:18-74:12 (Westfried).

295.    "[Dr. Westfried is] not [so] quick to make that huge inferential leap from what he did with her."  Tr. at 73:18-74:12 (Westfried).

296.    "For example, he said he didn't like her."  Tr. at 73:18-74:12 (Westfried).

297.    "She made him really anxious."  Tr. at 73:18-74:12 (Westfried).

298.    "That she and some other folks were confrontational with him, and that he just shut down; that he didn't make an effort."  Tr. at 73:18-74:12 (Westfried).

299.    "That's different than malingering."  Tr. at 73:18-74:12 (Westfried).

300.    "That is what he described."  Tr. at 73:18-74:12 (Westfried).

301.    "People shut down."  Tr. at 73:18-74:12 (Westfried).

302.    "We all know this happens, and very basically."  Tr. at 73:18-74:12 (Westfried).

303.    "So the kid that knows the answers on the test and in 5th grade math, but gets so anxious when taking the test that they run out of the room and get an F because they didn't complete the test . . . they [are not] malingering . . . [t]hey're certainly not cooperating with what we expect of them, but [that is not] purposeful, intentional with the goal of avoiding taking the

test [and Dr. Westfried has] never heard anybody make that argument about a kid with test anxiety." Tr. at 73:18-74:12 (Westfried).

304.    E. Martinez can still malinger, even with a cognitive defect, however, meaning that even Dr. Westfried's diagnoses do not negate malingering as a matter of course.  See Tr. at 75:4-7 (Westfried).

305.    E. Martinez has "consistently obtained scores on IQ testing that were low, problems with reliability are there."  Tr. at 82:5-24 (Westfried).

306.    "He's consistently obtained scores on memory testing that are low."  Tr. at 82:5-24 (Westfried).

307.    "And those results [that Dr. Westfried] obtained on the California verbal learning test would have placed him at a standard score in the 60s in terms of his learning and his delayed recall."  Tr. at 82:5-24 (Westfried).

308.    "His attention and concentration functions were impaired, although there were a few instances where he functioned a little bit higher, right above the line, the cut off line for impairment, and he had impaired level scores on tests of executive functioning, and have talked about his real ability and validity measures that [Dr. Westfried] administered indicated that he was making an adequate effort and was motivated to perform well on those tests."  Tr. at 82:5-24 (Westfried).

309.    "Th[e] . . . neuropsychological test data . . . [Dr. Westfried] obtained with Mr. Martinez . . . meet[s] criteria for a mild . . . cognitive disorder."  Tr. at 82:5-24 (Westfried).

310.    E. Martinez has not undergone any medical testing in connection with his competency evaluations, such as an MRI, to identify the brain injuries.  See Tr. at 83:9-16 (Westfried).

311.    Specifically regarding E. Martinez' results on "the TOMM," which is a "50 item test where you show people 50 pictures and ask [them] to remember those pictures, then you show [them] 50 pages that have two pictures on it, one of which is a picture that you have shown them and asked [them] to remember, and you ask them to show you which picture you had shown them," Tr. at 83:9-16 (Westfried), if E. Martinez scored lower than chance on the TOMM test, that result would suggest malingering, but E. Martinez did not receive that result, see Tr. at 85:1-7 (Westfried, Castellano).

312.    Specifically regarding E. Martinez' IQ score of 80 when he was seventeen, and his subsequent decrease in scores for the tests he took after the age of seventeen, see Tr. at 86:21-22 (Westfried), Dr. Westfried suspected the reason for the lower score in Dr. Johnson's case was a lack of cooperation, see Tr. at 87:1-5 (Westfried).

313.    As to the test that Dr. Harrington administered, upon which E. Martinez' state charges were dismissed, see Tr. at 87:6-20 (Westfried, Castellano), and which was also lower than 80, Dr. Westfried would not deny that E. Martinez may have learned that, if he gave an inadequate effort on those tests, as he may have done with Dr. Harrington, he would be found incompetent and criminal charges would be dropped.  See Tr. at 89:10-11 (Westfried).

314.    Regarding, specifically, E. Martinez' legal competence to stand trial, Dr. Westfried concluded that, while interviewing E. Martinez, E. "Martinez had difficulty expressing what his charges were and the possible consequences."  Westfried Report at 18.

