# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA; SHAUNA GUTIERREZ
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER[1]

---

[1]In its Sealed Memorandum Opinion and Order, filed June 9, 2017 (Doc. 1187)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect

**THIS MATTER** comes before the Court on the: (i) Defendants' Joint Motion to Sever Defendants Charged with Offenses in Counts 6 & 7, filed December 23, 2016 (Doc. 807)("Motion to Sever"); (ii) Defendant Santos Gonzales' Motion for a Severance of Defendant, filed January 27, 2017 (Doc. 858)("Gonzales' Motion to Sever"); (iii) Opposed Motion to Sever Counts Four and Five, filed January 31, 2017 (Doc. 868)("A. Gallegos' Motion to Sever"); (iv) Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2, filed February 2, 2017 (Doc. 882)("Troup's Motion to Sever"); (v) Defendant Javier Alonso's Motion to Sever Count 3 and to Sever the Trials of Edward Troup and Javier Alonso, filed February 5, 2017 (Doc. 893)("Alonso's Motion to Sever"); and (vi) Defendant Santos Gonzales' Amended Motion for a Severance of Defendant, filed February 7, 2017 (Doc. 901)("Gonzales' Amended Motion to Sever").  The Court held a hearing on February 7, 2017; May 9, 2017; and May 19, 2017.  The primary issues are whether: (i) severance of Counts 6 and 7 from the fourteen other Counts set forth by the Superseding Indictment, filed April 21, 2016 (Doc. 367)("Superseding Indictment") and the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Second Superseding Indictment"), is required or appropriate; (ii) severance of Counts 4 and 5 from the fourteen other Counts set forth by the Superseding Indictment and the Second Superseding Indictment is required or appropriate; (iii) severance of Counts 1 and 2 from the fourteen other Counts set forth by the Superseding Indictment and the Second Superseding Indictment is required or appropriate; (iv) severance of Count 3, or of Defendant Javier Alonso individually, is required or

---

confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1.  The Court gave the parties 14 calendar days to provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

appropriate; or (v) severance of Defendant Santos Gonzales[2] is required or appropriate.  Because the Court concludes that some severance is appropriate to ensure judicial efficacy, efficiency, and economy during a joint trial for the complex charges the Second Superseding Indictment raises, the Court will order severance in accordance with the Plaintiff United States of America's proposal at the February 7, 2017, hearing on this matter, wherein the United States suggested two trial groupings.  Accordingly, the Court will grant in part and deny in part the: (i) Motion to Sever; (ii) A. Gallegos' Motion to Sever; (iii) Gonzales' Motion to Sever; (iv) Troup's Motion to Sever; (v) Alonso's Motion to Sever; and (vi) Gonzales' Amended Motion to Sever.  The Court will sever for trial the Superseding Indictment's Counts 6-12 from its Counts 1-5 and 13-15.  The result is a trial for the Superseding Indictment's Counts 6-12, and another, separate trial for the Superseding Indictment's Counts 1-5 and 13-15.  A Second Superseding Indictment was filed on March 9, 2017, after most of the severance motions were filed, adding an additional Defendant, Brandy Rodriguez, as well as an additional Count 16, both of which will be tried in the Counts 1-5 and 13-15 grouping.

## FACTUAL BACKGROUND

The Court takes its facts from both the Superseding Indictment and the Second Superseding Indictment.  The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753).  See United States of America v. Angel DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.).  See also United States v. DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.).  The Court does not

---

[2]The Superseding Indictment and case caption identifies a "Santos Gonzalez." Superseding Indictment at 1.  Gonzales' briefing, however, identifies a different spelling -- "Santos Gonzales."  Gonzales' Amended Motion to Sever at 1.  The Court will use Gonzales in this Memorandum Opinion and Order.

set forth these facts as findings or the truth. The Court recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Sindicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM")[3] allegedly committed through its members. Superseding Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Superseding Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Superseding Indictment at 3. SNM has approximately 250 members, comprised of "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members." Superseding Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders

---

[3]Each of the Indictments in this case uses the term "Syndicato." Superseding Indictment at 1-2. The Court has become aware, however, that the correct spelling of the Spanish translation for the English term "Syndicate" is "Sindicato." Real Academia Española, Asociación de Academias de la Lengua Española, Diccionario de la lengua Española, Sindicato (300th ed. 2014). The Court will use Sindicato.

outside the prison system.  See Superseding Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Superseding Indictment at 4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Superseding Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Superseding Indictment at 4.  If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power.  See Superseding Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Superseding Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show it superiority over others."  Superseding Indictment at 4-5.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Superseding Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Superseding Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Superseding Indictment at 7.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation by the Federal Bureau of Investigations ("FBI").  United States v. Garcia, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's

Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)("United States' Garcia Response")).  The other relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). United States v. DeLeon, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See United States v. DeLeon, 2016 WL 7242579, at *3.  That New Mexico grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See United States v. DeLeon, 2016 WL 7242579, at *3.  The Doña Ana County, New Mexico, District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015. See United States v. DeLeon, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." United States v. DeLeon, 2016 WL 7242579, at *3.

The United States now brings this case against thirty Defendants, a case that it indicted in Las Cruces, New Mexico, charging them with a total of sixteen counts.  See Superseding Indictment at 1; Second Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise, and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an

agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Superseding Indictment at 6-31. Defendants Arturo Arnulfo Garcia, Gerald Archuleta,[4] Benjamin Clark, M. Rodriguez, Anthony Ray Baca, Robert Martinez, Roy Paul Martinez,[5] and Daniel Sanchez are the enterprise's alleged leaders. See Superseding

---

[4]Archuleta plead guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the S[i]ndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture I distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity. In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it. Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement, filed June 16, 2016 (Doc. 586).

[5]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the S[i]ndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including  murder, kidnapping,

Indictment at 6.  The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Superseding Indictment at 9.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly murdered "F.C."  Superseding Indictment at 9.  On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Superseding Indictment at 12.  On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S."  Superseding Indictment at 15.  On

---

attempted murder, and conspiracy to manufacture I distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.  In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State. Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.  Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement, filed September 15, 2016 (Doc. 686).

November 12, 2012, Defendants J. Gallegos and Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 18. On the same day, Defendants J. Gallegos and A. Gallegos allegedly murdered A.B. See Superseding Indictment at 19. In March, 2014, Defendants Armenta, Montoya, M. Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera and Rudy Perez allegedly conspired to murder "J.M." Superseding Indictment at 20-21. On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M. See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Baca, Archuleta, and Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Superseding Indictment at 27. Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Defendants Baca, R.P. Martinez and Robert Martinez allegedly conspired to murder "D.S." Superseding Indictment at 28. During the same period of time, Defendants Baca, R.P. Martinez, R. Martinez and Christopher Garcia allegedly conspired to murder "G.M." Superseding indictment at 28. On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Superseding Indictment at 29. On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Superseding Indictment at 29.

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, B. Rodriguez, Santos Gonzales, Paul Rivera, and Shauna Gutierrez allegedly conspired to murder "J.G." Superseding Indictment at 30; Second Superseding Indictment at 17-18. Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera

and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Superseding Indictment at 31; Second Superseding Indictment at 17-18.  The same Defendants also allegedly tampered with evidence.  See Second Superseding Indictment at 17-18.

For fuller factual context, there are now four cases before the Court related to SNM's alleged federal criminal activity.  In a related case -- United States of America v. Anthony Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.)[6] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[7]  There is also a prosecution of one Defendant for drug crimes, see United States of America v. Christopher Garcia, No. 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct, as is alleged in the present case, constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States of America v. Mauricio Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

---

[6]The Court has granted a conditional severance of one Defendant in that case.  See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- was asserting his Speedy Trial Act rights.  The Court concluded that, given R. Gallegos' assertion of those Speedy Trial Act rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772 at *30-32.  Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772 at *32 (setting a new trial date to ensure his speedy trial rights were upheld).

[7]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

## PROCEDURAL BACKGROUND

On December 1, 2015, a federal grand jury indicted twenty-four Defendants for the crimes of Murder (under 18 U.S.C. § 1959(a)(1)); Violent Crimes in Aid of Racketeering and U.S.C. § 2: Principals), Conspiracy to Murder (under 18 U.S.C. § 1959(a)(5); and Conspiracy to Commit Assault Resulting in Serious Bodily Injury (under 18 U.S.C. § 1959(a)(6)).    See Indictment at 1, filed December 1, 2015 (Doc. 1)("Indictment").    The Defendants were all allegedly members, prospects, or otherwise associated with SNM, which constitutes an enterprise as 18 U.S.C § 1959(b)(2) defines that term. See Indictment at 2.

On April 21, 2016, a grand jury, by the Superseding Indictment, indicted thirty Defendants -- twenty-four of whom were Defendants in the original Indictment.    See Superseding Indictment at 1.  In addition to the new Defendants, the Superseding Indictment also contains new charges under modified count numbers.  See Superseding Indictment at 9-31.  The Superseding Indictment contains fifteen counts for: (i) the Murder of F.C. ("Count 1"); (ii) the Murder of R.G. ("Count 2"); (iii) the Murder of F.S. ("Count 3"); (iv) Conspiracy to Murder A.B. ("Count 4"); (v) the Murder of A.B. ("Count 5"); (vi) Conspiracy to Murder J.M. ("Count 6"); (vii) the Murder of J.M. ("Count 7"); (viii) Conspiracy to Commit Assault Resulting in Serious Bodily Injury to J.R. ("Count 8"); (ix) Conspiracy to Murder D.S. ("Count 9"); (x) Conspiracy to Murder G.M. ("Count 10"); (xi) Felon in Possession of a Firearm ("Count 11"); (xii) Using and Carrying a Firearm During and in Relation to a Crime of Violence ("Count 12"); (xiii) Assault with Dangerous Weapon of J.G. ("Count 13"); (xiv) Conspiracy to Murder J.G. ("Count 14"); and (xv) Attempted Murder of J.G., Assault with a Dangerous Weapon Upon J.G., Resulting in Serious Bodily Injury to J.G. ("Count 15").  Superseding Indictment at 9-31.  At the time of the Superseding Indictment's filing, some of the Defendants were death-penalty eligible.

See The United States' Notice of Intent Not To Seek a Sentence of Death, filed June 6, 2016 (Doc. 567)(stating that it would not seek a death sentence against twenty-one Defendants). The Honorable Ken Gonzales, United States District Judge for the District of New Mexico, initially presided over the case until it was reassigned to the Court on March 30, 2016.[8] See Judge Update, filed December 1, 2015, and Notice of Case Reassignment, filed March 30, 2016 (Doc. 351). Given the large number of Defendants and the safety concerns at issue in these cases Judge Gonzales initially entered a Protective Order regulating discovery, and the Defendants continue to receive their discovery on tablets managed by a coordinated discovery management firm.[9] See Protective Order, filed June 16, 2016 (Doc. 589)("Protective Order").

On March 9, 2017, a grand jury, in a Second Superseding Indictment, indicted thirty-one Defendants -- thirty of whom were Defendants named by the Superseding Indictment. See Second Superseding Indictment at 1. The Second Superseding Indictment adds an additional Defendant, B. Rodriguez, as well as a count for Tampering With a Witness, Victim, or Informant by Physical Force or Threat ("Count 16"). Second Superseding Indictment at 17-18. B. Rodriguez is named in Count 14, Count 15, and the added Count 16. Count 16 alleges that, on February 27, 2016, J. Gallegos, Gonzales, Rivera, Gutierrez and B. Rodriguez, "used and

---

[8]The Honorable Judge Gonzales declared United States v. DeLeon complex in January, 2016, suspending the Speedy Trial Act's deadlines. See Order Declaring Case Complex, filed January, 7, 2016 (Doc. 211).

[9]On January 2, 2016, Judge Gonzales granted the Defendants' Joint Ex Parte Motion for Order Appointing Coordinating Discovery Attorney, Russell M. Aoki, for the Benefit of All Court-Appointed Counsel. See Order Appointing Coordinating Discovery Attorney, filed January 22, 2016 (Doc. 231)("Discovery Coordinator Appointment Order"). Judge Gonzales held a hearing on January 20, 2016, with all parties present. Discovery Coordinator Appointment Order at 1. Judge Gonzales concluded that appointing Mr. Aoki was justified given the complexity of this case and the thousands of pages of discovery documents. See Discovery Coordinator Appointment Order at 2.

attempted to use physical force and the threat of physical force against J.G. by assaulting J.G. with a dangerous weapon with the intent to influence, delay, or prevent J.G. from testifying against JOE LAWRENCE GALLEGOS in an official proceeding . . . in violation of 18 U.S.C. §§ 1512(a)(2)(A) and 2." Second Superseding Indictment at 18.

### 1.    **Motion to Sever.**

The Motion to Sever explains that "Defendants Jerry Armenta, Jerry Montoya, Mario Rodriguez, Timothy Martinez, Anthony Ray Baca, Mauricio Varela, Daniel Sanchez, Carlos Herrera and Rudy Perez (2014 Defendants) are charged in the 15-count superseding indictment in Counts 6 and 7 with conspiracy to commit murder and murder of Javier Molina [('J.M.')]" on March 7, 2014, at Southern New Mexico. Motion to Sever at 1. Of the nine Counts 6 and 7 Defendants, whom the Motion to Sever refers to as the "2014 Defendants," only Baca, the Motion to Sever explains, has been charged in the other Counts in the Superseding Indictment. Motion to Sever at 1-2. The Motion to Sever thus advances

> three main arguments: (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

Motion to Sever at 2.

After recapping an extensive factual background of the case similar to that which the Court has provided in this Memorandum Opinion and Order, the Motion to Sever primarily elaborates on what the Defendants "believe[] the government's theory" is underlying the

Superseding Indictment's factual background regarding Counts 6 and 7.  Motion to Sever at 5.

The Motion to Sever surmises:

> Defendant Baca ordered Mr. Molina to be killed because he was alleged to have cooperated with law enforcement.  Defendants Sanchez and Varela, as alleged intermediate leaders of the SNM, are alleged to have given the go-ahead for the killing and given orders to help execute it.  Defendant Herrera also allegedly sanctioned the killing.  Defendant Perez is accused of providing his walker to make a shank or shanks for the killing.  Defendants Rodriguez and Martinez are accused of going into Molina's cell and choking him until he was unconscious and Defendant Armenta and Defendant Montoya are alleged to have then gone into the cell and stabbed Molina multiple times, which ultimately led to his death. All the 2014 Defendants are alleged to be members of the SNM.

Motion to Sever at 5.  The Motion to Sever also reiterates that, "for the murder of Molina," the "Third Judicial District Attorney's Office in Las Cruces, obtained indictments against Defendants Jerry Armenta, Jerry Montoya and Mario Rodriguez," and that the case was "ready to proceed to trial on November 16, 2015," before the United States brought the present federal charges.  Motion to Sever at 5.

Regarding Counts 1-5, the Motion to Sever does not provide any further factual background beyond that which the Superseding Indictment alleges and which the Court recounts in its Factual Background.  See Motion to Sever at 4-5.  The Motion to Sever highlights, however, the distance in both time and location between the conduct alleged in Counts 1-5, and the conduct in Counts 6 and 7, as well as the different Defendants alleged to have committed the conduct.  See Motion to Sever at 4-5.  For Count 8, the Motion to Sever elaborates on the Superseding Indictment's factual allegations, stating that,

> [i]n his Plea Agreement, Defendant Archuleta states that in 2003 he had a falling out with J.R., who is also alleged to be an SNM member. . . .  As a result, Defendant Archuleta states he put a "green light" on J.R., which is common slang for ordering the murder of a person. . . .  Because of Archuleta's green light, J.R. was shot in 2003, but survived, and then was assaulted in 2015 in SNMCF for the same reason. . . .  Defendant Archuleta implicates Defendant Baca as sanctioning the green light . . . .

Motion to Sever at 6.  For Counts 9 and 10, the Motion to Sever elaborates on the Superseding

Indictment's factual allegations by providing:

> Counts 9 and 10 are both alleged conspiracies to murder Dwayne Santistevan, the head of [the New Mexico Department of Correction's ("NMDOC") Security Threat Intelligence Unit ("STIU")] and former Secretary of Corrections Greg Marcantel.  Defendants Anthony Baca, Roy Martinez and Robert Martinez, are charged in both counts.  Defendant Roy Martinez has entered a plea to both counts. . . .  In his plea, Mr. Martinez claims he conspired with Defendants Baca, Robert Martinez, and others, to kill Marcantel and Santistevan.  Other than Defendant Baca, Martinez does not identify any of the other defendants in Counts 6 and 7 as being involved.  Defendant Chris Garcia is charged in Count 10.

Motion to Sever at 6-7.  The Motion to Sever, last, does not further elaborate on the Court's

recitation of the Superseding Indictment's factual allegations underlying its Counts 11-15.  See

Motion to Sever at 7.

The Motion to Sever then turns to its substantive argument in favor of Counts 6 and 7's

severance.  See Motion to Sever at 7.  The Motion to Sever argues: "Joinder in criminal cases is

governed by Rule 8, and severance, Rule 14 of the Federal Rules of Criminal Procedure as well

as the Fifth Amendment."  Motion to Sever at 7.  Regarding rule 8 of the Federal Rules of

Criminal Procedure, the Motion to Sever explains that "[u]nder Rule 8(a) the joinder of offenses

is appropriate only when the offenses are of the same or similar character, or are based on the

same act or transaction, or are connected with or constitute parts of a common scheme or plan."

Motion to Sever at 7 (emphasis added)(internal quotation marks and citations omitted).  In turn,

the Motion to Sever asserts that "[w]hile Rule 8(a) is construed broadly to allow liberal joinder to

enhance the efficiency of the judicial system, joinder is only proper where at least one of the

Rule 8(a) conditions are met, and those conditions, although phrased in general terms, are not

infinitely elastic."  Motion to Sever at 7-8 (internal quotation marks and citations omitted).  The

Motion to Sever also explains: "Rule 8(b) applies to the joinder of defendants in a criminal trial[,

and, u]nder Rule 8(b), joinder of defendants is proper only where the defendants are alleged to have participated in the same act or transactions, or in the same series of acts or transactions constituting a crime."  Motion to Sever at 8 (emphasis added)(internal quotation marks and citations omitted).

> Still further, the Motion to Sever asserts:
>
> Even if two or more offenses or defendants are properly joined under Rule 8(a) or (b), joinder is also subject to scrutiny under Rule 14.  While the purpose of joinder is to promote economy and efficiency and to avoid a multiplicity of trials, these objectives must be achieved without substantial prejudice to the right of the defendants to a fair trial.

Motion to Sever at 8 (internal quotation marks and citations omitted).  According to the Motion to Sever, regarding rule 14 of the Federal Rules of Criminal Procedure, rule 14

> provides for relief from prejudicial joinder, allowing that if the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Motion to Sever at 8 (internal quotation marks and citations omitted).  Nonetheless, the Motion to Sever concedes, "[u]nder Rule 14, the determination of the risk of prejudice and the decision whether to grant a motion to sever is soundly within the discretion of the trial court."  Motion to Sever at 8 (internal quotation marks and citations omitted).  The Motion to Sever explains that, "[i]n determining whether to grant a motion to sever under Rule 14, the Court must weigh the potential prejudice to the defendant against the considerations of judicial economy and efficiency," and that the United States Court of Appeals for the Tenth Circuit "has held that [p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived."  Motion to Sever at 8-9 (citing United States v. Johnson, 130 F.3d 1420, 1427 (10th Cir. 1997)(internal quotation marks omitted)).

Accordingly, the Motion to Sever first contends that "Counts 6 and 7 were improperly joined under Rule 8(a) and must be severed from the remaining counts," because the offenses joined by the Superseding Indictment are not offenses that are "(1) of the same or similar character, (2) based on the same act or transaction, or (3) constitute parts of a common scheme or plan."  Motion to Sever at 10.  The Motion to Sever identifies that the Superseding Indictment likely joins Counts 11 and 12 -- C. Garcia's firearms offenses -- in accordance with rule 8(a)'s third prong, "constitute parts of a common scheme or plan," but contends that "[t]here are limits, however, to how broadly a Court can construe a common scheme or plan."  Motion to Sever at 10-11.  The Motion to Sever argues: "Under Rule 8(a), offenses are part of a common scheme or plan when the alleged offenses are similar, carried out in the same manner, and are alleged to have occurred over a relatively short period of time."  Motion to Sever at 11 (citing United States v. Jordan, 602 F.2d 171, 172 (8th Cir. 1979)).  The Motion to Sever thus provides:

> Here, all the government can claim is that the defendants are alleged members of the SNM and have been indicted with VICAR offenses.  While the government can claim that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), there is no RICO exception to Rule 8 and the government should not be allowed to rely on allegations of RICO conspiracy to draw every alleged crime of every alleged SNM member under the mantel of a common scheme or plan for purposes of Rule 8(a).

Motion to Sever at 11 (citing United States v. Guiliano, 644 F.2d 85, 89 (2d Cir. 1981)("One of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count.")).

The Motion to Sever then concedes that, besides C. Garcia's offenses, the remaining counts are "either the same type of offense -- murder or conspiracy to commit murder -- or are similar in character -- assault or attempted murder [and w]ith regard to these charges, perhaps the

government could satisfy the first prong of Rule 8(a)" in joining them with Counts 6 and 7.

Motion to Sever at 11.  The Motion to Sever thus argues:

> There is no evidence, however, that Counts 6 and 7 are based on the same acts or transactions as these other charges.  In fact, the crimes alleged in Counts 1 and 2 occurred over a decade before the allegations resulting in Counts 6 and 7.  Thus, while many of these other offenses are the same character of offense as Counts 6 and 7, because of the differences in time, location and offenders the "same act or transaction" provision of Rule 8(a) cannot be met here.

Motion to Sever at 11-12 (citing United States v. Riebold, 557 F.2d 697, 707 (10th Cir.

1977)(holding that joinder is proper "[w]here the evidence overlaps and the offenses are similar .

. . and the operable events occurred within a relatively short span of time").  Further, the Motion

to Sever argues, when

> [t]urning to the last provision of Rule 8(a), the 11 other murder, conspiracy and assault charges do not constitute parts of a common scheme or plan.  In the Tenth Circuit, the test for joinder is whether there is a common thread.  In this case, there are simply no common threads between Counts 6 and 7 and the other counts, and the only commonality shared by all defendants is their alleged involvement with the SNM.

Motion to Sever at 12 (citing United States v. Caldwell, 560 F.3d 1202, 1212 (10th Cir.

2009)(quoting United States v. Rogers, 921 F.2d 975, 984 (10th Cir. 1990))).  The Motion to

Sever, then, ultimately contends:

> While proof a "common purpose" is sufficient to bring a group of people under RICO, Rule 8(a) and the Tenth Circuit require that the offenses share a commonality that goes beyond merely the goals or purpose of the group.  Here, the government will likely argue that these crimes were all committed by SNM members to further SNM goals and thus demonstrate a common scheme or plan.  This argument fails, however, because the government cannot simply use the umbrella of RICO to join every alleged SNM crime by simply stating that the offense shared a common purpose.  The plain language of Rule 8(a) and the Tenth Circuit's test requires more.

Motion to Sever at 12-13.

Next, the Motion to Sever contends that the Counts 6 and 7 "Defendants were improperly joined under Rule 8(b) with the other 21 Defendants and their trial on Counts 6 and 7 should therefore be severed." Motion to Sever at 13. The Motion to Sever then concedes that, "[i]n *Zafiro*, the Supreme Court [of the United States] stated that joinder under Rule 8(b) serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Motion to Sever at 13 (citing Zafiro v. United States, 506 U.S. 534, 537 (1993)). The Motion to Sever argues, however:

> This possibility of scandal and inequity, however, is not a risk in this case. In cases where other defendants' charges are based on the same alleged crime and similar evidence or stem from the same conduct, as was the case in *Zafiro*, the court's concern with inequality and inconsistency is understandable. In *Zafiro*, four defendants were arrested together in an apartment with more than 70 pounds of cocaine and other drugs. . . . All four defendants were charged and convicted of conspiring to possess illegal drugs, and the Court affirmed the denial of defendants' motions to sever.
>
> In *United States v. Hill*, the Tenth Circuit affirmed the district court's denial of a motion to sever where multiple co-defendants and members of the Tulsa, Oklahoma[,] Hoover Crips were tried and convicted of conspiracy to commit bank robbery. . . . Co-defendant Dejuan Hill's motion to sever was denied because the court reasoned that "[a]lthough the Indictment . . . charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants had conspired and agreed with each other to commit all six of the robberies."

Motion to Sever at 13-14 (quoting United States v. Hill, 786 F.3d 1254, 1258 (10th Cir. 2015), cert. denied, Hill v. United States, 136 S. Ct. 377 (2015)). Accordingly, the Motion to Sever asserts:

> Unlike the defendants in *Zafiro* and *Hill*, here, there is no allegation that the 2014 Defendants, and the other defendants, with the exception of Defendant Baca where noted, conspired and agreed with each other to commit the other crimes alleged in the indictment. In short, there is no evidence that the crimes alleged in Counts 6 and 7 were part of a series of acts or transactions. Even in the most favorable light, the indictment alleges that, out of the nine 2014 Defendants, only Defendant Baca participated in any of the other counts. Further, there is no evidence of a transactional nexus between the 2014 Defendants and any of the

other defendants or other counts.  There is no evidence that the any of the other 2014 Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these defendants for more than two and half years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

Motion to Sever at 14.  The Motion to Sever then reiterates the contention that, because

the crimes alleged in Counts 6 and 7 only involve the 2014 Defendants, the *Zafiro* court's concerns for equality and consistence do not exist.  Because the charges against the 2014 Defendants are discrete and not connected to any of the other defendants, a separate trial would not lead to potential inconsistent verdicts with regard to the 2014 Defendants and the other 20 defendants.

Motion to Sever at 15.

Last, the Motion to Sever argues in the alternative that "Counts 6 and 7 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will severely prejudice the 2014 Defendants, and a joint trial of all defendants on all counts is impractical."  Motion to Sever at 15.  The Motion to Sever states:

The Federal Rules envision . . . that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights. Therefore, a three-step inquiry is necessary to determine whether the Court should grant a motion to sever.  First, the Court must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence.  Finally, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Motion to Sever at 15-16 (internal quotation marks omitted)(citing United States v. Neha, 2005 WL 3663695, at *2 (D.N.M. 2005)(Browning, J.), aff'd, United States v. Neha, 301 Fed. Appx. 811 (10th Cir. 2008); United States v. Gould, 2007 WL 1302587, at *2 (D.N.M. 2007)(Browning, J.); United States v. Pursley, 474 F.3d 757, 765 (10th Cir. 2007)).  The Motion to Sever then discusses the case United States v. Gallo, 668 F. Supp. 736 (E.D.N.Y. 1987)(Weinstein, C.J.), where "the District Court granted the defendants' motion for severance

- 20 -

under Rule 14 and separated a 22-count RICO indictment charging 16 defendants into 7 separate

trials."  Motion to Sever at 16.  In that case, the Motion to Sever explains:

> The 22 count indictment charged the defendants, alleged members and associates
> of the Gambino Crime Family, with RICO and a multitude of "substantive"
> offenses that took place over the course of two decades and were related to an
> alleged criminal enterprise. . . .   Although the court determined that the
> defendants were properly joined under Rule 8(b), it held that severance was
> required under Rule 14 after considering the prejudice resulting from: (1) the
> complexity of the indictment; (2) the disproportionality of evidence; (3) whether
> there is an antagonism of defense strategies and theories; (4) whether there is
> evidence only admissible as to some defendants; (5) the potential inadequacy of
> limiting instructions; and (6) the balancing requirements of Rule 14 including the
> deleterious effect of prolonged complex cases, and whether granting a severance
> saves time.

Motion to Sever at 16-17.  The Motion to Sever thus argues that, like in United States v. Gallo,

sufficient prejudice would result from a joint trial of these Defendants.  See Motion to Sever at

20.  The Motion to Sever cites the facts that: (i) "Like *Gallo*, this case deals with a complex

RICO indictment spanning decades' worth of criminal allegations [involving] separate, distinct

alleged murder conspiracies that took place at different points in time, involved completely

different alleged conspirators, and different alleged victims"; (ii) "the disproportionality of the

evidence in relation to the 30 defendants charged"; (iii) "it is unclear at this point whether the 30

defendants' defenses are so antagonistic as to be mutually exclusive"; (iv) "[p]resentation of

evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the

firearms charges not contained in Counts 6 and 7 will subject the 2014 Defendants to undue

prejudice by creating an atmosphere of criminal propensity"; (v) "[i]n a case this complex, a

limiting instruction is more aspirational than a reality, and in a judicial system, dedicated to truth

and justice, such a lack of connection with reality is unacceptable"; (vi) "severing . . . Defendants

from the other co-defendants would best serve the interest of the Court and the jury"; and (vii)

"[e]ven the largest of the federal courtrooms in the District of New Mexico, however, cannot

adequately accommodate the trial, much less *voir dire*."  Motion to Sever 20-25.  The Motion to Sever also highlights the Court's grant of severance in the related case United States v. Baca, where the Court "grant[ed] severance in part because a joint trial would prevent the jury from making a reliable judgment in a case where many defendants with varying degrees of culpability would be tried together," and because "the risk of prejudice was heightened given the co-Defendants' 'markedly different degrees of culpability.'"  Motion to Sever at 23 (quoting United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.)).  That reasoning, the Motion to Sever argues, is persuasive here, because, "[a]lthough the Court based its decision to sever that case on several other factors as well, there are clear parallels with this case, where the defendants in question (with the exception of Defendant Baca) are only alleged to have been involved with one incident and the related conspiracy."  Motion to Sever at 23.

In conclusion, the Motion to Sever makes one last argument that "severance of Counts 6 and 7 is necessary to protect the 2014 Defendants' respective rights to a fair trial under the Fifth Amendment."  Motion to Sever at 25.  The Motion to Sever contends that "[m]isjoinder rises to the level of a constitutional violation when it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial" and that "[h]ere the fact that the defendants have been charged with VICAR offenses cannot overcome the 2014 Defendants' right to a fair trial on the charges alleged against them."  Motion to Sever at 26-28.  Accordingly, the Motion to Sever concludes:

> A joint trial of Counts 6 and 7 alongside the other 13 charges is not permitted under Rule 8(a), or Rule 8(b) and if it were, it is not permitted under Rule 14 or under the Fifth Amendment, as the 2014 Defendants would be prejudiced by the presentation to the jury of similar offenses by other purported members of the SNM.

Motion to Sever at 28.  For clarity, because there are many motions in this case, the Motion to

Sever explains:

> Counsel for the 2014 Defendants Jerry Montoya (by Larry Hammond), Daniel
> Sanchez (by Amy Jacks), Anthony Ray Baca (by Theresa Duncan), Mauricio
> Varela (by Mary Stillinger) and Timothy Martinez (by Steven Almanza) join in
> the Motion. Counsel for Defendants Joe Gallegos (by Brock Benjamin),
> Christopher Chavez (by Orlando Mondragon), Santos Gonzales (by Erlinda
> Johnson), Conrad Villegas (by B.J. Crowe) and Paul Rivera (by Keith Romero)
> do not oppose this Motion.  Counsel for Defendants Eugene Martinez (by
> Douglas Couleur) and Leonard Lujan (by Dean Clark) take no position on this
> Motion.

Motion to Sever at 28.

### 2.    **The Count 3 Defendants' Response.**

"Defendants, Edward Troup, Javier Alonso and Arturo Arnulfo Garcia (the Count 3

defendants), through counsel," submitted a response to the Motion to Sever.  Response of

Certain Count 3 Defendants to Joint Motion to Sever Defendants Charged with Offenses in

Counts 6 and 7 [Doc. 807], filed January 6, 2017 (Doc. 812)("Count 3 Response").  The Count 3

Response begins by explaining that "Defendants Edward Troup, Javier Alonso, Arturo Arnulfo

Garcia, Benjamin Clark, and Ruben Hernandez are charged in Count 3 with the murder of

Freddie Sanchez, alleged to have occurred on June 17, 2007":

> Although the government's theory is not entirely clear, it appears, based on the
> discovery produced to date, that the government's theory regarding Count 3 is
> that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie
> Sanchez be killed, that co-defendant Ruben Hernandez assisted in the homicide
> by covering security cameras, and that co-defendants Edward Troup and Javier
> Alonso killed Freddie Sanchez.  It must be reiterated that this seems to be the
> government's theory; however, discovery has been produced which directly
> contradicts the government's presumed theory.

Count 3 Response at 2-3.  The Count 3 Response then joins the Motion to Sever, primarily

because the Count 3 conduct is alleged to have occurred almost seven years before the Counts 6

and 7 conduct.  See Count 3 Response at 3.  Further, the Count 3 Response argues that "the

factor that allegedly unites the Count 3, 6 and 7 defendants, *i.e.* SNM membership and participation in alleged gang activity, was not present in March of 2014," when at least one of the Count 3 defendants (Javier Alonso) had renounced any association with the SNM and the other active Count 3 defendants (Edward Troup and Arturo Garcia) were not even in the custody of the New Mexico Department of Corrections" during the time period of the Counts 6 and 7 conduct. Count 3 Response at 3-4. For clarity, the Count 3 Response concludes by stating: "Undersigned counsel attempted to confer with co-defendants Clark and Hernandez to determine their position regarding this motion. Counsel for co-defendant Clark indicated that they take no position. Counsel for co-defendant Hernandez did not respond." Count 3 Response at 4.

3.     **The Count 1 and 2 Defendants' Response.**

"Defendants Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen Patterson, and Christopher Chavez, by and through their attorneys," also have submitted a response to the Motion to Sever. See Response of Certain Count 1 and 2 Defendants to Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed January 6, 2017 (Doc. 813)("Count 1 and 2 Response"). The Count 1 and 2 Response first posits, for Counts 1 and 2:

> It appears based on the discovery produced to date, that the government's theory is that the two murders, which occurred on the same day in 2001, were orchestrated by Defendant Billy Garcia. The government's theory is that Mr. Garcia was the "shot caller" for the SNM gang for the period of time encompassing Counts 1 and 2 of the Superseding Indictment. The government asserts that Mr. Garcia, acting on orders of those higher up in the SNM, orchestrated the murder of both victims by ordering co-defendant Leonard Lujan to arrange for the murders. The government's theory is that Mr. Lujan then arranged for two teams to carry out the murders of Frank Castillo and Rolando Garza on March 26, 2001. The government alleges that the first team was comprised of Defendants Angel DeLeon, Joe Lawrence Gallegos, and Edward Troup and that the second team was comprised of Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez. It must be reiterated that this seems to be the government's theory; however, discovery has been produced which directly contradicts this theory.

Count 1 and 2 Response at 1-2.  The Count 1 and 2 Response then states that, with respect to the

March, 2014, incident date range for the conduct underlying Counts 6 and 7,

> Counts 1 and 2 Defendants Angel DeLeon, Edward Troup, Billy Garcia, Eugene
> Martinez, Christopher Chavez, Allen Patterson were not even in the custody of
> the New Mexico Department of Corrections on March 7, 2014.  Accordingly, the
> factor that allegedly unites the Count 1, 2, 6 and 7 defendants, *i.e.* SNM
> membership and participation in alleged gang activity, was not present in March
> of 2014.

Count 1 and 2 Response at 3.  The Count 1 and 2 Response thus agrees that

> joinder of Counts 1, 2, 6 and 7 will significantly complicate and lengthen any trial
> and that consideration of Federal Rules of Criminal Procedure 8 and 14 counsels
> in favor of severance.  The Counts 1 and 2 Defendants adopt the arguments in the
> Joint Motion to Sever Counts 6 and 7 and accordingly join in the request to sever
> Counts 1, 2, 6, and 7.

Count 1 and 2 Response at 3.  For clarity, the Count 1 and 2 Response explains that "Counsel for

Eugene Martinez takes no position" on the Count 1 and 2 Response.  Count 1 and 2 Response at

3.

### 4.    The United States' Response.

The United States responded to the Motion to Sever with the United States' Response in

Opposition to the Joint Motion to Sever Defendants Charged with Offenses in Counts 6 and 7

[807], filed January 20, 2017 (Doc. 836)("United States' Response").  Ultimately, the United

States Response takes the position that the

> Defendants' contention in the Joint Motion to Sever . . . that Counts 6 and 7 are
> improperly joined under Rule 8(a) is mistaken, because Rule 8(a) . . . does not
> apply in cases where more than one defendant is joined in the same indictment. . .
> . Defendants' second contention that they are improperly joined under Rule 8(b)
> also fails to find support in the law or the facts, because courts construe Rule 8(b)
> generally to allow for joint trials where the charges overlap factually, and because
> the different defendants in the different counts are all based on SNM's criminal
> activities is particularly logical here, given that the SNM operates as a gang
> within the New Mexico prison system where the incarcerated leaders cannot
> move freely and thus use separate SNM members or associates to carry on the
> SNM enterprise's business -- murders, assaults and assaults with deadly weapons.

Finally, given the reality that SNM's operations necessarily require that different leaders and members located within and without the different prisons still carry on the SNM's criminal enterprise, and because the nature of the charges require that the United States prove as an element that the SNM is a racketeering enterprise, neither Rule 14 nor the United States Constitution require or support severance of Counts 6 and 7.

United States Response at 1-2 (internal quotation marks and citation omitted).  The United States' Response then recaps much of the same facts from the Superseding Indictment which the Court has provided in its Factual Background and then provides its recitation of the applicable law.  See United States' Response at 2-4.  Here, the United States contends first that "Federal Rule of Criminal Procedure 8 describes two tests for joinder."  United States' Response at 5.

Rule 8(a) specifically provid[es] that "a single defendant" may be charged with two or more offenses "if the offenses charged are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Rule 8(b) provid[es] that "two or more defendants" may be charged "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."

United States' Response at 5-6 (internal citations omitted).  The United States then argues that only rule 8(b) applies when "more than one defendant is joined in the same indictment," United States' Response at 6 (citing United States v. Riebold, 557 F.2d 697, 707 (10th Cir. 1977)), and under rule 8(b), "joinder of offenses among multiple defendants was appropriate . . . where a 'number of common threads and much common evidence connecting offenses charged in the indictment'" existed, United States' Response at 6 (quoting United States v. Caldwell, 560 F.3d 1214, 1212 (10th Cir 2009)).

Turning then to the Motion to Sever's argument that the "United States has not alleged that [Counts 6 and 7] Defendants participated in the same series of acts or transactions with the other defendants charged," the United States argues that it "explicitly alleges" all Defendants participated in the "same predicate acts as the other Defendants."  United States' Response at 6-

7.  The United States contends that those allegations are sufficient, because "the Supreme Court unanimously held that, to be found guilty of a conspiracy to commit a RICO violation, a defendant need not personally commit or agree to commit two predicate acts of racketeering." United States' Response at 6-7 (citing United States v. Salinas, 522 U.S. 52, 64 (1997)("The RICO conspiracy statute, §1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts.")). Further, the United States maintains that rule 8(b) "permits joinder of defendants in a single indictment where the defendants participated in the same series of acts or transactions constituting an offense.  The rule does not condition joinder upon whether the defendants conspired with each defendant to commit the offenses."  United States' Response at 8.

Next, the United States addresses the Motion to Sever's argument that "the crimes alleged in Counts 6 and 7 are not connected to the other defendants," and asserts that the United States "provided evidence demonstrating that the crimes alleged are connected" to those of all of the other defendants.  United States' Response at 8.  The Motion to Sever's argument, the United States contends, "cannot logically be correct because it circumvents the essential framework of the RICO Act and VICAR statute.  If it were true that such defendants cannot be charged together, this would preclude multi-defendant RICO trials.  That simply cannot be true."  United States' Response at 8.  Indeed, the United States maintains that rule 8(b)'s language permitting joinder for the "same series of acts or transactions . . . is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system."  United States' Response at 8.  The United States thus argues that, under "RICO, the requirements of Rule 8(b) are satisfied when each defendant participated in the affairs of the same enterprise through the commission of the

alleged predicate racketeering acts," United States' Response at 9, and, further, "[a]s is the case under RICO, the requirements for joinder of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and that the defendants' charged crimes related to the affairs of the same enterprise."  United States' Response at 10.  In sum, regarding rule 8(b) as it applies to this case, the United States explains:

> The United States alleges that the SNM gang is a criminal enterprise within the meaning of RICO and VICAR, that Defendants are members of the gang.  The grand jury found probable cause supports those allegations.  The Defendants are charged in Counts 6 and 7 with predicate racketeering offenses -- conspiracy to murder, and murder -- relating to the affairs of the SNM enterprise.  Given the abundance of case law pertaining to joinder of defendants in RICO and VICAR cases, joinder of Defendants in Counts 6 and 7 is clearly proper under Rule 8(b) . . . .

United States' Response at 10-11.

The United States Response next addresses the Motion to Sever's contention that "Counts 6 and 7 should be severed under Federal Rule of Criminal Procedure 14 because a joint trial of all defendants is impractical, and evidence against other defendants charged in the Superseding Indictment will prejudice the Defendants charged in these counts."  United States Response at 11.  According to the United States, the Defendants "fail to satisfy the first prong of severance inquiry," wherein the Court must "determine whether the defenses presented are so antagonistic that they are mutually exclusive."  United States' Response at 11.  Here, the United States argues:

> In reality, as Defendants admit, it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive. . . .  The Rule 14 inquiry requires the Court to find not only that the defenses are antagonistic, but that they are "mutually exclusive.". . .  Defendants fail to provide any basis at this point on which the Court may determine that joinder of defendants or offenses would result in the type of prejudice that Rule 14 requires to warrant severance.

United States' Response at 12-13.  The United States also argues that the "Defendants fail to satisfy the second prong of severance inquiry," wherein the Court "must next determine whether relief is available based on a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence," because: (i) there is "no serious risk that a joint trial will prevent the jury from making a reliable judgment about guilt or innocence"; (ii) there is "no serious risk that joinder will compromise Sixth Amendment trial right"; and (iii) there is "no serious risk that joinder will compromise Fifth Amendment trial right."  United States' Response at 13-21.  Specifically, the United States contends that the Defendants are "not entitled to severance merely because they may have a better chance of acquittal in separate trials," and that prejudice "always exists when more than one defendant or offense are tried together," "[b]ut even where a defendant may show such specific and compelling prejudice, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice."  United States' Response at 13-14.  The United States then shrugs off the Motion to Sever's argument that the case's complexity and magnitude would render a limiting instruction ineffective, because the Tenth Circuit and the Supreme Court counsel otherwise.  See United States' Response at 14.

The United States also provides:

[I]n the unique circumstances that the Superseding Indictment alleges, these murders, conspiracies to murder and other violent crimes that involve the various SNM member Defendants are *res gestae* of the SNM's racketeering "enterprise.". . . Unlike a generic drug-trafficking conspiracy (even a large one), and unlike an organized crime family, the SNM's criminal enterprise operates within the confines of the New Mexico prison system, in which the leaders and the members are not at liberty to travel freely to perpetrate their crimes. . . .  Also locked up in different prison facilities at different locations throughout New Mexico are the victims and targets of the SNM enterprise, including J.M.  Thus, unlike the unconstrained criminals in a drug-trafficking conspiracy or an organized crime

> family, in this case, only SNM members within the particular prison at which the
> targeted victim resides may carry out the "hit." It is therefore logical, and
> unsurprising, that different SNM members are alleged to have carried out the
> SNM's crimes that took place at different locations where the different victims
> were housed.

United States' Response at 16. Complexity notwithstanding, the United States then maintains

that "courts routinely have found that juries can and do follow jury instructions in complex

RICO and VICAR cases, and that jury instructions are an effective mechanism for granting relief

where prejudice may arise." United States' Response at 17. Regarding the Defendants' Sixth

Amendment trial rights and the Motion to Sever's argument that the courtroom is inherently not

conducive to maintenance of that right, the United States next contends that "the hearings have

worked fine just far, and there is no reason to believe that will change." United States' Response

at 19. Then, regarding the Defendants' Fifth Amendment trial rights, and the Motion to Sever's

argument that "joinder will prejudice their right to a fair trial because they have been charged

with VICAR offenses alongside other Defendants charged with other crimes," the United States

argues that the "Defendants fail to specify how joinder would compromise their right to a fair

trial. But, more than that, they fail to acknowledge that, given the nature of the VICAR charges

in Counts 6 and 7, severance would not even cure the prejudice theory they contend may exist."

United States' Response at 19. Although the Defendants in the Motion to Sever harp on the

notion of spillover prejudice across the counts, the United States maintains:

> VICAR is a properly enacted statute that Congress saw fit to enact to prevent the
> exact activity alleged in the Superseding Indictment: violent crimes such as
> murders perpetrated by individuals who join in a racketeering enterprise such as
> SNM. Second, by charging this murder and conspiracy to murder as VICAR
> violations, the United States placed additional burdens on itself: to prove that the
> SNM is an enterprise, engages in racketeering activities, and that this murder and
> conspiracy to murder were committed by the Defendants to receive pecuniary
> value from SNM or to gain entry to, or to maintain or increase position in, SNM.
> To the extent that Defendants complain about the additional evidence that's
> admissible in a VICAR case such as this, they conveniently omit from their

> Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

United States' Response at 21.

Turning to the "third prong" of the severance inquiry, the United States again asserts that the Motion to Sever fails to establish the prong's requirements. United States' Response at 22. The United States explains that the Motion to Sever contends that "Counts 6 and 7 would best serve the interest of the Court and the jury by (1) permitting the Court greater flexibility in scheduling matters; (2) facilitating jury selection for fewer defendants; and (3) relieving jury members of jury service for inordinate stretches of time." United States' Response at 22 (internal quotation marks omitted). The United States, then, downplays the burden on the Court and the parties of the joint trial, primarily by arguing that "juries are capable of handling complex litigation." United States' Response at 23. The United States, in sum, objects to severance of the Counts 6 and 7. See United States' Response at 23.

### 5. **The Supplemental Pleading**.

M. Rodriguez replied to the United States' Response with Defendant Mario Rodriguez' Supplemental Filing in Support of Motion for Severance of Counts 6 and 7; and Motion to Join, filed January 24, 2017 (Doc. 845)("Supplemental Pleading"). The Supplemental Pleading first states:

> Mr. Rodriguez is charged in Counts 6 and 7, and no other Counts. By this pleading, he moves to join the severance request of all other Count 6 and 7 defendants (dkt. 807). We also set forth the following supplemental points and authorities, to more fully advance the concept of the Court's inherent authority on this issue (even absent a showing of prejudice), and to briefly respond to several matters contained in the Government's Response.

Supplemental Pleading at 2-3. The Supplemental Pleading implores that "the traditional factors which establish a judicial preference for joint trials are inapplicable here," because "due to the

unique facts and circumstances of this case, and the nature of the requested severance, neither of these traditional justifications weigh in the Government's favor, regardless of whether or not prejudice otherwise exists." Supplemental Pleading at 3. Indeed, the Supplemental Pleading emphasizes:

> The Government ignores the significance of the fact that the instant severance only involves those Defendants charged in Counts 6 and 7, *to wit*: the 2014 J.M. murder. Accordingly, there can be no 'scandal and inequity of inconsistent verdicts' as a result of the requested severance, since all those so charged will be tried together.

Supplemental Pleading at 3.

The Supplemental Pleading next suggests that, "[a]lthough traditional Rule 8 and Rule 14 considerations are certainly always applicable, [c]ases have been severed in which there is no mention of prejudice to the prosecution or to the defendants." Supplemental Pleading at 4 (internal quotation marks omitted). The support for such severance, according to the Supplemental Pleading, comes from "the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy." Supplemental Pleading at 4 (citing United States v. Bundy, 2016 U.S. Dist. LEXIS 172868 (D. Nev. 2016)("Courts have the inherent authority to manage their docket by severing large groups of defendants into more manageable groups.")). The Supplemental Pleading then alerts the Court to the failure of the United States to recognize the Court's power in this regard. See Supplemental Pleading at 5-8.

Turning then to the issue of "public trial considerations," the Supplemental Pleading asserts that there "is a realistic danger that Defendants' Sixth Amendment right to a public trial (among other rights) may be violated." Supplemental Pleading at 8. That is the case, according to the Supplemental Pleading, because, "[t]o whatever extent the Las Cruces Federal Courthouse

has difficulty physically accommodating a complex, multi-defendant trial with this many participants and required spectators, the Defendants' public trial rights are implicated." Supplemental Pleading at 9.   The Supplemental Pleading then concludes with a block quote regarding an opinion out of the United States District Court for the District of Nevada:

> [Chief Judge Reed's] . . . decision thoughtfully reviewed and considered the difficulties of a joint trial in a complex multi-defendant case.   The decision pointed out that a complex multi-defendant case is "fraught with problems."  He recognized that a single trial of a complex multi-defendant case imposes enormous burdens on the defendants, defense counsel, prosecutors, jurors, the court, and the judge.   Dozens of people are required to be in court every day. Therefore, the absence of any one person may bring the entire trial to a screeching halt.  Complex multi-defendant cases involve reconciling the individual calendars of the prosecutors and each defense attorney with the court's docket.   Attorneys carrying a full case load have conflicts with other trials, and the longer the case lingers, the more pronounced these conflicts become.  Judge Reed noted that a lengthy trial of multiple defendants creates a unique hardship on each party involved.   Jurors spend months away from their daily lives, defendants are required to endure months of pretrial incarceration before their case is finally adjudicated, and often significant amounts of time-consuming evidence are presented which are unrelated to a particular defendant.  Attorneys are unable to spend significant time on their remaining cases.  The court is forced to expend an exorbitant amount of time on a single case, and other litigants must "queue up for the remaining courtrooms."   The result is a strain on the court's docket and unconscionable delays of all other cases.  Mancuso also recognized the personal strain on the trial judge in a long complex case.   The trial court is required to make rulings as issues come up which often require frequent adjournments necessitated by unavoidable problems associated with multiple jurors, multiple defendants, and their counsel as well as the witnesses and courtroom personnel who are required to be present at all times.

Supplemental Pleading at 11 (quoting United States v. Bundy, 2016 U.S. Dist. LEXIS 172868 (citations omitted)).

### 6.    **Gonzales' Motion to Sever**.

Gonzales filed his Amended Motion to Sever on February 5, 2017, and readopted Gonzales' Motion to Sever in full and further addressed Gonzales' speedy trial rights.   See Gonzales' Amended Motion to Sever at 1 n.1.   The Court addresses Gonzales' severance

arguments in the context of Gonzales' Amended Motion to Sever, because it is difficult to consider Gonzales' Motion to Sever in a vacuum.

   7.    **A. Gallegos' Motion to Sever.**

   A. Gallegos and J. Gallegos submitted A. Gallegos' Motion to Sever, with A. Gallegos stating:

> Andrew Gallegos, who is not charged elsewhere in the superseding indictment, respectfully request[s] that this Court sever Counts 4 and 5 from trial of the other counts in the superseding indictment.  Although, Defendant Joe Gallegos is also charged in counts 1, 13, 14 and 15 . . . he join[]s in this Motion because the offenses alleged in these other counts involve other different defendants, and occurred in different locations, three to four years after the alleged AB murder, and with respect to count 1, twelve years before the alleged AB murder.  Furthermore, none of these additional counts have any relationship to counts 4 and 5.

A. Gallegos' Motion to Sever at 1-2.  A. Gallegos argues:

> (1) Counts 4 and 5 were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 28 other defendants; and (2) should the Court find joinder proper under Rule 8, severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the two Defendants for Counts 4 and 5 alongside the 28 other defendants and the 13 other counts in the superseding indictment will deprive the Gallegos Defendants of their right to a fair trial, especially given that only a small portion of the evidence in the trial of all the defendants would be relevant to Counts 4 and 5.

A. Gallegos' Motion to Sever at 2.  A. Gallegos also asserts that "judicial efficiency and economy supports severance, as a trial of all 24 Defendants on all 15 counts would last considerably longer given the number of defendants and the span of decades between many of the allegations."  A. Gallegos' Motion to Sever at 2.  A. Gallegos also contends that

> a joint trial would be logistically impractical because all defendants and their counsel may not even fit in the courtroom during the trial.  These logistical limitations alone implicate the Defendants' right to confront witnesses, be present at all critical stages of the trial and to have a public trial under the Sixth Amendment.

A. Gallegos' Motion to Sever at 2.  After recapping an extensive factual background of the case similar to that which the Court has provided in this Memorandum Opinion and Order, the Motion to Sever primarily elaborates on the nature of Counts 4 and 5, "conspiracy to murder and murder of Adrian Burns (AB)."  A. Gallegos' Motion to Sever at 2-3.

According to A. Gallegos, the Superseding Indictment provides that "Joe and his younger brother, Andrew Gallegos, conspired to and did murder AB on or about November 12, 2012, in Socorro and Valencia counties."  A. Gallegos' Motion to Sever at 4.  A. Gallegos provides, however:

> Although the basis for Counts 4 and 5 are not precisely clear, it is believed the government's theory of the case is, in part, that Defendants Joe and Andrew Gallegos were allegedly low level members of the SNM who received orders from higher-up to kill AB.  It is unspecified as to who specifically gave the kill-order or as to when, where, or how exactly the order came down.  At the time of the murder, AB is alleged to have been the Gallegos Defendants' drug supplier and possible rival of the SNM.  The Gallegos Defendants, who deny membership with the SNM, are alleged to have tortured and killed AB to gain membership or status with the SNM.  AB's body (shot, gasoline doused and burnt) was found in the Bosque with his vehicle, just outside of Socorro County.

A. Gallegos' Motion to Sever at 4.  According to A. Gallegos, he and J. Gallegos are

> alleged to have been the last people to see AB alive at his home in Los Lunas, N.M., where he was first shot and killed.  Some hours after his death, the Gallegos Defendants were said to have been seen in public with blood and pinhole burnt marks on their clothes.

A. Gallegos' Motion to Sever at 4.  These facts, A. Gallegos explains, resulted in

> the State of New Mexico, by the Third Judicial District Attorney's Office in Socorro County, charg[ing] Defendants Joe and Andrew Gallegos in County Magistrate Court (Docket No: M-52-FR-2012-00230) with the murder of AB, along with several other related charges.  The case was investigated by the New Mexico State Police (NMSP), who later arrested the Gallegos Defendants for the murder of AB on November 20, 2012 in Albuquerque, New Mexico.  Upon information and belief, two subsequent DNA tests of the blood found on their clothing was determined to be non-human.  The burnt marks on their clothes were also tested and determined to be non-gasoline related.  The Gallegos Defendants have asserted all along that the blood came from the roasting of a pig during a

birthday celebration the night that they were seen in public, and that the burnt marks were likely from the party or from welding jobs that the brothers often did for spare cash.

A. Gallegos' Motion to Sever at 3-4.  The State of New Mexico, on December 14, 2012, according to A. Gallegos, "filed a *Nolle Prosequi* for both defendants indicating insufficient evidence to proceed."  A. Gallegos' Motion to Sever at 5.  A. Gallegos thus provides and argues:

> Three years later, the first indictment in this federal cause was filed. . . .  Andrew Gallegos and the AB murder were not included in these counts until the superseding indictment was filed on April 21, 2016. . . .  The other counts in the superseding indictment, except Counts 6 and 7 did not have a parallel state prosecution.  Furthermore, the AB murder, unlike most of the alleged murders in the Superseding Indictment, occurred outside of prison and was allegedly committed for profit and not retaliatory reasons.  Upon information and belief, there were no witnesses to the murder or specific, concrete evidence, including DNA, that directly links the Gallegos Defendants to this murder, the murder scene, or to the location where AB's body was found.

A. Gallegos' Motion to Sever at 5.

A. Gallegos then argues that "[t]he Gallegos Defendants must be severed, as their joinder with other 21 defendants under Rule 8(b) is improper and sets a dangerous precedent for infinite joinders."  A. Gallegos' Motion to Sever at 9.  A. Gallegos relies on Zafiro v. United States, 506 U.S. at 537, arguing, "[i]n *Zafiro*, the Supreme Court stated that joinder under Rule 8(b) 'serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'  506 U.S. at 537.  This possibility of scandal and inequity, however, is not a risk in this case."  A. Gallegos' Motion to Sever at 9.  A. Gallegos explains:

> In short, there is no evidence that the crimes alleged in Counts 4 and 5 were part of a series of acts or transactions.  Even in the most favorable light, the indictment alleges that, out of the two Defendants in Counts 4 and 5, only Joe Gallegos is alleged to have participated in any of the other counts.  Also, there is no evidence of a transactional nexus between the Gallegos Defendants named in Counts 4 and 5 and any of the other defendants or other counts.  There is no evidence that the Gallegos Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these

defendants for more than four years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

A. Gallegos' Motion to Sever at 10. The risk of an inconsistent verdict -- should the Court sever Counts 4 and 5 -- does not exist, A. Gallegos argues, because "Counts 4 and 5 only involve the Gallegos Defendants, and are discrete and not connected to any of the other defendants, [and] joinder of the Gallegos Defendants is improper under Rule 8(b)." A. Gallegos' Motion to Sever at 10. Additionally, A. Gallegos argues, although "[t]he government claims that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1)," and "[t]he government further claim[s] that proof of a 'common purpose' is sufficient to bring a group of people under RICO," "the government should not be allowed to simply use the umbrella of RICO to join every alleged SNM crime by simply alleging that the offense shared a common purpose. This would create a slippery slope that this Court, as a public policy matter, should view with great caution." A. Gallegos' Motion to Sever at 10-11.

A. Gallegos alternatively argues that "[C]ounts 4 and 5 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will prejudice the Gallegos Defendants, and a joint trial of all defendants on all counts is impractical." A. Gallegos' Motion to Sever at 11. A. Gallegos relies on the Court's recitation of its rule 14 analysis in United States v. Gould, 2007 WL 1302587, at *2, to argue that the Court should consider in his case "whether the defenses presented are so antagonistic that they are mutually exclusive," whether he has shown "a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence," and whether the Court should then "exercise[] its discretion and weigh[] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and

expedition in judicial administration." A. Gallegos' Motion to Sever at 11-12. A. Gallegos then

points to

> United States v. Hardwell, [where] the Tenth Circuit held that joinder under Rule
> 8(b) was not proper when six co-defendants were all charged with conspiracy,
> money laundering, and possession of cocaine with intent to distribute. 80 F.3d
> 1471 (10th Cir. 1996), *on reh'g in part*, *United States v. Hardwell*, 88 F.3d 897
> (10th Cir. 1996).

A. Gallegos' Motion to Sever at 12. A. Gallegos argues that, in United States v. Hardwell,

> [t]he Tenth Circuit explained that severance was not necessary, in part, because
> the "conspiracy was to commit a single offense; there were only six defendants,
> all charged with the [one] conspiracy" and there was not a great disparity in
> culpability among the defendants. . . . In reaching this decision, the court directly
> contrasted *Hardwell*, with *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y.
> 1987), a RICO case where severance was granted because it is substantially more
> complex than *Hardwell*, and remarkably similar to the case at hand.

A. Gallegos' Motion to Sever at 12. A. Gallegos then discusses United States v. Gallo, where

"the District Court granted the defendants' motion for severance under Rule 14 and separated a

22-count RICO indictment charging 16 defendants into 7 separate trials," because:

> Although the court determined that the defendants were properly joined under
> Rule 8(b), it held that severance was required under Rule 14 after considering the
> prejudice resulting from: (1) the complexity of the indictment; (2) the
> disproportionality of evidence; (3) whether there is an antagonism of defense
> strategies and theories; (4) whether there is evidence only admissible as to some
> defendants; (5) the potential inadequacy of limiting instructions; and (6) the
> balancing requirements of Rule 14 including the deleterious effect of prolonged
> complex cases, and whether granting a severance saves time.

A. Gallegos' Motion to Sever at 12-13. In particular, A. Gallegos notes the United States v.

Gallo court's decision that the RICO indictment in that case was a complex RICO conspiracy,

the jury would need to work hard to keep the legal and factual elements in perspective, and some

defendants were less culpable than the others. See A. Gallegos' Motion to Sever at 13-14. A.

Gallegos also notes that, in United States v. Gallo, the court concluded there was a likelihood of

frequent instances in which "evidence admitted against one defendant would also be relevant as

to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate

trial of that defendant alone because its probative value would be outweighed by the danger of

unfair prejudice," and also discussed how

> the indictment charged a central RICO conspiracy, numerous other conspiracies
> in the substantive counts and the predicates acts and potential uncharged
> conspiracies, the result would be "conspiracies within conspiracies, and
> conspiracies to conceal other conspiracies, conspiracies which are discrete and
> finite, and those which are amorphous and indefinite, involving conspirators
> joining and leaving the conspiracy at various times." . . . Meaning that in such a
> complex trial, "[a]dmissibility decisions will often depend on having faith in the
> jury's ability to heed extraordinarily intricate limiting instructions" which "[o]ver
> the course of several months . . . would virtually be impossible without the aid of
> a computer" given the number of the co-defendants and counts.

A. Gallegos' Motion to Sever at 14.    Specifically, A. Gallegos then provides that, in

"[c]onsidering the balancing requirement of Rule 14, the court noted that '[t]rials in these

"monster" cases' 'create an enormous burden on the courts, as well as on the defendants, the

defense bar, juror, and even prosecutors.'"  A. Gallegos' Motion to Sever at 15.  Indeed, A.

Gallegos references United States v. Gallo's conclusion that

> the overall trial time was probably diminished in the Gallo case by splitting up the
> trials . . . because the trial would be smoother and more concise . . . evidence in
> each case does not scatter about the various contours of the conspiracy . . . there
> are two or three defense counsel cross-examining and raising objections rather
> than one or two dozen . . . sidebars are much more infrequent . . . and
> continuances and adjournments are less common.

A. Gallegos' Motion to Sever at 16 (internal quotation marks and citation omitted).  A. Gallegos

then draws comparisons between this SNM case and United States v. Gallo, suggesting:

> Like *Gallo*, this case deals with a complex RICO indictment spanning decades'
> worth of criminal allegations.  In fact, this Court declared it complex on January
> 7, 2016, even before the government unsealed the April 21, 2016, superseding
> indictment. . . .  Also similar to *Gallo* is the disproportionality of the evidence in
> relation to the 30 defendants charged.  A review of the discovery to date
> demonstrates that the government has revealed far more and far stronger evidence
> against some co-defendants, including audio-recorded conversations and self-
> incriminating statements, than against others.    Accordingly, "[i]nevitable

> prejudice to the peripheral defendants is caused by the slow but inexorable
> accumulation of evidence against the major players." . . .   To date, the
> government has only presented rumor, conjectures and circumstantial evidence as
> to the guilt of the Gallegos Defendants, which is not only substantially weaker
> evidence when compared to the evidence against most of the other defendants, but
> is clearly indicative of the government relying on the principle of "guilt by
> association" to prove their case in counts 4 and 5.

A. Gallegos' Motion to Sever at 16-17.   Further, although A. Gallegos concedes that "it is

unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually

exclusive," he contends "there can be no doubt that there will be antagonistic defenses.   For

instance, many defendants may argue they were not or are not SNM members.   Other defendants

will likely argue the alleged crimes were not done in furtherance of the SNM."   A. Gallegos'

Motion to Sever at 17.

Ultimately, A. Gallegos reiterates that the risk of prejudice in this case is great, given the

different nature of all of the Counts, and that in particular -- for him in Counts 4 and 5 -- the

scant evidence against him will be bolstered by the appeal to guilt by association.   See A.

Gallegos' Motion to Sever at 17-18.   A. Gallegos also reiterates that the nature of the

Superseding Indictment limits the potential effectiveness of limiting instruction to the jury,

stating that

> if no severance is granted, the jury will hear about the other murders, conspiracies
> to commit murder (not of the same victims), a conspiracy to commit assault,
> assault, and an attempted murder plus the firearms charges, all allegedly in
> furtherance of the SNM.   Simply hearing about this activity by alleged fellow
> gang members makes it unlikely the Gallegos Defendants can get a fair shake
> with the jury, even if a limiting instruction is given and even if the defendants
> present viable defenses.

A. Gallegos' Motion to Sever at 18-19.   A. Gallegos also notes that, regarding his constitutional

right to a fair trial, "[e]ven the largest of the federal courtrooms in the District of New Mexico

cannot adequately accommodate the trial, much less voir dire, if a severance is not granted."   A.

Gallegos' Motion to Sever at 19-20.  Here, A. Gallegos thus last contends that "severance of counts 4 and 5 is necessary to protect the Gallegos Defendants' respective rights to a fair trial under the Fifth Amendment."  A. Gallegos' Motion to Sever at 21.  A. Gallegos concludes by stating that Gonzales, Lujan, and Sanchez join he and J. Gallegos in filing A. Gallegos' Motion to Sever, and that no other Defendants have opposed A. Gallegos' Motion to Sever.

      **8.**       **Troup's Motion to Sever.**

Troup and B. Garcia filed Troup's Motion to Sever, and were joined by "Defendants Andrew Gallegos, Christopher Chavez, A[r]turo Arnulfo Garcia, Rudy Perez, Daniel Sanchez," in their request to sever Counts 1 and 2.  Troup's Motion to Sever at 1-2.  Troup's Motion to Sever then explains the factual allegations underlying for Counts 1 and 2:

> The 15-count superseding indictment in this case describes alleged activities involving [SNM], over a period of two decades and in regard to alleged criminal acts that occurred in varied locations.  Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia are charged in Count 1 with a VICAR violation based on the substantive allegation that they knowingly and intentionally murdered Frank Castillo. . . .  Defendants Leonard Lujan, Billy Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez are charged in Count 2 with a VICAR violation based on the substantive allegation that they knowingly and intentionally murdered Rolando Garza. . . .  Counts 1 and 2 accuse these eight defendants (collectively, the "2001 Defendants") of murdering Castillo and Garza on the same day (March 26, 2001), at [Southern New Mexico].

Troup's Motion to Sever at 1-2.  Troup's Motion to Sever makes five primary arguments, much of which are similar to those presented in A. Gallegos' Motion to Sever and the Motion to Sever:

> (1) Counts 1 and 2 are remote in time from the remaining counts; (2) when the vast majority of the crimes alleged in the superseding indictment occurred, almost all of the 2001 defendants were living in the community at large and were not part of the prison system; (3) the allegations in Counts 1 and 2 are alleged to have been carried out by a different faction of the SNM than those alleged to have been committed in the other counts; (4) the introduction of evidence of the crimes in the other counts will unfairly prejudice the defendants indicted in Counts 1 and 2 in a manner which limiting instructions cannot cure; and (5) severance of Counts 1 and 2 would be in the interest of judicial economy and efficiency.

Troup's Motion to Sever at 2-3.  Ultimately, Troup's Motion to Sever contends "that a court determining whether to grant a motion to sever under Rule 14 must weigh the potential prejudice to the defendant against considerations of judicial economy and efficiency," and that "Federal Rule of Criminal Procedure 14(a) permits the trial court to conduct separate trials if the joinder of separate offenses appears to prejudice the defendant or the government."  Troup's Motion to Sever at 7.  Troup's Motion to Sever states: "In most instances, fairness is pitted against judicial economy and the court must use its discretion to balance which valid consideration should prevail.  This case presents no such dilemma . . . fairness and judicial economy both favor severance."  Troup's Motion to Sever at 8.

Troup first argues that Counts 1 and 2 Defendants "will be unduly prejudiced by joinder," because "[e]vidence concerning Counts 9 and 10 will unfairly prejudice all other defendants." Troup's Motion to Sever at 8.  Specifically, Troup argues

> that Counts 9 and 10 include allegations of a 2015 conspiracy to murder two corrections officials in the community, as opposed to violence by inmates against inmates within the confined walls of the prison system.  Those crimes are different in nature and character, and will undoubtedly cause fear in citizen jurors.

Troup's Motion to Sever at 8.  Indeed, Troup provides:

> A review of the indictment's paragraphs 3-13 does not reveal that attacking corrections officers was ever a goal or purpose in the formation or operation of the SNM.  Any and all defendants not charged in counts 9 and 10 would suffer unfair prejudice if joined with Counts 9 and 10.

Troup's Motion to Sever at 8.  Troup also argues that "[t]here exists a disparity in the quality and quantity of evidence, which creates antagonistic defenses," and that "[t]he allegations in the superseding indictment are not related to a single criminal enterprise, but rather describe several distinct and different criminal enterprises."  Troup's Motion to Sever at 8-9.  Essentially, Troup argues that SNM has divided and fractured in such a fashion as to extinguish any ties amongst

the Counts 1 and 2 Defendants, and those alleged SNM members in the other counts.  See

Troup's Motion to Sever at 9-12.  In considering whether there are multiple criminal enterprises,

Troup relies on the factors United States v. Woods, 1985 U.S. Dist. LEXIS 16113, at *22-23 (D.

Conn. 1985), sets forth, which are:

> (1) the criminal offenses charged in the indictments; (2) the participants of the conspiracies; (3) the dates between which the conspiracies took place; (4) the methods of operation; (5) overt acts done in furtherance of the conspiracies; (6) the geographic scope of the purported conspiracies or locations where the overt acts occurred; (7) the extent to which the purported conspiracies share a common objective;  and  (8)  the  degree  of  interdependence  between  the  purported conspiracies.

Troup's Motion to Sever at 10.  Troup then explains that the distinct SNM factions from which

the Defendants named in the Superseding Indictment are alleged to associate are the "All Stars,"

the "Old Timers," and the "Rejects," all of whom Troup argues do not interact.  Troup's Motion

to Sever at 11.  In fact, Troup provides:

> The  question  of  whether  this  is  one  criminal  enterprise  or  several  different criminal enterprises is a question of fact to be determined by this Court in analyzing whether the counts should remain joined or severed.  The government's entire basis for joinder rests on the premise that the SNM is a single criminal enterprise.  The facts belie this notion.  The SNM is an umbrella name for a group of individuals, much like the name Crips is a name used by various street gangs. Just like a Crips gang in one part of Los Angeles may not be the same criminal enterprise as another Crips gang in Los Angeles -- where they share nothing more than a generalized camaraderie -- the SNM factions often operated independently from each other and, indeed, counter to each other.  To say they shared similar illegal goals is not to say they are the same criminal enterprise.  The All Stars, for example, wanted to exterminate the Old Timers and wanted to take over the New Mexico prison system.

Troup's Motion to Sever at 12-13.  Accordingly, Troup argues, "[a]pplying the Woods factors to

these facts leads inescapably to the conclusion that the superseding indictment in reality alleges

separate enterprises."  Troup's Motion to Sever at 13-14.

Troup next appeals to rule 14, and the Court's decision in United States v. Gould, in regard to severance of the Superseding Indictment for efficiency's sake.  See Troup's Motion to Sever at 14.  Troup first reiterates that there will be no risk of inconsistent verdicts if the Court severs Counts 1 and 2, because Troup is not "requesting severance of defendants within a single criminal episode," but instead requests severance of the entire Counts 1 and 2.  Troup's Motion to Sever at 14.  Indeed, "[e]fficiency, in the unique circumstances presented in this case, favors severance," Troup argues, and "[t]he cost of a joint trial versus four separate trials cannot be ignored."  Troup's Motion to Sever at 14-15.  Troup then extrapolates on the costs and burden of a joint trial, estimating that a joint trial of the twenty Defendants left in the case at the time he filed his motion would result in compensation for all defense counsel's time, lodging, meals, and travel, in the amount of $3,236,309.00.  See Troup's Motion to Sever at 15-20.  In the alternative, Troup provides that the compensation for all defense counsel's time, lodging, meals, and travel, should the Court -- for example -- choose to sever the Counts into five distinct trials, would be in the amount of $1,125,635.72 -- a considerably smaller burden on the taxpayer's dollars.  See Troup's Motion to Sever at 20.  The difference, ostensibly, is a result of more manageable trials which proceed faster -- or not at all, after Defendants have seen the outcome of one or more of the trials.  See Troup's Motion to Sever at 16-19.

Troup last argues that "a joint trial would involve the introduction of innumerable statements and items of evidence inadmissible against the 2001 Defendants, and limiting instructions would not suffice to cure the resulting prejudice."  Troup's Motion to Sever at 20.  Essentially, Troup contends, "counts 3-15 involve conspiracies to commit crimes that do not involve Defendants Billy Garcia, Lujan, Eugene Martinez, Patterson, or Chavez.  Counts 4-15 involve conspiracies that do not involve defendant Troup.  That evidence is either irrelevant,

inadmissible hearsay, or inadmissible testimonial statements, as to Counts 1 and 2." Troup's

Motion to Sever at 20. Troup then explains:

> The government's argument is that all of the evidence is relevant against all defendants, as res gestae of the criminal enterprise. Assuming arguendo that the government gets beyond the relevancy hurdle via the res gestae exception, the evidence may still be inadmissible hearsay or a testimonial statement subject to a right of confrontation. The statements of co-defendants who will not testify will all be inadmissible against any defendant who was not a co-conspirator. It is well settled that the question whether a single conspiracy or multiple conspiracies exist is a question of fact for the trial court to determine.

Troup's Motion to Sever at 20-21. Troup also rejects

> [t]he government's plan in a joint trial . . . for the Court to utilize a litany of limiting instructions designed to isolate and constrain the jury's consideration of evidence to selected defendants[, because l]iterally, for all but two weeks of a two- to three-month trial, under the government's plan, the Court would be reading a limiting instruction on a continuing basis indicating the evidence is not admissible against defendants,

which is untenable. Troup's Motion to Sever at 21 ("The variations of the instructions will

mount in the dozens if not hundreds."). Troup argues this method is impractical and supports

severance, relying in part on United States v. Gallo, where the Court concluded the indictment in

fourteen-defendant, twenty-two count RICO case was "far too extensive and intricate to expect

that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that

would be required by the inevitable plethora of limiting instructions necessary." Troup's Motion

to Sever at 22. Specifically, Troup asserts that "[a] joint trial here would prevent the jury from

making reliable judgments about guilt or innocence, from one defendant (or set of defendants) to

the next." Troup's Motion to Sever at 23 (citing Zafiro v. United States, 506 U.S. at 539).

Troup also distinguishes the complex nature of this Superseding Indictment with cases in which

courts determined jury instructions could cure the prejudice in a multi-defendant trial. See

Troup's Motion to Sever at 23-25 (pointing, in particular, to United States v. Giampa, 904 F.

Supp. 235 (D.N.J. 1995); United States v. Cervone, 907 F.2d 332 (2d Cir. 1990); and United States v. DiNome, 954 F.2d 839 (2d Cir. 1992), in which there was no severance, because "each of these cases involved participation in a common, consistent thread that bound the defendants directly to an identifiable, actual participant in the larger case").  Accordingly, Troup argues:

> Under these circumstances -- unlike those in *Giampa*, *Cervone*, and *DiNome* -- there exists a very real and very strong likelihood of a 'spillover effect' from the more recent crimes alleged in the later counts onto the comparatively ancient crimes alleged in Counts 1 and 2 that involved separate participants, victims, methods, and locations.

Troup's Motion to Sever at 24-25.  Troup, in conclusion, alerts the Court that the Second Circuit "described [in] *Cervone* [that] a Rule 14 motion 'is committed to the sound discretion of the trial court' and is 'virtually unreviewable.'"  Troup's Motion to Sever at 25.

### 9.    The Reply.

Perez replied to the United States' Response with Defendant Perez's Reply to the Government's Response to Motion to Sever Defendants Charged with Offenses in Counts 6 and 7, filed February 3, 2017 (Doc. 887)("Reply").  The Reply reiterates that "there is little doubt that severance is required under Rule 8 and Rule 14.  The only question is how the Court should sever the entirety of the Superseding Indictment."  Reply at 2.  The Reply notes, and the Court is cognizant of, the fact that other parties have sought severance of certain Counts of the Superseding Indictment, providing that: "Regardless of how the other counts and defendants should ultimately be tried, what remains clear is that the six remaining Defendants charged in Counts 6 and 7 should be tried separately from the remaining defendants and the remaining counts.  This outcome is dictated both by Rule 8 and Rule 14."  Reply at 2.  The Reply also argues that severance of Counts 6 and 7 is "dictated by judicial economy, both now and during trial."  Reply at 2.  The Reply maintains:

> The government's suggestion this Court should not sever because only a few defendants are likely to proceed to trial is misguided. This approach runs contrary to the interests of judicial economy and is also entirely contrary to the positions of the remaining Defendants. All six of the 2014 Defendants submit they will proceed to trial. The remaining Defendants in the remaining counts have indicated the same. While it is certainly possible some may plea, Defendants do not wish to rely on the government's clairvoyance.

Reply at 3. The balance of the Reply restates the arguments in the Motion to Sever, in particular highlighting Perez' contention that "[s]imply alleging that the Defendants are members of the SNM does not demonstrate that the Defendants are connected and is insufficient to permit joinder." Reply at 8. Further, according to Perez,

> the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme . . . [and h]ere, the United States did not charge a single overarching conspiracy because they could not. The facts simply do not provide sufficient overlapping to warrant it.

Reply at 8. The Reply then mostly discusses the impact of this multi-count and multi-Defendant trial in Las Cruces on judicial economy and efficiency. See Reply at 8-14. Specifically, the Reply argues that "analyzing the cost-benefit of having separate trials in favor of one joint trial weighs heavily in favor of severance," an important factor Perez wishes to bring to the Court's attention. Reply at 15.

**10.     Alonso's Motion to Sever.**

Alonso's Motion to Sever requests that the Court "sever Count 3 from all other counts of the Superseding Indictment. Within Count 3, Mr. Alonso further moves that his trial be severed from the trial of co-defendant Edward Troup." Alonso's Motion to Sever at 1. In support of the motion, Alonso makes

> three main arguments: (1) Count 3 was improperly joined under Rule 8(a), as Count 3 does not share a sufficient nexus with the other charges to permit joinder; (2) Javier Alonso was improperly joined under Rule 8(b), as he is not alleged to have participated in the same act or transaction or in the same series of acts or

- 47 -

transactions that constitute crimes as the other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of [] Mr. Alonso alongside the other remaining defendants and the 14 other counts in the Superseding Indictment will deprive him of his right to a fair trial. Additionally, severance of Count 3 will advance the interests of judicial economy because a joint trial on all counts would be substantially longer and logistically impractical given the number of defendants and the span of decades between many of the allegations.

Alonso's Motion to Sever at 2. Regarding Count 3, Alonso provides:

Count 3 alleges that Edward Troup, Javier Alonso, Arturo Arnulfo Garcia, Benjamin Clark, and Ruben Hernandez, murdered Freddie Sanchez on June 17, 2007 at the Southern New Mexico [] in Las Cruces. Based on the discovery produced to date, it appears that the government's theory regarding Count 3 is that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie Sanchez be killed, that codefendant Ruben Hernandez assisted in the homicide by covering security cameras, and that co-defendants Edward Troup and Javier Alonso killed Freddie Sanchez. While defense counsel has attempted to discern the government's theory, discovery has been produced that contradicts the government's presumed theory.

Alonso's Motion to Sever at 4.

Alonso, then, first argues -- under rule 8 -- that joinder of the murder alleged in Count 3 is dissimilar in character to other Counts in the Superseding Indictment, in particular "Counts 11 and 12," and that there is "no evidence that the events underlying Count 3 are based on the same act or transaction as any of the other charges," making joinder inappropriate. Alonso's Motion to Sever at 8. Alonso thus contends joinder was inappropriate, because

Count 3 is simply not based on the same act or transaction as any other count in this case . . . [and] there is no evidence of any nexus between Count 3 and any other count in the Superseding Indictment. Count 3 is a discrete event, unconnected to any other count, unconnected to the other defendants, separated by many years from every other allegation in the case, and as a result not part of a common scheme or plan.

Alonso's Motion to Sever at 8.

Alonso next argues in favor of rule 14 severance, stating that

- 48 -

> [t]he factors that counsel in favor of severance under Rule 8 also demonstrate why Javier Alonso would be prejudiced by a joint trial. It is precisely because (1) there is no nexus between Count 3 and the other counts, and (2) because Count 3 and the other counts are not based on the same act or transaction that a joint trial would be unfair to Mr. Alonso.

Alonso's Motion to Sever at 9. Alonso argues that "[t]he introduction of evidence of the other 14 unrelated crimes purportedly committed by and co-defendants who are not charged in Count 3 will deprive Mr. Alonso of his rights to fair trial such that severance should be granted under Rule 14." Alonso's Motion to Sever at 9. Alonso also argues that the "complexity of the indictment, the disproportionality of evidence, and the presence of evidence that would only be admissible as to some defendants make severance a prudent exercise of discretion." Alonso's Motion to Sever at 9. Further, although the United States argues each of the Superseding Indictment's counts are "linked by a shared affiliation with the SNM," Alonso argues that "such link did not exist as to Mr. Alonso during the time alleged in Counts 4-15," Alonso's Motion to Sever at 9-10. In that regard, Alonso points to a conspiracy case, Krulewitch v. United States, 69 S. Ct. 716, 719-20 n.2 (1949)(discussing United States v. Falcone, 109 F.2d 579, 581 (2d Cir. 1940)), for the proposition that a

> co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.

Alonso's Motion to Sever at 10. Alonso also requests severance of Count 3 in the interest of "judicial efficiency and economy," because "a trial of all Defendants on all 15 counts would last considerably longer and would be logistically impractical." Alonso's Motion to Sever at 10-11.

Alonso then turns to argument why he, individually, requests "severance . . . from Edward Troup," because "Edward Troup allegedly made statements that, if admitted at a joint

trial, would implicate Javier Alonso." Alonso's Motion to Sever at 12. Specifically, Alonso explains:

> In *Bruton v. United States*, 391 U.S. 1231 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession implicating a defendant at their joint trial violated the defendant's Sixth Amendment Confrontation Clause rights. *Bruton*, involved two defendants -- Evans and Bruton -- tried jointly for robbery. Evans did not testify, but the Government introduced into evidence Evans' confession, which stated that both he (Evans) and Bruton together had committed the robbery. . . . The trial judge told the jury it could consider the confession as evidence only against Evans, not against Bruton. . . . The Court held that, despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial had violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses. . . . The Court recognized that in some circumstances a limiting instruction may not adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant.

Alonso's Motion to Sever at 12. Alonso also notes that, in Bruton v. United States, the Supreme

Court held that

> "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. . . ." The Court found that Evans' confession constituted just such a "powerfully incriminating extrajudicial statement," and that its introduction into evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights.

Alonso's Motion to Sever at 13 (quoting Bruton v. United States, 391 U.S. at 135-36). Alonso

then explains how Bruton v. United States has been refined in the wake of its publication, noting

specifically, however, that, "[d]espite these refinements, *Bruton*'s protective rule remains intact.

Even where the codefendant's statement is not facially or directly inculpatory, *Bruton*

nevertheless applies 'when the statement is evidence of a fact critical to the prosecution's case.'"

Alonso's Motion to Sever at 12 (quoting United States v. Sarracino, 340 F.3d 1148, 1160 (10th

Cir. 2003)(citing United States v. Glass, 128 F.3d 1398, 1404 (10th Cir. 1997))).  As to Troup's

statements which Alonso contends implicate him and might result in a confrontation-clause

violation should he be tried with Troup, those statements are as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that
> he held Freddie Sanchez's legs while Javier Alonso strangled him with the
> drawstring from a laundry bag.
>
> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS
> that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald
> Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was
> ordered to kill Sanchez.
>
> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he
> and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  Alonso concludes by stating that Sanchez, Troup, and A. Baca

have joined Alonso's Motion to Sever, and that no Defendants have objected.  See Alonso's

Motion to Sever at 13.

**11.    Gonzales' Amended Motion to Sever.**

Gonzales' Amended Motion to Sever requests his individual severance from a joint trial

of all Defendants named in the Superseding Indictment.  See Gonzales' Amended Motion to

Sever at 1.  Regarding Gonzales' exposure under the Superseding Indictment, Gonzales explains

that he is "charged in counts 14 and 15 with violent crimes in aid of racketeering (Attempted

murder, assault resulting in serious bodily injury, assault with a dangerous weapon and

conspiracy), in violation of 18 U.S.C. § 1959(a)(3) and (5)."  Gonzales' Amended Motion to

Sever at 1.  More specifically, Gonzales provides:

> According to the discovery provided, the charges against Mr. Gonzales stem from
> his alleged involvement in the beating of J.G. on February 27, 2016.  According
> to various inconsistent versions of events, on February 27, 2016, Santos Gonzales,
> Brandi Rodriguez and Paul Rivera allegedly traveled to a home where J.G. had

been staying. The trio allegedly entered the home and beat J.G. Much of what was reported about the motive for the beating is inconsistent. Some accounts reported that co-defendant Shaunna Gutierrez had spoken with Brandi Gutierrez, outside the presence of Mr. Gonzales, about how J.G. had agreed to testify against Joe Gallegos. Ms. Gutierrez allegedly advised Ms. Rodriguez that J.G., a.k.a. Tiny was staying with C.J. at her home. According to the different accounts of the incident, at the time Gutierrez and Rodriguez were discussing J.G., Santos Gonzales was outside in Ms. Gutierrez's truck.

Gonzales' Amended Motion to Sever at 1-2. Further, Gonzales explains:

According to various versions, shortly thereafter Ms. Rodriguez, Messrs. Rivera and Gonzales went to C.J.'s home. J.G. was in a back bedroom. According to one of the versions given by J.G, he was at C.J.'s residence when she left to the methadone clinic. He was awakened when he was hit in the stomach. He saw four (4) people in the room with him (Santos Gonzales, Brandy Dominguez, "Oso" (Paul Rivera) and another female). J.G. stated Santos told him 'you remember me?' and hit him on his right eye. J.G. stated they told the girl he did not know to go and stand watch by the door to the house. He said "Oso" hit him with a baton and then gave it to Brandy who hit him as well. He said "Oso" hit him with a machete. . . . After the February 27, 2016, incident, J.G. provided varying accounts of the events. Approximately two weeks after the incident, on March 9, 2016, J.G. stated that he believed that Joe Lawrence Gallegos was also involved in the attack as he was upset with J.G. for failing to provide Gallegos' girlfriend with heroin while Gallegos was in custody.

Gonzales' Amended Motion to Sever at 2. Gonzales also argues that there is no evidence he is an associate of SNM or that he participated in "J.G.'s beating in exchange for consideration for the receipt of and as consideration for a promise and an agreement to pay, anything of value from SNM or for the purpose of gaining entrance to and maintaining or increasing a position in the SNM." Gonzales' Amended Motion to Sever at 3.

Gonzales thus first relies on Zafiro v. United States for the proposition that "severance should be granted . . . if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," and argues that "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is

admitted against a codefendant." Gonzales' Amended Motion to Sever at 4. Regarding severance, Gonzales suggests the Court consider:

> [1] the number of defendants and counts in the indictment; [2] the complexity of the indictment; [3] the estimated length of the trial; [4] disparities in the amount or type of proof offered against the defendants; [5] defendants with markedly different levels of culpability in the overall scheme; [6] conflicts between defense theories or strategies; and [7] potential prejudice from evidence admitted against co-defendants that is inadmissible or excluded as to a particular defendant [i.e., prejudicial spillover].

Gonzales' Amended Motion to Sever at 5 (citing United States v. Dowtin, 2012 WL 7679552, at *2 (E.D.N.Y. 2012)(Levy, M.J.)("No one of the factors is dispositive; instead, the court must decide whether the jury would be reasonably able to consider the evidence as to each individual defendant, independent of his or her co-conspirators.")). Here, accordingly, Gonzales contends that the case is so complex and his role is alleged to be so small that "the evidence against co-defendants will prejudice Mr. Gonzales and it will be difficult for the jury to compartmentalize." Gonzales' Amended Motion to Sever at 6. Specifically, Gonzales' Amended Motion to Sever highlights the gruesome nature and inflammatory images that will be evidence against the Defendants charged in Counts 1, 2, 3, 4, 5, 6, and 7. See Gonzales' Amended Motion to Sever at 6-12. Gonzales thus maintains that there will be "complex and inflammatory evidence" that the

> government will introduce at a joint trial. There can be no dispute that this case presents for the jury a complex determination of facts. In the case against most of the co-defendants, the jury will be asked to determine guilt for offenses that date back to 2001 and involve allegations of murder. The trial will surely be lengthy. On the other hand, if Santos Gonzales is tried separately, the proceedings will be short and more streamlined. The government will only have to present evidence on the limited offenses in which Mr. Gonzales is alleged to have participated. Accordingly, a separate trial would last a fraction of the time of a joint trial. Given the short duration of a separate trial, this factor weighs in favor of severance.

Gonzales' Amended Motion to Sever at 13.

Gonzales also argues in favor of severance by asserting the prejudice to his "fundamental right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution." Gonzales' Amended Motion to Sever at 13.  Gonzales also argues that the "disparity of evidence justifies separate trials," particularly in a case such as this where Gonzales' alleged role is "dwarf[ed]" by the "sheer volume and magnitude of evidence against the co-defendants." Gonzales' Amended Motion to Sever at 16-17.  Gonzales then cites to Zafiro v. United States, where the Supreme Court held: "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." Gonzales' Amended Motion to Sever at 17.

Gonzales next argues that "antagonistic defenses justifies severance," because there will be "conflicts between defense theories or strategies."  Gonzales' Amended Motion to Sever at 18-19.  Specifically, Gonzales states that he is likely to

> present as his defense that he was wholly unaware of the SNM's alleged scheme, particularly whether Joe Lawrence Gallegos had a dispute with J.G. or had ordered a hit on J.G. Mr. Gonzales would also present as part [of] his defense that he is not a member or associate of SNM, he does not know the majority of the co-defendants nor was he involved in or aware of any of the alleged conduct set forth in counts 1-13.  Given the fact that Mr. Gonzales' defense will very likely be antagonistic to the other defendants, a severance is necessary.

Gonzales' Amended Motion to Sever at 19.  Gonzales also suggests that potential "*Bruton* error requires severance," because his "*Bruton* rights . . . will be implicated if the government introduces into evidence statements made by Paul Rivera and Shauna Gutierrez."  Gonzales' Amended Motion to Sever at 19.  Gonzales indicates, that,

> after Paul Rivera was arrested, he said that he had been hanging out at Shauna Gutierrez's trailer.  On the morning of February 27, 2016, Shauna, Brandy Rodriguez and Rivera were at Shauna's trailer.  During which time, Shauna allegedly said that she had found out the whereabouts of J.G., a.k.a. Tiny. According to Rivera, Rodriguez and Gutierrez had been upset because J.G. would testify against Joe Lawrence Gallegos on a state murder case.  According to

Rivera, after Gutierrez and Rodriguez had been discussing J.G., Santos Gonzales arrived at the trailer with his girlfriend. Rivera told agents that he drove Gonzales and Rodriguez to the home where J.G. had been staying. Rivera claimed that Santos Gonzales had a machete. Rivera claimed that Mr. Gonzales hit J.G. with the machete and that Rodriguez had told J.G. "you better not testify against my jefe or I'll kill you." After the beating, the trio allegedly went back to Gutierrez's trailer. According to Rivera, Santos Gonzales cleaned the blood off the machete and some metal pieces.

Amended Motion to Sever at 20. Further, Gonzales provides:

After Shauna Gutierrez was arrested, she gave agents a statement. According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Gutierrez to borrow her truck. According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying. When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

Amended Motion to Sever at 20. According to Gonzales,

These statements could be interpreted by the jury as implicating Mr. Gonzales in misconduct related to the allegations set forth in counts 14 and 15 and result in prejudice as Mr. Gonzales would not be able to confront and cross examine the declarants. This prejudice cannot be cured or even mitigated by a cautionary instruction.

Gonzales' Amended Motion to Sever at 20. Gonzales argues

that the fact that Mr. Rivera and Ms. Gutierrez's incriminating statements against Mr. Gonzales are testimonial as defined by *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, *Hammon v. Indiana*, 547 U.S. 813 (2006), doubly implicates Mr. Gonzales' Sixth Amendment rights and the introduction of the statements would result in a violation thereof. A defendant's right under the Sixth Amendment applies even if a co-defendant's statement does not directly or facially implicate another defendant so long as the statement is evidence of a fact critical to the government's case. *United States v. Glass*, 128 F.3d 1398, 1404 (10th Cir. 1997). In this case, defendants Rivera and Gutierrez made incriminating statements to a law enforcement officer and the statements inculpate Mr. Gonzales. Mr. Gonzales was not present during Rivera and Gutierrez's statement. Where a *Bruton* situation exists, the Court may, despite the Confrontation Clause, admit the confession of a non-testifying co-defendant that does not expressly implicate the defendant. "'The confession must be (i) redacted to eliminate any reference to the non-confessing defendant, and (ii) accompanied by an appropriate limiting instruction that the confession is to be considered only against the confessor.'" *Fowler v. Ward*, 200 F.3d 1302, 1307 (10th Cir. 2000).

Gonzales' Amended Motion to Sever at 21-22.  Because "it is clear that Rivera and Gutierrez's statements cannot be redacted in a way to omit reference to Mr. Gonzales, [and] because of the nature of the interview which led to Rivera and Gutierrez's incriminating statements," Gonzales maintains that "[t]he only way to avoid a Confrontation Clause violation is to sever the trials of Mr. Gonzales from Rivera and Gutierrez."  Gonzales' Amended Motion to Sever at 22-23.  Gonzales then concludes by stating that no party has joined Gonzales' Amended Motion to Sever, but that only the United States objects.

12.    **The February 7, 2017, Hearing**.

The Court held a hearing on February 7, 2017.  See Transcript of Hearing, filed February 24, 2017 (Doc. 923)("Tr.").  The Court indicated, before hearing argument from Perez on the Motion to Sever, that:

> We're dealing with a little bit of reduced crowd here in DeLeon.  I guess I'm wondering if some of this may sort itself out as we get a little bit closer to trial in July.  I mean, I don't know how many of the people that are here are still going to be here.  And so I'm wondering if it's a little premature -- not for the argument, I don't mind hearing the argument -- but I wonder if it's a little premature for me to make sort of nuanced decisions here, until we kind of know a little bit better as to who is going to be going to trial.  I do have some problems with -- I think there is a defendant or two that has just some gun charges, felon in possession.  And it seemed to me that those probably shouldn't be going to trial.  But it seemed to me that I had a lot of discretion in this area.  And the RICO charges, the overarching RICO charges, I think it makes it difficult to say that the Government is misjoined.  Maybe I could get a little closer on just the stand-alone gun charges.  But in any case, it seems to me that it's hard for me to say they've been misjoined.  And so it's more of -- falls into the discretion of the Court to try to put a case together that can be tried, and can be tried fairly.  And it seems to me, we're in early February, looking at a July trial date.  It may be that I have to sit on this a little bit until I get a clearer picture of who is actually being -- who is going to go to trial.  So those are my thoughts coming in.  That doesn't mean we don't begin to talk about those issues.  But I'm wondering if I, as the judge, need to wait until I get a little better visibility on what the trial is going to look like.

- 56 -

Tr. at 32:8-33:18 (Court).  Perez agreed that, perhaps, things would look different in July, 2017, but that, nonetheless, he was not "sure that the Government can simply allege SNM is a criminal enterprise engaged in racketeering and join every single violent crime that they could find from 1980."  Tr. at 33:24-34:3 (Villa).  The Court responded that "the problem here [is] that the Government has got to prove predicate acts . . . so, once you have the RICO alleged and their obligation to prove predicate acts, how do I start keeping evidence out . . . of predicate acts?"  Tr. at 34:20-25 (Court).  The Court continued: "[I]sn't the request, though, it's requesting me to sort of slice and dice, here in February, the Government's evidence, and say, well, you and I think they ought to prove their predicate acts by this way, rather than letting the Government decide how they're going to prove their predicate acts."  Tr. at 35:14-22 (Court).  Perez disagreed with the Court's characterization of the Motion to Sever as being an attempt to screen evidence, and explained that "I don't think that they can just say, we're going to try Counts 1 through 5 alongside Counts 6 and 7, simply because those are predicate acts."  Tr. at 36:13-16 (Perez).  The Court was not convinced, explaining that regardless of the severance, the United States' presentation of evidence to establish the RICO predicate acts -- which the Motion to Sever contends might be prejudicial, given the expansive timeline of the conduct in the Superseding Indictment -- would be the same.  See Tr. at 36:17-19 (Court).  The Court then reiterated that the Motion to Sever is, in part, "asking me to turn to the Government and say: You don't need to prove it this way, you can prove it this way.  And that's kind of hard to do.  I mean, typically, we let each side kind of put on their own case."  Tr. at 38:6-9 (Court).  Perez agreed, but suggested that

> there has to be a limiting principle at some point.  I mean, imagine how many more counts and defendants could they add if they found a few more SNM counts?  There has to be some limiting principle.  And that's the balancing act that

the Court does on the Rule 14 side of things. . . .   [And] I think Rule 8 is a limiting principle, too.

Tr. at 38:12-16 (Villa).  Perez continued:

> You know, what we're asking the Court to do is just sever 6 and 7.  What happens with the rest of the case is outside of our control, I guess.  But you know, I think, when you examine the Rule 8 joinder law in terms of overlap of offenses and overlap of participants, you've got a joinder problem.  When you look at the Rule 14 severance with respect to prejudice issues, you've got a problem.  And that's not just an evidentiary problem.  It's, we want the jury to find each of these individuals guilty on their own merits and not on the culmination of all these different murders that are all a little bit different, that involve different players.  And there is no evidence that they were all working together, other than this sort of general notion of this is what the SNM does.

Tr. at 40:21-41:11 (Villa).

Perez, after his general colloquy with the Court about the Motion to Sever, began a

slideshow presentation in which he attempted to examine the

> benefits that we'll see from having counts severed based on when the counts occurred, the geographical location, the dates, the times, is going to benefit us pretrial as well.  I mean, Counts 6 and 7 is severed, and there [are] now six of us, and we have a motion hearing that not necessarily everybody needs to be here for -- they certainly can -- we're going to avoid some of these issues that we have even here today.  And I think costs, which we'll talk about as well.

Tr. at 43:4-14 (Villa).  The Court pressed, however, whether,

> if we just hang together a little bit, at what point does it begin to really be any sort of prejudice to you as to whether 6 and 7 are severed or not severed?  At what point, with a July 10th trial date, how long does just rocking along, at what point does it begin to be a real problem for you?

Tr. at 44:10-16 (Court).  Perez supposed that

> I think it's a problem now . . . in terms of prejudice to the defendant, I guess the concerns I have are the same; they need to review that discovery.  But also I have concerns whether this joint trial could happen in July.  I believe 6 and 7 could go.  I mean, it was weeks from trial in state court, granted, on only three defendants, but it's basically teed up.

Tr. at 44:20-45:2 (Villa).  Perez then jumped into his primary arguments for the day, explaining:

> You know, the Court's familiar with the Rule 8 standard for joiner. But I think that the question in a case like this is whether, in light of the factual overlap among the charges, joint proceedings create efficiencies such that joinder is proper. And when you're dealing with conspiracy or racketeering, what the more recent case law has found is there must be some relationship between the facts underlying each offense, such that proof of those facts is necessary to establish each offense.

Tr. at 46:19-47:3 (Villa). Perez then recapped some of the unique factual elements of the SNM prosecution that he had outlined in his Motion to Sever, particularly the fact that the jail murder alleged in Counts 6 and 7 occurred in 2014, whereas the jail murders and conduct alleged in Counts 1, 2, and 3 occurred in 2001. <u>See</u> Tr. at 47:4-49:1 (Villa). Perez also argued that, because of the lapse in time, a "completely different faction of the SNM" is responsible for the murder in Counts 6 and 7, so

> you're just talking about members of the same gang from 15 years 10 apart involved in similar type murders. That's the only factual overlap you have. You don't have any overlap of defendants. So there [are] no overlapping defendants. And other than the enterprise separated by 13 years, [there is] no overlap in facts.

Tr. at 49:8-14 (Villa). Perez then reiterated:

> [S]o 1 through 3, I think we have the overlap problem. I think we have the overlap problem. If you go over to the Rule 14 analysis, you have a propensity problem; right? The theory that the Government will put forth is that in Counts 6 and 7 and 1 through 3, there was a member of the SNM who allegedly cooperated with police and was killed for it. And so you try these cases alongside each other. Even if the Government is right, and some people take plea deals, or as we know that that may happen, you've got this atmosphere, if you will, of propensity, where, you know, the 2014 guys may have had no idea about the 2001 case.

Tr. at 50:14-51:1 (Villa). Then, Perez argued, the nature of Counts 4 and 5 -- a conspiracy and murder in 2012 which occurred "outside of the prison walls, in Socorro and Valencia Counties, so not inside the prison" -- widens the gap of factual overlap amongst the Counts, because

> [i]t [is] not like 1 through 3 and 6 and 7, where you have, you know, an order from the top to kill somebody who is also a member of the SNM because they're cooperating with law enforcement. This is just a couple of guys from Valencia

County . . . who had some issues with each other, and one of them ended up
dead.

Tr. at 52:15-21 (Villa).  Perez contended:

This is outside of the prison walls.  This brings a different element to the jury's
mind.  And there [are] also some issues, I think, [was] this even an SNM case?
None of the defendants overlap with Counts 6 and 7.  And there is an unclear
SNM connection.  This isn't the same modis operandi.  And again, different
geographical location, outside of the prison walls.  The defenses are much
different in a case like this.

Tr. at 53:5-13 (Villa).

Perez then addressed Baca, who is alleged to have ordered the murder in Counts 6 and 7,

and also is alleged to have been complicit in the conduct underlying Counts 8, 9, and 10.  See Tr.

at 54:19-24 (Villa).  Perez conceded that, because Baca has been charged in those Counts along

with Counts 6 and 7, there is more factual overlap than with Counts 1-5; however, Perez

maintains that, "[a]gain, the only overlapping facts are the SNM enterprise.  You know, 8, 9, and

10 are much different in character and nature, just like 4 and 5 were."  Tr. at 55:3-6 (Villa).

Perez, accordingly, contended:

And so I think that . . . trying 8 and 9 through 12, you know, Defendant Baca is
going to be accused of being [a] leader[] of SNM, ordering these hits, trying to set
up a conspiracy to kill Mr. Marcantel and Mr. Santistevan.  And if you try those
counts alongside 6 and 7, where Defendant Baca is also alleged to have ordered
the hit of the victim, I think you have a real propensity-type problem.

Tr. at 56:8-16 (Villa).  Perez made this argument, because Counts 9 and 10 "are the more

prominent, I guess, allegations of hits on the Secretary of Corrections and the head of STIU,"

ordered by Baca, and Count 8 is

sort of unique, as it stands on its own, but it's also different.  So it's an assault on
JR, who had a falling out with Gerald Archuleta; not necessarily clear what the
nature of the falling out was, but because Gerald Archuleta was basically one of
the heads of one of the different SNM factions, he has a falling out with this guy;
he orders the hit on him in 2003.  An attempt on his life is made; it failed; the
green light stays in effect.  And another attempt is made in 2015, also at Southern

- 60 -

New Mexico. None of the defendants overlap, except for Defendant Baca. But Defendant Baca is -- he's not in Southern. He's -- at the particular time of this incident, I'm not sure where he is. He may have been back in Santa Fe North. But it appears to be the only connection is Gerald Archuleta saying Mr. Baca is involved.

Tr. at 55:16-56:7 (Villa). Further,

[Counts] 9 and 10 are the two conspiracies we talked about. The only difference between 9 and 10 is, for 10, you add Chris Garcia. Chris Garcia is the subject of 11 and 12, felon in possession of a firearm and 924(c). I think the Government's theory is that the gun Mr. Garcia had was going to be passed on to an individual [who] was supposed to execute these hits on the Secretary and the head of STIU. So those four counts are sort of associated in that way. But, again, Mr. Baca is the only overlapping defendant. And there aren't any overlapping facts except the SNM.

Tr. at 57:1-12 (Villa). Perez then told the Court about the dissimilarity of

Counts 13 through 15, these all are, again, outside the prison, executed primarily by Joe Gallegos; he's Count 13 by himself. This is the same victim, JG. It's an assault with a deadly weapon; that's Count 13. 14 and 15 is now a conspiracy to murder JG, and that brings in some of these other defendants, three of whom are going to trial as we sit here today. And again, it appears that JG and Mr. Gallegos had some personal problems, and this was the result of that, and not necessarily any sort of SNM-ordered hit from the higher-ups or things like that. The connection with SNM is tenuous. The Gallegoses have denied membership in the SNM.

Tr. at 57:13-25 (Villa).

Returning to Counts 6 and 7, Perez then reiterated that he was going to trial, and so were the other Defendants involved in those Counts -- making the United States' contention that the numbers would be winnowed by the trial date inaccurate. See Tr. at 58:13-59:25 (Villa). Indeed, Perez then recognized the Court's "discretion: weighing the prejudice with judicial economy. So I think that there is a little bit less discretion when you're looking at antagonistic defenses and compromising trial rights." Tr. at 60:2-5 (Villa). Perez also suggested that the evidence against him in Counts 6 and 7 outweighs the strength of the evidence against some of the other Defendants, such as those in Counts 1 and 2, because the United States has evidence of

the Counts 6 and 7 victim being murdered in jail footage and DNA evidence, supporting his argument that the Superseding Indictment should be severed.  See Tr. at 61:1-25 (Villa).  Perez also continued to argue that the facilities at the Court's disposal would not effectively handle the magnitude of a joint trial, commenting that a complete rebuild would be necessary to ensure a constitutional trial.  See Tr. at 62:1-63:25 (Villa).  Perez argued that the magnitude also would cause a burden for the jury, whom may not be able to compartmentalize the evidence they are considering as it relates to the separate Counts.  See Tr. at 64:14-19 (Villa).  Perez also argued that a trial of magnitude would be cost prohibitive in this District, given the available facilities and the involvement of so many different attorneys whom have other caseloads, necessitating severance.  See Tr. at 65:14-21 (Villa).  Perez next reiterated what he calls the specific prejudice to the Counts 6 and 7 Defendants by the nature of the other Counts, in particular Counts "9 [through] 12, the real high profile conspiracies, I think anybody who has to be tried alongside those folks, you know, are just going to experience prejudice."  Tr. at 68:4-7 (Villa).  Perez then concluded his argument.  See Tr. at 68:16-19 (Villa).

M. Rodriguez next addressed the Court, stating:

I'd like to call the Court's attention first to something in the Government's response to the severance motion. . . .  It says, "Prejudice always exists when more than one defendant or offense are tried together."  That's in the Government's pleading, and the Government readily concedes that.  That is a powerful statement.  I think everyone in this courtroom -- I hope the Court included -- acknowledges that if these guys are tried together, there is going to be prejudice.  That's inevitable.  The Court can give all the curative instructions, make all the evidentiary rulings, do everything within its power.  There is going to be prejudice.  Our law says that that prejudice is acceptable when the two traditional justifications for joint trials exist: Preventing the scandal and inequity of inconsistent verdicts, and judicial efficiency.  I believe Mr. Villa has already touched on the inconsistent verdicts scandal and inequity issue.  The Count 6 and 7 Defendants are asking to be tried together.  As a matter of law, by definition, there can be no scandal and inequity of inconsistent verdicts on Counts 6 and 7 by virtue of a severance, if they're all tried together.  So that turns us to the one possible thing that could justify the inevitable admitted prejudice of a joint trial:

> Judicial efficiency. . . .  I submit to the Court, based on all the cases that we set out in our pleading and the supplemental pleadings filed by other counsel, that that judicial preference ceases to exist when you're talking about mega trials of this nature.  When you get to a certain point -- I believe in the Second Circuit the presumptive number of defendants is 10.

Tr. at 69:10-70:22 (Potolsky).  M. Rodriguez also provided:

> we've got defendants who, through no fault of their own, other than they're joined in a mega trial, have to turn their back to the Court.  That's not a good thing.  When we've got defendants in the jury box, in the second row of the spectators' area, and we are thinking about not giving them a fair trial, but how do we pack them all into a courtroom so that their public trial rights are realized, that is a problem.  If it saves time and prevents scandal inequity, the law says that's okay.

Tr. at 71:1-11 (Potolsky)(commenting on the fact that the Court has been using the largest courtroom at its disposal, and there is still overflow necessity, because with the United States Marshals, Court personnel, attorneys, and Defendants, there is sometimes more than fifty people in the courtroom at a time).

B. Garcia next argued, and reiterated that a large number of Counts 1 and 2 Defendants would not be taking plea deals and would be proceeding to trial.  See Tr. at 76:15-25 (Castle).  B. Garcia also argued that there

> is a large amount of litigation that we're going to be involved in, especially with regards to delay in indictment.  I think the Court heard a little earlier that the DNA was degraded so bad that the FBI tried to retest it in 2014, and could not come up with any results.

Tr. at 79:7-12 (Castle).  Further, B. Garcia, explained, "[w]e're going to need more time.  We didn't have the advantage of -- I guess advantage -- of being prosecuted in state court, and having some attorneys working on the case.  We just don't have that situation.  And we're doing a case that is 15 years old."  Tr. at 79:14-19 (Castle).  B. Garcia had more to add to his argument, but changed counsel at this point, and in the meantime, the Court asked M. Rodriguez to clarify what he had said about a presumption that ten Defendants or more "exceeded what [the Second

Circuit] would tolerate as far as a joint trial." Tr. at 83:18-25 (Court).  M. Rodriguez told the

Court he would supplement his argument the next day.  See Tr. at 84:1-5 (Potolsky).  B. Garcia

then argued:

> I thought of these cases as separate matters that ideally should be tried by themselves.  I represent one of the defendants in Count 1 and 2, Billy Garcia. Billy Garcia is 61 years of age.  Billy Garcia was out of custody at the time, in 2015, agents went to his house and arrested him.  Billy Garcia will never take a deal.  Billy Garcia is never going to enter a plea in this case.  He's 61 years old. He is alleged to be the shot caller with regard to Counts 1 and 2.  The Government won't give him a 10-year deal.  We haven't had any discussions whatsoever.  But just knowing the offers that are going to come out of the Government's office, there won't even be a 10-year deal.  And for a 61-year-old man -- I'm 63, Judge -- for a 61-year-old man living in prison, he is not going to take a 10-year deal, because that is essentially a life sentence.  And when the Government says that there are, at the end of the day, only going to be five defendants, I don't see that. I just absolutely don't see that.

Tr. at 83:14-85:14 (Cooper).  Further, B. Garcia maintained:

> Th[e] effort, just in itself, is going to take just a huge amount of time.  We haven't gotten into any other substantive motions that need to be filed.  I just think it's -- I think that it makes more sense to divide things up.  And it's not going to be seven. I don't think that is the number.  But I think it ought to be three or four, probably. And I have my thoughts on how that should happen.  But I think that after some of these defendants see what happens in Counts 6 and 7 -- 6 and 7 is ready.  We are not ready.  We're still trying to identify and locate witnesses that were around in 2001, that heard parts of conversations with regard to our two counts.  And we're having a difficult time doing that.  Your Honor, some of the evidence, we think, no longer exists.  Some of these individuals who are witnesses no longer exist.  I suspect you're going to see a preindictment delay motion coming from us. There is just a tremendous amount of work.

Tr. at 87:12-88:7 (Cooper).  B. Garcia concluded:

> I think it's going to create havoc on other judges' calendars, when we have this mega trial with 15 or 20 individuals, Your Honor.  But I think there ought to be a severance of Counts 6 and 7.  I think Counts 1 and 2 ought to be severed.  I think the Marcantel counts ought to be severed.  I think a couple of the other cases ought to be severed.  And I understand that's the best case scenario.

Tr. at 88:18-89:2 (Cooper).

Gonzales then argued regarding the Motion to Sever, clarifying that, "under 18 USC 1959, the Government is not required to prove the predicate acts. This is VICAR, Violent Crimes in Aid of Racketeering. And what the Government has to prove is that there is a criminal organization; that the organization is a racketeering enterprise at the time of the offense." Tr. at 89:20-25 (Johnson). Gonzales continued that "[t]hey also have to prove that, obviously, the defendant committed a violent crime, and that the defendant acted for the purpose of promoting his position in a racketeering enterprise." Tr. at 90:6-9 (Johnson). Accordingly, Gonzales contended, because he was charged only in Counts 14 and 15 which occurred after 2015 -- and, therefore, after the Superseding Indictment allegedly dismantled SNM -- and because he is not an SNM member, proof of the racketeering enterprise is different for his case. See Tr. at 90:10-23 (Johnson). Gonzales reiterated that "what you have here is the Government is essentially trying to bootstrap unrelated acts of violence under the umbrella of [VICAR], . . . [and here] the Government doesn't have to prove predicate acts, all they have to prove is the existence of an enterprise." Tr. at 91:13-15 (Johnson). The Court was not convinced, asking Gonzales: "How do you prove racketeering enterprise without something that looks a whole lot like proving predicate acts?" Tr. at 91:21-23 (Court). Gonzales then responded that "I guess in a way, they do have to present evidence of these particular offenses. But what may be admissible as -- I don't want to call them predicate acts -- but what may be admissible as to one defendant may not be admissible under Rule 403 as to another defendant." Tr. at 92:1-6 (Johnson). Gonzales then maintained that there will be admissibility problems should there be a megatrial involving him. See Tr. at 93:2-6 (Johnson).

Varela then argued that he was charged only in Counts 6 and 7, and that his role in Counts 6 and 7 is alleged to have been the delivery of paperwork ordering the hit, and that "[m]y

concern is if this case is not severed, it will actually be a prejudicial effect on Mr. Varela, because it's going to be -- [painting] many of these defendants with one broad brush is going to [make it] -- much easier to have a guilty verdict." Tr. at 95:11-15 (Spencer).  A. Gallegos and J. Gallegos then alerted the Court that they had moved to sever Counts 4 and 5, and that they were actively investigating those counts.  See Tr. at 96:1-23 (Sindel).  A. Garcia then also explained that he was only charged in Count 3, and that he did not object to severance of Counts 6 and 7. See Tr. at 97:1-12 (Blackburn).  A. Garcia also explored for the Court that his counsel had done

> a case in Arizona that the prosecution started here in New Mexico, and moved to Arizona.  And the U.S. Attorney's Office here in Albuquerque prosecuted the case along with the individuals in Arizona.  Several months before trial motions were filed, which I expect are going to be filed in this particular case, about how we're going to have security as relates to the trial.  There were issues about having an anonymous jury.  There were issues about how the defendants were going to be placed in the courtroom.  There was not as many murders in that particular case as are alleged in this case.  And we're not talking about a racketeering.  This was a conspiracy, as it relates to a drug organization, not something going back to 1980.  In the end, the Government asked for, and the judge granted the ability for the defendants to be shackled during the course of the trial, and for them to have sort of a belly chain around them during the course of this.  We were in the federal courthouse in Arizona.  In order to do that, and to have that many people that were going to be there, they had to reconstruct that courtroom.

Tr. at 99:13-100:21 (Blackburn).  A. Garcia then reiterated that this case is going to be tried in Las Cruces, and that

> we would have to reconfigure or build a courtroom, which we had to do in Arizona, in order that the jurors could not see their feet being shackled, or because the marshal's office had a device that they could place around the defendants, and if something happened, that it would relate in a shock to them, that they had to be covered from basically the arms down.  And it took them quite a bit of time to construct that courtroom over there.  I think Mr. Hammond -- he was on the phone, I think that was who was on the phone earlier -- he was involved in this particular case where we had to do this.  We had to rebuild the courtroom.

Tr. at 101:4-17 (Blackburn).  A. Garcia then concluded by reiterating the mechanical problems

not severing the case poses.  See Tr. at 101:18-103:18 (Blackburn).  Gonzales then addressed the

Court and said:

> You asked about the case with regard to the 10 defendants.  I have that . . .  The
> case [is] U.S. v. Casamento, which is 887 F.2d 1141.  And the quote is at page
> 1152.  It is a Second Circuit case, Your Honor.  That quote, "in assessing the
> appropriate number of defendants for a trial, in which the prosecution's case is
> likely to exceed four months, the judge should require an especially compelling
> justification for a joint trial of more than 10 defendants."

Tr. at 104:10-16 (Johnson).  Gonzales also stated:

> I would direct the Court's attention to United States v. John Shea, 750 F. Supp.
> 46.  It's a District of Massachusetts 1990 case wherein the Court did grant
> severance.  And the opinion starts out with, "Given the number of defendants, the
> number of counts, and estimates of probable length of trial, the Court has an
> obligation to take steps early in the life of this case to ensure the goals enumerated
> in Rule 2 of the Federal Rules of Criminal Procedure, quote, 'These rules are
> intended to provide for the just determination of every criminal proceeding.  They
> shall be construed to secure simplicity in procedure, fairness in administration,
> and the elimination of unjustifiable expense and delay," and cites to Federal Rule
> of Criminal Procedure 2.

Tr. at 104:17-105:8 (Johnson).

The United States then argued against the Motion to Sever.  See Tr. at 105:20

(Castellano).  The United States agreed that a joint trial of twenty or more Defendants would be

practically untenable.  See Tr. at 105:25-106:4 (Castellano).  Although not a concession, the

nature of the United States' agreement was as follows:

> THE COURT: Mr. Castellano, let me ask you a few questions.  Would you agree
> that it's going to be extremely difficult and probably not a good idea to try a case
> with 20 defendants?
>
> MR. CASTELLANO: It may be difficult, Your Honor.  It's not unprecedented.
> Even one of the cases cited by the defense, I think, had 23 defendants who were
> not severed.  But I do agree that there could be some logistical problems.

> THE COURT: If we were in agreement on that, that we probably shouldn't be barreling toward a trial with 20 defendants, what's the solution from your standpoint?
>
> MR. CASTELLANO: Well, the solution is really how to cut up the pie.

Tr. at 105:21-106:10 (Court, Castellano). The United States did not want to start cutting up the pie yet, however, and suggested a "wait and see attitude," and requested the Court wait until "possibly May to see how the dust settles. . . . We probably [will] have . . . two 10-defendant cases." Tr. at 106:25-107:10 (Castellano). The United States added the gloss that "I'm not sure it will be just five defendants, but I think it will be a smaller amount." Tr. at 108:10-11 (Castellano). The Court then asked:

> Since we seem to be at some agreement that we're not going to be trying 20 defendants, tell me what you think the biggest hurdles to trying 20 defendants are. What is it that, in your mind, you go, yeah, we shouldn't be trying 20 defendants in one case? What do you think the biggest? Is it the size of courtrooms we have in Las Cruces? Is it the security involved? What is it that, if you had to pick three of the top reasons you think 20 is not doable, what are they?

Tr. at 108:16-25 (Court). The United States would not concede that the logistics were as big of a problem as the Defendants had argued, but discussed that an

> issue may be a configuration of the courtroom in terms of real problems, and that could be done. I mean, we could certainly rearrange tables, and things of that nature. I know there are issues with defendants who are shackled or handcuffed. But that's been handled in this district a number of times by putting the sheeting in front of tables, and things of that nature. So most of these problems are not problems we haven't seen and addressed before, even in this district.

Tr. at 109:17-110:1 (Castellano). The United States also reiterated that

> the defense has mentioned the word 'propensity' a number of times. But in a VICAR case like this, the charge invites propensity evidence. The charge tells us that we have to prove that the enterprise engaged in racketeering activities. It's not individuals, it's the enterprise. So understand those circumstances, all of this stuff, for the most part, is fair game and we'll be presenting that evidence.

Tr. at 110:20-111:6 (Castellano).  The Court then pushed the United States to give it some

options as to how severance might be accomplished, posing:

> Well, if I put pressure on you to split it up so that there is a smaller number than
> two 10-defendant trials, it doesn't sound like you're ready today to say what you
> would want.  So I guess the question is: Do you want to propose a three trial, less
> than 10 defendants in each trial, way of getting through this case, or do you want
> me to do it?

Tr. at 114:11-18 (Court).  The United States responded: "Obviously, with that option, we would

want to choose it.  But if we were going to do that, I would potentially consider presenting at

least two proposals."  Tr. at 114:19-24 (Castellano).  The United States cautioned, however, that

"some of these defendants . . . said, we would agree to a continuance if we could have our case

tried in 2017 . . . [s]o once again, we're going to have to consider Speedy Trial, and have a

waiver of anybody who agrees to have their case pushed back."    Tr. at 114:25-115:7

(Castellano).  The United States also indicated that

> I think, once you unsever, there is no going back.  I don't think the defense would
> agree to be rejoined into a case, because we'd hear the same thing you heard
> today regarding the need to file motions and we need to prepare for trial.  So I
> think once it happens, it's highly unlikely those counts or defendants will get back
> together.  I think you'd certainly hear from the defense about that.

Tr. at 116:15-23 (Castellano).  The United States then queried the Court:

> I think the only thing really driving severance at this point is logistics.  So the
> question is whether logistics breaks up this case or not.  Because I don't think the
> defense has put forth any other arguments which would warrant severance in this
> case.  So it's obviously in the Court's discretion.

Tr. at 117:15-21 (Castellano).  The United States also reiterated that it would be putting on the

same evidence in any of the severed trials, see Tr. at 118:21-22 (Castellano), because:

> It's on us to prove it, Your Honor.  So, if we allege a prior murder, we have to
> prove the murder.  So that means we have to prove it in the way that we think we
> can prove it.  We can't ask the jury in the middle of trial whether or not we think -
> - they think that we have enough.  We have to present the evidence in a way that
> causes us to believe we proved it beyond a reasonable doubt.  We can't ask that

jury that in the middle of trial.  So, obviously, we have to prove it in the way that we have to prove it.  And that is the burden that's on us.  That was part of our brief, is when you charge a VICAR, you have to prove these things,

Tr. at 119:22-120:9 (Castellano).

The United States then hypothesized that, should there be some severance, the issue of

timing would be an issue; the United States stated:

Because that one does affect the way the defense prepares, I guess one thing we could do is do this in parts.  We submit our proposals to the Court; let defense counsel take a look at it; then we get together on another occasion to decide the batting order.  And we could give our reasons why we think they should go in a certain order.  I guess the defense could do theirs.  So I think we could do it in probably a few steps. . . .  Because I guarantee no one is going to agree on the order, because people want to try these cases in a different order for different reasons.

Tr. at 123:1-14 (Castellano).  At this point, Gonzales indicated that he was indeed asserting his

speedy trial rights and that he would not waive that right.  See Tr. at 123:16-124:3 (Johnson).

Perez then argued that even splitting trial groups into ten Defendants gave him pause, positing:

How do we handle logistics, if that's going to be handled in Las Cruces?  And how do we deal with the atmosphere, if you will, that's going to come with the Counts 9 and 10 related to the Marcantel conspiracy that has gotten an extensive amount of media coverage, and that, I think, just adds to the atmosphere?

Tr. at 124:11-17 (Villa).  The Court responded to that query, stating:

Well, I guess, you know, you can push back on this, but you know -- I mean, I've had high profile -- and I will bet you I've had higher profile than this -- trials.  I always get a jury.  We just -- we get it done.  So I guess I'm not worried about getting a jury.  You know, the television stations in Las Cruces, they don't even cover northern New Mexico.  So I've always been able to -- cases up here, draw from the south, because many times they don't even know the news up here.  So when you say carnival environment, I guess if you're talking about the jury, I guess I've got a high degree of confidence we're going to get plenty of folks that know next to nothing about this case, either here or in Las Cruces or statewide.  You can push back on that.  But that's my thoughts.  That's the reason I'm not too worried about that.

Tr. at 124:18-125:9 (Court).  The Court further supposed that

- 70 -

> you know, a lot of people don't know Marcantel from anyone else.  Is it that much more sensational than it might be to somebody that's, you know, stepping outside of this case, or something like that?  But once we're in the box, once we're in the case, it's another alleged victim, it's another alleged murder.

Tr. at 125:15-21 (Court).  Perez was not so sure, indicating that Counts 6 and 7 fell into the realm of "classic prison murder," whereas the Counts 9 and 10 allegations involving the NMDOC Secretary was a different matter.  Tr. at 125:23-126:13 (Villa).

B. Garcia then argued, and addressed the potential for inconsistent verdicts should, for example, J. Gallegos be sorted into more than one trial grouping upon severance, stating that: "the quantum of evidence with regard to each of those counts is very different.  And if he is found guilty on one, not guilty on two others, that's not necessarily inconsistent."  Tr. at 127:9-12 (Cooper).  The United States, to that point, responded that

> the bottom line is, for all of those counts we have the same elements; four out of five elements are the same.  The only difference is the element involving the murder.  So we have to prove the existence of the enterprise; that it engaged in racketeering activity, interstate commerce, and ultimately, that the crime was committed for the purpose of gaining or maintaining position in the enterprise or pecuniary gain.

Tr. at 128:4-13 (Castellano).  This requirement, the United States argued, could give the Defendants that might end up in multiple trials more "bites at the apple."  Tr. at 129:17-19 (Castellano).  Regarding the differential evidentiary support across Counts, Baca then addressed the Court and argued that there will be spillover prejudicial effect: "Especially, when you juxtapose that with what I would even concede is stronger evidence with regard to some of the counts."  Tr. at 131:18-20 (Lowry).  Baca also suggested:

> Having a Baca trial with the 6 and 7, and have that stand alone.  And then have all the other Baca charges grouped together, which would be 8, 9, 10.  And, if I heard the Government correctly, they would throw in 11 and 12, because the Chris Garcia charges were associated with the Marcantel allegations.  From Mr. Baca's standpoint, that would be the more preferred approach.  And I think in the overall

fairness of the proceeding, that would be a more just and equitable resolution for all of the co-defendants together.

Tr. at 132:6-16 (Lowry).

> The Court then considered the argument it had heard, and stated:

> I get the feeling that the defendants are wanting to slice, slice, slice. And that seems to me to be too many trials. Because I will end up having a lot of the same evidence over and over, if I take the Government at its word that they're going to put it on over and over. And it seems to me that it's a little early to try to deal too much with the spillover. It's more logistics.

Tr. at 135:23-136:5 (Court). B. Garcia, accordingly, addressed the Court:

> Judge, I've been taking copious notes. I've listened to the questions you've been asking. I know what you want to do, I think, given the questions you're asking. And I think that we, as counsel, will probably give you a proposal with regard to three trials. I'd love to split it up seven ways, because I think that would be fairest to everybody concerned. But that's not going to happen. But I think we can split it up three different ways. And I think the Government can give you their proposal as to how to split it up three ways. Then you'll have two, three, four different proposals in front of you, and you can make that determination. But I think we can do that.

Tr. at 136:6-19 (Cooper). Baca then inquired:

> Once we're deciding these severance issues, and you're talking about hearing evidence over and over again, I think in terms of the proof of an ongoing enterprise was engaged in racketeering activities, it's really a question of the level of generality that that proof is made. Because the deeper down you get into the substantive counts, the more prejudicial spillover effect you get to co-defendants who happen to be grouped with somebody whose substantive VICAR count they're not associated with at all. So that's really the question I'd like to ask the Government is: Do they expect that evidence to come in at a level of generality, with one or two government witnesses that say, Oh, over the few years they're involved in mayhem, murder, and kidnapping[?]

Tr. at 137:15-138:6 (Lowry). The Court answered that the reason the United States would need to continually introduce the evidence would be, because it "has the burden of proof; [its] going to put on the proof that [it] thinks [it] has to have to prove it beyond a reasonable doubt." Tr. at 138:9-12 (Court). Baca suggested, however, that some of that proof could come in the form of a

"stipulation."  Tr. at 139:7-9 (Lowry).  The Court then stopped that argument, because "the decision on the table is a severance motion," and the Court could not get that into the "weeds" at this time.  Tr. at 139:10-13 (Court).  B. Garcia then quickly alerted the Court that there are

> several cases that stand for this proposition, which is that, in VICAR, the temporal period you should be looking at is much shorter.  The pattern of racketeering activity has some kind of temporal constraint; that the Government is not allowed to just go and prove things over a long period of time.  They've got to focus on the racketeering activity surrounding the alleged offenses.

Tr. at 139:25-140:5 (Castle).  B. Garcia also argued that, regarding

> temporal limits to the racketeering activity that they can show against certain groups of defendants . . . our position, frankly, is it's not just free range; you can't go back to the '80s, or even the early 2000s, when you're talking about matters of the last few years.  So I would ask if [the United States thinks] there is any temporal limit to their ability to prove a pattern of racketeering activity.

Tr. at 141:7-15 (Castle).  The Court then broke for lunch and directed all of the parties to "give me a proposal.  I'd like to see single-digit trials, no more than three.  Try to give me your proposal.  See how close we are."  Tr. at 141:20-23 (Court).

The United States returned from lunch and addressed B. Garcia's inquiry regarding "[h]ow far back in time do you -- if you're putting on a show for the jury, how far back in time do you think your evidence can go?"  Tr. at 143:18-20 (Court).  According to the United States,

> I don't know if there is a bright line rule . . . I'm showing the Court 18 USC Section 1961(5), which is not VICAR, but it is related to RICO.  And that's the one that says, "One of the acts had to occur after the effective date of this chapter, and the last occurring within 10 years, excluding any period of imprisonment after imprisonment for a prior act."

Tr. at 144:15-21 (Castellano).  The United States then gave the Court its proposal for severance:

> First, I'll continue to note the Government's objection, obviously, regarding the severance.  But given the posture that we're in now, we have a breakdown of two trials.  The first trial being six to 10 defendants, without singling anybody out or talking about discussions, that we have reason to believe that we will be at six to 10 in the first group.  And the second group would be seven to eight defendants.  So those would both be single digits.  And the six to 10 certainly will become at

least nine.  We're fairly certain of that.  So we would have two trials, both with single digit defendants, and we would have defendants all tried on their own counts and not charged in separate counts in separate trials.  And we think it works if we have to do it this way.  And I can break it down for the Court if you'd like.

Tr. at 147:12-148:3 (Castellano).  The breakdown was:

So the first would be Counts 1 through 5, and then Counts 13 through 15.  That would be one trial.  And that trial would include Santos Gonzales.  So he's asserted his Speedy Trial right, so I suppose, if he's in that trial, that would go first, just because the Speedy Trial. . . .  The second trial would be Counts 6 through 12, and that would result in a case with probably seven to eight defendants.  And, of course, those numbers could shrink, but these are pretty solid numbers otherwise.  And so Counts -- the first proposal has Andrew Gallegos in all of his counts; it has Mr. Troup in Counts 1 and 3, so he's not separated.  And it has Andrew Gallegos tried with his brother, Joseph Gallegos.  And also in Counts 1 and 2, you would have Mr. Garcia, so that would keep both of his counts together in one trial.  Then Counts 6 through 12 would involve everyone in the Javier Molina murder, and these would all, for the most part, be Anthony Baca counts.  So he would have all of his counts in one trial. . . .   And so -- [l]ooking at Counts 6 and 7, Mr. Armenta, Mr. Montoya, and Mr. Martinez are out of the case.  Mr. Archuleta is out of the case.  Both of the Martinezes in Count 9 are out of the case.  And so this number is smaller than what it looks.

Tr. at 148:9-149:16 (Castellano).  This proposal, the United States argued, "meet[s] the requirements, or at least the -- a preference for judicial economy.  We have kept defendants together who are charged together, and we've kept their counts together.  So they're not severed under the rules."  Tr. at 150:17-21 (Castellano).

The Defendants next gave their proposal:

Judge, before we start, with regard to the Government's proposal, they believe that Counts 1, 2, 3, 4, 5, 13 through 15, they will only have six to 10 defendants.  Based on everything that I know in my discussions with these individuals, I believe that number to be 12.  And the second number seven to eight.  I believe that is accurate.  But the first one I believe is 12.  So, Judge, we have 20 defendants and almost 40 lawyers.  We do not have a unanimous consensus for this proposal.  Every one of us have some sort of an objection or other with regard to this proposal.  Some of us have stronger objections than others, but we, in light of the Court's request, came up with this proposal.  Counts 6 and 7, that's the Molina murder which occurred in 2014, we believe that six defendants will go to trial in that case.  We then broke out Counts 4 and 5, and then 13 through 15.  In

Counts 4 and 5 -- that's Joe Gallegos and Andrew Gallegos -- are charged in that offense with, in that count, 2012 murder, and then, with regard to 13 through 15, again, Joe Gallegos and co-defendants in that case are charged with offenses that occurred in 2012, 2015, and 2016. There are four defendants in that case. The next case that we believe should be tried together, or some people think should be tried together, Counts 1, 2, and 3, those are the offenses that occurred down at Southern New Mexico Corrections Facility in 2001 and 2007. We believe eight defendants will be at trial in that case. And then, finally, Counts 8 through 12, offenses that basically relate to the Marcantel-Santistevan case, and also Julian Garcia -- or Julian Romero case -- primarily deal with Anthony Ray Baca, Christopher Gallegos, Santos Gonzales, and Shauna Gutierrez. We think, Your Honor, that you will have three defendants in that trial. And I just listed four. I think there is a fairly good likelihood, Your Honor, that we never get to that last trial. I think, given what may happen in trials prior to that, that trial may go away. But we have -- so we gave you the four separate trials: 6 and 7; 4, 5, 13 through 15; 1, 2 and 3; and then 8 through 12. We think that is probably the best way to divvy it up. The Court asked us to give you three proposals. And so what we did -- I don't believe that this proposal is as good as the -- our former proposal, but we think Counts 6 and 7, the Molina murder occurring in 2014, together with 13, 14, and 15, offenses that occurred also in 2015 and '16 would be a trial in which you would have nine defendants. Next, we would try 4 and 5, and then 8 through 12. 4 and 5 deals with Joe Gallegos and Andrew Gallegos. And then 8 through 12, we would have Anthony Ray Baca, Conrad Villegas, Christopher Garcia. And we believe that out of that group there would be five defendants. And then the last trial would be eight defendants in the 2001 and 2007 murders at Southern, Counts 1, 2, and 3. So those are the two proposals that we gave or that we worked on in the last hour.

Tr. at 152:10-154:24 (Cooper). After the proposal, Perez reiterated to the Court his concerns about prejudicial spillover across the Counts, citing the public nature of Baca's charges in Counts 9 and 10 regarding the "Marcantel stuff," as well as the "A & E [television] series about the Molina murder." Tr. at 155:20-156:20 (Villa). Perez also highlighted that

the entire Marcantel case, as I understand it -- and I'm not an expert in it -- is a bunch of recorded conversations between the various players, including Mr. Baca, Mr. Garcia. And none of those are admissible against the other 6 and 7 defendants. And if Mr. Garcia and Mr. Baca proceed to trial, as we would expect in a joint trial, you know, during the Government's case-in-chief anyway, there is going to be a huge <u>Bruton</u> problem that's going to cause logistical problems, which I think the Court was concerned about at this early juncture. But it's also going to cause constitutional problems. I mean, I won't even get into the individual <u>Bruton</u> issues we have in 6 and 7.

Tr. at 156:15-157:5 (Villa).  Specifically regarding the United States' proposal, Perez argued:

> I think it brings up the issues I discussed with the Baca prejudice, the spillover effect, the media coverage that comes with it.  The number of defendants, I think I agree with Mr. Cooper's estimates of the total number of defendants.  I think it's nine right now.  The Government suggests that it might be a seven to eight defendant trial.  And they're basing that on information that I just don't have available to me.  But I think the bigger problem with the Government's proposal is not quite as much the number of defendants as it is putting the Marcantel counts with the 6 and 7 defendants.  There is too much of a risk of prejudice, and there is, although logistical problems that you have to deal with, if you take the other proposals, that might work.  But I think you have to separate the Marcantel stuff.  I think it's unfairly prejudicial, frankly, for anybody else's count to go along with that.  I just think that it would be too difficult for the jury to set that aside.  And there is not a whole lot we can do, as much as we believe in the limiting instructions and the Court's guidance.  I just think that's too much of a problem.  Not just hearing the evidence, but again, the spectacle that comes with it.  I think, without having as much information about the other sets of counts, some of the other attorneys may be better suited, but I think that, you know, 1 through 5, and 13 through 15, which is the Government's first proposal, is lumping together, again, Counts 1 through 3; 3 sort of classic murdering of a snitch, if you will, in the prison, with activities that are taking place outside of the prison.  And there is sort of a tenuous SNM connection with Counts 4 through 5, 13 through 15.  It looks to me more like Joe Gallegos issues that he has from his hometown in Valencia County.

Tr. at 159:21-161:13 (Villa).

B. Garcia then added that, regarding the United States' proposition, that "the defendants that need to go to trial twice in our proposal, they have no objection to that. . . .  So I don't think that the Government's proposal, because you only have to go to trial once, is really a factor that impresses the defense."  Tr. at 161:24-162:11 (Cooper).  Villegas then put the Court on notice that no matter how the severance might happen, he would individually be moving for severance for his own trial, because "he is charged in a single incident . . . and . . . there are markedly different levels of culpability . . . [because he is] charged in a three-year max with a bunch of life maxes."  Tr. at 163:1-15 (Crow).  J. Gallegos then argued that the United States' proposal, through the impact of spillover prejudice, was making it easier on itself to prove Counts 1 and 2

by juxtaposing those Counts -- from 2001 -- with more recent conduct in Counts 13-15. See Tr. at 164:1-165:1 (Sindel). Gonzales agreed with J. Gallegos, and reiterated that he was maintaining his speedy trial rights, and would not be willing to wait for the Counts 1 and 2 Defendants to become ready for trial. See Tr. at 165:5-20. Alonso similarly objected to the United States' proposal, arguing that his conduct was significantly less culpable of the other Defendants in his grouping and that the grouping harmed the Count 3 Defendants. See Tr. at 165:24-166:21 (Chambers). A. Gallegos then took the opportunity to remind everyone that he was not J. Gallegos. See Tr. at 167:6-13 (Roberts). Gutierrez reiterated Gonzales' argument that Counts 13-15 were dissimilarly situated from Counts 1-5, and that she objected to the groupings and would file her own motion to sever, as well. See Tr. at 167:18-168:2 (Arellanes). The United States then responded that

> our preference would be for a 13-defendant trial. But we would live with two trials of six and seven defendants. Because the Court has mentioned 15 would be a decent number. If we could potentially get to 13, that could put all the defendants back together. But I think in terms two of trials, I think we could probably make that work.

Tr. at 175:3-10 (Castellano). The Court then took the Motion to Sever under advisement and gave its thoughts, positing:

> I don't have a ruling this afternoon, but let me tell you what I'm thinking. I'm a little bit back to where I was maybe at the beginning of the day. I'm much more informed, and I appreciate that. We all come to a case like this drawing on our experiences. Ms. Wild can probably tell you how many multi-defendant cases I've had of this number, but I would say three or four in the 20 range or more. And I guess I am still -- I know this case may be just different, but I guess I'm still a little bit taken back that there is going to be numbers of even like 13 left in this case. I mean, that just may be the reality, and I'll just have to live with the reality, because I don't have, as you can imagine, the information that y'all have, as y'all talk with each other. That's just not something I can or should have privy to. But if I bring my experience to bear, that's a lot of people that are going to trial. And I just haven't had that experience before. So I bring a skepticism to it. So I push these numbers down; probably not much reason for me to push them down below where the Government is saying they are, but I tend to push them

down.  And if that is the case, I probably am going to be looking more of a two trial solution to this, rather than a four or three.  I think I can probably try it.  I don't have a sense in my head as to whether the combination that the Government has proposed is the appropriate one.  But that's sort of my thinking.  I'm not going to sit here and drag this out.  But at the same time, I'm not going to rush toward it.

Tr. at 175:17-176:23 (Court).

### 13.     United States' Gonzales Response.

Regarding Gonzales' Motion to Sever and Gonzales' Amended Motion to Sever, the United States filed its United States Response in Opposition to Defendant's Motion to Sever [858], filed February 24, 2017 (Doc. 925)("United States' Gonzales Response").  The United States refutes Gonzales' argument that his "charged offenses are distinguishable from the overarching [SNM] racketeering enterprise . . . because (1) Defendant's alleged conduct is res gestae of the SNM's racketeering enterprise, and (2) Defendant fails to demonstrate real prejudice resulting from joinder in this case."  United States' Gonzales Response at 1.  The United States further refutes Gonzales' request for severance based on prejudicial spillover, because

> (1) joinder of Defendants in this case does not impose an insurmountable burden upon the Court and jury, (2) fewer Defendants who are charged with similar offenses will be proceeding to trial, and (3) Defendant fails to demonstrate that jury instructions will be insufficient to provide any protection against "prejudicial spillover."

United States' Gonzales Response at 1.  The United States also refutes Gonzales' request for severance based on mutually antagonistic defense theories, because "wholesale denial of association with the SNM and its members does not present a mutually antagonistic defense." United States' Gonzales Response at 1.  Last, the United States refutes Gonzales' argument that "severance should be granted because of a violation of Defendant's Sixth Amendment right

under *Bruton* . . . because there is no *Bruton* issue with regard to either of the proposed co-Defendant statements." United States' Gonzales Response at 1-2.

The United States then recaps the facts it considers salient, in particular the account of the conduct underlying Counts 14 and 15 by Rivera, who pled guilty, and

> admitted that on or about February 1, 2016 and continuing to February 27, 2016, Rivera conspired with SNM gang members or associates to kill J.G. who was believed to be a witness against fellow SNM gang member, Joe Lawrence Gallegos. . . . On February 27, 2016, an attempt was made to kill J.G. by assaulting him with a machete and a baton causing serious bodily injury. . . . Gonzalez, Rodriguez, and Rivera were at the residence where J.G. was attacked. . . . The group intended to prevent J.G. from testifying or cooperating with law enforcement. . . . Rivera committed these crimes by virtue of [his] membership in the SNM.

United States' Gonzales Response at 2-4. Regarding the applicable law, the United States then provides that, "[t]o justify relief under Rule 14, a defendant bears a 'heavy burden of showing real prejudice to his case.'" United States' Gonzales Response at 4 (quoting United States v. Gould, 2007 WL 1302587, at *1). Further, the United States provides, "'Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'" United States' Gonzales Response at 4 (quoting Zafiro v. United States, 506 U.S. at 538-39). Accordingly, here, the United States maintains that Gonzales' "alleged conduct is indistinguishable from the SNM VICAR conspiracy" and that the Court should not grant severance based on Gonzales' "attempt to minimize his overall culpability." United States' Gonzales Response at 5-6. The United States argues that Gonzales' self-described "minor participa[tion]" is an argument that

> may find some support if Defendant was charged with aiding and abetting a multi-defendant tax fraud conspiracy involving several key players and consisting of over eighty substantive counts. . . . It may also find some support if this were a RICO conspiracy centered on a traditional organized crime family, in which there's one godfather with a select couple of enforcers who carry out the lion's share of the family's criminal activities. . . . In cases of that nature, an individual

or certain individuals who allegedly engaged in one crime only may have "a markedly different degree of capability," *United States v. Baca*, No. CR 16-1613 JB, 2016 WL 6404772, at *31 (D.N.M. Oct. 20, 2016)(Browning, J.)(quoting *Zafiro*, 506 U.S. at 539), or may be "'conspirators joining and leaving the conspiracy at various times,'" *United States v. Gallo*, 668 F. Supp. 736, 751 (E.D.N.Y. 1987).

United States' Gonzales Response at 6. Here, however, the United States argues that, "in the unique circumstances that the Superseding Indictment alleges, in which the SNM operates by sending its members or associates to assault or murder individuals in their close proximity, Defendant's alleged offense is res gestae of the SNM's racketeering 'enterprise.'" United States' Gonzales Response at 6. With respect to the United States' burden of proving a "racketeering enterprise," the United States then explains that -- for VICAR -- it "must prove that 'an enterprise engaged in racketeering activity,' and that individual members committed racketeering activity 'for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group.'" United States' Gonzales Response at 7 (United States v. Feliciano, 223 F.3d 102, 116-17 (2d Cir. 2000)). The United States thus argues that Gonzales' arguments that he is only a minor participant is without merit. See United States' Gonzales Response at 7.

The United States next addresses the concept of "spillover prejudice" and argues that "spillover prejudice is insufficient for severance under Rule 14." United States' Gonzales Response at 8. The United States provides that "prejudice always exists when more than one defendant or offense are tried together," and that Gonzales' burden is to show prejudice "of a type which the court is unable to afford protection" and "that the spillover prejudice will prevent the jury from individualizing each defendant." United States' Gonzales Response at 8. Here, the United States maintains that jury instructions will adequately ensure that the jury does not compartmentalize the Defendants and the evidence, arguing specifically that "limiting

instructions may minimize the risk of undue prejudice," and that "juries can and do follow jury instructions in complex RICO and VICAR cases."  United States' Gonzales Response at 8-11 (citing, e.g., United States v. Jones, 530 F.3d 1292, 1303 (10th Cir. 2008)).

Next, the United States asserts that "wholesale denial of guilt is not a mutually antagonistic defense," and that Gonzales' argument that "severance is necessary because his general denial of association with the SNM and its members is so mutually antagonistic that joinder will be prejudicial" must fail.  United States' Gonzales Response at 12.  According to the United States, the concept of mutually antagonistic defenses is governed as follows:

> In *United States v. Lynn*, the Tenth Circuit found that, "[i]n this circuit, the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'"  31 F.3d 987, 992 (10th Cir. 1994)(citing *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985)).  The Tenth Circuit held: denial of guilt by one party while accusing another is "not so contradictory that the jury must have necessarily disbelieved one to believe another."  *Id*.  Indeed, the Court found "the jury could have believed all of the Defendants' theories and acquitted all of them, but unfortunately for Defendants, did not."  *Id*.

United States' Gonzales Response at 12.  The United States explains that, here, Gonzales seeks to argue

> that he was wholly unaware of the SNM's alleged scheme, particularly where Joe Lawrence Gallegos had a dispute with J.G. or had ordered a hit on J.G. [Defendant] would also present as part of his defense that he is not a member or associate of SNM, he does not know the majority of the co-defendants nor was he involved in or aware of any of the alleged conduct set forth in counts 1-13. . . . The sum of Defendant's theory is a wholesale denial of guilt.  As the Tenth Circuit found in *Lynn*, this type of claim "amounts to no more than finger pointing," and affords no basis for severance on these grounds.

United States' Gonzales Response at 12-13 (quoting United States v. Lynn, 31 F.3d 987, 992 (10th Cir. 1994)).  The United States thus requests that the Court deny Gonzales' Motion to Sever on this basis.  See United States' Gonzales Response at 13.

Last, the United States addresses Gonzales' assertions that "incriminating statements provided to federal investigators by defendants Paul Rivera and Shauna Gutierrez, also charged in Counts 14 and 15, raises a *Bruton* violation requiring severance on Sixth Amendment grounds." United States' Gonzales Response at 13 (internal quotation marks omitted). Regarding Rivera's statements, the United States first argues that Gonzales' "*Bruton* claim . . . is moot," because,

> [i]n *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held: the admission of a non-testifying codefendant's confession naming the defendant as a participant in a crime violates a defendant's Sixth Amendment right to confront a witness against him. On February 1, 2017, Paul Rivera pled guilty to Counts 14 and 15. . . . The United States intends to call Mr. Rivera as a witness to testify against Defendant. Accordingly, a *Bruton* issue is not raised where Rivera will testify, and Defendant will have an opportunity to cross-examine Rivera at trial. Defendant is thus not entitled severance based on Rivera's statement to federal investigators.

United States' Gonzales Response at 13. The United States then reminds the Court what Gutierrez' statement, which Gonzales argues creates a <u>Bruton v. United States</u> conflict, is:

> According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez to borrow her truck. According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying. When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

United States' Gonzales Response at 13-14. According to the United States, that statement is not even a "confession within the meaning of *Bruton*," because "Gutierrez does not confess to her role in the attempted murder of J.G. or 'expressly incriminate the [D]efendant as [her] accomplice.'" United States' Gonzales Response at 14 (quoting <u>Bruton v. United States</u>, 391 U.S. at 124 n.1). The United States alternatively argues, that, "assuming arguendo the Court finds that a *Bruton* issue is raised, the statement may be admissible against Defendant if properly redacted." United States' Gonzales Response at 14. Indeed, here, the United States maintains

that "any reference to Defendant's existence could be redacted with a neutral pronoun or phrase without raising a *Bruton* violation."  United States' Gonzales Response at 15.

### 14.    **Gutierrez' Response**.

Gutierrez filed a supplement to the other Defendants' severance briefing.  See Defendant Shauna Gutierrez' [sic] Opposed Supplement in Support of Motions for Severance, filed February 28, 2017 (Doc. 932)("Gutierrez' Response").  Regarding the allegations against her, Gutierrez first describes:

> Counts 14 and 15 allege that Shauna Gutierrez conspired with Joe Lawrence Gallegos, Santos Gonzales and Paul Rivera to murder J.G. (Jose Gomez) in violation of 18 U.S.C. § 1959, attempted murder of J.G. and Assault with a Dangerous Weapon resulting in Serious Bodily injury to J.G., as consideration of receipt of anything of pecuniary value of the [SNM] Gang, an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in the SNM gang.

Gutierrez' Response at 1-2.  More specifically,

> [t]he discovery . . . states that on February 27, 2016, Jose Gomez was battered by Santos Gonzales, Brandy Dominguez [sic], Oso (Paul Rivera) and an unknown female (not Shauna).  Brandy Dominguez [sic] and Paul Rivera are now cooperating witnesses.  On March 28, 2016, Brandy Rodriguez was arrested and provided a statement in which she claims that Shauna told Brandy that "Tiny" (J.G.) was at Charlene's residence and they needed to go get him.  Rodriguez, Santos Gonzales and Paul Rivera drove Shauna's truck to Charlene's house where they beat and assaulted J.G.  The discovery is replete with conflicting information concerning Shauna Gutierrez.

Gutierrez' Response at 2.  Gutierrez then asserts that she is not an SNM member and is only alleged to be "an associate," and that the only reason she "is indicted is because of her former relationship, formed two (2) months before the first indictment filed December 2015, with Joe Lawrence Gallegos.  Ms. Gutierrez is not the wife of Joe Lawrence Gallegos nor a family member."  Gutierrez' Response at 2-3.

Gutierrez then specifically argues against the United States' proposal at the February 7, 2017, hearing, to sever the Superseding Indictment into two groupings, one of which would be "counts 1-5 and 13-5." Gutierrez' Response at 3. According to Gutierrez, the allegations in Counts 1 and 2 are temporally separated from Counts 14 and 15 by "15 years," and "bear absolutely no relation to each other." Gutierrez' Response at 3. Given each of the Counts' discrete nature, Gutierrez further argues that the prejudice by joinder "is so compelling that the Court would be unable to afford protection, and thus prejudice would result in an unfair trial." Gutierrez' Response at 4. Gutierrez also argues that "joinder of Counts 14 and 15 with Counts 6, 7, 8, 9, 10, 11, and 12 is [also] illogical," because all of the Counts involve Defendants and offenses not of the "same or similar character" as those named and alleged in Counts 14 and 15. Gutierrez' Response at 4. Gutierrez then concludes:

> The allegations claimed by the Government against Ms. Gutierrez is a small fraction compared to the overall scope of this indictment against the twenty nine (29) other Defendants in this case. The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve" a minor defendant in any way.

Gutierrez' Response at 5 (quoting United States v. Gallo, 668 F. Supp. at 736).

### 15. **United States' A. Gallegos Response.**

The United States responded to A. Gallegos' Motion to Sever with the United States' Response in Opposition to the Opposed Motion to Sever Counts 4 and 5 [868], filed February 28, 2017 (Doc. 933)("United States' A. Gallegos Response"). The United States refutes A. Gallegos' argument that the Counts in the Superseding Indictment are

> improperly joined under Rule 8(b) . . . because (1) conspiracy to commit other offenses charged in the Superseding Indictment is not a requirement for joinder; (2) the United States offers a sufficient legal and factual basis for the Court to determine that Defendants participated in the affairs of the [SNM] through the commission of the alleged racketeering offenses; and (3) the United States

establishes Defendants were members of the SNM functioning to achieve a "common purpose."

United States' A. Gallegos Response at 1.    The United States also refutes A. Gallegos' contention

> that severance of Counts 4 and 5 should be severed under Rule 14 fails, because (1) Defendants fail to show any prejudice arising from antagonistic defenses; (2) Defendants fail to show joinder will prejudice Defendants' Fifth and Sixth Amendment rights, or prevent the jury from making a reliable judgment about Defendants' guilt or innocence; and (3) severance does not serve the best interests of the Court or jury.

United States' A. Gallegos Response at 1.    Specifically, regarding A. Gallegos' rule 8(b) improper joinder argument, the United States reiterates that "a plain reading" of rule 8(b) "permits joinder of two or more Defendants 'if [defendants] are alleged to have participated in the same act or transaction, or same series of acts or transactions, constituting an offense or offenses.'"    United States' A. Gallegos Response at 5 (quoting Fed. R. Crim. P. 8(b)).    The United States also argues that "the test for a proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts" and here, the

> Defendants are among 20 Defendants charged with VICAR offenses committed on behalf of the SNM.    Section 1959 makes it a crime to commit any of a list of violent crimes, including murder and conspiracy to murder, in return for anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of joining, remaining with, or increasing a position in such an enterprise.
> . . .  [T]he United States alleges that the SNM gang is a criminal enterprise within the meaning of RICO and VICAR, and that Defendants are members of the gang.
> . . .  The grand jury found probable cause supports those allegations.  Defendants' alleged conduct is therefore part and parcel of the SNM's reputation for violence, comprising exactly the type of conduct that has enabled the SNM to continue its racketeering enterprise for over 36 years.    Based on these criminal allegations and the body of "common evidence as to various counts" charged in the Superseding indictment . . . a sufficient basis exists for the Court to determine proper joinder of Defendants under Rule 8(b).

United States' A. Gallegos Response at 6-7 (quoting <u>United States v. Caldwell</u>, 560 F.3d 1202, 1212 (10th Cir. 2009)).  Additionally, "[a]s is the case under RICO, the requirements for joinder

of defendants under VICAR may be satisfied by establishing the existence of an enterprise, and

that the defendants' charged crimes related to the affairs of the same enterprise."  United States'

A. Gallegos Response at 8.  Accordingly, here, the United States argues it

> charged Defendants with participating in the affairs of the SNM enterprise
> through the commission of the alleged predicate racketeering acts.   As the
> Superseding Indictment alleges, Defendants are members of the SNM, a criminal
> enterprise, and, at the behest of the gang, have participated in predicate
> racketeering acts, namely, conspiracy to murder and murder, to assert and
> preserve the reputation of the SNM. . . .   The Superseding Indictment
> characterizes the Defendants' collective conduct as "Violent Crimes in Aid of
> Racketeering" pursuant to 18 U.S.C. §§ 1959(a)(1) and (a)(5). . . .  Accordingly,
> Defendants cannot escape joinder by claiming that their offenses are "not
> connected to any of the other defendants," when the co-Defendants' alleged acts
> fulfill the essential expectations of the SNM VICAR conspiracy.

United States' A. Gallegos Response at 8.  Further, the United States has not abused the rule 8(b)

joinder standard in this case, because -- for the VICAR allegations -- the "United States is

allowed to prove all of the[] essential elements effectively."   United States' A. Gallegos

Response at 9.

Turning then to A. Gallegos' arguments regarding severance under rule 14, the United

States first argues that A. Gallegos has failed "to show prejudice arising from antagonistic

defenses," in part because, "[b]y virtue of the number of Defendants who have already pled in

this case, and those who will likely plead in the coming months, the risk of prejudice arising

from antagonistic defenses is diminished."   United States' A. Gallegos Response at 12.

Additionally,

> Defendants fail to establish any prejudice whatsoever resulting from antagonistic
> defenses  [b]ecause Defendants offer no theory of defense of their own,
> Defendants point to two antagonistic theories that might arise in the course of
> trial: (1) "many defendants may argue they were not or are not SNM members,"
> and (2) "[o]ther defendants will likely argue the alleged crimes were not done in
> furtherance of the SNM.". . .  These arguments are analogous to the defendants'
> claim of antagonistic defenses in Linn.  The Tenth Circuit held: denial of guilt by
> one party while accusing another is "not so contradictory that the jury must have

- 86 -

necessarily disbelieved one to believe another.". . .  This type of claim "amounts to no more than finger pointing," and affords no basis for severance on these grounds.

United States' A. Gallegos Response at 13.

The United States next contends that the "Defendants fail to show joinder will prejudice specific trial rights or prevent the jury from making a reliable judgement [sic] about guilt or innocence."  United States' A. Gallegos Response at 14.  In fact, "the Court already noted at the hearing on February 7, 2017 that it is inclined to sever this case into groups of 10 or less Defendants.  So, Defendants have already effectively been provided the relief they seek."  United States' A. Gallegos Response at 14.  Regarding the ability of a jury to reach a reliable conclusion, the United States argues that A. Gallegos' reliance on United States v. Gallo is misplaced, because, in that case, that court "dealt with a RICO conspiracy centered on a traditional organized crime family, in which one godfather directed a select couple of enforcers to carry out the lion's share of the family's criminal activities."  United States' A. Gallegos Response at 14.  Unlike the circumstances of United States v. Gallo, the United States contends

> the scope of SNM VICAR offenses and the distribution of defendants across the Superseding Indictment is narrow.  Here, the majority of charges stem from violations of Section 1959.  Moreover, no more than six Defendants will proceed on any one count in the indictment, with the largest number of Defendants charged in Counts 6 and 7, of which Defendants are not charged.  Unlike the defendants in Gallo, Defendants are not charged in a small portion of the counts nor are they implicated by bits and pieces of evidence.  In the unique circumstances that the Superseding Indictment alleges, Defendants' alleged offenses are res gestae of the SNM's racketeering "enterprise."

United States' A. Gallegos Response at 15.  The United States also reiterates that, "to the extent that Defendants will suffer prejudice from evidence admitted against co-Defendants, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue

prejudice."  United States' A. Gallegos Response at 17 (citing <u>Zafiro v. United States</u>, 506 U.S. at 539).  Essentially, the United States maintains that A. Gallegos has not sufficiently shown a need for severance, "[b]ecause Defendants rely on assertions of prejudice generally, and do not point out specific and compelling prejudice, Defendants fail to uphold their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence." United States' A. Gallegos Response at 17.

The United States also asserts that there is "no risk that joinder will compromise Sixth Amendment trial rights," because A. Gallegos and the Defendants

> fail to establish that joinder would deny Defendants the rights that the Sixth Amendment hold[s] crucial such as, the Constitutional right to cross-examination, opportunity to present an individual defense, right to confront witnesses against them, right to counsel, or right to properly instruct the jury on the admissibility of evidence as to each defendant.  The hearings have worked fine thus far, and there is no reason to believe that will change.  The rights that Defendants assert may be infringed are not of the same magnitude.

United States' A. Gallegos Response at 18.  Additionally, the United States argues, A. Gallegos has not shown that a "risk joinder will compromise Defendants' Fifth Amendment rights," because "given the nature of the VICAR charges in Counts 4 and 5, severance would not cure the prejudice they contend may exist."  United States' A. Gallegos Response at 19.  The United States explains that the "Defendants complain throughout their Motion to Sever that the United States is somehow improperly using the VICAR statute to back-door evidence that is 'likely inadmissible,'" and, the United States argues, that complaint lacks bases in law, because

> VICAR is a properly enacted statute that Congress saw fit to enact to prevent the exact activity alleged in the Superseding Indictment: violent crimes such as murders perpetrated by individuals who join in a racketeering enterprise such as SNM.  Second, by charging this murder and conspiracy to murder as VICAR violations, the United States placed additional burdens on itself: to prove that the SNM is an enterprise, engages in racketeering activities, and that this murder and conspiracy to murder were committed by the Defendants to receive pecuniary value from SNM or to gain entry to, or to maintain or increase position in, SNM.

> To the extent that Defendants complain about the additional evidence that's admissible in a VICAR case such as this, they conveniently omit from their Motion to Sever that they receive a huge benefit: if the United States fails to prove any one of these additional elements beyond a reasonable doubt, they will be found not guilty of the VICAR crimes with which they're charged.

United States' A. Gallegos Response at 20.

Last, the United States contends that "severance does not best serve the interests of the Court or jury," because "it will require the court to undergo the same trial process on multiple occasions," and it does not otherwise "impose an unbearable weight on individual jury members." United States' A. Gallegos Response at 21-22. According to the United States, ultimately, a jury would be capable of handling the complex litigation and severance would not save the judiciary its resources in a meaningful fashion. See United States' A. Gallegos Response at 22. The United States thus requests that the Court choose not to sever the Superseding Indictment. See United States' A. Gallegos Response at 22.

### 16.    United States' Troup Response.

The United States responded to Troup's Motion to Sever with the United States' Response in Opposition to Defendants Motion to Sever Counts 1 and 2 [882], filed March 2, 2017 (Doc. 936)("United States' Troup Response"). The United States argues:

> Defendants' first contention that joinder of Counts 1 and 2 will result in undue prejudice fails, because (1) Defendants do not show real prejudice resulting from joinder; (2) disparity of quality and quantity of evidence does not constitute an antagonistic defense; and (3) Defendants' claims of prejudice are negated by their own admissions. Defendants' second contention that severance should be granted based on considerations for judicial economy fails, because prejudice, not judicial economy, is the proper basis for severance in the Tenth Circuit. Defendants' third contention that Counts 1 and 2 should be severed because joinder will result in the introduction of inadmissible evidence and a tangled web of jury instructions fails, because Defendants offer an insufficient legal and factual basis for severance on this ground.

United States' Troup Response at 1. In support, after recapping some of the factual background of this case, the United States first argues that

> the Superseding Indictment clearly states that the purpose of the SNM is to "promot[e] and enhance[e] the enterprise and the activities of its members and associates through criminal acts," and to "keep victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence."

United States' Troup Response at 5 (quoting Superseding Indictment at 7). Accordingly, then, the United States maintains that joinder is proper in this VICAR case: "Under RICO, Rule 8(b) joinder requirements are satisfied when each defendant participated in the affairs of the same enterprise through the commission of the alleged predicate racketeering acts." United States' Troup Response at 5. As the United States has argued in other briefing, it reiterates that the Superseding Indictment

> charged Defendants with participating in the affairs of the SNM enterprise through the commission of the alleged racketeering acts. As the Superseding Indictment alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest of the gang, participated in racketeering acts, namely the murders of F.C. and R.G. . . . The Superseding Indictment characterizes the Defendants' collective conduct as "Violent Crimes in Aid of Racketeering" pursuant to 18 U.S.C. § 1959(a)(1). . . . Accordingly, Defendants cannot escape joinder by claiming that they are in "no way shape or form" responsible for Counts 9 and 10 when the co-Defendants' alleged acts fulfill the essential elements of the SNM VICAR conspiracy.

United States' Troup Response at 7.

The United States next argues that "disparity of quality and quantity of evidence does not constitute an antagonistic defense for purposes of severance under Rule 14," because those bases do not satisfy the prejudicial standard. United States' Troup Response at 8. Instead, Troup needs to show, the United States argues, "real prejudice, rather than merely not[ing] that each defendant is trying to exculpate himself while inculpating the other," and the "conflict between codefendants' defenses must be such that the jury, in order to believe the core of one defense,

must necessarily disbelieve the core of the other." United States' Troup Response at 8 (internal

quotation marks omitted). Here, the United States maintains that Troup's argument that the

evidence against the Counts 1 and 2 Defendants is older, and perhaps not as robust, as the

evidence for the later Counts, is not grounds for severance under rule 14. See United States'

Troup Response at 8-9.

The United States then addresses Troup's arguments that the Counts 1 and 2 Defendants

were in a different SNM faction than the Counts 3-15 Defendants. See United States' Troup

Response at 9. In that regard, the United States provides that,

> [t]o the extent that Defendants' complain of prejudice resulting from joinder, Defendants' own admissions provide a sufficient factual basis for the Court to determine that Defendants were members of the SNM during the commission of offenses charged in Counts 1 and 2. Defendants' claims are further negated by joinder of defendant Troup who establishes the ongoing nature of the enterprise. Troup is charged with murdering F.C. in 2001 and F.S. in 2007 -- nearly five years after the Defendants claim "The All Stars" assumed control of the gang. . . . Defendants' Motion to Sever should be denied on these grounds.

United States' Troup Response at 9. The United States also refutes Troup's argument that the

Counts in the Superseding Indictment correspond with allegations for conduct by fundamentally

different SNM enterprises, stating that

> [a] reasonable jury could find that despite variations of membership, the criminal purpose of the SNM has remained the same: to preserve and protect the power, territory, reputation, and profits of the enterprise throughout the New Mexico penal system and the streets of New Mexico through the use of intimidation, violence, threats of violence, assaults, and murder. . . . A reasonable jury could also find that the change of name or factions within a group does not establish the existence of separate and distinct groups. Indeed, the Supreme Court recognized that an enterprise need not even have a name, let alone one that remains constant over the course of the enterprise's existence. . . . Finally, a reasonable jury could find that despite infighting among the original members of the SNM, the enterprise remained the same.

United States' Troup Response at 10.

Next, the United States asserts that the Court "may not grant severance based on considerations for judicial economy alone." United States' Troup Response at 11. The United States provides that the Tenth Circuit has held that

> the Court may weigh "considerations of economy . . . and expedition of judicial administration," if the Court finds (1) "defenses presented are so antagonistic that they are mutually exclusive," and (2) "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence."

United States' Troup Response at 11 (quoting United States v. Pursley, 474 F.3d at 757). The United States thus asserts: "Without a requisite finding of prejudice under the first two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion for severance." United States' Troup Response at 11-12. Nonetheless, the United States further argues that the "Defendants still fail to show that severance is more convenient and cost effective than joinder in this case. The benefits proposed by Defendants overlook the additional expense of time and judicial resources incurred by severance." United States' Troup Response at 12. The United States supports its argument by reiterating the "additional time and resources from the Court, Defendants, defense counsel, and the United States" multiple trials would necessitate. United States' Troup Response at 12-13.

The United States last argues that the "Defendants overstate the effect of inadmissible evidence and excessive jury instructions," because they rely "on a major assumption that all the evidence in Counts 3-15 is either irrelevant, inadmissible hearsay, or inadmissible testimonial statements, as to Counts 1 and 2." United States' Troup Response at 14 (internal quotation marks omitted). Indeed, the United States contends, "[t]he effect of Defendants' contention would preclude the United States from producing evidence that Defendants were members of the SNM, and that the SNM was a criminal enterprise when the alleged VICAR offenses were

committed.  This cannot be true."  United States' Troup Response at 14.  At this point, the United States once again reiterates the fact that "juries can and do follow jury instructions in complex racketeering cases," and that this case is no different.  United States' Troup Response at 15.

### 17.    United States' Alonso Response.

The United States responded to Alonso' Motion to Sever with the United States' Response in Opposition to Defendant's Motion to Sever [893], filed March 6, 2017 (Doc. 940)("United States' Alonso Response").  According to the United States,

> Defendant's first contention that joinder of Count 3 is improper under Rule 8 fails, because (1) Defendant's Motion to Sever under Rule 8(a) is improper, and (2) Defendant fails to provide a legal or factual basis to support a claim of improper joinder under Rule 8(b).  Defendant's second contention that severance should be granted under Rule 14 fails, because (1) Defendant fails to show real prejudice resulting from joinder in this case, and (2) prejudice, not judicial economy, is the proper basis for severance in the Tenth Circuit.  Defendant's third contention that severance should be granted because joinder will result in a *Bruton* violation fails, because co-Defendant statements implicating Defendant are not testimonial.

United States' Alonso Response at 1.  Regarding Alonso's arguments for severance under rule 8, the United States reiterates its arguments that rule 8(b) applies in this case and that, under rule 8(b), "the test for proper joinder is a common thread to each of the defendants which may be established by common evidence as to various counts. . . .  Defendant's involvement in Count 3 clearly shares a common thread with each of the co-Defendants charged in the Superseding Indictment," given the enterprise-related allegations.  United States' Alonso Response at 2-7 (internal quotation marks omitted).  The United States also argues that Alonso fails to "support his contention that joinder of Count 3 will result in prejudice," stating that

> the Court may weigh "considerations of economy . . . and expedition of judicial administration," if the Court finds (1) "defenses presented are so antagonistic that they are mutually exclusive," and (2) "a serious risk that a joint trial would

compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Pursley*, 474 F.3d at 765 (emphasis added). Without a requisite finding of prejudice under the first two prongs, the Court has no discretion to weigh considerations for judicial economy in a motion for severance.

United States' Alonso Response at 9-10.

The United States next turns to Alonso's argument that "admission of Edward Troup's statements will . . . violate *Bruton*." United States' Alonso Response at 11. The United States explains that Alonso contends that incriminating statements "provided to federal investigators by defendant Edward Troup, also charged in Count 3, raises a *Bruton* violation requiring severance on Sixth Amendment grounds," and if he "is forced to go to trial with Edward Troup, where some or all of [Troup's] statements are admitted, [Alonso's] constitutional right to confrontation will be denied." United States' Alonso Response at 11 (alterations in original). In this case, the United States refutes Alonso's arguments, by arguing that "Troup's statements are not testimonial." United States' Alonso Response at 11. The United States then provides that "[t]he *Bruton* Rule protects a defendant's right to confrontation by barring the admission of testimonial statements made by a non-testifying co-defendant," but "if a co-defendant's statements are 'made unwittingly to a Government informant,' those statements are considered 'nontestimonial,' and are accordingly beyond the scope of *Bruton*." United States' Alonso Response at 11 (quoting United States v. Smalls, 605 F.3d 765, 777 (10th Cir. 2010)). For reference, the United States reminds the Court that the following statements are at issue:

Defendant's Exhibit 1: Troup confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico. Troup stated that during one of the murders, he held [F.S.'s] legs while [Alonso] strangled him to death with a drawstring from a laundry bag.

Defendant's Exhibit 2: Troup bragged about being a part of the murder of [F.S.] as well, and told [confidential informer] that [Alonso], also from Roswell, was ordered to kill [F.S.].

Defendant's Exhibit 3: In 2007, Edward Troup admitted to CHS that he and [Alonso] killed [F.S.].

United States' Alonso Response at 11. Those statements, the United States explains, were "made to a confidential informer whose status was unknown to him at the time," and because "'the Confrontation Clause simply does not apply to nontestimonial statements,' Defendant's Sixth Amendment right to confrontation will not be violated by admission of Troup's statements." United States' Alonso Response at 11-12 (quoting United States v. Smalls, 605 F.3d at 780). Nonetheless, the United States maintains that, "even assuming arguendo that Troup's statements are testimonial, these statements will still be admissible if properly redacted." United States' Alonso Response at 12. Indeed, the United States asserts that "[r]eferences to Defendant are extremely limited, and can be easily redacted with a neutral pronoun or phrase without raising a *Bruton* violation." United States' Alonso Response at 12.

### 18.  **Gonzales' Reply.**

Gonzales replied to the United States' Gonzales Response with Defendant Santos Gonzales' Reply to United States' Response to Mr. Gonzales' Motion to Sever Defendant, filed March 14, 2017 (Doc. 975)("Gonzales' Reply"). Gonzales first argues that "antagonistic defenses in this case require[] severance," because, "[u]nlike other cases involving charges of violent crimes in aid of racketeering and conspiracies to commit thereto, the conspiracies charged in the second superseding indictment are separate and distinct; they are not substantially interrelated by their facts and common aims and rarely involved at least one common participant." Gonzales' Reply at 1. Gonzales also argues that, "[w]hen two defense strategies inexorably clash, particularly considering the duty of co-defendant's counsel to represent his/her

- 95 -

client vigorously as possible by contrasting the two defendants' behavior, severance is necessary," and that is the case here.  Gonzales' Reply at 2.

> Indeed,

> Mr. Gonzales submits that his defense is inexorably antagonistic to his co-defendants to the point that if severance is not granted, prejudice will result.  Mr. Gonzales submits that the offenses charged in counts 1-13 span a period of 14 years, do not involve him whatsoever and are not interrelated or connected.  The government argues that those charged offenses constitute the res gestae of the SNM's racketeering enterprise.  However, critical to Mr. Gonzales is the fact that he is not an SNM member or associate.  Notably, the vast majority of the offenses charged in counts 1-12 occurred in a prison setting and involved validated members of SNM.  Mr. Gonzales simply had no association to SNM.  Just because the government says Mr. Gonzales is an "associate" of SNM does not make it so.  There is no evidence to support their claim unless witnesses are coached into parroting the unfounded allegation.

Gonzales' Reply at 3.  Accordingly, Gonzales contends that, "[i]n a joint trial, the government will introduce evidence of crimes allegedly committed by validated members of SNM in prison settings over a period of 14 years," and this proof will be prejudicial, because

> Mr. Gonzales' defense will be squarely and irreconcilably antagonistic to Ms. Rodriguez, Ms. Gutierrez and Mr. Gallegos' defenses.  Indeed, Mr. Gonzales was unaware of any connection between J.G. and Joe Gallegos.  Therefore, to the extent that the jury will be faced with disbelieving one defense over the other, severance is required.

Gonzales' Reply at 3-4.  In the same vein, Gonzales further argues that the "danger of spillover evidence justifies a severance."  Gonzales' Reply at 4.  In support, Gonzales provides that "[t]he Supreme Court has recognized that when a jury hears large amounts of incriminating evidence it could predispose them to convict a codefendant who they otherwise would not."  Gonzales' Reply at 4 (citing Zafiro v. United States, 506 U.S. at 539).  Gonzales then alerts the Court that "some Courts have granted severance based entirely on the issue of disparity of evidence."  Gonzales' Reply at 4-5 (citing United States v. Burke, 789 F. Supp. 2d 395 (E.D.N.Y. 2011)(noting that the trial of the first two defendants involved three murders, several

kidnappings, drug trafficking, and thirty years' involvement with the Gambino Crime Family, but the third defendant was only charged with tampering with witnesses while incarcerated, and concluding that spillover prejudice was enough to sever the trials); United States v. Haworth, 168 F.R.D. 658 (D.N.M. 1996)(Hansen, J.)(considering seven defendants indicted for narcotics trafficking in an organization where two defendants were death penalty eligible and were facing at least twenty offenses, including murder, attempted murder, arson, and firearm offenses, and concluding that, even though all the defendants' charges stemmed from the same conspiracy, the large number as well as the severity of the charges against the two death eligible defendants would prejudice the other defendants if they were joined for trial)).   Here, then, Gonzales reiterates his small role in the grand scheme of the Superseding Indictment in comparison to the other Defendants.  See Gonzales' Reply at 5-6.

Gonzales last addresses the Bruton v. United States issue, and argues that "[w]hen the statement of a co-defendant implicates the defendant to the point that it presents a substantial threat to a defendant's right to a fair trial, defendant may be entitled to a severance."  Gonzales' Reply at 6.  Accordingly, Gonzales asserts that "the United States Supreme Court [has] held that the admission of statements by a co-defendant who did not take the stand deprived the defendant of his rights under the Sixth Amendment Confrontation Clause when those statements implicated the defendant."  Gonzales' Reply at 7.  In Gonzales' specific case, he maintains:

> The government erroneously argues that the statements made by co-defendant Shauna Gutierrez do not implicate Mr. Gonzales.  To the contrary, Ms. Gutierrez's statement implicates Mr. Gonzales to the extent Gutierrez claims Mr. Gonzales was present when Brandy Rodriguez and Paul Rivera allegedly discussed confronting J.G.  According to Ms. Gutierrez's statement, Mr. Gonzales then accompanied Rivera and Rodriguez to J.G.'s home.  Ms. Gutierrez's statements unquestionably incriminate Santos Gonzales as her statements place him at the scene of the crime as well as engaging in the crime.  Specific testimony that Mr. Gonzales was involved in the crime is vivid incriminating evidence.  Replacing Mr. Gonzales' name with a blank or pronoun will do nothing to cure

the prejudice as it will be clear to the jury that there were only four people allegedly involved in the offense.

Gonzales' Reply at 7.  Gonzales also provides that,

> since the filing of Mr. Gonzales' motion to sever, co-defendant Brandy Rodriguez was added to the indictment.  There is no dispute Ms. Rodriguez has made statements implicating Mr. Gonzales.  Indeed, according to Ms. Rodriguez, Mr. Gonzales accompanied her and Mr. Rivera to J.G.'s home and once there the trio beat J.G.  Given the fact that Ms. Rodriguez is now a charged co-defendant and the government would seek to introduce her statements against Mr. Gonzales, in order to avoid a violation of Mr. Gonzales' right to confront and cross examine, severance is required.

Gonzales' Reply at 8.

### 19.    **Troup's Reply.**

Troup also submitted the Defendants' Reply to the United States' Response in Opposition to the Defendants Motion to Sever Counts 1 and 2, filed March 27, 2017 (Doc. 1014)("Troup's Reply").  Troup's Reply begins with discussion about the February 7, 2017, hearing, where "the Court suggested that it might be premature to rule on severance because it was unclear at that time how many defendants would actually be going to trial."  Troup's Reply at 1.  Troup then argues that the United States is overstating the number of Defendants who might plea and that accordingly the Court should not be relying on that information as it considers severance.  See Troup's Reply at 2.  Troup then confirms that "the Defendants seek severance under Federal Rule of Criminal Procedure 14 and the Due Process Clause of the U.S. Constitution," and argues that, "under Rule 14, the Court may grant severance anytime joinder appears to prejudice a defendant."  Troup's Reply at 3-4 (internal quotation marks omitted).  Indeed, Troup argues, it is not the case that "mutually antagonistic defenses is the only situation where severance may occur," and, instead, "the Court should grant a severance whenever there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence."  Troup's Reply at 4 (citing <u>Zafiro v.</u>

<u>United States</u>, 506 U.S. at 539).  Risk of prejudice, Troup argues, could occur

> [w]hen evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.  When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.  Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.  Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.

Troup's Reply at 4 (citing <u>Zafiro v. United States</u>, 506 U.S. at 539).  Troup then argues that, at

> this stage, of course, there is no way to determine whether a failure to sever will be actually prejudicial, because the Court cannot know how the evidence will come in or even if there will be a conviction.  All this Court can evaluate is whether there is a risk of prejudice warranting severance.  That is what Rule 14 requires.

Troup's Reply at 5-6.

Next, Troup reiterates that severance of Counts 1 and 2 is appropriate, primarily because,

through

> alleging that SNM is a singular enterprise spanning several decades, the government attempts to render admissible any evidence about that enterprise regardless of applicability to any charged individual. . . .  In painting with such a broad brush, however, the government demonstrates why severance is necessary to protect the 2001 Defendants from unfairly prejudicial evidence and testimony.

Troup's Reply at 6.  Accordingly, Troup concludes, the broad allegations create "the problem in

this case[, which] is that a reasonable jury very well could conflate the evidence to find

culpability or a relationship where none really existed."  Troup's Reply at 7.  Troup bases his

argument in the "declaration of Joel D. Lieberman, Ph.D., Chair of the Criminal Justice

Department at the University of Nevada, Las Vegas," who asserts that, "in this case, the risks of

prejudice from joinder are very real and . . . jury instructions will be insufficient to remedy those

risks." Troup's Reply at 7 (citing Declaration of Joel D. Lieberman at 1, filed March 27, 2017 (Doc. 1014-1)("Lieberman Decl.")). Troup also provides that joinder generally results in an increased likelihood of conviction and that, here, "[c]ontrary to the government's arguments that counts should remain joined because of the similarity of evidence that may be presented during separate trials . . . the fact that the various offenses are of a similar character itself makes the risk of unfair prejudice all the greater." Troup's Reply at 7-8.

Troup next considers the notion that "SNM is one, longstanding enterprise" and argues that it is not such an enterprise, and that the nature of the allegations regarding the enterprise favors severance, because:

> In terms of the secondary concern that individuals' perceptions of a group may color the perceptions of individuals affiliated with the group, Reed and Bornstein (2015[]) argue "people tend to make judgments about individuals based on perceptions of their group (Waytz & Young, 2012), with people seeing all group members as similar (Wilder, 1978). This is particularly true when the group is perceived as cohesive, in which cases individual[] member[] are seen as more responsible for the group's collective actions (Hamilton & Sherman, 1996; Waytz & Young, 2012)" (p. 2). However, it does not appear that the behavior of all group members contribute equally to the perception of a group. Rather, the malevolent nature of a group was determined by the most extreme behavior (e.g., homicide) of specific group members (Leon, Oden, & Anderson, 1973). Given that the defendants in U.S. v. DeLeon, et al. are all alleged to be members of [SNM], a group that is cohesive in nature, and that some defendants are charged with very heinous acts, there is reason to believe that jurors will have a pejorative view of many of the defendants, irrespective of the specific evidence presented against them, if defendants are joined at trial.

Troup's Reply at 9 (quoting Lieberman Decl. at 6). Ultimately, Troup contends that the risk of spillover prejudice is great and that the Court ought consider severance on that factor alone. See Troup's Reply at 9-11. Troup in part makes that argument, because the United States' assertion that "limiting instructions" would cure the prejudice is premised in a misunderstanding regarding the "complexity of this case, the large number of defendants, and the fact that there will be many, many instances of evidence admissible against a limited number of defendants." Troup's Reply

at 11.  Troup also points to the Lieberman Decl. for the proposition that limiting instructions, generally, are ineffectual.  See Troup's Reply at 12 (citing Lieberman Decl. at 7).  Troup then concludes by asserting that the risk of prejudice to the individual Defendants outweighs the interest in judicial economy that joinder can serve, and that the best approach for ensuring that the Defendants receive a fair trial is by severance.  See Troup's Reply at 12-14.

20.    **A. Gallegos' Reply.**

A. Gallegos replied to the United States' A. Gallegos Response with the Reply to United States' Response to Motion to Sever Counts 4 and 5, filed March 30, 2017 (Doc. 1031)("A. Gallegos' Reply").  A. Gallegos adopts the arguments of his co-Defendants which are in favor of severance, and reiterates that he is not an SNM member and has not "participated in the activities of the enterprise."  A. Gallegos' Reply at 1-2.  A. Gallegos also asserts that, in comparison to his co-Defendants, his role as alleged by the Second Superseding Indictment is de minimis, and that the evidence the United States will present against the other Defendants will surely prejudice his defense in a joint trial, particularly where he shares a last name with one of the Defendants who is charged with some of the more egregious conduct.  See A. Gallegos' Reply at 2-4.  A. Gallegos contends, further, that his "defense is antagonistic to his co-defendants," because:

> If forced to go to trial together, Andrew Gallegos will have no choice but to take the uncomfortable position that his brother or perhaps other co-defendants are responsible for AB's death.  This would, essentially, place Andrew on the same side as the government; an unfair scenario, particularly for Joe Gallegos, because it would be the equivalent of a denial of a fair and impartial trial for Joe.

A. Gallegos' Reply at 4-5.  A. Gallegos concludes by stating that

> the allegations claimed by the Government against him is small in comparison to the overall scope of this indictment against the twenty-plus other defendants in this case.  The prejudice suffered by Defendants charged in a small portion of the counts is compounded because the jury is subject to months and months of trial dealing with dozens of indictments of criminal misconduct that does not involve a minor defendant in any way.

A. Gallegos' Reply at 6.

**21.    <u>Alonso's Reply</u>.**

Alonso replied to the United States' Alonso Response with his Reply to the Government's Response in Opposition to Defendant's Motion to Sever [893] [Doc. 940], filed March 30, 2017 (Doc. 1036)("Alonso's Reply").  Alonso explains that "Federal Rule of Criminal Procedure 14 authorizes courts to sever defendants' trials where consolidation appears to prejudice either the government or a defendant," and that

> [t]he 1966 amendment to Rule 14 added a provision which provided that "in ruling on a motion by a defendant for severance the court may order the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at trial."

Alonso's Reply at 2.  Further, Alonso explains that

> [t]he 1966 Advisory Committee's Note stated that "a defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant.  This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand.  Limiting instructions to the jury may not in fact erase the prejudice."

Alonso's Reply at 2.  According to Alonso, that "1966 amendment to [rule 14] foreshadowed *Bruton v. United States*, 391 U.S. 123 (1968) which came two years later."  Alonso's Reply at 3.

Alonso next explains:

> In 2002, Crim. P. 14 was again amended.  The 2002 amendment deleted the reference to a defendant's "confession."  The Advisory Committee reported that "the reference to the 'defendant's statement' in the amended rule would fairly embrace any confessions or admissions by a defendant." (emphasis added).  Had the 2002 amendment deleted the word "statement" and kept only the word "confession" the government's argument that severance cannot be based on admissions to persons who are not members of law enforcement might find some limited traction.  Instead the 2002 amendment chose to retain the broader word "statement" while eliminating the more narrow word "confession."  The Advisory Committee Notes should dispel any argument that severance pursuant to Crim. P. 14 can only be founded on "confessions" to law enforcement.

Alonso's Reply at 3.  Accordingly, Alonso asserts "this Court has discretion pursuant to Crim. P. 14 to order severance of Alonso and Troup.  Further, considering the plain language of Crim. P. 14, that Troup's statements were not made to law enforcement does not impinge upon this Court's discretion."  Alonso's Reply at 3-4.

Alonso next addresses Bruton v. United States, where the Supreme Court held that "it was constitutional error to admit into evidence the incriminating statement made by [a] co-defendant . . . which implicated defendant Bruton and that this error is not cured by a limiting instruction."  Alonso's Reply at 5.  In Bruton v. United States, the Supreme Court was considering a co-Defendant's "confession to a postal inspector in which he admitted that he and Bruton had committed the robbery," which the district court admitted pursuant to a limiting instruction that the jury was not to allow the statement to incriminate Bruton.  Alonso's Reply at 5. Ultimately, the Supreme Court said that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

Alonso's Reply at 5.  Thus, Alonso provides, the Supreme Court concluded that, "[d]espite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence implicating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination."  Alonso's Reply at 6.  Alonso then argues that the Supreme Court's "opinion in *Bruton* did not

rest solely on the Confrontation Clause of the Sixth Amendment," because the Supreme Court

stated:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an
> involuntary confession, it may also be a denial of due process to rely on a jury's
> presumed ability to disregard a codefendant's confession implicating another
> defendant when it is determining that defendant's guilt or innocence. Indeed, the
> latter task may be an even more difficult one for the jury to perform than the
> former. Under the New York procedure, which *Jackson* held violated due
> process, the jury was only required to disregard a confession it found to be
> involuntary. If it made such a finding, then the confession was presumably out of
> the case. In joint trials, however, when the admissible confession of one
> defendant inculpates another defendant, the confession is never deleted from the
> case and the jury is expected to perform the overwhelming task of considering it
> in determining the guilt or innocence of the declarant and then of ignoring it in
> determining the guilt or innocence of any codefendants of the declarant. A jury
> cannot segregate evidence into separate intellectual boxes. . . . It cannot
> determine that a confession is true insofar as it admits that A has committed
> criminal acts with B and at the same time effectively ignore the inevitable
> conclusion that B has committed those same criminal acts with A.

Alonso's Reply at 6-7 (citing Bruton v. United States, 391 U.S. at 130-31)(internal quotation

marks omitted)(discussing Jackson v. Denno, 378 U.S. 368 (1964), where the Supreme Court

held "it is difficult, if not impossible, to prove that a confession which a jury has found to be

involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is

the course it took, was affected by the very evidence showing the confession was true," in its

consideration of a New York rule -- that it held violated Due Process -- requiring a jury

determine the voluntariness of a defendant's confession)).  Alonso, accordingly, argues that "the

*Bruton* rule has constitutional underpinnings separate and apart from the Confrontation Clause.

Accordingly, any dilution or diminution of the Sixth Amendment right to confrontation does not

necessarily dilute or diminish the *Bruton* rule."  Alonso's Reply at 7.

Alonso then addresses Bruton v. United States' progeny, first stating that the Bruton v.

United States rule "can be satisfied by redaction."  Alonso's Reply at 8-9 (citing Richardson v.

Marsh, 481 U.S. 200 (1987)).  Alonso notes, however, that "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result."  Alonso's Reply at 9-10 (quoting Gray v. Maryland, 523 U.S. 195 (1997)).  Alonso explains that the Supreme Court

> in *Bruton* made no distinction between statements made to law enforcement officers and statements made to civilians.  Neither did the *Bruton* Court distinguish between statements made during formal interrogation and statements made during casual conversation.  Following *Bruton*, the admission of statements of a co-defendant did not depend on whether the statement was made to law enforcement or a civilian.

Alonso's Reply at 10.  Alonso's discussion of Bruton v. United States' progeny then brought him to Crawford v. Washington, 541 U.S. 36, which "introduced a new paradigm to evaluate the application of the Confrontation Clause to hearsay."  Alonso's Reply at 11.  According to Alonso, "[r]ecently some courts have taken the *Crawford* Court's distinction between testimonial and nontestimonial hearsay as an opportunity to undercut *Bruton*.  The Tenth Circuit's opinion in *United States v. Smalls*, 605 F.3d 765 (10th Cir. 2010), the case upon which the government's Response primarily relies, is an example."  Alonso's Reply at 11.

Alonso then detours his argument to more fully explain to the Court the "impact of *Crawford*," because "[i]t is critical to accurately appreciate precisely what *Crawford* holds and also to recognize what issues *Crawford* does not address" to understand the state of Bruton v. United States in Crawford v. Washington's wake.  Alonso's Reply at 12.  Crawford v. Washington, Alonso argues,

> reversed and overruled *Ohio v. Roberts*.  The Court held that "testimonial statements of witnesses absent for trial" are admissible "only where the declarant is unavailable, and only where the defendant had a prior opportunity to cross-examine [the witness].". . .  The Court noted that "the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than

a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."

Alonso's Reply at 13-14 (quoting Crawford v. Washington, 541 U.S. at 59 (discussing Ohio v. Roberts, 448 U.S. 56 (1980)(creating a two-part test to admit hearsay without running afoul of the Sixth Amendment: (1) establish that the declarant is unavailable, and (2) prove that the statement bears adequate indicia of reliability))). Alonso then asserts that the Supreme Court, in Crawford v. Washington,

> did not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay. The Court noted that "various formulations" or "articulations" or "definitions" of "testimonial" could be posited; however, apart from citing examples of statements that would qualify as testimonial under any definition, the Court specifically declined to undertake crafting a controlling definition of testimonial.

Alonso's Reply at 14.

Accordingly, Alonso explains that, "[f]ollowing *Crawford*, the Court has provided little clarity to distinguish testimonial from non-testimonial hearsay." Alonso's Reply at 14. Alonso concedes, however: "In the companion cases of *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), the Court explored the meaning of 'testimonial.' The Court ruled that statements are non-testimonial when made under circumstances indicating that the primary purpose of the statement is to meet an 'ongoing emergency.'" Alonso's Reply at 14. Further, Alonso argues, the Supreme Court divulged in those cases that,

> on the other hand, statements are testimonial when the circumstances indicate that there is no ongoing emergency and the purpose is to establish or prove past events. . . . In providing this definition the Court explicitly acknowledge that the definition was intended to have limited application. The Court stated "without attempting to produce an exhaustive classification of all conceivable statements -- or even all conceivable statements in response to police interrogations -- as either testimonial or nontestimonial, [its definition] suffices to decide the present case.". . . Importantly, the Court seems to implicitly recognize that some statements may be testimonial even if the statement is not in response to police interrogation.

Alonso's Reply at 14-15.  Specifically, Alonso provides:

> In *Davis*, the hearsay statements were made by a domestic dispute victim to a 911 operator in the context of an "ongoing emergency." . . . .  The Court found that the statements in *Davis* were made during an "ongoing emergency" in which the declarant was "speaking about events as they were actually happening, rather than describing past events.". . .  Accordingly, the statements in *Davis* were non- testimonial.
>
> In *Hammon* the hearsay statements were also made by a victim of a domestic dispute but, unlike *Davis*, not in the context of an "ongoing emergency" but rather as part of an investigation into "what happened.". . .  In *Hammon*, although the statements at issue were made within minutes of the crime, the Court found that there was no ongoing emergency and the declarant was describing what happened instead of "what was happening."  Hence, the statements were testimonial.

Alonso's Reply at 15 (quoting <u>Davis v. Washington</u>, 547 U.S. 813, 817, 827 (2006); <u>Hammon v. Indiana</u>, 547 U.S. at 819-20).  Alonso thus argues that the Court "should guard against the invitation to draw the line between testimonial and nontestimonial hearsay based on whether the statement was made to law enforcement or a civilian."  Alonso's Reply at 16.  Regarding <u>Davis v. Washington</u> specifically, Alonso suggests that "the Court indicated that its opinion was focused on 'interrogations' by law enforcement officers, and thus it was 'unnecessary to consider whether and when statement made to someone other than law enforcement personnel are "testimonial." '"  Alonso's Reply at 16.  Alonso argues, however, that "[t]he *Davis* Court did . . . cite as authority decisions suggesting that statements made to civilians may be testimonial and thus subject to Confrontation Clause limitations."  Alonso's Reply at 16.  Indeed, Alonso provides:

> Recently in *Ohio v. Clark*, __ U.S. __, 135 S.Ct. 2173 (2015), the Court held that statements by a three-year-old boy to his preschool teacher implicating his stepfather as an abuser were not testimonial.  The Court, however, declined to hold that statements to civilians can never be testimonial.  The Court stated that "[b]ecause at least some statements to individuals who are not law enforcement

officers could conceivably raise confrontation concerns, we decline to adopt a categorical rule excluding them from the Sixth Amendment's reach.

Alonso's Reply at 16-17.  Returning, then, to Crawford v. Washington, Alonso argues that "[a]ccepting, as we must, the Court's conclusion that the "primary object" of the Framer's concern in crafting the Sixth Amendment was testimonial hearsay, does not mean that testimonial hearsay was the Framer's sole or only concern.  Primary and sole are not synonymous."  Alonso's Reply at 17.  Alonso thus explains that the Supreme Court "observed that '[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule.'"  Alonso's Reply at 18 (quoting Crawford v. Washington, 541 U.S. at 54 (citing Lilly v. Virginia, 527 U.S. 116, 134 (1999)).

Alonso then concedes that "the Court, first in *Davis*/*Hammon* and subsequently in *Whorton v. Bocking*, 549 U.S. 406 (2006), did suggest that the Confrontation Clause is only concerned with testimonial hearsay.  However, neither of *Davis*/*Hammon* nor *Whorton* involved joint jury trials or even cited *Bruton* or the *Bruton* line of cases."  Alonso's Reply at 18.  Alonso explains that

> *Whorton v. Bocking* dealt with the narrow issue of whether Crawford was retroactive under the rules of *Teague v. Lane*, 489 U.S. 288 (1989).  Those who would expand the holding to *Crawford* to abolish *Bruton* have seized on the Court's comment in *Whorton* that "under Crawford, . . . the Confrontation Clause has no application to [nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability.". . .  Given the extremely narrow issue in *Whorton*, i.e. whether *Crawford* is retroactive, this statement is dicta.

Alonso's Reply at 18 (quoting Whorton v. Bocking, 549 U.S. at 420).  Alonso argues that:

> In *Crawford*, the Supreme Court held that testimonial statements are inadmissible against a criminal defendant unless the declarant is unavailable and the defendant has had "a prior opportunity for cross-examination."  *Crawford*, 549 U.S. at 68.  This is not a repudiation of *Bruton*.  In *Whorton*, the Supreme Court simply held that the rule announced in *Crawford* did not apply retroactively.  *Whorton*, 549 U.S. at 421.  This also is not a repudiation of *Bruton*.  Neither *Crawford* nor *Whorton* considered the applicability of *Bruton* to non-testimonial statements of

co-defendants, and neither case imposed a bar to the applicability of the Confrontation Clause to non-testimonial statements in general.

Alonso's reply at 19. Alonso thus asserts that "in *Whorton* we learn that *Crawford* had nothing to do with Due Process. Accordingly, *Crawford* left the Due Process analysis of *Bruton* undisturbed. Due Process as a basis for *Bruton*, separate and apart from the Sixth Amendment Confrontation Clause, was untouched by *Crawford* and therefore *Bruton* survives *Crawford*." Alonso's Reply at 20.

Alonso next addresses the possibility that, "[i]f, as the government argues, the admissibility of Troup's statements is not circumscribed by the Constitution, then, according to the government's theory, admissibility is determined solely by reference to the rules of evidence." Alonso's Reply at 20. In that respect, the Supreme Court, Alonso argues, has held that "a co-defendant's confession is not admissible against a fellow defendant." Alonso's Reply at 20. Indeed, Alonso provides:

> In *Lee*, 476 U.S. at 541 the Court stated, "the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." In fifty years of interpreting *Bruton* the Court has never departed from this rule. The *Bruton* line of cases rather address whether particular remedial measures (limiting instructions and redactions) ameliorate the error occasioned by the improper introduction of a co-defendant's statement.

Alonso's Reply at 21. Alonso concludes:

> Synthesizing Crawford and its progeny with F.R.E. 804(b)(3) supports the conclusion that Troup's statements are in fact testimonial. For example, *Davis* suggested that statements are testimonial when the purpose is "to establish past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. F.R.E. 804(b)(3) is an exception to the hearsay rule that applies when the statement "at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." The overlap between the *Davis* formulation of testimonial and Rule 804(b)(3) is apparent. If a statement does indeed "subject the declarant to criminal liability" then by necessity it is "potentially relevant to later criminal prosecution." To make out the evidentiary foundation necessary for admission under F.R.E. 804(b)(3) will

concomitantly satisfy the *Davis* articulation of what it means for a statement to be testimonial.

Alonso's Reply at 21-22.  Further, Alonso concedes that

> *Smalls* operates as binding precedent upon the Court.  Nonetheless, the Supreme Court has yet to define the precise contours of the definition of testimonial statements.  Nor, has any Supreme Court decision called into question or stated that Crawford in any way limits the *Bruton* rule.  To the contrary, the *Crawford* opinion cites *Bruton* with approval indicating that it is an example of the Supreme Court upholding core Sixth Amendment confrontation clause principles.

Alonso's Reply at 22.  Ultimately, Alonso argues:

> It is [his] position that Troup's statements implicating the defendant will ultimately be found to be within the broader class of testimonial statements as described in *Crawford*.  Moreover, the defense maintains that the *Bruton* rule remains as an independent component of the Sixth Amendment's Confrontation Clause protections.  The special concerns raised by a co-defendant statement implicating the defendant reaching the jury without testing by adversarial cross-examination would require exclusion even if it did not somehow technically fall within the range of testimonial statements.  These concerns were laid out in *Bruton* and re-emphasized in *Crawford*.  Troup's statements are not recorded or written.  The supposed hearers of Troup's statements presumably are cooperating government witnesses.  There is no practical and reliable way to redact the contents.  Thus, severance is the appropriate remedy.  Although it would not fully cure the problem, in the absence of severance, the defendant would request that the Court order redaction.

Alonso's Reply at 23.

## 22.    The May 9, 2017, Hearing.

At the May 9, 2017, hearing, the Court severed the Second Superseding Indictment into two trial groupings.  See Transcript of Hearing at 28:18-29:2 (taken May 9, 2017)(Court)("May Tr.").[10]  One of the trial groupings that the Court created is Counts 1-5, and Counts 13-16; the other grouping Counts 6-12.  See May Tr. at 28:18-29:2 (Court).  The Court welcomed, however, further argument regarding severance as well as argument regarding which trial grouping would

---

[10]The Court's citations to the transcript of the hearing refers to the court reporters original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

go first.  See May Tr. at 29:3-30:7 (Court).  The Court quickly resolved that issue, as Perez -- the

only Defendant in the Counts 6-12 grouping who was opposed to a continuance of the July 10,

2017, trial date -- agreed to the continuance in light of the Court's severance order.  See May Tr.

at 32:20-33:6 (Villa).  Accordingly, the pieces fell into place for the Counts 1-5 and 13-16 trial

grouping going first, because Gonzales -- the only Defendant in that grouping opposed to a

continuance of the July 10, 2017, trial date -- maintained his refusal to consent to a continuance.

See May Tr. at 33:23-34:9 (Court); 37:1-22 (Johnson).  The Court then allowed Gonzales to

argue Gonzales' Amended Motion to Sever, beginning the hearing in earnest.  See May Tr. at

37:25-38:6 (Court).

> Gonzales argued:
>
> The problem respectfully with grouping counts 13 through 16 with Count 1
> through 5 is that what you have is you have evidence that's going to come in in
> counts one through five that would otherwise not be admissible in counts 13
> through 16.  And here's what's more important, Your Honor is that when you
> look at the dates of the incidents, for example Count 1.  Mr. Gonzales was 11
> years old when Count 1 occurred.  Counts one through five involved homicides in
> a prison setting.  Validated SNM members, Mr. Santos Gonzales is neither an
> SNM member nor an associate.  That's our position.

May Tr. at 38:1-19 (Johnson).  The Court responded that "I [] understand, and this is something

I'll say, I can't assume anybody's case, you know, I know what your argument is, but I can't

assume Government's case, I can't assume your case.  When I'm mak[ing] necessary decisions I

just have to assume they're disputed, right?"  May Tr. at 38:21-39:1 (Court).  Gonzales argued

that he understood the Court's position and that, at this stage, the Court is engaged in a facial

challenge to the indictment in the context of his motion to sever, but that

> the Government needs to prove [] that Number 1 [] at the time the offense was
> committed that an enterprise affecting interstate commerce existed and the
> problem with going to trial [on Counts] one through five with counts 13 . . .
> through 16 [is counts 13-16] post-date the original waive [of] indictments in this
> case.  Now, essentially the SNM was dismantled in December of 2015.  So you

have counts 14 through 16 occurring in February of 2016.  So you have evidence
or if you look at the indictment itself, since you're limited to the facial, to the
information in the indictment, the SNM was allegedly started sometime in the
1980s, you have incidents or crimes occurring in 2001, 2007, as charged in counts
one through five. . . .  These all predate the effective dismantling of the SNM with
the first waive of indictments in December of 2015.  So then we get February of
2016, when by the Government's even own admission the SNM had been
essentially dismantled.  So then what you're going to have is this prejudicial
evidence from counts one through five when the SNM was allegedly still active
and had not yet been dism[antled] and that's going to spill over and prejudice the
defendants in counts 14 through 16, because these counts occurred after the SNM
had been dismantled and that is obvious and evident from the face of the
indictment and secondly, Your Honor, the Government needs to prove that the
enterprise at the time that the incident occurred was engaging in racketeering
activity.  So I would submit to the Court, Your Honor, that the evidence that
would be admitted in counts one through five would result in substantial prejudice
as to Mr. Gonzales, because effectively there was no SNM or had been
dismantled by the Government by December of 2015, so I would respectfully
submit Your Honor that actually counts 14 through 16 should be tried separately
because of this very dangerous issue that you're going to have, the Government
wants counts through five tried with counts 14 through 16.  Because 14 through
16 suffer from tremendous fatal deficien[cies] one of those as I mentioned begins
that there was no enterprise.

May Tr. at 39:6-40:24 (Johnson).  Gonzales also argued to the Court that his assertion of his

Speedy Trial rights, and refusal to consent to a continuance, was pitting his speedy trial rights

against co-Defendants' effective assistance of counsel rights, because the Defendants named in

Counts 1-5 "simply are not ready" to try their case in July considering the more complex nature

of those murder Counts.  May Tr. at 41:22-43:25 (Johnson).  The Court then indicated that

splitting up the trials any further would probably be breaking up the Second Superseding

Indictment up too much and that the cases Gonzales cited where the trial courts sliced up multi-

defendant indictments into very small groupings were not persuasive.  See May Tr. at 43:1-3

(Court).  Gonzales nevertheless persisted, arguing that

I would submit that the evidence that is before the Court here actually necessitates
[sever]ing counts 13 through 16 primarily because you're going to have
introduction of evidence from 2001, 2012, 2007 when the SNM [had] not been

dismantled which would not be admissible in counts 13 through 16. So I would
on behalf plaintiff . . . ask that the Court [se]ver 13 through 16.

May Tr. at 43:4-12 (Johnson). The Court noted Gonzales' argument, but stated:

> I think it's premature for me to decide what evidence is coming in and not. I
> know a lot of people argued <u>Bruton</u> problems and things like that, but the
> Government, I [have] opinions out there they can see what I do with [<u>Bruton</u>].
> They've got to make a calculation . . . whether they'll get their evidence [in] but I
> thin[k] [it is] a little early for me to say this is in and that's out.

May Tr. at 43:17-25 (Court).

J. Gallegos then argued that, should the Court consider further severance of the Second

Superseding Indictment, he would not be opposed to being tried twice, because if the Court

severed Counts 1-5 from 13-16, he would be the only Defendant in that position. <u>See</u> May Tr. at

45:8-46:12 (Benjamin). J. Gallegos also argued that the Court should not be allowing the United

States to make decisions as to what should be admitted, suggesting that the Court had stated as

much. <u>See</u> May Tr. at 46:5-12 (Benjamin). The Court stopped J. Gallegos, and stated:

> No, that's not what I'm saying at all. I'm saying that right now they, they're over
> here opposing continu[ances], agreeing to continu[ances,] opposing severance,
> agreeing to certain things, y'all are making some arguments like <u>Bruton</u>
> arguments. Ms. Johnson did say this evidence is inadmissible. I can't make those
> fine-tooth [determinations]. This is not a motion in limine. So when in they're
> making their positions over here and they're taking their positions, they've got to
> make a decision for themselves, not for the Court, for themselves as to whether
> they can get evidence in. So that's all I'm doing. I'm kind of. It's a warning to
> them, not to you, it's a warning to them that if they're going to sit here and
> oppose [severances] and things like that, they better thin[k] about their evidence.
> I can't make a determination at this point whether certain evidence is going to be
> admissible or not. So they're not going to determine the evidence in the case, I
> am. But they've got make professional judgments as they oppose motions to
> sever.

May Tr. at 46:13-47:9 (Court).

B. Garcia then argued in favor of Gonzales' Motion to Sever, because

if you deny that motion for severance, what I think effectively happens is that we
place Santos Gonzalez's right to a speed[y] trial[,] we elevate that above the right

> for a fair trial to all of the counts one through five defendants. Those are the oldest cases Your Honor. I represent Billy [Garcia,] Billy is charged in counts one and two [and] those counts occurred in 2001. It's incredibly more difficult to investigate a 2001 murder than . . . a 2007, 2012, or the incidents that occurred just a couple of years ago. So I think if it's not severed, then what I think what we are telling all of the other defendants, the Billy Garcias, the Alan Pattersons, the Edward Troups who are charged in Counts 1 and 2 that they're right to a fair trial is less important than Santos Gonzalez's right to a speedy trial.

May Tr. at 48:6-22 (Cooper). B. Garcia then reiterated that he is "not anywhere close to being ready," so I think the only way to save that time, Judge, is to sever the Santos Gonzales matter, give him his right to a Speedy Trial." May Tr. at 49:25-50:2 (Cooper). Troup then addressed the Court and noted that he had intended to have a university professor, who had submitted an affidavit attached to Troup's Motion to Sever in favor of severance in this matter, testify before the Court to make a complete record on his motion. See May Tr. at 51:5-12 (Burke). The Court indicated that it had every intention of keeping an open mind as it heard argument regarding Troup's Motion to Sever, and testimony from whomever, and also that it had read and understood the Lieberman Decl., but that it was hearing argument on Gonzales' Motion to Sever at the present time. See May Tr. at 51:23-52:2 (Court).

The United States argued next and maintained that it would prefer the Court keep the trial together. See May Tr. at 53:1-2 (Castellano). Specifically regarding Gonzales' Motion to Sever, the United States explained:

> Everyone points to the face of the indictment indicating that these are se[perate] acts but if you look at the face of the indictment what it establishes is one of the elements that we would have to prove at trial and that's the ongoing nature of the enterprise. If you have an . . . enterprise there is a requirement to show the ongoing nature of the enterprise. So if the SNM started in approximately 1980 and exists until today that's evidence we would have to prove. I disagree with Ms. Johnson that arresting . . . members of the SNM [dismantled the enterprise]. . . . I mean this case [is] a per[fect] example of that[,] we have a number of murders that occurred in prison and I think a number of the defendants would disagree with the fact that the [SNM] is now at an end. So arresting and imprisoning members of the SNM does not dismantle the enterprise. There is an

> SNM in the state system and also a[n] SNM in the federal system. So this doesn't
> put an end to anything at this point.

May Tr. at 53:21-54:15 (Castellano). The United States reiterated that it was prepared to prove

at trial that this is an ongoing enterprise, and agreed with the Court that "in terms of judicial

economy two trials is better than three. It is the same evidence." May Tr. at 54:19-55:9

(Castellano). Regarding Bruton v. United States, the United States agreed with the Court that the

evidentiary issues are not ripe for a determination and that, specifically, as it pertains to co-

Defendants' statements, the United States has experience redacting such statements to avoid a

Bruton v. United States problem at the trial. See May Tr. at 55:10-56:21 (Castellano, Court).

Indeed, the United States indicated that, as it relates to Bruton v. United States, and its attempt to

introduce evidence of co-Defendants' statements, proceeding in a joint trial as it intends is done

"at our own peril, Your Honor. We get that." May Tr. at 57:3-4 (Castellano).

Gonzales then addressed the Bruton v. United States issue, and the Court stated: "It

sounds like the Government is willing to run the risk that you may be right on this Bruton

problem and I may keep this evidence out and they still want to try the cases to[gether] rather

than separate." May Tr. at 58:24-59:3 (Court). Gonzales disagreed, and argued:

> I would submit to the Court that . . . clearly Ms. Gutierrez made statements [--]
> post arrest statements [--] that implicate Mr. Gonzales. Essentially her statements
> put Mr. Gonzales at the scene of a crime [and] those are clearly in[culpatory]
> statements that raise a Bruton issue if we're tried with Ms. Gutierrez. Ms.
> [Rodriguez] also implicated Mr. Gonzales, not just what one co-defendant said
> during the alleged commission of the crime but simply you have these defendants
> making post arrest statements to the Government about what each co-defendant
> allegedly did. And Your Honor, I would submit to the Court that simply
> redacting, cutting out Mr. Gonzales' name is going to, is not going to cure the
> problem.

May Tr. at 59:4-18 (Johnson).  Gonzales also represented to the Court that he was ready for trial, and that he was not making a misrepresentation about that fact.  See May Tr. at 61:32-62:2 (Johnson, Court).  At this point, the Court explained:

> [I] have thought long and hard about the motion to sever that I expected [Erlinda Johnson, Gonzales' counsel] to renew today.  I wanted to get a feel for what people had to say after I made the order of [severance and] I wanted to see if the Government, after I severed this way what their position would be[.]  [When I] really focus [on] what I think is one of the main things is when I turn to this jury and start instructing this jury, when they can compartmentalize the evidence, and I think on Ms. Johnson's client that they can.  They can compartmental[ize and] I think it's going to be reduced.  I know there [are] going to be some evidentiary issues, I don't minimize those in any way and we're going to have to work through authorization but I think as far as giving Ms. Johnson her client a fair trial, I think I have gone a long ways toward doing that, and so I'm not inclined to grant the . . . motion to sever.  Down [the] road if it pops up and Government starts looking at its evidence and wants to rethink[], we can certainly look at it . . . but I think at the present time [the] severance that's been granted is going to solve a lot of the problems for Ms. Johnson and Mr. Go[nzales], and so I'm not inclined to grant it.

May Tr. at 62:7-63:7 (Court).  The Court also stated that

> when Ms. Johnson stands up and says Mr. Gonzales is not part of the SNM gang, I'm not in a position to say one way or [the other] but it concerns me that I need to get her case to a trial.  [But] I'm not inclined to give a de facto severance [for] the reasons I've already stated.  So I'm going to deny the request.

May Tr. at 82:13-19 (Court).

In relevant part, the Court next addressed Alonso's Motion to Sever.  See Transcript of Hearing at 48:2, taken May 10, 2017 (Chambers)("2 May Tr.").[11]  Alonso suggested that "the severance motion has largely been decided," and that he understands

> that [the Court] even said that some dead [horses] deserve to be beat and this is one that does but I'm not going to do it.  I think that the severance issue is going to continue to come up.  But I'm not going to [waste] your time today arguing things you've already read and thought about and ruled on.

---

[11]The May 9, 2017, hearing continued into May 10, 2017.  The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

2 May Tr. at 48:2-11 (Chambers).  Alonso wished to argue in depth Bruton v. United States,

because

> I heard Your Honor yesterday say that in your experience that most Bruton issues
> can [b]e cured with some scissors and white out[.]  I well, let me say it a little bit
> differently.  I have had success, I can't speak for the entire body of law whether
> every Bruton problem can be solved that way but you just work hard at it.  And
> generally my experience has been that Ibuprofen [is] able to solve the problem.  If
> you can't solve it . . . [t]he evidence doesn't com[e in.].

2 May Tr. at 48:16-49:2 (Chambers).  The Court agreed, stating "[t]hat's the reason I warned the

Government that you know they've got to start staring at this stuff.  This is pretty serious[.]

[M]y experience has been though that we usually can massage the things[,] but I can't speak for

the body of Bruton issues out there."  2 May Tr. at 49:3-7 (Court).  Alonso agreed, but explained

that

> many B[ruton] issues can be resolved with proper redaction and the Government
> even acknowledges as much in their response.  It's a little more dicey in this case
> than in some other cases.  Frequently the [Bruton] issue involves perhaps a
> written statement of a co-defendant which can be edited, consistent with . . . the
> rules. . . .  [I]t's a little trickier though when you're dealing here with confidential
> informants who will probably just be testifying as to what someone told them.
> They are, you are, near relying on the informant to make the necessary
> re[daction].

2 May Tr. at 49:10-23 (Chambers).  Alonso then explained that, here,

> the fact that these Bruton issues arise in the context of statements made to
> Government informants leads me then to another part of the discussion.  And that
> is the Government takes the position the statements made to Government
> informants are beyond the reach of Bruton.  And they take the position that
> Bruton only applies to statements made to law enforcement officers.

2 May Tr. at 49:25-50:8 (Chambers).  The Court indicated that it was inclined to agree with

Alonso, saying: "I'm not sure I see that distinction so maybe I can be educated on it but I have

not thought Bruton drew that distinction.  That's a Crawford type issue.  That's not really a

Bruton type issue, I'm not sure I draw that distinction."  2 May Tr. at 50:18-23 (Court).  Alonso

argued that the Court was "very wise the[n]. . . .  <u>Bruton</u> doesn't draw that distinction.  <u>Bruton</u> makes no distinction whatsoever between s[tatements to] law enforcement officers or to civilians."  2 May Tr. at 50:23-51:3 (Chambers).  The Court surmised that maybe

> what they're getting into and I thought about this earlier there may be a hearsay problem with you know the statements in the first place but that's an initial problem rather than a <u>Bruton</u> problem[.]  [Y]ou've always got a hearsay problem when you've got a <u>Bruton</u> problem but those are two different testimony decision[s] . . . .  [M]aybe they're  anticipating that it doesn't have a <u>Crawford</u> issue . . . .  I mean I guess that's one of the things we're going to have to determine is whether these cooperators[']statements that the cooperators are picking up are those <u>Crawford</u> hearsay problems.

2 May Tr. at 51:4-21 (Court).  Alonso agreed, acknowledging that "<u>Crawford</u> created in some people's minds issues as to the continued vitality of <u>Bruton</u>."  2 May Tr. at 52:2-5 (Chambers).  Alonso maintained, however, that some statements which are made to persons not in law enforcement can still come within the purview of the Confrontation Clause, primarily because

> <u>Crawford</u> was certainly a Sixth Amendment confrontation clause case but that's not all it was.  <u>Crawford</u> does not rest solely on the confrontation [clause] it also has due process . . . [and] the constitutional underpinnings of <u>Bruton</u> are not sole[ly] [the] confrontation clause or . . .  it's also due process so . . . to the extent that <u>Crawford</u> is a [confrontation] clause [case and] impacted the foundations of <u>Bruton</u>, it didn't touch the due process foundations of <u>Bruton</u>.

2 May Tr. at 52:16-53:3 (Chambers).  Further, Alonso argued,

> <u>Bruton</u> doesn't draw a distinction between statements of law enforcement or civilians or statements made during formal interviews or during casual conversation it simply doesn't draw that distinction and what's important is to remember the history of <u>Bruton</u>, <u>Bruton</u> was decided two years after rule 14 was amended  . . . and . . . the advisory committee notes to rule 14 . . . also draw[] no distinction between statements to law enforcement and statements to anybody else.  There is no distinctions drawn in rule 14.

2 May Tr. at 53:4-14 (Chambers).  Alonso also alerted the Court to the recent case "<u>Ohio v. Clark</u> . . . [,] [where the Supreme Court] specifically said that at least some statements made to

individuals who are not law enforcement could come within the confrontation clause."  2 May

Tr. at 54:14-16 (Chambers).

Alonso then addressed the "Tenth Circuit [and] this opinion of theirs in <u>Smalls</u> . . .

[which] is wrongly decided but of course I understand that you are obliged to follow it, even if

it's wrong."  2 May Tr. at 54:16-23 (Chambers).  Alonso explained, however, that "<u>Smalls</u> leaves

undisturbed Rule 14 and the Court's discretion under Rule 14 to take appropriate remedial

steps," and

> I think it's when you consider the Government's argument and indeed the Tenth
> Circuit's interpretation of <u>Bruton</u> and <u>Crawford</u>, the results adopting that
> particular interpretation are stunning.  If you -- if <u>Smalls</u> is the law, and if the
> Tenth Circuit's reading of <u>Crawford</u> and <u>Bruton</u> is correct, then it is possible for a
> defendant to be convicted entirely through unconfronted hearsay.  It's possible
> under the Government's argument.

2 May Tr. at 54:23-55:9 (Chambers).  The Court was not so sure, positing that

> before you run it through the <u>Crawford</u> -- though, and even an expanded <u>Crawford</u>
> and <u>Bruton</u>, you still have to go through first the hurdle of the hearsay right?  I
> mean, if it's blocked by the hearsay rules, it's not coming in . . .  so when you say
> that they would be convicted entirely on hearsay -- well, that's not possible, right?

2 May Tr. at 55:12-21 (Court).  Alonso disagreed, arguing that, "under <u>Smalls</u>," that is possible,

because "<u>Smalls</u> said that a statement made by a co-defendant to an informant is admissible

against a co-defendant because it's nontestimonial."  2 May Tr. at 55:25-56:3 (Chambers).  The

Court was hesitant and suggested that the co-Defendant's statement "has to satisfy some hearsay

exception or be nonhearsay before we even get to the constitutional issue."  2 May Tr. at 56:5-7

(Court).  Alonso provided:

> Well, the hearsay exception that would be relied upon is statement against penal
> interests  . . .  but <u>Smalls</u> doesn't say that.  <u>Smalls</u> says it's coming in against
> everybody . . . and that's frightening, because could you be, a defendant could be
> convicted based entirely on unconfronted [hearsay] and here's how [that wor]ks
> Your Honor, you've got three guys who get arrested for mu[rder] and they get
> placed in separate cells.  And they all talk to their cell ma[te], and during those

conversations they implicate a fourth person.  Under <u>Smalls</u>, and under the Government's interpretation of <u>Crawford</u> and <u>Bruton</u>, that fourth person could be convicted based on the testimony of the three cell mates.  Based on the testimony of people who know nothing at all about the case except what a co-defendant told them.  That fourth person could be convicted without any ability to cross-examination a witness who has personal knowledge of the defendants' own conduct.  That's what <u>Smalls</u> says.  And that is scary.  That, but that's what <u>Smalls</u> says and that's what the Government is arguing, and we're going to have to [wrestle] with these <u>Bruton</u> issues at some point, and maybe I'm jumping the gun here.

2 May Tr. at 56:8-57:8 (Chambers).  The Court asked Alonso:

Well, do you think that the briefing that is supplied is robust enough for me to make those rulings at this point?  Or is it [] I mean, my [impression] was that it was more general, and that everybody was flagging this as a reason why I should [sever], but it wasn't robust in the sense like I would see with a motion in limine, where I'm really got to sit down and decide whether evidence is coming in or not.  What's your thoughts about the state of the record?"

2 May Tr. at 57:9-18 (Court).  Alonso stated that the Court was in possession of the "reports that deal with the statements that I believe implicate [<u>Bruton</u>]" and that if "Your Honor believes that you need to actually hear from the informants to testify what the declarant said, then I suppose we can do tha[t]."  2 May Tr. at 57:18-58:1 (Chambers).  The Court indicated it did not think that testimony

was probably necessary . . . .  But I do have to exactly know, I've got to know what the statements are precisely.  There can't be any fudging on it, because like I said, if we're cutting and pa[sting] and redacting and leading it's got to be pinpoint.  And then I've got to know what the Government i[]s relying on with the two step process, and maybe even three step here to get the evidence in.  So I'm not sure I need the witness as long as there is precision about the statement that's coming in.

2 May Tr. at 58:2-11 (Court).

B. Garcia then argued about "<u>Bruton</u> and <u>Crawford</u>," and stated that when Alonso argued he

talked about the concept that there was perhaps a due process layer for the analysis the Court needs to undertake[] and if we read <u>Bruton</u> and we read <u>Lee</u> []

and Lilly, at the basis of all of those decision[s], even though they're in confrontation clause terms, they're really talking about the reliability and the fairness involved in the introduction of certain categories of statements and in Lee and in Lilly and prior to Crawford, these statements were historically considered unreliable; that is statements by informants in jail houses. Now, when the Smalls decision was undertaken it was in 2000, I believe. Since 2000, the United States Supreme Court . . . has actually veered in its decision and suggested perhaps there is a [due] process concept here that we need to look at. I would point to the Melendez-Diaz v. Massachusetts case in 2009. . . and in that decision the Supreme Court stated that the Sixth Amendment cont[em]plates two class[es] of witnesses, those against the defendant and those in favor. The prosecution must produce the former. The defendant may call the latter. There is not a third category of witnesses helpful for the prosecution, but somehow immune from confrontation, so the Supreme Court is saying that . . . the prosecution's position that there is a category of witnesses against the defendant that do not need to be confro[nted] [--] Melendez-Diaz rejected that. [T]hey also quoted, we're talking about Thomas' . . . concurrence in part and dissent in part in the Davis decision. But his concurrence specifically stated that the confrontation clause also reaches and prohibits prosecutorial use of technically informal statements when used by the prosecution to evade the confrontation clause.

2 May Tr. at 59:11-60:22 (Castle).  B. Garcia continued:

Now, what I'm suggesting and obviously I'm not arguing [Alonso's] motion. But I think since, what's on the table here, essentially is some ideas about whether, how the Court should deal with what we[]re traditionally considered Bruton statements is that the Court would need to undertake not just a hearsay analysis and a strict confrontation clause analysis but also a due process [analysis] . . . [like] where the Court [considers] voluntariness of statements, identifications made [at a] a crime scene[,] [or] the admissibility of expert testimony in areas that have not been, that are novel. In all these instances, the Court [] under[]takes it's due process role to make sure that unreliable evidence doesn't come before the jur[y] and so all I'm suggest[ing] here is that the Supreme Court seems to be moving this direction away from the Smalls strict analysis [which arose] probably because it was close in time after Crawford, and that, and I don't think Smalls, I haven't read in it a while[,] says that there isn't a due process layer that needs be reviewed, and so I think the suggestion . . . may have been by Mr. Chambers that the Court might need to take a look at these statements is a good one because perhaps within the statements the Court can see its reliable. Now, I understand that sounds a lot like Ohio v. Roberts the old standard, but there seems to be . . . a movement back away from the simple concept, is it testimonial or not. And I can't read Melendez-Diaz in any other way than when they said that the confrontation right applies to statements against a defendant.

2 May Tr. at 60:23-62:4 (Castle).

The United States then argued and ultimately stated Alonso "is upset that we're relying on the Smalls case, but the Smalls case is the law of the Circuit and he acknowledges as much in his reply to our response. So the real question is whether or not the Court is willing to overturn Tenth Circuit precedent." 2 May Tr. at 62:18-23 (Castellano). The Court, of course, is not willing to overturn the Tenth Circuit, but instead asked the United States if it sees "anything that in the Supreme Court law since Smalls [--] because it's getting a little bit down the pike [--] that would call into question what the Tenth Circuit did in Smalls." 2 May Tr. at 63:2-5 (Court). The Court also suggested that, "whe[n] the Tenth Circuit first came out with their interpretation of Crawford, they didn't quite nail it. And they had to backtrack from that with subsequent Tenth Circuit opinions is my impression." 2 May Tr. at 63:9-13 (Court). The United States responded by stating:

> [L]et's focus on the statements at issue here for starters. Okay, so this is page 11 of our response and it states that Troup, defendant Troup . . . confessed . . . [w]hen I say confessed it's not to law enforcement it's to another inmate. Troup [confesses] to . . . being a part of two murders in which two people were strangled to death at the southern New Mexico correctional facility at Las Cruces New Mexico. Troup stated that during one of the murders he held F.S.[] at least while the defendant Mr. [Alonso] strangled him to death [with a draw string]. . . . [T]he next is Troup bragged about being a part of the murder [of] F.S. and [said] that the defendant [Alonso] was ordered to kill F.S. [T]he other statement . . . was in 2001 Edward Troup admitted to the CHS that he and [Alonso] . . . had killed F.S. so you can see why it's of concern to Mr. Alonso. Because when you make statements to someone in prison like this, it's nontestimonial, meaning you don't expect this statement to show up in court some day, like you would a confession to law enforcement.

2 May Tr. at 63:16-64:12 (Castellano). The United States then reiterated that Troup made his statements to random prisoners, who were not

> at the time . . . cooperating with anybody. It was talk amongst gang members. So at that time they had no incentives, they were not being paid, nothing of the sort. So, once again there was no expectation that these admissions would come into Court someday. So, once they're nontestimonial, they're outside of Crawford. So we're not talking about Crawford, we're not talking about Bruton.

2 May Tr. at 64:17-25 (Castellano).  The Court was not convinced, and indicated "[t]hat's the leap I'm struggling with . . . why [are] we not talking about Bruton?"  2 May Tr. at 65:1-2 (Court).  The United States responded: "Because Bruton refers to the right to the confrontation where [a] confession was made to a[] Government agent and introduced at a joint trial.  So that is . . . testimonial." 2 May Tr. at 65:3-6 (Castellano).  The Court conceded that such was "certainly the factual situation of Bruton," but pressed the United States whether it could really limit the language in that fashion.  2 May Tr. at 65:7-9 (Court).  The United States argued:

> Not to our facts, because this is a statement against interests that falls under rule 804.  [H]earsay statements against interests are inherently reliable traditionally because those are statements you don't make unless they're believed to be true.  Well, they fall outside of hearsay, they fall outside of Bruton because once again we're not talk building testimonial statements here we're talking about nontestimonial.

2 May Tr. at 65:10-19 (Castellano).  The Court further pressed the United States, stating that, although "the hearsay statement is easily satisfied if you have the witness who heard it . . . on the stand," "[b]ut that doesn't get us . . . that doesn't solve the Bruton problem, right?"  2 May Tr. at 65:23-66:3 (Court).  The United States maintained:

> I don't think we're in Bruton, Your Honor.  Because those are testimonial statements, traditionally testimonial statements because they're given to law enforcement and once we give statements to law enforcement we expect them to show up in Court against you so it's testimonial in that way.  Under these circumstances, Smalls tells us that if I murder somebody with Ms. Armijo and I tell Mr. Beck about it, the statement comes in against both myself and Ms. Armijo.  That's what Smalls tells us, that is the law of the Circuit as it stands now.

2 May Tr. at 66:4-14 (Castellano).  The Court was not persuaded: "Well, you may be right[.] I'm struggling with squaring that with Bruton, though, but you may be right as far as Smalls."  2 May Tr. at 66:17-19 (Court).

At this point, the United States explained that <u>United States v. Smalls</u> involved three defendants who murdered a cooperator in jail, and one of the defendants made statements to "an informant, a person not known to him as an informant[,] I'm not sure was even cooperating with the Government at the time until the admissions were taken[, and] the informant then informed law enforcement of the situation."  2 May Tr. at 70:15-71:4 (Castellano).  The United States continued, explaining that eventually law enforcement

> went back with a recorder and the informant took additional statements from [one of the defendants].  And in <u>Smalls</u> what happened was the statements all became admissible against [the defendant who made them], [as well as the other two defendants whom the defendant had implicated].  And [there] is a similar situation here.  So regarding what you were asking about, part of what's in the <u>Smalls</u> case says the text of the confrontation clause reflects focus on the testimonial hearsay.  It applies to witnesses against the accused.  In other words those who bear testimony[,] citing to Webster's American dictionary[,] testimony in turn is typically a . . . legal declaration or affirmation made for the [purpose of] proving some fact.  An [ac]cuser makes a formal s[tatement to] Government officers there is testimony in a sense that a person who makes a casual remark to an acquaintance does not.

2 May Tr. at 71:5-22 (Castellano).  The United States reiterated: "The difference . . . is <u>Bruton</u> involved testimonial statements and therefore the confrontation clause, <u>Smalls</u> involves nontestimonial statements that fall outside of the confrontation cla[use] and because it's a statement against interest[] it also falls outside of hearsay.  So that's one of the distinctions."  2 May Tr. at 72:21-73:2 (Castellano).

Alonso then took the opportunity to respond and argued: "Your Honor observed . . . that you were having a difficult time squaring <u>Smalls</u> with <u>Bruton</u>.  And you're not alone.  As evidenced by Judge Kelly's vigorous dissent in <u>Smalls</u>."  2 May Tr. at 74:22-25 (Chambers).  Alonso continued:

> The Government first argues, just categorically they state as if it's a matter of settled law that <u>Bruton</u> does not apply to nontestimonial statements.  And that is a matter that remains a matter of dispute, Your Honor.  The Supreme Court has

certainly never ruled that.  Those who would use <u>Crawford</u> to gut <u>Bruton</u> se[ize] upon this language in [<u>Wharton</u>] which I've cited to the Court.  And there was some language by the Court in <u>Wharton</u> . . . that suggest[s] that <u>Bruton</u> doesn't apply to nontestimonial [hearsay statements] but that . . . was not a ruling.  The issue in <u>Wharton</u> . . . was a very narrow issue.  It had to deal with <u>Crawford</u>'s retroactive application under the rules of <u>Teague v. Lane</u>.  And so that's [the] only issue in <u>Wharton</u> . . . but people have taken this language in [<u>Wharton</u>] and taken it completely out of its context []and started stating as a matter of established law that <u>Bruton</u> doesn't apply to nontestimonial hearsay.  And the Supreme Court has never said that.  They never said it in [<u>Bruton</u>], they've never overruled <u>Bruton</u>, so it's a stretch.

2 May Tr. at 75:16-76:14 (Chambers).  Further, regarding <u>Crawford v. Washington</u>, Alonso

argued

the right to be confronted with a witness against him is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding . . . .  The Court went on to say, accomplice confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule citing <u>Lilly v[.] Virginia</u>.  So if a statement against pen[]al interests is not within a firmly ro[o]ted exception to a hearsay rule, it necessarily could not have been an exception that existed at the time of the founding.

2 May Tr. at 76:25-77:12 (Chambers).  Indeed, Alonso suggested,

when you're thinking about whether a statement against penal interests is inherently reliable, it might be as to the person who is inculpating himself.  But there is certainly no reliability as when he inculpates other people.  And the United States Supreme Court has made that recognition as well in a case that I cited in my reply, the <u>Williamson [v. United States</u>, 512 U.S. 600-01 (1994)] case, where the Court said, and I quote, "In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.  The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else," end quote.

2 May Tr. at 77:13-78:5 (Chambers).  Alonso then concluded, explaining:

Your Honor, you know, this is a real co[ol] issue.  It's fascinating.  But the fact of the matter is no matter what you do with <u>Crawford</u> no matter what [you do] with <u>Bruton</u> no matter what you do with <u>Smalls</u> no matter how you slice that . . . it doesn't change one fact.  Rule 14 still exists.  <u>Smalls</u>, <u>Crawford</u> did not touch rule 14.  And rule 14 gives you the discretion [].  . . .  [H]ere's what rule 14 says, if the

joinder of offense or defendants in []an indictment and information whose consolidation for trial appears to prejudice a defendant or the Government, the Court may in order separate trials of the counts, [sever] the defendants' trials or provide any other relief that justice requires.  You have discretion.  That discretion is untouched by Smalls, by Crawford, by anything else.  You have the discretion to make this fair.  And in making that, in exercising your discretion your discretion should be informed by things such as Rule 403.  And the unfair prejudice that comes to people like Mr. Alonso, if the [United States] gets [it]s wish to put in Troup's statements, just without any limitation.

2 May Tr. at 78:6-79:3 (Chambers).

The Court, having considered Alonso's argument, then stated:

Well I'm not going to grant the motion to sever at this time.  Obviously I'm going to have to continue to monitor this case and the evidence that's coming in.  And I'm going to have to probably start making some rulings, so maybe I'll use this motion to drill down a little bit more on the Smalls and Bruton and Crawford issues to give some guidance in this case.  I am inclined to think that given the law that we have here in the Tenth Circuit that . . . this is not a sound basis for declining or for granting the motion to [se]ver.  It does concern me a little bit letting in some statements that even though the Tenth Circuit may be [al]lowing at the present time . . . letting them come in, and down the road the[] landscape may change on us, and decisions that I make []now based upon Tenth Circuit law may change because of the Supreme Court's changing character.  But we all have to deal with that.  And so I think the decision to keep Count 3 in the case and keep Alonso and Troup [together] remains sound but I'm still going to continue to take hard looks at this to make sure that everybody gets a fair trial.

2 May Tr. at 79:8-80:5 (Court).  The parties continued to argue, however, because the United

States then asserted:

I'd also point the Court to the 2014 Smalls decision[,] it's the decision that came out post-trial, post-conviction.  Related to a discussion of prior consisten[t] statements it says that Smalls also argues that for a prior consistent statement to be admissible under the confrontation clause[.]  [I]t must meet pre[-C]rawford standards of reliability but the confrontation clause has no application to nontestimonial statements and therefore permits their admission even if they [lack] indicia of [reliability].

2 May Tr. at 80:7-17 (Castellano).  The Court was unsure why the United States had made that

assertion, because "I don't think there is any disagreement on that, right.  I mean that the

confrontation clause has no application to nontestimonial statements . . .  I'm not trying to butt

- 126 -

up against that.  But I am trying to -- I mean as [Alonso] put it[,] we are talking about Troup's

statements, right?"  2 May Tr. at 80:20-81:1 (Court).  Alonso then argued "the law is what it is,

Crawford says what it says . . . about whether the confrontation clause applies to nontestimonial

hearsay.  But that doesn't answer the question."  2 May Tr. at 81:16-19 (Chambers).  Alonso

continued that

> [i]t . . . doesn't answer the question about the limits of that about the borders of
> the confrontation clause, because the Crawford Court specifically declined to
> define what was testimonial and what was nontestimon[ial] and furthermore . . . in
> cases since Crawford such as Davis and Hammon . . . which were companion
> cases the Court has provided scant they haven't helped much in defining what is
> testimonial and what is nontestimonial.

2 May Tr. at 81:23-82:9 (Chambers).  The Court interjected, stating "it certainly seems to me

that this would fall safely into the nontestimonial" category, because "I mean this one doesn't

seem to me on the edges as much as some other scenarios I've seen."  2 May Tr. at 82:14-16

(Court).  Alonso responded:

> I believe it's testimonial, and my position is derived from a reading of both Davis
> . . . and Ham[mon].  But Davis and Hammon, and the distinction that the Court
> drew in Davis and Hammon was a statement is nontestimonial if it is made in the
> context of an ongoing emergency.  It is testimonial if it is describing past events.

2 May Tr. at 82:17-24 (Chambers).  The Court replied:

> That's more where you come up on the scene and you're sorting out police are
> there, but you can still have some nontestimonial statements with police around.
> You can't draw a bright line and say just because the cops are there it's
> testimonial. . . .  But if you're in a prison cell and you've got a guy talking to [a]
> prisoner, seems to me that's pretty classic nontestimonial?

2 May Tr. at 82:24-83:4 (Court).  Alonso maintained:

> In Davis . . . and in Hammon they're both domestic violence cases, and in Davis
> [and] Hammon, cops talked to the victim of a domestic violence incident.  In
> Davis the hearsay statements were made by [a] domestic dispute victim to a 9/11
> operator . . . after ongoing emergency . . .  [and t]he Court found that statements
> in Davis were made during an ongoing emergency in which the declarant was
> speaking about events as they were actually happening rather than describing past

events. . . .   Accordingly, the <u>Davis</u> Court held that the statements were nontestimonial.  In <u>Hammon</u> the statements were also made by the victim of a domestic dispute.  But unlike <u>Davis</u>, not in the context an ongoing [emergency], but rather as an investigation into . . . what happened.  In <u>Hammon</u> although the statements at issue were made within minutes of the crime, the Court found that there was no ongoing emergency and the declarant was describing what happened instead of what was happening.  Hence, the statements were testimonial.  Well, here, the statements that are at issue here are not describing [] current events as they are happening.  They are describing what happened.

2 May Tr. at 83:14-84:14 (Chambers).  The Court disagreed:

I think those are unique.  I'm probably not going to buy that distinction.  Because otherwise, anytime you have somebody giving historical facts you're saying that that's testimonial, and that seems to me I think you've got to still have the presence of the cops.  That's what's making <u>Hammon</u> and <u>Davis</u> so important is that you've got law enforcement. . . .  It's almost the excited utterance exception to the <u>Crawford</u> rule [-- in that] you're in the middle of the fray and people are saying what they're saying they're not going to toss that evidence out. . . . . [Here, y]ou've got somebody that you know is just talking on the phone to somebody else and say I killed that person and they're talking to their cousin and they said they killed somebody.  And you know, how would that not be nontestimonial?

2 May Tr. at 84:14-85:9 (Court).  Alonso reiterated:

Well, the <u>Davis</u> Court actually specifically cites cases, Your Honor, and I'm looking for them in my brief.  One of them is an ancient case you'll probably have to dust off -- wipe the dust off -- this book if you want to read the opinion[.  I]t's found at 1 Leach 199, a case, <u>King v[.] Brasier</u>, [from] 1799.  But <u>Davis</u> cites it.  The United States Supreme Court relied on it.  I'll leave for another day my opinion about whether the United States Supreme Court [should be] relying on international authority but they did here.  And there it was not a statement to a cop.  It was not.  And that was in 1799.  And in 2015 they reached the same conclusion in <u>Ohio v[.] Clark</u>, where they specifically said, at least some statements to individuals who are not law enforcement [could] conceivably raise confrontation concerns[.  W]e decline to adopt a categorical rule excluding them from [the] Sixth Amendment's reach.

2 May Tr. at 85:10-86:2 (Chambers).  The Court commiserated and stated:

I think that's true.  That's what I keep asking Mr. Castellano.  Who is this cooperator, tell me about him.  I mean you[,] know, is this a person that you know that is being paid by law [enforcement][,] or something like that[?]  So I agree with that statement.  You can't just say well it was another prisoner.  Wait, tell me about that prisoner.  So I agree, but I think to just make it a functional test [that is

informative.  The question of w]as it past history or was it current event is sweeping too broadly.  I think you'd gut the testimon[ial] [and] nontestimonial distinctions that have been developed since <u>Crawford</u> so I'm probably not going to go that direction.

2 May Tr. at 86:3-15 (Court).  Alonso assured the Court: "I didn't say that <u>Davis</u> and <u>Hammon</u> defined testimonial because I don't think it does define it.  I think it provides some guidance, though.  That's about the best I can do."  2 May Tr. at 86:16-19 (Chambers).

> A. Gallegos then argued A. Gallegos' Motion to Sever, and explained to the Court:
>
> Judge I won't [take] I don't think too much of your time.  These issues have been sort of litigated.  The Court has [it] looks like a decision on this or at least [has] proposed a decision.  But to the extent that the Court will remain fluid as its indicated on these issues we would like to say a few things on behalf of Mr. Andrew Gallegos specifically.

Transcript of Hearing at 35:20-26:2 (taken May 11, 2017)(Roberts)("3 May Tr.").[12]  A. Gallegos then argued that Counts 4 and 5 were so dissimilar from the other Counts -- because they occurred outside of prison, were remote in time, and were not linked to SNM and instead reflect a personal "beef" -- that they counsel in favor of severance of those Counts.  3 May Tr. at 37:2-38:25 (Roberts).  Indeed, A. Gallegos argued, there is also a disparity of evidence:

> [T]hey don't have any DNA evidence.  They don't have any fingerprint evidence.  There is no confession, there is no statement regarding this that I'm aware of.  There was supposedly a wire that was withdrawn, so there is no wire.  There is no tape recording that I'm aware of.  There is no video evidence.  The body of Mr. Burns was found sometime after he was killed at a different location.  So I'm not sure if we have evidence as to when exactly he was killed.  He was apparently shot in a different location and brought to a remote location in the Bosque and burned from the evidence.  But we don't know exactly when that happened, when that occurred.  The gang connection in terms of what the Government has proposed is somewhat tenuous[.  T]his feeder gang concept that they've put forward, it's not clear, even against how or who ordered this murder where it came from, how it came down.

---

[12]The May 9, 2017, hearing also continued into May 11, 2017.  The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

3 May Tr. at 40:1-18 (Roberts).   Regarding A. Gallegos' co-Defendant in Counts 4 and 5, however, A. Gallegos argued that J. Gallegos has been charged in six Counts total, reflecting a stark disparity in culpability.   See 3 May Tr. at 40:19-41:9 (Roberts).   Further, should the Court try Counts 4 and 5 alongside the other Counts, A. Gallegos argued that the evidence would begin to stack against all of A. Gallegos' co-Defendants, resulting in a tipped scale against his innocence by the process of spillover prejudice.   See 3 May Tr. at 41:10-43:18 (Roberts).

The United States then argued, and primarily reiterated that A. Gallegos was not the only Defendant in this case who is charged in only one Count.   See 3 May Tr. at 44:2-23 (Castellano). Further, the United States maintained that A. Gallegos was in a "feeder gang into the SNM.   We also believe he's an SNM gang member[.   W]e will have evidence at trial indicating that he is and that people who have lived with him indicate that he [has] an SNM gang mentality."   3 May Tr. at 45:1-5 (Castellano).   The Court then changed subject and inquired: "Does the gang function, is it the Government's theory . . . that the G[ang] functions even when some of these people go to federal prison?"   3 May Tr. at 45:11-14 (Court).   The United States indicated that, yes, indeed, SNM persisted in federal prison; however "they're not [the] biggest fish in the pond in the federal system so they may belong to each other and recognize as S[NM] but also fall under other larger gangs."   3 May Tr. at 45:23-46:1 (Castellano).   The United States then reiterated its theory that the crimes alleged in Counts 4 and 5 were done at the SNM enterprise activity's behest, and that the evidence in support of their theory is not as weak as A. Gallegos paints it.   See 3 May Tr. at 46:5-47:3 (Castellano).   A. Gallegos did not reply, and the Court indicated:

> Well, as I [have] indicated . . . I thought long and hard about it and I was working
> even this morning putting charts into the opinion that I have written that's getting
> a little bit longer, and as I indicated I [will roll all of these motions into the
> opinion, but] at the present time I'm not inclined to sever it further.   I think I've

broken it out in a way that is manageable, increase[s] the fairness to all the defendants. I tried to reduce to a minimum any prejudice, and still try to be efficient and get these things moving toward trial so I think I've done the best I can on severance. I'll continue to look at it. I'll continue to evaluate it as we bar[r]el forward, but at the present time I'm inclined to keep it on the path I've indicated . . . [s]o I'm going to deny this motion. But [I] will continue to look at the shape of the case as we get closer, but at the present time that's how I'm going to di[vide] it up and get ready to get these trial.

3 May Tr. at 47:12-48:6 (Court).

### 23.    The May 19, 2017, Hearing.

Troup argued Troup's Motion to Sever at the May 19, 2017, hearing. See Transcript of Hearing (taken May 19, 2017)("4 May Tr.")(Burke).[13] Troup recognized that the Court had already met much of his concerns by severing the trial into two trial groupings at the previous hearing, but argued nonetheless in favor of further severance of the Counts 1 and 2 Defendants. See 4 May Tr. at 13:2-14:4 (Burke). Troup also, in response to the Court's question, supported the Court's analysis regarding the import that administrative and logistical concerns in its rule 14 inquiry regarding prejudice to the United States or the Defendants. See 4 May Tr. at 14:12-19 (Burke). Troup told the Court that the cases which support such an inquiry included "Gould . . . Zafiro . . . [and] Fox v. Ward." 4 May Tr. at 15:5-20 (Burke). Regarding the further severance of the Counts 1 and 2 Defendants, Troup provided:

> [T]he prejudice for the Counts 1 and 2 defendants is that [the] Adrian Burns homicide is nasty, and that's Counts 4 and 5. And then you have -- we would have Counts 13 through 16, and we have this old homicide, you know, 2001. And yet the events that are portrayed in Counts 13 through 16 not only bring us out of prison into the real world, so to speak, and that's the 2012 homicide involving Adrian Burns. We then have the beatdown of Jose Gomez, and that's Counts 14 through 16. And then there was an incident, and that's in 2016. So expanding from 2001 forward to 2012, and then 2016, does create some prejudice for what I'm calling the Counts 1 and 2 defendants, the five people.

---

[13]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

4 May Tr. at 17:2-16 (Burke).  Regarding the jury's ability to compartmentalize the different Counts and offenses charged in the new Counts 1-5 and 13-16 trial grouping, however, Troup conceded that the arrangement alleviated some of the prejudice, and represented to the Court that he was "glad that we are not in a trial with the Counts 6 through 12 defendants, because that would have been -- I don't know how we could have -- how a jury could have compartmentalized all of that."  4 May Tr. at 18:12-16 (Burke).  Troup argued that the potential for spillover prejudice still exists in his trial grouping, and reminded the Court that the Counts 1 and 2 Defendants were alleged to have committed conduct in 2001, and many of them were out of prison when the rest of the Second Superseding Indictment's charged conduct occurred.  See 4 May Tr. at 19:2-20:25 (Burke).  B. Garcia then argued and explained to the Court that, in its rule 14 analysis and in its consideration of the management of a joint trial, there is "also the independent authority of the Court to supervise its docket."  4 May Tr. at 21:11-25 (Castle).  The Court was hesitant and suggested that the United States has argued there must be a showing of prejudice to the Defendants before it can consider administrative or logistical concerns.  See 4 May Tr. at 22:22-23:3 (Court).  B. Garcia indicated, in response, that "the inherent authority of the Court to manage its docket is [a] good reason.  And the separation of powers favors the judiciary in managing its docket, not the executive branch in defining, essentially, how this Court is going to provide justice to the defendants."  4 May Tr. at 23:6-11 (Castle).

The United States then argued and explained that its position which the Court is referencing comes from "a quote [in] the Gould case, which talks about first looking at antagonistic defenses and prejudice, before getting to the meaning of the first two factors, followed by the Court's administration of justice."  4 May Tr. at 24:2-14 (Castellano).  Perhaps then recognizing that its position was in relation to an exploration of prejudice in the context of

- 132 -

antagonistic defenses specifically, the United States represented to the Court: "We think the Court has discretion. We think the Court has exercised that discretion. If the Court's going to leave the case severed this way, we really don't have much more to say about it." 4 May Tr. at 24:21-25 (Castellano). The Court then asked the United States opinion regarding the jury's ability to compartmentalize the evidence which would be presented at the two trials, to which the United States responded:

> I do think we can compartmentalize, Your Honor. I mean, there are individual counts, and within those counts there are individual stories. So the jury will hear about a Garza murder, a Castillo murder, a Sanchez murder, a Burns murder. So each of those, even though there is an overarching presentation of the evidence, we still have to prove each of those individual murders. And I think they have their own story, and the jury can compartmentalize each of those stories.

4 May Tr. at 26:4-13 (Castellano). That ended the argument on severance, and the Court decided not to grant any further severance for the Counts 1 and 2 Defendants at this time. See 4 May Tr. at 26:21-22 (Court).

## LAW REGARDING RULE 8(b) JOINDER

Rule 8 of the Federal Rules of Criminal Procedure is the procedural vehicle for joinder of both of offenses and of defendants in a criminal proceeding. Rule 8 provides:

> (a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(a)-(b). In the Tenth Circuit rule 8(b) governs the propriety of joinder of multiple defendants and their alleged offenses into one indictment. See United States v.

- 133 -

Eagleton, 417 F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment.  Such joinder [of offenses] is governed by Rule 8(b).").  See also 1A Wright et al., Fed. Practice & Procedure: Criminal § 143 (4th ed.)(2017)("The conventional wisdom is that [Rule 8(a)] applies only to the prosecution of a single defendant; if more than one defendant is involved, Rule 8(b) states the test for joinder."); United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012)("Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)."); United States v. Walker, 657 F.3d 160, 169 (3d Cir. 2011)("Rule 8(a) applies only to prosecutions involving a single defendant, and[,] in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b).").  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro v. United States, 506 U.S. at 537).

Under rule 8(b), then, multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Rule 8(b), along with its phrase "same series of acts or transactions," Fed. R. Crim. P. 8(b), "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980).  In light of rule 8(b)'s broad construction, courts conclude that a conspiracy count -- albeit not necessary -- is sufficient to warrant joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act.

> Although the Indictment in this case charged six different robberies alleged to
> have been committed by different defendants over a more than two-year period, it

also alleged that the defendants conspired and agreed with each other to commit all six of the robberies. Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder.

United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015), cert. denied, 136 S. Ct. 377 (2015). See also 1A Wright, et al., Fed. Practice & Procedure: Criminal § 144 ("All courts agree that a conspiracy count normally provides a sufficient allegation that the defendants engaged in the same series of acts or transactions, making joinder permissible . . . . Not all of the defendants charged as conspirators need be charged on all substantive counts . . . .").

Although rule 8(b) allows grand juries to indict defendants together in the same charging instrument "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," Fed. R. Crim. P. 8(b), and federal courts generally prefer that defendants who are indicted together be tried together, see Zafiro v. United States, 506 U.S. at 537 (explaining the "preference in the federal system for joint trials of defendants who are indicted together"), a trial court may still sever defendants and offenses, and order separate trials -- under rule 14(a) of the Federal Rules of Criminal Procedure -- if joinder appears to otherwise prejudice a defendant. See Fed. R. Crim. P. 14(a). The Supreme Court has recognized, however, that joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" Zafiro v. United States, 506 U.S. at 537 (citing Richardson v. Marsh, 481 U.S. at 210). Some courts, then, will "'apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008)(quoting United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007)).

## LAW REGARDING RULE 14(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure a court may order separate trials if joinder appears to prejudice a defendant.  See Fed. R. Crim. P. 14(a).  Although rule 8 is liberally and broadly applied in the interest of efficiency, rule 14(a) envisions circumstances that may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights.  Rule 14(a) provides, in relevant part: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Under rule 14(a), then, the court may sever the trials of co-defendants when "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  See Zafiro v. United States, 506 U.S. at 538 (using rule 14 as the standard for a severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance).  The decision to sever is "within the sound discretion of the trial court."  United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)).  See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting severance "is peculiarly within the discretion of the trial court")(citations omitted).

"Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case."  United States v. Hall, 473 F.3d at 1302 (quoting United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984)).  Again, "[j]oint trials of defendants who are indicted together are preferred, because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).

- 136 -

Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial." Cummings v. Evans, 161 F.3d at 619 (citing United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir. 1993)).  The prejudice standard envisioned by rule 14 thus requires a showing of actual prejudice, not merely a showing that a defendant "may have a better chance of acquittal in separate trials."  United States v. Pursley, 474 F.3d at 766.  To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'"  United States v. Pursley, 474 F.3d at 766 (quoting Zafiro v. United States, 506 U.S. at 539).  Significantly, "[r]ule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."  Zafiro v. United States, 506 U.S. at 538-39.

In interpreting Rule 14, Courts of Appeals have explored the risk that "mutually antagonistic" or "irreconcilable" defenses may supply the prejudice needed in some circumstances as to warrant severance.  Zafiro v. United States, 506 U.S. at 538 (citing, e.g., United States v. Benton, 852 F.2d 1456, 1469 (6th Cir. 1988); United States v. Smith, 788 F.2d 663, 668 (10th Cir. 1986); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir. 1984); United States v. Berkowitz, 662 F.2d 1127, 1133-1134 (5th Cir. 1981); United States v. Haldeman, 559 F.2d 31, 71-72 (D.C. Cir. 1976)).  The Tenth Circuit, in United States v. Pursley, provided that, in such a scenario, where a defendant seeks severance because of mutually antagonistic defenses as compared to co-defendants,

> a trial court engages in a three step inquiry.  First, it must determine whether the defenses presented are "so antagonistic that they are mutually exclusive."  *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989).  Second, because "[m]utually antagonistic defenses are not prejudicial per se," a defendant must further show "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or

innocence." *Zafiro v. United States*, 506 U.S. [at] 539[].  Third, if the first two factors are met, the trial court exercises its discretion and "weigh[s] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Peveto*, 881 F.2d at 857.

United States v. Pursley, 474 F.3d at 765.  In a court's consideration of such a scenario, "defenses are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'"  United States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d 987, 992 (10th Cir. 1994)).  Defendants must show that "'the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.'"  United States v. Pursley, 474 F.3d at 765-66 (quoting United States v. Peveto, 881 F.2d at 857 (holding mutually exclusive defenses where one defendant said he was preparing to be an informant and invited the other defendant, a purported drug dealer, to his house to gather information, while the other defendant said he was innocently at the house and the first defendant held the second defendant against his will)).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion.  See United States v. Pursley, 474 F.3d at 765.  In exercising its discretion, however, the court should "weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  United States v. Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-68 (10th Cir. 1989)).  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Bailey, 952 F.2d at 365 (citation omitted).

Essentially, severance will be appropriate when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. On a rule 14(a) motion, the defendant bears the "heavy burden" of demonstrating a risk of prejudice from continued joinder. United States v. Bailey, 952 F.2d at 365 n.4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)). The Supreme Court has stated:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *See* 481 U.S., at 211.

Zafiro v. United States, 506 U.S. at 539 (emphasis added)(citations omitted).

With respect to a district court's application of rule 14 in practice, particularly in the context of multi-count and multi-defendant RICO, VICAR, or conspiracy indictments, one district court has explained:

> Most often, severance of defendants will be required to protect the rights of defendants against undue prejudice resulting from joinder. In other situations, severance may be required, or at least the argument for severance will be bolstered, by the physical limitations of the courthouse and the logistical difficulties of attempting to conduct a complex multi-defendant trial.

United States v. Gray, 173 F. Supp. 2d 1, 7-8 (D.D.C. 2001)(Lamberth, J.).   Another district

court addressed the possibility of prejudicial joinder of the defendants

> deriving from the number of defendants and the number of counts, the complexity
> of the indictment, estimated length of the trial, disparities in the amount or type of
> proof offered against the defendants, disparities in the degrees of involvement by
> defendants in the overall scheme, possible conflict between various defense
> theories or trial strategies; and, especially, prejudice from evidence admitted only
> against co-defendants but which is inadmissible or excluded as to a particular
> defendant.

United States v. Gallo, 668 F. Supp. at 749.    Indeed, in citing to United States v. Gallo, which

involved a sixteen-defendant prosecution on a twenty-two-count indictment, the United States v.

Gray court approved of "the finding of the *Gallo* court that multi-defendant 'mega-trials' may

warrant some severance."   United States v. Gray, 173 F. Supp. at 8.   Specifically, the United

States v. Gray court explained that, in United States v. Gallo:

> After weighing the potential prejudice against defendants, the court decided that
> the dispositive factor counseling severance was judicial efficiency.   [United States
> v. Gallo, 668 F. Supp.] at 753 ("[T]he prejudices to the defendants are not clearly
> dispositive . . . , we might be reluctant to grant such severances on Rule 14 alone.
> . . .   [W]e question the traditional assumption that denial of severance . . .
> promotes efficiency.").

United States v. Gray, 173 F. Supp. at 8-9.   Indeed, the United States v. Gray court stated that

"[m]any of the factors that counseled against complete joinder of defendants [in United States v.

Gallo] are also persuasive in the instant case" and so it concluded:

> [T]hat despite the general presumption favoring joinder, some form of severance
> is necessary because of the physical limitations of the courtroom and hardship on
> the jurors, the defendants, and the Court.   Severance, however, should be of the
> most limited form necessary to satisfy those interests, because the Court finds that
> joinder of defendants, to the extent possible, will preserve judicial resources and
> permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.   Accordingly, the United States v. Gray court severed

a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on

logistical concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court also considered that

> [s]everal defendants have moved for complete severance or other joint trial configurations based on Rule 14 concerns of prejudice against defendants.  In order to prevail upon a claim for severance, [those] defendant[s] must show that joinder would violate that defendant's constitutional fair trial rights, or would "prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10.  Although the United States v. Gray court had already severed the indictment in that case into two trial groupings to alleviate the risk of prejudice to the defendants by logistical inefficiency and impracticality, the court was still open to further requests for severance of individual defendants upon a specific showing that joinder in either of the trial groupings still ran afoul of Zafiro v. United States and rule 14.  See United States v. Gray, 173 F. Supp. at 10.  The rule 14 inquiry regarding the propriety of joinder is ongoing, and as the United States v. Gray court concluded in severing that case's indictment into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants."  United States v. Gray, 173 F. Supp. at 18.

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant

has had a prior opportunity to cross-examine."  541 U.S. at 59.  In <u>Davis v. Washington</u>, 547

U.S. 813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a

'formal declaration made by the declarant that, when objectively considered, indicates' that the

'primary purpose of the [statement is] to establish or prove past events potentially relevant to

later criminal prosecution.'"    <u>United States v. Morgan</u>, 748 F.3d 1024, 1048 (10th

Cir. 2014)(alteration in original)(quoting <u>United States v. Smalls</u>, 605 F.3d at 777-78).  <u>Accord</u>

<u>United States v. Chaco</u>, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing

developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial

statement).

   In <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009), the Supreme Court addressed

whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit

that the substance which police seized from the defendant was cocaine of a certain amount,

violated the Confrontation Clause.  <u>See</u> 557 U.S. at 307.  The Supreme Court first found that

such affidavits were testimonial, because they were "made under circumstances which would

lead an objective witness reasonably to believe that the statement would be available for use at a

later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to

provide prima facie evidence of the content of the substance seized.  557 U.S. at 310.  The

Supreme Court then used the affidavit introduced by the prosecution to outline its concerns

regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]"  At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320 (citation omitted).  Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause.  See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.").  The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."  Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710, 2715 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'").

The importance of the Confrontation Clause's application is further delineated by the Supreme Court's consideration of the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face, which -- except in rare cases -- will violate a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, No. 04-2362, 2006 WL 1228953, *7-9 (D.N.M. Mar. 7, 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the

Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant. See 497 U.S. at 860. While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." 497 U.S. at 845.[14]

The Supreme Court in Maryland v. Craig recognized that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings." 497 U.S. at 846. The Supreme Court in Maryland v. Craig also acknowledged the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

The Supreme Court explained in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case."

---

[14]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence. See Crawford v. Washington, 541 U.S. at 61.

497 U.S. at 849 (internal quotation marks omitted).  The Supreme Court emphasized that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."  497 U.S. at 850.

While the issue is decidedly less clear, it is unlikely that a violation of a defendant's Confrontation Clause rights occur when he calls one of his own witnesses who is aligned with him by videoconference or telephonically.   See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)).   Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others.").  The need for "adversariness" is not present when the witness is aligned with the defendant.  Maryland v. Craig, 497 U.S. at 845.  The Supreme Court spoke in Crawford v. Washington about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant.  541 U.S. at 58.  The Federal Rules of Evidence, for example, generally do not permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness.  See Fed. R. Evid. 611(c).[15]  A defendant might also waive a Confrontation Clause challenge by calling his own witness by videoconference or telephonically.  See United States v. Lopez-Medina, 596 F.3d

_____

[15]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.    Ordinarily,   the   court   should   allow   leading   questions:   (1)   on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  Fed. R. Evid. 611(c) (bold in original).

716, 730-734 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule.").

Like many constitutional rights, a defendant may choose to waive his Confrontation Clause rights.  In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty.  See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit has recognized that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial.  See United States v. Lopez-Medina, 596 F.3d at 730-734 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit stated: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule."  United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy."  Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting one of its witnesses' videotaped deposition.  See Earhart v. Konteh, 589 F.3d 337, 344 (6th Cir. 2009).  The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the

videotape deposition.  In Bailey, we held that a criminal defendant waived his right to confrontation by entering into a quid pro quo agreement with a state prosecutor.  Id. at 657.  The petitioner in Bailey had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance.  Id.  Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape.  Id.

Earhart v. Konteh, 589 F.3d at 344.  Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court.  See 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

### LAW REGARDING CO-DEFENDANTS' STATEMENTS AND THE CONFRONTATION CLAUSE AFTER CRAWFORD V. WASHINGTON: BRUTON V. UNITED STATES AND NONTESTIMONIAL HEARSAY

Bruton v. United States, 391 U.S. 123 (1968), held that, in a joint trial, a defendant's Sixth Amendment right of confrontation is violated, regardless of any limiting instruction that might be given to the jury, by admitting the confession of a non-testifying codefendant which implicates the defendant.  In Bruton v. United States, George Bruton and William Evans were jointly tried for robbery, and, upon his arrest, Evans gave a confession to a postal inspector in which he admitted that he and Bruton had committed the robbery.  See 391 U.S. at 124.  At trial, the prosecution was allowed to introduce Evans' confession, and the trial court -- perhaps recognizing that evidence might pose a problem -- gave a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton."  391 U.S. at 125.  Both Bruton and Evans were convicted, but, as mentioned, the Supreme Court held that it was constitutional error to admit into evidence the incriminating statement which co-defendant Evans made and which implicated defendant Bruton, and that this error was not otherwise cured by a limiting instruction.  See 391 U.S. at 128.  The Supreme Court noted that a co-defendant's

confession is admissible under hearsay rules only against the confessing co-defendant, which is why the Supreme Court contemplated whether a limiting instruction could satisfactorily cure the problem by instructing jurors to ignore the confession in determining non-confessing co-defendant's guilt or innocence.  See 391 U.S. at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant.").  The Supreme Court said that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . .  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36.  The Supreme Court also stated:

> If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence.

391 U.S. at 130-31.  Ultimately, under Bruton v. United States, the Supreme Court held that there is a substantial threat that the jury would ignore a limiting instruction and use the co-defendant's confession as evidence of the other non-confessing defendant's guilt, and thus such confessions are inadmissible unless the codefendant testifies.  See 391 U.S. at 137.

The Supreme Court subsequently explored its Bruton v. United States doctrine in Richardson v. Marsh, 481 U.S. at 200, and Gray v. Maryland, 523 U.S. at 195.  In Richardson v. Marsh, Clarissa Marsh, Benjamin Williams and Kareem Martin faced murder charges.  See 481

U.S. at 202.  Both Marsh and Williams were tried jointly, but Williams did not testify at the joint

trial.  See 481 U.S. at 202, 204.  At trial, the prosecution introduced evidence of Williams'

confession by which he implicated co-Defendants Marsh and Martin, as well as himself.  See

481 U.S. at 203-04.  The trial court redacted the confession to remove references to Marsh, and

"omitted all indication that anyone other than Martin and Williams participated in the crime."

481 U.S. at 203.  The trial court also instructed the jury to "not use it (Williams' confession) in

any way against (Marsh)."  481 U.S. at 204.  The Supreme Court ultimately concluded that the

trial court did not err by admitting Williams' confession as it had been redacted, because "the

confession was not incriminating on its face."  481 U.S. at 208.  Accordingly, the Supreme Court

affirmed that its Bruton v. United States holding could be satisfied in practice by redaction.  See

Richardson v. Marsh, 481 U.S. at 209 (referring to Bruton v. United States, 391 U.S. at 134

n.10).

In Gray v. Maryland, Anthony Bell and Kevin Gray were tried jointly for murder.  See

Gray v. Maryland, 523 U.S. at 188.  After Bell was arrested, he told the police that he, Gray, and

a third person were responsible for the victim's death.  See Gray v. Maryland, 523 U.S. at 188.

At Bell and Gray's joint trial, the trial court permitted introduction into evidence a redacted

version of Bell's confession.  See 523 U.S. at 188.  The detective who testified about Bell's

confession said "deleted" or "deletion" whenever the name of Gray or the third participant

appeared.  523 U.S. at 188.  Immediately thereafter, however, the detective testified that the

police arrested Gray only upon Bell's confession.  See 523 U.S. at 189.  A written copy of Bell's

confession was introduced with the names of Gray and the third person having been replaced

with blank spaces that were separated by commas.  See 523 U.S. at 189.  The jury was also

instructed that Bell's confession could not be used as evidence against Gray.  See 523 U.S. at 189.

The Supreme Court acknowledged that, in Richardson v. Marsh, it had, indeed, held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants will not violate Bruton v. United States.  See Gray v. Maryland, 523 U.S. at 190-91.  The Supreme Court noted, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland referenced the existence of the non-confessing defendant, because the government merely replaced Gray's name with the word "deleted" or a blank space.  Gray v. Maryland, 523 U.S. at 192.  The Supreme Court concluded that a redaction that replaced a defendant's name with an obvious indication of deletion falls within Bruton v. United States' purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton [v. United States*'] unredacted statements that, in our view, the law must require the same result."  Gray v. Maryland, 523 U.S. at 189.

Then came Crawford v. Washington.  See Crawford v. Washington, 541 U.S. at 36.  In Crawford v. Washington, the Supreme Court essentially held that that the Confrontation Clause is violated when hearsay is "testimonial," admitted against a criminal defendant, and the hearsay declarant does not testify at the defendant's trial, unless (i) the declarant was unavailable for trial, and (ii) the defendant was previously able to cross-examine the declarant.  See Crawford v. Washington, 541 U.S. at 59-61.  Crawford v. Washington held that the Confrontation Clause is violated only when testimonial hearsay is admitted against a defendant and the defendant is not given the opportunity to cross-examine the declarant.  See U.S. at 59-61.  This holding necessarily implicates the logic underlying Bruton v. United States, because, to the extent that

Bruton v. United States protects the rights afforded to criminal defendants under the Confrontation Clause, Crawford v. Washington makes clear that the Confrontation Clause protects only against testimonial hearsay that is admitted against a defendant absent the opportunity to cross-examine the declarant. See 541 U.S. at 59-61. With respect to what such a "testimonial" statement might be, however, the Supreme Court in Crawford v. Washington did not provide a definition to differentiate "testimonial" from "non-testimonial" hearsay, and instead noted only that "various formulations" or "articulations" or "definitions" of "testimonial" could be posited; and, apart from citing examples of statements that would qualify as testimonial under any definition, the Supreme Court specifically declined to undertake crafting a controlling definition of "testimonial." 541 U.S. at 51-53. The Court indeed reiterated that it was not providing a definition for "testimonial": "[W]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" Crawford v. Washington, 541 U.S. at 68. The Supreme Court has provided, however, that statements made by defendants to fellow prisoners are not testimonial, meaning they would not fall under the purview of the Confrontation Clause after Crawford v. Washington. See Davis v. Washington, 547 U.S. at 825 (providing that statements from one prisoner to another are "clearly" not testimonial).

Subsequent to Crawford v. Washington, many Courts of Appeal have, accordingly, superseded Bruton v. United States' analysis with Crawford v. Washington's. That is, the Courts of Appeal have held that Crawford v. Washington limited Bruton v. United States to protect co-defendants only from testimonial statements. See United States v. Dale, 2010 WL 2977410, at *9 (8th Cir. 2010)(holding that defendant's statements to prisoner were not testimonial and therefore did not violate co-defendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010)(holding that defendant's recorded telephone statements to

his mother were non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because Bruton v. United States is based on the Confrontation Clause, then it also only applies to testimonial statements, and any non-testimonial statement is not subject to it); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008)("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").  Some federal courts have concluded otherwise, however, and continue to apply Bruton v. United States to nontestimonial statements despite Crawford v. Washington.  See United States v. Ramos-Cardenas, 524 F.3d 600, 609-10 (5th Cir. 2008)(holding that, although the co-defendant's statements were nontestimonial, because they were entered against the declarant, Bruton v. United States governs the analysis and not Crawford v. Washington); United States v. Williams, 2010 WL 3909480 (E.D. Va. 2010)(Cacheris, J.).

Although the weight of precedent counsels otherwise, the Court pauses to discuss the conclusion in United States v. Williams, a non-binding, out-of-circuit opinion.  United States v. Williams, involved co-defendants Marvin Wayne Williams, Jr., Freddie Wigenton, and Deshawn Anderson, who were charged with conspiracy to distribute crack cocaine, intentional killing while engaged in drug trafficking, and use of a firearm during a drug offense relating in death.  See 2010 WL 3909480, at *1.  These defendants allegedly made statements to several witnesses incriminating both themselves and their co-defendants, and the United States intended to introduce those statements at their joint trial.  See United States v. Williams, 2010 WL 3909480, at *1.  The United States District Court for the Eastern District of Virginia concluded that, while the Supreme Court in Crawford v. Washington had held that the Confrontation Clause covers

testimonial hearsay, it did not hold that the Clause exclusively covers only testimonial hearsay. See United States v. Williams, 2010 WL 3909480, at *2-3 (citing Crawford v. Washington, 541 U.S. at 60-61 ("Members of this Court and academics have suggested . . . two proposals: First, that we apply the Confrontation Clause only to testimonial statements. . . .  Second, that we impose an absolute bar to statements that are testimonial. . . .  In [White v. Illinois, 502 U.S. 346, 352-53 (1992)], we considered the first proposal and rejected it.  Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether it survives our decision today. . . .")).  The Eastern District of Virginia court reasoned that it is "highly unlikely that Crawford (a case that expanded the Confrontation Clause's application) would have eviscerated Bruton (a Confrontation Clause case that Crawford cited) so casually." United States v. Williams, 2010 WL 3909480, at *4.  Thus, the Eastern District of Virginia court held that Bruton v. United States can still apply to the co-defendants' statements at issue in that case and bar their introduction regardless whether they were non-testimonial.  See United States v. Williams, 2010 WL 3909480, at *4.[16]

The Tenth Circuit has foreclosed the analysis underlying United States v. Williams and instead dictates the Court's inevitable conclusion that Crawford v. Washington limited Bruton v.

---

[16]Some academics agree.  See Colin Miller, Avoiding A Confrontation? How Courts Have Erred in Finding That Nontestimonial Hearsay Is Beyond the Scope of the Bruton Doctrine, 77 Brook. L. Rev. 625, 661 (2012)(arguing that: "[T]here are two possible interpretations of the scope of the Bruton doctrine in the wake of Crawford and its progeny -- and that each should preclude the admission of nontestimonial codefendant confessions.  The first is that Crawford, like its predecessor, had nothing to say about the inadmissibility of codefendant confessions under the Bruton doctrine, meaning that courts should find that even nontestimonial codefendant statements can violate the doctrine.  The second is that Crawford deconstitutionalized the Bruton doctrine, meaning that nontestimonial codefendant statements do not violate the Confrontation Clause.  In this case, however, courts should readily find that such nontestimonial codefendant statements violate Federal Rule of Evidence 403 and are therefore inadmissible anyway.").  The Court reiterates, however, that the Tenth Circuit has reached a different conclusion.  See United States v. Smalls, 605 F.3d at 768 n.2.

United States's scope to testimonial statements by co-Defendants.  See United States v. Smalls, 605 F.3d at 768 n.2.  In United States v. Smalls, the Tenth Circuit considered a case where Glenn Dell Cook, Walter Melgar-Diaz, and Paul Othello Smalls had been accused of killing Phillip Gantz, who was a jailhouse informant.  See 605 F.3d at 767-68.  Gantz had been helping federal drug enforcement officials with their investigations, and was housed in the same unit as the three defendants Cook, Melgar-Diaz, and Smalls.  See 605 F.3d at 767-68.  Prison guards made a recording of one of the defendants, Cook, implicating his co-defendant Smalls in a confession regarding the murder to a fellow inmate and confidential informant.  See 605 F.3d at 767-68. Relying on Bruton v. United States, the district court severed the two defendants' trials, because it concluded that Cook's statement could not be introduced against Smalls.  605 F.3d at 768 n.2. The United States nonetheless moved to admit this statement against Smalls in his separate trial, arguing that the statement was made against his codefendant Cook's penal interests.  See 605 F.3d at 772-73.  The district court concluded that Cook's statement was non-testimonial and then "analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation Clause jurisprudence as set forth in *Ohio v. Roberts*," thereafter concluding that the statement lacked a "particularized guarantee of trustworthiness," and that the court should exclude the statement.  United States v. Smalls, 605 F.3d at 772-73.

The United States then appealed that decision, and the Tenth Circuit reversed it.  See 605 F.3d at 773-74.  The Tenth Circuit concluded that, if Cook's statement had been testimonial, its exclusion would have been proper, but, because the statement was non-testimonial the Confrontation Clause's protections did not apply.  See 605 F.3d at 787.  The Tenth Circuit reasoned that if the statement met the definition for "statements against interest" under the Federal Rules of Evidence, it was admissible against Smalls.  605 F.3d at 780.  The Tenth

Circuit, accordingly, held that the district court erred in excluding the entire statement, and it

remanded the case to determine exactly which parts of the statement were self-inculpatory and

therefore admissible.  See 605 F.3d at 786-87.  Notably, in reaching this conclusion, the Tenth

Circuit also provided:

> Although the district court's severance order is not part of the record on appeal,
> we take judicial notice of it under Fed. R. Evid. 201 as it appears of record in
> *United States v. Smalls*, No. 06–CR–2403-RB-1, Memorandum Opinion and
> Order (D.N.M. May 7, 2008)(Doc. # 280).  Relying on *Bruton v. United States*,
> 391 U.S. 123 [] and its progeny, the district court reasoned the admission into
> evidence of a recorded statement in which Cook incriminated both himself and his
> alleged cohorts before a CI would violate Defendant Smalls' right to
> confrontation.  In *Bruton*, the Court held that defendant was deprived of his Sixth
> Amendment right to confrontation where his accomplice's confession, made to a
> postal inspector during an interrogation, was introduced at their joint trial.  The
> Court explained that a limiting jury instruction was insufficient under the facts of
> the case to cure any prejudice to that defendant.  As will become apparent from
> our opinion, *Bruton* is consistent with the present state of Sixth Amendment law
> because the accomplice's confession, unlike Cook's statement, was testimonial,
> rendering it inadmissible against the defendant absent an opportunity for cross-
> examination.  Notably, however, the *Bruton* rule, like the Confrontation Clause
> upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2.  In the Tenth Circuit, after United States v. Smalls,

it is clear that Crawford v. Washington limits Bruton v. United States and now protects against

the admission only of co-defendants' testimonial statements.  See United States v. Smalls, 605

F.3d at 768 n.2.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, 2011 WL

5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the

Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Fed. R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a

defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. A party opponent's statement is excluded from the definition of hearsay where:

> The statement is offered against an opposing party and:
>
> > **(A)** was made by the party in an individual or representative capacity;
> >
> > **(B)** is one the party manifested that it adopted or believed to be true;
> >
> > **(C)** was made by a person whom the party authorized to make a statement on the subject;
> >
> > **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> >
> > **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The United States Court of Appeals for the Tenth Circuit has stated:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when

taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(internal quotation marks and alterations omitted).[17]

Hearsay evidence is generally inadmissible "because it is considered unreliable." United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S. 594, 598 (1994)). See Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted in the statement"). In addition to nonhearsay-styled statements under rule 801, the hearsay rule is also subject to several exceptions. Under rule 804(b)(3), an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest." United States v. Lozado, 776 F.3d at 1125 (citing Williamson v. United States, 512 U.S. at 599-600). A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the

---

[17]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note on 2011 Amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 should still be useful for cases after the restyling. Fed. R. Evid. 801.

statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

- 158 -

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will grant in part and deny in part: (i) the Motion to Sever; (ii) Gonzales' Motion to Sever; (iii) A. Gallegos' Motion to Sever; (iv) Troup's Motion to Sever; (v) Alonso's Motion to Sever; and (vi) Gonzales' Amended Motion to Sever. At the February 7, 2017, hearing, the United States agreed that a joint trial of twenty or more Defendants would be practically untenable. See Tr. at 105:25-106:4 (Castellano). Although not a concession, the nature of the United States' agreement was as follows:

> THE COURT: Mr. Castellano, let me ask you a few questions. Would you agree that it's going to be extremely difficult and probably not a good idea to try a case with 20 defendants?

MR. CASTELLANO: It may be difficult, Your Honor. It's not unprecedented. Even one of the cases cited by the defense, I think, had 23 defendants who were not severed. But I do agree that there could be some logistical problems.

THE COURT: If we were in agreement on that, that we probably shouldn't be barreling toward a trial with 20 defendants, what's the solution from your standpoint?

MR. CASTELLANO: Well, the solution is really how to cut up the pie.

Tr. at 105:21-106:10 (Court, Castellano). The Court then requested that the United States and the Defendants present the Court with different options regarding its determination whether severance of the Superseding Indictment in some manner would be proper. See Tr. at 141:20-23 (Court). The Court, having initially adopted a "wait and see approach" regarding severance, is now faced with a July 10, 2017, trial date, and nineteen Defendants who are still in the case. Tr. at 32:8-33:18 (Court). The Court also notes that various Defendants have, to date, moved against the Superseding Indictment and Second Superseding Indictment, alleging misjoinder under rule 8 of the Federal Rules of Criminal Procedure and prejudicial joinder under rule 14 of the Federal Rules of Criminal Procedure. Some Defendants have also asserted their Speedy Trial Act rights as grounds for severance, and some have suggested that Bruton v. United States necessitates severance under the Confrontation Clause, because certain co-Defendants' inculpatory statements could potentially be introduced against them at a joint trial.

The Second Superseding Indictment charges a total of thirty-one Defendants with 16 Counts of various assault, conspiracy to murder, murder, and firearms violations, which the United States further alleges are violent crimes in aid of the SNM racketeering conspiracy. The Defendants named are not all charged with the same Counts or substantive offenses, causing some Defendants to face a variable level of criminal exposure in comparison to their co-Defendants. The Second Superseding Indictment's allegations also span a large period of time,

with the first alleged murders occurring in 2001.  After considering the Superseding Indictment; the Second Superseding Indictment; the Motion to Sever; Gonzales' Motion to Sever; A. Gallegos' Motion to Sever; Troup's Motion to Sever; Alonso's Motion to Sever; and Gonzales' Amended Motion to Sever, the Court concludes that a joint trial of all nineteen remaining Defendants would be impractical at this time.  The unique complexity of this multi-count Second Superseding Indictment, as it now stands, "would render it difficult, if not impossible, for the Court to adequately charge a jury as to the applicable law with respect to each defendant and for the jury to apply the law intelligently in reaching verdicts on the many charges involved." United States v. Moreton, 25 F.R.D. 262, 263 (W.D.N.Y. 1960)(Henderson, J.).   Further, although rule 8 of the Federal Rules of Criminal Procedure exists to "enhance the efficiency of the judicial system," United States v. Bagby, 696 F.3d 1074, 1086 (10th Cir. 2012)(citation omitted), and although "joint trials conserve state funds, diminish inconvenience to witnesses and public authorities," United States v. Jones, 530 F.3d at 1298-99 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)), the Court is convinced that a joint trial for the Second Superseding Indictment's charges would in fact not facilitate any of those principles. Accordingly, acting under its authority pursuant to rule 14 of the Federal Rules of Criminal Procedure, the Court will sever the Second Superseding Indictment at this time in accordance with the United States' proffer at the February 7, 2017, hearing: Counts 6-12 will be severed from Counts 1-5 and 13-16.  This severance order is akin to that of the trial court in United States v. Gray, where the trial court -- tasked with managing an indictment of similar scale -- concluded that in severing that case's indictment into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an

expeditious resolution for all defendants." United States v. Gray, 173 F. Supp. at 18. As to the individual defendants arguing for further severance, the Court further tests their motions in accordance with the standard of prejudice they must demonstrate under Zafiro v. United States, all the while bearing in mind the beneficial effect of the trial's severance into two trial groupings by this opinion.

The Court thus grants in part and denies in part the Motion to Sever; Gonzales' Motion to Sever; A. Gallegos' Motion to Sever; Troup's Motion to Sever; Alonso's Motion to Sever; and Gonzales' Amended Motion to Sever. In this opinion, the Court first explains its reasoning for choosing to sever the Second Superseding Indictment in the aforementioned fashion. Next, the Court addresses its reasoning for choosing not to sever the Second Superseding Indictment as each of the individual moving Defendants has requested. The Court's reasoning for those denials is rooted in part in the alleviation of the logistical complexities by severance into two distinct trial groupings. The Court's reasoning is also rooted in its adherence to Tenth Circuit law providing: "[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements." United States v. Smalls, 605 F.3d at 768 n.2. Ultimately, the Defendants have not demonstrated a prejudice sufficient enough to warrant further severance from the two severed trial groupings at this time.

I.    **THE COURT WILL SEVER COUNTS 6-12 FROM COUNTS 1-5 AND 13-16.**

At present time the Court is faced with a Second Superseding Indictment charging Violent Crimes in Aid of Racketeering, and alleging:

**Count 1: Murder of Frank Castillo -- 3/26/2001 [Southern New Mexico]**
Angel DeLeon
Joe Gallegos
Edward Troup
Leonard Lujan
Billy Garcia

**Count 2: Murder of Rolando Garza -- 3/26/2001 [Southern New Mexico]**
Leonard Lujan
Billy Garcia
Eugene Martinez
Allen Patterson
Chris Chavez

**Count 3: Murder of Freddie Sanchez -- 2007 [Southern New Mexico]**
Javier Alonso
Edward Troup
Arturo Arnulfo Garcia
Ben Clark
Ruben Hernandez

**Counts 4 & 5: Murder of Adrian Burns -- 2012 [Socorro & Valencia Counties]**
Joe Gallegos
Andrew Gallegos

**Counts 6 & 7: Murder of Javier Molina -- 2014 [Southern New Mexico]**
Jerry Armenta
Jerry Montoya
Mario Rodriguez
Timothy Martinez
Anthony Ray Baca aka "Pup"
Mauricio Varela
Daniel Sanchez
Carlos Herrera
Rudy Perez

**Count 8: Conspiracy to Assault Julian Romero -- 2003 to 2015 [Southern New Mexico & Dona Ana County]**
Anthony Ray Baca
Gerald Archuleta aka "Styx"
Conrad Villegas

**Count 9: Conspiracy to Murder D. Santistevan -- 2013 to 2015**
Anthony Ray Baca
Roy Martinez
Robert Martinez

**Count 10: Conspiracy to Murder Marcantel -- 2013 to 2015**
Anthony Ray Baca
Roy Martinez
Robert Martinez
Christopher Garcia

- 163 -

**Count 11: Felon in Possession of Firearm**
Christopher Garcia

**Count 12: Using a Firearm during a Crime of Violence [924(c)]**
Christopher Garcia

**Count 13: Assault with Dangerous Weapon on Jose Gomez -- [Valencia County(not in prison)]**
Joe Gallegos

**Count 14: Conspiracy to Murder Jose Gomez -- Feb. 2016 -- [Otero & Valencia Counties]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

**Count 15: Attempted Murder of Jose Gomez -- [Valencia County (not in prison)]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

**Count 16: Witness Tampering -- [Valencia County (not in prison)]**
Joe Gallegos
Santos Gonzales
Paul Rivera
Shauna Gutierrez
Brandy Rodriguez

Second Superseding Indictment, passim.   The graphical representation of the charges is as follows:

- 164 -

| Counts: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2001 | 2007 | 2012 | 2012 | 2014 | 2014 | 03-15 | 2013 | 2013 | 2015 | 2015 | 2015 | 2016 | 2016 | 2016 |
| Angel DeLeon | x | | | | | | | | | | | | | | | |
| Joe Lawrence Gallegos | x | | x | x | | | | | | | | | x | x | x | x |
| Edward Troup | x | | x | | | | | | | | | | | | | |
| Leonard Lujan | x | x | | | | | | | | | | | | | | |
| Billy Garcia | x | x | | | | | | | | | | | | | | |
| Eugene Martinez | | x | | | | | | | | | | | | | | |
| Allen Patterson | | x | | | | | | | | | | | | | | |
| Christopher Chavez | | x | | | | | | | | | | | | | | |
| Javier Alonso | | | x | | | | | | | | | | | | | |
| Arturo Garcia | | | x | | | | | | | | | | | | | |
| Ben Clark | | | x | | | | | | | | | | | | | |
| Ruben Hernandez | | | x | | | | | | | | | | | | | |
| Jerry Armenta | | | | | | x | x | | | | | | | | | |
| Jerry Montoya | | | | | | x | x | | | | | | | | | |
| Mario Rodriguez | | | | | | x | x | | | | | | | | | |
| Timothy Martinez | | | | | | x | x | | | | | | | | | |
| Mauricio Varela | | | | | | x | x | | | | | | | | | |
| Daniel Sanchez | | | | | | x | x | | | | | | | | | |
| Gerald Archuleta | | | | | | | | x | | | | | | | | |
| Conrad Villegas | | | | | | | | x | | | | | | | | |
| Anthony Ray Baca | | | | | | x | x | x | x | x | | | | | | |
| Robert Martinez | | | | | | | | | x | x | | | | | | |
| Roy Paul Martinez | | | | | | | | | x | x | | | | | | |
| Christopher Garcia | | | | | | | | | | x | x | x | | | | |
| Carlos Herrera | | | | | | x | x | | | | | | | | | |
| Rudy Perez | | | | | | x | x | | | | | | | | | |
| Andrew Gallegos | | | | x | x | | | | | | | | | | | |
| Santos Gonzales | | | | | | | | | | | | | | x | x | x |
| Paul Rivera | | | | | | | | | | | | | | x | x | x |
| Shauna Gutierrez | | | | | | | | | | | | | | x | x | x |
| Brandy Rodriguez | | | | | | | | | | | | | | x | x | x |

As the Court mentioned, nineteen Defendants still remain in the case. Count 16 has also recently been added, and B. Rodriguez, too. The Court grants in part and denies in part each of the motions to sever. The Motion to Sever, in particular, advances

three main arguments: (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and

- 165 -

(3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

Motion to Sever at 2. Rule 8 of the Federal Rule of Criminal Procedure provides the standards for joinder of offenses and defendants in criminal cases:

> **(a) Joinder of Offenses.** The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged -- whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> **(b) Joinder of Defendants.** The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(a)-(b). Courts construe this rule "broadly to allow liberal joinder to enhance the efficiency of the judicial system." United States v. Bagby, 696 F.3d at 1086 (citation omitted). This approach recognizes that "joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" United States v. Jones, 530 F.3d at 1298-99 (quoting United States v. Lane, 474 U.S. at 449). "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).

The Court first concludes that there is not misjoinder of Defendants or offenses in this case. Because the charged offenses are alleged to be violent crimes in aid of racketeering activity, the joined offenses are "connected with or constitute parts of a common scheme or plan" under rule 8(a). Fed. R. Crim. P. 8(a). Similarly, rule 8(b) authorizes joinder of the individual

Defendants in this case, because the Defendants "are alleged to have participated in the same act or transactions constituting an offense or offenses," namely violent crimes in aid of a racketeering enterprise.  Fed. R. Crim. P. 8(b).

> If . . . [predicate] acts could properly be considered part of a "pattern of racketeering activity," we see no reason why they could not similarly constitute part of a "series of acts or transactions constituting an offense" within the meaning of Rule 8(b).  Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a "pattern of racketeering activity" under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial.

United States v. Weisman, 624 F.2d 1118, 1129 (2d Cir. 1980).  The Court thus cannot soundly conclude that the Second Superseding Indictment, making VICAR allegations, misjoined either the Defendants or their charged offenses.  See United States v. Caldwell, 560 F.3d 1202, 1212 (10th Cir. 2009)(requiring a common thread amongst Defendants and offenses to warrant joinder).

Even if separate counts or defendants are appropriately joined under rule 8, where that joinder "appears to prejudice a defendant or the government," a "court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  "That is, Rule 14 provides a safety valve for the highly technical and inclusive analysis under Rule 8."  United States v. Thomas, 61 F. Supp. 3d 1221, 1226 (D.N.M. 2014)(Vázquez, J.), aff'd in part, 849 F.3d 906 (10th Cir. 2017).  In consideration of rule 14 severance, the Court has in the past used the three-part test it outlined in Gould, 2007 WL 1302587, when considering prejudice by the potential that joint defendants might proceed with antagonistic defenses, to guide its analysis:

> First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable

judgment about guilt or innocence. Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Gould, 2007 WL 1302587, at *2 (discussing United States v. Pursley, 474 F.3d at 765). In consideration of rule 14, however, the Court has almost unlimited discretion to determine whether sufficient prejudice exists to warrant severance. See Opper v. United States, 348 U.S. 84, 95 (1954). To that point, the United States Court of Appeals for the Second Circuit has suggested that a defendant "must meet the heavy burden of showing that a joint trial would result in substantial prejudice amounting to a miscarriage of justice." United States v. Gallo, 668 F. Supp. at 749 (citing United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir. 1985); United States v. Sotomayor, 592 F.2d 1219, 1227 (2d Cir. 1979)).

> Among the factors the court must consider in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice" are the following: the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

United States v. Gallo, 668 F. Supp. at 749. "There are no precise tests applicable to one or a combination of these factors that can provide a foolproof resolution under Rule 14." United States v. Gallo, 668 F. Supp. at 749. According to United States v. Gallo, then,

> the court must decide whether the jury would be "reasonably able" to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators. Often relied upon is the standard formulated by Judge Weinfeld in *United States v. Kahaner*, 203 F. Supp. 78, 81-82 (S.D.N.Y. 1962). . . . The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?

United States v. Gallo, 668 F. Supp. at 749.  In some cases, despite

> the general presumption favoring joinder, some form of severance is necessary because of the physical limitations of the courtroom and hardship on the jurors, the defendants, and the Court.  Severance, however, should be of the most limited form necessary to satisfy those interests, because the Court finds that joinder of defendants, to the extent possible, will preserve judicial resources and permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.  The United States v. Gray court severed a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on logistical concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court also considered that

> [s]everal defendants have moved for complete severance or other joint trial configurations based on Rule 14 concerns of prejudice against defendants.  In order to prevail upon a claim for severance, [those] defendant[s] must show that joinder would violate that defendant's constitutional fair trial rights, or would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10.  Although the United States v. Gray court preemptively severed the indictment in that case into two trial groupings to presumptively alleviate the heightened risk of prejudice to the defendants by logistical inefficiency and impracticality, the court was still open to further requests for severance of individual defendants upon a specific showing of prejudice by joinder in either of the trial groupings.  See United States v. Gray, 173 F. Supp. at 10.  The rule 14 inquiry regarding the propriety of joinder is ongoing, and as the United States v. Gray court concluded when severing that case's indictment into two trial groupings, its chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants." United States v. Gray, 173 F. Supp. at 18.  The Court considers the United States v. Gray

approach, as well as that of the district courts in the Second Circuit, to be the most-sound approach when considering multi-count and multi-defendant indictments. See 173 F. Supp. at 18; United States v. Moreton, 25 F.R.D. 262, 263 (W.D.N.Y. 1960)(Henderson, J.)("The complex involvement of the various defendants and the multiplicity of charges contained in the indictment would render it difficult, if not impossible, for the court to adequately charge a jury as to the applicable law with respect to each."). Here, the Court concludes -- as a threshold matter -- that numerous logistical and mechanical factors suggest that the jury's compartmentalization of the evidence during a joint trial of the nineteen Defendants might prove to be very difficult or unlikely, and the Court will accordingly sever the Superseding Indictment into two trial groupings, before it considers any other arguments regarding prejudice under rule 14.

First, the physical constraints of the courtroom present logistical challenges. At the present time, the Court has created a large table for the Defendants by pushing two tables together. At that table, the Court can sit five Defendants and seven to eight of their lawyers. Not all Defendants in this case are seated at the table, meaning that some Defendants and their lawyers are seated in the gallery and in the jury box. The Court has been using the Rio Grande Courtroom in Albuquerque, which is the largest courtroom in the District's two modern buildings that are for criminal trials. The Court thinks that proceedings in Las Cruces, where this trial will be held, will pose harder problems for situating the Defendants than the Court has addressed in Albuquerque. Thus, even a high single-digit Defendant trial will require some reorganizing of the courtroom. The Court notes that it has not had to worry yet about the jury seeing chains and shackles, but that will be a major concern at trial. However, the Court does not see how it can even try numerous Defendants at one time in a Las Cruces or Albuquerque

courtroom, even its larger one.  Thus, before it even considers prejudice, the Court concludes it must sever in some fashion.

The United States argues that the Court cannot consider the inconvenience to the Court or logistics until it determines that the parties will be prejudiced by failure to sever.  The United States relies on the Court's statements in United States v. Gould, wherein the Court quoted the Tenth Circuit's opinion in United States v. Pursley, which dealt with defendant's arguments for rule 14 severance, because the co-defendants intended to present mutually antagonistic and exclusive defenses at trial:

> First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence.  Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Gould, 2007 WL 1302587, at *2 (relying on United States v. Pursley, 474 F.3d at 765).  The Court does not, however, read that quote as saying that the Court cannot consider logistical concerns.  Moreover, if the Court cannot physically try a case, that prejudices the parties.  It is here that rule 14 says: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Cf. United States v. Gray, 173 F. Supp. 2d at 9 ("First, there is hardship on the administrative structure of the Court -- the absence of any 'one juror, one defendant, one defense attorney, one prosecutor' can thwart the progress of the trial.").

In any case, the Court is convinced that a joint trial of nineteen Defendants runs the risk of preventing the jury from making a reliable judgment.

> When many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence is heightened.

Zafiro v. United States, 506 U.S. at 539.  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Hack, 782 F.2d 862, 870 (10th Cir. 1986).  The potential risk that a joint trial of nineteen Defendants at this time will prevent the jury from making a reliable judgment is heightened where, as here, the Superseding Indictment's charges reflect the fact that the co-Defendants have "markedly different degrees of culpability."  Zafiro v. United States, 506 U.S. at 539.  There is a possibility that, in a trial of this magnitude, the jury would lump all defendants together and potentially think of them as a unit, rather than as individuals.  Severing the Second Superseding Indictment will lessen this risk to an acceptable level by lessening the burden on the jury to compartmentalize the evidence.

> The complex involvement of the various defendants and the multiplicity of charges contained in the indictment would render it difficult, if not impossible, for the court to adequately charge a jury as to the applicable law with respect to each . . . defendant, and for the jury to apply that law intelligently in reaching verdicts on the many charges involved.

United States v. Moreton, 25 F.R.D. at 263.  See United States v. Casamento, 887 F.2d 1141, 1152 (2d Cir. 1989)("In assessing the appropriate number of defendants for a trial, in which the prosecution's case is likely to exceed four months, the judge should require an especially compelling justification for a joint trial of more than 10 defendants.").

Again, compounding the jury's potential ability to make a reliable judgment for these Defendants is the impact that the Second Superseding Indictment's complexity will have on judicial resources, given the Second Superseding Indictment's inherent logistical and mechanical

issues as they relate to a nineteen-Defendant megatrial.  It is primarily for those mechanical and logistical problems which the Court will sever the Second Superseding Indictment into what it considers will be two smaller trials of less-than-ten Defendants each.  At present time, the Court has retained nearly all of the lawyers on the complex Criminal Justice Act panel in New Mexico to work for Defendants in this case.  Cf. United States v. Gray, 173 F. Supp. 2d at 9 ("First, there is hardship on the administrative structure of the Court -- the absence of any 'one juror, one defendant, one defense attorney, one prosecutor' can thwart the progress of the trial.").  If scheduling hearings for all of these Defendants to hear pretrial motions is an indicator, the logistical burden of scheduling and facilitating one large trial will be difficult.  The Defendants, further, are scattered at facilities across New Mexico, the fifth-largest state in the country, which burdens the United States Marshals and other law enforcement involved in prisoner transport. The Court can envision a scenario, in a joint trial of all of the Defendants, where there would be routine delays or postponements just as a result of the logistics.  Such delays and postponements, the Court supposes, would most likely have a negative impact on the jury's task in this case. Further, the Court has agreed to try this case in Las Cruces inside of a courtroom which is smaller than the courtroom in which the Court has held its hearings in Albuquerque.  At the pretrial hearings, the Court has been so burdened by the amount of Defendants that the Defendants have been seated everywhere in the courtroom -- and this has included the juror box, counsel tables, gallery, and even the corner off to the right side of the Court's bench. Cf. United States v. Gray, 173 F. Supp. 2d at 8-9 (discussing the capacity and physical limitations of a courthouse in regard to a megatrial for multiple defendants).

Indeed, the Defendants make an argument which appeals to this problem in the Supplemental Pleading, which suggests that, "[a]lthough traditional Rule 8 and Rule 14

considerations are certainly always applicable, [c]ases have been severed in which there is no mention of prejudice to the prosecution or to the defendants." Supplemental Pleading at 4 (internal quotation marks omitted). The support for such severance, according to the Supplemental Pleading, comes from "the court's inherent authority to manage its case load and to sever in the interest of efficient administration of justice and judicial economy." Supplemental Pleading at 4. Cf. United States v. Bundy, 2016 WL 7227882 at *13-15 (D. Nev. 2017)(Leen, M.J.)("Courts have the inherent authority to manage their docket by severing large groups of defendants into more manageable groups."). Such argument, the Court concludes, comports with the United States v. Gray approach, wherein the district court first severed the trial into two manageable trial groupings given the potential risk of prejudice from the unsevered trial's logistics, and then considered other risks of prejudice on a case-by-case basis. See United States v. Gray, 173 F. Supp. at 18.

Generally, holding a joint trial would certainly be more convenient for the Court -- hence the genesis of rule 8. The potential risk of prejudice, however, outweighs this consideration on the facts of this case as it is presently situated. The Court, accordingly, concludes that the interests underlying its rule 14 authority counsel severance of the Superseding Indictment in some fashion given the logistical and mechanical impossibilities of a nineteen-Defendant megatrial. The United States has suggested two distinct trials, in which the Defendants are tried only once for the Counts in which they are named. The Court has reviewed the United States' suggestion, and agrees that their proffered method of severance of the Superseding Indictment will reduce the potential for prejudice leading the Court to conclude that severance of some type under rule 14 is appropriate. The Court also notes that, in light of the Second Superseding

Indictment, Count 16 will fit neatly into its calculations regarding severance of the Superseding Indictment.  The breakdown will be as follows.

The Court will sever Counts 1-5 and 13-15 of the Superseding Indictment for one trial and include in that grouping the Second Superseding Indictment's additional Defendant -- B. Rodriguez -- as well as its Count 16.  That severed trial would then involve the prosecution of eleven Defendants, none of whom are named in Counts 6-12.  At the February 7, 2017, hearing, the United States indicated that it anticipated plea deals would lessen the number of Defendants to as few as six Defendants in that grouping.  In the Court's own estimation, it anticipates the number of Defendants will fall from eleven to nine by the time of trial.  By severing Counts 1-5 and 13-16 from Counts 6-12, the Counts 6-12 grouping would involve the prosecution of eight Defendants, none of whom are named in Counts 1-5 or 13-16.  At the February 7, 2017, hearing, the United States indicated that it anticipated plea deals would lessen the number of Defendants to as few as seven Defendants in that grouping.  In the Court's own estimation, it anticipates the number of Defendants will fall from eight to five by the time of trial.

The Court is thus left with two trial groupings of what it anticipates will be less than ten Defendants each.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding its two trial group "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").  Although the Court's research did not uncover any hard and fast bright line rule, the Court is confident that severing the nineteen Defendants into two trials of less than ten will yield the most effective and manageable path forward.  Many courts, especially in the Second Circuit, sever trials to ensure there are single-digit numbers of defendants.  See United States v. Casamento, 887 F.2d at 1152 ("In assessing

the appropriate number of defendants for a trial, in which the prosecution's case is likely to exceed four months, the judge should require an especially compelling justification for a joint trial of more than 10 defendants."). Cf. United States v. Bundy, 2016 WL 7227882 at *13-15 (severing indictment charging seventeen defendants into three groups of less than ten defendants); United States v. Gray, 173 F. Supp. 2d at 9 (severing indictment charging seventeen defendants into two groups of less than ten defendants); United States v. Andrews, 754 F. Supp. 1161, 1184 (N.D. Ill. 1990)(considering a nineteen-defendant indictment, and ordering severance into three groups of less than ten defendants); United States v. Gallo, 668 F. Supp. at 749 (considering a sixteen-defendant indictment and severing into 5 groups with less than ten defendants); United States v. John Shea, 750 F. Supp. 46, 48-50 (D. Mass. 1990)(Keeton, J.)("Given the number of defendants, the number of counts, and estimates of probable length of trial, the Court has an obligation to take steps early in the life of this case to ensure the goals enumerated in Rule 2 of the Federal Rules of Criminal Procedure: 'These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay.'")(emphasis omitted). But see United States v. Cervone, 907 F.2d 332, 341-43 (2d Cir. 1990)(finding jury instructions were sufficient to avoid prejudice in a RICO case charging 18 defendants with numerous racketeering offenses, where the district court did not sever the indictment, and also stating that a district court's severance decision is "virtually unreviewable"); United States v. DiNome, 954 F.2d 839 (2d Cir. 1992)(finding careful instructions by the trial judge, an outline of the elements of the offenses charged, numerous requests for feedback, and the length of deliberations reinforced the court's conclusion that the jury comprehended a RICO case involving nine defendants charged with numerous racketeering

offenses -- and also stating that the district court's denial of the motion to sever could be reversed only upon a showing that "the district court clearly abused its discretion").

Having reviewed and considered all relevant pleadings and briefing in connection with the Motion to Sever, the Court concludes that the most logical, efficient, and manageable way to try this case is to sever the charges in the Second Superseding Indictment in this fashion. By severing Counts 6-12 from Counts 1-5 and 13-16, the Court is able to significantly lessen the burden of this complex case on the District of New Mexico, as well as elevate the jury's ability to make a reliable judgment for these Defendants in light of the case's expanse and complexity.

The Court will next consider each of the moving Defendants' arguments in favor of further severance. These Defendants have moved for either complete severance or other trial configurations based on rule 14 prejudice concerns. As presented, to prevail on an individual severance claim under rule 14 the Court will require a Defendant show that joinder -- in either of the two trial groupings -- will violate that Defendants' constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. There is a "heavy burden" of showing sufficient prejudice. United States v. Hall, 473 F.3d at 1302. Specifically, the Defendants in this case argue for further severance, because of the disparity of evidence, potential spillover prejudice, antagonistic defenses, and the admission of co-Defendants' inculpatory statements.

## II.  THE COURT DENIES THE REQUEST TO SEVER COUNTS 6 AND 7 IN THE MOTION TO SEVER.

The Counts 6 and 7 Defendants argue in the Motion to Sever that sufficient prejudice -- to them as a grouping individually -- would result from a joint trial of these Counts 6 and 7 Defendants with their co-Defendants in Counts 8-12. See Motion to Sever at 20. In the Motion to Sever the Counts 6 and 7 Defendants specifically cite the facts that: (i) "this case deals with a

complex RICO indictment spanning decades' worth of criminal allegations [involving] separate, distinct alleged murder conspiracies that took place at different points in time, involved completely different alleged conspirators, and different alleged victims"; (ii) "the disproportionality of the evidence in relation to the 30 defendants charged"; (iii) "it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive"; (iv) "[p]resentation of evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the firearms charges not contained in Counts 6 and 7 will subject the 2014 Defendants to undue prejudice by creating an atmosphere of criminal propensity"; (v) "[i]n a case this complex, a limiting instruction is more aspirational than a reality, and in a judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable"; (vi) "severing . . . Defendants from the other co-defendants would best serve the interest of the Court and the jury"; and (vii) "[e]ven the largest of the federal courtrooms in the District of New Mexico, however, cannot adequately accommodate the trial, much less *voir dire*."  Motion to Sever 20-25.  The Counts 6 and 7 Defendants argue that "severance of Counts 6 and 7 is necessary to protect [their] respective rights to a fair trial under the Fifth Amendment."  Motion to Sever at 25.  The Counts 6 and 7 Defendants contend that "[m]isjoinder rises to the level of a constitutional violation when it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial" and that "[h]ere the fact that the defendants have been charged with VICAR offenses cannot overcome the 2014 Defendants' right to a fair trial on the charges alleged against them."  Motion to Sever at 26-28.  Accordingly, the Motion to Sever concludes:

> A joint trial of Counts 6 and 7 alongside the other 13 charges is not permitted under Rule 8(a), or Rule 8(b) and if it were, it is not permitted under Rule 14 or under the Fifth Amendment, as the 2014 Defendants would be prejudiced by the presentation to the jury of similar offenses by other purported members of the SNM.

Motion to Sever at 28.  The Court, by severing the case into two distinct trial groupings has -- in its estimation -- resolved the logistical and practical arguments which the Counts 6 and 7 Defendants make.  See Motion to Sever at 20-25.  Instead, then, the Court will focus on the Counts 6 and 7 Defendants' arguments that they still stand to suffer a more discrete and substantial prejudice from the joint trial with their co-Defendants in Counts 8-12, perhaps mandating further severance of their Counts.  In light of the Counts 6 and 7 Defendants' arguments, the Court must consider whether the Counts 6-12 trial grouping either violates the Counts 6 and 7 Defendants' constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro v. United States, 506 U.S. at 539.  That principle is the standard against which the Court must test the Counts 6 and 7 Defendants' arguments, and there is a "heavy burden" to show sufficient prejudice and persuade the Court that further severance under rule 14 is warranted.  United States v. Hall, 473 F.3d at 1302.

At the outset, the Court is not in a position at this time to ascertain whether the Counts 6 and 7 Defendants will present mutually exclusive antagonistic defenses as compared to their co-Defendants, and the Counts 6 and 7 Defendants concede that reality.  See Motion to Sever at 20-25.  The Counts 6 and 7 Defendants instead generally rely upon the potential for spillover prejudice as grounds for severance, suggesting that substantial prejudice exists given the numerous different victims and offenses that the Second Superseding Indictment charges, the different roles that each of the Defendants have allegedly played according to the Counts in the Second Superseding Indictment, and the inability of a limiting instruction to allow the jury to compartmentalize the evidence against each Defendant as an individual.  See Motion to Sever at

20-25. The Court does not agree that sufficient prejudice for further severance exists at this time for the Counts 6 and 7 Defendants.

First, the Court notes that the Defendants were charged by a grand jury with the following:

1.      Defendants were members/prospects/associates of the S[i]ndicato de Nuevo Mexico (SNM) gang, a criminal organization whose members/prospects/associates engaged in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking.

2.      SNM was formed after the February 1980 prison riots at the Penitentiary of New Mexico, and has continued as a criminal enterprise within the New Mexico penal system, and outside of that system, for almost 40 years, bolstering as many as 500 members, and currently consisting of approximately 250.

3.      The gang, including its leadership, membership, prospects, and associates, constitutes an "enterprise" as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.

4.      The enterprise constitutes an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

5.      In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM gang also engages in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send messages to others that it was strong, powerful and not to be provoked.

6.      Members of the SNM gang are expected to seek out and beat, stab, or shoot rival gang members. Similarly, members of the SNM gang are expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.

7.      Members who fail to show continued loyalty to the gang are disciplined in various ways, to include murder and assaults.

United States' Response at 1-3 (internal citations omitted).  Each Defendant charged by the Second Superseding Indictment is, therefore, alleged to have committed an offense out of a "common purpose of achieving the objectives of the enterprise."  United States' Response at 1-3.  Joint trials under rule 8(b) can be an efficient administration of justice where the charges overlap factually, such as here, where the different Defendants charged in the different counts are logically sorted by the Second Superseding Indictment in accordance with discrete examples of SNM's criminal activity.  See United States' Response at 1.  This arrangement and joinder is -- to an extent -- logical, because SNM operates as a prison gang across New Mexico prison system -- where the incarcerated leaders cannot move freely -- and thus have been alleged to use separate SNM members or associates to carry on the SNM enterprise's business in different locations and in different fashions.  See United States' Response at 1.  The reality is that SNM's operations necessarily require that different leaders and members located within different prisons carry on the SNM's criminal enterprise.  See United States' Response at 1.  Because the United States  must prove as an element that the SNM is a racketeering enterprise, and, because Counts 6 and 7 relate to an SNM-sanctioned murder and conspiracy to murder an individual cooperating with law enforcement at Southern New Mexico, the Court considers it sound that the United States would try jointly the SNM members who carried out the SNM enterprise's criminal activity of murdering J.M. at Southern New Mexico (Counts 6 and 7), with the other SNM leaders and members charged with similar violent crimes in aid of racketeering.  See Fed. R. Crim. P. 8(b).  The Court also considers that the nature of the Second Superseding Indictment's charges and allegations -- which suggest that SNM's criminal operations as a prison gang throughout New Mexico inherently requires that the SNM have different leaders at the different prisons who order criminal activities and sanction murder of certain individuals by members and

associates in the same location as the victim and the leader(s) who ordered the hits -- is incompatible with the Counts 6 and 7 Defendants' arguments that the murder charged in those Counts was so remote in time, or was committed by such a remote group of individuals, that rule 14 must be used to sever the Counts given the possibility of spillover prejudice.

The Court recognizes, further, that prejudice "always exists when more than one defendant or offense are tried together." United States v. Gould, 2007 WL 1302587, at *2. Here, specifically, the Defendants are charged with engaging in violent criminal conduct in support of the SNM's alleged criminal enterprise; there will, undoubtedly, be prejudice given that the United States must prove how the discrete conduct charged in each of the Counts relates to the big-picture SNM enterprise. The Court is cognizant, however, of rule 8(b)'s import and Congress' choice to incriminate VICAR conduct in the manner in which it has chosen. To justify severance, the Defendants must demonstrate that joinder violates their constitutional fair trial rights, or would otherwise "prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. The "heavy burden" of showing sufficient prejudice, United States v. Hall, 473 F.3d at 1302, is not the only hurdle, however; even where a defendant may show such specific and compelling prejudice, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice, see Zafiro v. United States, 506 U.S. at 539 (limiting instructions often will suffice to cure any risk of prejudice); United States v. Lane, 883 F.2d 1484 (10th Cir. 1989)("As a general rule, we presume that juries follow [limiting] instructions."); United States v. Jones, 530 F.3d 1292 (10th Cir. 2008)(establishing that mere allegations that evidence against one defendant would have a "spillover effect" against another defendant does not demonstrate prejudice (internal quotations omitted)). Here, the

Counts 6 and 7 Defendants merely make general assertions of prejudice, and fail to specifically identify specific and compelling prejudicial concerns, arguing only that there may be propensity problems and an inability of the jury to compartmentalize the evidence, because limiting instructions are merely aspirational in a case this complex. See Motion to Sever at 20-25. The Court must conclude, then, that the Counts 6 and 7 Defendants do not meet their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence. See Zafiro v. United States, 506 U.S. at 539. The Court, further, will apply this conclusion across the board to all of the Defendants' motions for severance: mere assertions of spillover prejudice are not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise. The Court is, in particular, emboldened about its conclusion to deny further severance to the Counts 6 and 7 Defendants, because it has already severed the trial into two distinct trial groupings. Cf. United States v. Gray, 173 F. Supp. at 18. These trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct charged in each Count, and, with the help of limiting instructions[18] -- which will charge the jury to consider each Count in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant. See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial). The Court will not, therefore, sever Counts 6 and 7, from the Counts 6-12 trial grouping, at this time.

---

[18]For example, the Court -- where applicable -- will instruct the jury that the evidence admitted against a Defendant is competent evidence only as to that Defendant, and that the jury must disregard that evidence when determining any co-Defendants' guilt or innocence.

III.    **THE COURT DENIES THE REQUESTS IN GONZALES' AMENDED MOTION TO SEVER TO SEVER GONZALES.**

Gonzales' Amended Motion to Sever makes a variety of arguments in favor of severance of him, individually, because his charged offenses are distinguishable from the overarching SNM racketeering enterprise, the risk of prejudicial spillover, a disparity of evidence with respect to Gonzales, the existence of mutually antagonistic defenses, and the potential for a Bruton v. United States violation should a co-Defendant's statements be introduced against him.    See Gonzales' Amended Motion to Sever at 1-2.    The Court has already considered the Second Superseding Indictment's nature and the nature of its allegations regarding the Defendants' criminal conduct in contribution to the SNM racketeering enterprise, and has concluded that the inherent spillover prejudice is not so substantial as to warrant further severance; the Second Superseding Indictment alleges criminal conduct that is logically and appropriately separated into discrete Counts charging Defendants with committing the conduct for the SNM racketeering enterprise.    See United States' Response at 1-3.    Indeed, the Court is convinced that, in the context of its already severed two trial groupings, the Court will be able to adequately instruct the jury and manage the proceedings to ensure that the jury is able to compartmentalize the evidence, and to consider each count and defendant individually.    See Zafiro v. United States, 506 U.S. at 539.    Regarding Gonzales' argument about the disparity of evidence against him as compared to against his co-Defendants, the Court notes that VICAR, 18 U.S.C. § 1959, does not require, for example, that a defendant commit a "pattern of racketeering activity," but rather, the United States must prove that "an enterprise engaged in racketeering activity," and that individual members committed racketeering activity "for the group and/or in concert with other members, or acted in ways that contributed to [or furthered] the purposes of the group, or that were facilitated or made possible by the group." United States v. Feliciano, 223 F.3d at 116-17.

The Court, then, in consideration of the crimes' natures as the Second Superseding Indictment alleges, will require a much more substantial showing with respect to the evidence's alleged disparity, because Gonzales' singular violent conduct for the SNM racketeering enterprise is what the United States has charged.  See United States v. Feliciano, 223 F.3d at 116-17. Gonzales' claims that he is a "minor participant, lately come to the venture," or that he had no role in "devising" the SNM enterprise or was not in any manner involved in its execution, do not persuade the Court that severance is necessary to ensure his rights to a fair trial, on that account. Gonzales' Motion to Sever at 17.  See Zafiro v. United States, 506 U.S. at 539.  Gonzales also contends that he is not an SNM member and that he will present as a defense a wholesale denial of his guilt, which is necessarily a mutually exclusive antagonistic defense in comparison to his co-Defendants.  See Gonzales' Motion to Sever at 18.  That argument lacks merit, however, because the Tenth Circuit holds that, "[i]n this circuit, the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'"  United States v. Lynn, 31 F.3d at 992 (citing United States v. Swingler, 758 F.2d 477, 495 (10th Cir. 1985)).  One party's denial of guilt, while accusing another, is "not so contradictory that the jury must have necessarily disbelieved one to believe another."  United States v. Lynn, 31 F.3d at 992.

Last, Gonzales argues that the United States will introduce, against him, incriminating statements provided to federal investigators by defendants Rivera and Gutierrez.  See Motion to Sever at 19.  Gutierrez' statement was made as follows:

> According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez to borrow her truck.  According to Gutierrez, sometime later, Rodriguez returned to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G. Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the home where he was staying.  When the trio returned to Gutierrez's home, Rodriguez had blood on her shoes and all three asked to be taken home.

Motion to Sever at 19.  Rivera's statement was made as follows:

> [A]fter Paul Rivera was arrested, he said that he had been hanging out at Shauna
> Gutierrez's trailer.  On the morning of February 27, 2016, Shauna, Brandy
> Rodriguez and Rivera were at Shauna's trailer.  During which time, Shauna
> allegedly said that she had found out the whereabouts of J.G., a.k.a. Tiny.
> According to Rivera, Rodriguez and Gutierrez had been upset because J.G. would
> testify against Joe Lawrence Gallegos on a state murder case.  According to
> Rivera, after Gutierrez and Rodriguez had been discussing J.G., Santos Gonzales
> arrived at the trailer with his girlfriend.  Rivera told agents that he drove Gonzales
> and Rodriguez to the home where J.G. had been staying.  Rivera claimed that
> Santos Gonzales had a machete.  Rivera claimed that Mr. Gonzales hit J.G. with
> the machete and that Rodriguez had told J.G. "you better not testify against my
> jefe or I'll kill you."  After the beating, the trio allegedly went back to Gutierrez's
> trailer.  According to Rivera, Santos Gonzales cleaned the blood off the machete
> and some metal pieces.

Amended Motion to Sever at 20.  According to Gonzales, "[t]hese statements could be
interpreted by the jury as implicating Mr. Gonzales in misconduct related to the allegations set
forth in counts 14 and 15 and result in prejudice as Mr. Gonzales would not be able to confront
and cross examine the declarants," and further, "[t]h[at] prejudice cannot be cured or even
mitigated by a cautionary instruction."  Gonzales' Amended Motion to Sever at 20.[19]  Gonzales
argues, specifically,

> that the fact that Mr. Rivera and Ms. Gutierrez's incriminating statements against
> Mr. Gonzales are testimonial as defined by *Crawford v. Washington*, 541 U.S. 36
> (2004) and *Davis v. Washington*, *Hammon v. Indiana*, 547 U.S. 813 (2006),
> doubly implicates Mr. Gonzales' Sixth Amendment rights and the introduction of
> the statements would result in a violation thereof.  A defendant's right under the
> Sixth Amendment applies even if a co-defendant's statement does not directly or
> facially implicate another defendant so long as the statement is evidence of a fact
> critical to the government's case.  *United States v. Glass*, 128 F.3d 1398, 1404
> (10th Cir. 1997).   In this case, defendants Rivera and Gutierrez made

---

[19]Relying, in part, to the Supreme Court's rejection in <u>Bruton v. United States</u> of a trial
court's choice to only instruct the jury -- and to not redact in a meaningful way the hearsay
statement -- that although one defendant's confession was competent evidence against the
declarant, it was inadmissible hearsay against the co-defendant and therefore had to be
disregarded in determining the co-defendant's guilt or innocence.  See <u>Bruton v. United States</u>,
391 U.S. at 125.

> incriminating statements to a law enforcement officer and the statements inculpate Mr. Gonzales. Mr. Gonzales was not present during Rivera and Gutierrez's statement. Where a *Bruton* situation exists, the Court may, despite the Confrontation Clause, admit the confession of a non-testifying co-defendant that does not expressly implicate the defendant. "'The confession must be (i) redacted to eliminate any reference to the non-confessing defendant, and (ii) accompanied by an appropriate limiting instruction that the confession is to be considered only against the confessor.'" *Fowler v. Ward*, 200 F.3d 1302, 1307 (10th Cir. 2000).

Gonzales' Amended Motion to Sever at 21-22. Gonzales contends that, because "it is clear that Rivera and Gutierrez's statements cannot be redacted in a way to omit reference to Mr. Gonzales, [and] because of the nature of the interview which led to Rivera and Gutierrez's incriminating statements," "[t]he only way to avoid a Confrontation Clause violation is to sever the trials of Mr. Gonzales from Rivera and Gutierrez." Gonzales' Amended Motion to Sever at 22-23. Rivera has pled and the United States intends to call Rivera to testify, mooting Gonzales' arguments as to Rivera; regarding Gutierrez, the Court agrees that the testimonial statements which Gutierrez made cannot be redacted in a manner which satisfies Bruton v. United States. Nonetheless, at this time, the Court concludes that, because the United States has indicated that it intends to run the risk of introducing limited evidence at the behest of severance, severance is not necessary under rule 14 at this time.

> At the outset, at the hearing, the Court noted Gonzales' argument, but stated:

> I think it's premature for me to decide what evidence is coming in and not. I know a lot of people argued Bruton problems and things like that, but the Government, I [have] opinions out there they can see what I do with [Bruton]. They've got to make a calculation . . . whether they'll get their evidence [in] but I thin[k] [it is] a little early for me to say this is in and that's out.

May Tr. at 43:17-25 (Court). The Court maintains its inclination that it is too soon to be definitively ruling on evidentiary issues without the benefit of more targeted briefing, and recognizes that, regarding Bruton v. United States issues, the United States agrees with the Court that the evidentiary issues may not be ripe for a determination at this time, and, that, specifically

regarding Gonzales' co-Defendants' statements, the United States intends to redact competently such statements to avoid a Bruton v. United States problem at the trial. See May Tr. at 55:10-56:21 (Castellano, Court). Here, the Court notes, however, that it might not be feasible to redact Gutierrez' references to Gonzales to ensure that that her statements against her own interest are admitted in a fashion which is only against her own interest. The Court considered a redaction in a number of ways, from changing pronouns to eliminating the reference to Gonzales altogether. Indeed, the United States recognizes that, as it relates to Bruton v. United States, and its attempt to introduce evidence of co-Defendants' statements, proceeding with a joint trial will be done "at our own peril, Your Honor," as it comes to the admission of certain items of evidence." May Tr. at 57:3-4 (Castellano). The Court analyses and redacts Gutierrez' statement as follows.

The Court explains, first, that when Gonzales addressed the Bruton v. United States issue at the hearing, the Court stated: "It sounds like the Government is willing to run the risk that you may be right on this Bruton problem and I may keep this evidence out and they still want to try the cases to[gether] rather than separate." May Tr. at 58:24-59:3 (Court). Gonzales disagreed and argued:

> I would submit to the Court that . . . clearly Ms. Gutierrez made statements [--] post arrest statements [--] that implicate Mr. Gonzales. Essentially her statements put Mr. Gonzales at the scene of a crime [and] those are clearly in[culpatory] statements that raise a Bruton issue if we're tried with Ms. Gutierrez. Ms. [Rodriguez] also implicated Mr. Gonzales, not just what one co-defendant said during the alleged commission of the crime but simply you have these defendants making post arrest statements to the Government about what each co-defendant allegedly did. And Your Honor, I would submit to the Court that simply redacting, cutting out Mr. Gonzales' name is going to, is not going to cure the problem.

May Tr. at 59:4-18 (Johnson). At this point, the Court explained:

> [When I] really focus [on] what I think is one of the main things is when I turn to this jury and start instructing this jury, when they can compartmentalize the evidence, and I think on Ms. Johnson's client that they can. They can

> compartmental[ize and] I think it's going to be reduced.  I know there [are] going
> to be some evidentiary issues, I don't minimize those in any way and we're going
> to have to work through [that] but I think as far as giving Ms. Johnson her client a
> fair trial, I think I have gone a long ways toward doing that, and so I'm not
> inclined to grant the . . . motion to sever.  Down [the] road if it pops up and
> Government starts looking at its evidence and wants to rethink[], we can certainly
> look at it . . . but I think at the present time [the] severance that's been granted is
> going to solve a lot of the problems for Ms. Johnson and Mr. Go[nzales], and so
> I'm not inclined to grant it.

May Tr. at 62:7-63:7 (Court).  Regarding <u>Bruton v. United States</u>, then, and Gutierrez' obviously

inculpatory statement which suggests her role as a potential accomplice to assault, the Court

notes that, in its experience, it on some occasions has been able to redact statements like this and

instruct the jury in a sufficient manner to comply with <u>Bruton v. United States</u>' requirements

pertaining to testimonial statements such as those here which Gutierrez made to law enforcement

agents.    <u>See</u>  <u>United States v. Verduzco-Martinez</u>,  186  F.3d  1208,  1214  (10th  Cir.

1999)("[W]here a defendant's name is replaced with a neutral pronoun or phrase there is no

*Bruton* violation, provid[ed] that the incrimination of the defendant is only by reference to

evidence other than the redacted statement and a limiting instruction is given to the jury.")(citing

<u>Bruton v. United States</u>, 391 U.S. at 123).  The statement at issue here is different, on this record.

Gutierrez' statement is as follows:

> According to Ms. Gutierrez, on February 27, 2016, she allowed Brandi Rodriguez
> to borrow her truck.  According to Gutierrez, sometime later, Rodriguez returned
> to her trailer with Gonzales and Rivera and Rodriguez decided to go confront J.G.
> Gutierrez stated that Rodriguez, Rivera and Gonzales went to confront J.G. at the
> home where he was staying.  When the trio returned to Gutierrez's home,
> Rodriguez had blood on her shoes and all three asked to be taken home.

Motion to Sever at 19.  The Court notes that neither party has cited to the Court the exact

statement at issue or provided the Court with the document that contains the proffered statement,

and the Court must thus work from the replication Gonzales provides.  <u>Cf.</u> United States'

Gonzales Response at 13-14.  Given that the statement is post-arrest and knowingly made to a

police officer, Gutierrez' statement, under <u>Bruton v. United States</u> and <u>Crawford v. Washington</u>, is testimonial.  On this record, the Court cannot redact the statement to only incriminate her.  The first statement incriminates someone else: "According to Ms. Gutierrez, on February 27, 2016, she allowed <u>Brandi Rodriguez</u> to borrow her truck."  Motion to Sever at 19 (emphasis added).  The second sentence incriminates three people: "According to Gutierrez, sometime later, <u>Rodriguez</u> returned to her trailer with <u>Gonzales</u> and <u>Rivera</u> and <u>Rodriguez</u> decided to go confront J.G."  Motion to Sever at 19 (emphases added).  The third sentence incriminates three people: "Gutierrez stated that <u>Rodriguez</u>, <u>Rivera</u> and <u>Gonzales</u> went to confront J.G. at the home where he was staying."  Motion to Sever at 19 (emphases added).  Likewise, the fourth sentence incriminates three people: "When the trio returned to Gutierrez's home, <u>Rodriguez</u> had blood on her shoes and <u>all three</u> asked to be taken home."  Motion to Sever at 19 (emphases added).  The Court is not convinced that it can, under <u>Bruton v. United States</u>, redact the four sentences to only incriminate Gutierrez -- her self-inculpation flows from inculpating the others.  Accordingly, the Court will exclude the statement entirely.  The United States will need to think hard whether it has other evidence, but the Court does not think that this confession or self-incriminating statement may come in.  The Court, accordingly, cannot redact this statement to alleviate any <u>Bruton v. United States</u> concerns at this time.  The United States may need other evidence.  If it has none, the United States may be in a position where severance of Gonzales from Gutierrez could become necessary.  The Court may not be able to admit this statement without severing Gonzales from Gutierrez.  The Court notes that the United States' theory might also involve statements made by Gutierrez regarding where J.G. was located.  The Court does not yet have a full picture of all the evidence against these Defendants in these Counts.  At the present time, however, the Court will not sever Gonzales, because the United States has stated

that it intends to run the risk of limiting evidence rather than pursue severing more Defendants. See May Tr. at 57:3-4 (Castellano)(discussing at the hearing that the United States recognizes that, as it relates to Bruton v. United States, and its attempt to introduce evidence of co-Defendants' statements, proceeding with a joint trial will be done "at our own peril, Your Honor," as it comes to the admission of certain items of evidence).

In a complex joint trial such as this, the Court is prepared to reconsider such nuanced evidentiary decisions when they are fully briefed as motions in limine. At this time, the Court still has an unclear picture of which Defendants will be testifying at trial, what statements the United States intends to introduce at trial, and what the precise context is of the excerpted statements that Gonzales alludes to in Gonzales' Amended Motion to Sever. The United States is now on full alert that the Court will scrutinize testimonial statements that co-Defendants in this case have made which inculpate other co-Defendants, before the Court admits them in light of Bruton v. United States' ban on the admission against joint defendants of unredacted co-defendants' testimonial statements against interest. See Bruton v. United States, 391 U.S. at 135-36. Bruton v. United States, the Court reiterates, held:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. . . ."

Bruton v. United States, 391 U.S. at 135-36. The Court, accordingly -- despite not being able to admit the statement before it at this time -- cannot conclude at this time that sufficient prejudice

to Gonzales exists warranting his further severance from the Counts 1-5 and 13-16 trial grouping

at this time.

## IV.    THE COURT DENIES THE REQUESTS TO SEVER COUNTS 4 AND 5 IN A. GALLEGOS' MOTION TO SEVER.

A. Gallegos contends that the Court should sever Counts 4 and 5, because this SNM case

is comparable to the case United States v. Gallo, arguing:

> Like *Gallo*, this case deals with a complex RICO indictment spanning decades'
> worth of criminal allegations.  In fact, this Court declared it complex on January
> 7, 2016, even before the government unsealed the April 21, 2016, superseding
> indictment. . . .  Also similar to *Gallo* is the disproportionality of the evidence in
> relation to the 30 defendants charged.  A review of the discovery to date
> demonstrates that the government has revealed far more and far stronger evidence
> against some co-defendants, including audio-recorded conversations and self-
> incriminating statements, than against others.   Accordingly,  "[i]nevitable
> prejudice to the peripheral defendants is caused by the slow but inexorable
> accumulation of evidence against the major players."  . . .   To date, the
> government has only presented rumor, conjectures and circumstantial evidence as
> to the guilt of the Gallegos Defendants, which is not only substantially weaker
> evidence when compared to the evidence against most of the other defendants, but
> is clearly indicative of the government relying on the principle of "guilt by
> association" to prove their case in counts 4 and 5.

A. Gallegos' Motion to Sever at 16-17.  A. Gallegos concedes that "it is unclear at this point

whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive," but he

nonetheless contends "there can be no doubt that there will be antagonistic defenses.  For

instance, many defendants may argue they were not or are not SNM members.  Other defendants

will likely argue the alleged crimes were not done in furtherance of the SNM."  A. Gallegos'

Motion to Sever at 17.  A. Gallegos gives no further examples, and the Court agrees it is not in a

position to understand what defenses each Defendant may present at this time.  Ultimately,

however, A. Gallegos' argument in favor of severance of Counts 4 and 5 -- in addition to relying

on the logistics and impracticality of a joint 16-Count trial -- maintains that the risk of prejudice

in this case is great, given the different nature of all of the Counts, and that he specifically --

being charged only in Counts 4 and 5 -- risks that an appeal to guilt by association with his co-Defendants will bolster the scant evidence against him.  See A. Gallegos' Motion to Sever at 17-18.  A. Gallegos also reiterates that the Superseding Indictment's nature limits the potential effectiveness of a limiting instruction to the jury, stating that,

> if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM.  Simply hearing about this activity by alleged fellow gang members makes it unlikely the Gallegos Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

A. Gallegos' Motion to Sever at 18-19.  The Court disagrees at this time.

The Court has already concluded that the risk of spillover prejudice does not warrant severance of any individual counts in this case.  Here, A. Gallegos merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against him, because limiting instructions will not stop the weight of evidence against his co-Defendants from spilling over and affecting his defense.  The Court again concludes that A. Gallegos has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence in his case.  See Zafiro v. United States, 506 U.S. at 539.  A. Gallegos' mere assertion of spillover prejudice is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.  The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of A. Gallegos' concerns regarding prejudice.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding that its "arrangement of the defendants appears to be, at least on the information now available, the most

efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").  The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Count in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant.  See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial).  The Court will not, therefore, sever A. Gallegos, from the Counts 1-5 and 13-16 trial grouping, at this time.

## V.    THE COURT DENIES THE REQUEST TO SEVER COUNTS 1 AND 2 IN TROUP'S MOTION TO SEVER.

Troup's Motion to Sever, concerned with severance of Counts 1 and 2, argues that at this stage in the prosecution, "there is no way to determine whether a failure to sever will be actually prejudicial, because the Court cannot know how the evidence will come in or even if there will be a conviction.  All this Court can evaluate is whether there is a risk of prejudice warranting severance."  Troup's Reply at 5-6.  As it pertains to Counts 1 and 2, Troup primarily argues:

> By alleging that SNM is a singular enterprise spanning several decades, the government attempts to render admissible any evidence about that enterprise regardless of applicability to any charged individual. . . .  In painting with such a broad brush, however, the government demonstrates why severance is necessary to protect the 2001 Defendants from unfairly prejudicial evidence and testimony. . . . [T]he government does not really dispute that after the homicides at issue in Counts 1 and 2, SNM factionalized and did not reflect what it may have been previously.  Nor does the government dispute that the members of SNM who conspired to murder corrections officials in the community in 2015 as alleged in Counts 9 and 10, and the organization that would be the SNM at that time, bore no connection to the individuals charged in Counts 1 and 2.

Troup's Reply at 6.  Accordingly, because Counts 1 and 2 are remote in time and, because Troup contends that the Counts 1 and 2 Defendants are not part and parcel involved in the same SNM

gang activity as those Defendants charged with conduct in the more recent Counts -- such as Counts 13-16 -- Troup urges the Court to further sever the Second Superseding Indictment to avoid a risk of spillover prejudice to the Counts 1 and 2 Defendants.  See Troup's Reply at 8. That is, Troup argues that severance is appropriate, because "spillover prejudice will prevent the jury from individualizing each defendant."  Troup's Reply at 10 (internal quotation marks and citation omitted).  Troup also asserts that a joint trial will likely result in a "tangled web" of complicated jury instructions, which he argues supports further severance, because the jury will struggle to compartmentalize the evidence.  Troup's Reply at 10-13.

The United States disagrees.  According to the United States, as it has argued in its responses to other Defendants' severance motions, the Counts 1 and 2 Defendants have been charged with VICAR conduct for the SNM enterprise.  See United States' Troup Response at 1-3.  In particular, Counts 1 and 2 allege:

> At approximately 8:35 a.m., R.G., an inmate and associate of the SNM, was found dead in his cell in the Ocean-One-Yellow housing unit at the SNMCF.  R.G.'s body was discovered lying down on his stomach in his bed.  It appeared that he had been strangled.  Nearly 30-minutes later, F.C., an inmate and active member of the SNM, was found dead in his cell in the Paul-One-Green housing unit at the SNMCF.  F.C.'s body was discovered lying face down in his bed with a laundry bag tied around his neck.  The autopsy revealed that the cause of death as to both victims was ligature strangulation, and the manner of death was homicide.  After an extensive investigation, federal investigators discovered that a "green light" was issued for R.G. and F.C. by the SNM.  It was believed that R.G. was cooperating with federal investigators and F.C. "ratted" on another inmate while in prison in Santa Fe.  Witnesses and confidential human informants confirmed that the "green light" was issued by Billy Garcia, a high ranking member of the SNM, and that Edward Troup was involved in the murder of F.C.

United States' Troup Response at 2.  The United States reiterates, then, that it has

> charged Defendants with participating in the affairs of the SNM enterprise through the commission of the alleged racketeering acts.  As the Superseding Indictment alleges, Defendants are members of the SNM, a criminal enterprise, and, at the behest of the gang, participated in racketeering acts, namely the murders of F.C. and R.G. . . .  The Superseding Indictment characterizes the

- 195 -

> Defendants' collective conduct as "Violent Crimes in Aid of Racketeering" pursuant to 18 U.S.C. § 1959(a)(1). . . .   Accordingly, Defendants cannot escape joinder by claiming that they are in "no way shape or form" responsible for Counts 9 and 10 when the co-Defendants' alleged acts fulfill the essential elements of the SNM VICAR conspiracy.

United States' Troup Response at 7.   Regarding Troup's arguments that the changes in leadership for SNM between the time that the conduct alleged in Counts 1 and 2 occurred, and the present time, the United States maintains that "the change of name or factions within a group does not establish the existence of separate and distinct groups," and that

> the Government is required to prove three structural features to establish the existence of an association-in-fact enterprise: "a purpose, relationships among those associated with the racketeering enterprise, and longevity sufficient to permit these associates to pursue the racketeering enterprise's purpose."   A reasonable jury could find that despite variations of membership, the criminal purpose of the SNM has remained the same: to preserve and protect the power, territory, reputation, and profits of the enterprise throughout the New Mexico penal system and the streets of New Mexico through the use of intimidation, violence, threats of violence, assaults, and murder.

United States' Troup Response at 9-10.

Troup primarily argues that spillover prejudice favors further severance of Counts 1 and 2; the Court has already concluded, however, that the risk of spillover prejudice does not warrant severance of any individual counts in this case.   Here, Troup merely makes a general assertion of prejudice, and fails to specifically identify specific and compelling prejudicial concerns, arguing only that there may be an inability of the jury to compartmentalize the evidence against the Counts 1 and 2 Defendants, because limiting instructions will not stop the weight of evidence against the more-recent offending Defendants from spilling over and affecting their defense.   See Troup's Reply at 10.   The Court again concludes that Troup has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence regarding the Counts 1 and 2 Defendants in this case.   See Zafiro v. United States, 506

U.S. at 539.  Troup's reliance on an assertion of spillover prejudice rooted in remoteness of time and flux regarding SNM leadership is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise.  It is not surprising that an organization -- criminal or otherwise -- changes and evolves over time, particularly as leadership changes.  Organizations' cultures change.  That change does not mean, however, that the organization no longer exists.  The Court cannot and should not decide the issue on a motion to sever.  That issue is one for the jury, and the United States will have to prove, beyond a reasonable doubt, that there has been one and only one SNM enterprise, and that it still exists.  The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of Troup's concerns regarding prejudice by the jury's failure to compartmentalize.  Cf. United States v. Gray, 173 F. Supp. at 18 (concluding that its "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants").  The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Defendant in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant.  See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial).  The Court will not, therefore, sever Counts 1 and 2, from the Counts 1-5 and 13-16 trial grouping, at this time.

# VI.    THE COURT DENIES THE REQUESTS IN ALONSO'S MOTION TO SEVER TO SEVER HIM FROM COUNT 3 AND TO SEVER COUNT 3 IN TOTALITY.

Alonso's Motion to Sever requests that the Court "sever Count 3 from all other counts of the Superseding Indictment.  Within Count 3, Mr. Alonso further moves that his trial be severed from the trial of co-defendant Edward Troup."  Alonso's Motion to Sever at 1.  In support of the motion, Alonso -- in addition to arguing that the interests of judicial economy warrant some severance generally -- argues primarily that "severance is . . . required under Rule 14 and the Fifth Amendment because a joint trial of [] Mr. Alonso alongside the other remaining defendants and the 14 other counts in the Superseding Indictment will deprive him of his right to a fair trial."  Alonso's Motion to Sever at 2.  Regarding Count 3 in particular, Alonso provides:

> Count 3 alleges that Edward Troup, Javier Alonso, Arturo Arnulfo Garcia, Benjamin Clark, and Ruben Hernandez, murdered Freddie Sanchez on June 17, 2007 at the Southern New Mexico [] in Las Cruces.  Based on the discovery produced to date, it appears that the government's theory regarding Count 3 is that co-defendants Arturo Garcia and Benjamin Clark ordered that Freddie Sanchez be killed, that codefendant Ruben Hernandez assisted in the homicide by covering security cameras, and that co-defendants Edward Troup and Javier Alonso killed Freddie Sanchez.  While defense counsel has attempted to discern the government's theory, discovery has been produced that contradicts the government's presumed theory.

Alonso's Motion to Sever at 4.  Under rule 14, then, Alonso provides that he will endure prejudice in a joint trial, "because (1) there is no nexus between Count 3 and the other counts, and (2) because Count 3 and the other counts are not based on the same act or transaction . . . a joint trial would be unfair to Mr. Alonso."  Alonso's Motion to Sever at 9.  Specifically, Alonso argues that "[t]he introduction of evidence of the other 14 unrelated crimes purportedly committed by . . . co-defendants who are not charged in Count 3 will deprive Mr. Alonso of his rights to fair trial such that severance should be granted under Rule 14."  Alonso's Motion to Sever at 9.  Alonso also argues that the "complexity of the indictment, the disproportionality of

evidence, and the presence of evidence that would only be admissible as to some defendants make severance a prudent exercise of discretion."   Alonso's Motion to Sever at 9.   Further, although the United States argues each of the Superseding Indictment's counts are "linked by a shared affiliation with the SNM," Alonso argues that "such link did not exist as to Mr. Alonso during the time alleged in Counts 4-15."   Alonso's Motion to Sever at 9-10.

Alonso also argues why he, individually, requests "severance . . . from Edward Troup," because "Edward Troup allegedly made statements that, if admitted at a joint trial, would implicate Javier Alonso."   Alonso's Motion to Sever at 12.   Specifically, Alonso explains:

> In *Bruton v. United States*, 391 U.S. 1231 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession implicating a defendant at their joint trial violated the defendant's Sixth Amendment Confrontation Clause rights.   *Bruton*, involved two defendants -- Evans and Bruton -- tried jointly for robbery.   Evans did not testify, but the Government introduced into evidence Evans' confession, which stated that both he (Evans) and Bruton together had committed the robbery. . . .   The trial judge told the jury it could consider the confession as evidence only against Evans, not against Bruton. . . .   The Court held that, despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial had violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses. . . .   The Court recognized that in some circumstances a limiting instruction may not adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant.

Alonso's Motion to Sever at 12.   Alonso also notes that, in <u>Bruton v. United States</u>, the Supreme Court held that

> "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.   Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect. . . .   The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. . . ."   The Court found that Evans' confession constituted just such a "powerfully incriminating extrajudicial statement," and that its introduction into

evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights.

Alonso's Motion to Sever at 13 (quoting <u>Bruton v. United States</u>, 391 U.S. at 135-36).  Here, Alonso contends that Troup has made statements which implicate him and might result in a Confrontation-Clause violation should he be tried with Troup.  <u>See</u> Alonso's Motion to Sever at 13.  Alonso provides that the statements he has pinpointed are as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that he held Freddie Sanchez's legs while Javier Alonso strangled him with the drawstring from a laundry bag.

> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was ordered to kill Sanchez.

> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  Because of the inculpatory and inherently prejudicial nature of these statements, Alonso requests further individual severance under rule 14.  <u>See</u> Alonso's Motion to Sever at 13.

The Court, first, will address Alonso's request to sever Count 3 from the other Counts in the Second Superseding Indictment.  Here, Alonso primarily argues that spillover prejudice and a disparity of evidence favors further severance of Count 3 from the other Counts in the Second Superseding Indictment; the Court has already concluded, however, that the risk of spillover prejudice does not warrant severance of any individual counts in this case.  The Court, in considering Alonso's arguments, views them as making a general assertion of prejudice that fail to specifically identify specific and compelling prejudicial concerns.  Instead, Alonso attempts to argue only that the jury may be unable to compartmentalize the evidence against the Counts 3 Defendants, because limiting instructions will not stop the weight of evidence against their co-

Defendants from spilling over and affecting their defense in a prejudicial manner. The Court again, concludes that Alonso has not met his heavy burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence regarding the Count 3 Defendants in one joint trial. See Zafiro v. United States, 506 U.S. at 539. This case involves a VICAR indictment, and Alonso's reliance on the potential for spillover prejudice overlooks the inherent nature of the SNM criminal enterprise and Congress' choice to criminalize this conduct in this fashion. The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of Alonso's concerns regarding prejudice by the jury's failure to compartmentalize in a constitutional manner. Cf. United States v. Gray, 173 F. Supp. at 18 (concluding that its "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants"). The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Count in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant. See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial). The Court will not, therefore, sever Count 3, from the Counts 1-5 and 13-16 trial grouping, at this time. The Court next considers Alonso's arguments that Bruton v. United States requires severance of him from his co-Defendant Troup; and, additionally, should Bruton v. United States not apply to Troup's statements, whether the admission of Troup's statements requires severance of Troup from Alonso nonetheless.

The problem with Alonso's reliance on Bruton v. United States is twofold.  First, in 2004, the Supreme Court in Crawford v. United States held that the Confrontation Clause protects defendants only from the introduction of testimonial hearsay statements without the opportunity to meaningfully confront the declarant.  Second, subsequent to Crawford v. United States, the majority of the Courts of Appeal similarly have held that Crawford v. Washington has now limited Bruton v. United States to only protect co-defendants from testimonial statements.  See United States v. Dale, 2010 WL 2977410, at *9 (holding that the defendant's statements to prisoner were not testimonial and therefore did not violate the co-defendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d at 65 (holding that the defendant's recorded telephone statements to his mother was non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d at 326 (holding that, because Bruton v. United States is based on the Confrontation Clause, then it also applies only to testimonial statements, and any non-testimonial statement is not subject to it); United States v. Pike, 292 F. App'x at 112 ("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").  Accordingly, the Tenth Circuit has foreclosed the analysis underlying Alonso's arguments and instead dictates the Court's inevitable conclusion that Crawford v. Washington limits Bruton v. United States' scope to co-Defendants' testimonial statements.  See United States v. Smalls, 605 F.3d at 768 n.2.  In United States v. Smalls, the Tenth Circuit -- in no uncertain terms -- stated:

> In *Bruton*, the Court held that defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a postal inspector during an interrogation, was introduced at their joint trial.  The Court explained that a limiting jury instruction was insufficient under the facts of the case to cure any prejudice to that defendant.  As will become apparent from our opinion, *Bruton* is consistent with the present state of Sixth Amendment law

> because the accomplice's confession, unlike Cook's statement, was testimonial, rendering it inadmissible against the defendant absent an opportunity for cross-examination.  Notably, however, the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2 (emphasis added).  United States v. Smalls, specifically, involved a joint prosecution of three co-defendants, and considered statements that one co-defendant -- Cook -- made which implicated himself and his co-defendants.  See United States v. Smalls, 605 F.3d at 767-68.  One co-defendant pled, and relying on Bruton v. United States, the district court severed the two remaining defendants' -- Cook and Smalls -- trials, concluding that Cook's statement could not be introduced against his remaining co-defendant, Smalls.  United States v. Smalls, 605 F.3d at 768 n.2, 772-73.  The United States nonetheless moved to admit this statement against Smalls in his separate trial, arguing that the statement was made by Cook against Cook's penal interests.  See 605 F.3d at 772-73.  The district court concluded that Cook's statement was non-testimonial and then "analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation Clause jurisprudence as set forth in *Ohio v. Roberts*," thereafter concluding that the statement lacked a "particularized guarantee of trustworthiness" and that it should be excluded.  United States v. Smalls, 605 F.3d at 772-73.

When the United States appealed that decision to the Tenth Circuit, the Tenth Circuit reversed it.  See 605 F.3d at 773-74.  The Tenth Circuit concluded that, if Cook's statement had been testimonial, its exclusion would have been proper, but, because the statement was non-testimonial, the Confrontation Clause's protections do not apply.  See 605 F.3d at 787.  As long, therefore, as the statement met the definition for "statements against interest" under the Federal Rules of Evidence, it would be admissible against Smalls.  United States v. Smalls, 605 F.3d at 780.  The Tenth Circuit, accordingly, held that the district court had erred in excluding the

entirety of Cook's statement, and then remanded the case so the district court could determine exactly which parts of Cook's statement were self-inculpatory and therefore admissible against Smalls.  See 605 F.3d at 786-87.  Notably, in reaching this conclusion, the Tenth Circuit also provided:

> Although the district court's severance order is not part of the record on appeal, we take judicial notice of it under Fed. R. Evid. 201 as it appears of record in *United States v. Smalls*, No. 06-CR-2403-RB-1, Memorandum Opinion and Order (D.N.M. May 7, 2008)(Doc. # 280).  Relying on *Bruton v. United States*, 391 U.S. 123 [] and its progeny, the district court reasoned the admission into evidence of a recorded statement in which Cook incriminated both himself and his alleged cohorts before a CI would violate Defendant Smalls' right to confrontation.  In *Bruton*, the Court held that defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a postal inspector during an interrogation, was introduced at their joint trial.  The Court explained that a limiting jury instruction was insufficient under the facts of the case to cure any prejudice to that defendant.  As will become apparent from our opinion, *Bruton* is consistent with the present state of Sixth Amendment law because the accomplice's confession, unlike Cook's statement, was testimonial, rendering it inadmissible against the defendant absent an opportunity for cross-examination. Notably, however, the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.

United States v. Smalls, 605 F.3d at 768 n.2 (emphasis added).  In the Tenth Circuit, then, the import of United States v. Smalls is that Crawford v. Washington limited Bruton v. United States and now protects only against the admission of co-Defendants' testimonial statements.  See United States v. Smalls, 605 F.3d at 768 n.2.  The Court's analysis, therefore, must proceed by first inquiring whether Troup's statements which Alonso challenges are testimonial and, then, if they are testimonial, inquiring whether redaction of the statements would alleviate the Bruton v. United States concerns.  Should the Court be unable to alleviate the Bruton v. United States concerns, the Court would be forced to consider severance of Alonso and Troup under rule 14, because a co-defendant's testimonial and inculpatory statement would be inadmissible against the declarant's co-defendants.  See United States v. Smalls, 605 F.3d at 768 n.2.

The Court begins its analysis by recognizing that Troup made his statements to what appears to be various different CHSs.  Those statements, as Alonso describes them, are -- once more -- as follows:

> Statement at Deleon 680-681 []: Here Mr. Troup allegedly told a CHS that he held Freddie Sanchez's legs while Javier Alonso strangled him with the drawstring from a laundry bag.

> Statement at Deleon 1238-1239 []: Here Mr. Troup allegedly told a CHS that the murder of Freddie Sanchez was called by Arturo Garcia and Gerald Archuleta, that he (Troup) was part of the murder, and that Javier Alonso was ordered to kill Sanchez.

> Statement at Baca 2464 []: Here Mr. Troup allegedly told a CHS that he and Javier Alonso killed Freddie Sanchez.

Alonso's Motion to Sever at 13.  In full, the statements are as follows.  Troup, first, apparently spoke to a CHS, with the relevant FBI report stating:

> In late November 2012, [REDACTED] had a conversation with SNM gang member EDWARD TROUP in back yard off of [REDACTED] in Albuquerque. During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico.  TROUP stated that during one of the murders, he held "Fred Dawg's" (agent note: identified as FREDDIE SANCHEZ, DOB) legs while "Wino" (agent note: identified as SNM gang member JAVIER ALONSO, Jr., DOB) strangled him to death with a drawstring from a laundry bag.  Both TROUP and ALONSO disposed of the drawstring and then took off their clothes and tore up the evidence in an attempt to hide their part in the murder.

FBI 302 Report, U.S. v. Deleon, Et Al 680-81 at 1-2, filed February 5, 2017 (Doc. 893-1)("Troup Statement 1").  Troup, next, apparently spoke to another CHS, with the relevant FBI report stating:

> Fred Sanchez, aka Fred Dawg, from Roswell, New Mexico, was killed by the SNM because he "ratted."  The murder of Sanchez was called by SNM leaders Arturo Garcia, aka Shotgun and Gerald Archuleta, aka Sticks.  Troup bragged about being a part of the murder of Sanchez as well, and told that Javier Alonso Jr., aka Wino, also from Roswell, was ordered to kill Sanchez.

FBI 302 Report, U.S. v. Deleon, Et Al 1238-39 at 1-2 (interview with CHS taken July 5, 2013), filed February 5, 2017 (Doc. 893-2)("Troup Statement 2").  A third FBI Report and CHS Reporting Document indicates that: "In 2007, Edward Troupe [sic] admitted to CHS that he and Javier Alonso killed Freddie Sanchez."  FBI 302 Report FD-1023, U.S. v. Baca, Et Al 2464 at 1, filed February 5, 2017 (Doc. 893-3)("Troup Statement 3").

The Court concludes that Troup's statements are not testimonial, and therefore that Bruton v. United States does not bar their introduction against Alonso under the Confrontation Clause.  In Crawford v. Washington, the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  In Davis v. Washington, the Supreme Court has further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has also restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d at 1048 (alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78).  Accord United States v. Chaco, 801 F. Supp. 2d at 1209-10 (discussing developments in Tenth Circuit precedent on the test

regarding what qualifies as a testimonial statement).[20]  With respect to precisely what a "testimonial" statement is, however, the Supreme Court in <u>Crawford v. Washington</u> was careful

_____

[20]Specifically, the Court explained:

The Tenth Circuit has stated that a critical element in determining whether a statement is testimonial or non-testimonial "centers on the reasonable expectations of the declarant."  <u>United States v. Summers</u>, 414 F.3d 1287, 1302 (10th Cir. 2005).  The Tenth Circuit has held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime." <u>United States v. Townley</u>, 472 F.3d 1267, 1272 (10th Cir. 2007) (quoting <u>United States v. Summers</u>, 414 F.3d at 1302).  Other Circuit Courts of Appeal are in accord.  <u>See United States v. Townley</u>, 472 F.3d at 1272 (citing <u>United States v. Hinton</u>, 423 F.3d 355, 360 (3d Cir. 2005); <u>United States v. Cromer</u>, 389 F.3d 662, 675 (6th Cir. 2004); <u>United States v. Saget</u>, 377 F.3d 223, 229 (2d Cir. 2004)). The Tenth Circuit in <u>United States v. Smalls</u> . . . called into question some aspects of the definition of testimonial that it set down in <u>United States v. Summers</u>.  <u>See United States v. Smalls</u>, 605 F.3d at 777 ("Upon close inspection, Summers' definition of 'testimonial' appears somewhat in tension with <u>Davis[ v. Washington</u>, 547 U.S. 813[] (2006) ]' strictures, and perhaps overly broad. . . ."). Specifically, the Tenth Circuit stated that a testimonial statement must be made in a "formal" context, although they were not specific about what that might mean. <u>See United States v. Smalls</u>, 605 F.3d at 777-78.  Next, the Tenth Circuit specified that the <u>United States v. Summers</u> articulation ignored the statement's "primary purpose," and focused instead on the foreseeability to the declarant of the purposes to which the statement "might" be put.  <u>United States v. Smalls</u>, 605 F.3d at 777-78.  With those two clarifications, it declined to restate a precise definition of a testimonial statement, instead setting forth two proposed definitions, either one of which it might adopt if the issue were put directly before it:

> [W]e might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

<u>United States v. Smalls</u>, 605 F.3d at 778 (proffering these potential tests, but

not to provide a definition to differentiate "testimonial" from "non-testimonial" hearsay, and instead only noted that "various formulations," "articulations," or "definitions" of "testimonial" could be posited; and, apart from citing examples of statements that would qualify as testimonial under any definition, the Supreme Court specifically declined to undertake crafting a controlling definition of testimonial.  541 U.S. at 51-53.  The Court indeed made sure to reiterate that it was not providing a definition for testimonial:  "[W]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"  541 U.S. at 68.  The Supreme Court has provided, however, that statements defendants make to fellow prisoners are not testimonial, meaning they would not fall under the purview of the Confrontation Clause after Crawford v. Washington.  See Davis v. Washington, 547 U.S. at 825 (providing that statements from one prisoner to another are "clearly" not testimonial).  The Court considers that this guidance is particularly persuasive in the context of Troup's statements to the CHSs -- whom the Court considers were similarly situated to the prisoner-type CHS comprehended by Davis v. Washington -- whom are now at issue in this case.

Essentially, in Bruton v. United States, the Supreme Court held that a defendant is deprived of his Sixth Amendment right to confrontation where his co-defendant's inculpatory statement, made to a government agent, is introduced at their joint trial.  The Bruton v. United States doctrine and rule, as Crawford v. Washington refined it, thus protects a defendant's right to confrontation by barring the admission of testimonial statements that a non-testifying co-defendant makes.  See United States v. Smalls, 605 F.3d at 768 n.2.  The statements here, by

---

holding "we need not now . . . tender a definitive definition of 'testimonial,' because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply").

United States v. Chaco, 801 F. Supp. 2d at 1209-10.

which Troup confessed to CHSs that he and Alonso had been ordered to kill, and killed, F.S.,
appear to have been made boastfully and in passing, particularly Troup Statement 1, which the
Court understands occurred in a "backyard."  Troup Statement 1 at 2.  See Troup Statement 2 at
1 ("Troup bragged . . . .").  Although the Crawford v. Washington court was sure not to impose
upon the lower courts a hard-and-fast rule for what a testimonial statement might be, the
Supreme Court has subsequently provided that, where a co-defendant's statements are "made
unwittingly to a Government informant," those statements are not testimonial and are therefore
not afforded the protections provided by Bruton v. United States.  United States v. Smalls, 605
F.3d at 777 ("A declarant's statements to a confidential informant, whose true status is unknown
to the declarant, do not constitute testimony . . . .")(quoting United States v. Saget, 377 F.3d 223
(2d Cir. 2004)).  See Davis v. Washington, 547 U.S. at 825 (citing Bourjaily v. United States,
483 U.S. 171, 181-84 (1987)(considering statements made unwittingly to a government
informant); Dutton v. Evans, 400 U.S. 74, 87-89 (1970)(plurality opinion)(considering
statements from one prisoner to another)).  Indeed, the Tenth Circuit more explicitly emphasized
this maxim in United States v. Smalls, stating:

> Synthesizing *Crawford* and *Davis*, we might today formulate a definition of a
> testimonial statement which reads: a formal declaration made by the declarant
> that, when objectively considered, indicates the primary purpose for which the
> declaration was made was that of establishing or proving some fact potentially
> relevant to a criminal prosecution.  Or, to better conform to the current state of
> Tenth Circuit precedent, we might say: A formal statement is testimonial if a
> reasonable person in the position of the declarant would objectively foresee that
> the primary purpose of the statement was for use in the investigation or
> prosecution of a crime.  *See Summers*, 414 F.3d at 1302.  As we recognized in
> *Summers*, "'[t]he proper inquiry . . . is whether the declarant intends to bear
> testimony against the accused.'"  *Id.* at 1302 n.9 (quoting *United States v.
> Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)).  And the standard by which a court
> measures the declarant's intent is an objective one.  *See Davis*, 547 U.S. at 822;
> *Summers*, 414 F.3d at 1302.  Fortunately, we need not now resolve the apparent
> tension between *Davis* and *Summers*, or tender a definitive definition of
> "testimonial," because Cook's statement is nontestimonial regardless of which of

the foregoing definitions we apply.  In *Davis*, the Court expressed the view that "statements made unwittingly to a Government informant" or "statements from one prisoner to another" are "clearly nontestimonial."

United States v. Smalls, 605 F.3d at 778.

Absent a testimonial statement, then, Alonso cannot make out an argument premised in the Confrontation Clause with respect to the possible introduction of Troup Statement 1, Troup Statement 2, and Troup Statement 3, all of which inculpate him in a murder.  Indeed, because there cannot be a Confrontation Clause violation on the basis of these nontestimonial statements, the Court considers Alonso's issues with these statements to be akin to the arguments each Defendant in this case has been raising regarding spillover prejudice and disparity of the evidence.  The Court, however, has only been given snippets of the evidence that is available to the parties, with these three statements being an example of those particular snippets which the parties choose to attach to their pleadings.  Alonso has not, as of yet, argued to the Court that these three inculpatory statements by Troup are the only items of evidence against him -- or perhaps only a small example of the evidence against him.  Should Alonso or the United States represent as much to the Court, the rules of evidence, like rule 403, could further come into play as the Court considers the United States' case against Alonso.  At the present time, in the context of a motion to sever, the Court is not prepared to sever Alonso from Troup on the basis of three nontestimonial statements which, under Crawford v. Washington and United States v. Smalls, do not implicate Alonso's rights under the Confrontation Clause.  The Court is prepared, however, to make a preliminary ruling as to the admissibility of Troup's three nontestimonial statements in the context of the already severed trial grouping of Counts 1 to 5 and 13-16.  The Court recognizes this issue was briefed and argued as being a Confrontation Clause issue, and thus will

leave open the possibility that further argument and evidence from the parties could alter the Court's perception of the evidence as it relates to the hearsay rules.

To be sure, the Court does not have a robust record to make a definitive Bruton v. United States determination. Trial is set for July 10, 2017. First, the Court does not know, definitively, whether the CHS in each of the three statements is the same person. Because the parties have not told the Court otherwise, the Court will assume it is the same CHS, or at least the different CHSs are similarly situated. Second, the parties do not tell the Court that the CHS or CHSs are testifying. If they are not testifying, then there is no Bruton v. United States issue for the Court to decide. Third, the parties have not indicated that the CHS was a paid informant at the time the statements were made. The Court will assume the CHS was not paid or otherwise working for the United States or some other government agency at the time. In other words, the CHS was not working off charges or otherwise cooperating with a government agency at the time the statements were made. If the CHS were working for or with a government when the statements were made, the Court might need to look closer at whether the statements were testimonial. Accordingly, the statements do not appear to be testimonial, and the Court does not understand Alonso to argue otherwise. The statements are, under Smalls v. United States, admissible against Alonso and Troup. Even if the Court were to sever Alonso from Troup, these statements would be admissible against Alonso in a separate, standalone trial. Hence, even if the Court were to sever Alonso's trial from Troup's, the severance would not accomplish what Alonso wishes.

Moreover, even if the Supreme Court or Tenth Circuit clarifies the law before the time of trial, and decides that Bruton v. United States requires some cutting and pasting, the Court can do that with these statements. As to Troup Statement 1, the Court could put a period after "legs," and eliminate the rest of that sentence. In the next sentence, the Court could delete "Both" and

"and Alonso," and replace "their" with "his" in the rest of the sentence.  Troup Statement 1 would then read:

> During the conversation, TROUP confessed to being a part of two murders in which two people were strangled to death at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces , New Mexico.  TROUP stated that during one of the murders, he held "Fred Dawg's" (agent note: identified as FREDDIE SANCHEZ, DOB [REDACTED]) legs.  TROUP disposed of the drawstring and then took off his clothes and tore up the evidence in an attempt to hide his part in the murder.  TROUP told [REDACTED] that CHICKIE LNU and his brother cleaned up the mess that was made during the murder, to include Sanchez' urine.  TROUP also said that an unknown Corrections Officer (CO) thought that the inmates were giving each other tattoos, and did not respond to the area of the commotion, despite the fact that tattooing was considered contraband inside the prison facility.  As a result, the SNM gang members were able to carry out the murder without any CO intervention.  TROUP also mentioned that the murder of Fred Dawg was an order from headquarters , to which [REDACTED] interpreted the term "headquarters" to mean the main New Mexico Prison Facility in Santa Fe, New Mexico, where the majority of the SNM leadership was incarcerated.  [REDACTED] stated that TROUP was remorseful and was crying during much of the conversation.  TROUP told [REDACTED] that Fred Dawg provided information on a murder, which was against the SNM by-laws, and that was the cause for his murder.

Troup Statement 1 at 1.  Thus, under an older <u>Bruton v. United States</u> analysis, the statement is coming in against Troup.  There is no reason to sever the case when this statement can be redacted, as provided, to ensure that it comes in against Troup alone.

The result is the same for Troup Statement 2.  The Court can put a period after "well" and end the sentence there.  Troup Statement 2, barring any further <u>Bruton v. United States</u> redactions, would then read:

> Fred Sanchez, aka Fred Dawg, from Roswell, New Mexico, was killed by the SNM because he "ratted."  The murder of Sanchez was called by SNM leaders Arturo Garcia, aka Shotgun and Gerald Archuleta, aka Sticks.  Troup bragged about being a part of the murder of Sanchez as well.

Troup Statement 2 at 1.  Thus, under an old <u>Bruton v. United States</u> analysis, the statement is coming in against Troup.  There is no reason to sever the case when the statement will come in against Troup alone if the case is tried jointly.

The result for Troup Statement 3 is, again, the same.  The Court could take out "and Javier Alonso."  The statement would then read: "Edward Troupe [sic] admitted to CHS that he killed Freddie Sanchez."  Troup Statement 3 at 1.  There is no sound reason to sever the case further when the statement about which Alonso is concerned can come in against Alonso even if he were tried alone.  Moreover, even under an old <u>Bruton v. United States</u> analysis, the statement is still coming in -- as redacted by the Court -- even if Alonso and Troup are tried together.

Here, Alonso cannot keep the statement from coming in, even if Troup is in the case. The Court can redact it, even under an old <u>Bruton v. United States</u> analysis, to let it in against Troup.  There is no <u>Bruton v. United States</u> problem.  And under <u>Smalls v. United States</u>, it is coming in against Alonso.

The Court, now being left with Troup's three nontestimonial statements which inculpate his co-defendant Alonso, will admit the hearsay statements under an unavailable-declarant exception to the hearsay rule.  Again, the United States appears to be eager to introduce these statements against Alonso in its prosecution of Count 3, and Troup does not appear eager to testify.  Because Troup's statements are nontestimonial and the Confrontation Clause does not come into effect, the Federal Rules of Evidence alone will govern their admissibility, and the Court concludes that these hearsay statements will be admissible against Alonso under rule 804's exception to the ban against hearsay where the declarant is unavailable, "subject, of course, to Rule 403's balancing test."  <u>United States v. Smalls</u>, 605 F.3d at 780.  <u>See</u> Fed. R. Evid. 804(b)(3).  Under rule 804, a hearsay statement is admissible if it is:

A statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3)(A)-(B). Rule 802 "renders hearsay, defined in Rule 801 as an out-of-court statement 'offered in evidence to prove the truth of the matter asserted,' generally inadmissible precisely because it is considered unreliable." Williamson v. United States, 512 U.S. at 598 (quoting Fed. R. Evid. 802). Rule 804(b)(3) is one of many exceptions, however, to the hearsay ban, because -- in part -- a hearsay statement "against the declarant's penal interest" is "less subject to legitimate claims of unreliability." United States v. Smalls, 605 F.3d at 780. Indeed, "[r]ule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson v. United States, 512 U.S. at 599. In the Tenth Circuit, "'[t]he circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.'" United States v. Smalls, 605 F.3d at 780-81 (quoting Fed. R. Evid. 804 advisory committee's notes). The Tenth Circuit has held, further, that "'[t]here are many circumstances in which Rule 804(b)(3) does allow the admission of statements that inculpate a criminal defendant,' including 'the confessions of arrested accomplices . . . if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor.'" United States v. Smalls, 605 F.3d at 781 (quoting Williamson v. United States,

512 U.S. at 603).  To explicate this concept, the Tenth Circuit has relied on Supreme Court guidance and stated:

> Perhaps the best (but not only) examples of "truly self-inculpatory" statements admissible against third persons arise in cases of conspiracy.  The Court provided the following explanation, apropos to the present state of affairs:
>
>> For instance, a declarant's squarely self-inculpatory confession -- "yes, I killed X" -- will likely be admissible under Rule 804(b)(3) against accomplices who are being tried under a co-conspirator liability theory.  Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well.  And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly.

United States v. Smalls, 605 F.3d at 782 (quoting Williamson v. United States, 51 U.S. at 603).

Troup Statement 1, Troup Statement 2, and Troup Statement 3 all proceed in the same fashion: Troup makes a self-inculpatory statement to a CHS that he and Alonso killed F.S.  See Troup Statement 1 at 1-2; Troup Statement 2 at 1-2; Troup Statement 3 at 1.  At no point does Troup shift the blame or even appear to reprise his own role in the murder.  See Troup Statement 1 at 1-2; Troup Statement 2 at 1-2; Troup Statement 3 at 1.  The Court, accordingly, considers Troup Statement 1, Troup Statement 2, and Troup Statement 3 to be sufficiently "against the declarant's penal interest" to make them "less subject to legitimate claims of unreliability." United States v. Smalls, 605 F.3d at 780.  The Court concludes that the statements are admissible under rule 804(b)(3), but must next consider the statements under rule 403's balancing test.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court weighs the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record,

873 F.2d at 1375.  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d at 638 (quoting United States v. Sides, 944 F.2d at 1563).  Further, district courts should "remain mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  See United States v. Smalls, 605 F.3d at 780 (citing United States v. Tan, 254 F.3d at 1211).

A trial court is vested with wide discretion to balance possible unfair prejudice against probative value.  See United States v. Bice-Bey, 701 F.2d at 1089; United States v. Masters, 622 F.2d at 87-88.  Evidence can be unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.  See United States v. Rodriguez, 192 F.2d at 951.  Evidence is not unfairly prejudicial simply because it damages a case.  See United States v. Caraway, 543 F.3d at 1301; United States v. Curtis, 344 F.3d at 1067; United States v. Martinez, 938 F.2d at 1082.  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note)(emphasis omitted).

Here, Alonso has not had the opportunity to explicate for the Court precisely what evidence he will face at trial.  Alonso has provided in Alonso's Motion to Sever only Troup Statement 1, Troup Statement 2, and Troup Statement 3.  The Court has already concluded that those statements are admissible hearsay statements against penal interest and further concludes that they are not unfairly prejudicial.  Upon this record, the Court is hard pressed to conclude that

"the evidence [has] 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 453 F.3d at 1301. Regarding the evidence's probative value, which directly implicates both Troup and Alonso in the murder of F.S., such evidence is exceedingly probative. Regarding the prejudicial impact of the evidence to Alonso, evidence of his involvement in the crime charged does not otherwise tend to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged. See United States v. Rodriguez, 192 F.2d 951. The Court will not, on this record, exclude the evidence of Troup Statement 1, Troup Statement 2, or Troup Statement 3.

Accordingly, the Court will deny Alonso's request to sever Count 4, from the Counts 1-5 and 13-16 trial grouping, and will also deny Alonso's request to sever him from a joint trial for Count 3 alongside of Troup. Regarding severance of Count 3 itself, Alonso has not met his high burden of demonstrating that the risk of spillover prejudice in this joint trial necessitates severance of the individual count. As the Court has mentioned previously, with respect to Alonso's assertions of impracticality and logistical concerns, the Court has already exercised its discretion, and severed the Second Superseding Indictment into two manageable and logically cohesive trial groupings, alleviating -- in the Court's estimation -- much of those concerns. Further, the statements Troup made to CHSs regarding the murder alleged by Count 3 do not implicate his Count 3 co-Defendant Alonso's rights under the Confrontation Clause, because they are nontestimonial. The hearsay statements are, also, nonetheless admissible against both Troup and Alonso as statements against penal interest. And, even if the Court does an "old school" Bruton v. United States analysis for prejudice, it could redact or separate each statement to inculpate only Troup and not also Alonso, and still try them together. The Court will not sever

Alonso from Troup, and try Count 3 twice, because Alonso has not demonstrated a sufficient risk of prejudice by merely contesting the admission of a co-Defendant's inculpatory, nontestimonial statements.

**IT IS ORDERED** that: (i) the Defendants' Joint Motion to Sever Defendants Charged with Offenses in Counts 6 & 7, filed December 23, 2016 (Doc. 807), is granted in part and denied in part; (ii) Defendant Santos Gonzales' Motion for a Severance of Defendant, filed January 27, 2017 (Doc. 858), and Defendant Santos Gonzales' Amended Motion for a Severance of Defendant, filed February 7, 2017 (Doc. 901), are granted in part and denied in part; (iii) Defendant A. Gallegos' Opposed Motion to Sever Counts Four and Five, filed January 31, 2017 (Doc. 868), is granted in part and denied in part; (iv) Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2, filed February 2, 2017 (Doc. 882), is granted in part and denied in part; and (v) Defendant Javier Alonso's Motion to Sever Count 3 and to Sever the Trials of Edward Troup and Javier Alonso, filed February 5, 2017 (Doc. 893), is granted in part and denied in part.  The Court, accordingly, severs: (i) Counts 6-12 of the Second Superseding Indictment into one trial grouping; and (ii) Counts 1-5 and 13-16 of the Second Superseding Indictment into a second trial grouping.  The Court is, at the present time, prepared to first try the Counts 1-5 and 13-16 trial grouping, because Defendant Gonzales has asserted his Speedy Trial Act rights and objects to any continuances.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
   United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

*Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

*Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

*Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

     *Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

      *Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

      *Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

      *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

    *Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

    *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzales*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

    *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Walz & Associates
Albuquerque, New Mexico

    *Attorney for Defendant Brandy Rodriguez*