# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Daniel Sanchez's Motion to

Sever the Trial of Counts 6-7 from the Trial of Counts 8-12, filed October 6, 2017 (Doc.

1296)("Severance Motion"). The Court held a hearing on November 8-9, 2017. The primary issue is whether the Court should reconsider its decision in its Memorandum Opinion and Order, 2017 WL 3054511, filed June 30, 2017 (Doc. 1204)("Severance MOO") to try Counts 6-7 and Counts 8-12 of the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment") in the same proceeding. Severance MOO, 2017 WL 3054511, at *106 ("The Court will not, therefore, sever Counts 6 and 7, from the Counts 6-12 trial grouping, at this time."). The Court's earlier ruling in the Severance Motion was without prejudice to the Defendants renewing their request to sever in that it recognized that further factual development could alter its severance determination. See Severance MOO, 2017 WL 3054511, at *104 ("The Court does not agree that sufficient prejudice for further severance exists at this time for the Counts 6 and 7 Defendants."). The Court will accordingly consider Defendant Daniel Sanchez' arguments that a joint trial "would create a serious risk of prejudice to Mr. Sanchez." Severance Motion at 2. The Court will not, however, modify its purely legal determination that, "[t]o justify severance, the Defendants must demonstrate that joinder violates their constitutional fair trial rights, or would otherwise 'prevent the jury from making a reliable judgment about guilt or innocence.'" Severance MOO, 2017 WL 3054511, at *106 (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)). The Court concludes that the Severance Motion does not satisfy "[t]he 'heavy burden' of showing sufficient prejudice," Severance MOO, 2017 WL 3054511, at *106 (quoting United States v. Hall, 473 F.3d 1295, 1302 (10th Cir. 2007)), so the Court will deny the Severance Motion.

## FACTUAL BACKGROUND

The Court takes its background facts from the Indictment. The background facts are largely unchanged from those that the Court provided in its Severance MOO, its Motion

Memorandum Opinion and Order, 2016 WL 7242579, filed October 28, 2016 (Doc. 753), and its Memorandum Opinion and Order, 2016 WL 3124632, filed May 27, 2016 (Doc. 557). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. See Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM has approximately 250 members and has "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are

expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.  SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment at 4.  If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4.  SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8.  SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation.  See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).  The other relevant facts giving rise to this case are as follows.

        In March of 2014, a Doña Ana County, New Mexico grand jury indicted Defendant Jerry Montoya and Defendant Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their

incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). Memorandum Opinion and Order, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See Memorandum Opinion and Order, 2016 WL 7242579, at *3. That New Mexico indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See Memorandum Opinion and Order, 2016 WL 7242579, at *3.  The Doña Ana County, New Mexico, District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See Memorandum Opinion and Order, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." Memorandum Opinion and Order, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the enterprise's operation and management and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."   Indictment at 9-18.  Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant Anthony

---

[1]Archuleta pled guilty on June 16, 2016, stipulating:

Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and Sanchez are the

> In 1990, while incarcerated at the Penitentiary of New Mexico, I became a
> member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an
> ongoing criminal organization whose members, prospects and associates engage
> in acts of violence and other criminal activities, including murder, kidnapping,
> attempted murder, and conspiracy to manufacture and distribute narcotics. The
> SNM operates in the District of New Mexico and elsewhere. The SNM
> constitutes an enterprise (individuals associated in fact that engaged in, or the
> activities of which, affected interstate commerce) that is engaged in racketeering
> activity. In 2003, I was an active member of the SNM. The person listed as J.R.
> in Count 8 of the Superseding Indictment was also a member of the SNM, and we
> were both engaged in racketeering activities for the SNM. J.R. and I had a falling
> out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in
> the SNM, this "green-light" was well known to members of the SNM. The
> "green-light" resulted in other members of the SNM shooting J.R. in 2003;
> however, J.R. survived the shooting. The "green-light" remained in effect in
> 2015; consequently, another member or associate of the SNM acted on the "hit,"
> and J.R. was assaulted while incarcerated at the Southern New Mexico
> Correctional Facility in Dona Ana County, New Mexico. This attack and "hit"
> had been approved of by leaders of the SNM gang, including Anthony Ray Baca.
> As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-
> light" and sanctioned it. Thus, from 2003 to July, 2015, I conspired with
> members and associates of the SNM gang to commit assault resulting in serious
> bodily injury to J.R. This conspiracy was for the purpose of maintaining and
> increasing my position in the SNM, as well as the other people who were
> involved with the assault.

Plea Agreement, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

> In 1995, while incarcerated at the Penitentiary of New Mexico, I became a
> member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an
> ongoing criminal organization whose members, prospects and associates engage
> in acts of violence and other criminal activities, including murder, kidnapping,
> attempted murder, and conspiracy to manufacture and distribute narcotics. The
> SNM operates in the District of New Mexico and elsewhere. The SNM
> constitutes an enterprise (individuals associated in fact that engaged in, or the
> activities of which, affected interstate commerce) that is engaged in racketeering
> activity. In 2013, I was an active member of the SNM. On or before 2013, I
> conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup,"
> and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the
> New Mexico Corrections Department (NMCD) for moving him out of State.
> Baca, as the purported leader of the SNM at the time, ordered the murders of
> G.M. and D.S. As a result, in 2015, I agreed to write letters to SNM gang

enterprise's alleged leaders.  <u>See</u> Indictment at 6.  The other Defendants are allegedly members

or associates who acted under the direction of the enterprise's leaders.  <u>See</u> Indictment at 6.  The

SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering

activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in

violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512 and 1513,

"involving obstruction of justice, tampering with or retaliating against a witness, victim, or an

informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841

and 846.  Indictment at 9.

     Specifically, the Indictment alleges that, on March 26, 2001, Defendant Angel DeLeon,

Defendant Joe Gallegos, Defendant Edward Troup, Defendant Leonard Lujan, and Defendant

Billy Garcia murdered "F.C."  Indictment at 9 (Count 1).  On the same day, Lujan, B. Garcia,

Defendant Eugene Martinez, Defendant Allen Patterson, and Defendant Christopher Chavez

allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17, 2007, Defendant Javier

Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S."

Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos and Defendant Andrew

Gallegos allegedly conspired to murder "A.B."  Superseding Indictment at 11 (Count 4).  On the

same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  <u>See</u> Indictment at 11-12 (Count

5).  In March, 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca,

Defendant Mauricio Varela, Sanchez, Defendant Carlos Herrera and Defendant Rudy Perez

allegedly conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014, Armenta,

---

          members ordering the murders and in fact, did write letters ordering the members
          to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to
          maintain and increase my position in the SNM.  Thus, from 2013 to continuing
          into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement, filed September 15, 2016 (Doc. 686).

Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera and Perez allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S."  Indictment at 14 (Count 9).  During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M."  Indictment at 15 (Count 10).  On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Indictment at 15-16 (Count 11).  On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, B. Rodriguez, Defendant Santos Gonzales, Defendant Paul Rivera, Defendant Shauna Gutierrez, and Defendant Brandy Rodriguez allegedly conspired to murder "J.G."  Indictment at 17 Count 14.  Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Indictment at 17-18 (Count 15).  The same Defendants also allegedly tampered with a witness, J.G.  See Indictment at 18 (Count 16).

For fuller factual context, there are now four cases before the Court related to SNM's alleged federal criminal activity.  In a related case -- United States of America v. Anthony Baca,

No. CR 16-1613 JB (D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4] There is also a prosecution of one Defendant for drug crimes, see United States of America v. Christopher Garcia, No. CR 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for alleged violations of 18 U.S.C. § 1959 ("VICAR"). See United States of America v. Mauricio Varela, No. 15-4269 JB (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

Nearly a year ago, the Defendants charged in Counts 6 and 7 of the Indictment filed the Defendants' Joint Motion to Sever Defendants Charged with Offenses in Counts 6 & 7 at 29, filed December 23, 2016 (Doc. 807)("Original Severance Motion"). The Original Severance Motion requests that the Court sever Counts 6 and 7 from the Indictment's other charges, because, "[w]ith the exception of Defendant Baca, none of the defendants charged in Counts 6

---

[3]The Court has granted a conditional severance of one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- was asserting his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those Speedy Trial Act rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32. Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld).

[4]The Court has also declared that case complex under the Speedy Trial Act. See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

and 7 are charged in any other count of the superseding indictment." Original Severance Motion at 1-2. The Original Severance Motion contains three main arguments:

> (1) Counts 6 and 7 were improperly joined under Rule 8(a), as they do not share a sufficient nexus with the other charges to permit joinder; (2) the 2014 Defendants [the Defendants charged in Counts 6 and 7] were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 21 other defendants; and (3) should the Court find joinder proper under Rule 8(a) and Rule 8(b), severance is still required under Rule 14 and the Fifth Amendment [to the Constitution of the United States,] because a joint trial of the 2014 Defendants for Counts 6 and 7 alongside the 21 other defendants and the 13 other counts in the superseding indictment will deprive the 2014 Defendants of their right to a fair trial.

Original Severance Motion at 2.

The Court rejects those arguments in its Severance MOO.[5] The Court concludes that the Indictment satisfies rule 8 of the Federal Rules of Criminal Procedure, see Fed. R. Crim. P. 8(b) ("The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."), because

> the United States must prove as an element that the SNM is a racketeering enterprise, and, because Counts 6 and 7 relate to an SNM-sanctioned murder and conspiracy to murder an individual cooperating with law enforcement at Southern New Mexico, the Court considers it sound that the United States would try jointly the SNM members who carried out the SNM enterprise's criminal activity of murdering J.M. at Southern New Mexico (Counts 6 and 7), with the other SNM leaders and members charged with similar violent crimes in aid of racketeering.

Severance MOO, 2017 WL 3054511, at *105. See Fed. R. Crim. P. 8(b) ("The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."). The Court also concludes that, "[t]o justify severance, the Defendants must

---

[5]The Court did, however, sever the case into two trial groups: (i) Counts 6-12; and (ii) Counts 1-5 and 13-16. See Severance MOO, 2017 WL 3054511, at *103.

demonstrate that joinder violates their constitutional fair trial rights, or would otherwise 'prevent the jury from making a reliable judgment about guilt or innocence.'"  See Severance MOO, 2017 WL 3054511, at *106 (quoting Zafiro v. United States, 506 U.S. at 539).  Moreover, even where defendants clear that hurdle, "both the Supreme Court [of the United States] and the [United States Court of Appeals for the] Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover effect where limiting instructions may minimize the risk of undue prejudice."  Severance MOO, 2017 WL 3054511, at *106.

Because "the Counts 6 and 7 Defendants merely make general assertions of prejudice, and fail to specifically identify specific and compelling prejudicial concerns, arguing only that there may be propensity problems and an inability of the jury to compartmentalize the evidence," the Court concludes, in its Severance MOO, that "the Counts 6 and 7 Defendants do not meet their burden of showing that the jury would be prevented from making a reliable judgment about guilt or innocence."  Severance MOO, 2017 WL 3054511, at *106.  The Court also articulates a general rule that "mere assertions of spillover prejudice are not sufficient to warrant severance, particularly in the context of" the Indictment's allegations regarding the "inherent nature of the SNM criminal enterprise,"  Severance MOO, 2017 WL 3054511, at *106, i.e., that the SNM's structure "as a prison gang throughout New Mexico inherently requires that the SNM have different leaders at the different prisons who order criminal activities and sanction murder of certain individuals by members and associates in the same location as the victim and the leader(s) who ordered the hits," Severance MOO, 2017 WL 3054511, at *105.

1.    **The Severance Motion.**

In the Severance Motion, Sanchez argues that, if his charges are tried alongside Counts 8-12, then "the jury will be exposed to detailed and convincing evidence of highly inflammatory crimes" that "would not be otherwise admissible to prove the offenses charged against Daniel

Sanchez in Counts 6-7." Severance Motion at 2. Sanchez supports that assertion by comparing the Counts 6-7 evidence with the Counts 8-12 evidence. See Severance Motion at 5-11.

