# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                           No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

     **THIS MATTER** comes before the Court on Plaintiff United States' Notice of, and Motion

*in Limine* to Admit Gang Expert Witnesses' Testimony, filed October 6, 2017

(Doc. 1299)("Motion").  The Court held a hearing on November 27, 2017.  The primary issues are: (i) whether the Court should allow Plaintiff United States of America to call gang expert witnesses, to testify about Syndicato de Nuevo Mexico ("SNM"); and (ii) if the Court allows such expert testimony, whether the Court should limit the proposed expert witnesses' testimony.  The Court concludes that it will admit the gang experts' testimony to the extent that the gang experts describe gangs generally but will preclude testimony specifically about snm.  Accordingly, the Court grants the Motion in part and denies it in part.

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those facts that the Court provides in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585).  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that SNM allegedly committed through its members.  See Indictment at 2.  SNM, through its members, operates in the District of New Mexico, and its members engage in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2.  The SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Indictment at 2-3.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage.  Indictment at 3.  During the riot, thirty-three

inmates were killed, and over 200 inmates were injured.  See Indictment at 3.  After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members.  See Indictment at 3.  SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.

SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power.  See Indictment at 4.  If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  SNM's rivalry with other gangs also manifests in beatings and stabbings within the prison system.  See Indictment at 4.  SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers.  See Indictment at 8.  SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections

Department") Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). See MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See MOO at 6-7, 2016 WL 7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against J. Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and

management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and Defendant

_____

[1]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a

Daniel Sanchez are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9 (Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson,

---

member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

and Christopher Chavez allegedly murdered "R.G." Indictment at 10 (Count 2). On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3). On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Indictment at 11 (Count 4). On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Indictment at 11-12 (Count 5). In March 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Defendant Mauricio Varela, Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6). On March 7, 2014, Armenta, Montoya, M. Rodriguez, Timothy Martinez, Baca, Varela, Sanchez, Herrera, and R. Perez allegedly murdered J.M. See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a conspiracy to murder charge. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez

allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4] There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for

_____

[3]The Court granted a conditional severance to one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32. Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[4]The Court has also declared that case complex under the Speedy Trial Act. See United States v. Baca, 2016 WL 6404772, at *33.

alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

The FBI's SNM investigation resulted in this case as well as three other cases before the Court. See United States v. Varela, No. CR 15-4269; United States v. Garcia, No. CR 15-4275; and United States v. Baca, No. CR 16-1613. On June 9, 2017, the Court severed Counts 6-12 from Counts 1-5 and 13-16 in United States v. Deleon. See United States v. DeLeon, No. CR 15-4268, 2017 WL 3054511 (D.N.M. June 30, 2017)(Browning, J.). This decision creates two trials. Defendants Sanchez, Baca, Herrera, and Perez will be tried in the first trial; Defendants J. Gallegos, Troup, B. Garcia, Patterson, A. Garcia, and A. Gallegos will be tried in the second trial. Other Defendants listed in the Indictment have agreed to plea deals with the United States. The parties agree to begin the first trial on January 29, 2018. See Fourth Scheduling Order at 2, filed July 7, 2017 (Doc. 1205).

### 1.    The Motion.

The United States filed the Motion on October 6, 2017. See Motion at 1. The United States notes that it will call Ronald Martin, Chris Cupit, and Sergio Sapien ("gang experts") at trial, and summarizes their proposed testimony. Motion at 1-6. The United States says Martin will testify generally about prison gang activity and more specifically about: (i) the SNM's "history, culture, codes of conduct, methods of operation and communication, and behavior"; (ii) "specific membership and affiliation of the Defendants and the Victims in SNM"; (iii) prison weapons and New Mexico Corrections Department sanctions for gangs; and (iv) the SNM's rules and requirements for participation in violent crimes. Motion at 1-2. The United States then describes

the proposed testimony in greater detail, discussing SNM's history, goals, iconography and the gang's "means and methods." Motion at 5. See id. at 2-6.

The United States describes the gang experts and their qualifications. See Motion at 6-9. First, Martin is a Sergeant at the NM Corrections Department. See Motion at 6. He has worked in the Security Threat Intelligence Unit ("STIU") for eleven years. Motion at 6. He investigates prison-related drug trafficking and prison gangs -- specifically, the California Sureno prison gang. See Motion at 7. The United States argues that "Sergeant Martin's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case." Motion at 7. The next proposed witness, Cupit, also works for the NM Corrections Department's STIU. See Motion at 7. He has worked for the STIU for six-and-a-half years as an Institutional Investigator helping to classify prison gangs, identify their members, and investigate their activity. See Motion at 7-8. The United States says Cupit "is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and to law enforcement agencies." Motion at 8. The final proposed witness, Sapien, has worked for the NM Corrections Department for seventeen-and-a-half-years. See Motion at 8. He has worked with the STIU for over three years, and he also has provided gang training and seminars to law enforcement and corrections agencies. See Motion at 9. He has certified prison security threat groups, identified members, and otherwise investigated prison gangs. See Motion at 9.

The United States concludes its brief with a discussion of the applicable law. See Motion at 9-11. The United States argues that the Court should "exercise its 'special gatekeeping obligation'" to the gang experts' testimony, because they "have 'a reliable basis in knowledge and experience' in their field." Motion at 10 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 152 (1999)).  The United States notes that the Court has "'broad discretion'" in assessing

expert's reliability, Motion at 10 (quoting <u>United v. Velarde</u>, 214 F.3d 1204, 1208 (10th Cir.

2000)), and it argues that the proposed testimony does not fall "within 'the narrow range of

opinions still prohibited under Rule 704" of the Federal Rules of Evidence, Motion at 10 (quoting

<u>United States v. Richard</u>, 969 F.2d 849, 855 (10th Cir. 1992)).  The United States ends by arguing

that the gang experts' testimony is admissible, because "there are no novel scientific principles at

play and adequate assurances of reliability are set forth above."  Motion at 11.

### 2.    <u>The B. Garcia Response</u>.

B. Garcia responds, and Defendants J. Gallegos, Troup, Chavez, A.A. Garcia, Rodriguez,

Sanchez, Baca, C. Garcia, Herrera, Perez, and A. Gallegos join B. Garcia's response.  <u>See</u>

Response and Objection to Government's Proposed Gang Expert Evidence (DOC. No. 1299) on

Sixth Amendment Confrontation and Evidentiary Grounds at 1-2, filed October 17, 2017

(Doc. 1337)("B. Garcia Response").  B. Garcia notes that, according to the United States, the gang

experts will give just one opinion -- that the SNM is an enterprise.  <u>See</u> B. Garcia Response at 3.

The rest of their testimony, B. Garcia argues, will be a "compilation of factual information that

these officers and others have collected from testimonial statements from other gang intelligence

officers and from inmates during investigative interviews."  B. Garcia Response at 3.  B. Garcia

says, ordinarily, expert testimony is not based on testimonial statements, but here, the gang

experts' testimony "is entirely built on anecdotal evidence which, in reality, is almost entirely

derived from reports from other law enforcement officers or out-of-court statements made by gang

members to law enforcement during the course of investigations."  B. Garcia Response at 3.

B. Garcia insists that this testimony violates the Confrontation Clause in the Sixth Amendment to

the Constitution of the United States of America  <u>See</u> B. Garcia Response at 4.

B. Garcia notes that there "is no 'forensic' or 'expert' exception to the Confrontation Clause."  B. Garcia Response at 5 (citing <u>Bullcoming v. New Mexico</u>, 564 U.S. 647 (2011)("<u>Bullcoming</u>"); <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009)("<u>Melendez-Diaz</u>")).  B. Garcia also discusses gang expert cases from the United States Court of Appeals for the Tenth Circuit and the United States Court of Appeals for the Second Circuit.  <u>See</u> B. Garcia Response at 5-7 (citing <u>United States v. Garcia</u>, 793 F.3d 1194 (10th Cir. 2015)(Hartz, J.); <u>United States v. Mejia</u>, 545 F.3d 179 (2d Cir. 2008)("<u>Mejia</u>").  He argues that these two cases

> make clear that "[w]hen an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense."

