# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                     No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Billy Garcia's Motion in Limine Regarding Alleged Bad Acts, filed October 10, 2017 (Doc. 1308)("B. Garcia's First Motion"); (ii) Defendant Edward Troup's Motion *in Limine* Regarding Alleged Bad Acts, filed November 30, 2017 (Doc. 1504)("Troup's First Motion"); (iii) Defendant Rudy Perez' Opposed Motion to exclude references to and Evidence of Unrelated "Enterprise" Acts, filed December 1, 2017 (Doc. 1512)("Perez' First Motion"); (iv) Defendant Daniel Sanchez' Motion in Limine to Prohibit Government from Making Statements or Arguments that Improperly Suggest that Propensity Character Inferences Can or Should be Made from Extrinsic Act Evidence, filed December 1, 2017 (Doc. 1519)("Sanchez' First Motion"); (v) Defendant Daniel Sanchez' Motion in Limine to Prohibit the Government From Introducing Evidence of Alleged "Bad Acts," filed December 1, 2017 (Doc. 1530)("Sanchez' Second Motion"); (vi) Defendant Christopher Chavez' Motion in Limine Regarding Alleged Bad Acts, filed December 1, 2017 (Doc. 1531)("Chavez' First Motion"); (vii) Defendant Allen Patterson's Motion in Limine Regarding Alleged Bad Acts, filed December 1, 2017 (Doc. 1532)("Patterson's First Motion"); (viii) Defendant Anthony Ray Baca's Motion in Limine to Prohibit Government from Introducing Evidence of Alleged "Bad Acts," filed December 4, 2017 (Doc. 1538)("Baca's First Motion"); (ix) Defendant Anthony Ray Baca's Motion in Limine to Prohibit Government Attorneys from Using Rule 405, 608 or 609 Character Evidence Without Judicial Approval, filed December 4, 2017 (Doc. 1539)("Baca's Second Motion); (x) Defendant Carlos Herrera's Motion in Limine Regarding Alleged Bad Acts, filed December 7, 2017 (Doc. 1549)("Herrera's First Motion"); (xi) Defendant Christopher Garcia's Motion in Limine to Prohibit the Government From Introducing Evidence of Alleged "Bad Acts," filed December 8, 2017 (Doc. 1555)("C. Garcia's First Motion"); (xii) Defendant

Rudy Perez' Motion in Limine Regarding Alleged Bad Acts, filed December 9, 2017 (Doc. 1558)("Perez' Second Motion"); (xiii) Defendant Joe Gallegos' Motion in Limine to Prohibit the Government from Introducing Evidence of Alleged "Bad Acts," filed January 3, 2018 (Doc. 1602)("J. Gallegos' First Motion"); (xiv) Defendant Daniel Sanchez' Second Motion In Limine To Prohibit Government From Introducing Evidence Of Alleged "Bad Acts" Based On Government's January 22, 2018 "Bad Act" Disclosure, filed January 24, 2018 (Doc. 1684)("Sanchez' Renewed Motion"); (xv) Defendant Rudy Perez' Second Motion in Limine Regarding Alleged Bad Acts, filed January 24, 2018 (Doc. 1686)("Perez' Renewed Motion"); (xvi) Defendant Carlos Herrera's Motion *in Limine* To Exclude Purported Rule 404(b) Evidence, filed January 24, 2018 (Doc. 1687)("Herrera's Renewed Motion"); (xvii) Defendant Anthony Ray Baca's Renewed Motion In Limine To Prohibit Government From Introducing Evidence Of Alleged "Bad Acts", filed January 25, 2018 (Doc. 1702)("Baca's Renewed Motion"); (xviii) the United States' Motion in Limine Regarding Edward Troup, filed March 12, 2018 (Doc. 1976)("First U.S. MIL"); and (xix) The United States' Sealed Motion In Limine To Admit Evidence Intrinsic To The Crimes Charged And Notice Of Other Crimes Or Bad Acts Pursuant To Rule 404(B), filed April 15, 2018 (Doc. 2114)("Second U.S. MIL").  The Court held hearings on December 19, 2017; January 26, 2018; March 12, 2018; and April 3, 2018.  The primary issue is whether the Plaintiff United States of America's proposed prior-acts evidence is permissible under rules 403 and 404(b) of the Federal Rules of Evidence to prove the enterprise element under 18 U.S.C. § 1959 ("VICAR"), or whether such evidence is permissible for another purpose, such as to prove the SNM enterprise and its purpose, or as evidence intrinsic to the charged offenses.  The Court concludes that the United States does not offer the First Trial Defendants' prior acts as character evidence under rule 404(b) of the Federal Rules of Evidence.  Instead, the United States'

prior-acts evidence is largely relevant, and not unfairly prejudicial under rule 403 of the Federal Rules of Evidence, to prove VICAR's enterprise element. The Defendants are correct, however, that some of the United States' proffered prior-acts evidence are irrelevant to this case. The Court concludes that the same holds true for the second trial, with the exception of Troup's, B. Garcia's, and A. Garcia's threats against the United States' witnesses, which are admissible under rule 404(b) of the Federal Rules of Evidence. Further, the Court concludes that the United States may not make propensity arguments or ask the jury to draw such inferences. Finally, the Court concludes that the United States may impeach any of the Defendants' character witnesses by asking questions about the Defendants' prior acts, provided that the United States has a good faith basis that the act occurred, and provided that the United States does not ask hypothetical questions pertaining specifically to the allegations in Counts 6-12 of the Second Superseding Indictment.

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those facts that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of

individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power. See Indictment at 4. If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See

Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers. See Indictment at 8. SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). See MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See MOO at 6-7, 2016 WL 7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against J. Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to

be prosecuted at the federal court level."  MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Indictment at 9-18.  Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[1]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R.  Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca.  As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and D. Sanchez are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841

SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

and 846. Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered Frank Castillo Indictment at 9 (Count 1). On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Indictment at 10 (Count 2). On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3). On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Indictment at 11 (Count 4). On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Indictment at 11-12 (Count 5). In March 2014, Armenta, Montoya, M. Rodriguez, Martinez, Baca, Defendant Mauricio Varela, D. Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6). On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, D. Sanchez, Herrera, and R. Perez allegedly murdered J.M. See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a

conspiracy to murder charge.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14).  Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15).  The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity.   In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members

_____

[3]The Court granted a conditional severance to one Defendant in that case.  See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights.  The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . .  If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial Perez' First Motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32.  Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld).  On March 22, 2017, R. Gallegos pled guilty in his severed case.  See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4]  There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

### RELEVANT PROCEDURAL HISTORY

Early on in this case's litigation, the Defendants suspected that the United States would introduce a litany of their prior acts under a rule 404(b) exception.  The Court, to assuage the Defendants' concerns, directed the United States to disclose a list of Defendant's prior bad acts which the United States may seek to admit at trial, whether under rule 404(b) or some other rule.  See Transcript of Hearing at 249:21-250:18 (taken March 14, 2018)(Court), filed April 3, 2018 (Doc. 2028)("March 14 Tr.").  The United States produced a letter for each Defendant with such a list, and each Defendant then responded by filing a series of motions aimed at excluding these prior acts as violative of rule 404(b) of the Federal Rules of Evidence.  The Court also managed a series of motions and objections, on relevancy grounds, to the United States' proposed introduction of the Defendants' prior acts to prove VICAR's enterprise and racketeering elements.  The Court ultimately decided each prior act individually, but, to safeguard the Defendants' rights, directed the United States to approach the bench at trial, before admitting any prior act, to satisfy for the Court and the Defendants that the United States had a proper foundation tying each prior act to the SNM.

---

[4]The Court also has declared that case complex under the Speedy Trial Act.  See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

1.      **B. Garcia's First Motion**.

On May 22, 2017, the United States gave B. Garcia a comprehensive list of his prior acts which the United States may seek to introduce at trial.  See Letter from James Tierney to Cori Ann Harbour Valdez and Patrick Burke (dated May 22, 2017), filed October 10, 2017 (Doc. 1308-1)("First B. Garcia Notice").  That list includes a series of acts ranging from 1974 to 2007:

> On or about June 13, 1974, Billy Garcia assaulted an officer.
>
> On or about July 4, 1980, Billy Garcia was arrested for a DWI.
>
> On or about August 13, 1980, Billy Garcia committed residential burglary.
>
> On or about September 8, 1982, Billy Garcia committed armed robbery with a deadly weapon.
>
> On or about March 14, 1986, Billy Garcia committed larceny.
>
> On or about October 6, 1987, Billy Garcia committed armed robbery.
>
> On or about December 7, 1987, Billy Garcia committed unlawful taking of a motor vehicle.
>
> On or about December 6, 1990, while in the custody of NMCD, Billy Garcia was placed into Maximum Security Housing based on involvement in predatory type behavior.
>
> On or about February 25, 1992, while in the custody of NMCD, Billy Garcia threatened a correctional officer.
>
> On or about October 7, 1992, while in the custody of NMCD, Billy Garcia refused orders of a correctional officer.
>
> On or about November 2, 1992, while in the custody of NMCD, Billy Garcia refused orders of a correctional officer, and assisted another inmate in destroying contraband.
>
> On or between 1993 to 1998, Billy Garcia sponsored the admission of several people into the SNM.
>
> On or about November 3, 1993, while in the custody of NMCD, Billy Garcia violated conditions of work release.

On or about December 3, 1993, while in the custody of NMCD, Billy Garcia tested positive on his breath.

On or about February 8, 1994, while in the custody of NMCD, Billy Garcia refused to submit to a urinalysis test.

On or about May 5, 1995, Billy Garcia assaulted officers, while causing a disturbance during a heroin overdose.

On or about February 17, 1996, Billy Garcia committed armed robbery.

On or about June 11, 1996, Billy Garcia committed great bodily harm and great bodily harm/injury of human by a vehicle.

On or about May 10, 1997, while in the custody of NMCD, Billy Garcia assaulted a correctional officer.

On or about June 4, 1997, while in the custody of NMCD, Billy Garcia possessed drugs and drug paraphernalia.

On or about September 15, 1999, while in the custody of NMCD, Billy Garcia refused to submit to a urinalysis test.

On or about March 14, 1999, while in the custody of NMCD, Billy Garcia refused to be restrained or removed from his cell and chemical agents were used to regain his compliance.

On or about May 20, 2003, while in the custody of NMCD, Billy Garcia possessed contraband items.

On or about November 14, 2003, Billy Garcia assaulted an officer.

On or about November 2, 2006, Billy Garcia committed aggravated battery with a deadly weapon, reckless driving and criminal damage.

On or about September 20, 2007, while in the custody of NMCD, Billy Garcia stated "I have no love for him, and I never had any love for him," regarding Gerald Archuleta

First B. Garcia Notice at 1-3.

B. Garcia responded with his First Motion, and argued that the United States' list is overly broad and contains many acts which are irrelevant to this case.  See B. Garcia's First Motion at 2.

B. Garcia notes that the list includes "acts committed as long as 43 years ago and range from a

DWI to violating the conditions of work release to robbery and burglary." B. Garcia's First Motion at 2. B. Garcia also attacked the list's lack of specificity, noting that "the list includes amorphous allegations such as that on 'December 6, 1990, while in the custody of the NMCD, Billy Garcia was placed into Maximum Security Housing based on involvement in predatory type behavior' and that Mr. Garcia 'tested positive on his breath.'" B. Garcia's First Motion at 2 (quoting First B. Garcia Notice at 1-2).

B Garcia questions how these acts could fit into any rule 404(b) exception. See B. Garcia's First Motion at 2. B. Garcia also complains that the United States has not given any theory that ties the acts to "a fact of consequence" in this case so that B. Garcia can prepare his defense. B. Garcia's First Motion at 2. B. Garcia asserts that the United States Court of Appeals for the Tenth Circuit has "'developed a rigorous criteria for admitting evidence of other crimes, wrong or acts pursuant to Rule 404(b),'" and that the United States cannot satisfy that test. B. Garcia's First Motion at 2-3 (quoting United States v. Biswell, 700 F.2d 1310, 1317 (10th Cir. 1983)). "Finally," B. Garcia argues, "even if the trial court determines that the other acts evidence satisfies the criteria for admission under Rule 404(b), it must balance the evidence's probative value and prejudicial effect under Fed. R. Evid. 403." B. Garcia's First Motion at 4. B. Garcia does not, however, weigh in on how the Court should conduct such balancing.

### 2.    The United States' Response to B. Garcia's First Motion.

The United States responded to B. Garcia's First Motion on October 30, 2017. See United States' Response to Defendant Billy Garcia's Motion *in Limine* Regarding Alleged Bad Acts, filed October 30, 2017 (Doc. 1385)("B. Garcia Response"). The United States begins by asserting that B. Garcia's prior acts "are intrinsic to the charged [VICAR] offenses for which the defendant is facing trial, and thus do not implicate Federal Rule of Evidence 404." B. Garcia Response at 1.

The United States further argues that it "intends to offer as evidence [B. Garcia's] alleged bad acts at trial as evidence of [his] involvement with and allegiance to the SNM." B. Garcia Response at 1.

The United States first provides a list of elements that it must prove to convict B. Garcia under VICAR:

First[:] The existence of an "enterprise" as defined in 18 U.S.C. § 1959 (b)(2);

Second[:] The charged enterprise engaged in, or its activities affected, interstate or foreign commerce;

Third[:] The charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1);

Fourth[:] The defendant committed one of the following crimes . . . or conspired or attempted to commit one of these crimes . . . which crime violated state or federal law: murder, kidnapping, maiming, assault with a dangerous weapon, assault resulting in serious bodily injury, threatening to commit a crime of violence; and,

Fifth[:] The crime of violence was committed either: (1) as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the charged enterprise, or (2) for the purpose of gaining entrance to or maintaining or increasing position in the charged enterprise.

B. Garcia Response at 2 (citing 18 U.S.C. § 1959). The United States asserts that the "evidence will show that SNM constituted an association-in-fact enterprise that was dedicated to selling drugs and using violence to protect its activities and reputation within the New Mexico Penal system." B. Garcia Response at 2-3. As to B. Garcia's role, the United States asserts that it will prove that he "was a member of the SNM enterprise, and that he, as a leader/member/associate, shared the common purpose of carrying out unlawful activities in furtherance of the enterprise." B. Garcia Response at 3.

The United States also observes that it must "prove that Defendant Billy Garcia committed the violent crimes as consideration for something of value or to increase or to maintain his position in the enterprise." B. Garcia Response at 3. The United States argues that it need not prove that B. Garcia's "'sole or principal motive'" was to increase his standing in the SNM. B. Garcia Response at 3 (quoting United States v. Smith, 413 F.3d 1253, 1277 (10th Cir. 2005)). Instead, the United States argues, it must "'only establish'" that B. Garcia's violent crimes amounted to an "'integral aspect of his membership in the enterprise.'" B. Garcia Response at 3 (quoting United States v. Kamahele, 748 F.3d 984, 1008 (10th Cir. 2014)). To prove this element, the United States asserts that "[g]eneral testimony as to the expectation of or importance of violence to a criminal enterprise, coupled with a specific violent act, will satisfy" VICAR's motive requirement. B. Garcia Response at 3 (citing United States v. Phillips, 239 F.3d 283, 845 (7th Cir. 2001)). The United States maintains that it will introduce B. Garcia's prior acts "to establish at least one of three things: that [he] was an SNM member; that the [SNM] engaged in racketeering activity; and that the Defendant was motivated for the purpose of gaining entrance to or maintaining or increasing position in the enterprise." B. Garcia Response at 4.

The United States turns to its intrinsic-acts argument. The United States argues that B. Garcia's prior acts are intrinsic to the VICAR elements listed above and so are excepted from rule 404 altogether. See B. Garcia Response at 4. The United States does not identify whether all of B. Garcia's prior acts are intrinsic to the VICAR offenses or whether the United States chose those elements specifically because they are intrinsic, but relates that "'evidence is . . . intrinsic to the crime charged if both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" B. Garcia Response at 4 (quoting United States v. Arney, 248 F.3d 984, 992 (10th Cir. 2001)).

The United States also argues that B. Garcia's acts are admissible under rule 404(b).  The United States avers that the Tenth Circuit "takes an inclusive -- rather than exclusive -- approach" to rule 404(b), meaning that "evidence of other crimes of acts should be admitted 'except that which tends to prove *only* criminal disposition.'"  B. Garcia Response at 5 (quoting United States v. Tan, 254 F.3d 1204, 1208 (10th Cir. 2001))(emphasis in original).  As to the 404(b) exception under which the United States would admit B. Garcia's prior acts, the United States asserts that B. Garcia's prior acts prove that he "was in company of other SNM members, recruited SNM members, was in altercations with rival gangs, and admitted to being a member of the SNM."  B. Garcia Response at 6.  The United States notes that it must prove that B. Garcia committed the crimes charged in this case for a particular purpose, and so his "plan, motive, knowledge of the enterprise, and intent are thus relevant . . . and [his] prior acts are probative on those issues."  B. Garcia Response at 6.

Last, the United States asserts that B. Garcia's prior acts are not unfairly prejudicial.  See B. Garcia Response at 6-7.  The United States notes that "unfair prejudice must do more than 'damage the Defendant's position at trial.'"  B. Garcia Response at 6-7 (quoting United States v. Tan, 254 F.3d at 1211).  Instead, the United States asserts that "evidence is only unfairly prejudicial if 'it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly* apart from its judgment as to his guilt or innocence of the crime charged.'"  B. Garcia Response at 7 (quoting United States v. Tan, 254 F.3d at 1211-12)(emphasis in B. Garcia Response).  The United States asserts, without analysis, that, in B. Garcia's case, "the probative value of the evidence is not outweighed by any risk of unfair prejudice."  B. Garcia Response at 7.  The United States also suggests that a limiting instruction can cure any prejudice which the prior acts cause.  See B. Garcia

Response at 7. The United States concludes by requesting that the Court admit B. Garcia's prior

acts at trial. See B. Garcia Response at 7.

### 3.    **Troup's First Motion.**

On May 22, 2017, the United States gave Troup a comprehensive list of his prior acts that

the United States would introduce at trial. See Letter from Maria Armijo to Cori Ann Harbour-

Valdez and Patrick Burke (dated May 22, 2017), filed November 30, 2017 (Doc. 1504-1)("First

Troup Notice"). That list included a range of Troup's alleged, prior acts:

> On or about March 7, 1994, while in the custody of NMCD, Edward Troup assaulted inmate M.R. with a weapon, a homemade sharpened instrument (shank).

> On or about September 13, 1995, while in the custody of NMCD, Edward Troup assaulted inmate R.P. without a weapon.

> On or about December 4, 1995, while in the custody of NMCD, Edward Troup assaulted inmate M.G. with a weapon, a homemade sharpened instrument (shank).

> On or about March 14, 1997, Edward Troup committed larceny and possessed a firearm.

> On or about June 28, 2000, Edward Troup committed a parole violation.

> On or about November 22, 2001, Edward Troup transferred a stolen motor vehicle.

> On or about December 26, 2001, Edward Troup committed burglary, conspired to commit burglary, larceny and received/transferred a stolen vehicle.

> On or about June 16, 2004, while in the custody of NMCD, Edward Troup assaulted inmate D.S. by throwing feces on the inmate.

> On or about October 22, 2009, while in the custody of NMCD, Edward Troup threatened correctional officers.

> On or about March 25, 2010, while in the custody of NMCD, Edward Troup threatened correctional officers and contributed to a disturbance.

> On or about January 28, 2010, while in the custody of NMCD, Edward Troup verbally assaulted a correctional officer and possessed contraband items.

On or about May 24, 2011, Edward Troup contacted James Garcia and discussed SNM business.

First Troup Notice at 1-2.

Troup responded with his First Motion, contesting the authority by which the United States could introduce these acts at trial.  See Troup's First Motion at 2.  Troup argues that these acts "reach[] as far back as 23 years ago . . . and include[] acts which could not conceivably be admissible for any purpose such as committing a parole violation and that Mr. Troup contributed to a disturbance, verbally assaulted a correctional officer, and [] possessed contraband items." Troup's First Motion at 2.  Troup notes that these prior acts "cannot be used to show he had a propensity to commit the crime charged."  Troup's First Motion at 2 (citing United States v. Moran, 504 F.3d 1135, 1145 (10th Cir. 2007)).  Troup also argues that the prior acts must be relevant and "close in time to the crime charged," but acknowledges that "there is no absolute rule regarding the number of years that can separate offenses.'"  Troup's First Motion at 3 (quoting United States v. Franklin, 704 F.2d 1183, 1189 (10th Cir. 1983)).  Troup asserts that the United States' proffered list of bad acts "are not timely."  Troup's First Motion at 3.

Troup anticipates that "the government may attempt to claim that Mr. Troup's prior bad acts will not be offered to prove his bad character."  Troup's First Motion at 4.  Troup contends that these acts are not "probative of the government's VICAR allegations" because it is "illogical for the government to argue that the alleged bad acts are intrinsically related to the crime charged here."  Troup's First Motion at 4.  Troup immediately pivots to argue, however, that "'Rule 404(b) only applies to evidence of acts extrinsic to the charged crime.'"  Troup's First Motion at 4 (quoting United States v. Johnson, 42 F.3d 1312, 1316 (10th Cir. 1994)).  Troup continues that his "alleged bad acts are completely irrelevant to the crime charged here.'"  Troup's First Motion at 4.

4.    **Perez' First Motion**

Perez filed his First Motion, and indicated that "[a]ll defendants join." Perez' First Motion at 1. Perez notes that the United States "initially brought four cases related to SNM's alleged federal criminal activity" and "also charged additional defendants in one-off cases that are related to this case[.]" Perez' First Motion at 1-2. Perez acknowledges that the United States "must prove that 'an enterprise [existed and] engaged in racketeering activity'" and that individual enterprise members furthered the enterprise's purposes. Perez' First Motion at 2 (quoting United States v. Feliciano, 223 F.3d 102, 116-17 (2d Cir. 2000)). Perez argues that the United States "should be precluded from making any references to or from introducing evidence related to the three other SNM cases, to Counts 1-5 and 13-16 of this indictment, and to other unrelated acts and one-off cases." Perez' First Motion at 2.

Perez interprets rule 403 of the Federal Rules of Evidence, and argues that the "only relevant racketeering activity" is that which occurred "'during the time period relevant to the indictment.'" Perez' First Motion at 2 (quoting United States v. Pimentel, 346 F.3d 285, 299 (2d Cir. 2003)). Perez asserts that, even if the Court concludes that acts "unrelated to Counts 6-12" are relevant to those Counts, "any probative value of evidence of acts pertaining to Counts 1-5, 13-16, or the other SNM-related cases would be 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]'" Perez' First Motion at 3 (quoting Fed. R. Evid. 403). Perez asserts that these other acts' admission into evidence would "very likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter." Perez' First Motion at 3 (citing United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999)).

5.    **Sanchez' First Motion**.

Sanchez filed his First Motion on December 1, 2017.  See Sanchez' First Motion at 1.
Sanchez states that the "defendants jointly move for an order to prohibit the government from
making statements or arguments that improperly suggest that propensity character inferences can
or should be made from extrinsic act evidence."  Sanchez' First Motion at 1.  Sanchez argues that
the evidence that the United States will use to prove the SNM conspiracies to "assault inmate
Romero and to murder Corrections' Secretary [Greg] Marcantel and STIU Administrator
[Dwayne] Santestevan [sic] is susceptible to interpretation by the jury as character evidence of
defendant Anthony Baca's propensity to order alleged SNM gang members to perpetrate violent
acts."  Sanchez' First Motion at 1-2.  Sanchez also asserts that the jury may interpret the Marcantel
and Santistevan conspiracy evidence as proof of SNM members' propensity to follow "Baca's
orders to commit violent acts."  Sanchez' First Motion at 2.

Sanchez characterizes the rule against character evidence as grounded in a policy of
preventing the jury's prejudice against the defendant.  See Sanchez' First Motion at 2-3.  Sanchez
argues that rule 404(b), "[b]y it's [sic] plain language," is "not limited to 'a defendant's' character."
Sanchez' First Motion at 2 (quoting Huddleston v. United States, 485 U.S. 681, 685-686 (1988)).
Sanchez therefore asserts that the Court should extend rule 404(b)'s reach to other, uncharged
individuals involved with SNM.  See Sanchez' First Motion at 2 (citing United States v. Lucas,
357 F.3d 599, 605 (6th Cir. 2004)).  Sanchez does not specify the individuals whose acts he seeks
to exclude from evidence.

Sanchez then returns to his argument that the Court should sever Counts 6-7.  See Sanchez'
First Motion at 3.  Sanchez disagrees with the Court's preliminary ruling from the bench rejecting

his request that the Court sever Counts 6-7 from Counts 8-12.  <u>See</u> Sanchez' First Motion at 3 n.1.

Sanchez reiterates that request's arguments, that the United States' evidence for Counts 8-12

> is not otherwise admissible against Sanchez; creates the serious risk of unfair prejudice based on the likelihood that the jury will make the propensity character inferences at issue here, regardless of the Court's limiting instructions; and unfairly and prejudicially buttresses the credibility of cooperators the government will use to attempt to prove Counts 6-7.

Sanchez' First Motion at 3.  Accordingly, Sanchez argues that, even if the Court denies his

severance request, the United States should "not be permitted to use evidence of Counts 8-12 to

encourage fact-finders to make improper and prejudicial propensity inferences with that evidence

in evaluating the truth of the charges in Counts 6-7."  Sanchez' First Motion at 3.  "If the evidence

is admitted at a joint trial to prove that SNM is engaged in racketeering activity," Sanchez argues,

"then the use of that evidence should be strictly limited to that narrow purpose and none other."

Sanchez' First Motion at 3-4.  Sanchez then summarizes his request: the Court should prohibit the

United States "from making statements or arguments that suggest that propensity character

inferences can or should be made from the evidence it presents in its attempt to prove Counts 8-

12 and applied to the jury's consideration" of Counts 6-7.  Sanchez' First Motion at 4.

### 6.    <u>Chavez' First Motion.</u>

The United States, responding to the Court's instruction that it provide each of the

Defendants with a list of prior acts it would seek to introduce, provided Chavez his list on

November 30, 2017.  <u>See</u> Letter from Maria Armijo to Orlando Mondragon and John Granberg

(dated May 22, 2017), filed December 1, 2017 (Doc. 1531-1)("First Chavez Notice").

Chavez also attaches the United States' proffered list:

> On or about August 3, 1994, Christopher Chavez committed battery against a household member, criminal damage to property, assault and failure to appear.

> On or about June 16, 1995, Christopher Chavez possessed crack cocaine.

On or about July 20, 1995, Christopher Chavez committed criminal damage to public property, conspiracy to commit criminal damage to public property, and unauthorized graffiti.

On or about September 5, 1995, Christopher Chavez committed unlawful taking of a motor vehicle, receiving or transferring a stolen motor vehicle, larceny of a firearm, possession of burglary tools, tampering with evidence and conspiracy to commit a felony.

On or about October 1, 1996, Christopher Chavez committed unlawful taking of a motor vehicle, unauthorized graffiti personal or real property and parole violation.

On or about February 3, 1998, Christopher Chavez committed unlawful taking of a motor vehicle, unauthorized graffiti personal property or real property and probation violation.

On or about May 31, 1998, while in the custody of NMCD, Christopher Chavez tested positive for drugs.

March 20, 1999, Christopher Chavez committed unlawful taking of a motor vehicle, aggravated assault, contributing to the delinquency of a minor, possession of burglary tools and resisting/evading/obstructing an officer.

On or about April 1, 1999, Christopher Chavez committed unlawful taking of a motor vehicle, aggravated assault upon an officer, contributing to the delinquency of a minor, resisting/evading/obstructing an officer and reckless driving.

On or about June 6, 1999, Christopher Chavez possessed a destructive device.

On or about June 25, 1999, Christopher Chavez received and transported a stolen motor vehicle and conspired.

On or about August 13, 2000, while in the custody of NMCD, Christopher Chavez possessed drug paraphernalia.

On or about September 13, 2000, while in the custody of NMCD, Christopher Chavez along with SNM member Enrique Roybal assaulted inmate A.M.

On or about October 8, 2000, while in the custody of NMCD, Christopher Chavez possessed marijuana.

On or about October 15, 2000, while in the custody of NMCD, Christopher Chavez tested positive for drugs.

On or about December 21, 2000, Christopher Chavez committed aggravated assault with a deadly weapon and conspiracy.

On or about October 25, 2001, Christopher Chavez committed aggravated battery and was charged with habitual offender.

On or about March 17, 2006, while in the custody of NMCD, Christopher Chavez tested positive for drugs.

On or about October 31, 2009, Christopher Chavez committed burglary/breaking and entering, conspiracy and tampering with evidence.

On or about March 28, 2010, Christopher Chavez committed a narcotic violation and tampering with evidence.

On or about June 13, 2010, Christopher Chavez attempted to conceal his identity.

On or about July 10, 2010, Christopher Chavez committed burglary/breaking and entering, conspiracy and larceny. paraphernalia and committed tampering with evidence.

On or about September 10, 2010, Christopher Chavez committed a narcotic violation.

On or about March 27, 2011, Christopher Chavez committed burglary/breaking and entering and larceny.

On or about March 29, 2011 , Christopher Chavez committed aggravated battery on a police officer and aggravated fleeing of a police officer.

On or about January 3, 2012, while in the custody of NMCD, Christopher Chavez possessed marijuana.

On or about April 22, 2014, Christopher Chavez committed aggravated battery on an officer and aggravated fleeing of an officer.

First Chavez Notice at 1-3.

Chavez responded to the United States' notice of "intent to introduce a laundry list of 28

bad acts." Chavez' First Motion at 2. Herrera joins his co-Defendants in asserting that introducing

these bad acts to the jury violates the rules against character evidence.  See Chavez Motion at 2 (citing Fed. R. Evid. 404(b)(1).  Chavez also disputes these acts' relevance, noting that the list includes "acts committed as long as 23 years ago and range from concealing identity to drug possession." Chavez' First Motion at 2.  Chavez asserts that the United States "'must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.'" Chavez' First Motion at 2 (quoting United States v. Cuch, 842 F.2d 1173, 1177 (10th Cir. 1988)).  Chavez asserts that "the Tenth Circuit has 'developed rigorous criteria for admitting evidence of other crimes, wrongs or acts pursuant to Rule 404(b) [and has] held that the government first bears the burden of demonstrating how the proffered evidence is relevant to an issue in the case.'" Chavez' First Motion at 2 (quoting United States v. Biswell, 700 F.2d 1310, 1317 (10th Cir. 1983)).  Chavez complains that the United States "has not offered an evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred from any one or more of the other bad acts" which the United States intends to introduce.  Chavez' First Motion at 3.  Chavez alleges that the United States will introduce his prior acts "solely to prove [his] criminal disposition." Chavez' First Motion at 3.  Chavez further argues, consistent with his co-Defendants, that, should the Court conclude that the prior acts satisfy rule 404(b), the Court should nonetheless exclude the prior acts as unfairly prejudicial and so in violation of rule 403.  See Chavez' First Motion at 4 (citing United States v. Cuch, 842 F.2d at 1176).