315.    "It was possible he was trying to avoid giving a direct response."  Westfried Report at 18.

316.    "Similarly, he was unable to state available pleas or to provide accurate statements about the meaning of available pleas."  Westfried Report at 18.

317.    "He was unable to demonstrate an understanding of his rights to a trial or to not incriminate himself if he were to testify in his own case."  Westfried Report at 18.

318.    "He did not appear to understand the right to contest the advice of defense counsel."  Westfried Report at 18.

319.    "Based on his responses to questions about the role of the prosecuting attorney, it was not even clear he understood the adversarial nature of his case beyond being afraid of what people could or would do to him."  Westfried Report at 18.

320.    Further, "[c]onsistent with neuropsychological test results indicating impaired executive functions, there were signs of impaired decision-making/problem solving with regard to reasoning in his case."  Westfried Report at 18.

321.    "He consistently asserted that because he did nothing, there should be no legal proceedings."  Westfried Report at 18.

322.    "His reasoning involved believing that because he did nothing, there should be no need to present a defense."  Westfried Report at 18.

323.    "His neuropsychological test scores pertaining to executive functioning were consistently in the impaired range, especially when there was a processing speed component."  Westfried Report at 18.

324.    "Although he expressed motivation to obtain the best possible outcome in his case, at no point in the evaluation did he indicate any means of achieving his goal."  Westfried Report at 18.

325.    E. Martinez was able to demonstrate appreciation of the importance of defense counsel in his case, however, "but it was unclear he appreciated the severity of his case."  Westfried Report at 18.

326.     "Martinez described his need to rely on defense counsel because he does not himself understand what is happening in court."  Westfried Report at 18.

327.     "At the same time he described being fearful of defense counsel and as a consequence not disclosing all the information he has that is relevant to the case."  Westfried Report at 18.

328.     "Although . . . Martinez appeared to appreciate that part of the allegations against him involve a homicide and many other charges, his appreciation of his case was limited in detail and he described his exposure as being much less than it actually is."  Westfried Report at 18-19.

329.     Regarding his conclusion that E. Martinez was competent to enter a guilty plea, however, and how such competence would require knowledge of the players in the courtroom and an understanding of the elements of the offense, see Tr. at 103:5-24 (Castellano),  Dr. Westfried indicated that when "[he] explained to him [after] he said he did not know the meaning of a plea agreement, [Dr. Westfried] explained to him what a plea agreement was, the necessary plea, and the forfeited rights, and so then . . . this is an example of if he doesn't know something can you tell him and will he learn it."  Tr. at 105:8-17 (Westfried).

330.     "And this is an example of doing that on a single exposure which is not good enough for him."  Tr. at 105:8-17 (Westfried).

331.     "So [Dr. Westfried] c[a]me back after explaining it to him and asked him to tell [Dr. Westfried] what [Dr. Westfried] told him," Tr. at 105:8-17 (Westfried).

332.     "[W]ith adequate repetition, he would get it."  Tr. at 105:23-24 (Westfried).

333.     According to Dr. Westfried, E. Martinez can learn what he needs to do, at least in the instance of a plea hearing.  See Tr. at 17:6-66 (Westfried).

334.    E. Martinez' arrest in this case was recorded, as were the subsequent discussions with FBI agents, and Dr. Westfried agreed that E. Martinez' communications in the recordings indicated that he understood the seriousness of his charges -- because he might not see his wife again --  and he differentiated between the state and federal system with respect to bond and bail procedures.  See Tr. at 113:20-114:3 (Westfried).

335.    Dr. Westfried also noted, in the context of E. Martinez' recorded communication either by telephone or with FBI agents, that "[h]is syntax, the sentence structure in general that he has is extremely poor."  Tr. at 123:23-24 (Westfried).

336.    In sum, E. Martinez takes medication for an anxiety disorder, and exhibits anxiety in the courtroom.  See Westfried Report at 18.

337.    E. Martinez also reports hallucinations and trouble sleeping.  See Westfried Report at 19.

338.    E. Martinez' "overall intellectual functioning . . . is in the borderline/intellectually disabled range, [and] he has specific language problems at a mild level, affecting his ability to communicate."  Westfried Report at 18.