Sanchez contends that the evidence against him as to Counts 6-7 consists of: (i) surveillance video of J.M.'s murder at the hands of Armenta, Montoya, and T. Martinez; (ii) anticipated testimony from Armenta, Montoya, and T. Martinez stating that Sanchez ordered that murder; (iii) anticipated testimony from "some government cooperators" that, "just prior to the murder, Daniel Sanchez received and reviewed paperwork proving Molina had previously provided information to law enforcement"; (iv) anticipated testimony that Baca

> issued an order to kill Molina after reviewing paperwork that showed that in a prior case Molina provided statements to law enforcement incriminating a co-arrestee; that Baca caused the paperwork to be carried from the Penitentiary of New Mexico ("PNM") to SNMCF [Southern New Mexico Correctional Facility]; that the paperwork was transported by either co-defendant, Mauricio Varela, or government cooperator, Lupe Urquizo; and that Varela and/or Urquizo caused the paperwork to be passed, under a common door, from their unit to a neighboring unit, where Molina, Sanchez and others were housed[;]

and (v) anticipated testimony that Sanchez reviewed that paperwork "in a common area of his unit and then ordered others in the unit to commit the homicide." Severance Motion at 5-7. Notably absent from that list, according to Sanchez, are: (i) "any admissions or confessions to law enforcement or undercover government agents" by Sanchez; (ii) any "electronic recordings of Mr. Sanchez making incriminating statements regarding the murder"; (iii) any "physical or scientific evidence linking Mr. Sanchez to the murder"; (iv) any statements or testimony from prison staff who "reported seeing paperwork passed under the door or being reviewed by Mr. Sanchez in the unit's common"; (v) any surveillance video of paperwork being passed under the door or of Sanchez reviewing that paperwork; and (vi) any indication that paperwork "was ever recovered from Mr. Sanchez, his unit or the neighboring unit" notwithstanding "searches immediately after the crime." Severance Motion at 7. Sanchez asserts that,

> [t]hus, the government's evidence against Mr. Sanchez for the crimes charged in Counts 6 and 7, essentially boils down to the credibility of government informants who are liable for the murder, have provided prior inconsistent accounts of the crime, have had ample opportunity and access to information to manufacture a version of events that attempts to convincingly implicate others in the crime, are facing life imprisonment and will be testifying in an effort to earn a favorable sentencing recommendation from the government.

Severance Motion at 7-8.  Sanchez contends that, in contrast,

> the government's evidence in support of Counts 9-12 consists of the testimony of it's [sic] cooperator, Eric Duran, the letters written by Roy and Robert Martinez soliciting assistance in killing D.S. and G.M., the recordings, phone calls and text messages made by Duran with his government provided cell phone, and testimony of other cooperator(s), including Robert Martinez, Roy Paul Martinez, and Mario Montoya, each of whom will be corroborated with audio recordings and/or handwritten letters. As to Count 8, the government will, primarily, rely on cooperator testimony and video recordings of the crime.

Severance Motion at 10.

Sanchez asserts that the Counts 8-12 evidence would be inadmissible if he were tried alone for J.M.'s murder and conspiracy to commit that murder.  See Severance Motion at 11. Sanchez argues that the introduction of that evidence would unfairly prejudice him, because it is "susceptible to interpretation by the jury as character evidence establishing Baca's propensity to orchestrate murders," his "propensity to enforce SNM rules by ordering violent acts," and "the propensity of SNM gang members to comply with Baca's orders to commit murders and other violent acts."  Severance Motion at 13.  Sanchez contends that the jury could impermissibly infer from those propensities that Baca and Sanchez acted in conformity with those propensities on a particular occasion by ordering J.M.'s murder and by obeying that order.  See Severance Motion at 13-14.  See also Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").  Sanchez accordingly concludes that, if the jury is "exposed to the evidence that will be presented to prove Counts 8-12, there is a very serious

risk that the verdicts on Count 6-7 will be corrupted with factual conclusions based on character inferences that affront our longstanding and time-tested notion of due process." Severance Motion at 17.

Moreover, Sanchez argues that the conspiracies that Counts 8-12 allege, i.e., conspiracies "to murder G.M., the head of the NMCD [New Mexico Corrections Department], and D.S., a high ranking corrections official," have a "serious and sensational nature." Severance Motion at 17. According to Sanchez, "the more serious and sensational the nature of the offense, the more difficult it is for jurors to compartmentalize the evidence as to each defendant." Severance Motion at 18. It follows, again according to Sanchez, that showing the jury evidence relevant to Counts 8-12 would unfairly prejudice the jury when it considers the allegations against Sanchez in Counts 6 and 7. See Severance Motion at 18.

Sanchez contends that providing a limiting instruction to the jury would not effectively address the risk that the jury would misuse the evidence introduced to prove the allegations in Counts 8-12. See Severance Motion at 20-21 ("[E]ven the most expertly crafted limiting instruction would fail to mitigate the serious risk of prejudice to Mr. Sanchez."). Sanchez suggests that the Court should instead address that risk either by severing the trial of Counts 6-7 from the trial of Counts 8-12, see Severance Motion at 21-22, or by severing "Mr. Sanchez, and any similarly situated defendant(s) charged in Counts 6-7," from "Baca, Villegas, Garcia and any remaining defendant(s)[, who] would be tried in a separate trial for the crimes charged in Counts 6-12," Severance Motion at 22. In the alternative, Sanchez proposes a novel procedure where the Court would empanel two juries for a single trial:

> One jury would be empaneled to hear the Count 6-7 evidence, instruction, and argument as to Mr. Sanchez and any similarly situated defendant charged in Count 6-7; and the other jury would be empaneled to hear the Count 6-12 evidence, instruction, and argument as to defendants Baca, Villegas, Garcia and

any remaining defendant(s).  The evidence regarding the Molina homicide would be presented one time, to both juries simultaneously.  Throughout the trial, there would be times when only one jury is in the courtroom during the proceedings and times when both juries would be present.

Severance Motion at 22.

### 2.    **The Response**.

The United States filed a response.  <u>See</u> United States' Response in Opposition to Defendant's Motion to Sever the Trial of Counts 6-7 From the Trial of Counts 8-12 [1296], filed October 20, 2017 (Doc. 1352)("Response").  The United States contends that the substance of the Sanchez' Severance Motion "merely rehashes the previously raised arguments" that the Court addressed in its Severance MOO.  Response at 2.  The United States also contends that Sanchez "does not provide any specific or compelling prejudicial concern to invalidate the Court's previous decision."  Response at 2.  The United States accordingly concludes that the Court should deny the Severance Motion.  <u>See</u> Response at 2.