B. Garcia Response at 6 (quoting <u>United States v. Garcia</u>, 793 F.3d at 1213; <u>Mejia</u>, 545 F.3d at 191).  B. Garcia states that, in the Tenth Circuit, gang expert testimony based on out-of-court or testimonial gang member and victim statements is inadmissible, along with gang expert testimony about a defendant's status in a gang.  <u>See</u> B. Garcia Response at 7.  He argues that the United States' assurances that the expert information is not offered for the truth of the matter asserted are "not credible" in many cases, B. Garcia Response at 7, and that the Confrontation Clause will bar the gang experts' testimony about "the crime base, or the 'enterprise,' 'racketeering,' 'enterprise engaged in, or its activities affected, interstate or foreign commerce' elements or the *mens rea* element of 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise.'"  B. Garcia Response at 8 (quoting 18 U.S.C. § 1959(a)).

B. Garcia also warns the Court about the dangers of an expert witnesses testifying to his or her lay observations.  <u>See</u> B. Garcia Response at 8-10 (citing and quoting <u>United States v. Vera</u>, 770 F.3d 1232 (9th Cir. 2014); <u>United States v. Sandoval</u>, 680 F. App'x 713 (10th Cir. 2017);

Mejia, 545 F.3d at 190-91, 202).  He notes that a district court "must exercise its gate-keeping responsibilities in defining the proper bounds of such expert testimony, particularly where the challenged witness is offering a hybrid of expert and lay opinion, drawing not only from training and experience, but percipient facts, and facts obtained from witnesses who are unavailable at trial."  B. Garcia Response at 10 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)("Daubert"); United States v. Freeman, 498 F.3d 893 (9th Cir. 2007)).  B. Garcia also notes that different evidentiary rules govern lay and expert witnesses' testimony.  See B. Garcia Response at 11.

B. Garcia next turns to rule 404(b) of the Federal Rules of Evidence.  See B. Garcia Response at 11.  He argues that the gang experts' proposed foundation violates this rule, because the United States will use evidence of "other crimes, wrongs, or acts" to "prove the 'character of a person in order to show action in conformity therewith.'"  B. Garcia Response at 11 (quoting Fed. R. Evid. 404(b)).  He notes that the gang experts' evidence concerning how the SNM's members acted in the past may be used to explain how the Defendants behaved "during the charged period of time."  B. Garcia Response at 11.

B. Garcia then discusses why he believes each specific piece of evidence about which the gang experts will testify either derives from testimonial statements and/or violates rule 404(b). See B. Garcia Response at 12-22.  B. Garcia objects to all proposed gang expert testimony.  See B. Garcia Response at 23.  He concludes that, if the Court does not carefully control and limit the testimony, it "could easily descend to a discussion of specific events recounted by others, with the proposed experts merely adding 'unmerited credibility' to the sources, and summarizing evidence in a way that should be reserved for the government's closing argument."  B. Garcia Response at 23 (quoting United States v. Garcia, 793 F.3d at 1213).

3.      **The Sanchez Response.**

Sanchez responds to the Motion, and all Defendants join.  See Defendant Daniel Sanchez's Motion to Compel the Government to Comply with Rule 16 in Noticing its Intent to Rely on Gang Expert Witness Testimony or, in the Alternative, to Exclude the Government's Gang Expert Witnesses Altogether at 1, filed October 20, 2017 (Doc. 1345)("Sanchez Response").  Sanchez argues that the Motion violates rule 16 of the Federal Rules of Criminal Procedure, because it does not state what the experts' opinions are, the bases and reasons for each of these opinions, and the qualifications of the expert witnesses that are relevant to their ability to reliably form such opinions.  See Sanchez Response at 2.  Sanchez argues that, "absent swift and exacting government compliance with Rule 16," his constitutional rights will be violated.  Sanchez Response at 3.

Sanchez then discusses separate legal grounds for his argument that the United States must disclose the basis for the gang experts' testimony: (i) rule 16; (ii) rule 702 of the Federal Rules of Evidence; and (iii) the Fifth and Sixth Amendments.  See Sanchez Response at 4-10.  First, he notes that rule 16 states that the United States must provide a summary that "describe[s] the witness's opinions, the bases and reasons for those opinions and the witness's qualifications." Sanchez Response at 4 (quoting Fed. R. Crim. P. 16(a)(1)(G)).  In addition to the disclosure requirements that rules 16(a)(1)(E) and 16(a)(1)(F) impose, Sanchez argues that rule 16(a)(1)(G) also "plainly requires the prosecution to disclose the bases of its experts' opinions."  Sanchez Response at 5.  In support, he cites Advisory Committee Notes from the 1993 amendment to the rule, which state that "'the amendment requires a summary of the bases relied upon by the expert. That should cover not only written and oral reports, tests, reports and investigations, but any information that might be recognized as a legitimate bases for an opinion.'"  Sanchez Response at 6 (quoting Fed. R. Crim. P. 16, Advisory Comm. Notes, 1993 amendment).

Sanchez next argues that the United States must disclose the bases for the gang experts' opinions under rule 702. See Sanchez Response at 6-9. He states that rule 702 "'imposes a special obligation on a trial judge to ensure that any and all scientific testimony is not only relevant but reliable.'" Sanchez Response at 7 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 147). This obligation requires the Court to examine the gang experts' facts, reasoning, and methodology. See Sanchez Response at 7. Sanchez argues that, without knowing the bases for the gang experts' conclusions, his ability to "pose questions for which the Court must have answers to perform its gate keeping function" would be severely hindered, and it would be "impossible to know whether each specific opinion is even marginally reliable." Sanchez Response at 8. He also notes that the United States has not provided any information on the principles and methods that the experts are using to form their opinions. See Sanchez Response at 8.

Third, Sanchez argues that the Fifth and Sixth Amendments require the United States to disclose the bases for the gang experts' proposed opinions. See Sanchez Response at 9-10. He notes that "'[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense,'" and the "right of an accused to confront the witnesses against him includes the opportunity for adequate and effective cross-examination." Sanchez Response at 9 (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973) and citing Davis v. Alaska, 415 U.S. 308 (1974)). Sanchez states that he needs further discovery to rigorously examine the proposed testimony. See Sanchez Response at 9-10.

Sanchez argues that the United States' gang expert notice is "wholly inadequate" in light of this law. Sanchez Response at 10. He says that the list of topics about which Martin will testify does not "say anything about the actual content of the opinions that the government seeks to introduce or the information upon which the opinions are based." Sanchez Response at 10.

Sanchez also disputes Martin, Cupit, and Sapien's qualifications as experts, arguing that the Motion provides insufficient summaries of their qualifications and expertise.  See Sanchez Response at 12.  For these reasons, Sanchez requests that the Court order the United States to comply with rule 16, or, in the alternative, exclude the gang experts' testimony.

> ### 4.      **The Perez Response.**

 Perez responds to the Motion, and Sanchez, Baca, Herrera, C. Garcia, B. Garcia, Troup, J. Gallegos, Patterson, Chavez, A.A. Garcia, Rodriguez, A. Gallegos, and Gutierrez join.  See Response in Opposition to the Government's Notice of and Motion in Limine to Admit Gang Expert Testimony (Doc. 1299) and Request for Hearing Pursuant to *Daubert* and *Kumho Tire* at 1-2, filed October 20, 2017 (Doc. 1356)("Perez Response").  Perez first lays out the applicable law, see Perez Response at 2-4, and then adopts the B. Garcia Response's arguments, see Perez Response at 4-5.  Next, Perez argues that the United States has not shown that the gang experts are qualified to testify as experts on SNM.  See Perez Response at 5.  Perez says that the United States has stated that the gang experts qualify as experts, because the NM Corrections Department employs them.  See Perez Response at 5.  He argues that this argument is "circular reasoning" and that, for all three gang experts, the United States "provides no information as to the duration or depth of the investigation and review, if any, that these witnesses may have conducted regarding the SNM."  Perez Response at 6.