### 7.    **Patterson's First Motion.**

Patterson filed his First Motion on December 1, 2017, and requested that the Court "prohibit the admission of any and all other bad acts evidence the Government may seek to introduce against him pursuant to Rule 404(b)." Patterson's First Motion at 2.  Patterson asserts that he "has yet to be provided a list of Rule 404(B) [sic] prior bad acts, but given that Mr. Patterson

has lived a life relatively free from crime, one can surmise that any alleged bad acts would relate mainly to occasional disciplinary actions in his prison file." Patterson's First Motion at 2. Patterson then admits that he "has been convicted of two crimes in his life: Attempted Murder in 1996 (the offense which found him in the custody of the Department of Corrections) and DWI, a misdemeanor, in 2011." Patterson's First Motion at 2. Patterson asserts that neither of those crimes "involve prison gang activity and serve no other lawful and relevant reason for admission under Rule 404(b)." Patterson's First Motion at 2. Patterson then proposes stipulating, "for purposes of trial, [] that he was lawfully committed to the New Mexico Department of Corrections at the time the sole act charged against him in this matter occurred." Patterson's First Motion at 2-3.

As support for his First Motion, Patterson argues that the United States "bears a heavy burden in seeking admission of other bad acts evidence." Patterson's First Motion at 3. Patterson agrees with his co-Defendants that the United States must provide an "evidentiary hypothesis" tying each prior act with a relevant fact in the trial, and that the United States must, before introducing such evidence, "firmly establish that the prior act fits into one of the rule 404(b) exceptions." Patterson's First Motion at 3. Patterson also agrees that rule 403 dictates that each prior act be "reasonably close in time to the crime charged" and, even then, may be excluded as unfairly prejudicial depending on each act's probative value. Patterson's First Motion at 3-4 (citing Fed. R. Evid. 403).

### 8.  <u>Baca's First Motion</u>.

On November 30, 2017, the United States gave Baca a comprehensive list of his prior acts which the United States may seek to introduce at trial. <u>See</u> Email from Maria Armijo to Theresa

Duncan and Marc Lowry (dated November 30, 2017), filed December 4, 2017 (Doc. 1538-

1)("First Baca Notice").  The list includes a range of acts spanning several decades:

On or about August 7, 1982, Anthony Ray Baca committed voluntary manslaughter.

On or about October 15, 1982, Anthony Ray Baca committed battery on a peace officer.

On or about August 17, 1987, Anthony Ray Baca committed conspiracy to receiving stolen property.

On or about August 24, 1987, Anthony Ray Baca committed conspiracy to receive stolen property.

On or about January 1, 1988, Anthony Ray Baca committed armed burglary, aggravated burglary and aggravated battery.

On or about June 22, 1989, while in the custody of the NMCD, Anthony Ray Baca and another SNM Gang member murdered another inmate.

In or about December 2009, Anthony Ray Baca, sent a covert message to SNM member Jonathan Gomez, AKA "Baby G" instructing him to assault another inmate.

On or about December 15, 2009, while in the custody of the NMCD, Anthony Ray Baca possessed heroin.

On or about December 28, 2009, while in the custody of the NMCD, Anthony Ray Baca possessed heroin and attempted to destroy it when discovered by a correctional officer; other SNM Gang members obstructed the correctional officer.

Prior to March 2014, while in the custody of the NMCD, Anthony Ray Baca ordered the murder of SNM Gang member J.M. because the gang had paperwork indicating J.M. had cooperated with law enforcement.

On or about October 22, 2015, Anthony Ray Baca said that he wanted K. S., from Las Cruces, hit because he was a suspected informant and owed SNM Gang member Carlos Hererra [sic] a.k.a. "Lazy" $800 for drugs.

On or about October 22, 2015, Anthony Ray Baca, said that SNM member Benjamin Clark, a.k.a. "Cyclone," had provided Anthony Ray Baca with Suboxone. Anthony Ray Baca complained that the drugs provided had been "short," resulting in other SNM Gang members not receiving their share of the drugs. A dispute

within the SNM resulted, and SNM member L. M., a.k.a. "Psycho," was hit by SNM member A. E., a.k.a. "Ace."

On or about October 22, 2015, Anthony Ray Baca, said that SNM member Carlos Hererra [sic] and J. R., a.k.a. "BB," had made mistakes and both members would be hit.

On or about October 23, 2015, Anthony Ray Baca, said that he approved the SNM Gang hit on D.S.

On or about October 23, 2015, Anthony Ray Baca said that he had ordered SNM members in Las Cruces to hit rivals. SNM member J.B., a.k.a. "Greedy," hit a Burqueño and asked Anthony Ray Baca if he could be rewarded with a purple heart.

On or about October 23, 2015, Anthony Ray Baca, said that victim J.M. and SNM member Jerry Montoya were close friends. Anthony Ray Baca told Montoya that he needed to hit J.M.

On or about October 24, 2015, Anthony Ray Baca, said that SNM member R. B. was an informant, and he ordered SNM members F. Q., a.k.a., "Football Fred," and Leonard Lujan to hit him.

On or about October 24, 2015, Anthony Ray Baca, stated that he was brought into the gang after he assaulted another inmate on orders from SNM member D. S., Sr.

On or about October 24, 2015, Anthony Ray Baca, said that it would be best to hit NMCD officials D.S. and A.V. because they were the ones telling G.M. lies about the SNM Gang.

On or about October 24, 2015, Anthony Ray Baca, said he is sure he wanted the NMCD officials hit and said the worst thing that could happen to the gang is that they would be sent out of state.

On or about October 24, 2015, Anthony Ray Baca, said that he wanted research to be done on where NMCD officials lived. Anthony Ray Baca said that it would be easier to hit the NMCD officials if they lived off the prison grounds.

On or about November 11, 2015, while in the custody of the NMCD, Anthony Ray Baca participated in a recorded conversation with his girlfriend, where he advised his girlfriend to pass a message to another SNM Gang member to have an inmate killed. Anthony Ray Baca also instructed his girlfriend to smuggle narcotics to him in the prison so that he could distribute them to other inmates and told his girlfriend to pass a message to another SNM Gang member about an alliance between the SNM Gang and the Sureños Gang.

On or about November 11, 2015, Anthony Ray Baca requested Christopher Garcia to assist the SNM Gang in a "mission."

On or about November 15, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss the acquisition of firearms for the ·SNM Gang. Christopher Garcia agreed to obtain a "couple" of guns and said that he already had firearms on hand.

On or about November 18, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he would plant a firearm at a secret location to be retrieved by another SNM Gang member.

On or about November 19, 2015, while in the custody of the NMCD, Anthony Ray Baca ordered another SNM Gang member to threaten the family of a cooperating witness in a murder investigation.

On or about November 26, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss a firearm that was to be provided to another member of the SNM Gang.

On or about November 29, 2015, Christopher Garcia supplied another person with a firearm to be used in the murder ·of G.M., according to the instructions of Anthony Ray Baca.

On or about November 30, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he had provided a gun to another member of the gang to be used on the mission to kill G.M.

First Baca Notice at 1-4.

Responding, Baca filed his First Motion on December 4, 2017.  See Baca's First Motion at 1.  Baca states that the "other defendants in this case join this motion and the Government opposes it."  Baca's First Motion at 4.  Baca begins by noting that the United States notified him that it intends to "introduce evidence of nearly 30 alleged bad acts."  Baca's First Motion at 1.  Baca observes that some of the proffered acts occurred "more than 35 years ago" and that he committed some acts "years before the government alleges [he] joined the SNM."  Baca's First Motion at 1. Further, Baca notes, the United States "also lists acts committed by people other than Mr. Baca," such as the allegation that "SNM member Benjamin Clark, a.k.a Cyclone, had provided Anthony

Ray Baca with Suboxone." Baca's First Motion at 1. "Finally," Baca argues, "many of the alleged bad acts are the subject of this case, such as the allegation that Mr. Baca ordered the murder of Javier Molina as alleged in Counts 6 and 7 of the Second Superseding Indictment." Baca's First Motion at 2.

Baca asserts that the United States seeks to use these prior acts as character evidence in violation of rule 404(b) of the Federal Rules of Evidence. See Baca Motion at 2. Baca accordingly asserts that the "burden is on the government to show, at a pretrial evidentiary hearing if necessary, that its 404(b) evidence is admissible." Baca's First Motion at 2 (citing United States v. Biswell, 700 F.2d at 1317). Baca also asserts that the "'Government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.'" Baca's First Motion at 2 (quoting United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)). Baca argues that such a hypothesis must place the prior acts as an exception to rule 404(b), such as "'intent, knowledge, motive,' or one of the enumerated exceptions," and the prior act "must have real probative value, not just possible worth; and must be reasonably close in time to the crime charged.'" Baca's First Motion at 3 (quoting United States v. Cuch, 842 F.2d at 1176). Baca asserts that the 404(b) exceptions require that the prior acts have occurred recently, and argues that "many of the bad acts the Government seeks to introduce are over thirty years old," and so, accordingly, are "far too remote in time to be relevant to any fact at issue in this case." Baca's First Motion at 2-3.

Baca avers that the United States has not offered such an "evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred from any one or more of the other bad acts" which the United States offers. Baca's First Motion at 3. According to Baca, the absence of such a hypothesis, along with the United States' includion "all of Mr. Baca's prior convictions --

including for offenses committed long before he allegedly became a member of the SNM" -- renders it "apparent that the Government is seeking to introduce these bad acts solely to show Mr. Baca's purported criminal disposition, including an inference that he is more likely to have committed the charged criminal conduct due to those acts." Baca's First Motion at 3.

"Finally," Baca argues, "even if this Court were to determine that the other acts evidence satisfies" rule 404(b), the Court "must balance the evidence's probative value and prejudicial effect under" rule 403 of the Federal Rules of Evidence. Baca Motion at 4. Baca quotes at length from United States v. Kendall:

> [e]ven relevant evidence should be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice.' While trial courts have discretion in striking the balance between probative value and unfair prejudice, . . . they must be particularly sensitive to the potential prejudice that is always inherent in evidence of an accused's prior uncharged crimes or wrongs. . . . Although Rule 403 provides broad umbrella protection from unfair or undue prejudice, the specific provision in Rule 404(a) prohibiting evidence of uncharged crimes to show bad character or tendencies toward criminality not only reflects the special danger of other crimes evidence but should alert trial courts to be particularly careful in admitting such evidence.

Baca Motion at 3 (quoting United States v. Kendall, 766 F.2d at 1436)(alterations in Motion). Baca asserts that "[a]ny balancing test would dictate that" the United States' proffered bad acts "should be inadmissible in this case." Baca Motion at 4.

## 9.    Baca's Second Motion.

Baca filed his Second Motion on December 4, 2017. See Baca's Second Motion at 1. Baca states that "the other defendants in this case have joined the motion." Baca Second Motion at 1. Baca requests, "[p]ursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution," that the Court prohibit the United States "from introducing, under Fed. R. Evid. 404, 405, 608, [and] 609, impermissible character evidence to the jury," and further requests that the Court "limit, for potential character witnesses for the defense, the scope of any cross

examination so that the questioner cannot ask hypothetical question[s] of the witness that may, as the basis of the question, assume that any defendant is guilty."  Baca's Second Motion at 1.  Baca states that "the United States has indicated . . . that with regard to Fed. R. Evid. 609, this motion is not opposed," but that, "concerning character evidence to be used at trial under Fed. R. Evid. 404, 405, and 608 . . . this motion is opposed."  Baca's Second Motion at 1.

Baca notes that the United States alleges that Baca is an SNM leader, and so Baca "presumes that the United States may be tempted to present reputational or character evidence related to Mr. Baca's alleged leadership role in" SNM, "as well as other enterprise traits like the continuity of the enterprise's associations[.]"  Baca's Second Motion at 2.  Baca asserts that this evidence would violate the rules against character evidence, and so urges the Court to prohibit the United States "from introducing such evidence to the jury, like Mr. Baca's purported leadership status, in the form of reputation or opinion evidence from the witnesses at this trial."  Baca's Second Motion at 2.  Baca also requests that,

> should any defendant use a character witness for any trait that is allowed under Fed. R. Evid. 404[a](2)(A), the Court should prohibit the United States from asking any questions in the form of hypothetical questions that are based on the assumption that any defendant is guilty of any offenses alleged in the indictment.

Baca's Second Motion at 2.

As grounds for Baca's Second Motion, Baca notes that the Court has "broad discretion to control cross-examination" and may "prohibit hypothetical questions that assume the guilt of any defendant."  Baca's Second Motion at 2.  Baca points to United States v. Polsinelli, in which the Tenth Circuit "reversed a defendant's conviction for drug distribution when the prosecution asked the defense character witness if his opinion about the defendant would change if the witness knew that the defendant had distributed drugs."  Baca's Second Motion at 2-3 (citing United States v. Polsinelli, 649 F.2d 793, 796-97 (10th Cir. 1981)).  Baca contends that the Tenth Circuit held in

United States v. Polsinelli that "hypothetical questions that assumed guilt violated the due process rights of the defendant, not simply the rules of evidence." Baca's Second Motion at 2 (citing United States v. Polsinelli, 649 F.2d at 797). Accordingly, Baca seeks an order prohibiting the United States from "introducing reputation and opinion testimony . . . without first seeking judicial approval . . . , and to prohibit the prosecution from using guilt-assuming questions as part of any cross-examination of a defense character witness." Baca's Second Motion at 3.

      **10.**    **Herrera's First Motion.**

On November 30, 2017, the United States gave Herrera a comprehensive list of his prior acts which the United States may seek to introduce at trial. See Letter from Maria Armijo to Michael Davis and Carey Bhalla (dated November 30, 2017), filed December 6, 2017 (Doc. 1549-1)("First Herrera Notice"). The list includes a range of acts:

Herrera attaches the United States' proffered list of his prior acts to his First Motion:

On or about September 24, 1991, while in a detention home, Carlos Herrera was arrested for possession of contraband.

On or about November 16, 1991, Carlos Herrera was arrested for criminal trespass.

On or about January 12, 1994, Carlos Herrera was arrested on an outstanding warrant for auto theft.

On or about January 18 and 19, 1994, Carlos Herrera, attempted to contact a victim/witness through a third party and threatened the witness's life.

On or about March 14, 1994, Carlos Herrera was arrested for aggravated battery and resisting/eluding officers.

On or about June 29, 1994, Carlos Herrera was arrested for aggravated assault on a police officer and aggravated battery on a police officer.

On or about September 8, 1994, while in the custody of NMCD, Carlos Herrera threatened to assault a staff member.

On or about September 14, 1994, while in the custody of NMCD, Carlos Herrera refused to obey a lawful order.

On or about June 10, 1996, Carlos Herrera was arrested for receiving/transferring a stolen motor vehicle.

On or about December 2, 1996, while in the custody of NMCD, Carlos Herrera entered a different housing unit without permission.

On or about December 11, 1996, while in the custody of NMCD, Carlos Herrera refused to obey a lawful order.

On or about January 26, 1997, while in the custody of NMCD, Carlos Herrera possessed heroin.

On or about July 27, 1997, while in the custody of NMCD, Carlos Herrera used abusive words and gestures towards a staff member.

On or about September 14, 1997, while in the custody of NMCD, Carlos Herrera tested positive for illegal drugs.

In or around 1998, Carlos Herrera voted to bring Eugene Martinez in the SNM gang. On or about February 23, 1999, while in the custody of NMCD, Carlos Herrera engaged in, and coerced others to engage in activity that posed a threat to the security of the institution.

On or about May 24, 1999, while in the custody of NMCD, Carlos Herrera possessed drug paraphernalia.

On or about July 31, 1999, while in the custody of NMCD, Carlos Herrera possessed contraband and destroyed state property.

On or about November 3, 1999, Carlos Herrera was arrested for driving with a revoked license and a probation violation.

On or about September 8, 2000, Carlos Herrera was arrested on an outstanding warrant and was in possession of drug paraphernalia at the time of the arrest.

On or about January 5, 2001, Carlos Herrera was arrested for trafficking heroin, driving with a revoked driver's license and eluding/evading/resisting arrest.

On or about January 16, 2001, Carlos Herrera killed M.V.

On or about January 31, 2001, while in the custody of Bernalillo County Detention Center, assaulted several correctional officers.

On or about January 12, 2002, while in the custody of NMCD, Carlos Herrera possessed drug paraphernalia and refused to submit to a drug test.

On or about January 14, 2005, while in the custody of NMCD, Carlos Herrera battered a staff member.

On or about January 25, 2005, while in the custody of NMCD, Carlos Herrera assaulted a staff member.

On or about July 30, 2005, while in the custody of NMCD, Carlos Herrera assaulted a staff member.

On or about June 30, 2006, while in the custody of NMCD, Carlos Herrera possessed shanks and assaulted a staff member.

On or about January 25, 2007, while in the custody of NMCD, Carlos Herrera disobeyed a lawful order.

On or about June 20, 2007, Carlos Herrera threatened to bum down his ex-girlfriend's house via telephone.

On or about October 9, 2010, while in the custody of NMCD, Carlos Herrera threatened a staff member.

On or about December 23, 2010, while in the custody of NMCD, Carlos Herrera tested positive of illegal drug use.

On or about February 1, 2011, while in the custody of NMCD, Carlos Herrera attempted to introduce narcotics into a prison facility by soliciting and utilizing a staff member.

On or about October 6, 2011, while in the custody of NMCD, Carlos Herrera possessed pornography.

On or about October 18, 2011, while in the custody of NMCD, Carlos Herrera posses [sic] marijuana.

In or around March 2017, Carlos Herrera verbally threatened to join Al-Qaeda and blow up a federal building.

First Herrera Notice at 1-3.

Herrera responded on December 6, 2017.  See Herrera's First Motion at 1.  Herrera joins

his co-Defendants in asserting that introducing these bad acts to the jury violates the rules against

character evidence.  See Herrera's First Motion at 1 (citing Fed. R. Evid. 404(b)(1)).  Like Baca, Herrera also notes that the United States "has not offered an evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred from any one or more of the other bad acts" which the United States intends to introduce.  Herrera's First Motion at 2.  Herrera further argues, consistent with his co-Defendants, that, should the Court conclude that the prior acts satisfy rule 404(b), the Court should nonetheless exclude the prior acts as unfairly prejudicial and so violative of rule 403.  See Herrera's First Motion at 3 (citing Fed. R. Evid. 403; United States v. Cuch, 842 F.2d at 1176).

    **11.**    **C. Garcia's First Motion.**

The United States, responding to the Court's instruction that it provide each of the Defendants with a list of prior acts it would seek to introduce, provided C. Garcia his list on November 30, 2017.  See Letter from Maria Armijo to Amy Sirignano and Christopher Adams (dated November 30, 2017), filed December 8, 2017 (Doc. 1555-1)("First C. Garcia Notice").  The list includes a range of acts:

> On or about May 4, 1995, Christopher Garcia possessed cocaine for sale.

> On or about May 16, 1995, Christopher Garcia committed conspiracy to traffic cocaine.

> On or about March 7, 1997, Christopher Garcia participated in a drive-by shooting targeting a rival drug dealer.  A stray bullet from the shooting struck a two year old girl in the face.

> On or about September 12, 1997, Christopher Garcia assaulted a police officer.

> On or about February 19, 2004, Christopher Garcia was shot by rival gang member S.D. at the defendant's residence.

> Between 2004 and 2015, Christopher Garcia sold cocaine base and heroin several hundred times to another person.

On or around 2005, Christopher Garcia offered to pay others to kill rival gang member S.D., who had previously shot Christopher Garcia.

In or about February 2005, Christopher Garcia requested another person and Anthony Cordova, aka "Antone," to kill rival gang member S.D.

In February, 2005, Christopher Garcia paid another person and Anthony Cordova heroin and cash for killing S.D.

In February, 2005, Christopher Garcia traveled outside the District of New Mexico in order to create an alibi for himself during the time S.D. was murdered.

On or about February 4, 2005, victim S.D. was shot and killed by another person and Anthony Cordova on orders from Christopher Garcia.

ln 2005, on multiple occasions, Christopher Garcia spoke with another person and discussed smuggling crack cocaine into the prisons with the assistance of a correctional officer, who was an associate of the SNM Gang.

In 2005, on multiple occasions, Christopher Garcia provided crack cocaine to another person, who in turn gave the drugs to a correctional officer to smuggle in to the prison.  The crack cocaine was provided to SNM Gang members, to include Benjamin Clark and Daniel Sanchez.

On or about July 27, 2005, Christopher Garcia threatened to assault R.C.

On or about May 10, 2006, Christopher Garcia possessed a firearm.

On or about June 14, 2006, Christopher Garcia possessed cocaine and attempted to destroy evidence.

In or about 2012, Christopher Garcia paid another person $50 to use another person's residence to cut and package drugs.

ln 2015, Christopher Garcia wired $100 to SNM Gang leader Gerald Archuleta and Christopher Garcia used his wife's name in the wire transfer.

On or about May 2015, Christopher Garcia possessed heroin and cocaine for sale.

On or about May 6, 2015, Christopher Garcia attempted to flush cocaine and heroin down a toilet while sheriffs [sic] deputies executed a search warrant at his residence.

On or about August 7, 2015, Christopher Garcia sold another person heroin and crack cocaine.

On or about August 11, 2015, Christopher Garcia sold another person heroin.

On or about August 11, 2015, Christopher Garcia discussed the fact that rival gang member S.D. had shot him and was later killed.

On or about September 4, 2015, Christopher Garcia agreed to sell heroin to another person and discussed the whereabouts of various SNM Gang members, to include Anthony Ray Baca, and, Christopher Garcia sent Suboxone strips to "Mario and Boo-Boo" in prison, and agreed to sell heroin to another person so that the drugs could be smuggled into the prison.

On or about September 5, 2015, Christopher Garcia agreed to sell heroin to another person.

On or about September 9, 2015, Christopher Garcia discussed the sale of heroin with another person.

On or about September 10, 2015, Christopher Garcia sold an undercover agent heroin.

On or about November 11, 2015, Anthony Ray Baca requested Christopher Garcia to assist the SNM Gang in a "mission."

On or about November 15, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss the acquisition of firearms for the SNM Gang. Christopher Garcia agreed to obtain a "couple" of guns and said that he already had firearms on hand.

On or about November 18, 2015, Christopher Garcia sold another person heroin.

On or about November 18, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he would plant a firearm at a secret location to be retrieved by another SNM Gang member.

On or about November 26, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss a firearm that was to be provided to another member of the SNM Gang.

On or about November 29, 2015, Christopher Garcia advised another person that he did not trust Mandel Lon Parker and instructed that person to give Mandel Lon Parker a "hotshot" (lethal dose of heroin) after that person and Mandel Lon Parker murdered G.M. Christopher Garcia also advised that person to leave the murder weapon with Mandel Lon Parker.

On or about November 29, 2015, Christopher Garcia possessed a firearm.

On or about November 29, 2015, Christopher Garcia supplied another person a firearm to be used in the murder of G.M., according to the instructions of Anthony Ray Baca.

On or about November 30, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he had provided a gun to another member of the gang to be used on the "mission" to kill G.M.

On or about December 3, 2015, Christopher Garcia was in possession of several ounces of heroin at a drug stash house he operated.

On or about December 3, 2015, Christopher Garcia possessed marijuana and materials consistent with distribution of marijuana.

On or about December 3, 2015, Christopher Garcia possessed a cellular telephone that contained photographs of him posing with a marijuana plant and marijuana bags packaged for sale taken at his residence.

On or about December 3, 2015, Christopher Garcia sent a text message to another person stating that he had another gun to be used in the gang murder of G.M.

First C. Garcia Notice at 1-4.

C. Garcia responded on December 8, 2017. C. Garcia's First Motion at 1. Herrera joins his co-Defendants in asserting that introducing these bad acts to the jury violates the rules against character evidence. See C. Garcia's First Motion at 1 (citing Fed. R. Evid. 404(b)(1)). Like Baca, C. Garcia also notes that the United States "has not offered an evidentiary hypothesis by which a fact of consequence in this prosecution may be inferred from any one or more of the other bad acts" that the United States intends to introduce. C. Garcia's First Motion at 2. C. Garcia further argues, consistent with his co-Defendants, that, should the Court conclude that the prior acts satisfy rule 404(b), the Court should nonetheless exclude the prior acts as unfairly prejudicial and so violative of rule 403. See C. Garcia's First Motion at 3 (citing Fed. R. Evid. 403; United States v. Williston, 862 F.3d 1023, 1035 (10th Cir. 2017)).

12.    **Perez' Second Motion.**

The United States gave Perez his list on November 30, 2017. <u>See</u> Letter from Maria Armijo to Ryan Villa and Justine Fox-Young (dated November 30, 2017), filed December 4, 2017 (Doc. 1558-1)("First Perez Notice"). Perez' list includes a range of acts, beginning in 1987:

On or about May 12, 1987, Rudy Perez committed assault.

On or about March 3, 1988, Rudy Perez committed burglary and receiving stolen property.

On or about June 16, 1988, Rudy Perez committed commercial burglary.

On or about March 15, 1989, Rudy Perez was arrested for criminal sexual penetration.

On or about February 14, 1992, Rudy Perez committed burglary and was a habitual offender.

On or about December 21, 1992, Rudy Perez committed receiving stolen property to wit firearm.

On or about July 5, 1993, Rudy Perez committed assault on a family member.

On or about December 29, 1994, Rudy Perez committed larceny.

On or about April 11, 1996, while in the custody of NMCD, Rudy Perez assaulted inmates T.F. and D. M.  On or about September 23, 1996, while in custody of NMCD, Rudy Perez created a "dummy" out of clothes on his bunk.

On or about March 7, 1998, Rudy Perez committed theft.

On or about June 4, 1998, Rudy Perez committed unauthorized use of a motor vehicle.

On or about February 3, 2002, Rudy Perez committed unlawful taking of a motor vehicle.

On or about March 21, 2002, Rudy Perez committed fraud.

On or about June 27, 2002, Rudy Perez committed fraud.

On or about May 7, 2003, while in the custody of NMCD, Rudy Perez possessed a "stinger," a homemade weapon.

On or about December 31, 2005, Rudy Perez committed assault and resisting.

On or about February 14, 2006, Rudy Perez committed aggravated battery.

On or about July 2, 2007, Rudy Perez committed possession of a controlled substance and breaking and entering.

On or about July 15, 2007, Rudy Perez committed aggravated battery and aggravated battery with a deadly weapon.

On or about January 18, 2008, Rudy Perez committed bribery of a witness.

On or about August 28, 2008, Rudy Perez committed fraud.

On or about February 9, 2010, while in the custody of NMCD, Rudy Perez verbally threatened a caseworker.

On or about May 6, 2010, Rudy Perez committed possession of a controlled substance.

On or about June 6, 2010, while in the custody of NMCD, Rudy Perez attempted to incite other inmates to become disruptive by throwing food and trash on the floor.

On or about July 29, 2010, Rudy Perez violated probation.

On or about August 31, 2010, Rudy Perez committed possession of a controlled substance and breaking and entering.

On or about July 21, 2011, Rudy Perez committed aggravated battery with a deadly weapon, contempt of court and possession of a controlled substance.

On or about February 10, 2012, Rudy Perez committed battery.

On or about September 11, 2014, while in the custody of NMCD, Rudy Perez verbally threatened a correctional officer.

First Perez Notice at 1-2.

Perez also objects to the United States' proposed introduction into evidence of thirty prior acts which he allegedly committed, and asserts that "[a]ll remaining defendants join this Motion." See Perez' Second Motion at 1, 4. Perez observes that the United States "has provided notice to Mr. Perez of their intent to introduce a laundry list of 30 bad acts." Perez' Second Motion at 1. Perez agrees with his co-Defendants that the United States has not offered an "'evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts.'" Perez' Second Motion at 1 (quoting United States v. Cuch, 842 F.2d at 1177)). Perez asserts that this hypothesis must demonstrate "'a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.'" Perez' Second Motion at 2 (quoting United States v. Biswell, 700 F.2d at 1317). Perez similarly asserts that, even if the United States demonstrates such a connection, satisfying rule 404(b), the Court should exclude the prior acts as unfairly prejudicial and therefore violative of rule 403. See Perez' Second Motion at 3.

### 13. Sanchez' Second Motion.

The United States gave Sanchez his list on November 30, 2017. See Letter from Maria Armijo (dated November 30, 2017), filed December 1, 2017 (Doc. 1530-1)("First Sanchez Notice"). The list includes a range of acts beginning in 1992:

> On or about November 22, 1992, Daniel Sanchez committed murder in the first degree.

> On or about July 7, 1994, while in the custody of the NMCD, Daniel Sanchez incited a riot at the inmate recreation yard.

> On or about November 10, 1994, while in the custody of NMCD, Daniel Sanchez assaulted inmate P.C.

> On or about December 9, 1994, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer.

> On or about April 6, 1995, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer.

On or about August 12, 1995, while in the custody of NMCD, Daniel Sanchez threatened a correctional officer.

On or about September 24, 1996, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer.

On or about March 3, 1997, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer and threatened inmate D.J.

On or about April 25, 1997, while in the custody of NMCD, Daniel Sanchez threatened a correctional officer.

On or about July 1, 1997, while in the custody of NMCD, Daniel Sanchez threatened inmate J.H.

On or about November 14, 1998, while in the custody of NMCD, Daniel Sanchez possessed and attempted to conceal drug paraphernalia.

On or about February 19, 1999, while in the custody of NMCD, Daniel Sanchez threatened a correctional officer.

On or about March 13, 1999, while in the custody of NMCD, Daniel Sanchez attempted to flood his cell and incite a disturbance among the other inmates.

On or about April 26, 1999, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer.

On or about May 25, 1999, while in the custody of NMCD, Daniel Sanchez threatened a correctional officer.

On or about July 1, 2003, while in the custody of NMCD, Daniel Sanchez possessed a homemade weapon and attempted to conceal the weapon.