339.    E. Martinez' "attention/concentration and memory are variable, ranging from the moderately impaired to low average range in the auditory verbal domain."  Westfried Report at 18.

340.    "Neuropsychological test results indicate mildly impaired executive functioning, which is involved in problem solving and decision-making."  Westfried Report at 18.

341.    "His scores on numerous measures of processing speed were in the impaired range."  Westfried Report at 18.

342.    E. Martinez is capable of maintaining a clean living quarters in prison, and has presented well-groomed and hygienic at all times.  See Tr. at 165:5-166:5 (Johnson).

343.    E. Martinez is also capable of using the telephone to call his attorney, wife, and others, and has also exhibited the institutional knowledge needed to use prison commissary.  See 2 Tr. at 16:13-20 (Couleur, Johnson).

344.    E. Martinez also demonstrated knowledge of the separate federal and state criminal justice systems, and generally was capable of understanding that the charges against him were severe.  See Tr. at 113:20-114:3 (Westfried).

345.    E. Martinez, however, also struggled with certain legal concepts -- like the difference between a misdemeanor and a felony -- as well as the role of each party in the courtroom.  See Tr. at 105:8-17 (Westfried).

346.    E. Martinez, however, is capable of understanding after things are slowed down and explained.  See Tr. at 105:8-17 (Westfried).

**4.    The March 20-21, 2017, Hearing.**

347.    The Court held a sealed hearing on March 20, 2017, which continued on March 21, 2017.

348.    The Court will not make a detailed examination of the hearing transcript here, as it has already relied significantly on the hearing transcript in making its findings of fact.  The Court will, however, explain who the people at the hearing were and what their qualifications are.

349.    E. Martinez called two witnesses, the first being Frank Ortiz -- who "has known Eugene all of his life . . . [and] [wa]s going to give some background information, most of which

- 47 -

. . . w[ould] corroborate the history that was [presented] by both doctors" -- and the second, Dr. Westfried, "who did the neuropsychologist . . . evaluation."  Tr. at 5:22-6:9 (Couleur).

350.    Ortiz then took the stand and explained that he was a [REDACTED], and has previously worked for the [REDACTED], [REDACTED], and [REDACTED].  Tr. at 8:9-18 (Ortiz).

351.    Ortiz next explained that he knew E. Martinez, whose mother was Ortiz' wife's first cousin, and has had a relationship with E. Martinez for all of E. Martinez' life.  See Tr. at 9:1-5 (Ortiz).

352.    According to Ortiz, when E. Martinez was a young child he would play and interact with Ortiz' three daughters.  See Tr. at 8:9-18 (Ortiz).

353.    The children also all attended the same schools, although E. Martinez was in the Special Ed programs.  See Tr. at 9:11-10:5 (Ortiz).

354.    Dr. Westfried, a forensic neuropsychologist, next testified regarding the Westfried Report.  See Tr. at 38:13 (Westfried).

355.    Dr. Westfried first laid a foundation for his qualifications as an expert in psychology and neuropsychology, explaining that he has a bachelor's degree from the University of New Mexico, a master's degree from the University of Chicago, and a Ph.D. from Northwestern University Medical School, as well as a fellowship in neuropsychology at Fitzsimmons Army Medical Center.  See Tr. at 39:13-19 (Westfried).

356.    Dr. Westfried then explained that his concentration within his doctorate education for clinical psychology -- neuropsychology -- "involves the study and measurement for clinical purposes of brain functions, such as language, visual, spatial functions [--] [and] we generally

distinguish between those two different domains [--] attention, concentration, memory, problem solving." Tr. at 39:22-40:9 (Westfried).

357.    Dr. Westfried works "closely with neurosurgery and neurologists . . . measuring" cognitive functioning. Tr. at 39:22-40:9 (Westfried).

358.    Further, Dr. Westfried explained, his concentration of neuropsychology is a distinct branch of clinical psychology, and that people pursuing only doctorate psychology education would take a basic course in neuropsychology and likely nothing else. See Tr. at 40:25 (Westfried).

359.    According to Dr. Westfried, "unless you're specializing in neuropsychology, you wouldn't learn detailed analysis of Alzheimer's, the effect of solvent inhalants on the brain, traumatic brain injury, stroke," and Dr. Westfried has practiced, using his education, in forensics, testifying in court "approximately 10 times a year for the past . . . 22 years." Tr. at 41:4-45:19 (Westfried).