### 3.    **The Hearing**.

The Court held a hearing on November 8-9, 2017.  <u>See</u> Transcript of Hearing (held November 8, 2017), filed November 20, 2017 (Doc. 1456); Transcript of Hearing (held November 9, 2017), filed November 20, 2017 (Doc. 1457)("Nov. 9 Tr.").  The Court took up the Severance Motion during the second day of the hearing.  Nov. 9 Tr. at 101:25-101:1 (Court). Sanchez began by addressing the United States' argument that the Court already decided the issues which the Severance Motion raises.  <u>See</u> Nov. 9 Tr. at 102:11-15 (Jacks).  Sanchez articulated his "different reading" of the Severance MOO, which Sanchez "took as -- a basically, an invitation to -- if we did have some specific prejudice that we should brief it, and we should discuss that specifically with the Court."  Nov. 9 Tr. at 103:9-16 (Jacks).  Sanchez also noted that, when the parties filed the Original Severance Motion, "at that time all of the counts were

together."   Nov. 9 Tr. at 104:3-4 (Jacks).   Sanchez then reviewed his argument from the Severance Motion.  See Nov. 9 Tr. at 104:18-21 (Jacks).  According to Sanchez, the evidence against him is "uncorroborated testimony from informants who are currying favor with the Government to get favorable treatment on their own case," who "have made numerous prior inconsistent statements," and whose accounts are "not corroborated by contemporaneous recordings."   Nov. 9 Tr. at 5-11 (Jacks).   Sanchez asserts that the evidence against his co-Defendants is likewise "informant testimony," but Sanchez asserts that -- unlike the testimony against him -- the second set of informant  testimony is corroborated by recordings, "additional physical evidence[,] additional video evidence, and additional phone call evidence."  Nov. 9 Tr. at 105:17-24 (Jacks).   Sanchez then argued that the United States' evidence against his co-Defendants would not be admissible against Sanchez if he were tried alone, see Nov. 9 Tr. at 106:14-17 (Jacks), and "that in a large case with varying degrees of culpability, the potential for prejudice to any one defendant increases," Nov. 9 Tr. at 106:22-24 (Jacks).  Sanchez argued that Counts 8-12's nature means that the evidence supporting those counts is "very easily used by jurors, by anybody, as propensity character evidence."  Nov. 9 Tr. at 109:1-5 (Jacks).  Sanchez concluded by observing that the "serious and sensational nature of the allegations" in Counts 8-12 "weighs in favor of severing" Counts 6 and 7.  Nov. 9 Tr. at 108:2-10 (Jacks).

The United States then took to the podium, and indicated -- in response to an inquiry from the Court -- that, even if the Court severs Counts 6-7 from Counts 8-12, the United States could still use Counts 8-12 evidence in Sanchez' trial to establish "that an enterprise exists," that Baca is "one of the leaders of the enterprise," that Baca is "someone who issues orders" in the enterprise, and that Baca had the ability to "issue an order to kill someone in another prison." Nov. 9 Tr. at 108:21-109:15 (Court, Castellano).  The United States contended that this use of

the evidence does not violate rule 404(b)(1) of the Federal Rules of Evidence, because the United States "ha[s] to prove the enterprise, commerce, racketeering activity, and the motive" to establish a VICAR violation, Nov. 9 Tr. at 113:12-14 (Castellano), and because "[t]his is an association-in-fact enterprise, so we have to show the ongoing nature," Nov. 9 Tr. at 114:6-9 (Castellano). The United States also took issue with Sanchez' assertion that the testimony implicating Sanchez is uncorroborated. See Nov. 9 Tr. at 112:5-8 (Castellano)("Related to uncorroborated testimony, that's also not accurate. I know it's a subject of a motion to suppress, but Rudy Perez' recording is independent corroboration of the murder.").

The Court then gave Sanchez "the final word." Nov. 9 Tr. at 115:1-2 (Court). Sanchez noted that "Counts 6 and 7 are Section 1959 VICAR crimes," and not "substantive racketeering offense[s]," under 18 U.S.C. §§ 1961-68 ("RICO"). Nov. 9 Tr. at 115:11-16 (Jacks). Sanchez noted that "[t]he substantive RICO offense requires the proof of two predicate acts within certain relationship to each other to prove the elements of the offense," while "VICAR does not." Nov. 9 Tr. at 115:21-25 (Jacks). Sanchez asserted that, in a VICAR prosecution, "the Government has to prove that the charged enterprise engaged in racketeering activity" and not a "pattern of racketeering activity." Nov. 9 Tr. at 116:3-10 (Jacks). See 18 U.S.C. § 1961(5) (defining the term "pattern of racketeering activity" such that it "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity"). The Court then asked Sanchez to explain that distinction's relevance if the United States has the freedom "to choose which racketeering activity they want to prove" to establish that SNM is an enterprise engaged in racketeering activity. Nov. 9 Tr. at 116:11-13 (Court). Sanchez replied that the United States' freedom is "[s]ubject to the Court's

discretion, and subject to the Court's determination that what they want to prove isn't going to unfairly prejudice a defendant in the case, and prevent them from receiving a fair trial." Nov. 9 Tr. at 116:14-18 (Jacks). Sanchez contended that "the Government can prove that members of the SNM engaged in drug trafficking in prison" and "[t]hat alone could be sufficient to prove the racketeering activity." Nov. 9 Tr. at 116:20-23 (Jacks).

The Court then expressed its concern regarding "how I can tell the Government you can only prove the enterprise one way." Nov. 9 Tr. at 121:3-5 (Court). Sanchez stated that he is not trying to say that the United States has to prove VICAR's enterprise element in any particular way. See Nov. 9 Tr. at 12-13 (Jacks). Sanchez asserts, instead, that "the Court should exercise its discretion" by regulating how the United States proves the enterprise, because "they could prove it a million ways," and "[t]here is just one way they shouldn't be allowed to prove it, because it's going to unfairly prejudice Mr. Sanchez and deny him a fair trial." Nov. 9 Tr. at 121:10-23 (Jacks).