Perez then argues that the United States has not met its burden to show that the gang experts' proposed testimony is based on reliable methods and principles.  See Perez Response at 6-9.  According to Perez, this failure "gives the Court absolutely no basis on which to find that any such opinions or conclusions are supported by legitimate bases."  Perez Response at 7.  Similarly, Perez argues that there is no information about the proposed testimony's information source.  See

Perez Response at 8.  Perez notes that it "is apparent" that the United States "gleaned this information" from inmates and that, because the gang expert "testimony would only parrot this otherwise uncorroborated information from potential fact witnesses, it doesn't bear the requisite indicia of reliability to make it admissible."  Perez Response at 8.  Based on the United States' motion, Perez argues that the United States "seeks to put on a large amount of factual evidence in the form of expert opinions without really applying any methodology or specialized knowledge at all."  Perez Response at 8-9.  This testimony, Perez argues, violates Daubert.  See Perez Response at 9 (citing Mejia, 545 F.3d 179, 190 (2d Cir. 2008)).

Next, Perez objects to two specific pieces of proposed testimony.  He argues that the Court should exclude testimony that any Defendant has a gang affiliation, because "such evidence would constitute improper profile evidence that could serve as substantive evidence of guilt."  See Perez Response at 9-10.  Perez also argues that, "by instructing the jury that one or more elements of the charged offenses have been satisfied, the expert would contravene the Tenth Circuit's holding that expert witnesses may not usurp the jury's fact-finding role."  Perez Response at 9-10 (citing United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001)).

Finally, Perez argues that the gang experts' testimony will not assist the jury and will be substantially more prejudicial than probative.  See Perez Response at 10-12.  He states that presenting "a litany of facts describing historical bad acts of the SNM" would not help the jury and is inadmissible under rule 403's balancing test.  Perez Response at 10.  He argues that the "vast majority" of the gang experts' testimony is "entirely without relevance to this prosecution" and that jurors do not need experts to understand the specific crimes which SNM members committed.  Perez Response at 11.  Instead, Perez proposes that the United States introduce this crime evidence with cooperating witness testimony.  See Perez Response at 11.  Perez argues that,

if the Court finds that the SNM's history is relevant to the case, it should nevertheless exclude it as substantially more prejudicial than probative.  See Perez Response at 11-12.  He notes that expert witnesses create an "'aura of special reliability and trustworthiness'" which creates a risk of prejudice.  Perez Response at 12 (quoting United States v. Dukagjini, 326 F.3d 45, 53-54 (2d Cir. 2002)).   Perez cites United States v. Norwood, 16 F. Supp. 3d 848, 865 (E.D. Mich. 2014)(Goldsmith, J.), in which the district court excluded gang expert testimony, because it could establish the existence of a Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, enterprise.  Perez Response at 12.

### 5. The Supplemental Objections.

B. Garcia submits a supplemental brief detailing further objections to the Motion.  See Supplement to Objection to Government's Proposed Gang Expert Evidence on Sixth Amendment Confrontation Grounds, filed November 21, 2017 (Doc. 1466)("Supplemental Objection"). B. Garcia asserts that expert opinions and factual testimony derived from the presentation of data to the expert outside of court violates the Confrontation Clause if the data is based on testimonial statements.  See Supplemental Objection at 3.  He notes that rule 703 of the Federal Rules of Evidence was amended in 2000 to prevent parties from evading exclusionary evidence rules by having an expert rely on inadmissible evidence.  See Supplemental Objection at 4-6.  According to B. Garcia, the rule has not been updated to reflect Crawford v. Washington, 541 U.S. 36 (2004). See Supplemental Objection at 7-8.  While B. Garcia admits that he is "unable to identify any case in which either the Tenth Circuit or other circuits have analyzed whether the admission of expert *opinion testimony* violates the Confrontation Clause if it is derived from the testimonial statements of non-testifying witnesses," he argues that an expert's opinion is inadmissible after Bullcoming and Melendez-Diaz if it "is based on the testimonial statements of non-testifying witnesses."

Supplemental Objection at 9 (emphasis in original).

6.      **The Hearing.**

The Court held a hearing on November 27, 2017.  See Transcript of Motions Proceedings at 1 (taken November 27, 2017), filed December 6, 2017 (Doc. 1545)("Tr.").  As the Court took up the Motion, it noted that it is very similar to a motion litigated in United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).  See Tr. at 47:22-48:4 (Court, Beck).  The Court stated its general position on gang expert testimony from its previous ruling.  See Tr. at 48:10-50:13 (Court). The United States agreed "to a certain extent" with the Court, Tr. at 50:20 (Beck), but stated that, based on United States v. Garcia, "what was maybe a little too restrictive was saying that, the experts can't testify to the SNM Gang," Tr. at 51:1-3 (Beck).  The United States said that the gang experts should be allowed to testify about the SNM's tattoos, slang words, recruitment and communication methods, membership rules, structure, rivals, history, and the crimes SNM members commit.  See Tr. at 53:5-11 (Beck); id. at 56:1-14 (Beck).

B. Garcia responded that he doubts that the United States needs an expert to present testimony about SNM's gang culture.  See Tr. at 58:21-59:11 (Castle).  He argued that "this is not something that's so complicated the jury is not going to understand."  Tr. at 58:8-9.  He distinguished United States v. Garcia by arguing that its specific facts required expert testimony, see Tr. at 58:14-18 (Castle), and he reiterated that the Confrontation Clause would limit expert testimony that was based on out-of-court testimonial statements, see Tr. at 60:22-61:6 (Castle). B. Garcia then stated that the Court should take the same approach it took in United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.), where it allowed the expert to testify to find out the source of his opinions.  See Tr. at 61:6-19 (Castle).

B. Garcia also disputed the Court's preliminary conclusion that it would allow corrections

officers to testify about NM Corrections Department gang member classifications.  <u>See</u> Tr. at 62:18-22 (Castle).  The Court replied that it had concern about the gang experts giving their opinion that certain Defendants were SNM members but no concern about these witnesses testifying that the NM Corrections Department classified Defendants as SNM members.  B. Garcia stated that the United States needs "to call the person who has actual percipient knowledge that Mr. Garcia is an SNM member," Tr. at 65:11-12 (Castle), and that the United States can easily "do this independently through legitimate means," Tr. at 65:20-21 (Castle).

B. Garcia next noted that the gang experts "work for one of the victims."  Tr. at 66:10-11 (Castle).  He raised the question whether having a victim "employ experts that are presented before the Court" is "really the proper role of an expert."  Tr. at 66:15-18 (Castle).  He also argued that the Court should prevent testimony on whether the Defendants are committing crimes for the purpose of maintaining their position in the SNM, which is an element of the VICAR offense.  <u>See</u> Tr. at 67:9-22 (Castle).  Finally, he stated again that the gang expert testimony is likely based on out-of-court testimonial statements.  <u>See</u> Tr. at 68:1-6 (Castle).