In 2005, on multiple occasions, Christopher Garcia provided crack cocaine to another person, who in-turn gave the drugs to a correctional officer to smuggle into the prison. The crack cocaine was provided to SNM Gang members, to include Benjamin Clark and Daniel Sanchez.

First Sanchez Notice at 1-3.

Sanchez also objects to the United States' proposed introduction of his prior acts into

evidence. See Sanchez' Second Motion at 1. Sanchez observes that the United States "has

provided notice to Mr. Sanchez of its intent to introduce a laundry list of 27 bad acts." Sanchez'

Second Motion at 1. Sanchez asserts identical arguments to those of his co-Defendants: that the

prior acts constitute impermissible character evidence and thus violate rule 404(b), and that the

United States has not clearly established the 404(b)(2) exception under which the United States

seeks to introduce the prior acts. See Sanchez' Second Motion at 2-3. Sanchez also asserts that

"several of the alleged prior acts" that the United States offers "occurred two decades and more

ago" and so are "far too remote in time to be relevant to any fact at issue in this case." Sanchez'

Second Motion at 4. Finally, Sanchez argues that, even if the admission of his prior acts does not

violate rule 404(b), the Court should nonetheless exclude the acts as unfairly prejudicial and thus

violative of rule 403. See Sanchez' Second Motion at 4.

### 14. The Response.

The United States filed an omnibus response to each of the Defendants' Motions. See

United States' Omnibus Response to Defendants' Motions to Exclude Prior Bad Acts Evidence at

1, filed December 15, 2017 (Doc. 1581)("Response"). The United States asserts that the prior-acts

evidence that it intends to introduce "is admissible: (1) to prove that an enterprise existed; and (2)

the prior acts are intrinsically linked to evidence of the crimes charged." Response at 1.

The United States first argues that the prior-acts evidence is "probative of and admissible

to prove the existence of the racketeering enterprise," and that the United States is not introducing

the prior-acts evidence for character-evidence purposes. Response at 1. The United States notes

that it must prove the Defendants were members of an enterprise to satisfy RICO. See Response at

1-2. The United States asserts that courts generally "liberally admit evidence of prior bad acts as it

is relevant to proving the existence, organization, and nature of the RICO or VICAR enterprise, and

how each defendant engaged in the pattern of racketeering." Response at 2 (citing Old Chief v.

United States, 519 U.S. 172, 183 (1997); United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004); United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000); United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999); United States v. Badru, 97 F.3d 1471, 1474 (D.C. Cir. 1996)). "Specifically, the prior act evidence is admissible as relevant as to the structure and hierarchy of the organization, serving as the proof of the enterprise itself." Perez' First Motion at 3. Prior assaults, the United States avers, are relevant as "evidence of different leadership positions within the organization, and constitutes enterprise evidence." Perez' First Motion at 3 (citing United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011)(Sweet, J.)). Accordingly, the United States asserts, the use of prior-act evidence to prove an enterprise's existence "does not fall within the bulwark of Federal Rule of Evidence 404(b): 'An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an other act within the meaning of Rule 404(b); rather, it is part of the very act charged.'" Perez' First Motion at 4 (quoting United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992)).

The United States next disputes Perez' argument that "'[t]he only relevant racketeering activity is that which occurred during the time period relevant to the indictment.'" Response at 4 (quoting Perez' First Motion at 2). The United States asserts that, to the contrary, "courts have allowed the admission of other act evidence which occurred before the charged conspiracy commenced." Perez' First Motion at 4 (citing United States v. Franklin, 704 F.2d 1183, 1189 (10th Cir. 1983)). "Prior acts which occurred before the conspiracy are still probative," the United States argues, "and may be admitted 'to prove the existence of the alleged conspiracy as well as to show its background and history.'" Response at 4 (quoting United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993)). Accordingly, the United States argues that "the admission of prior act evidence does not depend on whether it occurred before the crime charged." Response at 4.

Turning to Perez' rule 404(b) argument, the United States asserts that this argument does "not find any sound support in the law." Response at 5. The United States beings by asserting that the prior-acts evidence is "both necessary and relevant to the government's case," and is also needed "'for evidentiary richness and narrative integrity in presenting the case.'" Response at 5 (quoting Old Chief v. United States, 519 U.S. at 183). The United States then argues that "Rule 404(b) is only applicable to evidence of acts extrinsic to the crimes charged; thus, acts which are intrinsic to the crimes charged are not excludable under Rule 404(b)." Response at 5 (citing United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)). Uncharged acts are considered intrinsic and outside rule 404(b), the United States argues, if: "(1) the act was part of the scheme that is being prosecuted; or (2) the act was 'inextricably intertwined with the charged crime such that a witness' testimony would have been confusing and incomplete without mention of the prior act.'" Response at 6 (quoting United States v. Record, 873 F.2d at 1372). The United States avers that the prior acts which it seeks to introduce "are intrinsically intertwined with the alleged offenses." Response at 6. Accordingly, the United States argues, "the prior act evidence is admissible and highly relevant to the proceedings." Response at 6-7.

Last, the United States asserts that the prior-act evidence is not unfairly prejudicial under rule 403. See Response at 7. The United States characterizes the exclusion of evidence under rule 403 as "'an extraordinary remedy and should be used sparingly.'" Response at 7 (quoting United States v. Pettigrew, 944 F.3d 1554, 1563 (10th Cir. 1991)). The United States argues that the "mere fact that the evidence would damage a defendant's reputation does not make it prejudicial." Response at 7 (citing United States v. Caraway, 605 F3d 765, 787 (10th Cir. 2010)). The United States quotes United States v. Caraway at length: "'To be unfairly prejudicial, the evidence must have an undue tendency to suggest decision on an improper basis, commonly, though not

necessarily, an emotional one.'"   Response at 7 (quoting United States v. Caraway, 453 F.3d at 1301).  The United States opines that the prior-acts evidence which it seeks to introduce is not more inflammatory than the charged crimes and so is not unfairly prejudicial to the Defendants.  See Response at 7.  Accordingly, the United States requests that the Court deny the Defendants' prior acts motions.  See Response at 8.

15.    **The December 19, 2017, Hearing**.

The Court heard arguments on each of the motions at the first of several hearings on the prior bad acts issues.  The Court indicated that it invited arguments on the Defendants' 404(b) and overt acts motions because "that's going to implicate both exhibits and witnesses," and the Court wished to "address any issues [it] can."  Transcript of Motions Hearing at 273:25-274:6 (taken December 19, 2017)(Court), filed January 4, 2018 (Doc. 1608)("Tr.").

a.    **Perez' First Motion**.

At the hearing, Perez summarized his First Motion: "[W]e're moving the Court to exclude specifically enterprise acts from the second trial, and certainly from the other cases, unless there is . . . a relevance finding."  Tr. at 17:13-19 (Fox-Young).  Perez elaborated his belief that the Court had construed VICAR and RICO too broadly.  See Tr. at 17:22-25 (Fox-Young).  "[F]or instance," Perez remarked, B. Garcia "is in the trial with allegations dating back to the year 2000.  We don't think that those . . . allegations should come in . . . for the government to prove up the existence of the enterprise, when they have nothing to do with the Molina and the Marcantel counts."  Tr. at 17:25-18:5 (Fox-Young).

The United States pointed to its Response and highlighted United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999).  See Tr. at 20:2-5 (Castellano).  The Court observed that, to establish the existence of an enterprise, the United States "can't just have a stand-alone act; you've got to link

it up in some way, and have evidence that it is not just some individual's bad act, but it is part of

their efforts on behalf of the enterprise." Tr. at 20:16-24 (Court). The United States agreed with

the Court and discussed "spillover," in which enterprise acts may necessarily be admitted in trials

involving enterprise co-defendants otherwise uninvolved in those acts. Tr. at 21:2-3 (Castellano).

See id. at 21:15-22 (Castellano). The Court analogized to the United States' position for the

upcoming James hearing[5] on co-conspirator statements: "So you prove one conspiracy here,

you've got another conspiracy over here, it comes in against both of them because both

conspiracies are in furtherance of the enterprise and its activities?" Tr. at 21:24-22:8 (Court). The

United States asserted that the United States Court of Appeals for the Tenth Circuit's opinion in

United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010)("Smalls")[6], negates many potential issues

that would otherwise arise under Bruton v. United States, 391 U.S. 123 (1968)("Bruton")[7]. The United

States then characterized the categories of co-conspirator statements that it will seek to introduce:

---

[5]A "James hearing" refers to a hearing that the Court holds to determine whether a preponderance of the evidence demonstrates that the out of court statements of a defendant's alleged coconspirators fall within rule 801(d)(2)(E) of the Federal Rules of Evidence's exclusion of co-conspirator statements from the definition of hearsay. The hearing is named for the United States Court of Appeals for the Fifth Circuit's decision in United States v. James, 590 F.2d 575 (5th Cir. 1979), in which the Fifth Circuit held that, under rule 104(a), the trial court must make the determination whether the foundations for coconspirator statements have been met and must make this finding by a preponderance of the evidence before the admitting the statements. See 590 F.2d at 578-82.

[6]In United States v. Smalls, the Tenth Circuit concluded that a co-defendant's casual conversation with a jailhouse informant, in which the co-defendant admitted to a murder, was not testimonial under Crawford v. Washington, 541 U.S. 36 (2004), because it "was not, even to the slightest degree, a formal declaration . . . [and] thus lack[ed] the formality 'essential to testimonial utterance.'" United States v. Smalls, 605 F.3d 765, 779 (10th Cir. 2010)(quoting Davis v. Washington, 547 U.S. 813, 830 (2006)).

[7]In Bruton v. United States, the Supreme Court of the United States of America held that the admission of a co-defendant's statement in a joint trial, even with a limiting instruction, violated the other defendant's rights under the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America. See 391 U.S. at 126.

> I think we'll have three categories. We're going to have co-conspirator statements under [United States v.] James[, 590 F.2d 575 (5th Cir. 1979)]. Then we'll have statements pursuant to Smalls, which will be statements against interest which point a finger at other defendants. And then, ultimately, there are Bruton statements out there. I think that number will be small in this case. . . . I think the Jose Gomez assault is the one that has statements in there that may be redacted. I can't think of any others other than that particular incident.

Tr. at 22:15-23:5 (Castellano). The United States then pointed to United States v. Harris, 695 F.3d 1125 (10th Cir. 2012), in which there was an "overarching enterprise," with three "subsets" who had "come together at various times," which constituted "an association-in-fact enterprise." Tr. at 23:9-20 (Castellano). The United States analogized to the three SNM subsets: "the Old Timers, and the Dropouts, and the All Stars," and asserted that each subset's statements "will come in against the entire enterprise." Tr. at 23:21-25 (Castellano).

Perez responded and distinguished the United States' cited cases as "not cases where there was a severance," and so asserted that "the Court still does need to do [rule] 403 analysis." Tr. at 24:7-10 (Fox-Young). Perez argued that, "with respect to very old, very dated acts coming . . . in the first trial, if the Government can't tie them up and connect them, I think the analysis is different where Your Honor has granted a severance." Tr. at 24:11-15 (Fox-Young). Perez opined that "the basis for the severance was not necessarily that the Court's concerned about prejudice. But that there may instances where that 403 analysis yields a different result." Tr. at 24:16-20 (Fox-Young). The Court then indicated it was inclined to deny the Perez' First Motion. See Tr. at 25:1-5 (Court).

### b.    Sanchez' First Motion.

Sanchez then argued his First Motion. See Tr. at 37:22 (Court). The Court first indicated its inclination on the matter:

---

I guess how I would draw the line is on either res gestae, or what I'm going to call enterprise or furtherance of the enterprise evidence, it seems to me that the Government should be prohibited from saying because they were involved in this murder, they were involved in the Molina murder, for example. [The United States is] free to argue that because they committed the murder in furtherance, that that shows that there was an enterprise, and that they did that in furtherance. But you still can't argue propensity. If I determine on the 404(b) that certain, what I'm going to call 404(b) evidence . . . if it comes in as 404(b), then you do get to argue that it's coming in to show intent or pattern, or whatever I'm letting it in for. But you can't argue that because they did it in the past, they must have done it this time. And so probably true propensity evidence, the Government can't make the argument and shouldn't use the argument.

Tr. at 38:3-39:14 (Court). The Court further indicated that it was "pretty much agreeing with [Sanchez] here." Tr. at 39:8-9 (Court). The Court then asked the United States whether it agreed that "the Government is not permitted to draw propensity inferences, ask the jury to draw one, [or] make an argument from any evidence that's going to get into the trial?" Tr. at 39:24-40:2 (Court). The United States agreed, but asserted that it could "tie up the evidence, as opposed to just saying one thing happened, and then you must believe the other thing happened." Tr. at 40:10-13 (Castellano). The Court also stated that the "defendants may be entitled to a limiting instruction," and pointed to the Tenth Circuit's pattern jury instruction for rule 404(b), but indicated that it would defer to the Defendants on whether and when to issue such an instruction. Tr. at 40:14-16 (Court). See id. at 41:1-4 (Court). With the parties in agreement, the Court stated: "that will be the ruling. The Government just can't ask the jury to draw any inferences or make any propensity arguments." Tr. at 41:12-14 (Court).

### c.    Sanchez' Second Motion.

The Court turned to Sanchez' Second Motion. See Tr. at 204:12-13 (Court). Sanchez complained about the United States' list of twenty-seven "alleged bad acts," which Sanchez contends "is 404(b) evidence." Tr. at 209:1-5 (Jewkes). Sanchez asserted that the first prior act is his "conviction in Valencia County for murder," and that the list "goes on to culminate in the

March 7, 2014, incident involving Javier Molina . . . .  We're talking about a span of 22 years."

Tr. at 209:6-11 (Jewkes).  Sanchez argued "that basically the problem is" that the United States,

> in order to meet their burden, must establish a link between the bad act, and link it
> to the enterprise.  And to do that, what they're going to have to show is that it's
> relevant -- the bad act, that is -- to establish any one of those elements that we find
> in 404(b).

Tr. at 209:20-210:2 (Jewkes).  The Court asked the United States to describe the purpose for which

it intends to use each of its proffered prior acts.  See Tr. at 204:17-19 (Court).  The Court stated

that it had two questions for each of the United States' proposed prior acts: "Tell me, if this what

I would call enterprise res gestae, furtherance of the enterprise, or is it a true bad act or crime that

you're using to show one of the 404(b) purposes?"  Tr. at 211:15-18 (Court).  The United States

responded that the "short answer is . . . none of this is 404(b)."  Tr. at 212:3-4 (Castellano).  The

United States asserted that, "with the exception of the 1992 charge, every one of these is an

allegation -- it's an overt act in the RICO conspiracy charged in a separate case."  Tr. at 213:2-5

(Castellano).

The United States then discussed each of its proffered prior acts for Sanchez.  See Tr. at

213:14-215:2 (Court, Castellano).  The United States said it would not introduce the allegations

that on February 24, 2012, Sanchez gave drugs to another inmate.  See Tr. at 231:21-25 (Court,

Castellano).  The Court then asked the United States what its "philosophy" and "thinking" was in

"charging the overt acts in the indictment."  Tr. at 214:5-9 (Court).  The United States responded

that "in the RICO indictment, the purpose was to establish . . . that each of these individuals in that

indictment conspired, or -- there is a conspiracy with one or more other people to violate the RICO

Act."  Tr. at 214:10-15 (Castellano).  The United States asserted that each of the overt acts "would

. . . be an indication of a conspiracy to commit racketeering acts in furtherance of the enterprise."

Tr. at 214:15-17 (Castellano).  The United States asserted that Sanchez was an SNM member in

1992, when Sanchez committed first-degree murder, an act which the United States wishes to introduce at trial.  See Tr. at 215:1-4 (Castellano).  The United States further argued that

> the reason that's included is that for purposes of recruiting for the SNM, things like pedigree, and the willingness to put in work for the gang is something that the gang looks for when they're recruiting members.  So if someone comes into prison with a murder, that's somebody who they may be interested in, knowing that someone is willing to take a life.

Tr. at 215:5-11 (Castellano).  The Court noted that if an individual committed a murder with the express purpose of either advancing in or gaining admission to SNM, "that would probably fall within the furtherance or evidence of the enterprise."  Tr. at 215:15-18 (Court).  The Court asked the United States, however, how it could introduce a murder if "we don't have any evidence that he was doing it for purposes of advancing the enterprise or becoming a member of the SNM gang."  Tr. at 215:18-23 (Court).  The United States responded that such a murder conviction "established that someone is willing to prove themselves for the gang."  Tr. at 216:3-5 (Castellano).  The Court responded that, "if he didn't put that thing on his resume to try to get into the gang, or advance the gang, it seems to me that it's not going to fall within the enterprise evidence."  Tr. at 216:7-12 (Court).  The United States acknowledged that it did not "believe [it] could establish that, in 1992, Mr. Sanchez committed that murder for the purpose of entering the enterprise."  Tr. at 216:16-20 (Castellano).   The United States further indicated that it was yet unaware whether it would introduce each of these bad acts at trial, but asked that the Court determine each act's admissibility. See Tr. at 217:13-21 (Castellano).

The United States then pointed again to United States v. Harris to argue that an enterprise "need not have a hierarchical structure or chain of command," but, instead, "decisions may be made on an ad hoc basis, and by any other number of methods."  Tr. at 218:2-12 (Castellano)(citing United States v. Harris, 695 F.3d 1125).  The United States argued that enterprises, for RICO and

VICAR purposes, need not be rigidly structured, and that members need not have fixed or well-defined roles. See Tr. at 218:11-18 (Castellano). "For example," the United States averred, "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means, may fall squarely within [RICO's] reach." Tr. at 218:18-22 (Castellano). The United States accordingly argued that, to prove RICO's enterprise element, it must prove "three things[:] . . . that the enterprise has a purpose, . . . [the] relationships among the members, . . . and then longevity." Tr. at 218:24-219:3 (Castellano). The United States asserted that the longevity element justifies the long span of its proposed prior acts. See Tr. at 219:3-5 (Castellano). "And so when we allege at least acts," the United States argued, "it is showing longevity of the gang, long enough for them to basically be a gang" for RICO's purposes. Tr. at 219:10-12 (Castellano).

The Court indicated that it was disinclined to include Sanchez' 1992 murder conviction: "I'm not seeing enough link there just between items on a resume or pedigree and the enterprise." Tr. at 219:19-22 (Court). The Court noted that "there may be some other reason it comes in," such as if Sanchez testifies, but for rule 404(b) purposes or to prove the existence of the enterprise, the Court would exclude Sanchez' 1992 murder. Tr. at 219:24-220:5 (Court). The Court then indicated that "the rest of [the proffered acts], they're not coming in under 404(b). But they'd be coming in for enterprise and furtherance of the enterprise's activities." Tr. at 220:5-8 (Court).

Sanchez responded that the United States' proffered list includes "eight or nine assaults inside prison, either involving correctional officers or other inmates," but argued that he had "received no showing that this was in furtherance of the enterprise [or] that it was tied to the enterprise." Tr. at 220:10-17 (Jewkes). Sanchez asserted instead that "the Court's going to hear ample evidence that inside the prison, these guys don't always get along[, so these acts may not] have anything to do with gang affiliation." Tr. at 220:17-20 (Jewkes). Sanchez then asserted that

the United States would have to demonstrate, "at some point," how the "remaining 25 overt acts" are "tied to the organization." Tr. at 220:24-221:2 (Jewkes). The Court then asked the United States whether, before it introduces evidence of its proffered bad acts, it could demonstrate each act's connection to the enterprise. See Tr. at 221:8-13 (Court). The United States responded that "the indictment alleges, among other things, that the gang rules the prison system by force and by fear and intimidation," so the United States was unsure "that every act would be considered in furtherance of membership in the gang." Tr. at 222:1-5 (Castellano). "For example," the United States continued, "one of the intent requirements under VICAR is that you do something in furtherance of the gang, . . . you do it because it's expected of you by virtue of your membership in the gang." Tr. at 222:6-11 (Castellano). The Court countered that it was striking a balance between simplicity and ensuring "the defendants have a meaningful ability to object, if they don't feel like the nexus is there, because this is the kind of evidence that once it's out, you just can't put it back in." Tr. at 222:14-21 (Court). The Court then proposed that the United States, "at some point," when it determines which overt acts it will use at trial, "send a letter to Mr. Jewkes and say: Here's the documents I'm going to be relying on, and these are the overt acts I'm going to prove." Tr. at 223:3-8 (Court). The United States responded that it would "give that a try" and see if it could "generate a shorter list beforehand" of the acts it intends to prove at trial. Tr. at 224:4-9 (Castellano). The Court cautioned the Defendants that each overt act "only has to be relevant [] so the standard is pretty low here." Tr. at 224:20-22 (Court). The Court previewed its analysis for such issues at trial: "If it . . . establishes the enterprise, or is in furtherance of the enterprise, it's not a call I make by a preponderance. It's simply, is it relevant?" Tr. at 224:22-25 (Court).

Sanchez accepted the Court's proposal and requested a deadline for the United States' shortened list. See Tr. at 225:4-5 (Jewkes). The Court indicated that it was unlikely to impose a deadline, "[b]ecause this is a little bit unusual," but that it would "protect the Defendants from having it blurted out at trial . . . I think we're going to have to make some calls as we go." Tr. at 225:7-11 (Court). The United States proposed, however, a deadline of one week before trial. See Tr. at 226:2-3 (Castellano). Sanchez agreed, but Baca objected to that deadline as "way too close to trial." Tr. at 226:24-227:6 (Court, Jewkes, Duncan). The Court assured Baca that he would not have to submit a brief arguing his objections to the United States' proposed acts, but instead could notify the Court the acts to which he objects, keeping in mind that "the standard is extremely low." Tr. at 227:18 (Court). See id. at 227:11-20 (Court).

### d.    **Baca's First Motion**.

The Court next heard arguments on Baca's First Motion. See Tr. at 230:10-13 (Court). The United States said that it would take the same position on Baca's prior, overt acts as it did on Sanchez' -- that Baca's acts are admissible not under rule 404(b), but rather as evidence of the enterprise's existence and of Baca's actions in furtherance of the enterprise. See Tr. at 231:1-7 (Court, Castellano). The United States repeated its argument that some of Baca's convictions predating his joining SNM are relevant to show that he was "known by reputation . . . willing to beat people down, and [he was] known for that type of activity, so that was used as a recruiting tool." Tr. at 234:5-10 (Castellano).

The United States then said it was agreeable to submitting a finalized list of Baca's overt acts which it would introduce at trial. See Tr. at 234:14-22 (Court, Castellano). The Court then indicated that, "based on the record and the representations of the Government," it would "not allow the first five at the present time." Tr. at 235:14-18 (Court). The Court noted that those acts

"seem to . . . be resumes or pedigrees that [Baca] may have established certain characteristics that would be attractive to the SNM gang.  But . . . they're not evidence of an enterprise, and they're not yet evidence that he was doing them in furtherance of the enterprise."  Tr. at 235:19-24 (Court).  The Court noted that, for the other overt acts, the United States assures the Court that it "has some evidence that's relevant, and probably would allow the Government to introduce that evidence."  Tr. at 235:24-236:4 (Court).  Baca agreed with the Court as to the first five overt acts, but noted that some of the remaining acts "are Department of Corrections reports summarizing statements by -- multiple levels of hearsay, so . . . the Government is going to have a major proof problem at trial."  Tr. at 236:13-18 (Duncan).  Baca also argued that the United States was "attributing to Mr. Baca statements that the informants made," and that "there are other acts . . . that aren't acts by Mr. Baca at all."  Tr. at 236:19-22 (Duncan).  "For example," Baca noted, "there are at least three overt acts that are really about Mr. [Christopher] Garcia and not Mr. Baca."  Tr. at 236:23-237:1 (Duncan).  Baca also asserted that a majority of the United States' proffered prior acts for Baca "are all predicated on conversations that Mr. Baca had with Eric Duran.  And they're pleading the bad acts, or how they want to plead the conspiracy, or the enterprise as things that Mr. Baca said[,] . . . so it's not really the act itself."  Tr. at 237:1-10 (Duncan).  Baca also repeated his request that the Court require the United States to give more advance notice of its final prior-acts list than a week before trial.  See Tr. 239:1-7 (Duncan).  Baca asserted that more advance notice is "the best way to protect Mr. Baca's constitutional rights, because a lot of this evidence is very prejudicial and somewhat tangential."  Tr. at 239:5-8 (Duncan).  The Court observed that, in many trials, the prosecution need not give advance notice of the prior acts it intends to introduce.  See Tr. at 239:12-16 (Court).

e.     **Baca's Second Motion**.

The Court turned to Baca's Second Motion.  See Tr. at 242:4-8 (Court).  The Court began by clarifying that "there is not going to be any 404(b) evidence," and that if these prior acts come in at trial, it would be "for the relevancy to the enterprise and the furtherance of the enterprise's activities."  Tr. at 242:20-24 (Court).  Baca asserted his concern with potential defense character witnesses, see Tr. at 243:5-6 (Lowry), but the Court noted that, until a Defendant testifies after the United States rests, "character is not going to be in evidence . . . or at play," Tr. at 243:10-18 (Court).  Baca clarified that his concern is with the use of hypotheticals, that the United States might challenge a Defense character witness by posing hypothetical questions that presume a Defendant's guilt to impeach that witness' opinion of a Defendant's character for truthfulness.  See 243:23:244:4 (Lowry).  Baca asserted that his concern is rooted in rule 608 of the Federal Rules of Evidence.  See Tr. at 244:20-22 (Lowry).  The Court observed that none of the overt acts on the United States' list pertains to reputation for truthfulness.  See Tr. at 245:2-4 (Court).  Accordingly, the Court stated that, "assuming [Baca] doesn't identify anybody there, I guess I'm not quite seeing the issue."  Tr. at 245:16-18 (Court).

Turning to Baca's character-evidence argument, the Court noted that, if Baca calls a witness to testify to Baca's peaceful character, "the Government would be able to ask that witness about all the violent bad acts that they've listed on their notice."  Tr. at 246:1-3 (Court).  Baca disagreed with the Court and pointed to United States v. Polsinelli, and described that "the Tenth Circuit reversed a conviction based on the use of those types of hypotheticals."  Tr. at 246:4-10 (Lowry)(citing United States v. Polsinelli, 649 F.2d 793 (10th Cir. 1981)).

The Court asked whether it would be proper if, instead of asking about hypothetical situations directly analogous to the allegations in the case, the prosecution based its hypothetical

on "prior convictions, or . . . prior times that there was evidence" that the defendant committed an act that serves as that hypothetical's basis. Tr. at 246:16-24 (Court). Baca responded that, given the breadth of the allegations in this case, "it really becomes hard to separate the past from the present." Tr. at 247:2-9 (Lowry). The Court agreed that it would be improper "for Mr. Castellano to ask . . . 'Well, but if you knew Mr. Baca tried to knock off the Corrections Secretary,' that would not be a proper question of your character witness." Tr. at 247:14-18 (Court). "On the other hand," the Court said, if the United States asked about a specific overt act on its list, "that would be proper." Tr. at 247:19-25 (Court). The Court indicated it is "inclined to think that the Marcantel [allegation] would be off limits, but other overt acts would be okay." Tr. at 248:5-7 (Court). Baca stated that he would think about the Court's distinction and perhaps respond at a later date. See Tr. at 248:8-9 (Lowry). Lowry asserted, however, that if the United States were to "ask a hypothetical, they could ask it without any reference to any specific allegation." Tr. at 248:19-22 (Lowry). The Court responded that the United States does not "have to ask hypothetical questions. This is not an expert. They can actually say: Did you know that . . . on June 22, 1989, he and another gang member murdered somebody?" Tr. at 248:23-249:5 (Court). Baca said that he would agree "if there was the equivalent of a judicial finding or a court finding or a plea agreement." Tr. at 249:6-8 (Lowry). Baca asserted, however, that "a lot of these overt acts, they're based on a subjective analysis that didn't lend itself to that kind of finality, in terms of . . . whether that specific instance of conduct could be attributed to Mr. Baca or not." Tr. at 249:9-13 (Lowry). The Court disagreed, noting that "it would seem that the Government doesn't have to prove, for a character witness . . . anything beyond a reasonable doubt or even by probable cause. They simply have to have a good faith basis for the question." Tr. at 249:18-23 (Court). Accordingly, the Court indicated that it would deny Baca's Second Motion. See Tr. at 250:17-18 (Court).

f.      **Herrera's First Motion**.

The Court turned to Herrera's First Motion.  See Tr. at 260:17-18 (Court).  Herrera noted

that "the whole entire first page" of the United States' proffered overt acts "were committed when

Mr. Herrera was in the juvenile detention facility, and when he was 13 years old."  Tr. at 261:2-5

(Bhalla).  The United States responded that it "had a tougher time with Mr. Herrera's [overt acts]

because he's not charged with overt acts in the RICO indictment."  Tr. at 262:8-10 (Castellano).

The United States agreed not to introduce evidence of the 1991 incidents and indicated a

willingness to strike all acts Herrera committed as a juvenile.  See Tr. at 263:4-6 (Castellano).  The

Court opined that "a bad act is a bad act.  It doesn't really matter whether it's a juvenile or not."

Tr. at 265:10-12 (Court).  The United States then listed the overt acts which it would not seek to

introduce:  the acts committed in 1991, see Tr. at 266:7-10 (Court, Castellano); the act committed

on January 12, 1994, see Tr. at 266:10-12 (Court, Castellano); the act committed on November 3,

1999, see Tr. at 266:18 (Castellano); the act committed on September 8, 2000, see Tr. at 267:4

(Castellano); and the act committed on October 6, 2011, see Tr. at 267:21-22 (Castellano).  The

United States believed, but could not be certain, that it would seek to admit each of the remaining

acts, not under rule 404(b), but rather as enterprise evidence.   See Tr. at 268:9-14 (Court,

Castellano).

As to the remaining overt acts, Herrera asserted that some are "fairly obviously not related

to enterprise."  Tr. at 269:16-17 (Bhalla).  Herrera acknowledged "that maybe there are four or

five that could potentially be applicable" as enterprise evidence.  Tr. at 269:13-14 (Bhalla).  The

Court suggested that, if the United States stipulates to introduce only the five overt acts which

Herrera identifies as enterprise evidence, the United States could then "focus on those five, and

see if [it] wants to bring those in[.]"  Tr. at 270:3-7 (Court).  Herrera agreed with that process, but

would not "concede that they're admissible."  Tr. at 270:8-10 (Bhalla).  Herrera identified, however, two acts which could arguably be construed as enterprise evidence:  Herrera's 1998 vote to admit Defendant Eugene Martinez to SNM, see Tr. at 270:23-25 (Bhalla); and the allegation that, on February 23, 1999, Herrera threatened a correctional officer, see Tr. at 271:2-3 (Bhalla). The Court then proposed that, as with Baca and Sanchez, the United States provide Herrera a list of the overt acts which it will seek to introduce at trial by January 22, 2018.  See Tr. at 272:1-5 (Court).  The United States "preview[ed]" its theory, however, and indicated that it would likely seek to introduce all of Herrera's overt acts pertaining to drugs.  Tr. at 272:12-14 (Court, Castellano).  See id. at 272:19-25 (Court, Castellano).