360.    There was no objection to E. Martinez' motion to have Dr. Westfried testify as an expert in the field of psychology and neuropsychology. See Tr. at 45:20-46:3 (Couleur, Castellano, Court). See also Curriculum Vitae, filed March 20, 2017 (Defendant's Hearing Exhibit A).

361.    The United States called three witnesses, Harlan Anderson, Dr. Johnson, and special agent Bryan Acee, who testified as to the statements of certain confidential sources who indicated that E. Martinez was not "crazy." 2 Tr. at 43:7 (Acee). See Tr. at 130:10 (Anderson); id. at 148:13 (Johnson).

362.    Anderson, the coordinator of the Security Threat Group at the New Mexico Department of Corrections Torrance County Detention Facility, testified about E. Martinez' conduct while incarcerated.  See Tr. at 130:10 (Anderson).

363.    Dr. Johnson testified about the Johnson Report and her evaluation of E. Martinez at MDC.  See Tr. at 148:13 (Johnson).

364.    Dr. Johnson received her "bachelor of arts degree in psychology from Texas Tech University in 2004; [her] master of arts in clinical psychology from Ball State University in 2006; and [her] Ph.D. in counseling psychology from Oklahoma State University in 2010."  Tr. at 148:13-25 (Johnson).

365.    Dr. Johnson also "completed a doctoral level internship at the federal medical center in Devins, Massachusetts, in 2010, [and,] following [her] internship, [she] worked as a staff psychologist at the federal correctional institution in Danbury, Connecticut."  Tr. at 148:18-25 (Johnson).

366.    "From 2010 to 2013 [she] started work as that forensic psychologist at the metropolitan . . . detention center in Los Angeles in June 2013."  Tr. at 148:18-25 (Johnson).  Dr. Johnson was qualified as an expert in "forensic psychology and clinical psychology."  Tr. at 152:25 (Court).

367.    After hearing testimony from all of the parties, the Court was inclined to conclude:

> Martinez has [not] met his burden of proof so I'm inclined to draft an opinion with findings and conclusions that so state that.  I think that Dr. Westfried has provided . . . evidence that he's not competent to stand trial, but I also think the Government has been successful over the last day and a half and more of pok[ing] some[] fairly serious holes in that, and I do think that Mr. Martinez is not cooperating with the Government has not helped him, because those holes are serious, and he needed to overcome his burden and pro[ve] that those holes were not valid.  But instead they remain, and they kind of [riddle] this case enough that

he hasn't met his burden.  So I give you an inclination of where I am today, without generating a final draft, because we do have a trial barreling [forward] and I wanted to make sure that Mr. Couleur and Mr. Martinez knew where I was in my thought process on this.  So . . . they can continue to fully prepare for trial, and know that I'm inclined at this point to find that the defendant has not met his burden of proof of showing that Mr. Martinez is unable to understand the nature of the proceedings against him, and/or to assist, and to assist his counsel in defending against these charges.

Tr. at 74:23-75:22 (Court).

**5.    Conclusions of Law.**

**LAW REGARDING A DEFENDANT'S COMPETENCY FOR TRIAL**

1.    "[T]he criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996)(quoting Medina v. California, 505 U.S. 437, 453 (1992)(plurality)).    See Redden v. Calbone, 223 F. App'x 825, 830 (10th Cir. 2007)(unpublished)[3]("It is well-settled that the criminal trial of an incompetent defendant violates due process.").

2.    "This 'prohibition is fundamental to an adversary system of justice.'" McGregor v. Gibson, 248 F.3d 946, 951 (10th Cir. 2001)(quoting Drope v. Missouri, 420 U.S. 162, 172 (1975)).

---

[3]Redden v. Calbone is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Redden v. Calbone has persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

3.      The Supreme Court of the United States of America has thus observed that "[t]he Federal Government and all 50 States have adopted procedures that address the issue of a defendant's competence to stand trial."  Medina v. California, 505 U.S. at 447 (plurality)(citing 18 U.S.C. § 4241).