## LAW REGARDING VICAR AND RICO

RICO prohibits specific activities when they are committed in connection with a pattern of racketeering activity. See, e.g., 18 U.S.C. § 1962(b)("It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."). RICO defines a "pattern of racketeering activity" such that it "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity includes "any act or threat involving

murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that is a state law felony, 18 U.S.C. § 1961(1)(A), and "any act which is indictable under any" one of myriad federal statutes, § 1961(1)(B)-(G)..

A VICAR violation requires an underlying state law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do."  18 U.S.C. § 1959(a). The underlying state law offense becomes a federal VICAR violation only when it is committed: (i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  VICAR employs RICO's definition of  racketeering activity.  See 18 U.S.C. § 1961(1) (defining racketeering activity for RICO purposes); 18 U.S.C. § 1959(b)(1)(stating that, under VICAR, racketeering activity "has the meaning set forth in section 1961 of this title").

RICO states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(1).  VICAR employs a slightly narrower definition of the term "enterprise" such that it "includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).  "An association-in-fact requires: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to

permit those associated with the enterprise to pursue the enterprise's purpose."  United States v.

Kamahele, 748 F.3d 984, 1003 (10th Cir. 2014)(Bacharach, J.).  See Boyle v. United States, 556

U.S. 938, 948 (2009)(Alito, J.)("[A]n association-in-fact enterprise is simply a continuing unit

that functions with a common purpose."); id. ("While the group must function as a continuing

unit and remain in existence long enough to pursue a course of conduct, nothing in RICO

exempts an enterprise whose associates engage in spurts of activity punctuated by periods of

quiescence.").

## LAW REGARDING RULE 8 JOINDER

Rule 8 of the Federal Rules of Criminal Procedure is the vehicle for joinder of both of

offenses and of defendants in a criminal proceeding.  Rule 8 provides:

> (a) Joinder of Offenses.  The indictment or information may charge a defendant in
> separate counts with 2 or more offenses if the offenses charged --whether felonies
> or misdemeanors or both -- are of the same or similar character, or are based on
> the same act or transaction, or are connected with or constitute parts of a common
> scheme or plan.

> (b) Joinder of Defendants.  The indictment or information may charge 2 or more
> defendants if they are alleged to have participated in the same act or transaction,
> or in the same series of acts or transactions, constituting an offense or offenses.
> The defendants may be charged in one or more counts together or separately.  All
> defendants need not be charged in each count.

Fed. R. Crim. P. 8.  In the Tenth Circuit, rule 8(b) governs the propriety of joinder of multiple

defendants and their alleged offenses into one indictment.  See United States v. Eagleton, 417

F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in cases where more than one

defendant is joined in the same indictment.  Such joinder [of offenses] is governed by Rule

8(b).").  See also United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012)("Where an

indictment joins defendants as well as offenses, the propriety of the joinder of offenses is

governed by Rule 8(b), rather than Rule 8(a)."); United States v. Walker, 657 F.3d 160, 169 (3d

Cir. 2011)("Rule 8(a) applies only to prosecutions involving a single defendant, and[,] in a multi-

defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b).").  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro v. United States, 506 U.S. at 537).

Under rule 8(b), then, multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Rule 8(b), along with its phrase "same series of acts or transactions," Fed. R. Crim. P. 8(b), "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980).  In light of rule 8(b)'s broad construction, courts conclude that a conspiracy count -- albeit not necessary -- is sufficient to warrant joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act.

> Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants conspired and agreed with each other to commit all six of the robberies.  Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder.

United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015).

## LAW REGARDING RULE 14(a) SEVERANCE

Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure, a court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if joinder "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).  Rule 14(a) envisions situations where a joint trial would be inappropriate and harmful to the accused's constitutional rights even though joinder is proper under rule 8, which is liberally and broadly

applied in the interest of efficiency.  See Zafiro v. United States, 506 U.S. at 538 (using rule 14 as the standard for a severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance).  The decision to sever is "within the sound discretion of the trial court."  United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)).  See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting severance "is peculiarly within the discretion of the trial court")(citations omitted).

     "Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case."  United States v. Hall, 473 F.3d at 1302 (quoting United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984)).  "Joint trials of defendants who are indicted together are preferred, because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).  Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial."  Cummings v. Evans, 161 F.3d at 619 (citing United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir. 1993)).  The prejudice standard envisioned by rule 14 thus requires a showing of actual prejudice, and not merely a showing that a defendant "may have a better chance of acquittal in separate trials."  United States v. Pursley, 474 F.3d at 766.  To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'"  United States v. Pursley, 474 F.3d at 766 (quoting Zafiro v. United States, 506 U.S. at 539).  Significantly, "[r]ule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound

discretion." Zafiro v. United States, 506 U.S. at 538-39.

In interpreting rule 14, United States Courts of Appeals have explored the risk of "mutually antagonistic" or "irreconcilable" defenses may supply the prejudice needed in some circumstances as to warrant severance. Zafiro v. United States, 506 U.S. at 538 (citing, e.g., United States v. Benton, 852 F.2d 1456, 1469 (6th Cir. 1988); United States v. Smith, 788 F.2d 663, 668 (10th Cir. 1986); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir. 1984); United States v. Berkowitz, 662 F.2d 1127, 1133-1134 (5th Cir. 1981); United States v. Haldeman, 559 F.2d 31, 71-72 (D.C. Cir. 1976)). The Tenth Circuit, in United States v. Pursley, provided that, in such a scenario, where a defendant seeks severance because of mutually antagonistic defenses as compared to co-defendants,

> a trial court engages in a three step inquiry. First, it must determine whether the defenses presented are "so antagonistic that they are mutually exclusive." *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989). Second, because "[m]utually antagonistic defenses are not prejudicial per se," a defendant must further show "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. [at] 539[]. Third, if the first two factors are met, the trial court exercises its discretion and "weigh[s] the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Peveto*, 881 F.2d at 857.