Before recess, the Court "put the proposal on the table."  Tr. at 68:9 (Court).  The Court stated that it did not disagree that testimony about a gang's history and territory could be helpful to a jury, but "that's a totally different question as to whether the expert can testify to that."  Tr. at 68:17-18 (Court).  The Court stated that it reads <u>United States v. Garcia</u> as holding that expert testimony on gang's history and territory still must comply with the Confrontation Clause and the Federal Rules of Evidence.  <u>See</u> Tr. at 5-11 (Court).  Because this opinion relies on <u>Mejia</u>, 545 F.3d 179, the Court stated that it would likely "draw[] the line where the Second Circuit draws it in <u>Mejia</u>."  Tr. at 69:14-15 (Court).  The Court stated that, while it would hear more arguments, it thought that the gang experts "can't specifically talk about the SNM gang and offer testimony on

that." Tr. at 69:20-21 (Court). If the United States "wants to push that," the Court said that it would use the same procedure it used in United States v. Rodriguez for admitting expert testimony. Tr. at 70:2-3 (Court).

After recess, the Court noted that it had read United States v. Pablo, 696 F.3d 1280 (10th Cir. 2012), and United States v. Sandoval, 680 F. App'x 713 (10th Cir. 2017), and was "fairly comfortable" with its proposed ruling. Tr. at 71:11-12 (Court). The Court then asked the Defendants whether they were "comfortable with where I'm drawing the line." Tr. at 71:14-15 (Court). B. Garcia stated that the Motion is not clear whether the gang expert testimony is based on personal perception and that, "with regards to specific areas" of testimony, "we're going to have to just analyze [the testimony] as it's presented at the hearing." Tr. at 72:13-16. Perez noted that the Court had largely addressed his concerns regarding gang experts' testimony that SNM is an enterprise, but he asked for clarification. See Tr. at 73:14-23 (Villa). The Court stated that expert testimony on whether SNM is an enterprise or certain acts are racketeering were legal conclusions better left for the jury. See Tr. at 74:9-17 (Court). Perez then raised objections to the gang experts' qualifications and their proposed testimony's cumulative nature. See 75:5-76:10 (Court, Villa). Sanchez echoed these objections. See Tr. at 76:16-77:2 (Jacks). The Court noted that its proposed ruling would address these concerns, see Tr. at 77:14-16 (Court), and stated that, if the proposed procedures do not satisfy the Defendants, they may readdress the issue, see Tr. at 78:6-12 (Court).

The United States stated that it does not intend to elicit testimony from the gang experts that SNM is a racketeering enterprise and does not intend to produce all three gang experts in each trial. See Tr. at 79:5-17 (Beck, Court). The United States stated its understanding that the Court "made its decision, but it's not ordering that at this point. It's going to look at the issues further

and take it under consideration," Tr. at 81:2-3 (Beck), but the Court replied that "given the place we are . . . what I'm saying is going to have to be the order," Tr. at 81:10-11 (Court).

The Court then asked B. Garcia, Sanchez, and Perez what else they needed under rule 16 and Daubert. See Tr. at 82:14-25 (Court). Sanchez said that he would like to know the specific opinions which the gang experts are offering. See Tr. at 83:6-8 (Jacks). In response, the Court asked the United States whether it could produce a summary of the gang experts' opinions and how they were formed. See Tr. at 84:22-85:11 (Court). The United States replied that it could "put together a list of opinions," Tr. at 85:17 (Beck), but that the "case law is pretty clear" that the gang experts' work experience is sufficient to satisfy rule 16, Tr. at 86:20 (Beck). Perez stated he would like to have a hearing after seeing the gang experts' opinions, but the Court said it was not "seeing Daubert issues here" and would not hold a hearing before trial. See Tr. at 87:5-88:20 (Fox-Young, Court). Last, B. Garcia argued again that the gang expert's testimony is likely based on testimonial hearsay statements. See Tr. at 88:25-89:16 (Castle). The Court stated that, in its opinion, if an investigator forms an opinion based on 2,000 interviews, there are probably no confrontation or hearsay issues. See Tr. at 89:17-90:3 (Court). B. Garcia disagreed, but noted that it was a novel legal question. See Tr. at 90:4-91:17 (Castle).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert . . . , trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

"Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

> Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)**    the testimony is based on sufficient facts or data;
>
> **(c)**    the testimony is the product of reliable principles and methods; and
>
> **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). In United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1239, the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and

individuals who are drug couriers within a drug organization; (vi) the significance
of the presence of multiple air fresheners in the vehicle; and (vii) the significance
of the presence of a firearm in the vehicle.

886 F. Supp. 2d at 1239.  The Court did not admit testimony on whether a highway portion was a

"drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down

the interstate' as traveling in a known drug route"  United States v. Goxcon-Chagal, 886

F. Supp. 2d at 1247 (quoting United States v. $252,300.00 in U.S. Currency, 484 F.3d 1271, 1274

n.3 (10th Cir. 2007)).    See  United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M.

2014)(Browning, J.)(deeming inadmissible testimony on the demeanor of a sex crime's victim

during an examination, and stating that "demeanor is not always a reliable indicator whether

someone is telling the truth, especially about sex -- then no expert testimony is needed.  That

knowledge is well within the knowledge of jurors and most people."); United States v. Rodella,

No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that

"testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive

force and" reasonableness).  The expert testimony's proponent has the burden of establishing by a

preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales

v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily

v. United States, 483 U.S. 171, 175 (1987)).   Once the trial court has determined that expert

testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge,

skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an

overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528

(10th Cir. 1974)(internal quotation marks omitted).  See United States v. Rodella, 2014 WL

6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of

nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the

proposed expert] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony.  See United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard").[5]  The trial court has broad discretion in deciding whether to admit or exclude expert testimony.  See Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").  "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)).  "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert, 509 U.S. at 594-95; Witherspoon

---

[5]The current law -- and its trajectory -- are casting serious shadows over the use of experience experts in cases, particularly those involving jury trials.  It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.  Lawyers and appellate courts overemphasize the importance of experts and distrust juries.

v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence

must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591). If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884. In Kumho Tire Co. v. Carmichael, the Supreme Court expanded the rules under Daubert to non-scientific expert testimony. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)(Butler, C.J.))). The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted)(quoting Daubert, 590 U.S. at 594).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal

quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222).  The proponent of the

expert's opinion testimony bears the burden of establishing that the expert is qualified, that the

methodology he or she uses to support his or her opinions is reliable, and that his or her opinion

fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp.,

397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193

(10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis. At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. at 146. See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

The restrictions in <u>Daubert</u> apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the <u>Frye</u>[6] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").  "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  <u>Daubert</u>, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  <u>Daubert</u>, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under <u>Daubert</u> . . . ."  <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[7] and in fact some courts have indicated their acceptance of it.").

### LAW REGARDING EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

---

[6]<u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

[7]A "[p]olymerase chain reaction" ("PCR"), <u>Att'y Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780, is a widely used method for copying DNA segments.  See <u>Polymerase chain reaction</u>, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

    **(a)**    **In General -- Not Automatically Objectionable.**  An opinion is not objectionable just because it embraces an ultimate issue.

    **(b)**    **Exception.**  In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).  "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).  The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished.  See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).  Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expressed, regarding testimony on ultimate issues.  More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts." A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., 936 F.2d 472, 476 (10th Cir. 1991).

    "Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier

of fact to satisfy rule 701, <u>see</u> Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." <u>United States v. Barile</u>, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the Court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." <u>United States v. Perkins</u>, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting <u>United States v. Barile</u>, 286 F.3d at 760).  In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning. <u>See United States v. Perkins</u>, 470 F.3d at 158.  The Court has addressed this issue in various contexts. <u>See</u>, <u>e.g.</u>, <u>Sec'y & Exch. Comm'n v. Goldstone</u>, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *1, *44 (D.N.M. May 10, 2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations and omissions," expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material" and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); <u>United States v. Rodella</u>, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); <u>United States v. Gould</u>, No. CR 03-2274 JB, 2007 WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred" (citing <u>Tanberg v. Sholtis</u>, 401 F.3d 1151, 1163-64 (10th Cir. 2005)); <u>Marquez v. City of Albuquerque</u>, 399 F.3d

1216, 1222 (10th Cir. 2005); Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL

2313527 (D.N.M. July 31, 2005)(Browning, J.).