### g.  C. Garcia's First Motion.

The Court heard the Second Trial Defendants' 404(b) motions on December 20, 2017.  See Transcript of Hearing (held December 20, 2017), filed January 5, 2018 (Doc. 1610)("Dec. 20 Tr."). C. Garcia began his argument by asserting that his forty prior acts are "highly prejudicial" and that "a majority of these [prior acts] are from [the United States'] snitch, Mario Montoya, that perhaps might have gone before the Grand Jury . . . , [w]hich would make them hearsay statements."  Dec. 20 Tr. at 113:12-15 (Sirignano).  C. Garcia noted that "every single one of these 40 are overt acts in the 16-CR-1613 case," with the exception of the second act, and so C. Garcia lacked "any evidence, other than the indictment in 1613, specifically, that ties this in to the SNM enterprise." Dec. 20 Tr. at 113:18-21 (Sirignano).  C. Garcia concluded that "none of" the United States' proffered prior acts "have anything to do with the SNM Gang."  Dec. 20 Tr. at 113:25-114:1 (Sirignano).

The United States then confirmed, on the Court's questioning, that all but one of C. Garcia's prior acts are pled as overt acts in 16-CR-1613.  See Dec. 20 Tr. at 114:4-9 (Court,

Castellano).  The United States also noted that the allegations that, in September, 2015, C. Garcia

sold heroin reflect C. Garcia's guilty plea from another case.  See Dec. 20 Tr. at 115:6-11 (Court,

Castellano).   C. Garcia responded that he "strenuously object[ed]" to introducing those acts,

because he "did not plead to drug trafficking on behalf of the SNM."  Dec. 20 Tr. at 115:15-19

(Sirignano).  The United States responded that it has evidence "that will supplement to what Mr.

Garcia pled to."  Dec. 20 Tr. at 115:20-24 (Court, Castellano).

> The Court then reiterated its request that the United States
>
> will not attempt to get any of these that have been marked as overt acts, you'll not
> attempt to get any of those in through 404(b), by pointing to some legitimate
> purpose?   You'll simply take the position that these are relevant to proving
> enterprise and proving that they're in furtherance of the enterprise's activities?

Dec. 20 Tr. at 116:2-10 (Court).  The United States agreed and committed to that approach.  See

Dec. 20 Tr. at 116:12-12 (Castellano).  For several of C. Garcia's prior acts, however, the United

States could not assert whether it had enough evidence linking each act to the SNM to justify

admission to prove the SNM enterprise.   See Dec. 20 Tr. at 116:13-19 (Court, Castellano).

C. Garcia objected, asserting that he "need[s] to know one way or the other."  Dec. 20 Tr. at

116:20-22 (Sirignano).  The Court then directed the United States to examine its list for C. Garcia

and "provide the evidence [it will] rely upon to establish and prove that these are related to the

establishment of the enterprise and in furtherance of the enterprise activity."  Dec. 20 Tr. at 117:16-

19 (Court).  The United States acknowledged that it could submit under rule 404(b) the allegation

that, on May 16, 1995, C. Garcia conspired to sell cocaine.   See Dec. 20 Tr. at 118:16-19

(Castellano).  The United States argued that, if C. Garcia argues that he does not traffic in narcotics,

then the May 16, 1995, allegation "could be used as 404(b), to show lack of mistake, knowledge,

and intent, among other 404(b) factors."  Dec. 20 Tr. at 118:18-23 (Castellano).  C. Garcia noted

that he is not charged with drug trafficking in this case, but rather with possessing a firearm as a

felon, and invited the "Government . . . to file a 404(b) motion to explain why it intends to bring in [C. Garcia's] prior convictions from 1995." Dec. 20 Tr. at 120:2-4 (Sirignano). The Court indicated that the United States' list amounts to notice under rule 404(b), and described that the Court would need to rule on the allegations "at the time, get a temperature as what [C. Garcia's] defense is through either [his] cross-examination in the Government's case-in-chief," to determine whether the 1995 allegation amounts to relevant rebuttal evidence. Dec. 20 Tr. at 120:14-20 (Court). C. Garcia responded that, regardless of his trial strategy, the 1995 allegation is unfairly prejudicial to C. Garcia. See Dec. 20 Tr. at 121:2-8 (Sirignano). The United States then noted that drug trafficking is relevant to prove the enterprise's interstate commerce effects, and that it would request "an instruction indicating that drug trafficking does affect interstate or foreign commerce." Dec. 20 Tr. at 122:5-15 (Castellano).

C. Garcia turned to the allegation that, in 2004, a member of a rival gang shot him. See Dec. 20 Tr. at 124:15-19 (Sirignano). C. Garcia asserted that he wishes to exclude that allegation, because it did not involve his actions, but the Court was skeptical, opining that C. Garcia wished to exclude the allegation, because it shows C. Garcia "is in one gang, and he's being shot by another gang." Dec. 20 Tr. at 125:13-15 (Court). See id. at 124:19-24 (Sirignano). The Court observed that, if C. Garcia believes the 2004 allegation does not amount to rule 404(b) evidence, then rule 401 governs its admission. See Dec. 20 Tr. at 126:1-4 (Court). The Court then summarized that the it may admit all of C. Garcia's prior acts but the second allegation on the United States' list, which may come in under rule 404(b), so long as the United States lays enough foundation to tie each act to the SNM enterprise. See Dec. 20 Tr. at 126:18-127:2 (Court). The Court gave the United States until January 22, 2018, to indicate which acts they would seek to admit at trial and the evidentiary support linking each of those acts to the SNM. See Dec. 20 Tr.

at 127:4-8 (Court). The Court then requested that the Defendants be mindful of their objections, as rule 404(b) has become largely irrelevant to each act's admissibility, and to instead focus on rules 401 and 403. See Dec. 20 Tr. at 127:12-19 (Court).

### h.    Perez' Second Motion.

The Court heard the last of the first trial 404(b) motions on December 20, 2017. See "Dec. 20 Tr. at 130:1 (Court). Before discussing Perez' Second Motion, the United States approached the bench and told the Court that it would not publish its overt act list for Perez, as it had for the previous Defendants, because "there is a crime on here [which the United States is] going to keep out from the rest of the group." Dec. 20 Tr. at 130:1-4 (Castellano). The United States indicated that "the conduct or the allegation[s] for the 1987 to 1993 [acts] are not in play." Dec. 20 Tr. at 131:12-14 (Castellano).

Perez then argued his Second Motion. See Dec. 20 Tr. at 132:12-14 (Court, Fox-Young). Perez noted that the United States notified Perez that it would seek to introduce thirty acts, and Perez "contest[s] that any of these are relevant to the establishment of the enterprise . . . and also were not conducted in furtherance of the activities of the enterprise." Dec. 20 Tr. at 132:18-23 (Fox-Young). Perez also relates that the "Government doesn't even allege that Mr. Perez was a member of the SNM . . . until 2009." Dec. 20 Tr. at 133:3-5 (Fox-Young). Perez asserted therefore that only overt acts that Perez committed after joining SNM are relevant. See Dec. 20 Tr. at 133:7-10 (Fox-Young). Perez averred, however, that he contests each of the proffered overt acts' relevancy. See Dec. 20 Tr. at 133:15-17 (Fox-Young).

The United States then indicated that it would seek to introduce the following overt acts: that, on December 29, 1994, Perez committed larceny, see Dec. 20 Tr. at 134:7-10 (Castellano); that, on April 11, 1996, Perez assaulted two inmates, see Dec. 20 Tr. at 134:7-10 (Castellano); and

that, on September 23, 1996, Perez "created a dummy out of clothes in his bunk" while in prison, Dec. 20 Tr. at 134:7-10 (Castellano). The United States then agreed not to introduce: "the March 21, 2002, fraud," Dec. 20 Tr. at 134:22-24 (Castellano); the "June 27, 2002, fraud," Dec. 20 Tr. at 135:1 (Castellano); the "August 28, 2008, fraud," Dec. 20 Tr. at 135:3 (Castellano); and the July 29, 2010, probation violation, see Dec. 20 Tr. at 135:5 (Castellano).

The Court observed that "Mr. Perez is not charged in the RICO counts" and asked whether the United States was "talking about any of these being alleged or pled as overt acts." Dec. 20 Tr. at 135:12-15 (Court). The United States then indicated which overt acts it would use as enterprise evidence: the "April of 1996 assault on two inmates," Dec. 20 Tr. at 136:1-3 (Castellano); the allegation that, on September 23, 1996, Perez made a "dummy . . . out of clothes on his bunk," Dec. 20 Tr. at 136:5-8 (Castellano); the allegation that Perez "possessed a stinger, a homemade weapon" on May 7, 2003, Dec. 20 Tr. at 136:10-11 (Castellano); each of the remaining "assaultive behavior related to the SNM," Dec. 20 Tr. at 136:15-17 (Castellano); the allegation that, on May 6, 2010, Perez possessed a controlled substance, see Dec. 20 Tr. at 138:24-25 (Castellano); and the allegation that, on June 6, 2010, Perez incited other inmates to violence, see Tr. at 139:2-4 (Castellano). The Court then asked the United States whether, "if the evidence doesn't pan out for enterprise" for its proffered overt acts, it would "agree not to try to get them in through 404(b), to establish some other legitimate purpose." Dec. 20 Tr. at 137:12-14 (Court). The United States responded "probably." Dec. 20 Tr. at 137:17 (Castellano). The Court then proposed that, for each of the overt acts which the United States indicates that it will use as enterprise evidence, the United States "will give [Perez] proof that those will be used, how they'll be used, or how they'll prove those." Dec. 20 Tr. at 138:17-3 (Court). "The rest will not come in through 404(b)" unless the United States notifies the parties "pretty promptly." Dec. 20 Tr. at 138:10-13 (Court). Perez and

-64-

the United States both agreed with this proposal.  See Dec. 20 Tr. at 139:15-25 (Court, Castellano, Fox-Young).

The Court then asked the United States whether it thought that, "since Mr. Perez is not charged in the racketeering side, that his 403 arguments have more force than the other folks who are charged with the racketeering activities, because" that evidence may be more prejudicial to Perez and less probative of his offenses.  Dec. 20 Tr. at 140:1-13 (Court).  The United States disagreed with the Court, and argued that, "when it comes to a VICAR count, which Mr. Perez is charged with, we only have to prove that the enterprise engaged in racketeering activity."  Dec. 20 Tr. at 140:14-18 (Castellano).  The United States further asserted that another enterprise member's overt act of racketeering activity could be attributed to Perez.  See Dec. 20 Tr. at 140:19-21 (Castellano).  The Court agreed with that characterization.  See Dec. 20 Tr. at 140:24-25 (Court).

**16.    J. Gallegos' First Motion.**

The United States gave J. Gallegos his list of prior bad acts on May 22, 2017.  See Letter from Maria Armijo to Brock Benjamin and Richard Sindel (dated May 22, 2017), filed January 3, 2018 (Doc. 1602-1)("First J. Gallegos Notice").  The First J. Gallegos Notice includes a range of acts:

> On or about March 28, 1989, Joe Gallegos attempted to commit robbery and aggravated assault.
>
> On or about August 15, 1989, Joe Gallegos committed aggravated battery.
>
> On or about August 28, 1990, Joe Gallegos possessed a firearm.
>
> On or about November 20, 1990, Joe Gallegos received stolen property.
>
> On or about July 28, 1991, Joe Gallegos committed criminal damage to property.
>
> On or about February 24, 1993, Joe Gallegos committed criminal damage to property, no insurance, DWI, disorderly conduct, obstructing an officer, eluding

an officer, suspended driver's license, assault on an officer and battery on an officer.

On or about July 18, 1993, Joe Gallegos possessed explosives.

On or about June 11, 1994, Joe Gallegos committed a DWI.

On or about July 22, 1994, Joe Gallegos committed an aggravated battery on an officer, resisted/obstructed and committed criminal damage to property. regarding drugs.

On or about August 4, 1995, Joe Gallegos possessed marijuana and drug paraphernalia.

On or about October 27, 1995, Joe Gallegos committed aggravated assault with a deadly weapon, shot at a dwelling, shot at from motor vehicle, aggravated burglary, accessory, contributed to the delinquency of a minor and conspiracy.

On or about February 23, 1996, Joe Gallegos contributed to the delinquency of a minor, committed criminal damage to property and possessed a firearm.

On or about December 8, 1996, Joe Gallegos bribed and intimidated a witness.

On or about January 16, 1997, Joe Gallegos committed a parole violation, contributed to the delinquency of a minor, criminal damage to property, battery on a peace officer, possessed a firearm and was charged as a habitual offender.

On or about March 19, 1997, while in the custody of NMCD, Joe Gallegos introduced heroin into the Central New Mexico Correctional Facility.

On or about April 14, 1997, while in the custody of NMCD, Joe Gallegos refused to submit to a urinalysis test.

On or about May 22, 1998, Joe Gallegos brought contraband into a place of imprisonment, conspired and was charged as a habitual offender.

On or about April 6, 1999, while in the custody of NMCD, Joe Gallegos participated, contributed to and impeded control of a disturbance.

On or about July 23, 1999, Joe Gallegos assaulted a prison guard and inmate, and was an accessory.

On or about October 15, 2000, while in the custody of NMCD, Joe Gallegos tested positive for drugs.

On or about October 15, 2000, while in the custody of NMCD, Joe Gallegos possessed heroin.

On or about February 27, 2001, while in the custody of NMCD, Joe Gallegos tested positive for drugs.

On or about March 9, 2005, Joe Gallegos intimidated a witness and violated his parole.

On or about January 25, 2014, Joe Gallegos failed to appear on a misdemeanor charge, tampered with evidence, assaulted an officer, resisted/evaded/obstructed an officer.

First J. Gallegos Notice at 1-3.

J. Gallegos objected to the United States' list of his prior acts on January 3, 2018.  See J. Gallegos' First Motion at 1.  J. Gallegos begins by noting that the United States' list includes "acts committed as long as 29 years ago and range from DWI, possession of a firearm, possession of marijuana[,] to assault on a correctional officer."  J. Gallegos' First Motion at 1.  J. Gallegos characterizes these acts as propensity evidence that violate rule 404.  See J. Gallegos' First Motion at 1.  Alternatively, J. Gallegos argues that, if the United States seeks to introduce these acts as exceptions under rule 404(b), the United States has not established such an exception, and the Court must require "a clear and logical connection between the alleged earlier offenses," and this case's allegations against J. Gallegos.  J. Gallegos' First Motion at 2.  "Many of the alleged bad acts are simply too remote to be reasonable."  J. Gallegos' First Motion at 2.  Last, J. Gallegos argues that, even if any of his prior acts fall under a rule 404(b) exception, those acts unfairly prejudice him and are only minimally probative, and so the Court should exclude them under rule 403.  See J. Gallegos' First Motion at 3.

### 17.    The United States' Response to J. Gallegos' First Motion.

The United States responded to J. Gallegos' First Motion on March 7, 2018.  See United States' Response to Defendant Joe Gallegos' Motion *in Limine* to Prohibit Government from

Introducing Evidence of Alleged "Bad Acts" at 1, filed March 7, 2018 (Doc. 1890)("J. Gallegos Response"). The United States begins by arguing that J. Gallegos' prior acts are admissible to prove the enterprise's existence and are further admissible because they are "intrinsically linked to evidence of the crimes charged." J. Gallegos Response at 1.

The United States first discusses its argument that the prior acts are probative of the racketeering enterprise's existence. See J. Gallegos Response at 1. The United States asserts that it will not introduce the prior acts "for propensity purposes," but rather to "prove that the defendant was a member of an *enterprise* as defined by the meaning of RICO." J. Gallegos Response at 1-2 (emphasis in original)(citing United States v. Kamahele, 748 F.3d at 1007). The United States asserts that courts tend to "liberally admit evidence of prior acts as it is relevant to proving the existence, organization, and nature of the RICO or VICAR enterprise, and how each defendant engaged in a patter of racketeering." J. Gallegos Response at 2 (citing United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)). The United States then cites several cases for the proposition that the United States is afforded considerable leeway in using the defendants' prior acts to prove the enterprise's existence, nature, and longevity. See J. Gallegos Response at 2-3 (citing Old Chief v. United States, 519 U.S. at 183; United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004); United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000); United States v. Badru, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United States v. Lasanta, 978 F.2d 1300, 1307-08 (2d Cir. 1992)). "Specifically," the United States argues, "the prior act evidence is admissible as relevant to the structure and hierarchy of the organization, serving as proof of the enterprise itself." J. Gallegos Response at 3 (citing United States v. Ashburn, No. 11-CR-0303, 2015 WL 588704, at *16 (E.D.N.Y. Feb. 11, 2015)(Garaufis, J.)). "For example," the United States asserts, "courts

have admitted evidence regarding prior assaults because it is considered evidence of different leadership positions within the organization, and constitutes enterprise evidence." J. Gallegos Response at 3 (citing United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011)(Sweet, J.)). Accordingly, the United States argues that rule 404 does not prohibit the admission of J. Gallegos' prior acts. See J. Gallegos Response at 4.

Nor should prior-act evidence be restricted to "the time that [the] conspiracy is alleged to have occurred," the United States argues, because these acts prove the enterprise's existence, background, and history. J. Gallegos Response at 4 (citing United States v. Franklin, 704 F.2d 1183, 1189 (10th Cir. 1983)). Similarly, the United States argues that prior acts need not directly establish a particular offense element to be relevant; "rather, to be considered relevant, evidence needs only to tend to prove the government's case," including evidence that "'adds context and dimension to the government's proof of charges.'" J. Gallegos Response at 5 (quoting United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997)).

Next, the United States develops its argument that the prior act evidence is "intrinsic to the charged offenses." J. Gallegos Response at 5. The United States asserts that rule 404(b) applies only to "evidence of acts extrinsic to the crimes charges; thus, acts which are intrinsic to the crimes charged are not excludable under Rule 404(b)." J. Gallegos Response at 5 (citing United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)). The United States argues that uncharged acts are considered intrinsic to charged offenses if "the act was part of the scheme that is being prosecuted[, or] the act was 'inextricably intertwined with the charged crime such that a witness' testimony would have been confusing and incomplete without mention of the prior act.'" J. Gallegos Response at 6 (quoting United States v. Richardson, 764 F.2d 1514, 1521-22 (11th Cir. 1984)). A third category of such intrinsic evidence, the United States avers, involves prior,

uncharged acts that are "direct proof of the charged conspiracy."  J. Gallegos Response at 6 (citing United States v. Baez, 349 F.3d 90, 94 (2d. Cir. 2003)).  The United States then argues, without further explanation, that J. Gallegos' prior acts are "actually direct evidence of the crimes charged."  J. Gallegos Response at 6-7.  Finally, the United States argues that J. Gallegos' prior acts are not unfairly prejudicial under rule 403.  See J. Gallegos Response at 7.  The United States asserts that the prior acts are not "more inflammatory" than the charged crimes and so cannot be unfairly prejudicial, especially given those acts' probative value.  J. Gallegos Response at 7 (quoting United States v. Ashburn, 2015 WL 588704, at *15).

### 18.    **The United States' Updated Prior Acts Lists.**

On January 22, 2018, the United States gave each of the First Trial Defendants an updated list of prior acts that the United States would seek to introduce at trial.  See Email from James Tierney to Marc Lowry and Theresa Duncan at 1 (dated January 22, 2018), filed January 25, 2018 (Doc. 1702-1)("Second Baca Notice"); Email from James Tierney to Ryan Villa and Justine Fox-Young at 1 (dated January 22, 2018), filed January 24, 2018 (Doc. 1686-1)("Second Perez Notice"); Email from James Tierney to Richard Jewkes and Amy Jacks (dated January 22, 2018), filed January 24, 2018 (Doc. 1684-1)("Second Sanchez Notice").  Baca, Perez, Herrera, and Sanchez each renewed their rules 403 and 404(b) objections to the introduction of the United States' proffered prior acts.  See Sanchez' Renewed Motion at 1; Perez' Renewed Motion at 1; Herrera's Renewed Motion at 1; Baca's Renewed Motion at 1.

19.    **The Second Trial Hearing**.[8]

The Court held pretrial hearings for several days on the Second Trial Defendants' motions, starting on March 12, 2018.  See Transcript of Hearing (held March 12, 2018), filed April 3, 2018 (Doc. 2026)("March 12 Tr.").  On March 14, the Court heard arguments from several of the Second Trial Defendants, and decided individually each disputed prior act's admissibility.  See Transcript of Hearing (held March 14, 2018), filed April 3, 2018 (Doc. 2028)("March 14 Tr.").

a.    **Troup's First Motion**.

Troup began by asserting that he contests each of his acts on the United States' list.  See March 14 Tr. at 257:3-8 (Burke).  Accordingly, the Court evaluated each of the acts on the United States list.  First, Troup argued against admitting the allegation that, on March 7, 1994, he assaulted Ramos.  See March 14 Tr. at 257:16-23 (Burke).  Troup asserted that this incident "wasn't part of the SNM enterprise," and that, instead, "it was a personal beef at the Northern New Mexico Correctional Facility" over heroin.  March 14 Tr. at 257:23-258:1 (Burke).  Troup conceded, "for the purposes of this hearing," that Troup joined the SNM around 1998.  March 14 Tr. at 258:3-11 (Burke, Court).  The United States responded that this incident "goes to the heart of a lot of SNM activity," because, in the United States' theory of the SNM, "a lot of things can be both personal and SNM-related."  March 14 Tr. at 259:6-11 (Armijo).  The United States accordingly argued that this incident "is typical of what the SNM activities are" "even if [Troup] was not validated [as an SNM member] at the time."  March 14 Tr. at 259:13-16 (Armijo).  The Court deferred ruling

_____

[8]A.A. Garcia, J. Gallegos, and Chavez, instead of arguing their motions before the Court, chose to meet and confer with the United States to attempt to reach an informal resolution to their objections to the United States' respective lists of their bad acts.  See March 14 Tr. at 276:15-19 (Court, Blackburn); id. at 276:24-277:2 (Court, Granberg); id. at 277:4-9 (Court, Benjamin).

on this incident until the United States could verify its evidence about when Troup joined the SNM. See March 14 Tr. at 260:7-19 (Armijo, Court, Burke).

The United States stipulated that it would not use the fourth, fifth, sixth, and seventh prior acts on the United States' list, which allege that Troup committed larceny, violated parole, committed burglary, and transferred a stolen vehicle in separate incidents between March, 1997, and December, 2001. See March 14 Tr. at 262:3-11 (Court, Armijo). The United States also stipulated that it would not use the allegation that, on June 16, 2004, Troup assaulted another inmate by throwing feces at him, see March 14 Tr. at 263:20-25 (Armijo), and the allegation that, on October 22, 2009, Troup threatened a correctional officer, see March 14 Tr. at 269:20-270:5 (Court, Burke, Armijo). The Court then excluded the allegation that, on March 25, 2010, Troup threatened a correctional officer, after the United States' only proffered SNM connection is that Troup was an SNM member at the time of the incident. See March 14 Tr. at 270:18-23 (Armijo); id. at 271:8-12 (Court). For the same reason, the Court also excluded the allegation that, on January 28, 2010, Troup threatened a correctional officer. See March 14 Tr. at 273:5-15 (Court). The Court admitted, however, the allegation that, on May 24, 2011, Troup spoke with another SNM member about intimidating correctional officers into allowing other SNM members to bring drugs into prison. See March 14 Tr. at 274:4-7 (Court). Returning to the first three prior acts, which happened between March, 1994, and December, 1995, the parties agreed to defer argument until the United States could verify when the NM Corrections Department confirmed Troup's SNM membership. See March 14 Tr. at 275:9-21 (Court, Burke, Armijo).

### b. **Patterson's First Motion**.

Patterson then argued his First Motion. See March 14 Tr. at 277:10-14 (Court, Lahann). Starting with the allegation that, on December, 28, 2000, Patterson threatened a correctional

officer, Patterson argued that the incident occurred when he was delirious and suffering from a

bladder infection, and that the allegation refers to comments he made to a correctional officer in

an attempt to see a doctor.  See March 14 Tr. at 278:18-23 (Lahann).  Patterson asserted that the

incident "had nothing to do with any gang-related activity."  March 14 Tr. at 279:1-2 (Patterson).

The United States responded that one of its witnesses will testify that "during this time period

especially . . . , [the SNM] were fighting a great deal with correctional officers," and that this

incident "would be a great defense to this" testimony.  March 14 Tr. at 279:5-10 (Armijo).  The

United States notes that Patterson was "actually found guilty of the verbal abuse or gestures, and

disobeying a lawful order" and argued that "it's SNM activity."  March 14 Tr. at 279:11-14

(Armijo).  The United States continued that it theorizes that, around 2000, the NM Corrections

Department was "housing all the SNM together under restrictive conditions . . . .  So there was sort

of an outstanding order to battle with, hit, assault [correctional officers] anytime anyone could

during that time."  March 14 Tr. at 280:25-281:4 (Beck).  The Court said that it would admit the

allegation, but only if, at trial, the United States can lay foundation that this dispute lasted

"throughout the entire period of 2000, including December 28," and that the United States' proof

"will need to get that specific -- because that's pretty late in the year."  March 14 Tr. at 282:8-20

(Court).  The Court extended this ruling to the October 4, 2001, incident in which Patterson

allegedly threatened a correctional officer.  See March 14 Tr. at 283:20-23 (Court).

        The Court turned to the allegation that, in a hearing for this case on October 4, 2016, Allen

Patterson and two SNM members shouted "Rat!  Rat!" at co-Defendants Jerry Armenta and

Benjamin Clark, United States' cooperating witnesses, as they left the courtroom.  March 14 Tr.

at 284:1-11 (Court, Lahann, Armijo).  Patterson argued that, "if you look at the gap from 2001 to

2016, there is absolutely no evidence that [he] was involved with SNM, did anything for SNM."

March 14 Tr. at 286:1-3 (Lahann).  Patterson thus objected that the incident is irrelevant to the

SNM enterprise.  See March 14 Tr. at 286:7-10 (Lahann).  The Court ruled that the October 4,

2016, incident is admissible as sufficiently related to SNM activities and practices.  See March 14

Tr. at 286:11-18 (Court).

            c.      **Chavez' First Motion**.

        Chavez argued his motion on March 16, 2018.  See Transcript of Hearing at 46:4-9 (held

March 16, 2018)(Court, Granberg), filed April 3, 2018 (Doc. 2030)("March 16 Tr.").  The parties

first informed the Court that the United States had stipulated that it will not introduce any acts on

the first page of the United States' list.  See March 16 Tr. at 46:18-20 (Granberg).  The United

States also stipulated to attempting to introduce only five acts from its Chavez List, plus three

more.  See March 16 Tr. at 48:1-11 (Granberg, Court, Armijo).  The United States asserted it would

seek to introduce the allegations that: (i) on August 13, 2000, Chavez possessed drug

paraphernalia; (ii) on September 13, 2000, Chavez and an SNM member assaulted an inmate;

(iii) on October 8, 2000, Chavez tested positive for drugs; (iv) on March 17, 2006, Chavez tested

positive for drugs; and (v) on January 3, 2012, Chaves possessed marijuana.  See March 16 Tr. at

49:23-50:6:2 (Court, Armijo).  The United States wished to add three new acts, including that,

while "Mr. Chavez was in Torrance [County Detention Center], he was tattooing inmates,

including Timothy Martinez, giving him his S for earning his Huesos."[9]  March 16 Tr. at 48:8-13

(Armijo).  The United States also plans to introduce the allegation that Chavez was indicted for

conspiracy to distribute suboxone.  See March 16 Tr. at 48:14-19 (Armijo).  Finally, the United

---

[9]"Hueso" is Spanish for "bone."  The Court heard testimony explaining that to "earn [one's] bones" is an SNM term of art that refers to murdering or assaulting somebody to gain esteem, rank, or membership within the SNM.  See Transcript of Jury Trial Volume 16 at 123:12-124:5 (taken February 20, 2018)(Beck, Rubio), filed February 22, 2019 (Doc. 2532).

States wished to admit evidence of the allegation that, two weeks earlier, Chavez was found with a shank at the United States courthouse in Las Cruces, New Mexico. March 16 Tr. at 48:21-24 (Armijo).

Chavez first challenged the allegation that he possessed drug paraphernalia in prison on August 13, 2000. See March 16 Tr. at 50:16-19 (Granberg). Chavez also challenged as inadmissible each of the remaining drug allegations, because "simply . . . testing positive or possess[ing] drugs is not in and of itself indicative of the pattern of behavior associated with the SNM." March 16 Tr. at 50:20-51:4 (Granberg). Chavez argued that drug use in New Mexico's prisons is so prevalent that his drug use is not unique to or indicative of any SNM activities. See March 16 Tr. at 51:6-8 (Granberg). The Court then proposed that, if Chavez does not contest that he uses drugs, then the Court would largely exclude prior acts reflecting drug use as cumulative. See March 16 Tr. at 51:17-20 (Court). The United States also proposed that, with Chavez' agreement, it could forego proving each of his prior acts involving drugs, and limit its witnesses' testimony to general statements like "'Yes, I supplied him with drugs or I knew he used drugs.'" March 16 Tr. at 53:4-10 (Armijo). Chavez agreed to the United States' proposal and stipulated to his general drug use. See March 16 Tr. at 54:5 (Granberg). The Court asked Chavez to alert it at trial if he feels the United States' evidence of his drug use at trial becomes cumulative. See March 16 Tr. at 60:1-5 (Court).