4.      Under 18 U.S.C. § 4241, a defendant or the government may file a motion for a competency hearing at any time after the beginning of prosecutorial proceedings, but before sentencing.  See 18 U.S.C. § 4241(a).

5.      Once such a motion has been filed, the court "shall" grant the motion if there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).

6.      To assist the court at the hearing, the court may order that a psychiatric or psychological evaluation of the defendant be conducted and that a report be filed with the court before the hearing.  See 18 U.S.C. § 4241(b).

7.      The United States Court of Appeals for the Tenth Circuit has discussed that the level of competency to stand trial is not great, and that the court must analyze "'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.'"  McGregor v. Gibson, 248 F.3d at 952 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)(per curiam)).  See 18 U.S.C. § 4241(a) ("[R]easonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and

consequences of the proceedings against him or to assist properly in his defense.").

8.      "In a competency hearing, the 'emphasis is on [the defendant's] capacity to consult with counsel and to comprehend the proceedings.'"  Medina v. California, 505 U.S. at 448 (plurality)(quoting Pate v. Robinson, 383 U.S. 375, 388 (1966)(Harlan, J., dissenting)).

9.      If the court finds the defendant incompetent to stand trial, "the court must order the defendant hospitalized for a reasonable period of time . . . for the purpose of determining whether there is a 'substantial probability' that the defendant will become competent in the foreseeable future."  United States v. Deters, 143 F.3d 577, 580 (10th Cir. 1998).

10.     To prove incompetency to stand trial, the defendant must prove incompetency by a preponderance of the evidence.  See Allen v. Mullin, 368 F.3d 1220, 1239 (10th Cir. 2004)("A substantive competency claim, on the other hand, requires the higher standard of proof of incompetency by a preponderance of the evidence."); United States v. Sanchez-Gonzales, 109 Fed. Appx. 287, 290 (10th Cir. 2004)("Moreover, the Government may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence.")(citing Cooper v. Oklahoma, 517 U.S. at 355; 18 U.S.C. § 4241(d).

11.     "[D]ue process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him."  Medina v. California, 505 U.S. at 448 (citing Dusky v. United States, 362 U.S. 402 (1960)).

12.     Because a finding of incompetence is a factual finding by the district court, the Tenth Circuit will review the finding under a clearly erroneous standard.  See United States v. Branham, 97 F.3d 835, 855 (6th Cir. 1996)("Because a district court's determination of

competency is a factual finding we apply a clearly erroneous standard of review."); United States v. Raymer, 941 F.2d 1031, 1039 (10th Cir. 1991)("[W]e review a district court's factual findings under the clearly erroneous standard; our review of the legal principles which guide the district court is *de novo*.").  See also United States v. Alainz, 2014 WL 3421061, at *5 (D.N.M. 2014)(Browning, J.)(allowing defendant to stand trial where counsel for both parties stipulated to competence); United States v. Mooney, 2014 WL 711551, at *4 (D.N.M. 2014)(Browning, J.)(finding defendant diagnosed with major depression, alcohol dependence, and dementia because of head trauma competent, despite expert doctors warning that the depression -- if somehow left unmanaged -- might render the defendant incompetent); United States v. Enriquez Frias, 2006 WL 1228938, at *3 (D.N.M. 2006)(Browning, J.)(ordering "Frias to be sent to a facility that the BOP designates for a second psychiatric evaluation to assist in a determination of competency"); United States v. Weathers, 374 F. Supp. 2d 957, 960 (D.N.M. 2004)(Browning, J.)(ordering a competency hearing).

## ANALYSIS

13.    E. Martinez has not met his burden of showing, by a preponderance of the evidence, that he is incompetent to stand trial.

14.    The Court has reviewed the Johnson Report, the Westfried Report, both Dr. Westfried's and Dr. Johnson's testimony at the March, 2017, hearing, and both the United States' and E. Martinez' presentations at the March, 2017, hearing, and determines that E. Martinez has not shown by a preponderance of the evidence that he cannot comprehend the proceedings in this matter, and is not capable of communicating with his attorney and assisting in his own defense.

15.     The Court determines, therefore, that E. Martinez has not shown by a preponderance of the evidence that he is not competent to proceed to trial.