United States v. Pursley, 474 F.3d at 765. In a court's consideration of such a scenario, "defenses are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" United States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d 987, 992 (10th Cir. 1994)). The Defendants must show that "'the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.'" United States v. Pursley, 474 F.3d at 765-66 (quoting United States v. Peveto, 881 F.2d at 857 (holding mutually exclusive defenses where one

defendant said he was preparing to be an informant and invited the other defendant, a purported drug dealer, to his house to gather information, while the other defendant said he was innocently at the house and the first defendant held the second defendant against his will)).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion.  See United States v. Pursley, 474 F.3d at 765.  In exercising its discretion, however, the court should "weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  United States v. Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-68 (10th Cir. 1989)).  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Bailey, 952 F.2d at 365 (citation omitted).  A defendant seeking severance bears the "heavy burden" of demonstrating a risk of prejudice from continued joinder.  United States v. Bailey, 952 F.2d at 365 n.4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)).  The Supreme Court has stated:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.  When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.  Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.  Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here.  When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, [481 U.S. 200 (1987)] less drastic

measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Zafiro v. United States, 506 U.S. at 539 (emphasis added)(citations omitted).

With respect to a district court's application of rule 14 in practice, particularly in the context of multi-count and multi-defendant RICO, VICAR, or conspiracy indictments, one district court has explained:

> Most often, severance of defendants will be required to protect the rights of defendants against undue prejudice resulting from joinder. In other situations, severance may be required, or at least the argument for severance will be bolstered, by the physical limitations of the courthouse and the logistical difficulties of attempting to conduct a complex multi-defendant trial.

United States v. Gray, 173 F. Supp. 2d 1, 7-8 (D.D.C. 2001)(Lamberth, J.). Another district court addressed the possibility of prejudicial joinder of the defendants

> deriving from the number of defendants and the number of counts, the complexity of the indictment, estimated length of the trial, disparities in the amount or type of proof offered against the defendants, disparities in the degrees of involvement by defendants in the overall scheme, possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987). The United States v. Gray court explained that, in United States v. Gallo:

> After weighing the potential prejudice against defendants, the court decided that the dispositive factor counseling severance was judicial efficiency. [United States v. Gallo, 668 F. Supp.] at 753 ("[T]he prejudices to the defendants are not clearly dispositive . . . , we might be reluctant to grant such severances on Rule 14 alone. . . . [W]e question the traditional assumption that denial of severance . . . promotes efficiency.").

United States v. Gray, 173 F. Supp. 2d at 8-9 (alterations in original). Indeed, the United States v. Gray court stated that "[m]any of the factors that counseled against complete joinder of defendants [in United States v. Gallo] are also persuasive in the instant case," and so it concluded that despite the general presumption favoring joinder, some form of severance is

> necessary because of the physical limitations of the courtroom and hardship on
> the jurors, the defendants, and the Court. Severance, however, should be of the
> most limited form necessary to satisfy those interests, because the Court finds that
> joinder of defendants, to the extent possible, will preserve judicial resources and
> permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10. Accordingly, the United States v. Gray court severed

a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on

logistical concerns alone. United States v. Gray, 173 F. Supp. at 1, 10. The United States v.

Gray court also considered that

> [s]everal defendants have moved for complete severance or other joint trial
> configurations based on Rule 14 concerns of prejudice against defendants. In
> order to prevail upon a claim for severance, [those] defendant[s] must show that
> joinder would violate that defendant's constitutional fair trial rights, or would
> "prevent the jury from making a reliable judgment about guilt or innocence."
> *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10. Although the United States v. Gray court had already

severed the indictment in that case into two trial groupings to alleviate the risk of prejudice to the

defendants by logistical inefficiency and impracticality, the court was still open to further

requests for severance of individual defendants upon a specific showing that joinder in either of

the trial groupings still ran afoul of Zafiro v. United States and rule 14. See United States v.

Gray, 173 F. Supp. at 10. The rule 14 inquiry regarding the propriety of joinder is ongoing, and

as the United States v. Gray court concluded in severing that case's indictment into two trial

groupings, its chosen "arrangement of the defendants appears to be, at least on the information

now available, the most efficacious in preserving judicial resources, preventing duplicitous

testimony and evidence, and reaching an expeditious resolution for all defendants." United

States v. Gray, 173 F. Supp. at 18.

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the

district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).  Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997)(Souter, J.).  "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged."  Old Chief v. United States, 519 U.S. at 180-81.  In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence."  Old Chief v. United States, 519 U.S. at 182.

## LAW REGARDING RULE 404(b)

Under rule 404(b) of the Federal Rules of Evidence, "[e]vidence of a crime, wrong, or

other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  The court can admit that sort of evidence, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too." Wilson v. Jara, No. CIV 10-0797, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).

The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  See Huddleston v. United States, 485 U.S. 681, 691-92 (1988). The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)).  See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir.2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. at 691-92).

When bad-act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted).  The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for

which such evidence is offered and the inferences to be drawn therefrom." United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)). "[A] broad statement merely invoking or restating Rule 404(b) will not suffice." United States v. Youts, 229 F.3d at 1317. Rules 401-403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the government must meet to successfully offer evidence under rule 404(b). See Huddleston v. United States, 485 U.S. at 686-91.

## ANALYSIS

The Court determines that the evidence the United States will use to prove the allegations in Counts 8-12 would be admissible to show that Sanchez committed the VICAR offenses alleged in Counts 6-7 in a single-defendant trial. That the Counts 8-12 evidence would be admissible in a single-defendant trial means that the introduction of Counts 8-12 evidence in a multiple-defendant trial does not violate any of Sanchez' fair trial rights. Consequently, the Court denies the Severance Motion.

## I.    EVIDENCE PROVING COUNTS 8-12 WOULD BE ADMISSIBLE IN A SINGLE-DEFENDANT TRIAL OF SANCHEZ FOR COUNTS 6-7.

Sanchez asserts that, if he is tried alongside the Counts 8-12 Defendants, the jury will be exposed to evidence that "is not admissible against Mr. Sanchez to prove the VICAR offenses charged in Counts 6-7 . . . and would not be admissible if Mr. Sanchez were tried alone for the conspiracy to murder and murder of J.M." Severance MOO at 11. That assertion is inaccurate, because the Counts 8-12 evidence is also relevant to Counts 6-7. Moreover, the risk that the Counts 8-12 evidence will unfairly prejudice Sanchez does not "substantially outweigh" that evidence's "probative value." Fed. R. Evid. 403.