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him." U.S. Const. amend. VI. The Tenth Circuit "has determined the Confrontation Clause does

not apply at noncapital sentencing proceedings under the Guidelines." United States v. Phillips,

165 F. App'x 677, 681 (10th Cir. 2006)(unpublished)[8](cited in United States v. Mata, No. CR 05-

2046 JB, 2006 WL 4079127, at *10 (D.N.M. May 2, 2006)(Browning, J.)). In Crawford v.

Washington, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Sixth

Amendment, "[t]estimonial statements of witnesses absent from trial [are admissible] only where

the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-

examine." Crawford v. Washington, 541 U.S. 36, 59 (2004). In Davis v. Washington, 547 U.S.

813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation
> under circumstances objectively indicating that the primary purpose of the

---

[8]United States v. Phillips is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See
10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited
for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have
> generally determined that citation to unpublished opinions is not favored. However,
> if an unpublished opinion or order and judgment has persuasive value with respect
> to a material issue in a case and would assist the court in its disposition, we allow a
> citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that United States
v. Phillips has persuasive value with respect to a material issue, and will assist the Court in its
disposition of this Memorandum Opinion and Order.

interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024, 1038 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d 765, 777-78 (10th Cir. 2010)).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1207-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).[9]

---

[9]In United States v. Chaco, the Court explained:

The Tenth Circuit has stated that a critical element in determining whether a statement is testimonial or non-testimonial "centers on the reasonable expectations of the declarant."  United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005). The Tenth Circuit has held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."  United States v. Townley, 472 F.3d 1267, 1272 (10th Cir. 2007)(quoting United States v. Summers, 414 F.3d at 1302).  Other Circuit Courts of Appeal are in accord.  See United States v. Townley, 472 F.3d at 1272 (citing United States v. Hinton, 423 F.3d 355, 360 (3d Cir. 2005); United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004); United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004)).  The Tenth Circuit in United States v. Smalls called into question some aspects of the definition of testimonial that it set down in United States v. Summers.  See United States v. Smalls, 605 F.3d at 777 ("Upon close inspection, Summers' definition of 'testimonial' appears somewhat in tension with Davis[ v. Washington, 547 U.S. 813 (2006)]' strictures, and perhaps overly broad . . . .").  Specifically, the Tenth Circuit stated that a testimonial statement must be made in a "formal" context, although they were not specific about what that might mean.  See United States v. Smalls, 605 F.3d at 777-78.  Next, the Tenth Circuit specified that the United States v. Summers articulation ignored the statement's "primary purpose," and focused instead on the foreseeability to the declarant of the purposes to which the statement "might" be put.  United States v. Smalls, 605 F.3d at 777-78.  With those two clarifications, it declined to restate a

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of an affidavit by a forensic chemist, who swore that the substance which the police seized from the defendant was cocaine, violated the Confrontation Clause.  See 557 U.S. at 307.  The Supreme Court first concluded that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and because, under Massachusetts law, the affidavit's sole purpose was to provide prima facie evidence of the content of the substance seized.  557 U.S. at 310.  The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use

---

precise definition of a testimonial statement, instead setting forth two proposed definitions, either one of which it might adopt if the issue were put directly before it:

> > [W]e might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution.  Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

> United States v. Smalls, 605 F.3d at 778 (proffering these potential tests, but holding "we need not now . . . . tender a definitive definition of 'testimonial,' because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply").

United States v. Chaco, 801 F. Supp. 2d at 1209-10.

> of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs."    At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320.  Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause.    See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error").  The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification  -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."    Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa'" (quoting Melendez-Diaz, 557 U.S. at 310 n.6)).  See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1950409, at *13 (D.N.M. May 7, 2014)(Browning, J.)(discussing the Confrontation Clause, but finding no violation where statement was not testimonial).

Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, No. CR 04-2362 JB, 2006 WL 1228953, at *7-9 (D.N.M. March 7, 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a

Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed-circuit television, which did not allow the witness to view the defendant. See Maryland v. Craig, 497 U.S. at 860. While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." 497 U.S. at 845.[10]

The Supreme Court in Maryland v. Craig recognizes that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings." 497 U.S. at 846. The Supreme Court in Maryland v. Craig also acknowledges the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and affirms that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

---

[10]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence. See Bullcoming v. New Mexico, 564 U.S. at 652 ("The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist."); Crawford v. Washington, 541 U.S. at 61 ("To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner . . . .").

The Supreme Court explains in <u>Maryland v. Craig</u> that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case."  497 U.S. at 849 (internal quotation marks omitted).  The Supreme Court emphasizes that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."  497 U.S. at 850.

While the issue is decidedly less clear, a violation of a defendant's Confrontation Clause rights does not occur when the defendant calls by videoconference or telephonically one of his or her own witnesses who is aligned with him.  <u>See</u> U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . .").  <u>Cf.</u> <u>United States v. Olguin</u>, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others.").  The need for "adversariness" is not present when the witness is aligned with the defendant.  <u>Maryland v. Craig</u>, 497 U.S. at 845.  The Supreme Court spoke in <u>Crawford v. Washington</u> about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant.  541 U.S. at 58.  The Federal Rules of Evidence, for example, generally do not permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness.  <u>See</u> Fed. R. Evid. 611(c).[11]  A defendant also waives a Confrontation

---

[11]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness' testimony.   Ordinarily, the court should allow leading questions: (1) on cross-

Clause challenge by calling his own witness by videoconference or telephonically.  See United States v. Lopez-Medina, 596 F.3d 716, 730-34 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule.").

In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty.  See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial . . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit recognizes that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial.  See United States v. Lopez-Medina, 596 F.3d at 730-34 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit states: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule."  United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held in prior cases that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy."  Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting a videotaped deposition of one of its witnesses.  See Earhart v.

---

examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  Fed. R. Evid. 611(c).

Konteh, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition. In Bailey, we held that a criminal defendant waived his right to confrontation by entering into a quid pro quo agreement with a state prosecutor. Id. at 657. The petitioner in Bailey had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance. Id. Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape. Id.

Earhart v. Konteh, 589 F.3d at 344. Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court. See 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

In United States v. Sandoval, the Court considered the Confrontation Clause in the context of a minor victim and her alleged sexual attacker, as well as a statute permitting such testimony over closed-circuit television. See 2006 WL 1228953, at *10-13. The Court concluded that "[t]wo-Way closed-circuit television testimony" would be appropriate in that case, "because the introduction of testimony in this manner" did not "violate[] the Confrontation Clause of the Sixth Amendment." 2006 WL 1228953, at *10. Given the accusations' nature and the case's unique circumstances, the Court allowed closed-circuit television testimony. See 2006 WL 1228953, at *12. The Court explained:

> Jane Doe will suffer emotional trauma if forced to testify in open court, in the same courtroom, with the person who allegedly abused her, and will thus be unable to testify. Jane Doe will also be unable to testify because of her fear of her father -- Dr. Kern's opinion does not rest on Jane Doe's ability to testify in a court room setting generally, but is based upon the fear of her father. The Court had an opportunity to examine Dr. Kern's findings at a hearing before trial and to make specific findings to satisfy the factors set forth in Maryland v. Craig and § 3509. The Court will best protect Jane Doe's welfare if it allows her to testify by two-way

closed circuit television, and Sandoval's Confrontation Clause rights will not be violated.