Chavez then challenged the United States' new allegation that he brought a shank into the courthouse. See March 16 Tr. at 54:5-7 (Granberg). Chavez said that he had recently been assigned a new cellmate and alleged that the new cellmate gave him the shank, but that "Mr. Chavez didn't really want it." March 16 Tr. at 54:9-12 (Granberg). Chavez noted that the shank was found in his cell, and opined that his new cellmate left it there. See March 16 Tr. at 54:22-

55:3 (Granberg).  The United States responded that it has evidence that Chavez told a government informant "that he was actually going to use it on a correctional officer because he didn't want to go down," meaning that he did not want to accept the United States' plea offer.  March 16 Tr. at 55:6-11 (Armijo).  See id. at 55:12-22 (Armijo).  The United States argued that the incident is relevant, because "the SNM does shank correctional officers.  That's one of their signature things that they do."  March 16 Tr. at 56:7-10 (Armijo).  The Court was skeptical, and asked "how does shanking an officer help him not take a plea deal?  . . .  [I]t looks like it would make his condition worse rather than help him out."  March 16 Tr. at 56:19-22 (Court).  The United States speculated that Chavez intended "possibly suicide by correctional officer."  March 16 Tr. at 57:1-3 (Armijo).  Chavez was also skeptical and said that he believed that his cellmate was the United States' informant.  See March 16 Tr. at 57:13-16 (Court).  The Court recalled the United States' allegation that the SNM expects its members to be always armed with shanks and indicated it would take a "fairly liberal" view on admitting shanks evidence.  March 16 Tr. 58:7-9 (Court).  Accordingly, the Court indicated it would admit this allegation.  See March 16 Tr. at 58:22-24 (Court).

### 20.    The United States' 404(b) Notice as to Troup.

On March 26, the United States gave formal notice to Troup that it intends to present "threatening statements made by Edward Troup to witnesses. pursuant to Rule 404(b)."  First U.S. MIL at 1.  In the First U.S. MIL, the United States provides that theory by which it would admit Troup's statements, but does not disclose those statements' nature.  See First U.S. MIL at 1-4.  Troup responded and objected that the United States' "notice is insufficient to allow either Mr. Troup to respond or the Court to make a ruling on admissibility."  Troup Objection at 1.  Troup asserts that "[n]owhere in its four-page 'notice' does the government actually give notice of what evidence it intends to introduce."  Troup Objection at 1.  Troup maintains that rule 404(b)(2)(A) entitles him

more notice, and that the fact that the United States told him only that it intends to introduce evidence that Troup threatened witnesses "does not serve the purpose of the notice requirement of rule 404(b)(2)(A)." Troup Objection at 1. To make this point, Troup quotes at length from the advisory committee notes to the 1991 amendments to rule 404:

> The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness. Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.

> Nothing in the amendment precludes the court from requiring the government to provide it with an opportunity to rule in limine on 404(b) evidence before it is offered or even mentioned during trial. When ruling in limine, the court may require the government to disclose to it the specifics of such evidence which the court must consider in determining admissibility.

Troup Objection at 2 (quoting Fed. R. Evid. 404, advisory comm. note to 1991 amendments). Troup argues that the absence of any "evidentiary hypothesis" in the United States' notice hinders the Court's and Troup's ability to gauge the admissibility of Troup's alleged threats. Troup Objection at 2. Accordingly, Troup requests that the Court exclude the alleged threats at trial. See Troup Objection at 2.

The next day, the United States replied. See United States' Reply in Support of Its Notice of Other Crimes of Bad Acts Pursuant to Rule 404(b), filed March 29, 2018 (Doc. 2000)("Troup Reply"). In its Reply, the United States specified the allegations it seeks to admit:

1.  On February 5, 2018, Guadalupe Urquizo testified that he was threatened at the detention facility in Otero County. He stated that Troup made remarks "saying there's another FBI informant right there, and started disrespecting and saying that Dan Dan and Sanchez [sic] and Carlos Herrerra [sic] came back from court and said, 'All you FBI informants need to stop doing what you're doing. Have some respect for each other and stop doing what you're doing.'"

2.  On February 20, 2018, Mario Montoya testified that Troup was "yelling out that all of us cooperators think that the FBI and the US Government is our

friend.  But we're going to find out in the end that, as soon as they're done prosecuting these guys, they're going to line us up and prosecute us next. That we're probably going to end up with more time than them."  He went on to say, "I thought he was just trying to plant the seed of doubt for us to come here today and cooperate."

3.     Troup made threatening statements to Benjamin Clark.

4.     Troup was also a member of a group of people who called Samuel Gonzales "a rat" when he was expected to testify in Trial 1.

Troup Reply at 1-2.  The United States argues that Troup's "threats against or to the witnesses, known to the defendant as prosecution witnesses at the time, exhibits his clear intent to interfere with the proceedings by attempting to scare witnesses into not testifying."  Troup Reply at 1.

**21. <u>The United States' Second Motion in Limine.</u>**

During the second trial, the United States filed a rule 404(b) notice of its intent to admit "Billy Garcia's and Arturo Garcia's statements and threats to two informant-witnesses: Leonard Lujan and Joseph Otero."  Second U.S. MIL at 1.  Specifically, the United States seeks to admit statements that B. Garcia and A. Garcia made in December, 2015, and newly discovered statements that they made on April 13, 2018.  <u>See</u> Second U.S. MIL at 1.  The United States asserts that, after B. Garcia and A. Garcia were arrested in December, 2015, they were housed together at the Otero County Jail, and they threatened "then-Defendant-and-now-government-informant/witness Leonard Lujan by calling him 'a piece of shit' and 'a snitch.'"  Second U.S. MIL at 2.  The United States also alleges that, on April 13, 2018, "Defendants B. Garcia and A. Garcia threatened witness Joseph Otero when they were in the loading area of the Otero County jail headed to court."  Second U.S. MIL at 2.  The United States requests that the Court admit these incidents, "both as evidence of racketeering activity and, under Rule 404(b), as evidence of consciousness of guilt."  Second U.S. MIL at 2.

The United States begins with its rule 404(b) argument.  The United States argues that rule 404(b) permits evidence of a defendant's consciousness of guilt as a means of introducing prior bad acts.  See Second U.S. MIL at 3 (citing United States v. Esparsen, 930 F.2d 1461, 1476 (10th Cir. 1991)).  The United States describes Tenth Circuit precedent as establishing that a defendant's threats against a witness demonstrate the defendant's intent to prevent that witness from testifying, and amount to an acknowledgment of guilt.  See Second U.S. MIL at 3 (citing United States v. Nichols, 374 F.3d 959 (10th Cir. 2004)).  The United States avers that "[e]vidence that Defendants B. Garcia and A. Garcia relayed threats against or to any of the witnesses, known to the defendant[s] as a prosecution witness at the time . . . exhibits their clear intent to interfere with these proceedings by attempting to scare witnesses into not testifying."  Second U.S. MIL at 3.  As support for this position, the United States asserts that its witnesses understood B. Garcia's and A. Garcia's statements as threats.  See Second U.S. MIL at 4.  Specifically, the United States says that B. Garcia's calling Lujan "a snitch" in December, 2015, is a "threat against Lujan for cooperating with the government, and the FBI specifically, several times since 2007."  Second U.S. MIL at 4.  The United States also describes that, after the Court's motions hearings in April, 2018, at which Otero testified, Otero was held in a cell near B. Garcia and A. Garcia.  See Second U.S. MIL at 4.  The United States alleges that B. Garcia and A. Garcia told Otero that "those persons 'telling on the SNM' better watch their backs," and that the United States' witnesses "'believe that the SNM is dead, but there are 150 or so of us on the streets and locked up, so they better watch their backs if they know what's good for them.'"  Second U.S. MIL at 4-5.  Otero understood these statements, the United States says, to be "threats to the effect that, if he testifies at trial, Defendants B. Garcia and A. Garcia, and the SNM in prison and out of the prison, will . . . place a hit to murder him."  Second U.S. MIL at 5.  The United States asserts that these statements

demonstrate B. Garcia's and A. Garcia's consciousness of guilt, which renders these statements admissible under rule 404(b).  See Second U.S. MIL at 5.

The United States acknowledges that rule 404(b) evidence is subject to rule 403's balancing test, but argues that these statements' probative value justifies any resulting prejudice.  See Second U.S. MIL at 5.  The United States asserts that exclusion of evidence as excessively prejudicial is a rarely used and discouraged remedy, such that the Court should favor admissibility.  See Second U.S. MIL at 5.  Only if the prior act so thoroughly distracts the jury from the issues at hand, the United States argues, should the Court exclude those acts under rule 403.  See Second U.S. MIL at 5 (citing United States v. Tan, 254 F.3d at 1211).  The United States avers that B. Garcia's and A. Garcia's alleged threats are not unfairly prejudicial.  See Second U.S. MIL at 5-6.  "This evidence is not of such an inflammatory nature that it would cause the jury to seek to punish the defendants solely on the basis of this evidence."  Second U.S. MIL at 6.  The United States anticipates that B. Garcia will assert that "he renounced the SNM," and thus his recent threats are probative of his ongoing membership in and allegiance to the SNM.  Second U.S. MIL at 6.  The United States also asserts that the threats demonstrate B. Garcia's and A. Garcia's fears that the United States' witnesses will provide damaging testimony at trial, and is thus "highly probative" of B. Garcia's and A. Garcia's guilt.  Second U.S. MIL at 6.  Accordingly, the United States urges the Court to admit these alleged threats under rules 403 and 404(b).

Alternatively, the United States avers that the alleged threats are admissible as evidence of racketeering activity, and thus probative of the crimes with which B. Garcia and A. Garcia are charged.  See Second U.S. MIL at 6.  The United States notes that RICO defines "racketeering activity," in part, to include "'any threat . . . involving murder,' and acts indictable under certain provisions of the United States Code, including 'obstruction of justice,' . . . and 'retaliating against

a witness, victim, or an informant.'"  Second U.S. MIL (quoting 18 U.S.C. §§ 1512, 1961(1)).

Discussing the various prohibitions against obstruction of justice in the United States Code, the

United States argues that B. Garcia's and A. Garcia's alleged threats against Otero "fall squarely

under these definitions."  Second U.S. MIL (citing 18 U.S.C. §§ 1512-1513).  The United States

says that both Lujan and Otero "will testify" that B. Garcia's and A. Garcia's statements "were

threats to kill them for . . .  testifying against [B. Garcia and A. Garcia] in this trial Second U.S.

MIL at 7.  The United States argues that such supporting testimony establishes B. Garcia's and

A. Garcia's alleged threats as racketeering activity under 18 U.S.C. §1961(1), and are therefore

admissible "against all Defendants as racketeering activity."  Second U.S. MIL at 7.

>    22.    **The April 4, 2018, Hearing**.

The Court heard arguments on several of the Second Trial Defendants' bad acts motions

on April 5, 2018.  See Transcript of Hearing at 103:9-13 (taken April 4, 2018)(Court), filed May

1, 2018 (Doc. 2190)("April 4 Tr.").  At the hearing, the Court took the same approach that it had

with the other Defendants, examining each prior act to determine admissibility.  See, e.g., April 4

Tr. at 113:16-21 (Court, Armijo).  Again, the Court directed the United States to approach the

bench at trial before introducing each prior act to assure the Court that the United States could

sufficiently tie each act to the SNM enterprise or its racketeering activities.  See, e.g., April 4 Tr.

at 113:16-21 (Court, Armijo).

>    a.    **B. Garcia's First Motion**.

The Court first heard arguments on B. Garcia's First Motion.  See April 4 Tr. at 62:21-24

(Court).  B. Garcia advised the Court that the United States sought to admit only two acts in the

First B. Garcia List, plus two more acts it had recently disclosed to B. Garcia.  See April 4 Tr. at

63:1-9 (Castle).  Specifically, the United States seeks to admit the allegations that, on February 25,

1992, B. Garcia threatened a correctional officer and that, on March 14, 1999, B. Garcia refused correctional officers' commands to leave his cell, resulting in the officers using pepper spray on B. Garcia. See April 4 Tr. at 63:7-11 (Castle). B. Garcia argued that the first allegation happened "26 years ago and is not the real . . . focus of this indictment." April 4 Tr. at 64:18-22 (Castle). B. Garcia acknowledged that he was an SNM member in 1992, but elaborated that the allegation is that "Mr. Bill Garcia became verbally abusive with an officer when he was serving chow in V pod by saying 'Get the fuck out of here,' and became abusive due to the fact that [the officer] refused to pass potato chips to Garcia." April 4 Tr. at 65:7-18 (Castle). The United States asserted that it could tie this incident to the SNM but stipulated that it would not introduce that allegation at trial. See April 4 Tr. at 66:3-7 (Castellano).

Moving to the March 14, 1999, allegation, B. Garcia asserted that the United States has offered no "connection whatsoever to the SNM at all," and so the allegation is "clearly just character evidence designed to make him look obstreperous, obstinate, and difficult, as an inmate 19 years ago." April 4 Tr. at 68:11-17 (Castle). The United States said that this incident happened when several SNM members, in solidarity, refused to cooperate with correctional officers. See April 4 Tr. at 70:21-71:3 (Castellano). The United States asserted that, of the eleven participants in this incident, "at least six" were SNM members such that the incident is probative of SNM coordination against correctional officers. April 4 Tr. at 71:24-72:2 (Castellano). B. Garcia responded by noting that, when the Court entered the courtroom, all those present rose, the majority of whom "were defense lawyers," but "that doesn't mean that it's a coordinated effort of all the defense lawyers." April 4 Tr. at 72:5-8 (Castle). B. Garcia also observed that the Second Superseding Indictment does not alleged "that the SNM used intimidation of guards in any fashion other than to prevent law enforcement officers from identifying offenders . . . . So what they're

trying to do is go outside the indictment, which is why it's a bad act." April 4 Tr. at 72:13-21 (Castle). B. Garcia argued that the United States would use the incident to show that "these are bad guys . . . [T]hey caused problems," which is "exactly 404(b) evidence." April 4 Tr. at 72:20-24 (Castle). The Court ruled that it would admit the allegation, as there were "enough SNM members participating that it is a reasonable inference that it was motivated, at least in part, to maintain or advance positions of the SNM members." April 4 Tr. at 73:5-12 (Court).

B. Garcia turned to the allegation that, between 1993 and 1998, B. Garcia admitted several people into the SNM. See April 4 Tr. at 73:18-21 (Castle). B. Garcia conceded that this allegation was relevant, but wanted to "make a record" that the Court should ensure that "appropriate foundation is laid that [the United States' witnesses] had personal knowledge" of B. Garcia admitting SNM members. April 4 Tr. at 73:22-25 (Castle). Finally, B. Garcia objected to admitting the allegation that, in 1999, B. Garcia murdered Bobby Ortega. See April 4 Tr. at 74:14-18 (Castle). B. Garcia elaborated that the United States alleges that B. Garcia, as an SNM leader, ordered SNM members to murder Ortega in another prison facility. See April 4 Tr. at 75:2-5 (Castle). B. Garcia objected, first, to that act's absence on the First B. Garcia List. See April 4 Tr. at 75:9-11 (Castle). The United States responded that it doubted that each bad acts letter "can cover every single act in this case," and that the 1999 murder amounts to enterprise evidence "which proves the elements in this case," rather than being rule 404(b) evidence. April 4 Tr. at 83:19-23 (Castellano). The Court agreed that the 1999 murder is enterprise evidence, and indicated that it would admit the 1999 murder allegation. See April 4 Tr. at 84:10-11 (Court). The Court admonished the United States, however, to quickly produce its evidence tying the 1999 murder to the SNM. See April 4 Tr. at 84:10-14 (Court). The Court also directed that the United

States refrain from mentioning the 1999 Ortega murder in its opening statements, given its disclosure's timing.  See April 4 Tr. at 87:14-19 (Court, Castellano).

> ### b.    **J. Gallegos' First Motion**.

J. Gallegos then argued his First Motion.  See April 4 Tr. at 103:14-17 (Court).  The United States indicated that it wished to introduce the allegation that, in March, 1995, J. Gallegos discussed drugs in a recorded telephone conversation.  See April 4 Tr. at 104:12-14 (Armijo).  The Court observed that several of the allegations on the J. Gallegos List involve drugs, and suggested that, if J. Gallegos agrees, the Court could limit the United States from introducing each specific drug allegation if J. Gallegos does not contest that he uses drugs.  See April 4 Tr. at 105:15-20 (Court).  J Gallegos said that he is amenable to that option, but noted that, "as of 2005, the New Mexico Department of Corrections lists Joe Gallegos as a nonvalidated member of the SNM." April 4 Tr. at 106:1-4 (Benjamin).  The United States responded that its witnesses will testify that J. Gallegos was an SNM member since at least 2001, when "his first murder did occur."  April 4 Tr. at 107:1-3 (Armijo).  J. Gallegos agreed that, if the United States establishes his SNM membership in 2001, he would stipulate that he has used and trafficked drugs, negating the need for the United States to admit specific instances of drug-related conduct.  See April 4 Tr. at 108:11-19 (Benjamin).

J. Gallegos turned to the allegation that, on December 8, 1996, he bribed and intimidated a witness.  See April 4 Tr. at 109:14-16 (Benjamin).  J. Gallegos asserted that the incident involved his attempt to protect a family member rather than to further the SNM.  See April 4 Tr. at 110:8-11 (Benjamin).  The United States indicated that it could serve as rule 404(b) evidence, given that J. Gallegos is charged in this case with witness intimidation.  See April 4 Tr. 111:1-5 (Armijo). The Court indicated, however, that it would exclude the allegation as too remote.  See April 4 Tr.

at 111:15-19 (Court).  Accordingly, with J. Gallegos' agreement to not contest his prior drug use, there remained no contested prior acts on the J. Gallegos List.

### 23.    The April 5, 2018, Hearing.

The Court heard arguments on the Second Troup Notice and corresponding motions on April 5, 2018.  See Transcript of Hearing at 228:15-19 (taken April 5, 2018)(Court), filed April 24, 2018 (Doc. 2150)("April 5 Tr.").  The United States began its argument by asserting that it could introduce Troup's statements under "either 404(b), or [as] substantive evidence of racketeering acts," because "the racketeering statute does include witness intimidation."  April 5 Tr. at 229:3-8 (citing 18 U.S.C. §§ 1512, 1513).  Troup argued that his first statement is not a threat.[10]  See April 5 Tr. at 229:15-17 (Burke).  The Court indicated that it agrees with Troup that the statement does not reflect "intimidation or attempt to scare."  April 5 Tr. at 230:6-16 (Court). The United States emphasized the word "disrespect," and argued that "disrespect in the SNM is a big deal . . . .  [B]y disrespecting the gang's rules, that alone is a communication to somebody that you're violating the Court's rules" against witness tampering and intimidation.  April 5 Tr. at 230:19-23 (Castellano).  Troup pointed to United States v. Smith, 629 F.2d 650 (10th Cir. 1980), and argued by analogy that 18 U.S.C. § 1512 contemplates as witness intimidation a defendant following a witness home and confronting the witness in the witness' driveway.  See April 5 Tr. at 231:10-18 (Burke).  Troup continued that "to call a rat a rat is not intimidating or threatening a witness."  April 5 Tr. at 231:19-21 (Burke).  The Court disagreed with Troup's intimidation definition, but agreed that calling a witness an FBI informant, while questionable, does not amount

---

[10]The first statement on the Second Troup Notice alleges that, during the first trial, Troup told the United States' witnesses to "have some respect for each other and stop doing what you're doing."  Second Troup List at 1.

to intimidation.  See April 5 Tr. at 232:1-9 (Court).  Accordingly, the Court excluded the first statement on the Second Troup List, absent further foundation or support from the United States establishing a threat.  See April 5 Tr. at 232:10-16 (Court).  The Court also observed potential hearsay problems in admitting "Troup saying what Mr. Sanchez and Mr. Herrera said."  April 5 Tr. at 235:1-4 (Court).  The Court then indicated it would include the second statement on Troup's Second List.[11]  See April 5 Tr. at 235:11-13 (Court).

Turning to the third and fourth items[12] on the Second Troup List, Troup asserted that the United States must disclose more information establishing those statements' admissibility under rule 404(b).  See April 5 Tr. at 235:17-25 (Burke).  The United States agreed that it needs to establish more foundation for the third item's admissibility.  See April 5 Tr. at 236:4-5 (Castellano).  For the fourth item, the United States described that Perez subpoenaed S. Gonzales to testify in the first trial, which resulted in Gonzales being held in a cell near "a number of defendants, including Mr. Troup."  April 5 Tr. at 236:6-9 (Castellano).  The United States asserted

---

[11]The second item on the Second Troup List provides that:

> On February 20, 2018, Mario Montoya testified that Troup was "yelling out that all of us cooperators think that the FBI and the US Government is our friend. But we're going to find out in the end that, as soon as they're done prosecuting these guys, they're going to line us up and prosecute us next. That we're probably going to end up with more time than them." He went on to say, "I thought he was just trying to plant the seed of doubt for us to come here today and cooperate."

Second Troup List at 1.

[12]The third item on the Second Troup List provides that "Troup made threatening statements to Benjamin Clark."  Second Troup List at 1.  The fourth item on the Second Troup List provides that "Troup was also a member of a group of people who called Samuel Gonzales 'a rat' when he was expected to testify in Trial 1."  Second Troup List at 1.

that the Defendants "were giving [S. Gonzales] a hard time about being there, and [had] a conversation about him being a rat." April 5 Tr. at 236:9-11 (Castellano). The United States said it will call S. Gonzales to testify in the second trial, but could not verify the date on which Troup allegedly called S. Gonzales a rat. See April 5 Tr. at 236:20-2 (Burke, Castellano). The Court noted that it did not recall a time when Troup and Gonzales were at the courthouse at the same time, and indicated that it would exclude the third and fourth items on the Second Troup List. See April 5 Tr. at 237:25-238:5 (Court).

## LAW REGARDING VICAR AND RICO

RICO prohibits specific activities when they are committed in connection with a pattern of racketeering activity. See, e.g., 18 U.S.C. § 1962(b)("It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."). RICO defines a "pattern of racketeering activity" such that it "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that is a state law felony, 18 U.S.C. § 1961(1)(A), and "any act which is indictable under any" one of myriad federal statutes, § 1961(1)(B)-(G).

A VICAR violation requires an underlying state law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the

laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a).

The underlying state law offense becomes a federal VICAR violation only when it is committed:

(i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). VICAR employs RICO's definition of racketeering activity. See 18 U.S.C. § 1961(1) (defining racketeering activity for RICO purposes); 18 U.S.C. § 1959(b)(1)(stating that, under VICAR, racketeering activity "has the meaning set forth in section 1961 of this title").

RICO states that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(1). VICAR employs a slightly narrower definition of the term "enterprise" such that it "includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). "An association-in-fact requires: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associated with the enterprise to pursue the enterprise's purpose." United States v. Kamahele, 748 F.3d at 1003. See Boyle v. United States, 556 U.S. 938, 948 (2009)("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."); id. ("While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See

<u>United States v. Abel</u>, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. <u>See</u> <u>United States v. Rodriguez</u>, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. <u>See</u> <u>United States v. Caraway</u>, 534 F.3d 1290, 1301 (10th Cir. 2008); <u>United States v. Curtis</u>, 344 F.3d 1057, 1067 (10th Cir. 2003); <u>United States v. Martinez</u>, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" <u>United States v. Caraway</u>, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." <u>Old Chief v. United States</u>, 519 U.S. at 180 (1997). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." <u>Old Chief v. United States</u>, 519 U.S. at 180-81. In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." <u>Old Chief v. United States</u>, 519 U.S. at 182.

**<u>LAW REGARDING RULE 404(b)</u>**

Under rule 404(b) of the Federal Rules of Evidence, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The court can admit that sort of evidence, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too." Wilson v. Jara, No. CIV 10-0797, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).

The Supreme Court has enunciated a four-part process to determine whether evidence is admissible under rule 404(b). See Huddleston v. United States, 485 U.S. at 691-92. The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)). See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. at 691-92).

When bad-act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." United

States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted).  The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom."  United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)).  "[A] broad statement merely invoking or restating Rule 404(b) will not suffice." United States v. Youts, 229 F.3d at 1317.  Rules 401-403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the government must meet to successfully offer evidence under rule 404(b).  See Huddleston v. United States, 485 U.S. at 686-91.

## ANALYSIS

The Court concludes that the United States does not offer the First Trial Defendants' prior acts as character evidence under rule 404(b) of the Federal Rules of Evidence.  Instead, the United States' prior-acts evidence is largely relevant, and not unfairly prejudicial, to prove VICAR's enterprise element.  However, the Defendants are correct that some of the United States' proffered prior-acts evidence is irrelevant to this case.  Additionally, the Court concludes that the United States may introduce evidence of enterprise acts pertaining to allegations other than those charged in Counts 6-12 of the Second Superseding Indictment.  Further, the Court concludes that the United States may not make propensity arguments or ask the jury to draw such inferences.  The Court also concludes that the United States may impeach any of the Defendants' character witnesses by asking questions about the Defendants' prior acts, provided that the United States has a good faith basis that the act occurred, and provided that the United States does not ask hypotheticals pertaining specifically to the allegations in Counts 6-12 of the Second Superseding Indictment. Finally, the Court concludes that the United States' rule 404(b) notices for Troup, B. Garcia, and A. Garcia largely comply with rule 404(b)(2)(A)'s notice requirement, and include prior acts that

are admissible either to prove consciousness of guilt or to prove the SNM enterprise's existence and purpose.

I.      **THE UNITED STATES MAY GENERALLY INTRODUCE EVIDENCE OF THE DEFENDANTS' PRIOR ACTS TO PROVE THE ENTERPRISE'S EXISTENCE AND DURATION, PROVIDED THAT IT LAYS PROPER FOUNDATION PRIOR TO EACH ADMISSION TO DEMONSTRATE EACH PRIOR ACT'S <u>EVIDENTIARY BASIS AND RELEVANCE</u>.**

Although the Federal Rules of Criminal Procedure do not require it, the United States gave the Defendants advance notice of each of the Defendants' prior acts which the United States would introduce at trial to prove RICO's enterprise element. Cf. Fed. R. Evid. 404(b)(2)(A)-(B) (enabling the defendant to receive advance notice of the government's intent to introduce "evidence of a crime, wrong, or other act" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"). While the Defendants object to the admission of each of these acts on rule 404(b) grounds, the Court concludes that the prior acts are largely admissible to prove an enterprise's existence and duration under RICO and VICAR, and not as rule 404(b) evidence.[13] Given the risk of improper admission, however, the United States must provide the Defendants evidentiary support tying each prior act to VICAR's enterprise element.

Relevant evidence is admissible unless the Constitution of the United States, a federal statute, the Federal Rules of Evidence, or a rule prescribed by the Supreme Court provides otherwise. See Fed. R. Evid. 402. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid.

---

[13]For the first trial, the United States offers no evidence under rule 404(b). For the second trial, the United states seeks to introduce, under rule 404(b), instances in which three Defendants threatened the United States' witnesses in connection with these proceedings. The Court addresses those threats' admissibility <u>infra</u> in Part V.

401.  A fact of consequence "may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action."  Fed. R. Evid. 401 advisory committee note.

Counts 6 and 7 allege that Sanchez, Baca, Herrera, and Perez violated VICAR by conspiring to murder Javier Molina and by murdering Molina.  See Indictment at 12-13.  Count 8 alleges that Baca conspired to assault Julian Romero.  See Indictment at 14.  Counts 9-10 allege that Baca conspired to murder Santistevan and Marcantel.  See Indictment at 14-15.  The United States must, however, do more than prove that the Defendants conspired to and committed these offenses to establish VICAR violations.  The United States also must show that the Defendants committed those offenses for a particular reason, i.e., "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  To satisfy that requirement, the United States will need to prove that the SNM exists, that the SNM is "engaged in racketeering activity," 18 U.S.C. § 1959(a), that the SNM is a "group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1959(b)(2), which in turn requires that the United States to establish that the SNM has a purpose, that there are relationships among those associated with the SNM, and that the SNM has "longevity sufficient to permit those associated with [it] to pursue [its] purpose," United States v. Kamahele, 748 F.3d at 1003.  The United States also must show that the SNM "is engaged in, or [its] activities . . . affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).

Defendants' prior acts, done in furtherance of an enterprise, are often necessary to prove an enterprise's existence.  Accordingly, the Court will admit the United States' proffered prior acts

so long as those acts are relevant to proving VICAR's enterprise element, see Fed. R. Evid. 401, and so long as those acts' unfair prejudice does not substantially outweigh their probative value, see Fed. R. Evid. 403.  A Defendant's prior act will be relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Here, the existence of an enterprise is a fact of consequence, see 18 U.S.C. § 1959, so the Court generally will admit prior acts which tend to establish any of the following: (i) the existence of an enterprise; (ii) that is engaged in racketeering activity; and (iii) which affects interstate commerce, see United States v. Kamahele, 748 F.3d at 1003.  See also 18 U.S.C. § 1959(b)(2).  Further, as the United States must prove that the SNM has "longevity sufficient to permit those associated with [it] to pursue [its] purpose," United States v. Kamahele, 748 F.3d at 1003, the timeframe for relevant prior acts is relatively long, particularly considering that one of the Counts in the First Trial alleges behavior beginning in 2003, see Indictment at 13-14 (alleging that Baca violated 18 U.S.C. § 1959(a)(6), "starting in or about 2003, and continuing until or our about July 13, 2015," when he conspired to assault J.R. "for the purpose of gaining entrance to and maintaining and increasing [Baca's] position in" the SNM).

Even if evidence is relevant, the Court may exclude it if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Unfair prejudice "means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee notes.  See United States v. Rodriguez, 192 F.3d at 915 ("'Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment

as to his guilt or innocence of the crime charged.'" (quoting <u>United States v. Roberts</u>, 88 F.3d at 880). When balancing a piece of evidence's probative value against its danger of unfair prejudice, a court should "take account of the full evidentiary context of the case as the court understands it when the ruling must be made," and "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well." <u>Old Chief v. United States</u>, 519 U.S. at 182. Accordingly, "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk." <u>Old Chief v. United States</u>, 519 U.S. at 182-83. <u>See</u> Fed. R. Evid. 403 advisory committee notes (stating that, when "reaching a decision whether to exclude on grounds of unfair prejudice," one appropriate factor may be "[t]he availability of other means of proof"). <u>See</u> <u>also</u> Fed. R. Evid. 404(b) advisory committee notes ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403.").

Accordingly, the Court will weigh the probative value of each of the United States' proffered prior acts, in light of VICAR, against each act's prejudicial effect, with an eye towards the availability of alternative means of proof. Given the duration of the offenses alleged in the Indictment, and the United States' need to prove VICAR's enterprise element, the Court will overrule most of the Defendants' objections to the United States' proffered prior acts list. The Court acknowledges, however, that many of these acts' relevancy -- and, therefore, admissibility -- depends on whether the United States lays the necessary foundation at trial to connect the prior acts to the SNM enterprise. Further, "this is the kind of evidence that once it's out, you just can't

put it back in." Tr. at 222:19-21 (Court). Accordingly, to prevent prejudice to the Defendants at

trial, the Court will require the United States to give the Defendants, for each proposed prior act,

evidence establishing its connection to VICAR's enterprise element.