## I.     E. MARTINEZ DOES NOT DISPUTE THAT HE IS COMPETENT TO TAKE A GUILTY PLEA, AND THE COURT FURTHER CONCLUDES THAT E. MARTINEZ IS ALSO COMPETENT TO STAND TRIAL.

16.     To prove incompetency to stand trial, the defendant must prove incompetency by a preponderance of the evidence.  See Allen v. Mullin, 368 F.3d at 1239 ("A substantive competency claim, on the other hand, requires the higher standard of proof of incompetency by a preponderance of the evidence."); United States v. Sanchez-Gonzales, 109 F. App'x at 290.

17.     "In a competency hearing, the 'emphasis is on [the defendant's] capacity to consult with counsel and to comprehend the proceedings.'"  Medina v. California, 505 U.S. at 448 (plurality)(quoting Pate v. Robinson, 383 U.S. at 388 (1966)(Harlan, J., dissenting)).

18.     In this case, E. Martinez argues that, given Dr. Westfried's diagnosis of an anxiety disorder, in conjunction with Dr. Westfried's diagnoses of a language disorder and a mild neurocognitive disorder, he is unable to meaningfully assist in his defense and consult with counsel over the course of a prolonged trial.  See Tr. at 66:25-67:5 (Couleur, Westfried).

19.     E. Martinez contends that Dr. Westfried's diagnosis of an anxiety disorder was the "icing on the cake" underlying his ultimate conclusion that E. Martinez was not competent to stand trial and was only competent to enter into a guilty plea.  Tr. at 66:25-67:5 (Couleur, Westfried).

20.     Specifically, Dr. Westfried indicates that, absent the anxiety disorder, E. Martinez' competency would be "stuck in the gray area still[, because] when measured . . . when he was 17 on [a] test having to do with problem solving, his abilities in that area [were] extremely low," and his language disorder and cognitive disorders are not of a nature which

would improve with treatment or time subsequent to his seventeen-year old results.  Tr. at 67:17-21 (Couleur, Westfried).

21.     Dr. Westfried thus explains that "[he] suspect[s] the brain damage he has is permanent in nature, [and] the anxiety limits his functioning even further, so . . . if he were to have effective treatment of anxiety, then he'd probably function somewhat cognitively."  Tr. at 67:23-69:2 (Westfried).

22.     In accordance with those conclusions, Dr. Westfried does not represent to the Court that E. Martinez is wholly incompetent to engage with the legal system; instead, Dr. Westfried represents that E. Martinez is competent to, at the least, enter a guilty plea, because in Dr. Westfried's estimation regarding E. Martinez' competency:

> It's more complicated than I would like.  My opinion is that he's probably capable of making his way through a plea agreement and sentencing.  Because that process is slow.  You can spend time with him, the Court can move slowly, can check in with him that he's getting what's going on.  The problem becomes a protracted in length trial, where his ability to track what is happening in the courtroom, and assist in his defense I don't think he has the capability of doing that cognitively.  The anxiety, and the language and the cognitive problems all combine in a way that when I get anxious and I'm usually anxious for example when I come up here to testify at first, but I know I've done this so many times, and this I'm capable and good enough to for this, so my anxiety subsides.  That's not how it is for him.  For him the anxiety climbs and gets more intense as he goes.  And that is a further inhibitor of his capacity to think about what is going on around him.  He's so focused on his anxious discomfort and distress that further makes an obstacle to his listening and comprehending and appreciating what's happening.

Tr. at 66:2-24 (Westfried).

23.     The Court concludes that E. Martinez has not met his burden on that proffer primarily because the Court sees no fundamental difference between the context of a plea hearing and a trial.

24. The problem solving that goes into making a guilty plea is commensurate with assisting in trial.

25. The Court recognizes that the medical profession seeks to highlight the gray area in cognitive functioning, but the legal profession has instead chosen to apply a bright-line rule to the construct of mental competence.

26. Of all the many psychology reports that the Court has seen in its nearly fourteen years on the bench, Dr. Westfried's report is, to the Court's memory, only the second one that said that the defendant was competent to plea, but not to go to trial.

27. Both of the reports came during a two-week period in 2017.

28. The timing makes the Court wonder if the local psychologists have gotten together and decided that the "split opinion" is a good approach to borderline cases.

29. While these taxpayer-purchased reports may be satisfactory to the psychology profession, they do not help the legal profession and the jury much in their tasks.