### A.    COUNTS 8-12 EVIDENCE IS ALSO RELEVANT TO COUNTS 6-7.

Relevant evidence is admissible unless the Constitution of the United States, a federal

statute, the Federal Rules of Evidence, or a rule prescribed by the Supreme Court provides otherwise.  See Fed. R. Evid. 402.  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  A fact of consequence "may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action."  Fed. R. Evid. 401 advisory committee note.

Counts 6 and 7 allege that Sanchez violated VICAR by conspiring to murder J.M. and by murdering J.M.  See Indictment at 12-13.  The United States must, however, do more than prove that Sanchez conspired to murder J.M. and murdered J.M. to establish two VICAR violations. The United States must also show that Sanchez committed those offenses for a particular reason, i.e., "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  To satisfy that requirement, the United States will need to prove that the SNM exists, that the SNM is "engaged in racketeering activity," 18 U.S.C. § 1959(a), that the SNM is a "group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1959(b)(2), which in turn requires the United States to establish that the SNM has a purpose, that there are relationships among those associated with the SNM, and that the SNM has "longevity sufficient to permit those associated with [it] to pursue [its] purpose," United States v. Kamahele, 748 F.3d at 1003.  The United States must also show that the SNM "is engaged in, or [its] activities . . . affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).

The best way -- and, perhaps, the only way -- to prove that the SNM was engaged in

racketeering activity when the conduct charged in Counts 6-7 occurred, i.e. March, 2014, see Indictment at 12-13, is to introduce evidence of roughly contemporaneous instances of racketeering activity in which the SNM engaged, such as the conspiracy to murder D.S. charged in Count 9, see Indictment at 14 (stating that the conspiracy to murder D.S. began "on a date uncertain, but no later than 2013," and continued until "on or about the date of this [Indictment]"), and the conspiracy to murder G.M. charged in Count 10, see Indictment at 15 (stating that the conspiracy to murder G.M. began "on a date uncertain, but no later than 2013," and continued until "on or about the date of this [Indictment]").  See also 18 U.S.C. § 1961(1)(defining "racketeering activity" to include "any act or threat involving murder . . . chargeable under State law and punishable by imprisonment for more than one year").  Counts 11 and 12 charge conduct that C. Garcia allegedly committed, and that conduct does not constitute racketeering activity -- being a felon in possession of a firearm, see Indictment at 14-15 (Count 11), and using and possessing a firearm during and in relation to a crime of violence, see Indictment at 15 (Count 12) -- but that conduct is intimately related to the racketeering activity charged in Count 10, see Indictment at 15 (alleging, in Count 12, that C. Garcia used and carried a firearm, on or about November 29, 2015, "during and in relation to a crime of violence . . . specifically, conspiracy to murder as charged in Count 10"); Indictment at 14 (alleging, in Count 11, that C. Garcia was a felon in possession of a firearm "[o]n or about November 29, 2015," the same time period identified in Count 12).

The conduct charged in Count 8 also does not constitute racketeering activity, and there is no apparent relationship between that conduct and the racketeering activity alleged in Counts 9 and 10.  See Indictment at 13-14 (alleging that, "[s]tarting in or about 2003, and continuing until on or about July 13, 2015," various Defendants violated VICAR by conspiring to "commit

assault resulting in serious bodily injury to J.R.").  Count 8 conduct is, nevertheless, relevant to Counts 6-7, because an SNM-related conspiracy that lasted for over a decade indicates that the SNM enjoys "longevity sufficient to permit those associated with [it] to pursue [its] purpose." United States v. Kamahele, 748 F.3d at 1003.  Consequently, the conduct charged in Count 8 is relevant to whether the SNM is an enterprise -- specifically an association-in-fact enterprise -- which is a fact that the United States must prove beyond a reasonable doubt to obtain convictions under Counts 6-7 of the Indictment.  Evidence establishing the allegations in Conducts 8-12 would, thus, be relevant even if Counts 6-7 were tried in isolation.

**B.    RULE 403 PERMITS COUNTS 8-12 EVIDENCE IN A COUNTS 6-7 PROSECUTION.**

Even if evidence is relevant, the Court may exclude it if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Unfair prejudice "means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee notes.  See United States v. Rodriguez, 192 F.3d at 915 ("'Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'" (quoting United States v. Roberts, 88 F.3d 872, 880 (10th Cir. 1996))).  When balancing a piece of evidence's probative value against its danger of unfair prejudice, a court should "take account of the full evidentiary context of the case as the court understands it when the ruling must be made," and "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well."  Old Chief v. United States, 519 U.S.

at 182.  Accordingly, "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk."  Old Chief v. United States, 519 U.S. at 182-83.  See Fed. R. Evid. 403 advisory committee notes (stating that, when "reaching a decision whether to exclude on grounds of unfair prejudice," one appropriate factor may be "[t]he availability of other means of proof").  See also Fed. R. Evid. 404(b) advisory committee notes ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403.").

To determine whether evidence supporting the allegations in Counts 8-12 would survive a rule 403 objection if Sanchez were tried as a lone defendant, the Court needs to weigh Counts 8-12 evidence -- and its probative value and danger of unfair prejudice -- against the other available evidentiary alternatives.  As noted above, the evidence regarding Counts 8-12 is relevant to Counts 6-7 in that it shows that SNM existed as an association-in-fact enterprise engaged in racketeering activity.  That evidence has further probative value with respect to the United States' expected theory of the case, i.e., Baca sent paperwork ordering J.M.'s murder to Sanchez, and Sanchez ordered Armenta, Montoya, and T. Martinez to carry out that murder.  See Severance Motion at 5-7.

Sanchez asserts that the United States will prove the allegations in Count 8 via surveillance video of J.R.'s assault and by Archuleta's testimony.  See Severance Motion at 10. Archuleta's testimony will, presumably, reflect the facts that he admits in his plea agreement:

> In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were

both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J.R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Plea Agreement, filed June 16, 2016 (Doc. 586).