2006 WL 1228953, at *12.

## LAW REGARDING GANG EXPERTS

"Numerous . . . courts have admitted expert testimony about street gangs, where such evidence is sufficiently relevant." 7 Jones on Evidence § 53:119. See, e.g., United States v. Rios, 830 F.3d 403, 415 (6th Cir. 2016), cert. denied sub nom. Casillas v. United States, 137 S. Ct. 1120 (2017), and cert. denied, 138 S. Ct. 2701 (2018); United States v. Garcia, 793 F.3d at 1213; United States v. Escobar, 462 F. App'x 58, 61-62 (2d Cir. 2012)(unpublished); Mejia, 545 F.3d at 194-95. For example, the Tenth Circuit has held gang expert testimony admissible in RICO and VICAR, 18 U.S.C. § 1959, cases. See United States v. Garcia, 793 F.3d at 1212-13 ("We have long recognized the usefulness of such testimony 'because the average juror is often innocent of the ways of the criminal underworld.'" (quoting United States v. Vann, 776 F.3d 746, 758 (10th Cir. 2015)); United States v. Kamahele, 748 F.3d at 998-99 (concluding that gang expert evidence on a gang's "distinctive traits" could be helpful to a jury). According to the Tenth Circuit, a district court could, for instance, conclude that an officer's testimony based on years of law enforcement experience and relevant schooling, and drawing information from multiple sources, satisfies rule 702's reliability requirements. See United States v. Kamahele, 748 F.3d at 999. See also United States v. Thomas, 490 F. App'x 514, 520 (4th Cir. 2012)(unpublished)(concluding that an expert opinion "related to the history and organization of the Bloods gang, how [a subset of the Bloods gang] related to the overall gang hierarchy, and gang symbology and colloquialisms" was based on sufficient qualifications when the expert had ten years of experience as a police officer, three years as a detective in a gang section, received training and classes on gangs, conducted field interviews and surveillance on gangs, and taught on gangs at a local college).

Gang expert testimony likely contravenes rule 702's relevance requirement when it focuses narrowly on the specific gang before the court and that gang's actions, particularly its crimes, because a jury can understand such information without assistance. See United States v. Rios, 830 F.3d at 415-16; United States v. Escobar, 462 F. App'x at 61-62; Mejia, 545 F.3d at 194-95. In Mejia, the Second Circuit reasons that general testimony places the expert in the role of providing expertise rather than summarizing facts:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

545 F.3d at 190. The Tenth Circuit quotes this passage in full in United States v. Garcia, 793 F.3d at 1213. The Second Circuit continues:

> When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

Mejia, 545 F.3d at 191 (citing United States v. Nersesian, 824 F.2d 1294, 1308 (2d Cir. 1987)). In Mejia, the Second Circuit held inadmissible the expert's testimony

> that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

545 F.3d at 194-95 (citations omitted). In United States v. Escobar, the Second Circuit similarly rejected evidence that a gang was "involved in narcotics trafficking, auto theft, assaults, murders, robberies," and

> that members of Neta could enhance their status within the gang by "committing crimes on behalf of the gang, whether it be dealing narcotics or stealing cars or committing assaults or procuring weapons or anything of that nature," including murder, . . .  that Neta members who violated the gang's rules were disciplined for their infractions and that the punishment might be in the form of assault "or even sometimes murder," . . .  and that encounters between members of Neta and MS-13 were generally violent . . . .

462 F. App'x at 61-62 (citations omitted).  In United States v. Rios, the Sixth Circuit likewise found inadmissible overly specific testimony about the gang around which the case revolved:

> Haglund's testimony was largely either within the appropriate scope of gang-expert testimony, as it focused on the traditional areas in which a gang expert can testify -- history, organization, and unique terminology or symbols -- or involved him testifying to specific facts and events he personally witnessed.  But Haglund strayed into testimony that is potentially problematic when he testified about specific criminal actions, including: (1) drug dealing by the Holland Latin Kings and, for example, his estimate that it was "a common thing for members to do" ; (2) how the Holland Latin Kings obtained and utilized "nation guns"; (3) his "experience" that the Holland Latin Kings commonly engage in violent disputes with other gangs; and (4) the use of violence against those who steal drugs from the Holland Latin Kings.

830 F.3d at 415-16 (citations omitted).  See, e.g., United States v. Castro, 411 F. App'x 415, 419 (2d Cir. 2011)(unpublished)("During trial, the special agent offered testimony about the structure of MS-13, based upon his experience as a law enforcement officer.  We have considered and approved of such testimony on numerous occasions" (citing United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007); United States v. Feliciano, 223 F.3d 102, 109 (2d Cir. 2000); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993); United States v. Daly, 842 F.2d 1380 (2d Cir. 1988); United States v. Levasseur, 816 F.2d 37, 45 (2d Cir. 1987); United States v. Borrone-Iglar, 468 F.2d 419, 421 (2d Cir. 1972)); Stephen A. Saltzburg, et. al, Federal Rules of Evidence Manual § 702.03[57][h], at 702-240 (11th ed. 2015)(stating that, in United States v. Street, 548 618 (8th Cir. 2008), the United States Court of Appeals for the Eighth Circuit held that a district court erred

in admitting testimony about "outlaw motorcycle gangs" when the defendant was not a member of the gang and had "minimal connections" with the gang).

In determining whether gang expert testimony is admissible, "[a]n important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony." United States v. Garcia, 793 F.3d at 1213. Testimony about specific information related to a gang is likely inadmissible. See United States v. Garcia, 793 F.3d at 1213-15. A court should avoid admitting internal information on the "investigation at hand," United States v. Garcia, 793 F.3d at 1213, because it conveys factual information to the jury and is indistinguishable from other inadmissible hearsay or evidence violating the Confrontation Clause, see United States v. Garcia, 793 F.3d at 1213-14. "Expert testimony about a gang's history, territory, colors, hand signs, graffiti use, naming practice, tattoos, structure, membership rules, and similar sociological evidence can assist the jury in understanding and evaluating evidence concerning the specific crimes charged." United States v. Garcia, 793 F.3d at 1213 (citing United States v. Archuleta, 737 F.3d 1287, 1294-95 (10th Cir. 2013); United States v. Robinson, 978 F.2d at 1561-63; United States v. Hartsfield, 976 F.2d 1349, 1352 (10th Cir. 1992); Mejia, 545 F.3d at 187). "But there is no sociological expertise in testifying to gang members' specific travels, specific uses of gang funds, or commission of specific crimes." United States v. Garcia, 793 F.3d at 1213.

"[E]ven where the evidence is clearly relevant enough to overcome a claim of unfair prejudice, a prosecutor and trial judge must take care not to cross the line between admissible expert testimony and an impermissible summary witness." Jones on Evidence, supra. See, e.g., United States v. Garcia, 793 F.3d at 1213 ("When the expert's testimony on such matters is not based on personal knowledge but on testimonial hearsay, the testimony violates not only the rules of evidence but also the Confrontation Clause."); United States v. Kamahele, 748 F.3d at 1000;

United States v. Thomas, 490 F. App'x at 521; Mejia, 545 F.3d at 197; Jack Nevin, Conviction,

Confrontation, and Crawford: Gang Expert Testimony as Testimonial Hearsay, 34 Seattle U. L.

Rev. 857, 880 (2010)(describing two areas in which a gang expert will testify based on testimonial

hearsay: (i) where he or she testifies about another's findings, and (ii) where he or she relies on

statements heard during his or her investigation).

> Federal Rule of Evidence 703 allows an expert to "base an opinion on facts or data
> in the case that the expert has been made aware of or personally observed"; and
> "[i]f experts in the particular field would reasonably rely on those kinds of facts or
> data in forming an opinion on the subject, *they need not be admissible for the
> opinion to be admitted*"

United States v. Garcia, 793 F.3d at 1212 (emphasis added by United States v. Garcia)(quoting

Fed. R. Evid. 703).  An expert using hearsay evidence can use the evidence "to explain how

he . . . formed some of his opinions and conclusions," but not offer it "to prove the truth of the

assertions made by the out-of-court declarants."  United States v. Affleck, 776 F.2d 1451, 1457

(10th Cir. 1985)(upholding the admission of expert testimony who used hearsay evidence in a 302-

page report providing his conclusions about a parties' financial records).  See, e.g., United States

v. Posey, 647 F.2d 1048, 1051 (10th Cir. 1981)("Stevenson's testimony was in compliance with

the rule.  It is quite reasonable for a chemist to review another chemist's analysis when forming

an opinion as to the veracity of the latter's test results.").