### A.    THE UNITED STATES GENERALLY MAY INTRODUCE SANCHEZ' PRIOR ACTS TO PROVE VICAR'S ENTERPRISE ELEMENT.

The United States arrived at a list of five of Sanchez' prior acts, which it seeks to introduce

at trial:

> In 2005, on multiple occasions, Christopher Garcia provided crack cocaine to another person, who in-turn gave the drugs to a correctional officer to smuggle into the prison. The crack cocaine was provided to SNM Gang members, to include Benjamin Clark and Daniel Sanchez.

> On or about November l4, 2005, while in the custody of NMCD, Daniel Sanchez attempted to murder rival gang member D.M. and stabbed him several times with a shank. Daniel Sanchez then assaulted a correctional officer with the weapon when the correctional officer attempted to intervene.

> On or about November 9, 2010, while in the custody of NMCD, Daniel Sanchez assaulted a correctional officer.

> In or about 2011, while in the custody of NMCD, Daniel Sanchez was given the "keys" to run the SNM Gang at the Penitentiary of New Mexico by SNM Gang leader Gerald Archuleta.

> In or about March 2014, while in the custody of NMCD, Daniel Sanchez called for the murder of SNM Gang member J.M. (this is charged in the second superseding indictment, U.S. v. DeLeon).

Second Sanchez Notice at 1-2. Sanchez objects that these acts constitute improper character

evidence and argues that "[t]hese alleged 'bad acts' cannot be used to show a defendant had a

propensity to commit the crime charged." Sanchez' Second Motion at 2 (citing United States v.

Moran, 503 F.3d at 1145). Sanchez further objects that, if the United States seeks to introduce

these acts under rule 404(b)(2), it must provide an "evidentiary hypothesis by which [Sanchez'

prior acts prove] a fact of consequence in this prosecution." Sanchez' Second Motion at 3. Finally,

Sanchez argues that, "even if the trial court determines that the other acts evidence satisfies the criteria for admission under Rule 404(b)," the prior acts are unfairly prejudicial and only minimally probative. Sanchez' Second Motion at 3. The United States responds that it "does not seek to put forward evidence of prior acts for propensity purposes . . . but rather to prove the existence of an enterprise and conspiracy in which the defendants all took part." Response at 1. "Specifically," the United States argues, "the prior act evidence is admissible as relevant as to the structure and hierarchy of the organization, serving as proof of the enterprise itself." Response at 3.

The prior acts are not character or propensity evidence. Instead, the prior acts are potential bases for the United States to prove VICAR's enterprise element. See, e.g., Tr. at 213:2-5 (Castellano). Accordingly, the Court evaluates each of the United States' proffered acts under rules 401 and 403.

The Court will admit evidence of the allegation that, in 2005, Sanchez received crack cocaine smuggled into prison by various SNM members. See Second Sanchez Notice at 1. The United States asserts that this act demonstrates SNM's racketeering activity of smuggling drugs into New Mexico's prison system, where it distributes drugs among its members to be sold in the prison population. See Transcript of Hearing at 129:16-130:5 (held January 26, 2018)(Court, Castellano), filed February 7, 2018 (Doc. 1759)("Jan. Tr."). The Court agrees that Sanchez' 2005 receipt of crack cocaine from a series of SNM members, originating from C. Garcia, is probative that the SNM is "engaged in racketeering activity," 18 U.S.C. § 1959(a), that the SNM is a "group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1959(b)(2). This act is also relevant to the SNM enterprise's longevity. See United States v. Kamahele, 748 F.3d at 1003. The risk of unfair prejudice to Sanchez does not substantially outweigh this act's probativeness. The act is unlikely to "provoke[] an emotional response in the jury or otherwise tend[] to affect

adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Rodriguez, 192 F.3d at 915.  Accordingly, the Court overrules Sanchez' objection to this prior act's admissibility.

The Court will also admit evidence of the allegation that, in November, 2005, Sanchez "attempted to murder rival gang member D.M. and stabbed him several times with a shank," and then "assaulted a correctional officer with the weapon when the correctional officer attempted to intervene."  Second Sanchez Notice at 1.  The United States asserts that this act demonstrates that the SNM enterprise is "a system ruled by threats and exertion of power and violence," which is "contained in the indictment."  Jan Tr. at 135:25-136:2 (Castellano).  Further, the United States alleges that the assault was SNM-related.  See Second Sanchez Notice at 1.  The Indictment alleges that the SNM, through its members, engaged in acts of violence "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  The 2005 assault is thus an overt act in furtherance of the SNM enterprise.  Further, given that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly," United States v. Smalls, 605 F.3d at 787, the Court overrules Sanchez' objection to the November, 2005, assault.

The Court will exclude the allegation that, on November 9, 2010, "Daniel Sanchez assaulted a correctional officer."  Second Sanchez Notice at 1.  The United States offers no evidence or foundation linking this assault to the SNM, or that Sanchez' SNM responsibilities motivated the assault.  Accordingly, the assault is not probative of VICAR's enterprise element, and the Court excludes it.

The Court will admit evidence of the allegation that, in 2011, Gerald Archuleta promoted Sanchez to an SNM leader at PNM.  See Second Sanchez Notice at 1.  The Indictment's allegation

of SNM's structure as a prison gang throughout New Mexico inherently requires that the SNM have different leaders at the different prisons who order criminal activities and sanction murder of certain individuals by members and associates in the same location as the victim and the leaders who ordered the hits. See Indictment at 1-2. Sanchez' leadership role is directly probative of the SNM's structure and how it acts through its members. See 18 U.S.C. § 1961(1). Accordingly, the Court overrules Sanchez' objections to this prior act. Finally, the Court admits the allegation that in March, 2014, Sanchez ordered Molina's murder. See Second Sanchez Notice at 1. Counts 6 and 7 specifically charge this act. See Indictment at 11-12.

### B.    THE UNITED STATES MAY GENERALLY ADMIT BACA'S PRIOR ACTS TO PROVE VICAR'S ENTERPRISE ELEMENT.

The United States arrived at a list of twenty-two prior acts which Baca allegedly committed:

On or about June 22, 1989, while in the custody of the NMCD, Anthony Ray Baca and another SNM Gang member murdered another inmate.

On or about December 15, 2009, while in the custody of the NMCD, Anthony Ray Baca possessed heroin.

On or about December 28, 2009, while in the custody of the NMCD, Anthony Ray Baca possessed heroin and attempted to destroy it when discovered by a correctional officer; other SNM Gang members obstructed the corrections officer.

Prior to March 2014, while in the custody of the NMCD, Anthony Ray Baca ordered the murder of SNM Gang member J.M., because the gang had paperwork indicating J.M. had cooperated with law enforcement (as charged in the second superseding indictment, U.S. v. DeLeon)

On or about October 22, 2015, Anthony Ray Baca said that he wanted K.S., from Las Cruces, hit because he was a suspected informant and owed SNM Gang member Carlos Hererra [sic] $800 for drugs (part of the charged conduct in the second superseding conduct, U.S. v. DeLeon).

On or about October 22, 2015, Anthony Ray Baca[] said that SNM member Benjamin Clark, a.k.a. "Cyclone," had provided Anthony Ray Baca with Suboxone.

Anthony Ray Baca complained that the drugs provided had been "short," resulting in other SNM Gang members not receiving their share of the drugs. A dispute within the SNM resulted, and SNM member L.M., a.k.a. "Psycho," was hit by SNM member A.E., a.k.a "Ace" (part of the charged conduct in the second superseding indictment, U.S. DeLeon).

On or about October 22, 2015, Anthony Ray Baca[] said that SNM member Carlos Hererra [sic] and J.R., a.k.a. "BB" had made mistakes and both members would be hit (part of the charged conduct in the second superseding indictment, U.S. v. DeLeon).

On or about October 23, 2015, Anthony Ray Baca[] said that he approved the SNM Gang hit on D.S. (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 23, 2015, Anthony Ray Baca said that he had ordered SNM membe3rs in Las Cruces to hit rivals. SNM member J.B. . . . hit a Burqueño and asked Anthony Ray Baca if he could be rewarded with a purple heart (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 23, 2015, Anthony Ray Baca said that Victim J.M. and SNM member Jerry Montoya were close friends. Anthony Ray Baca told Montoya that he needed to hit J.M. (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 24, 2015, Anthony Ray Baca[] said that SNM member R.B. was an informant, and he ordered SNM members F.Q., a.k.a. "Football Fred," and Leonard Lujan to hit him (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 24, 2015, Anthony Ray Baca[] said that it would be best to hit NMCD officials D.S. and A.V. because they were the ones telling G.M. lies about the SNM Gang (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 24, 2015, Anthony Ray Baca[] said he is sure he wanted the NMCD officials hit and said the worst thing that could happen to the gang is that they would be sent out of state (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about October 24, 2015, Anthony Ray Baca[] said that he wanted research to be done on where NMCD officials lived. Anthony Ray Baca said that it would be easier to hit the NMCD officials if they lived off the prison grounds (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 11, 2015, while in the custody of NMCD, Anthony Ray Baca participated in a recorded conversation with his girlfriend, where he advised his girlfriend to pass a message to another SNM Gang member to have an inmate killed. Anthony Ray Baca also instructed his girlfriend to smuggle narcotics to him in the prison so that he could distribute them to other inmates and told his girlfriend to pass a message to another SNM Gang member about an alliance between the SNM Gang and the Sureños Gang (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 11, 2015, Anthony Ray Baca requested Christopher Garcia to assist the SNM Gang in a mission (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 15, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss the acquisition of firearms for the SNM Gang. Christopher Garcia agreed to obtain a couple of guns and said that [he] already had firearms on hand (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 18, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he would plant a firearm at a secret location to be retrieved by another SNM Gang member (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 19, 2015, while in the custody of NMCD, Anthony Ray Baca ordered another SNM Gang member to threaten the family of a cooperating witness in a murder investigation (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 26, 2015, Christopher Garcia and Anthony Ray Baca used coded language to discuss a firearm that was to be provided to another member of the SNM Gang (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 29, 2015, Christopher Garcia supplied another person with a firearm to be used in the murder of G.M., according to the instructions of Anthony Ray Baca (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

On or about November 30, 2015, Christopher Garcia used coded language to tell Anthony Ray Baca that he had provided a gun to another member of the gang to be used on the mission to kill G.M. (part of the charged conduct in the Second Superseding Indictment, U.S. v. DeLeon).

Second Baca Notice at 1-3.

Of these twenty-three acts, Baca objects to nine.  See Jan. Tr. at 177:18-20 (Duncan).  Baca first objects to the allegation that, on June 22, 1989, Baca murdered another inmate.  See Jan. Tr. at 177:22-24.  The United States asserts that Baca committed the murder with another inmate, but cannot articulate the other inmate's identity or gang affiliation.   See Jan. Tr. at 178:17-20 (Castellano).  The United States also refers to a conversation between Baca and an SNM member, in which Baca discusses the 1989 murder, see Jan. Tr. at 178:18-21 (Castellano), and describes that "this is one gang member telling another gang member that someone disrespected him, and he killed him over it," Jan Tr. at 179:24-180:2 (Castellano).  Baca responds that, without more evidence linking the 1989 murder to the SNM, the murder is "just pure 404(b) to show that he's a violent person."  Jan. Tr. at 180:19-21 (Duncan).  The Court agrees with Baca.  Without anything more to tie the 1989 murder to the SNM, the 1989 murder is only minimally probative and substantially prejudicial.  Accordingly, the Court excludes the 1989 murder.

Baca also challenges the allegation that, in 2009, Baca possessed heroin.  See Jan. Tr. at 182:13-15 (Duncan).  Baca argues that this allegation "has no relevance to a fact in dispute in this case" and is "just intended to portray Mr. Baca as a bad person, as someone who uses drugs."  Jan. Tr. at 182:17-22 (Duncan).  The Court is concerned with an overly sanitized depiction of Baca in this case, especially given the alleged importance of drugs and trafficking in the SNM enterprise, but the Court agrees with Baca.  Without more tying this specific instance of drug use to the SNM, this allegation is not relevant to the SNM enterprise's existence or purpose.

Next, Baca challenges the allegation that, in 2009, correctional officers entered his cell to confiscate drugs, but other SNM members interfered until Baca told them to stand down.  See Jan. Tr. at 186:3-9 (Duncan).  The United States asserts that this is an instance of Baca's leadership role and demonstrates SNM's internal hierarchy.  See Jan. Tr. at 185:6-13 (Castellano).  The Court

agrees with the United States. This incident demonstrates the role of drugs in the SNM as well as the SNM's command structure. Accordingly, the Court admits the December 28, 2009, allegation.

Baca objects to the admission of the allegation that, on October 22, 2015, Baca ordered a hit in Las Cruces against an inmate whom he suspected was an informant and who owed Herrera money for drugs. See Jan. Tr. at 187:7-12 (Duncan). Baca argues that the United States' evidence of this incident is weak and that the allegation is "really prejudicial, and it's not incredibly probative." Jan. Tr. at 187:17-20 (Duncan). The United States asserts that this incident is probative because "there is talk of informants and hits and drug debts. Those are all SNM activity." Jan. Tr. at 187:23-25 (Castellano). "It would also refer to racketeering activity, because any murders or attempts to murder or conspiracies to murder would be racketeering activity, in addition to drug trafficking." Jan. Tr. at 188:5-9 (Castellano). The Court will admit this allegation. The allegation is sufficiently probative of the United States' theory of the SNM enterprise to merit admission.

Baca next objects to the allegation that, on October 22, 2015, Defendant Benjamin Clark gave drugs to Baca, who complained that the drugs were not enough, which resulted in one SNM member "hitting" another. Jan. Tr. at 188:13-19 (Duncan). Baca disputes the reliability of the United States' evidence: "It's not Mr. Baca ordering this . . . . He's just telling Duran something that happened in prison." Jan. Tr. at 189:3-6 (Duncan). "This is really a prior bad act for [Clark], not for Anthony Ray Baca." Jan. Tr. at 189:9-11 (Duncan). The United States argues that "Baca is laying out the rules of the game" and what happens when an SNM member violates those rules. Jan. Tr. at 189:22-190:3 (Castellano). The Court overrules Baca's objection. This incident is probative of the SNM enterprise and its purpose, and minimally prejudicial against Baca, who, as Baca acknowledges, did not order the hit.

Baca also objects to the admission of an allegation that Baca told an informant that two other SNM members "made mistakes and both members would be hit." Jan. Tr. at 191:1-5 (Duncan). Baca asserts that this allegation is "dragging Mr. Baca into other people's actions and seeking to hold those actions against him unfairly." Jan. Tr. at 191:15-18 (Duncan). The United States argues that this allegation "goes to the association-in-fact enterprise and relationships among those associated with the enterprise." Jan. Tr. at 191:24-192:1 (Castellano). The Court overrules the objection, as the United States alleges that the SNM is an enterprise-in-fact, which requires the United States to prove the SNM's "purpose, [and demonstrate] relationships among those associated with the enterprise." Boyle v. United States, 556 U.S. at 946. This incident is probative of the SNM's purpose to control the prison system through its members, and the repercussions for members' violation of the enterprise's rules.

Baca next objects to the allegation that, in October, 2015, Baca ordered two SNM members to kill an informant. See Jan. Tr. at 193:10-13 (Duncan). Baca argues that, in the cited conversation, he describes how SNM member Angel DeLeon ordered the hit. See Jan. Tr. at 193:16-19 (Duncan). The United States disagrees and asserts that Baca ordered this murder. See Jan. Tr. at 194:20-22 (Castellano). The Indictment alleges violations of 18 U.S.C §§ 1512 and 1513, which prohibit witness tampering. See Indictment at 18. Further, the United States alleges that this incident is an overt act in furtherance of the enterprise, which it will prove at trial. See Jan. Tr. at 194:20-24 (Court, Castellano). The Court overrules the objection, as the allegation constitutes an overt act in furtherance of the enterprise and is probative of the Indictment's allegations.

Baca also objects to the allegation that in November, 2015, Baca advised his girlfriend to convey a hit on another SNM member and directed her to smuggle narcotics to Baca in prison.

<u>See</u> Jan. Tr. at 195:20-24 (Duncan).  Baca asks that "this be excluded based on its incredible prejudicial value and its low relevancy to the allegations in this case."  Jan. Tr. at 196:4-7 (Duncan).  For the same reasons, Baca objects to the admission of the allegation that, in November, 2015, Baca ordered another SNM member to threaten a cooperating witness' family in connection with that witness' cooperation in this matter.  <u>See</u> Jan. Tr. at 196:8-13 (Duncan).  The Court overrules those objections.  The United States alleges that the SNM generates income by smuggling drugs into New Mexico's prison system, and that Baca is an SNM leader "who directed or delegated the power to direct other members of the enterprise to carry out unlawful activities in furtherance of the" SNM enterprise.  Indictment ¶ 10, at 5.  <u>See</u> Indictment ¶ 12, at 6.  Similarly, threatening the witnesses in this prosecution is illustrative of the United States' allegation of one of the SNM's main rules -- never cooperate with law enforcement -- and the SNM's treatment of its members who violate this rule.  This evidence is further probative of the enterprise element and of racketeering activity.

Accordingly, the Court grants in part and denies in part Baca's First Motion.

## C.    THE UNITED STATES MAY INTRODUCE BOTH OF HERRERA'S PRIOR ACTS.

The United States narrowed Herrera' prior acts to two: "(1) on June 30, 2006, possession of a shank and assault on a corrections staff member[; and] (2) on February 1, 2011, an attempt to introduce drugs into the facility."  Herrera's Renewed Motion at 1.  Herrera argued that these acts' timing and lack of connection with the SNM render them irrelevant and overly prejudicial.  <u>See</u> Jan. Tr. at 170:3-23 (Maynard).

For the first act, the United States argued that Herrera's assault on a correctional officer is "consistent with [its] theory about violence in the SNM and corrections officers."  Jan. Tr. at 171:7-11 (Castellano).  The United States also argued that Herrera, in the subsequent NM Corrections

Department disciplinary proceedings, listed an SNM member as his advocate.  <u>See</u> Jan. Tr. at 171:13-18 (Castellano).  The United States also argues that the first act is illustrative of SNM's use of shanks.  <u>See</u> Jan. Tr. at 172:15-18 (Castellano).  The Court will admit the allegation.  The United States alleges that, as part of its racketeering activity, SNM expects its members to be always armed in prison to maintain its intimidation of correctional officers and other inmates.  <u>See</u> Indictment at 5.  Herrera's possession of a shank and use of it on a correctional officer is probative of the United States' allegation of SNM's racketeering methods, and Herrera's choice of another SNM member to represent him in a subsequent disciplinary hearing illustrates the enterprise members' relationships with each other.

For the second act, the United States alleges that Herrera was a key player in the smuggling the and trafficking of drugs in New Mexico's prison system.  <u>See</u> Indictment at 6-7.  Herrera's attempt to smuggle drugs into a prison facility is highly probative of that allegation, and the indictment directly charges this act.  Accordingly, the Court admits that act, and denies Herrera's Renewed Motion.

### D.    THE UNITED STATES MAY NOT ADMIT PEREZ' THREE PRIOR ACTS.

The United States arrived at a list of three prior acts for Perez:

l.      On or about December 30, 2005, Rudy Perez committed assault and resisting.

2.      On or about February 14, 2006, Rudy Perez committed aggravated battery.

3.      On or about June 6, 2010, while in the custody of NMCD, Rudy Perez attempted to incite other inmates to become disruptive by throwing food and trash on the floor.

Second Perez Notice at 1.  Perez generally objects to these acts' admission as improper character evidence.  <u>See</u> Perez' Second Motion at 1-3.

Perez asserted that the first two acts are insufficiently related to the SNM, as Perez was "allegedly validated in the SNM sometime in 2009." Jan. Tr. at 137:11-16 (Villa). Perez also argues that these acts are misdemeanors and so inadmissible under rule 609 of the Federal Rules of Evidence. See Jan. Tr. at 137:17-23 (Villa). The Court agrees with Perez on the first two acts. Absent any connection between Perez' arrests and the SNM, the arrests have no probative value for the SNM as an enterprise. Accordingly, the Court excludes the first two acts.

Perez offered the same objection to the third act. See Jan. Tr. at 140:9-12 (Villa). The United States argued that it will offer testimony that SNM members seek to disrupt the prison system and interfere with correctional officers when they "get upset" at certain disciplinary sanctions. Jan. Tr. at 140:23-141:4 (Castellano). The United States acknowledged, however, that the inmates whom Perez incited were not SNM members. The Court accordingly excludes the third act. Although Perez may have been a validated SNM member at the time, see Jan. Tr. at 137:11-14 (Villa), not every act by an SNM member is probative of the SNM as an enterprise. Accordingly, the Court grants Perez' Second Motion, and his Renewed Motion.

The Court reminds the United States to approach the bench during trial before it admits the Defendants' prior acts so the Court can determine whether the United States has laid the proper foundation to tie each of these acts to the SNM enterprise. Once the United States rings the bell with many of these prior acts, it is difficult to unring it. Accordingly, to prevent the prejudice that could result from erroneous introduction of prior acts, the United States must, as agreed upon at the January Hearing, see Jan. Tr. at 176:15-25 (Court, Castellano), approach the bench and describe the evidentiary basis linking the prior acts with the SNM enterprise.

### E. THE UNITED STATES MAY ADMIT EVIDENCE OF PRIOR ACTS DEMONSTRATING B. GARCIA'S LEADERSHIP POSITION WITHIN THE SNM.

The United States informed the Court and B. Garcia that it would not seek to admit most of the acts in the First B. Garcia Notice. See April 4 Tr. at 63:1-9 (Castle, Armijo). The United States wishes to admit three of B. Garcia's prior bad acts. See April 4 Tr. at 63:7-11 (Castle). First, the United States seeks to admit evidence of the allegation that, between 1993 and 1998, B. Garcia admitted several people into the SNM. See April 4 Tr. at 73:18-21 (Castle). This incident is plainly probative of both B. Garcia's SNM membership and status, as well as of the SNM's structure and hierarchy. See United States v. Diaz, 176 F.3d at 79. Accordingly, the Court will admit evidence of this allegation at trial.

Next, the United States wishes to admit evidence of the allegation that, on March 14, 1999, B. Garcia resisted a correctional officer, who then sprayed mace at B. Garcia. See April 4 Tr. at 70:21-24 (Castellano). The United States asserts that this incident involves eleven inmates acting in solidarity, six of whom were SNM members. See April 4 Tr. at 72:24-72:2 (Castellano). The United States further argues that this incident is probative enterprise evidence which demonstrates that the SNM coordinates its opposition against correctional officers. See April 4 Tr. at 72:24-72:2 Castellano). B. Garcia contends that this incident "has no connection whatsoever to the SNM at all," such that the allegation "is clearly just character evidence designed to make him look obstreperous." April 4 Tr. at 68:11-17 (Castle). The Court concludes that evidence of this incident is admissible as evidence of the SNM's coordinated resistance against correctional officers, and is therefore relevant to the SNM's existence as an association-in-fact as well as to its purposes and methods. See United States v. Kamahele, 748 F.3d at 1003. The Court directs the United States to approach the bench at trial before attempting to admit evidence of this incident so it can assure the Court and B. Garcia that it has sufficient evidence linking the incident to the SNM.

Specifically, the Court will look at how many of the involved inmates were SNM members to determine the incident's connection to the SNM.

Finally, B. Garcia objects to admitting the allegation that, in 1999, B. Garcia murdered Bobby Ortega.  See April 4 Tr. at 74:14-18 (Castle).  The United States informed B. Garcia of its theory that B. Garcia, as an SNM leader, ordered other SNM members to murder Ortega.  See April 4 Tr. at 75:2-5 (Castle).  B. Garcia objects, first, to that act's absence on the First B. Garcia Notice.  See April 4 Tr. at 75:9-11 (Castle).  The Court observes that, on a defendant's request, the United States must give advance notice of extrinsic evidence that it seeks to admit under rule 404(b).  See Fed. R. Evid. 404(b).  No such notice is required, however, to admit prior acts which are admitted for another, non-404(b) purpose, such as to prove VICAR's enterprise element.  See United States v. DeLeon, No. CR 15-4268 JB, 2018 WL 4279442, at *2 (D.N.M. April 18, 2018)(Browning, J.)("The Court does not believe that enterprise evidence is subject to rule 404(b)(2)'s notice requirement in a criminal case.").  As the United States seeks to admit B. Garcia's involvement in the Ortega murder as enterprise evidence and not under rule 404(b), this incident's absence on the First B. Garcia Notice does not bar its admission at trial.  The Court agrees with the United States that the 1999 murder is admissible as enterprise evidence.  See United States v. Guerrero, 882 F. Supp. 2d at 492.  The Court admonishes the United States, however, to quickly produce its evidence tying the 1999 murder to the SNM.  Accordingly, the Court overrules B. Garcia's objections to the First B. Garcia Disclosure.

###    F.    THE UNITED STATES GENERALLY MAY ADMIT TROUP'S PRIOR ACTS, PROVIDED THAT IT ESTABLISHES EACH ACT'S CONNECTION TO THE SNM.

The United States agreed at the March 14 hearing to forgo the bulk of the alleged acts on the First Troup Notice.  See March 14 Tr. at 262:3-11 (Court, Armijo).  Troup first contests the

allegations that, between March 7, 1994, and December 4, 1995, Troup used shanks to assault three other inmates.  See March 14. Tr. at 275:9-21 (Court, Burke, Armijo). Troup argues that these incidents were not "part of the SNM enterprise," and that, instead, "it was a personal beef at the Northern New Mexico Correctional Facility" over heroin.  March 14 Tr. at 257:23-258:1 (Burke).  At the March 14 hearing, the United States could not verify when Troup joined the SNM. See March 14 Tr. at 259:13-16 (Armijo).  The United States nonetheless asserts that these incidents "go[] to the heart of a lot of SNM activity," because, in the United States' theory of the SNM, "a lot of things can be both personal and SNM-related."  March 14 Tr. at 259:6-11 (Armijo).  The United States accordingly argues that this incident "is typical of what the SNM activities are," "even if [Troup] was not validated [as an SNM member] at the time."  March 14 Tr. at 259:13-16 (Armijo).  The Court conditionally excludes evidence of this incident.  While assaulting other inmates with shanks may be typical SNM activity, Troup may not have been an SNM member at the time.  The Court concludes that these acts' relevancy -- and, consequently, their admissibility -- is dependent on the United States' proof of when Troup joined the SNM.  See Fed. R. Evid. 104. Accordingly, the Court will exclude these acts unless the United States proves that Troup joined the SNM around 1994 or 1995, or it can lay foundation that Troup did these assaults to gain entrance into and/or further or maintain his position, within the SNM.  See 18 U.S.C. 1959(a).

Troup next argues against admitting the allegations that, on January 28 and March 25, 2010, Troup threatened correctional officers.  See March 14 Tr. at 270:10-19 (Burke).  At the March 14 hearing, the United States justified these acts' admission by asserting that Troup was an SNM member at the time.  The Court will exclude evidence of these acts absent further evidence tying them to the SNM.  Mere membership in an enterprise is insufficient to justify the admission of every act the member commits.  See United States v. Biswell, 700 F.2d at 1319.

Alternatively, the Court will admit evidence of the allegation that, on May 24, 2011, Troup spoke with another SNM member about intimidating correctional officers into allowing other SNM members into bringing drugs into prison.  See March 14. Tr. at 274:4-7 (Court).  This incident is tied to the SNM, is reflective of SNM purposes, and is evidence of racketeering activity. See 18 U.S.C. § 1961(1) (defining "racketeering activity" in part as "any act or threat . . .  dealing in a controlled substance").

### G.    THE UNITED STATES MAY ADMIT EACH OF PATTERSON'S PRIOR BAD ACTS, PROVIDED THAT IT ESTABLISHES EACH ACT'S CONNECTION TO THE SNM.

Patterson seeks to exclude each of his prior bad acts.  See March 14 Tr. at 278:13-18 (Court, Lahann).  Patterson first objects to the allegation that, on December 28, 2000, he threatened a correctional officer.  See March 14 Tr. at 278:18-20 (Lahann).  Patterson argues that the incident occurred when he was delirious and suffering from a bladder infection, and that the allegation refers to comments he made to a correctional officer in attempt to see a doctor.  See March 14 Tr. at 278:20-23 (Lahann).  Patterson accordingly asserts that the incident is unrelated to the SNM. See March 14 Tr. at 279:1-2 (Lahann).  The United States argues that its witnesses will testify that, around the time of this allegation, the SNM was engaged in a coordinated resistance effort against correctional officers, and that Patterson's characterization of this incident would be a defense to the testimony of the United States' witnesses.  See March 14 Tr. at 279:5-10 (Armijo).  The Court will admit the allegation, provided that the United States can demonstrate, at trial, that the SNM's resistance campaign was contemporaneous with this incident.  The same logic holds for the allegation that, on October 4, 2001, Patterson threatened a correctional officer.  If the United States can establish through its witnesses' testimony that the SNM's coordinated resistance effort against correctional officers coincided with that incident as well, then both incidents are probative of the

SNM as an enterprise-in-fact, as well as of its methods for organizing against and resisting correctional officials. See Boyle v. United States, 556 U.S. at 946.

Finally, Patterson objects to admitting the allegation that, on October 4, 2016, Patterson and two SNM members shouted "Rat! Rat!" at co-Defendants Armenta and Clark, United States cooperating witnesses, as they left the courtroom. March 14 Tr. at 284:1-11 (Court, Lahann, Armijo). Patterson asserts that, because the United States has produced no evidence showing -- and Patterson's disciplinary history does not reflect -- that Patterson participated in SNM activities, this incident is irrelevant to the SNM as an enterprise. See March 14 Tr. at 286:7-10 (Lahann). The Court will allow this allegation's admission at trial. The Indictment alleges that the SNM coordinates attacks and intimidation against its members who cooperate with or otherwise assist law enforcement. See Indictment ¶¶ 5-14, at 3-8. Patterson's apparent inactivity from 2001 to 2016 does not diminish this incident's probativeness, as "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." Boyle v. United States, 556 U.S. at 948. Accordingly, the Court will permit the United States to admit each of Patterson's prior bad acts, provided that it establishes each act's connection to the SNM.