30. The Court notes that "the law of competency is well-settled." Allen v. Mullin, 368 F.3d at 1238.

31. "'[T]he criminal trial of an incompetent defendant violates due process. This prohibition is fundamental to an adversary system of justice.'" Allen v. Mullin, 368 F.3d at 1238 (quoting McGregor v. Gibson, 248 F.3d at 951).

32. The well-settled test for considering competency to stand trial is "[t]he trier of fact must consider whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." Allen v. Mullin, 368 F.3d at 1238-39 (internal quotations marks and citation omitted). Cf. 18 U.S.C. § 4241(a) (providing

that there is incompetence "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense")

33.    When providing that standard for determining competency, the Tenth Circuit has further stated that "[t]he standard of competence to enter a guilty plea is identical." Allen v. Mullin, 368 F.3d at 1238-39 (citing Godinez v. Moran, 509 U.S. 389, 399 (1993)).

34.    The Court, then, is obliged to adhere to the same standard in both the plea hearing and trial contexts, meaning that it must interpret Dr. Westfried's conclusion that E. Martinez is competent to enter a guilty plea as, to an extent, suggesting E. Martinez' legal competence to stand trial.

35.    The Court is mindful of the differences inherent to a trial and a plea hearing.

36.    A trial setting carries with it more magnanimity and could exacerbate E. Martinez' mental condition more than a plea hearing setting might.

37.    The Court notes, however, that the fundamental requirements of a plea and a trial are the same in the context of competency.

38.    The Court has accepted many pleas.

39.    The Court has presided over 117 federal trials as a judge, and a number of state and federal trials as a lawyer.

40.    Some guilty pleas go so fast that the Court has to purposefully slow them down to make absolutely certain the defendant understands what is happening.

41.     In context, some trials go so slow -- because of breaks, bench conferences, delays in witnesses, waiting on jurors, instructions conferences -- that they are slower paced than a quick guilty plea.

42.     The Court thinks a trial can be, and certainly can be made to be, as deliberate and slow paced as a guilty plea, and the Court can assure that the defendant has plenty of time to understand the proceedings.

43.     The Court is not convinced that -- particularly here, where Dr. Westfried has concluded that E. Martinez is competent to take a plea, because "[y]ou can spend time with him, the Court can move slowly, can check in with him that he's getting what's going on" -- Dr. Westfried's advice for approaching a plea hearing with E. Martinez is not equally applicable to the trial setting.

44.     The standard for determining E. Martinez' competence is whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him," Allen v. Mullin, 368 F.3d at 1238; cf. 18 U.S.C. § 4241(a) (providing there is incompetence "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"), and Dr. Westfried has suggested that, in E. Martinez' case, the Court can slow down the proceedings to engage in ongoing process with E. Martinez during a plea hearing to ensure his understanding of the proceedings, see Tr. at 66:2-24 (Westfried).

45.     The same standard applies to E. Martinez' competence to stand trial under Allen v. Mullin, and the Court thus concludes, on this record, that E. Martinez does not meet his

burden of showing by a preponderance of the evidence that he is not competent to stand trial, because, in part, he has provided evidence that he is competent to enter into a guilty plea which favorably suggests he is competent to stand trial.  See United States v. Sanchez-Gonzales, 109 F. App'x at 290.

46.    Again, the problem solving that goes into making a guilty plea is commensurate with the process of assisting in trial.

47.    The Court recognizes that the medical profession might seek to highlight the abundant gray areas in cognitive functioning, but the legal profession, at this time, applies a bright-line rule to the concept of mental competence which does not differentiate between plea and trial settings.

48.    The Court does not reach its conclusion based only upon the import of Dr. Westfried's split opinion regarding E. Martinez' competency to engage in a plea agreement.

49.    The Court further notes that it has ordered competency evaluations in the past, and E. Martinez' conduct in the courtroom and overall appearance does not comport with the conduct of defendants whom the Court has concluded were incompetent to stand trial.  See McGregor v. Gibson, 248 F.3d at 954 ("[E]vidence of . . . irrational behavior . . . demeanor . . . and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required.").