That the SNM was able and willing to order a hit on one of its members, that the hit was well known to SNM members, that the hit resulted in a 2003 shooting, and that the hit remained in effect for over a decade thereafter, see Plea Agreement, filed June 16, 2016 (Doc. 586), suggest that Sanchez' obedience to Baca, and Armenta's, Montoya's, and T. Martinez' obedience to Sanchez, were motivated by the prospect that disobedience would provoke retribution from an organization with a reputation for violence and for holding grudges, see Fed. R. Evid. 404(b)(2)("[Character] evidence may be admissible for another purpose, such as proving motive . . . .). As to the probative value of evidence regarding the conspiracies to murder G.M. and D.S. that Counts 9-10 allege, Sanchez asserts that those crimes "were allegedly plotted behind bars" and that two cooperators "are expected [to] claim that Baca 'ordered' the hits of D.S. and G.M., perhaps years prior." Severance Motion at 9-10. Evidence which establishes that Baca and others were able to plot and order those murders while imprisoned would also show that the SNM had the ability to transmit messages and orders among its imprisoned members. SNM's ability to transmit orders -- particularly Baca's ability to transmit orders -- is relevant to the United States' expected theory of the case regarding Counts 6-7, specifically the United States' expected contention that Baca sent paperwork to Sanchez that ordered J.M.'s murder. See Severance Motion at 5-7. Showing that Baca had the opportunity to

send paperwork to Sanchez is a legitimate use of Counts 9-10 evidence in a Counts 6-7 prosecution.  See Fed. R. Evid. 404(b)(2)("[Character] evidence may be admissible for another purpose, such as proving . . . opportunity . . . .").  Consequently, Counts 8-12 would have superior probative value to evidence that would just establish the SNM is an enterprise engaged in racketeering activity, such as evidence showing that "members of the SNM engaged in drug trafficking in prison."  Nov. 9 Tr. at 116:20-21 (Jacks).

As to unfair prejudice, it is unlikely that a jury would take Counts 8-12 evidence as evidence of a person's character and infer that "on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Sanchez asserts that jurors will take Counts 8-12 evidence "as character evidence establishing Baca's propensity to orchestrate murders," as "character evidence of Baca's propensity to enforce SNM rules by ordering violent acts," or as evidence showing "the propensity of SNM gang members to comply with Baca's orders to commit murders and other violent acts."  Severance Motion at 13.  Those assertions are incorrect for two distinct reasons.  First, character refers to a person's general traits and not to their tendency to commit particular actions, e.g., one can have a character for violence or ruthlessness, but one does not have a character for murder orchestration or a character for gang-rules enforcement through violent acts.  See Fed. R. Evid. 406 advisory committee note ("'Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness.'" (quoting McCormick on Evidence § 162, at 340)).  See also id. ("A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct . . . .").  Second, jurors are far more likely to take the evidence that Sanchez identifies as evidence regarding specific situations and not as evidence of individuals' general characteristics, or as evidence that

individuals acted in accordance with those general characteristics by committing the conduct that the United States seeks to prove. For example, jurors probably will not infer that SNM members are generally obedient people from evidence showing that SNM members tend to obey Baca's orders. A better, alternative explanation is that SNM members have a good reason to obey Baca in particular, e.g., fear that disobedience will lead to violent retribution. See Fed. R. Evid. 404(b)(2)("[Character] evidence may be admissible for another purpose, such as proving motive . . . .).

The Court accordingly concludes that, if Sanchez were tried on Counts 6-7 as a lone defendant, Counts 8-12 evidence would be admissible. As shown above, Counts 8-12 evidence is relevant to Counts 6-7. Moreover, the danger that Counts 8-12 evidence would produce unfair prejudice to Sanchez -- i.e., the danger that the evidence would be used as character evidence in violation of rule 404(b) -- is slight[6] while the probative value of Counts 8-12 evidence, even evaluated in light of the available evidentiary alternatives, is substantial. The Court, thus determines that Counts 8-12 evidence's probative value would not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Consequently, rule 403 would not

---

[6]At the Defendants' option, the Court would be willing to give the jury a limiting instruction based on the Tenth Circuit's pattern jury instruction regarding similar acts:

> You have heard evidence of other [crimes] [acts] [wrongs] engaged in by the defendant. You may consider that evidence only as it bears on the defendant's [e.g., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident] and for no other purpose. Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions § 1.30, at 46 (2011)(updated January 2017). The Court is aware that Sanchez is skeptical regarding the efficacy of a limiting instruction, see Severance Motion at 18-21, but the Court will not hold Sanchez or his co-Defendants to that position.

dislodge "the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its own choice." Old Chief v. United States, 519 U.S. at 186.

## II.    SEVERING SANCHEZ FROM THE COUNTS 8-12 DEFENDANTS IS NOT WARRANTED.

As the Court determined in the Severance MOO, "[t]o justify severance, the Defendants must demonstrate that joinder violates their constitutional fair trial rights, or would otherwise 'prevent the jury from making a reliable judgment about guilt or innocence.'" Severance MOO, 2017 WL 3054511, at *106 (quoting Zafiro v. United States, 506 U.S. at 539). Sanchez has not offered any sound reason for the Court to depart from its earlier determination regarding the showing necessary to justify severance, so the Court will continue to apply the law regarding severance in accordance with its Severance MOO. Thus, "mere assertions of spillover prejudice" -- i.e., "that there may be propensity problems and an inability of the jury to compartmentalize the evidence" -- "are not sufficient to warrant severance." Severance MOO, 2017 WL 3054511, at *106.

Sanchez has not argued that a joint trial would violate any of his fair trial rights other than his supposed right to exclude Counts 8-12 evidence. No such right exists, however, because that evidence would be admissible even if Sanchez is tried alone. Likewise, Sanchez has not argued that a joint trial would otherwise render unreliable the jury's determination as to his guilt or innocence. For instance, Sanchez does not argue that he and the Counts 8-12 Defendants will assert mutually antagonistic defenses. Accordingly, the Court concludes that Sanchez has not made the showing necessary to justify severing him from the Counts 8-12 Defendants and denies Sanchez' Severance Motion.

**IT IS ORDERED** that Defendant Daniel Sanchez's Motion to Sever the Trial of Counts 6-7 from the Trial of Counts 8-12, filed October 6, 2017 (Doc. 1296), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
  Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

      *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

      *Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

      *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

      *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

  *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

  *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

  *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

  *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

  *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

  *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

    *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

    *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*