An expert's testimony drawn from information that the expert compiled and analyzed does

not violate hearsay rules or the Confrontation Clause; however, expert testimony repeating

testimonial hearsay conversations violates both.  See, e.g., United States v. Garcia, 793 F.3d at

1212.  The Tenth Circuit has held that rule 703 and the Confrontation Clause "can be reconciled

if the expert exercises 'independent judgment' in assessing and using the hearsay (and other

sources) to reach an expert opinion."  United States v. Garcia, 793 F.3d at 1212 (quoting United

States v. Kamahele, 748 F.3d at 1000, and citing United States v. Pablo, 696 F.3d 1280, 1288 (10th

Cir. 2012)).  See, e.g., Mejia, 545 F.3d at 197 ("The expert may not, however, simply transmit that

hearsay to the jury" (citing United States v. Dukagjini, 326 F.3d at 54)).  But see Saltzburg, et. al,

supra (describing how, in United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000), the Ninth Circuit

concluded that an expert could rely on information "of the type normally obtained in his day-to-

day police activities" to testify "that gang members who testify against one of their own are

typically beaten or killed by other members of their gang").  In Mejia, the Second Circuit listed

the testimony it found inadmissible, because the expert recited hearsay:

> For example, his testimony that the Freeport clique initially funded itself
> through drug sales was based on "some of the articles that [he] had researched" and
> "[r]eports from law enforcement personnel."  His testimony about MS-13's
> taxation of drug sales by non-members was based on a gang member having told
> him so during a custodial interrogation in this case.  Alicea had learned about MS-
> 13 treasury funds from about a dozen MS-13 members both in and out of custody.
> Additionally, Alicea discovered his information about MS-13's involvement in
> Mexican immigrant smuggling through "research on the Internet," and more
> specifically from a website containing a media report and an interview with a law
> enforcement official.  And although Alicea did not identify the source of his
> statements about the number of firearms the Task Force had seized and the number
> of murders on Long Island that MS-13 members had committed, we cannot imagine
> any source for that information other than hearsay (likely consisting of police
> reports, Task Force meetings, conversations with other officers, or conversations
> with members of MS-13).

545 F.3d at 197.  See, e.g.,  United States v. Escobar, 462 F. App'x at 62 ("Second, Alicea

acknowledged that hearsay evidence -- including blogs, documents, and conversations with other

law enforcement officers -- was the source of much of his information. . . ."  (citation omitted)).

In United States v. Garcia, Judge Hartz, United States Circuit Judge for the Tenth Circuit,

combines the analyses for rule 702 challenges with those for hearsay and Confrontation Clause

challenges.  See 793 F.3d at 1212-13.  Judge Hartz notes that the Tenth Circuit has "held that the

Rule and the Clause can be reconciled if the expert exercises 'independent judgment' in assessing

and using the hearsay (and other sources) to reach an expert opinion." United States v. Garcia, 793 F.3d at 1212 (citing United States v. Kamahele, 748 F.3d at 1000; United States v. Pablo, 696 F.3d at 1288). According to Judge Hartz, the "independent-judgment requirement under the Confrontation Clause will generally be satisfied if the testimony by the expert satisfies the Rule 702 requirement that the expert testimony assist the jury because of the value of the witness's expertise." United States v. Garcia, 793 F.3d at 1212 (citing Williams v. Illinois, 567 U.S. 50, 80 (2012)). Because Judge Hartz identifies the "independent judgment" rule as resolving hearsay and Confrontation Clause concerns, and associates the "independent judgment" rule with rule 702's requirements, he gives priority in analyzing proposed gang expert testimony to rule 702's requirements. Judge Hartz notes that when

> an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." Id. at 191; cf. United States v. Dukagjini, 326 F.3d . . . 59 . . . (pre-Crawford opinion holding that expert testimony violated Confrontation Clause when gang expert "was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement," but rather "was relying on his conversations with non-testifying witnesses and co-defendants").

United States v. Garcia, 793 F.3d at 1213-14. Combining concerns about usefulness to the jury and concerns about parroting testimonial hearsay, Judge Hartz writes: "when gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding 'unmerited credibility' to the sources . . . and summarizing evidence in a way that should be reserved for the government's closing argument." 793 F.3d at 1213 (quoting Mejia, 545 F.3d at 192).[12] Applying the principles he articulates, Judge Hartz classifies as improper parroting and

---

[12]Although, in United States v. Kamaele, the Tenth Circuit emphasizes the general-specific distinction in differentiating its case from Mejia, the Tenth Circuit did so in response to the defendants' argument that Mejia controlled the decision and not as the rule for analyzing gang

as violative of the Confrontation Clause and hearsay rules testimony about specific gang activities, such as: (i) what made Guatemalans "attractive target[s]" to a particular gang's members, United States v. Garcia, 793 F.3d at 1214; (ii) what experience the officer had with Guatemalans losing substantial sums of money to that gang, see 793 F.3d at 1215; (iii) what status the defendants held within the gang, see 793 F.3d at 1215; (iv) what occurred in the gang's initiation rite, see 793 F.3d at 1215; and (v) information about a ledger recording members' payments to the gang, see 793 F.3d at 1215.

Expert testimony "parrot[ing] 'out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion'" is inadmissible, because it violates the Confrontation Clause. United States v. Kamahele, 748 F.3d at 1000 (quoting United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009)). "Introduction of opinion testimony does not violate the Confrontation Clause when the experts rely on their independent judgment -- even when this independent judgment is based on inadmissible evidence." United States v. Kamahele, 748 F.3d at 1000 (citing United States v. Johnson, 587 F.3d at 634-35). See United States v. Garcia, 793 F.3d at 1213 ("We have repeatedly cautioned about the impropriety of permitting an 'expert' witness to 'parrot[]' testimonial hearsay" (alteration in original)(quoting United States v. Kamahele, 748 F.3d at 1000)). Other Courts of Appeals have reached similar decisions. See United States v. Rios, 830 F.3d at 418 ("[T]he Confrontation Clause is concerned with the use of experts to transmit particular testimonial statements, or their specific substance, to the jury."); United States v. Thomas, 490 F. App'x at 521 ("[W]hile testimonial

_____

expert testimony. See 748 F.3d at 999 ("[T]he expert explained his testimony "not in terms of specific crimes (as in Mejia), but in generalities to explain the context in which [the gang] operated.").

hearsay raises special concerns because it implicates a defendant's constitutional rights, 'it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence'" (quoting United States v. Palacios, 677 F.3d 234, 243 (4th Cir. 2012)); Mejia, 545 F.3d at 198 ("When faced with the intersection of the Crawford rule and officer experts, we have determined that an officer expert's testimony violates Crawford "if [the expert] communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." (footnote omitted)(quoting United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. 2007)). In United States v. Kamahele, because the defendants did not indicate which statements the expert had "parroted," the Tenth Circuit concluded, "we are hard-pressed to find testimony by Officer Merino that simply parroted a testimonial fact learned from a particular interview." 748 F.3d at 1000. The Second Circuit in Mejia likewise could not determine how much information the expert drew from testimonial interrogations, but the Second Circuit noted: "We are at a loss in understanding how Alicea might have 'applied his expertise' to these statements before conveying them to the jury, such that he could have avoided 'convey[ing] the substance of [those] statements to the jury.'" 545 F.3d at 197-98 (quoting United States v. Lombardozzi, 491 F.3d at 73). See United States v. Lobo-Lopez, 468 F. App'x 186, 190-91 (4th Cir. 2012)(unpublished)(upholding a district court's decision to allow testimony when the "testimony indicates that [the expert] did not simply act as a conduit for transmitting testimonial hearsay, but instead offered statements that 'shed light on' the internal structure, rules, terminology, and methods of MS-3." (citations omitted)); United States v. Castro, 411 F. App'x at 419 ("[T]he special agent's testimony was not based upon individual interviews with members of MS-13, but instead, on his experience with this organization and careful analysis of its

operations."); United States v. Ayala, 601 F.3d 256, 275 (4th Cir. 2010)(upholding testimony where the experts "offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular.  These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members.").  But see United States v. Palacios, 677 F.3d at 243-44 (upholding a gang expert's admissibility when the expert "used . . . interviews, along with the other sources of his extensive knowledge about MS-13, to form an independent opinion about the gang's history, operation, structure, practices, and symbols").