**H.    THE UNITED STATES MAY ADMIT THE ALLEGATIONS PERTAINING TO CHAVEZ' USE OF SHANKS, BUT MAY NOT ADMIT SPECIFIC INSTANCES OF HIS DRUG USE AND TRAFFICKING, PROVIDED THAT CHAVEZ DOES NOT CONTEST THAT HE USED AND TRAFFICKED IN DRUGS.**

At the March 16, 2018, hearing, the United States stipulated that it would not seek to introduce most of the acts on the First Chavez Notice. See March 16 Tr. at 46:18-20 (Granberg). The United States wishes to admit five acts from the First Chavez Notice, plus three more. See March 16 Tr. at 48:1-11 (Granberg, Court, Armijo). Chavez asserts that allegations of his drug use are irrelevant, because drug use is so rampant in New Mexico's prisons that his drug use is not

unique to or indicative of any SNM activities.  <u>See</u> March 16 Tr. at 50:20-51:4 (Granberg).  The

parties agreed, however, that, if Chavez stipulates that he used and trafficked in drugs, the United

States will not admit specific instances of such use and trafficking.  <u>See</u> March 16 Tr. at 53:4-10

(Armijo).  The Court notes that Chavez' stipulation does not mean that the United States may not

properly admit evidence of Chavez' prior drug use.  <u>See</u> <u>Old Chief v. United States</u>, 519 U.S. at

174.  "The fact to which the evidence is directed need not be in dispute."  Fed. R. Evid. 401,

advisory committee notes.  Nonetheless, the Court retains discretion under rule 403 to exclude

evidence on the basis of cumulativeness and waste of time, <u>see</u> Fed. R. Evid. 403, and the Court

will exercise this discretion with Chavez' stipulation in mind.  Should the United States' evidence

of Chavez' drug use become cumulative, it will consider any objections Chavez might raise as to

such evidence's cumulativeness.

Chavez also objects to the allegation that he brought a shank to the courthouse in this case's

proceedings.  <u>See</u> March 16 Tr. at 54:5-7 (Granberg).  Chavez asserts that the shank was not his,

and that another Defendant left the shank in his cell.  <u>See</u> March 16 Tr. at 54:9-12 (Granberg).  The

Indictment alleges that the SNM expects its members to be always armed with shanks.  <u>See</u>

Indictment ¶¶ 12-14, at 6-8.  This incident is thus probative of the SNM's means and methods, as

well as of its racketeering activity.  The Court will permit this incident's admission at trial.

I.     **THE UNITED STATES MAY ADMIT EACH OF C. GARCIA'S PRIOR ACTS AS ENTERPRISE EVIDENCE, BUT THE COURT WILL EXCLUDE SPECIFIC INSTANCES OF C. GARCIA'S DRUG USE IF C. GARCIA DOES NOT CONTEST THAT HE USES DRUGS.**

C. Garcia argues that his prior bad acts are inadmissible because they are unfairly

prejudicial and minimally probative, and because a majority of those acts is derived from hearsay

statements.  <u>See</u> Dec. 20 Tr. at 113:12-15 (Sirignano).  C. Garcia directs his specific challenges,

however, to each allegation pertaining to his drug use and trafficking.  <u>See</u> Dec. 20 Tr. at 124:15-

19 (Sirignano). The Court will take the same approach to those allegations as it has with the other Defendants -- if C. Garcia does not contest his drug use and trafficking at trial, the United States need not admit specific allegations of his drug use and trafficking. The Court observes that several of the allegations on the First C. Garcia Notice are relevant to the SNM enterprise's racketeering and drug trafficking activities, and that some of these allegations may become admissible under rule 404(b) should C. Garcia argue that he did not traffic in narcotics for the SNM. See Fed. R. Evid. 404(b) (allowing specific acts, among other purposes, to show lack of knowledge, intent, or lack of mistake). The Indictment charges C. Garcia with conspiring to murder the New Mexico Secretary of Corrections, as well as with possessing a firearm as a felon. See Indictment at 14-15. C. Garcia's drug prior drug trafficking, however, is relevant to -- and thus admissible to prove -- the SNM as an enterprise. Further, C. Garcia's drug trafficking is not more prejudicial than the acts with which he is charged, rendering evidence of his trafficking admissible under rule 403's balancing test. See United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999). The Court will defer ruling on the allegations of C. Garcia's drug trafficking until trial, however, so it can ascertain whether C. Garcia's defense strategy renders those allegations relevant as rebuttal evidence.

**J.     THE UNITED STATES MAY NOT ADMIT J. GALLEGOS' PRIOR ACTS, PROVIDED THAT J. GALLEGOS DOES NOT CONTEST HIS DRUG USE AND TRAFFICKING.**

The United States agreed at the April 4 hearing to forego the admission of the bulk of the alleged acts on the First Gallegos Notice. See April 4 Tr. at 102:15-103:17 (Court, Armijo, Benjamin). The United States wishes to admit, however, evidence of several instances in which J. Gallegos either used, possessed, or trafficked drugs. See April 4 Tr. at 103:14-17 (Armijo). The Court proposed, and J. Gallegos agreed, that if J. Gallegos stipulates to his prior use and trafficking of drugs, the United States will not need to introduce specific instances of such conduct at trial.

See April 4 Tr. at 106:1-4 (Benjamin).  Accordingly, if J. Gallegos does not contest his drug use

and behavior at trial, those aspects of J. Gallegos' SNM membership will not be at issue, and

evidence of specific instances of J. Gallegos' trafficking and use of drugs will be unnecessary.

The Court notes that J. Gallegos' stipulation does not mean that the United States may not properly

admit evidence of J. Gallegos' prior drug use.  See Old Chief v. United States, 519 U.S. at 174.

"The fact to which the evidence is directed need not be in dispute."  Fed. R. Evid. 401, advisory

committee notes.  Nonetheless, the Court retains discretion under rule 403 to exclude evidence on

the basis of cumulativeness and waste of time, see Fed. R. Evid. 403, and the Court will exercise

this discretion with J. Gallegos' stipulation in mind.

Next, the United States seeks to admit evidence of the allegation that, on December 8,

1996, J. Gallegos bribed and intimidated a witness.  See April 4 Tr. at 109:14-16 (Benjamin).  J.

Gallegos argues that this incident involved his attempt to protect a family member rather than to

serve the SNM.  See April 4 Tr. at 110:8-11 (Benjamin).  The United States argues that this incident

is admissible under rule 404(b), because J. Gallegos is charged in this case with witness

intimidation.  See April 4 Tr. at 111:1-5 (Armijo).  The Court observes, however, that the United

States' theory of J. Gallegos' SNM membership asserts that he joined the SNM around 2001.  See

April 4 Tr. at 107:1-3 (Armijo).  The December 8, 1996, incident could be admissible under rule

404(b).  Evidence that a defendant previously tampered with witnesses or otherwise obstructed

justice is often admissible, under rule 404(b), to show the defendant's intent to obstruct justice in

the present matter.  See, e.g., United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997); United

States v. Moree, 897 F.2d 1329, 1335 (5th Cir. 1990).  The Court will nonetheless exclude the

December 8, 1996, allegation as being too remote and therefore insufficiently connected with

present SNM activity to be sufficiently probative.  This allegation occurred at least five years

before J. Gallegos allegedly joined the SNM and is thus "too remote in time to have probative

value even as to the element of intent."  Hale v. United States, 406 F.2d 476, 480 (10th Cir. 1969).

## II.   THE UNITED STATES MAY IMPEACH THE DEFENDANTS' CHARACTER WITNESSES WITH QUESTIONS OF OVERT ACTS, BUT MAY NOT USE HYPOTHETICALS TO ALLUDE TO THE ALLEGATIONS IN COUNTS 6-12.

Baca's Second Motion requests that the Court prohibit the United States "from using

guilt-assuming questions as part of any cross-examination of a defense character witness."  Baca's

Second Motion at 3.  Baca spends much of his Second Motion arguing against the introduction of

character and propensity evidence, see Baca's Second Motion at 1-3, but the United States

confirmed that it will introduce none of its evidence under rule 404(b) of the Federal Rules of

Evidence, see Tr. at 268:5-18 (Court, Castellano).  There is so much bad acts evidence that the

United States has generally not needed 404(b) evidence at trial.  If the evidence does not go to an

element -- enterprise or racketeering -- it serves no such purpose.  Accordingly, Baca's main request

is that the Court prohibit the United States from asking "hypothetical questions that assume[]

guilt."  Baca's Second Motion at 3.

Baca relies heavily on United States v. Polsinelli, 649 F.2d at 796-97.  In United States v.

Polsinelli, the Tenth Circuit reversed a defendant's drug-distribution conviction after the

prosecution asked the defendant's character witness whether his opinion about the defendant

would change if the witness knew the defendant had distributed drugs.  See 649 F.2d at 796.  The

defendant called his "86-year old grandmother," a priest, and a family friend to testify to their

knowledge of the defendant's "community reputation for honesty, truthfulness, veracity, and

integrity."  649 F.2d at 794.  On cross-examination, the prosecution asked the witnesses whether

their opinion would change "if you became aware that Mr. Polsinelli had on at least two occasions

distributed ounce quantities of cocaine," which "obviously refer[ed] to" the allegations at issue in the case. 649 F.2d at 794. In reaching its conclusion, the Tenth Circuit noted:

> "The nature of the question was a far cry from any concept of formulated community opinion. Rather, the questions posed sought speculative responses resting upon an assumption of guilt. Government counsel asked if [the defendant's] reputation would be affected if he were convicted of the alleged crime. These hypothetical questions struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial. We think that the risk of questions put have no place in a criminal trial."

649 F.2d at 796 (quoting United States v. Candelaria-Gonzalez, 547 F.2d 291, 294 (5th Cir. 1977)). Relying on United States v. Polsinelli, Baca asks that the Court prohibit the United States from asking "guilt-assuming questions" of any Defense character witnesses.

Rule 404(a)(2)(A) permits the United States to rebut a defendant's evidence concerning his or her character. See Fed. R. Evid. 404(a)(2)(A). Rule 405 provides:

> (a) . . . When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.
>
> (b) . . . When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

Fed. R. Evid. 405. The United States is correct that, if Baca or the other Defendants first open the door by presenting evidence of their character, it may rebut that character evidence. See Fed. R. Evid. 404(a)(2). If Baca or the other Defendants introduce evidence through witness testimony of their character for peacefulness, the United States is not left to rely solely on competing character witnesses. Rule 405(a) states: "On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." Fed. R. Evid. 405(a). Consequently, if the Defendants introduce character witnesses to testify to their peacefulness, the United States may, on cross-examination, ask those witnesses about the prior

incidents it has proffered for each of the defendants.  The Court agrees with Baca that, per United States v. Polinelli, the United States cannot ask the character witnesses whether, for example, their opinion of Baca would change if they knew he ordered the murders of NM Corrections Department officials.  The United States could, however, ask if their opinion would change if, say, they knew Baca had assaulted a correctional officer in 2001.  Accordingly, the Court grants in part and denies in part Baca's Second Motion.  Should the Defendants offer character witnesses, the United States may rebut those witnesses on cross-examination by asking about specific instances of the Defendants' conduct, but the United States may not allude to the conduct charged in Counts 6-12.

## III.    THE UNITED STATES MAY ADMIT ACTS PERTAINING TO COUNTS OTHER THAN COUNTS 6-12 TO PROVE THE ALLEGATIONS IN COUNTS 6-12.

The Court determines that the evidence which the United States will use to prove the Allegations in Counts 1-5 are admissible to show Sanchez, Baca, Herrera, and Perez committed the VICAR offenses in Counts 6-12.

The Defendants ask that the Court "exclude any references to and evidence of enterprise acts pertaining to allegations other than the charges in Counts 6-12 of the Indictment, as unrelated acts are not relevant to the charges in this trial and are otherwise prejudicial."  Perez' First Motion at 1.  The Defendants argue that "the only relevant racketeering activity is that which occurred 'during the time period relevant to the indictment.'"  Perez' First Motion at 2 (quoting United States v. Pimentel, 346 F.3d at 299.  The Defendants define relevance here as the time period in which the acts alleged in Counts 6-12 occurred.  See Perez' First Motion at 2.  The Defendants

further argue that, even if evidence pertaining to the other Counts is relevant, such evidence would be "'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Perez' First Motion at 3 (quoting Fed. R. Evid. 403).

As discussed above, to prevail on Counts 6 and 7, the United States must prove more than that the Defendants conspired to murder and murdered Molina. To prevail on Counts 9-10, the United States must prove more than that the Defendants conspired to murder Santistevan and Marcantel. It must also prove that the Defendants committed those offenses for a specific purpose that RICO and VICAR prohibit. The best way to prove that the SNM was engaged in racketeering activity when most of the conduct charged in Counts 6-12 occurred, i.e., in 2014 and 2015, is to introduce evidence of roughly contemporaneous instances of racketeering activity in which the SNM engaged, such as the several prior acts which the United States seeks to introduce.

Proving VICAR and RICO elements "may well entail evidence of numerous criminal acts by a variety of persons," even when "each defendant in a RICO case may reasonably claim no direct participation in some of those acts." United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). "Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant." United States v. DiNome, 954 F.2d at 843. Some of these acts may not constitute apparent racketeering activity. The Court notes that the conduct charged in Count 8, for example, does not constitute racketeering activity, and there is no apparent relationship between that conduct and the racketeering activity that Counts 9 and 10 allege. See Indictment at 13-14 (alleging that, "[s]tarting in or about 2003, and continuing until on or about July 13, 2015," various Defendants violated VICAR by conspiring to "commit assault resulting in serious bodily injury to J.R."). Nor does the conduct charged in Counts 11-12 constitute racketeering, and there is no immediately apparent relationship between that conduct and the racketeering activity alleged in Counts 6 and

7.  Count 8 conduct is, nevertheless, relevant to Counts 8 and 9, and the conduct that Counts 11 and 12 allege is relevant to Counts 6 and 7, because an SNM-related conspiracy that lasted for over a decade indicates that the SNM enjoys "longevity sufficient to permit those associated with [it] to pursue [its] purpose." United States v. Kamahele, 748 F.3d at 1003.

The same principle holds for evidence of the conduct that Counts 1-5 and 13-16 allege. The United States alleges as racketeering activity the conduct described in Counts 1-5, involving murder and conspiracy to murder informants and members of rival gangs, see Indictment at 9-12, and the conduct that Counts 13-15 allege, involving assault and attempted murder of informants, see Indictment at 16-18.

> "[T]he jury is entitled to rely not only on evidence of the defendant's own crimes, but also on evidence of the crimes of those with whom he is alleged to have thrown in his lot" because the judgment required is not simply what acts the defendant committed at particular moments, but whether those acts were "parts of a pattern," *i.e.,* "committed as part of [defendant's] association with a subculture of crime.

United States v. Basciano, 599 F.3d 184, 207 n.17 (2d Cir. 2010)(quoting Gerard E. Lynch, RICO: The Crime of Being a Criminal, Parts III & IV, 87 Colum. L. Rev. 920, 944 (1987)).  Consequently, the conduct charged in Counts 1-5 and 13-16 is relevant to whether the SNM is an association-in-fact enterprise -- a fact that the United States must prove beyond a reasonable doubt to obtain convictions under Counts 6-12 of the Indictment.

Even if evidence is relevant, the Court may exclude it if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When balancing a piece of evidence's probative value against its danger of unfair prejudice, a court should "take account of the full evidentiary context of the case as the court understands it when the ruling must be made," and "evaluate the degrees of probative value and

unfair prejudice not only for the item in question but for any actually available substitutes as well." Old Chief v. United States, 519 U.S. at 182.  Accordingly, "[i]f an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk."  Old Chief v. United States, 519 U.S. at 182-83.

To determine whether evidence supporting the allegations in Counts 1-5 and 13-16 would survive a rule 403 objection, the Court needs to weigh Counts 6-12 evidence -- and its probative value and danger of unfair prejudice -- against the other available evidentiary alternatives. Evidence of the conduct that Counts 1-5 and 13-16 allege is not just relevant, but important, because the United States must prove that the acts alleged in Counts 6-12 are related to each other and the enterprise, and demonstrate continued criminal activity.  See, e.g., United States v. Pizzonia, 577 F.3d 455, 463-64 (2d Cir. 2009)(concluding that the predicate acts must bear a relationship to each other that "manifest[s] the continuity required to prove a pattern").  This rule of admission is necessary because "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991).  As discussed above, the evidence regarding Counts 1-5 and 13-16 is relevant to Counts 8-12 in that it shows that the SNM existed as an association-in-fact enterprise engaged in racketeering activity which predates the conduct that Counts 6-12 allege.  That evidence has further probative value with respect to the United States' expected theory of the case, i.e., for Counts 6-7, that Baca sent paperwork ordering Molina's murder to Sanchez, and Sanchez conspired with Perez, Armenta, Montoya, and T. Martinez to carry out that murder.  See Indictment at 12-13.  That evidence -- of the SNM's

nature, purpose, and preexisting racketeering activity -- has further probative value for the United States' theory of Counts 9-10, that Baca and others directed associates outside the New Mexico prison system to murder Marcantel and Santistevan to send a message that the SNM was not to be taken lightly by NM Corrections Department officials. See Indictment at 14-15. Similarly, the Defendants cannot complain reasonably that the conduct from Counts 1-5 and 6-12 is overly prejudicial, given that the United States' lists of prior acts for each defendant --which could serve as alternative evidence of racketeering and the SNM enterprise -- are themselves full of the Defendants' prior bad acts. See supra Section IA-D.

Evidence of conduct from Counts 1-5 and 6-12 is also not unfairly prejudicial. See Fed. R. Evid. 403, advisory committee's note (defining "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'). One relevant factor in determining whether evidence is unfairly prejudicial is to compare it against the conduct for which a defendant is charged. See United States v. Mahdi, 598 F.3d 883, 892 (D.C. Cir. 2010). Counts 6-12 charge Sanchez, Baca, Herrera, and Perez with murder, conspiracy to commit murder, and assault, all to punish informants and/or to further the SNM's standing. See Indictment at 12-15. Counts 1-5 charge other SNM members with murder, conspiracy to commit murder, and assault, all to punish informants and/or further the SNM's standing. See Indictment at 9-12. Counts 13-16 allege assault, conspiracy to commit murder, attempted murder, and witness tampering. See Indictment at 16-18. Evidence of those crimes is thus not unfairly prejudicial, because the Defendants are all alleged to have engaged in the same categories of violent crimes in aid of racketeering. Further, the Counts do not allege conspiracy to murder state officials and so are likely even less prejudicial than evidence of the conduct that Counts 6-7 allege. The Defendants do not challenge the nature of the other Counts' conduct as unfairly prejudicial, but

rather argue that the introduction of offenses similar to Counts 6-12 will unfairly prejudice the jury's consideration of Counts 6-12.  <u>See</u> Perez First Motion at 2.  As discussed above, however, that evidence is highly relevant to Counts 6-12.  Accordingly, evidence of conduct alleged in Counts 1-5 and 13-16 is admissible to prove the conduct that Counts 6-12 allege.

## IV.    THE UNITED STATES MAY NOT MAKE STATEMENTS OR ARGUMENTS THAT SUGGEST THAT PROPENSITY CHARACTER INFERENCES CAN BE <u>DRAWN FROM EXTRINSIC EVIDENCE.</u>

The Defendants "jointly move for an order to prohibit the government from making statements or arguments that improperly suggest that propensity character inferences can or should be made from extrinsic act evidence."  Sanchez' First Motion at 1.  The Defendants argue that the United States' evidence of Counts 6-10 "is susceptible to interpretation by the jury as character evidence of defendant Anthony Baca's propensity to order alleged SNM gang members to perpetrate violent acts."  Sanchez' First Motion at 2.  The Defendant also argue that this evidence is "susceptible of interpretation by the jury as character evidence regarding the propensity of SNM gang members to comply with Baca's order to commit violent acts."  Sanchez' First Motion at 2.

Although the Court agrees with the Defendants, the Court makes two observations.  First, character refers to a person's general traits and not to their tendency to commit particular actions, <u>e.g.</u>, one can have a character for violence or ruthlessness, but one does not have a character for murder orchestration or a character for gang rules enforcement through violent acts.  <u>See</u> Fed. R. Evid. 406 advisory committee note ("'Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness.'" (quoting McCormick on Evidence § 162, at 340)).  <u>See</u> <u>also</u> <u>id.</u> ("A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct . . . .").  Second, jurors are far more likely to take the evidence that the Defendants identify

as evidence regarding specific situations and not as evidence of individuals' general characteristics, or as evidence that individuals acted in accordance with those general characteristics by committing the conduct that the United States seeks to prove.  For example, jurors will probably not infer that SNM members are generally obedient people from evidence showing that SNM members tend to obey Baca's orders.  Instead, the jury is more likely to infer that the SNM members have good reason to obey their superiors or else face violent retribution.

Nonetheless, even if the United States establishes the admissibility of the Defendants' prior acts under either rule 404(b) or, more likely, as enterprise evidence, the United States may not argue that the Defendants' prior acts support the inference that they have the propensity to commit similar acts which the Indictment alleges.  See United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(the rule 404(b) "proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act").  Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of character evidence.  See United States v. Lucas, 357 F.3d 599, 611 (6th Cir. 2004).  As the United States Court of Appeals for the Sixth Circuit noted, the rule against character and propensity evidence addresses two main policy concerns: (i) that the jury may convict a "bad man" who deserves to be punished, not because he is guilty of the crime charged, but because of his prior or subsequent misdeeds; and (ii) that the jury will infer that, because the accused committed other crimes, he probably committed the crime charged.  United States v. Phillips, 599 F.2d 134, 136 (6th Cir. 1979).  Accordingly, if the United States admits the Defendants' prior acts at trial, it may not argue that the Defendants' prior acts are demonstrative of a propensity to commit such acts and may not imply that the jury should make such an inference.  Propensity "is defined as a 'disposition or inclination to some action, course of

action, habit, etc.'"  Thorne v. U.S. Dep't of Def., 916 F. Supp. 1358, 1365 (E.D. Va. 1996)(Ellis, J.)(quoting The Oxford English Dictionary 637 (2d ed.1989)).  The Court is satisfied that the United States' rationales for admitting the Defendants' prior acts -- as enterprise evidence or under a rule 404(b) exception -- are not mere euphemisms for propensity, but will ensure that such arguments do not stray at trial to suggest the Defendants' propensity to commit the acts which the Indictment charges.[14]

Finally, Sanchez characterizes the rule against character evidence as being grounded in a policy of preventing the jury's prejudice against the defendant.  See Sanchez' First Motion at 2-3.  Sanchez argues that rule 404(b), "[b]y it's [sic] plain language," is "not limited to 'a defendant's character."  Sanchez' First Motion at 2 (quoting Huddleston v. United States, 485 U.S. at 685-686).  Sanchez therefore asserts that the Court should not limit rule 404(b)'s reach to only Defendants, but also to other, uncharged individuals involved with SNM.  See Sanchez' First Motion at 2 (citing United States v. Lucas, 357 F.3d at 605).  Sanchez does not specify the individuals whose acts he seeks to exclude from evidence.

---

[14]At the Defendants' option, the Court is willing to give the jury a limiting instruction based on the Tenth Circuit's pattern jury instruction regarding similar acts:

> You have heard evidence of other [crimes] [acts] [wrongs] engaged in by the defendant. You may consider that evidence only as it bears on the defendant's [e.g., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident] and for no other purpose. Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions § 1.30, at 46 (2011)(updated January 2017).

This argument lacks a sound basis in the caselaw.  "It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."  United States v. Baez, 349 F.3d at 93.  Nor is this rule limited to acts which only indicted defendants committed:

> Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible "to prove an essential element of the RICO crimes charged -- the existence of a criminal enterprise in which the defendants participated." United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (upholding admission of evidence of uncharged murders).

United States v. Mejia, 545 F.3d at 206 (emphasis added).  Instead of any categorical rule against admitting as enterprise evidence acts that other, uncharged enterprise members commit, courts subject each proffered act to rules of relevancy and unfair prejudice.  See United States v. Franklin, 704 F.2d 1183, 1189 (10th Cir. 1983).  Accordingly, the United States may admit evidence of prior, uncharged acts that uncharged SNM members and associates commit if such acts are relevant to and probative of VICAR's enterprise element.  See United States v. Diaz, 176 F.3d at 79.

## V.    THE UNITED STATES MAY GENERALLY ADMIT TROUP'S, B. GARCIA'S, AND A. GARCIA'S THREATS AGAINST THE UNITED STATES' WITNESSES UNDER RULE 404(B).

Although the United States generally eschewed the use of rule 404(b) to admit the Defendants' prior acts, it notified the parties and the Court of its intent to use rule 404(b) to admit three Defendants' threats against the United States witnesses.  See Troup 404(b) Notice at 1; United States MIL at 1.  The Court first addresses whether the United States complied with rule 404(b)'s notice requirement and then addresses each threat's admissibility.  The Court concludes that the United States has complied with rule 404(b)'s notice requirement, and concludes that the

United States may generally admit Troup's, B. Garcia's, and A. Garcia's threats against the United States' witnesses.

### A.   THE SECOND TROUP NOTICE COMPLIES WITH RULE 404(B)(2)(A), BUT THE UNITED STATES MAY ADMIT ONLY ONE OF TROUP'S ALLEGED THREATS ABSENT FURTHER FOUNDATION.

On March 26, 2018, the United States notified Troup of its intent to admit allegations that Troup threatened the United States' witnesses during the first and second trial. See First U.S. MIL at 1-2. Although the Second Troup Notice provides the theories by which the United States seeks to admit Troup's alleged threats, the First U.S. MIL does not list specifically the acts which the United States seeks to introduce. Troup responded on March 26, 2018, and argued that the United States' notice "is insufficient to allow either Mr. Troup to respond or the Court to make a ruling on admissibility." Troup Objection at 1. Troup argues that the absence of specific acts in the Second Troup Notice "does not serve the purpose of the notice requirement of rule 404(b)(2)(A)." Troup Objection at 2. The United States replied the next day, on March 29, 2018, and lists the four acts which it seeks to introduce. See Troup Reply 1-2.

The Court first addresses Troup's contention that the Second Notice is substantively deficient, because it is sparse on the specific details of Troup's alleged threats. Rule 404(b) of the Federal Rules of Evidence provides:

(b)     **Crimes, Wrongs, or Other Acts.**

(1)     **Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2)     **Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

        (A)      provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

        (B)      do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b) (emphasis in original). Troup contends that the Second Troup notice fails to list the specific acts which the United States seeks to introduce, and so the Court should exclude Troup's alleged threats. See Troup Objection at 2. This argument misreads the rule's requirements. Rule 404(b)(2)(A) requires the United States to "provide reasonable notice of the general nature" of evidence of "a crime, wrong, or other act." Fed. R. Evid. 404(b)(1)-(2). The United States need not provide "the dates, times, places and persons involved in such acts; the statements of each participant; [or] any documents that contain evidence of such other crimes or acts . . . ." United States v. Stoecker, 920 F. Supp. 876, 883 (N.D. Ill. 1996)(Gettleman, J.). See United States v. Jackson, 850 F. Supp. 1481, 1493 (D. Kan. 1994)(Crow, J.)("The notice need not provide precise details regarding the date, time, and place of the prior acts, but it must characterize the prior conduct to a degree that fairly apprises the defendant of its general nature.")(citations and quotations omitted).

      The First U.S. MIL provides that the United States "seeks to move the admission of threatening statements made by Edward Troup to witnesses pursuant to Rule 404(b)." First U.S. MIL at 1. This notice certainly could be, and should have been, more specific. The Second Troup Notice informs Troup that the United States will seek to admit Troup's alleged threats under rule 404(b)'s intent exception. See First U.S. MIL at 1-2. The Second Troup Notice further elaborates the United States' argument that Troup's alleged threats are probative of his consciousness of guilt, a valid purpose for prior-acts evidence under rule 404(b). See First U.S. MIL at 2. The advisory committee notes to rule 404 provide that the court "may require the government to disclose to it

the specifics of such evidence which the court must consider in determining admissibility." Fed. R. Evid. 404, advisory committee's notes to the 1991 amendments. The rule accordingly anticipates that the defense or the court may require the prosecution to develop further its foundation under rule 404. Here, before the Court could address the First U.S. MIL, the United States listed -- three days after filing the First U.S. MIL -- robustly the nature of Troup's alleged threats which it would seek to admit at trial, as well as those threat's location in the record. See Troup Reply at 1-2. Because the United States provided Troup with enough information in the Second Troup Notice to plan his defense, and because the United States corrected its under-specific notice three days after the First U.S. MIL, the Court concludes that the First U.S. MIL is not procedurally deficient under rule 404(b)(2)(A)'s notice requirement.

As to the First U.S. MIL's substance, the Court concludes that three of Troup's alleged threats are admissible under rule 404(b), and that each of Troup's alleged threats is admissible, with proper foundation, as enterprise and racketeering evidence or as an act intrinsic to the Indictment. The United States seeks to admit four instances in which Troup allegedly threatened the United States' witnesses:

1.   On February 5, 2018, Guadalupe Urquizo testified that he was threatened at the detention facility in Otero County. He stated that Troup made remarks "saying there's another FBI informant right there, and started disrespecting and saying that Dan Dan and Sanchez and Carlos Herrerra [sic] came back from court and said, 'All you FBI informants need to stop doing what you're doing. Have some respect for each other and stop doing what you're doing.'" Tr. Transcript, February 5, 2018, pgs. 275-276 (Trial 1).

2.   On February 20, 2018, Mario Montoya testified that Troup was "yelling out that all of us cooperators think that the FBI and the US Government is our friend. But we're going to find out in the end that, as soon as they're done prosecuting these guys, they're going to line us up and prosecute us next. That we're probably going to end up with more time than them." He went on to say, "I thought he was just trying to plant the seed of doubt for us to come here today and cooperate." Real Time Tr. Transcript, February 20, 2018, pgs 165-166 (Trial 1).

3.      Troup made threatening statements to Benjamin Clark.

4.      Troup was also a member of a group of people who called Samuel Gonzales "a rat" when he was expected to testify in Trial 1.

Troup Reply at 1-2.  The United States argues that these incidents are admissible under rule 404(b) to demonstrate Troup's "consciousness of guilt" and that these incidents show Troup's "clear intent to interfere with these proceedings by attempting to scare witnesses into not testifying." Troup Reply at 2.  The Tenth Circuit has noted that "matters such as motive, intent, plan, or knowledge essentially involve consciousness of guilt."  United States v. Esparsen, 930 F.2d at 1476 n.16.  Evidence of such "admission by conduct" is proper under rule 404(b) if an inference of guilt logically follows from the activity of the defendant.  United States v. Martinez, 681 F.2d at 1256.  In United States v. Smith, 629 F.2d 650 (10th Cir. 1980), a prosecution witness testified that the defendant followed him in his car, and made intimidating remarks and gestures.  See 629 F.2d at 651-52.  The Tenth Circuit held that "[e]vidence of threats to a prosecution witness is admissible as showing consciousness of guilt if a direct connection is established between the defendant and the threat, as it was here."  629 F.2d at 651-52.  The Tenth Circuit, interpreting Huddleston v. United States, has articulated a four-part test for admitting similar-act evidence under rule 404(b):

> "(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted."