50.    No party has raised complaints that E. Martinez is acting out, is unable to stay hygienic or well-groomed, or otherwise exhibits the conduct that is typical of persons who do not have the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and who do not have the "rational as well as factual understanding of the proceedings against him."  Allen v. Mullin, 368 F.3d at 1238.

51.    In fact, E. Martinez has proven capable of maintaining a clean living quarters in prison, and has presented well-groomed and hygienic at all times.  See Tr. at 165:5-166:5 (Johnson).

52.    E. Martinez has also proven to be capable of using the telephone to call his attorney, wife, and others, and has exhibited the institutional knowledge needed to use the prison commissary.  See 2 Tr. at 16:13-20 (Couleur, Johnson).

53.    E. Martinez also demonstrated knowledge of the separate federal and state criminal justice systems, and generally was capable of understanding that the charges against him were severe.  See Tr. at 113:20-114:3 (Westfried).

54.    Where E. Martinez demonstrated an initial lack of knowledge regarding certain legal concepts -- like the difference between a misdemeanor and a felony -- or the exact role of each party in the courtroom, see Tr. at 105:8-17 (Westfried), he has proven capable of understanding after things are slowed down and explained, see Tr. at 105:8-17 (Westfried).

55.    Dr. Westfried, in concluding E. Martinez was not competent to stand trial, focused primarily on the impact E. Martinez' anxiety had on E. Martinez' cognitive and language deficiencies.  See Tr. at 66:25-67:5 (Couleur, Westfried).

56.    Indeed, Dr. Westfried stated that, if E. Martinez "were to have effective treatment of anxiety, then he'd probably function somewhat cognitively."  Tr. at 67:23-69:2 (Westfried).

57.    In the Westfried Report, Dr. Westfried represented that E. Martinez was, however, being treated for his anxiety.  See Westfried Report at 18 ("He is currently taking medications for anxiety and depression . . . .").

58.    The Court's decision that E. Martinez is not competent at the present time to stand trial might not even result in a regimen of medication that differs from that which he is currently

taking; Dr. Westfried indicates that effective management of E. Martinez' anxiety would help E. Martinez' cognition in the courtroom, but Dr. Westfried has not told the Court that E. Martinez' present anxiety treatment is ineffective.

59.    Dr. Westfried instead muses about the impact of an untreated anxiety disorder, and such is not the case here -- E. Martinez is being treated for his anxiety.  See Westfried Report at 18.

60.    Because E. Martinez is being treated for his anxiety, and because Dr. Westfried has concluded that despite his diagnoses of possible language and cognitive disorders, E. Martinez is competent to make a plea hearing -- in addition to the Court's impressions from the multiple hearings where it has had the occasion to interact with E. Martinez -- the Court concludes that E. Martinez has not met his burden of showing by a preponderance of the evidence that he is not competent to stand trial.

61.    All parties agree that he did not cooperate with the BOP and, by not cooperating, he has purposely and voluntarily undermined his ability to show that he is not competent to stand trial.  Cf. Medina v. California, 505 U.S. at 455 (providing, in a concurring opinion by Justice O'Connor, the view that placing the burden on the defendant was permissible because it provided the defendant with an incentive to cooperate with the information-gathering process necessary to a reliable competency determination).

62.    E. Martinez is competent enough to purposefully not cooperate with the BOP's tests, which further shows that he fully understands the nature and severity of the charges against him and the proceedings.

63.    E. Martinez' failure to cooperate shows that he understands the charges against him, the proceedings, and how the system works.

64.     The Court is confident that it can, if necessary, slow the proceedings down sufficiently to ensure that E. Martinez understands the trial proceedings and can take breaks so that his competent and professional attorney can explain everything to E. Martinez and so that E. Martinez can ask questions.

65.     The Court concludes that E. Martinez is competent to understand the nature of the charges against him and all of the proceedings, and that he can assist his attorney in his defense.

66.     The Court finds E. Martinez legally competent to proceed to trial.  <u>See</u> 18 U.S.C. § 4241.

67.     **IT IS ORDERED** that, pursuant to 18 U.S.C. § 4241(b), the Court finds the Defendant Eugene Martinez competent to stand trial or take a guilty plea.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

*Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

      *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

      *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

     *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

     *Attorney for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

-- and --

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

 *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

 *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

 *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

 *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

 *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

-- and --

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

-- and --

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*