## ANALYSIS

At the November 27, 2017, hearing, the Court ruled that it would limit the gang experts' testimony to general statements about gangs, rather than specific statements about SNM:

> the experts are not going to be able to really talk about the SNM case -- gang specifically.  They can talk generally about gangs.  The fact that SNM comes out of their mouth as they talk about other gangs I don't think is important, but they can't specifically talk about the SNM gang and offer testimony on that.

Nov. 27 Tr. at 69:20-70:1 (Court).  If the United States wants to introduce specific SNM evidence the Court will "have a hearing," Nov. 27 Tr. at 70:8 (Court), and "listen to what the basis of [the gang experts'] opinion is, and then make balls and strikes calls on an individual basis," Nov. 27 Tr. at 70:9-11 (Court).  This ruling accords with its treatment of expert testimony in United States v. Rodriguez.  The Court, thus, grants the Motion in part and denies it in part.  Although the parties agreed to the gang experts' limitations, these limitations also follow Tenth Circuit caselaw and align with other Courts of Appeals' decisions.

The gang experts may testify to gangs' operation generally -- that, for instance, gang members may identify themselves with tattoos, use slang words to communicate, and advance their purposes through crime.  The gang experts may not testify specifically about SNM's

operations, crimes, purposes, tattoos, or vocabulary. When testifying as experts, the gang experts may not rely on hearsay from cooperators. While they may rely on testimonial statements, they must ultimately convey an "independent judgment." United States v. Garcia, 793 F.3d at 1212. Although the gang experts, in their capacity as lay witnesses, may testify to what they witnessed during relevant events, they may not do so as expert witnesses. If the United States wants the gang experts to testify on the NM Corrections Department, the gang experts may discuss how the NM Corrections Department identifies gang members but not whom it believes belongs to SNM. Finally, the gang experts may not opine whether SNM is an enterprise or engaged in racketeering activity.

The Court notes that its ruling follows caselaw from the Tenth Circuit and from other Courts of Appeals. The Court follows the Tenth Circuit's most recent opinion in United States v. Garcia in emphasizing the line between testimony on gangs generally, and testimony on SNM and its crimes particularly. 793 F.3d at 1213. Because reciting specific facts about the SNM and whom the NM Corrections Department identifies as SNM members involves specific evidence that may supplant the jury's role as factfinder, see United States v. Rio, 830 F.3d at 415-16; United States v. Escobar, 462 F. App'x at 61-62; United States v. Garcia, 793 F.3d at 1214-15; Mejia, 545 F.3d at 194-95, and, because the gang experts will likely draw on and recite facts gleaned from out-of-court sources, see United States v. Garcia, 793 F.3d at 1214-16, the gang experts should avoid such specifics, and let the information come to the jury through fact witnesses -- if it comes in at all. The jury will decide who is an SNM member -- not the NM Corrections Department -- although the Defendants, for tactical reasons, may want the jury to know that the NM Corrections Department treated some cooperators as SNM gang members. As Judge Hartz notes, "[a]n important consideration in distinguishing proper testimony from parroting is the generality or

specificity of the expert testimony." United States v. Garcia, 793 F.3d at 1213. "[W]hen gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding 'unmerited credibility' to the sources . . . and summarizing evidence in a way that should be reserved for the government's closing argument." United States v. Garcia, 793 F.3d at 1213 (quoting Mejia, 545 F.3d at 192). See United States v. Kamahele, 748 F.3d at 999. The Court trusts the jury to determine for itself the significance of many of SNM's activities, and the Court fears the gang experts becoming what the Second Circuit describes in Mejia:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

Mejia, 545 F.3d at 190. For similar reasons, the gang experts must refrain from testifying on the ultimate issue for the jury -- whether SNM is an enterprise or engages in racketeering activity. See United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005)("[A]n expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment."); Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1204-05 (D.N.M. 2016)(Browning, J.)(prohibiting expert witness from testifying on the ultimate issue in a class action certification); Sec'y & Exch. Comm'n v. Goldstone, 2016 WL 3135651, at *1, *44 (prohibiting expert testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material"); United States v. Rodella, 2014 WL 6634310, at *29 (disallowing expert witness from testifying on the ultimate issue whether police conduct was "reasonable"). The gang experts can, of course, use their expertise to synthesize information

gleaned from hearsay conversations to present the jury with "sociological" evidence, United States v. Garcia, 793 F.3d at 1213, but they may not testify to facts gathered directly from cooperators' hearsay statements and parrot such statements to the jury, see, e.g., United States v. Garcia, 793 F.3d at 1212-13; United States v. Kamahele, 748 F.3d at 1000. Moreover, the Court stresses that its prohibition on testimony specifically about SNM does not prevent the gang experts from using their personal knowledge to testify about events involving SNM. See, e.g., United States v. Martinez, 657 F.3d 811, 817 (9th Cir. 2011)(recognizing that a gang expert testified as an expert "on the Mexican Mafia's coded communications" and as a lay witness "of some events"); United States v. Feliciano, 223 F.3d at 121 (recognizing that a gang expert testified as both an expert and a lay witness, and that "[s]uch dual testimony is not objectionable in principle").

The line that the Court draws in excluding the gang experts' testimony differs from the line that the Honorable Christina Armijo, United States District Judge for the District of New Mexico, drew in United States v. Dalley, No. CR 07-748 MCA, 2009 WL 10681855, at *4 (D.N.M. May 12, 2009)(Armijo, J.). Judge Armijo permitted the gang expert to testify on: (i) the Aryan Brotherhood's structure in New Mexico and Texas and changes in the Aryan Brotherhood's leadership; (ii) the Aryan Brotherhood's membership requirements; and (iii) "jargon, codes, or other specialized modes of communication" that the Aryan Brotherhood used. 2009 WL 10681855, at *4. Judge Armijo decided United States v. Dalley, however, before the Tenth Circuit decided United States v. Kamahele or United States v. Garcia. In light of United States v. Garcia, the Court does not see how the line that Judge Armijo drew can remain a valid delineation of the permissible scope of gang experts' testimony. Accordingly, given the Court's adherence to United States v. Garcia and the parties' agreement to the gang experts' limitations, the Court grants the Motion in part and denies it in part.

**IT IS ORDERED** that the request in Plaintiff's Notice of, and Motion *in Limine* to Admit Gang Expert Witnesses' Testimony, filed October 6, 2017 (Doc. 1299), is granted in part and denied in part.  The Court will admit Ronald Martin's, Chris Cupit's, and Sergio Sapien's testimony to the extent that they describe gangs generally, but it will preclude them from offering specific testimony about the Syndicato de Nuevo Mexico to which they cannot testify with personal knowledge as a lay witness.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
      Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

         *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

    *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

    *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

    *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

    *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

    *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

     *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

     *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Brandy Rodriguez*