United States v. Poole, 929 F.2d 1476, 1481 (10th Cir. 1991)(quoting United States v. Jefferson, 925 F.2d 1242, 1258 (10th Cir. 1991)).

-131-

Troup argues that the first incident does not amount to a threat, and is thus not admissible under rule 404(b).  See April 5 Tr. at 229:15-17 (Burke).  The United States seizes on the word "respect," and argues that "disrespect in the SNM is a big deal . . . . [B]y disrespecting the gang's rules, that alone is a communication to somebody that you're violating the Court's rules" against witness tampering and intimidation.  April 5 Tr. at 230:19-23 (Castellano).  Troup's alleged statement that Herrera and Sanchez told Troup that the United States witnesses' should "[h]ave some respect for each other and stop doing what you're doing," Troup Reply at 1-2, however, pertains to a statement with two levels of hearsay.  The United States seeks to offer this statement for the truth it asserts -- that Troup said those words to the United States' witnesses.  See Fed. R. Evid. 801.  Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly labeled double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  Troup's statement is admissible against him as a party opponent.  See Fed. R. Evid. 801(d)(2)(A).  The United States argues that Herrera's and Sanchez' alleged statement that "[a]ll you FBI informants need to stop doing what you're doing.  Have some respect for each other and stop doing what you're doing" is admissible for the non-hearsay purpose of its effect on the listener.  April 5 Tr. at 234:5-8 Castellano).  The Court agrees with the United States.  See United States v. Nieto, 60 F.3d 1464, 1468 (10th Cir. 1995).  "'[T]estimony is not hearsay when it is offered to prove only that a statement was made and not the truth of the statement.'"  Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., No. CIV 10-0698 JB\RHS, 2013 WL 311846, at *19 (D.N.M. Jan. 18, 2013)(Browning J.)(original alterations omitted)(quoting Creaghe v. Iowa Home Mut. Cas. Co., 323 F.2d 981, 984 (10th Cir. 1963)).  Statements offered not to prove the statements' truth, but rather "offered for the effect on the listener . . . are generally not hearsay."  Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434

(10th Cir. 1993).  See United States v. Smalls, 605 F.3d at 785 n.18 ("[S]tatements offered for their effect on the listener are not hearsay.").  Troup's statement is admissible to demonstrate its effect on Urquizo.  Accordingly, the hearsay rule does not bar the admission of Troup's first statement.[15]  That statement is also admissible under rule 404(b).  Troup's alleged attempt to influence and discourage the United States' witnesses -- while those witnesses are at the courthouse waiting to testify -- are probative of his connection to the SNM and consciousness of guilt, which are permissible purposes for prior-act evidence.  See United States v. Esparsen, 930 F.2d 1461, 1476 n. 16 (10th Cir. 1991).  Accordingly, the Court admits Troup's first alleged threat.  For the same reasons, the Court admits the allegation that, on February 20, 2018, Troup told the United States' witnesses to mistrust the United States' prosecution team in this case.  See Troup Reply at 1.  Troup also made this statement during the first trial in this case, and the statement reflects Troup's intent to thwart the United States' witnesses from testifying, from which an inference of guilt logically flows.  See United States v. Martinez, 681 F.2d at 1256.

The third and fourth allegations' admissibility will depend on the extent to which the United States can provide background information establishing Troup's consciousness of guilt.  At present, the Court excludes the third allegation -- that Troup "made threatening statements to Benjamin Clark" -- and admit the fourth allegation -- that Troup "was also a member of a group of people who called S. Gonzales a rat when he was expected to testify in Trial 1."  Troup Reply

---

[15]The Court notes that it severed the case into two trial groups: (i) Counts 6-12; and (ii) Counts 1-5 and 13-16.  See Memorandum Opinion and Order, 2017 WL 3054511 at *103, filed June 30, 2017 (Doc. 1204).  Herrera and Sanchez are Defendants in the first trial.  Accordingly, although the Tenth Circuit has concluded that Bruton v. United States, 391 U.S. 123, does not apply to nontestimonial statements, see United States v. Clark, 717 F.3d 790, 814 (10th Cir. 2013), the Court has discussed a persuasive view that Crawford v. Washington, 541 U.S. 36, does not modify United States v. Bruton.  See United States v. DeLeon, 287 F. Supp. 3d 1187, 1259 (D.N.M. 2018)(Browning, J.).

at 2. At the April 5, 2018, hearing, the United States conceded that it had no further evidence depicting the third allegation's context. See April 5 Tr. at 236:2-5 (Court, Castellano). Although the Court has concluded that the Second Troup Notice generally complies with rule 404(b)(2)(A)'s notice requirements, see supra, the third allegation does not "characterize the prior conduct to a degree that fairly apprises the defendant of its general nature." United States v. Jackson, 850 F. Supp. at 1493. The Court will, however, admit the fourth allegation. The United States says that it will call S. Gonzales to testify at trial and that he will describe that, while he was held at the courthouse under a subpoena to testify in the first trial, Troup called him a rat. See April 5 Tr. at 236:6-10 (Castellano). Troup argues that calling a witness a rat does not amount to "404(b) intimidation," and compares this incident to that in United States v. Smith, 629 F.2d 650, in which the defendant followed a witness home and threatened him in his driveway. April 5 Tr. at 231:10-18 (Burke). Troup argues that rule 404(b) contemplates more serious intimidation and threats than a defendant calling a witness a rat. See April 5 Tr. at 231:10-18 (Burke). The Court disagrees with Troup's argument. See United States v. Sterling, 103 F.3d 245, 1996 WL 685663, at *2 (10th Cir. 1996)(unpublished table decision)(concluding that a defendant calling a witness "a rat and a snitch" is admissible under rule 404(b) as probative of the defendant's consciousness of guilt). Section 1513(e) of Title 18 of the United States Code prohibits knowingly taking "any action harmful to any person" in retaliation for that person's helping law enforcement. 18 U.S.C. § 1513(e). The United States' evidence of the SNM's treatment of all those suspected of assisting law enforcement render Troup calling Gonzales a rat more than a mere passing statement, but rather a threat from which an inference of guilt logically flows. See United States v. Sterling, 1996 WL 685663, at *2. Further, the Court views this incident in the context of the United States' allegation that the SNM expects its members to assault and murder on sight anyone known to have

cooperated with law enforcement. See Indictment ¶¶ 6-14, at 5-9. Troup's comments to Gonzales thus amount to probative, non-propensity evidence. The Court accordingly admits this incident under rule 404(b).

Having determined that Troup's alleged threats generally are admissible under rule 404(b), the Court concludes that these acts' unfair prejudice does not outweigh their probative value. See United States v. Poole, 929 F.2d at 1481. As discussed, Troup's threats are probative of his consciousness of guilt and of his intent to thwart the United States' prosecution of the SNM. The Indictment alleges that Troup murdered Frank Castillo in 2001 and murdered Frank Sanchez in 2007. See Indictment at 9-10. That Troup may have threatened the United States' witnesses is not "more inflammatory" than the conduct with which he is charged. United States v. Livoti, 196 F.3d at 326.

Finally, United States v. Poole directs courts to issue limiting instructions, when appropriate, limiting the jury's consideration of rule 404(b) evidence to a proper purpose. See 929 F.2d at 1481. The Court concludes, however, that, although three of the four allegations on the Second Troup Notice are admissible under rule 404(b), all are at least potentially admissible[16] as intrinsic to the conduct with which Troup is charged or as substantive evidence of the SNM's racketeering activities. Although the United States did not pursue this point in its briefing, it argued at the April 5, 2018, hearing that Troup's alleged threats are "substantive evidence of racketeering acts," because "the racketeering statute does include witness intimidation under 18 U.S.C. Section[s] 1512 and 1513." April 5 Tr. at 229:4-8 (Castellano). There are thus further avenues which may permit the United States to admit Troup's allegations at trial. With the proper

---

[16]The Court describes Troup's alleged threats as potentially admissible, because, as noted, the United States must lay more foundation establishing each alleged incident's threatening nature, as well as its connection to the SNM to be relevant under rule 401.

foundation at trial tying Troup's alleged threats to the SNM, these incidents are admissible as intrinsic to the crimes with which he is charged and as substantive evidence of the SNM's racketeering activities.

Troup's alleged threats are probative of the SNM as an enterprise, as well as of its racketeering activity. "[W]hen the other-act evidence is relevant to prove a material fact other than the defendant's propensity, it is not barred by Rule 404(b)." United States v. Concepcion, 983 F.2d at 392. A VICAR violation requires an underlying state law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a). The underlying state law offense becomes a federal VICAR violation only when it is committed: (i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The United States asserts, primarily, that the Defendants committed their charged actions for the purpose of gaining entrance to, or maintaining or increasing their position in the SNM enterprise. See Indictment ¶¶ 10-11, at 6. Threatening the witnesses in this prosecution is illustrative of the United States' allegation of one of the SNM's main rules -- never cooperate with law enforcement -- and the SNM's treatment of its members who violate this rule. This evidence is further probative of the enterprise element and of racketeering activity. If the United States can establish through its witnesses' testimony that active SNM-members endeavored to thwart this prosecution --and thereby maintain SNM's status as an enterprise, and maintain or advance their positions within the SNM -- then these incidents

are probative of the SNM as an enterprise-in-fact, as well as its methods for organizing against and resisting correctional officials. See Boyle v. United States, 556 U.S. at 946.

The Tenth Circuit, in United States v. Johnson, 42 F.3d 1312 (10th Cir. 1994), explained that rule 404(b) does not apply to uncharged acts that are intrinsic to the conduct with which a defendant is charged:

> Rule 404(b) only applies to evidence of acts extrinsic to the charged crime. An uncharged act may not be extrinsic if: (1) it was part of the scheme for which a defendant is being prosecuted . . . or (2) it was "inextricably intertwined" with the charged crime such that a witness' testimony "would have been confusing and incomplete without the prior act."

United States v. Johnson, 42 F.3d at 1316 (citations omitted)(quoting United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)). An act is likely to be intrinsic to the charged crime if it occurs "within the time frame of the" crime, and "formed an 'integral and natural part of the witness' accounts of the circumstances surrounding the offense for which the defendant was indicted.'" United States v. Johnson, 42 F.3d at 1316 (quoting United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982)).[17] Troup's alleged threats here happened well after the events which

---

[17]Although many Courts of Appeals take a lenient view of what constitutes intrinsic evidence, the Court takes the view that the concept of extrinsic evidence is ambiguous and therefore subject to abuse. Similarly, it is difficult to identify what evidence is not necessary to tell the prosecution's story, see United States v. Shirley, 214 F. Supp. 3d 1124, 1149 (D.N.M. 2016)(Browning, J.), as all relevant evidence, to varying degrees, tells a story. Particularly in a RICO or conspiracy case, where it is difficult to disprove the argument that a potentially isolated act is not "inextricably intertwined or . . . part of a single criminal episode," United States v. Irving, 665 F.3d 1184, 1212 (10th Cir. 2011), the concept of intrinsic evidence is subject to abuse and conclusory assertions by prosecutors and courts alike.

Other courts have cautioned hesitancy to admit res gestae and intrinsic evidence, criticizing the test for admitting such evidence as "vague, overbroad, and prone to abuse, and we cannot ignore the danger it poses to the vitality of Rule 404(b)." United States v. Green, 617 F.3d 233, 248 (3d Cir. 1999). The United States Court of Appeals for the Third Circuit accordingly narrowly defines the concept of intrinsic evidence:

> First, evidence is intrinsic if it "directly proves" the charged offense. See e.g., United States v. Cross, 308 F.3d 308, 320 (3d Cir. 2002); United States v.

———————————

Gibbs, 190 F.3d 188, 217-18 (3d Cir. 1999) (acts of violence admissible as direct proof of the charged drug conspiracy).  See also United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)[(Robertson, J.)] (acknowledging that evidence of "an act that is part of the charged offense . . . is properly considered intrinsic").  This gives effect to Rule 404(b)'s applicability only to evidence of "other crimes, wrongs, or acts."  Fed. R. Evid. 404(b) (emphasis added).  If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime.  Gibbs, 190 F.3d at 218.  Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."  Bowie, 232 F.3d at 929.

United States v. Green, 617 F.3d at 248-49.  The Third Circuit has nonetheless affirmed the admission of uncharged prior acts in RICO prosecutions.  See, e.g., United States v. Ali, 493 F.3d 387, 392 (3d Cir. 2007).  In United States v. Ali, the Third Circuit affirmed the use of a defendant's uncharged extortionate activity, because "this evidence was necessary to establish participation in the alleged RICO enterprise; the continuous existence of the enterprise separate and apart from the criminal acts constituting racketeering activity."  493 F.3d at 392.

The United States Court of Appeals for District of Columbia Circuit has likewise "rejected the rule" which most other Courts of Appeals take, that "evidence is intrinsic if it 'complete[s] the story' of the charged crime.'"  United States v. McGill, 815 F.3d 846, 879 (D.C. Cir. 2016)(quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)).  The D.C. Circuit notes that "all relevant prosecution evidence explains the crime if it completes the story," and the fact that "omitting some evidence would render a story slightly less complete cannot justify circumventing Rule 404(b) altogether."  United States v. Bowie, 232 F.3d at 929.  The D.C. Circuit has accordingly frowned upon using, as intrinsic evidence, prior, uncharged acts which do not coincide with the indictment's timeframe.  See United States v. McGill, 815 F.3d at 883 (rejecting the admission of an antecedent murder that brought the RICO enterprise-members together, because the murder was not "'performed contemporaneously with the charged crime.'" (quoting United States v. Bowie, 232 F.3d at 929)).

Nonetheless, most courts of appeals take a lenient view of uncharged intrinsic acts, particularly in conspiracy and RICO cases.  See, e.g., United States v. Luster, 480 F.3d 551, 556 (7th Cir. 2007).  In such cases, the United States is "usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.'"  United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000)(quoting United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000)).  See United States v. Eufrasio, 935 F.2d 553, 571 (3d Cir. 1991).  In United States v. Petrucelli, 2004 WL 1088780 (2d Cir. 2004), the United States Court of Appeals for the Second Circuit held, on plain error review, that the defendant's prior, uncharged acts of theft and armed robbery were admissible as intrinsic evidence in a RICO prosecution, because "[i]t is well established that an act done in furtherance of a racketeering enterprise is not an other act within the meaning of 404(b) because 'it is part of the very act charged.'"  2004 WL 1088780, at *2 (quoting United States v. Diaz, 176 F.3d at 79).  The Court observes a tendency to admit acts similar to charged conduct in RICO cases, and attributes this tendency to RICO's expansiveness.  See, e.g., United States v. McGill, 815 F.3d 846, 881 (D.C. Cir. 2016)(noting that the "conspiracy charged in this case had a broad scope that encompassed

the Indictment charges, but as part of an effort to thwart the United States' prosecution of the Indictment. The Indictment alleges that one of the SNM's main policies is to retaliate against and intimidate those who cooperate with law enforcement; indeed, the United States alleges in the Indictment that the SNM's members committed each of the charged murders to fulfill this policy. See Indictment ¶ 8, at 5 (alleging that "a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants[ and] cooperating witnesses"). Although Troup's alleged threats do not occur "within the time frame of the" Indictment's allegations, United States v. Johnson, 42 F.3d at 1316, the United States alleges that Troup made these threats to protect himself and the SNM enterprise from prosecution, see Second Troup Notice at 2 ("[M]embership in the SNM is for life . . . . [T]here has been no testimony whatsoever that the known informants have left the SNM without the threat of death following them."). "An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other act' within

_____

acts of violence for multiple purposes," and holding that "[a]dmission of evidence bearing on such violence accordingly was admissible as direct evidence of the conspiracy, without Rule 404(b) coming into play"); United States v. Conley, 878 F. Supp. at 755.

     The Court believes that the proper course for determining intrinsic evidence -- in case not involving conspiracy -- is to apply rule 404(b) to all acts that do not directly prove the charged offenses or occur during the indictment's covered time period. See United States v. Green, 617 F.3d at 248-49. Acts that coincide with the charged behavior and which directly serve or are caused by the charged offense may be admissible as intrinsic evidence, provided that those acts occurred roughly contemporaneously with the events charged in the indictment. The Court recognizes that, in a RICO case, the United States is afforded greater leeway to demonstrate an enterprise's existence, duration, and purpose, see United States v. Mathis, 216 F.3d at 26, and so may not be limited to the indictment's time frame and may need evidence of enterprise's activities and duration beyond the crimes that an indictment charges, see Boyle v. United States, 556 U.S. at 948. ("[N]othing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence."). The Court nonetheless believes the courts should be particularly hesitant, in a RICO case, to rely on intrinsic evidence's "inextricably intertwined" definition, United States v. Johnson, 42 F.3d at 1316, as such a definition potentially invites admission of any and all acts committed by members of a conspiracy during the conspiracy.

the meaning of Rule 404(b); it is part of the very act charged." United States v. Concepcion, 983

F.2d at 392. As the United States established that Troup threatened the United States' witnesses

to serve the SNM enterprise, those threats are admissible as intrinsic to the Indictment's charged

conduct.

> **B.    THE UNITED STATES MAY ADMIT ONLY B. GARCIA'S AND A. GARCIA'S RECENT THREATS UNDER RULE 404(B).**

During the second trial, the United States filed its MIL. See Second U.S. MIL at 1. The

United States seeks to admit, "evidence of Defendants Billy Garcia's and Arturo Garcia's threats

to two informant-witnesses: Leonard Lujan and Joseph Otero." Second U.S. MIL at 1. The United

States likens its MIL to the Second Troup Notice, and argues that the Court should likewise admit

B. Garica's and A. Garcia's threats, "under Rule 404(b), as evidence of consciousness of guilt."

Second U.S. MIL at 1-2.

Specifically, the United States seeks to admit two instances in which B. Garcia and A.

Garcia allegedly threatened the United States' witnesses. See Second U.S. MIL at 3-4. First, the

United States seeks to admit evidence of the allegation that, in December, 2015, while some of the

Defendants were housed together in the Otero County Jail, Defendant B. Garcia called "then-

Defendant-and-now-government-witness Leonard Lujan 'a piece of shit,' and a 'snitch.'" Second

U.S. MIL at 4. The United States asserts that "Lujan understood this to be a threat against Lujan

for cooperating with the government, and the FBI specifically, several times since 2007." Second

U.S. MIL at 4. The United States says that Lujan told the FBI about the SNM's 2001 murders of

Garza and Castillo, and that he would be willing to testify in this case. See Second U.S. MIL at 4.

Next, the United States seeks to admit evidence of the allegation that, on April 13, 2018,

B. Garcia and A. Garcia were placed in a cell near Otero, and that, upon recognizing him, "B.

Garcia and A. Garcia then made statements to the effect that those persons 'telling on the SNM'

better watch their backs." Second U.S. MIL at 4. The United States alleges that B. Garcia and A. Garcia "continued to the effect that: 'They [the testifying witnesses] believe that the SNM is dead, but there are 150 or so of us on the streets and locked up, so they better watch their backs if they know what's good for them.'" Second U.S. MIL at 4-5. The United States says that Otero understood these statements to be threats that, if he testifies against the SNM, the SNM will murder Otero. See Second U.S. MIL at 4-5. The United States avers that these incidents are admissible under rule 404(b) to demonstrate B. Garcia's and A. Garcia's "consciousness of guilt," which the United States argues is the theme behind rule 404(b)'s exception for extrinsic evidence that is probative of motive, intent, plan, or knowledge. Second U.S. MIL at 5 (citing United States v. Esparsen, 930 F.2d at 1476 n.16).

The Court first addresses whether the United States MIL complies with rule 404(b)'s notice requirement. Rule 404(b) provides that, "[o]n request by a defendant in a criminal case, the prosecutor must . . . provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." Fed. R. Evid. 404(b). The advisory committee notes provide that, because notice is a "condition precedent to admissibility of 404(b) evidence," the "offered evidence is inadmissible if the court decides that the notice requirement has not been met." Fed. R. Evid. 404 advisory committee notes to the 1991 amendments. "If the government does not comply with the notice requirement of Rule 404(b) after a request by the accused, the offered evidence is inadmissible." United States v. Lopez-Gutierrez, 83 F.3d 1235, 1241 (10th Cir. 1996). Rule 404(b)(2)(B) directs the United States to "do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(2)(B). The United States here provided its rule 404(b) notice during the trial. See United States MIL at 1. One of the alleged threats which the United States seeks to admit happened in December, 2015. Courts typically find

-141-

good cause when the United States seeks to admit evidence which, despite all diligence, it discovered at or shortly before trial.  See United States v. Lopez-Gutierrez, 83 F.3d at 1241.  The United States does not provide this information's source, but the Court will not excuse the United States' mid-trial notice of its intent to admit, under rule 404(b), an incident which occurred over two years before trial.  The Court concludes, however, that the United States' notice is sufficient for B. Garcia's and A. Garcia's second threat, which allegedly occurred less than a week before trial.  See Second U.S. MIL at 4.  Rule 404(b)(2)(A) plainly contemplates notice as late as trial, provided that good cause exists for such notice's timing.  See Fed. R. Evid. 404(b)(2)(A).  In United States v. Lopez-Gutierrez, good cause existed for the United States' mid-trial notice, because the United States learned of the evidence only at an interview with its witness the night before trial.  See 83 F.3d at 1241.  Here, the United States learned of B. Garcia's and A. Garcia's threats because they were made just before trial.  See Second U.S. MIL at 4.  The Defendants may not escape the consequences of their threats against the United States' witnesses by making such threats after the United States' pretrial disclosure has largely ceased.  See United States v. Brazel, 102 F.3d 1120, 1153-54 (11th Cir. 1997).

As to the second threat's substantive admissibility under rule 404(b), the United States contends that the threat is probative of B. Garcia's and A. Garcia's consciousness of their own guilt and, specifically, their intent to thwart the United States' prosecution of this case.  See Second U.S. MIL at 4.  The Tenth Circuit has stated that, traditionally, conduct like "flight has been viewed as an admission by conduct which expresses consciousness of guilt."  United States v. Martinez, 681 F.2d 1248, 1256 (10th Cir. 1982)(citing McCormick, Handbook of the Law of Evidence § 271 at 655 (2d ed. 1972)).  Evidence of such "admission by conduct" is proper under rule 404(b) if an inference of guilt logically follows from the activity of the defendant.  United States v. Martinez,

681 F.2d at 1256.  Various Courts of Appeals have articulated a four-part test for evaluating such evidence's probativeness.  For example, in United States v. Myers, the United States Court of Appeals for the Fifth Circuit stated that the probative value of flight

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

550 F.2d 1036, 1049 (5th Cir. 1977).  See United States v. Johnson, 535 F.3d at 892 (articulating the same test).  The Tenth Circuit, however, has stated that "the facts as a whole are of importance." United States v. Martinez, 681 F.2d at 1256.  Under either approach, where there is a strong inference of guilt, evidence of admission by conduct "carries with it a strong presumption of admissibility."  United States v. Martinez, 681 F.2d at 1256 (citation omitted).

First, the Court observes that one does not have a character or propensity to threaten witnesses.  Character refers to a person's general traits and not to their tendency to commit particular actions, e.g., one can have a character for violence or ruthlessness, but one does not have a character for enforcing gang rules through threats of violence.  See Fed. R. Evid. 406 advisory committee note ("'Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness.'" (quoting McCormick on Evidence § 162, at 340)); id. ("A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct . . . .").

Given these principles, evidence of B. Garcia's and A. Garcia's threats against Otero while Otero awaited testifying in this case's proceedings is proper under rule 404(b), because it raises an inference of B. Garcia's and A. Garcia's consciousness of guilt.  See United States v. Martinez, 681 F.2d at 1256.  Such evidence does not suggest normal interaction with former associates;

-143-

rather, it suggests that B. Garcia and A. Garcia were acting upon a guilty conscience. See United States v. Zanghi, 189 F.3d 71, 83 (1st Cir. 1999)(holding that evidence of flight is admissible to prove a "guilty mind" if "there is an adequate factual predicate for the inference that the defendant's movement was indicative of a guilty conscience, and not normal travel"). Evidence of B. Garcia's and A. Garcia's threats is also relevant under rule 401, because the inference of guilt suggested by this incident tends to establish their involvement in the SNM enterprise, as well as their efforts to protect it and themselves from prosecution.

Having concluded that the United States offers the April 13, 2018, threats for a proper purpose under rule 404(b) and that those threats are relevant under rule 401, the Court must assess whether the evidence's potential for unfair prejudice substantially outweighs its probative value under rule 403. See United States v. Zamora, 222 F.3d at 762 (stating that rule 403 balancing is the third analytical step to determine admissibility under rule 404(b)). The Court concludes that this threat is not unfairly prejudicial. That B. Garcia and A. Garcia threatened Otero establishes a strong inference of their consciousness of guilt, but the Court will also permit the United States to elicit testimony from Otero about the nature of the threat. The United States alleges that B. Garcia and A. Garcia told Otero to watch his back, and reminded him that, regardless of the outcome at trial, over one hundred SNM members remained on the streets and in New Mexico state prisons, and intimated that those members would come after Otero. See United States MIL at 2. "Mr. Otero understood these statements to be threats to the effect that, if he testifies in this trial, B. Garcia and A. Garcia . . . will greenlight Otero, or place a hit to murder him." United States MIL at 2. These threats are not more prejudicial than the Indictment's allegations against B. Garcia and A. Garcia. The Indictment alleges that B. Garcia murdered Freddie Garcia and Rolando Garcia, and that A. Garcia murdered Rolando Garcia. See Indictment at 9-10. That B. Garcia and A.

Garcia sought to prevent a witness from testifying against them in those murders' prosecution is probative of their consciousness of guilt, and the threat's prejudicial effect does not substantially outweigh the threat's probative value.  See United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007)(concluding that evidence of a defendant's death threats to informants were no more inflammatory than the charged murder itself).  In any event, if B. Garcia and A. Garcia request, the Court can give a limiting instruction pursuant to rule 105 of the Federal Rules of Evidence, directing the jury to consider evidence of the April 13, 2018, threat only for its probative value about B. Garcia's and A. Garcia's consciousness of guilt.  See United States v. Zamora, 222 F.3d at 762 (stating that this is the final step under rule 404(b) analysis).  Accordingly, the United States may admit both of B. Garcia's and A. Garcia's alleged threats under rule 404(b), subject to a limiting instruction.

**IT IS ORDERED** that: (i) Billy Garcia's Motion in Limine Regarding Alleged Bad Acts, filed October 10, 2017 (Doc. 1308), is granted in part and denied in part; (ii) Edward Troup's Motion *in Limine* Regarding Alleged Bad Acts, filed November 30, 2017 (Doc. 1504), is granted in part and denied in part; (iii) Rudy Perez' Opposed Motion to exclude references to and Evidence of Unrelated "Enterprise" Acts, filed December 1, 2017 (Doc. 1512), is denied; (iv) Daniel Sanchez' Motion in Limine to Prohibit Government from Making Statements or Arguments that Improperly Suggest that Propensity Character Inferences Can or Should be Made from Extrinsic Act Evidence, filed December 1, 2017 (Doc. 1519), is granted; (v) Sanchez' Motion in Limine to Prohibit the Government From Introducing Evidence of Alleged "Bad Acts," filed December 1, 2017 (Doc. 1530), is granted in part and denied in part; (vi) Christopher Chavez' Motion in Limine Regarding Alleged Bad Acts, filed December 1, 2017 (Doc. 1531), is granted in part and denied in part; (vii) Allen Patterson's Motion in Limine Regarding Alleged Bad Acts, filed December 1,

2017 (Doc. 1532), is denied; (viii) Anthony Ray Baca's Motion in Limine to Prohibit Government from Introducing Evidence of Alleged "Bad Acts," filed December 4, 2017 (Doc. 1538), is granted in part and denied in part; (ix) Anthony Ray Baca's Motion in Limine to Prohibit Government Attorneys from Using Rule 405, 608 or 609 Character Evidence Without Judicial Approval, filed December 4, 2017 (Doc. 1539), is granted; (x) Carlos Herrera's Motion in Limine Regarding Alleged Bad Acts, filed December 7, 2017 (Doc. 1549), is granted in part and denied in part; (xi) Christopher Garcia's Motion in Limine to Prohibit the Government From Introducing Evidence of Alleged "Bad Acts," filed December 8, 2017 (Doc. 1555), is granted in part and denied in part; (xii) Perez' Motion in Limine Regarding Alleged Bad Acts, filed December 9, 2017 (Doc. 1558), is granted in part and denied in part; (xiii) Defendant Joe Gallegos' Motion in Limine to Prohibit the Government from Introducing Evidence of Alleged "Bad Acts," filed January 3, 2018 (Doc. 1602), is granted in part and denied in part; (xiv) Defendant Daniel Sanchez' Second Motion In Limine To Prohibit Government From Introducing Evidence Of Alleged "Bad Acts" Based On Government's January 22, 2018 "Bad Act" Disclosure, filed January 24, 2018 (Doc. 1684), is granted in part and denied in part; (xv) Perez' Second Motion in Limine Regarding Alleged Bad Acts, filed January 24, 2018 (Doc. 1686), is granted; (xvi) Herrera's Motion *in Limine* To Exclude Purported Rule 404(b) Evidence, filed January 24, 2018 (Doc. 1687), is granted in part and denied in part; (xvii) Baca's Renewed Motion In Limine To Prohibit Government From Introducing Evidence Of Alleged "Bad Acts", filed January 25, 2018 (Doc. 1702), is granted in part and denied in part; (xviii) the United States Motion in Limine Regarding Edward Troup, filed March 12, 2018 (Doc. 1976), is granted; and (xix) the United States' Sealed Motion In Limine To Admit Evidence Intrinsic To The Crimes Charged And Notice Of Other Crimes Or Bad Acts Pursuant To Rule 404(B), filed April 15, 2018 (Doc. 2114), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

  *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

  *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

  *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

  *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

  *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

    *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

    *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

    *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Ray Velarde
El Paso, Texas

--and--

Steven Lorenzo Almanza
Las Cruces, New Mexico

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

> *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

> *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

> *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

    *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

    *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*