# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a. "Huero
Troup," LEONARD LUJAN, BILLY GARCIA,
a.k.a. "Wild Bill," EUGENE MARTINEZ, a.k.a.
"Little Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo," ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun,"
BENJAMIN CLARK, a.k.a. "Cyclone," RUBEN
HERNANDEZ; JERRY ARMENTA, a.k.a.
"Creeper," JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue," TIMOTHY
MARTINEZ, a.k.a. "Red," MAURICIO VARELA,
a.k.a. "Archie," a.k.a. "Hog Nuts," DANIEL
SANCHEZ, a.k.a. "Dan Dan," GERALD
ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma,"
CONRAD VILLEGAS, a.k.a. "Chitmon,"
ANTHONY RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY PAUL
MARTINEZ, a.k.a. "Shadow," CHRISTOPHER
GARCIA, CARLOS HERRERA, a.k.a. "Lazy,"
RUDY PEREZ, a.k.a. "Ru Dog," ANDREW
GALLEGOS, a.k.a. "Smiley," SANTOS
GONZALEZ; PAUL RIVERA, SHAUNA
GUTIERREZ, and BRANDY RODRIGUEZ,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) Defendant Billy Garcia's Motion to

Produce Post-Conviction Discovery and for In Camera Review, filed October 15, 2018

---

[1]The Court intended to issue this Memorandum Opinion and Order before it entered the
Judgment and Commitment ("J&C") for Defendants Billy Garcia and Arturo Arnulfo Garcia. The

(Doc. 2416)("B. Garcia Motion"); (ii) Defendants Joe Gallegos and Andrew Gallegos' Rule 29 Motion for Judgment of Aquittal [sic] or in the Alternative Motion for New Trial With Regard to Counts Four and Five, filed October 15, 2018 (Doc. 2415)("Gallegos Joint Motion"); (iii) Andrew Gallegos' Motion for Judgment of Acquittal or in the Alternative Motion for New Trial, filed October 15, 2018 (Doc. 2418)("A. Gallegos Motion"); (iv) Defendant Joe Gallegos' Rule 29 Motion for Judgment of Acquittal or in the Alternative Motion for New Trial on Count 1, filed October 15, 2018 (Doc. 2419)("J. Gallegos Motion"); (v) Edward Troup's Motion for New Trial, filed October 16, 2018 (Doc. 2420)("Troup NTM"); (vi) Defendant Arturo Arnulfo Garcia's Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2), filed October 16, 2018 (Doc. 2422)("A. Garcia Motion"); and (vii) Andrew Gallegos' Supplement to His Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2) (Doc 2422), filed January 15, 2019 (Doc. 2491)("A. Gallegos Supplement"). The Court held evidentiary hearings on December 17, 2018, and December 18, 2018, in which the Court heard the motions for judgment of acquittal or new trial. The primary issues are: (i) whether no reasonable factfinder could believe the United States' story and find J. Gallegos, Troup, and A. Gallegos guilty beyond a reasonable doubt, requiring a judgment of acquittal or new trial for J. Gallegos and A. Gallegos, and a new trial for Troup; (ii) whether combining Counts 1-5 and 13-16 into one trial prejudiced J. Gallegos, Troup, B. Garcia, and A. Gallegos, such that J. Gallegos and A. Gallegos are entitled to a judgment of acquittal or new trial, and Troup and B. Garcia are entitled to a new trial; (iii) whether the Violent Crimes in Aid of Racketeering Act, 18 U.S.C.

---

support staff mistakenly filed the J&Cs, not understanding that the Court still owed this opinion. This situation explains the timing of the Memorandum Opinion and Order.

§ 1959 ("VICAR") violates the Commerce Clause to the Constitution of the United States of America on its face and as applied to A. Garcia, because Freddie Sanchez' murder did not affect interstate commerce; (iv) whether the Court has subject-matter jurisdiction, because there is little evidence that F. Sanchez' murder affected interstate commerce; (v) whether the Court's admission of witness Michael Jaramillo's testimony prejudiced J. Gallegos, Troup, and B. Garcia, such that J. Gallegos is entitled to a judgment of acquittal or new trial, and Troup and B. Garcia are entitled to a new trial; (vi) whether the Court's admission of Amber Sutton's and Morgan Ramirez' testimonies violated J. Gallegos' and A. Gallegos' rights under the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America; (vii) whether the jury instructions contain plain errors that affected J. Gallegos', Troup's, and B. Garcia's substantial rights, such that these three Defendants are entitled to a new trial; and (viii) whether the destruction of records of Federal Bureau of Investigation ("FBI") Agent Bryan Acee's and witness Leroy Lucero's telephone calls and text messages entitles B. Garcia to a judgment of acquittal or a new trial, because the Jencks Act, 18 U.S.C. § 3500, required the United States to produce the records at trial.  The Court concludes that: (i) a rational factfinder could find J. Gallegos, Troup, and A. Gallegos guilty beyond a reasonable doubt, because the three Defendants had a fair trial and no miscarriage of justice occurred; (ii) combining Counts 1-5 and 13-16 did not unfairly prejudice J. Gallegos, Troup, B. Garcia, and A. Gallegos, because the Court took measures to minimize spillover prejudice, and the Court properly severed the case into two trials under rules 8 and 14 of the Federal Rules of Criminal Procedure; (iii) VICAR does not violate the Commerce Clause on its face or as applied to A. Garcia, because the statute explicitly punishes crimes committed to further the purposes of an enterprise engaged in interstate commerce, and the United States proved this VICAR element; (iv) the Court has subject-matter jurisdiction, because VICAR contains a

jurisdictional element, and the United States satisfied this element by offering evidence of the enterprise's effect on interstate commerce; (v) the admission of Jaramillo's testimony did not prejudice J. Gallegos, Troup, and B. Garcia, because the three Defendants do not show how they would have prepared differently had Jaramillo been included on the United States' Pretrial Witness List, and the United States did not act in bad faith; (vi) the Court's admission of A. Sutton's and Ramirez' testimonies did not violate J. Gallegos' and A. Gallegos' rights under the Confrontation Clause, because A. Sutton's testimony did not contain hearsay, and J. Gallegos' statements in Ramirez' testimony were not testimonial, and <u>Bruton v. United States</u>, 391 U.S. 123 (1968), does not apply to non-testimonial statements; (vii) the jury instructions do not contain plain errors, because the Court had justification for each challenged jury instruction, nearly all of which mirror the United States Court of Appeals for the Tenth Circuit's pattern jury instructions; and (viii) the destruction of records of Acee's and Lucero's telephone calls and text messages does not entitle B. Garcia to a judgment of acquittal or a new trial, because Acee destroyed the records according to the FBI's policies, and the United States did not suppress the records in bad faith.  The Court therefore denies the B. Garcia Motion, the Gallegos Joint Motion, the A. Gallegos Motion, the J. Gallegos Motion, the Troup NTM, the A. Garcia Motion, and the requests in the A. Gallegos Supplement.

## **FACTUAL BACKGROUND**

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585).  The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of

events and that the Defendants are all presumed innocent.

This case deals with crimes that Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment at 4. If another gang does not abide

by SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials precipitated the FBI's present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133). The other relevant facts giving rise to this case are as follows.

In March 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Armenta and Jerry Montoya on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Armenta and Montoya's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("Oct. 28 MOO"). The New Mexico Third Judicial District Attorney's Office accused Armenta and Montoya of fatally stabbing Molina with a shank in a gang-related attack. See Oct. 28 MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged Armenta and

Montoya with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See Oct. 28 MOO at 6-7, 2016 WL 7242579, at *3. In November 2015, the state District Attorney dismissed the charges against Armenta and Montoya -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See Oct. 28 MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." Oct. 28 MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendants A. Garcia, Benjamin Clark, M. Rodriguez, Daniel Sanchez, Gerald Archuleta,[2] Baca, Robert Martinez, and Roy Paul

---

[2]Archuleta pled guilty on June 16, 2016, stipulating:

> In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

> In 2003, I was an active member of the SNM. The person listed as J.R. in

Martinez[3] are the enterprise's alleged leaders.  <u>See</u> Indictment at 6.  The other Defendants are

---

Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R.  Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca.  As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[3]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

allegedly members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, J. Gallegos, Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9 (Count 1). On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17, 2007, Defendants Troup, Javier Alonso, A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3).  On November 12, 2012, Defendants J. Gallegos and A. Gallegos allegedly conspired to murder "A.B.," or Adrian Burns.  Indictment at 11 (Count 4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered Burns.  See Indictment at 11-12 (Count 5). In March 2014, Defendants Armenta, Montoya, M. Rodriguez, Timothy Martinez, Mauricio Varela, Sanchez, Baca, Carlos Herrera, and Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6).  On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and Perez allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Defendants Archuleta,

---

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

Conrad Villegas, and Baca allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R. Martinez, and R.P. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Defendants Baca, R. Martinez, R.P Martinez, and Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, Defendants J. Gallegos, Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). On February 27, 2016, J. Gallegos, Gonzales, Rivera, Gutierrez, and B. Rodriguez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[4] -- the United States names twelve defendants, all alleged SNM members

---

[4]The Court has granted a conditional severance of one Defendant in that case. See United States v. Baca, No. CR 16-1613, 2016 WL 6404772 (D.N.M. Oct. 20, 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his rights under the Speedy Trial Act, 18 U.S.C. §§ 3161-74. See United States v. Baca,

or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[5]  There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On October 4, 2016, in a pretrial hearing, the Court outlined its general approach regarding discovery in this case.  See Transcript of Hearing (held October 4, 2016), filed October 18, 2016 (Doc. 743)("Oct. 2016 Tr.").  The United States agreed to produce material subject to the Jencks Act fourteen days before trial even though the Jencks Act does not require the United States to produce a witness' statements until after the witness testifies, see Oct. 2016 Tr. at 19:2-12 (Beck), and the Court indicated that it was "not going to require any Jencks material to be produced before

---

2016 WL 6404772, at *31-32.  The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . .  If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32.  Ultimately, the Court notes, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld).  On March 22, 2017, R. Gallegos pled guilty in his severed case.  See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[5]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, 2016 WL 6404772, at *33.

the 14 days," Oct. 2016 Tr. at 23:10-12 (Court).  The Court indicated, however, that the United States "needs to go in and look at these files and do a [Brady v. Maryland, 373 U.S. 83 (1963)('Brady')] review," and "produce the Brady material promptly, immediately." Oct. Tr. at 23:16-19 (Court).  The Court later memorialized its discovery determinations in its Sealed Memorandum Opinion and Order at 106-11, 2017 WL 2271430, at *50-52, filed January 3, 2017 (Doc. 809).

On June 30, 2017, the Court severed for trial the Indictment's Counts 6-12 from its Counts 1-5 and Counts 13-16.  See Memorandum Opinion and Order at 3, 2017 WL 3054511, at *1, filed June 9, 2017 (Doc. 1187)("Severance MOO").  The result of this severance is one trial for the Indictment's Counts 6-12 ("Trial 1"), and another, separate trial for the Indictment's Counts 1-5 and 13-16 ("Trial 2").  Severance MOO at 3, 2017 WL 3054511, at *1.  At the time of severance, nineteen Defendants remained in the case.  See Severance MOO at 175, 2017 WL 3054511, at *102.  The trial of the Indictment's Counts 1-5 and 13-16 "would then involve the prosecution of eleven Defendants, none of whom are named in Counts 6-12."  Severance MOO at 175, 2017 WL 3054511, at *102.  Further, the trial of the Indictment's Counts 6-12 "would involve the prosecution of eight Defendants none of whom are named in Counts 1-5 or 13-16."  Severance MOO at 175, 2017 WL 3054511, at *102.

The Court scheduled Trial 1 to begin on January 29, 2018, at 9:00 a.m. at the federal courthouse in Las Cruces.  See Fourth Scheduling Order at 2, filed July 7, 2017 (Doc. 1205).  The Court scheduled Trial 2 to begin on April 9, 2018.  See Fourth Scheduling Order at 3.  Some Defendants charged in Counts 1-5 and 13-16 pled guilty, leaving J. Gallegos, Troup, B. Garcia, Patterson, Chavez, A. Garcia, and A. Gallegos as the second trial's Defendants.  See Clerk's Minutes at 6, filed April 9, 2018 (Doc. 2324)("Trial Minutes").  The parties gave their opening

statements on Thursday, April 12, 2018, and the United States began its case in chief the same day. See Trial Minutes at 11. The parties gave their closing statements and turned the case over to the jury for it to begin deliberations on Tuesday, May 22, 2018. See Trial Minutes at 53-54.

The jury returned its verdict on Friday, May 25, 2018. See Verdict (dated May 25, 2018), filed May 25, 2018 (Doc. 2332). The jury found J. Gallegos "guilty of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the Indictment," "guilty of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of the Indictment," "guilty of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the Indictment," "not guilty of violent crimes in aid of racketeering in the assault with a dangerous weapon against Jose Gomez, as charged in Count 13 of the Indictment," "not guilty of violent crimes in aid of racketeering in conspiring to murder Jose Gomez, as charged in Count 14 of the Indictment," "not guilty of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, or the assault resulting in serious bodily injury to Jose Gomez, or assault with a dangerous weapon upon Jose Gomez, as charged in Count 15 of the Indictment," and "not guilty of tampering with a witness by physical force or threat, as charged in Count 16 of the Indictment." Verdict at 1-3. The jury found Troup "guilty of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the Indictment," and "guilty of violent crimes in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the Indictment." Verdict at 3. The jury found B. Garcia "guilty of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the Indictment," and "guilty of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the Indictment." Verdict at 3. The jury found Patterson "not guilty of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the Indictment." Verdict

at 4.  The jury found Chavez "not guilty of violent crimes in aid of racketeering in the murder of Rolando Garza, as charged in Count 2 of the Indictment."  Verdict at 4.  The jury found A. Garcia "guilty of violent crimes in aid of racketeering in the murder of Freddie Sanchez, as charged in Count 3 of the Indictment."  Verdict at 4.  Finally, the jury found A. Gallegos "guilty of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of the Indictment," and "guilty of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the Indictment."  Verdict at 4-5.

       1.       **The B. Garcia Motion.**

      B. Garcia filed the B. Garcia Motion on October 15, 2018, and J. Gallegos, Troup, A. Garcia, Sanchez, Baca, Herrera, and A. Gallegos join it.  <u>See</u> B. Garcia Motion at 1, 5. B. Garcia asks the Court to order the United States "to produce materials to the defense which may be the basis of a motion for post-conviction relief under Fed. Crim. P. 32."  B. Garcia Motion at 1. B. Garcia notes that, "throughout the case," the Defendants "asserted their rights under the Jencks Act in regard to Leroy Lucero and all testifying witnesses."  B. Garcia Motion ¶ 4, at 2.  B. Garcia avers that the Court, in its Memorandum Opinion and Order, 323 F. Supp. 3d 1285 (D.N.M. April 25, 2018)(Browning, J.)("April 25 MOO"),  "ordered production to include, 'stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.'"  B. Garcia Motion ¶ 4, at 2 (quoting April 25 MOO at 5 n.4, 323 F. Supp. 3d at 1290 n.4 (quoting 18 U.S.C. § 3500(e)(1))).  According to B. Garcia, the United States possesses "statements of at least one testifying witness, Leroy Lucero, for which they did not provide a copy to the defense during trial nor utilized the mandatory statutory in camera review process."  B. Garcia Motion ¶ 5, at 2.  B. Garcia asserts that Acee and Lucero exchanged "41 phone

calls and 92 text messages . . . between the dates of 2/15/2018 and 5/3/2018. The phone calls vary in length up to 25 minutes in duration and just short of 3 hours in total." B. Garcia Motion ¶ 6.c, at 3. B. Garcia says that he "informally requested" copies of the text messages and recordings of the phone calls. B. Garcia Motion ¶ 7, at 3. B. Garcia argues that the requested documents are "relevant," because they: (i) "[r]eflect a bias in Mr. Lucero"; (ii) "[m]ay be evidence of consciousness of guilt pointing towards a codefendant or alternate suspect"; or (iii) "[m]ay be disproved by the phone records which would constitute a dishonest statement of Mr. Lucero which could have been used for impeachments purposes." B. Garcia Motion ¶ 8, at 3.

B. Garcia says that Lucero asserted his "right to remain silent" under the Fifth Amendment to the Constitution of the United States of America on March 13, 2018, and March 16, 2018. B. Garcia Motion ¶ 9, at 4. B. Garcia notes that Lucero "made a formal statement on March 23, 2018," in which he agreed to cooperate with the United States "against his attorney's advice." B. Garcia Motion ¶ 9, at 4. According to B. Garcia, Acee and Lucero had a fifteen-minute telephone call, and exchanged eleven text messages during the time between Lucero's two assertions of his right to remain silent. See B. Garcia Motion ¶ 9, at 4. B. Garcia argues that the "content of these communications between Mr. Lucero and Agent Acee, that culminated in Mr. Lucero disregarding his own decision to assert his fifth amendment rights and ignore his attorney's advice, are highly relevant." B. Garcia Motion ¶ 9, at 4. B. Garcia contends that the telephone call recordings and text messages "would have been important for the jury to assess when Mr. Lucero testified." B. Garcia Motion ¶ 9, at 4. B. Garcia notes, however, that the United States "has asserted that the messages and phone calls were not substantive in nature and have otherwise declined to produce such materials." B. Garcia Motion ¶ 10, at 4. B. Garcia

moves for an order requiring production of all text messages between Agent Acee or any government agent and any testifying witness during or before trial.  If such messages have been destroyed the defense requests notice of any such destruction and the details regarding such destruction.  The defense similarly requests production of any FBI 302's[6] or written memoranda which reflect the substance of any phone calls between government agents and testifying witnesses.

B. Garcia Motion ¶ 11, at 4-5.  B. Garcia also asks the Court to order the United States to "deliver any statement" that the United States "asserts does not relate to the subject matter of the testimony of the witness for the inspection of the court in camera."  B. Garcia Motion ¶ 12, at 4.

### 2.    The B. Garcia Motion Response.

The United States responds to the B. Garcia Motion.  See United States' Response to Billy Garcia' [sic] Motion to Produce Post-Conviction Discovery and for In Camera Review [Doc. 2416], filed October 29, 2018 (Doc. 2433)("B. Garcia Motion Response").  The United States maintains that it has provided "an extraordinary amount of information and discovery" to B. Garcia, and that it is "mindful of its discovery obligations."  B. Garcia Motion Response at 1. The United States says that the Jencks Act "requires the United States to produce statements made by a government witness or prospective government witness (other than the defendant), after that witness testifies at trial which relate to the subject matter as to which the witness has testified." B. Garcia Motion Response at 1.  The United States avers that it disclosed "Lucero's statements that were in the government's possession during trial."  B. Garcia Motion Response at 1.

The United States reiterates that these communications between Acee and Lucero are "not substantive in nature and not related to the subject matter of Lucero's testimony."  B. Garcia Motion Response at 2.  According to the United States, the "topics included Lucero's safety

---

[6]302s, also known as FD-302s, are FBI forms that agents use to summarize the interviews they conduct.

concerns, Lucero's relocation, a vehicle accident that Lucero was in on Lucero's way home from testifying following a motions hearing, a burglary in which the victim was Lucero's wife, and the logistics of Lucero's travel to Las Cruces to testify." B. Garcia Motion Response at 2 (citing FD-209a (dated May 2, 2018), filed October 29, 2018 (Doc. 2433-1); FD-302 (dated May 21, 2018), filed October 29, 2018 (Doc. 2433-2); FD-1023 (dated May 24, 2018), filed October 29, 2018 (Doc. 2433-3)). The United States asserts that, when B. Garcia informally requested communications between Acee and Lucero, the United States told B. Garcia that Lucero had an attorney when the communications occurred, and that Lucero's attorney is "extremely protective of him." B. Garcia Motion Response at 2. The United States argues that "Acee was careful not to have discussions with Lucero pertaining to his anticipated or prior testimony." B. Garcia Motion Response at 2. The United States further argues that B. Garcia "has not shown good cause for the discovery he now seeks" and that B. Garcia is engaging in a "fishing expedition." B. Garcia Motion Response at 2. The United States adds that the communications between Acee and B. Garcia are not in the United States' "control and custody," because Acee acquired a new cellular telephone in May, 2018, and thus "all text messages to and from his prior cellular number were lost." B. Garcia Motion Response at 2-3.

### 3.    The B. Garcia Motion Reply.

B. Garcia replies to the B. Garcia Motion Response. See Reply to Government's Response to Motion for Post-Conviction Discovery and for In Camera Review (Doc. No. 2433), filed November 2, 2018 (Doc. 2438)("B. Garcia Motion Reply"). B. Garcia notes that the United States "concedes that there were written and telephonic communications" between Acee and Lucero, B. Garcia Motion Reply ¶ 1, at 1, but that the United States "does not address whether recordings exist of the phone calls between" Acee and Lucero, B. Garcia Motion Reply ¶ 2, at 1. B. Garcia

argues that, because the United States admits that Acee and Lucero's "calls were the subject of an investigation which included grand jury subpoenas," the recordings and text messages "are substantive as they related to an investigation of witness intimidation."  B. Garcia Motion Reply ¶ 4, at 2.  B. Garcia argues that the "alleged threats or intimidation of Leroy Lucero" are "relevant to the trial against" B. Garcia.  B. Garcia Motion Reply ¶ 5, at 2.  According to B. Garcia, the United States argues -- and Lucero testified -- that B. Garcia "planned and orchestrated the murders."  B. Garcia Motion Reply ¶ 5, at 5.  B. Garcia counters, however, that Lucero "planned and orchestrated the murders," and thus B. Garcia argues that "Lucero's motivations in testifying and his credibility were central to the defense of the case."  B. Garcia Motion Reply ¶ 5, at 2. B. Garcia argues that,

> [s]ince the government has not denied that a codefendant or someone aligned with Lucero could have been the source of the alleged threats, the Court should conduct an in camera review.  In addition, the government should be ordered to disclose the results of their investigation.  The evidence and statements concerning the alleged threats or intimidation, if true, may also have been relevant to demonstrate that Lucero was beholden to the FBI, who he was counting on to protect him.

B. Garcia Motion Reply ¶ 6, at 3.  B. Garcia adds that Lucero's "claims of intimidation" may be "invalid," and if so, "it would show the extent to which Lucero was willing to go to create [a] false impression of victimhood when he may very well have been the individual who ordered and orchestrated the murders."  B. Garcia Motion Reply ¶ 8, at 4.

B. Garcia also argues that Acee and Lucero's communications "are evidence of a potential bias."  B. Garcia Motion Reply ¶ 9, at 4 (citing United States v. Abel, 469 U.S. 45, 52 (1984)). B. Garcia argues that, although the United States maintains that the recordings and text messages between Acee and Lucero do not relate to Lucero's testimony, "the Jencks Act is clear that 'the court shall order the United States to deliver such statement for the inspection of the court *in*

*camera*.'"  B. Garcia Motion Reply ¶ 10, at 4 (quoting 18 U.S.C. § 3500(c)).  B. Garcia asserts that the FBI Records Management Policy "requires text messages to be preserved."  B. Garcia Motion Reply ¶ 11, at 5 (citing FBI Records Management Policy Guide at 39, filed November 2, 2018 (Doc. 2438-1)).  B. Garcia adds that it is "iron[ic]" that the United States argues that the FBI cannot retrieve text messages, because "some portion of their mission is to do just that when they wish to review [a] citizen's text messages."  B. Garcia Motion Reply ¶ 12, at 5.  B. Garcia argues that Acee's text messages are "backed up and accessible on . . . the current FBI recordkeeping system."  B. Garcia Motion Reply ¶ 13, at 6.  B. Garcia also argues that, although the United States says that B. Garcia "has not shown 'good cause'" for disclosing the communications, the Jencks Act "requires production to the Court for its review."  B. Garcia Motion Reply ¶ 14, at 6 (quoting B. Garcia Motion Response at 2).  B. Garcia avers that the communications' production to the Court "should have been done during trial but was not; now it is time for their belated disclosure and review by the Court."  B. Garcia Motion Reply ¶ 14, at 6.  B. Garcia notes that, if the United States cannot produce the communications, then he will file a "motion for new trial . . . based on destruction of evidence."  B. Garcia Motion Reply ¶ 14, at 6.

### 4.    The Gallegos Joint Motion

J. Gallegos filed the Gallegos Joint Motion on October 15, 2018, on his own behalf and on his brother's behalf.  See Gallegos Joint Motion at 1.  They renew their oral motions for acquittal, which they made following the close of the United States' case and which the Court denied.  See Gallegos Joint Motion at 1.  They begin by arguing that acquittal is proper, because the Court should have held a pre-evidentiary hearing to determine whether there was sufficient evidence for the Court to have jurisdiction over Counts 4 and 5 of the Indictment.  See Gallegos Joint Motion at 1.

J. Gallegos and A. Gallegos then argue several alternative grounds to support acquittal or a new trial. First, they argue that acquittal is appropriate, because "the evidence was insufficient to sustain a conviction under VICAR" without any evidence that J. Gallegos and A. Gallegos entered into an agreement with SNM to commit murder. Gallegos Joint Motion at 2. They reason that the United States produced no evidence to show that the "members of the SNM hierarchy approved or even knew that" J. Gallegos and A. Gallegos were going to murder Adrian Burns. Gallegos Joint Motion at 3.

Second, they assert that acquittal or a new trial is appropriate, because the improper inclusion of hearsay evidence violated the Defendants' rights under the Sixth Amendment's Confrontation Clause. See Gallegos Joint Motion at 3. They argue that Amber Sutton's testimony includes a statement by Burns that the Court should have excluded, because the statement was addressed to Daniel Orndorff, who did not testify at trial, rather than to A. Sutton, who did testify at trial. See Gallegos Joint Motion at 4. J. Gallegos and A. Gallegos maintain that the "Government's purpose for introducing this statement was to show the jurors that the defendants had a reason to conspire and murder under the dictates of VICAR." Gallegos Joint Motion at 4. According to J. Gallegos and A. Gallegos, "[b]ecause Mr. Orndorff did not testify it was impossible for the defense to challenge whether this statement was made for the truth of the matter the government asserts." Gallegos Joint Motion at 4. J. Gallegos and A. Gallegos argue that, because the statement was not addressed to A. Sutton, the "hearsay exception of unavailability should not apply." Gallegos Joint Motion at 4.

Third, J. Gallegos and A. Gallegos argue that a new trial is appropriate, because A. Sutton's testimony violates their Sixth Amendment right to confront Orndorff, to whom Burns' statement was addressed. See Gallegos Joint Motion at 5. According to J. Gallegos and

A. Gallegos, the "only evidence of the substance of the statement was repeated by a bystander to the conversation between Mr. Burns and Mr. Orndorff." Gallegos Joint Motion at 5. J. Gallegos and A. Gallegos further argue that "since Ms. Sutton had no direct knowledge about whether Mr. Orndorff relayed the remarks of Adrian Burns to the Gallegos brothers, the hearsay statement of Ms. Sutton has no indicia of reliability." Gallegos Joint Motion at 5.

### 5.    The Gallegos Joint Motion Response.

The United States responded to the Gallegos Joint Motion on November 30, 2018. See United States' Response to Defendants' Rule 29 Motion for Judgment of Acquittal or in the Alternative, Motion for New Trial With Regard to Counts Four and Five, filed November 30, 2018 (Doc. 2452)("Gallegos Joint Motion Response"). The United States addresses each of the Gallegos' arguments in turn. Responding to the first argument, the United States argues that J. Gallegos and A. Gallegos are not entitled to a new hearing. See Gallegos Joint Motion Response at 9. The United States argues that an evidentiary hearing is required "'only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law.'" Gallegos Joint Motion Response at 10 (quoting United States v. Velarde, 485 F.3d 553, 559 (10th Cir. 2007)).

Responding to the second argument -- that J. Gallegos and A. Gallegos should be acquitted because the United States failed to prove that J. Gallegos and A. Gallegos entered into an agreement with SNM to murder Burns -- the United States argues that "there was sufficient evidence to sustain a VICAR conviction." Gallegos Joint Motion Response at 4. The United States reasons that, according to SNM rules, J. Gallegos did not need SNM members' approval to murder Burns. See Gallegos Joint Motion Response at 5. The United States further argues that J. Gallegos was following SNM rules regarding disrespect when he murdered Burns, and it presents

supporting evidence in the form of trial testimony excerpts.  <u>See</u> Gallegos Joint Motion Response at 6 (stating that J. Gallegos was obligated under SNM rules to "not let [disrespect] go without retribution"); <u>id.</u> at 5 (citing Jake Armijo's testimony that he stabbed two people because of disrespect); <u>id.</u> at 5 (quoting Frederico Munoz' testimony that SNM members "have to act on the person that disrespected you by. . . in some cases[,] killing them"); <u>id.</u> at 6 (quoting Billy Cordova's testimony that, when someone disrespects an SNM member, the response should be "assault or murder" with the "intent to try to kill").  The United States also presents J. Gallegos' and A. Gallegos' admissions that they were at Burns' house the night of his murder as further evidence of the VICAR violation.  <u>See</u> Gallegos Joint Motion Response at 6-7.

Responding to the third argument -- that J. Gallegos and A. Gallegos are entitled to a new trial because of improper admission of hearsay evidence in violation of the Sixth Amendment -- the United States argues that the referenced testimony "was properly admitted, and the defendants' Sixth Amendment rights were not violated."[7]  Gallegos Joint Motion Response at 6.   The United States recounts the Court's ruling that the evidence is admissible only to "determin[e] whether Mr. Burns made that statement,"  because it could show that Burns disrespected Gallegos.  Gallegos Joint Motion Response at 9.  The United States also notes that the Court gave the jury a limiting instruction about the evidence.  <u>See</u> Gallegos Joint Motion Response at 9 (citing A. Sutton Tr. at 60:8-14 (Court)).

---

[7]J. Gallegos and A. Gallegos do not cite or quote the testimony that they allege was improperly included.   The United States presumes that the testimony was "Amber Sutton's testimony that Adrian Burns told 'Sleepy' to tell Joe Gallegos that 'if he doesn't have my money to stop being a bitch and give me a call.'"  Gallegos Joint Motion Response at 8 (quoting Transcript of Expert of Testimony of Amber Sutton at 59:23-25 (Castellano)(taken April 27, 2018), filed November 30, 2018 (Doc. 2456)("A. Sutton Tr.").  The Court concludes that this testimony aligns with J. Gallegos and A. Gallegos' argument and therefore presumes it is the referenced testimony.

Responding to the fourth argument[8] -- that the admission of A. Sutton's testimony violated J. Gallegos' and A. Gallegos' Sixth Amendment rights -- the United States repeats the Court's conclusion that A. Sutton's statements do not violate the Confrontation Clause because of hearsay exceptions.  See Gallegos Joint Motion Response at 9 (citing A. Sutton Tr. at 13:15-19 (Court)). The United States also notes that J. Gallegos requested and received a limiting instruction.  See Gallegos Joint Motion Response at 9 (citing A. Sutton Tr. at 60:8-14 (Court)).  The United States did not address further the Confrontation Clause argument.

### 6.    <u>The Gallegos Joint Motion Reply</u>.

J. Gallegos and A. Gallegos filed a Reply to the Gallegos Joint Motion Response.  See Defendants' Reply to the United States Response to Doc 2415 Motion for Judgment of Acquittal or Motion for New Trial, filed December 14, 2018 (Doc. 2467)("Gallegos Joint Motion Reply"). J. Gallegos and A. Gallegos argue that the United States makes only two arguments in the Gallegos Joint Motion Response: (i) an argument regarding "VICAR sufficiency"; and (ii) "an argument regarding the admission of a statement by a third party in the testimony of Amber Sutton." Gallegos Joint Motion Reply at 1.  J. Gallegos and A. Gallegos argue that the United States uses two allegedly separate statements in the United States Response to support each argument, but that the statements were the same statement.  See Gallegos Joint Motion Reply at 2 (citing Gallegos Joint Motion Response at 6, 8).  J. Gallegos and A. Gallegos argue that the United States used Burns' statement to Orndorff -- "Tell him if he doesn't have my money to stop being a bitch and

---

[8]While J. Gallegos' and A. Gallegos' third argument mentions a Sixth Amendment violation, it does not elaborate beyond stating the violation.  See Gallegos Joint Motion at 4.  ("In addition, the Defendants' Sixth Amendment rights found haven beneath the wheels of the Government's juggernaut.").  J. Gallegos and A. Gallegos' fourth argument elaborates, however, on the Sixth Amendment violation.  Because the fourth argument expounded upon the third argument, the Court will treat these two arguments together.

give me a call," A. Sutton Tr. at 59:23-25 (Castellano) -- to demonstrate that Burns "disrespected" J. Gallegos, was what the jury used "in its decision to convict the Gallegos brothers."  Gallegos Joint Motion Reply at 2.  According to J. Gallegos and A. Gallegos, although the Court instructed the jury not to consider the statement for the truth of the matter asserted, the jury nevertheless relied upon it to convict them.  See Gallegos Joint Motion Reply at 2.

J. Gallegos and A. Gallegos next argue that the United States mischaracterizes SNM's rule about how SNM members respond to disrespect as "entirely inflexible."  Gallegos Joint Motion Reply at 2.  As an example, J. Gallegos and A. Gallegos point to Archuleta's testimony that a child who pretends to be a member of SNM is not violating any rules.  See Gallegos Joint Motion Reply at 2.  J. Gallegos and A. Gallegos then assert that "[t]here is no way that pretending to be a member of SNM does not disrespect its actual members."  Gallegos Joint Motion Reply at 2.  J. Gallegos and A. Gallegos note, however, that, "it is not a violation . . . for a kid to impersonate a SNM gang member and lie about being brought into the gang."  Gallegos Joint Motion at 3.  According to J. Gallegos and A. Gallegos, this inconsistency shows that "[w]hat constitutes disrespect, especially when outside of the pervasive influence of prison, is not as ironclad or rock solid as portrayed to the jury."  Gallegos Joint Motion Reply at 3.

    **7.**    **The A. Gallegos Motion.**

A. Gallegos filed the A. Gallegos Motion on October 15, 2018.  See A. Gallegos Motion at 1.  A. Gallegos makes two arguments: (i) the Court should grant a judgment of acquittal because "the government failed to establish a nexus between the murder of Adrian Burns and the VICAR conspiracy SNM"; and (ii) the Court should grant a new trial because A. "Gallegos was prejudiced by the combined trial of codefendants."  A. Gallegos Motion at 3, 9.   A. Gallegos addresses each argument in turn.

First, A. Gallegos argues that the Court should acquit him, because the United States did not provide sufficient evidence demonstrating a link between Burns' murder and SNM. See A. Gallegos Motion at 3.   A. Gallegos argues that the fifth element of a VICAR offense -- "the defendant's purpose in . . . [committing the crime] was to gain entrance to, or to maintain, or to increase his position in the enterprise."   A. Gallegos Motion at 5.   A. Gallegos argues that the United States did not present sufficient evidence that SNM's goals were "furthered by the murder, or that either men committed the murder to gain status in the organization."   A. Gallegos Motion at 5.   A. Gallegos argues that "there was no evidence that the leadership had any involvement with the Burns murder. . . .   [T]he jury could have just as easily concluded that the murder was the result of a drug deal gone bad or an argument over money."   A. Gallegos Motion at 6.

A Gallegos next argues that the "entire government VICAR case rests on . . . Sutton's testimony that Adrian Burns made a statement to Daniel Orendorf . . . to tell Joe Gallegos that he was being a 'bitch' for not squaring a minor debt," A. Gallegos Motion at 6, which was never shown to have "made its way to" J. Gallegos, A. Gallegos Motion at 7.   Furthermore, A. Gallegos argues, the United States did not "show how the disrespect of Joe Gallegos would give reasons pursuant to the VICAR statute for Andrew Gallegos to engage in the murder of Adrian Burns. . . . Defense of one's brother's honor does not meet the VICAR standard."   A. Gallegos Motion at 7. A. Gallegos further asserts that "[m]ere association with [SNM] is not sufficient [for a VICAR violation], nor is the fact that the predicate offenses had some effect on [SNM]'s affairs." A. Gallegos Motion at 7.

A. Gallegos next argues that a judgment of acquittal is appropriate for the conspiracy charge.   See A. Gallegos Motion at 8.   A. Gallegos reiterates the Court's conclusion that, "'[i]f the United States fails to introduce such evidence at trial, (required VICAR nexus evidence), then a

judgment of acquittal would be appropriate because the evidence would be insufficient to sustain a conviction' on Counts 4 and 5.'"  A. Gallegos Motion at 8 (quoting Memorandum Opinion and Order, No. CR 15-4268 JB, 2018 WL 1388462 (D.N.M. March 16, 2018)(Doc. 1950)(Browning, J.)("March 16 MOO")).  To demonstrate that this burden was not met, A. Gallegos points to an "insufficiency of evidence to conclude a conspiracy between Joe and Andrew Gallegos . . . [or that] the murder was done as part of the SNM conspiracy."  A. Gallegos Motion at 9.  A. Gallegos reiterates that his role in the murder could be attributed to his loyalty to his brother and not his loyalty to SNM.  See A. Gallegos Motion at 9.

Next, A. Gallegos argues that the Court should grant him a new and separate trial, because his joint trial with the co-Defendants prejudiced him.  See A. Gallegos Motion at 9.  Specifically, A. Gallegos avers that the Court should have severed his trial, because J. Gallegos' confession was "improperly admitted," and because the co-Defendants' defense was "antagonistic" to his own defense.  A. Gallegos Motion at 9.  A. Gallegos contends that E. Martinez "was by far [his] best witness," because he testified that A. Gallegos was not an SNM member, but that Martinez' credibility was "completely destroyed" in the cross-examination that A. Gallegos' co-Defendants' counsel conducted.  A. Gallegos Motion at 10.  According to A. Gallegos, counsel for B. Garcia and for Patterson portrayed E. Martinez as a "liar," and as "mentally unstable."  A. Gallegos Motion at 11.  During cross-examination, A. Gallegos states that Martinez admitted to "lying about witnessing his father's murder to gain government perks and the sympathy of the jury."  A. Gallegos Motion at 11.  As a result of this "witness destruction," A. Gallegos' counsel did not mention E. Martinez' testimony during closing arguments, "even though it was helpful to Andrew Gallegos."  A. Gallegos Motion at 11.  According to A. Gallegos, his defense strategy was the "polar opposite" of B. Garcia's and Patterson's defense strategies, and therefore severance was

warranted.  A. Gallegos Motion at 11-12 (citing <u>United States v. Carpentier</u>, 689 F.2d 21, 27-28 (2d Cir. 1982)).

A. Gallegos also argues that his rights under the Sixth Amendment's Confrontation Clause were violated, because J. Gallegos' confession was admitted through witness Morgan Ramirez' testimony.  <u>See</u> A. Gallegos Motion at 12.  A. Gallegos cites three admissions by Ramirez that referenced J. Gallegos' confession to killing Burns, and A. Gallegos argues that his rights under the Confrontation Clause were violated, because he could not cross-examine J. Gallegos, a non-testifying co-Defendant, about his confession.  <u>See</u> A. Gallegos Motion at 12-13 (citing <u>Bruton v. United States</u>, 391 U.S. 123).  First, according to A. Gallegos, Ramirez testified that she could not remember whether J. Gallegos told her "I" shot Adrian Burns or "we" shot Adrian Burns.  A. Gallegos Motion at 14.  A. Gallegos contends that, although Ramirez did not testify that the "we" did include or might have included A. Gallegos, "the damage . . . had been done" and "the implication remained."  A. Gallegos Motion at 15.  A. Gallegos argues that, although the Court provided a limiting instruction, the limiting instruction did not cure the alleged Sixth Amendment violation.  <u>See</u> A. Gallegos Motion at 12, 15 (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 400-07 (1965)).

In the second Ramirez statement, A. Gallegos asserts that, following the Court's limiting instruction, Ramirez testified that J. Gallegos told her that no one died in his house but that he may have shot someone in his house.  <u>See</u> A. Gallegos Motion at 16.  Third, A. Gallegos describes that, without a limiting instruction, Ramirez testified that J. Gallegos told her that "they shot" Adrian Burns, but Ramirez did not specify to whom "they" refers.  A. Gallegos Motion at 16.  A. Gallegos argues that these three statements never would have been admitted in a trial against only himself.  <u>See</u> A. Gallegos Motion at 16.  As to the Court's limiting instructions, A. Gallegos asserts that "Ramirez' testimony was so prejudicial as to be incurable by any instruction" and that the jury was

"more prone" to convict him because it knew that J. Gallegos had confessed to killing Burns -- a confession that A. Gallegos contends implicated him.  A. Gallegos Motion at 17-18.  A. Gallegos thus argues that the "potential 'prejudicial impact' [of admitting J. Gallegos' confession through Ramirez' testimony] warrants a new trial to guarantee [that he] has a fair trial."  A. Gallegos Motion at 18 (quoting United States v. Gabaldon, 91 F.3d 91, 93-94 (10th Cir. 1996)).

A. Gallegos argues that the Court should not have admitted an audio recording depicting J. Gallegos as a "demanding 'boss,'" because it was irrelevant and prejudicial to him.  A. Gallegos Motion at 18.  A. Gallegos says that the United States played the audio recording during Gutierrez' testimony, and that it related to Counts 14 and 15.  See A. Gallegos Motion at 18.  Although A. Gallegos was not charged with these counts, A. Gallegos maintains that he was charged as a co-Defendant to J. Gallegos in other counts, and that the audio recording "had an effect on the jury and subsequently on Andrew Gallegos."  A. Gallegos Motion at 19.  A. Gallegos avers that the audio recording, which was admitted against J. Gallegos, was also relevant to Gutierrez under rule 401 of the Federal Rules of Evidence, but "should have been excluded under [r]ule 403 in a separate trial of Andrew Gallegos because its probative value would be outweighed by the danger of unfair prejudice."  A. Gallegos Motion at 19.

A. Gallegos next argues that the jurors were "unable to disregard irrelevant or questionable testimony" that B. Cordova provided, and that B. Cordova testified that A. Gallegos confessed to killing Burns.  A. Gallegos Motion at 20.  A. Gallegos describes B. Cordova as "a self-admitted exploiter of the system" and avers that B. Cordova "testified to incorrect facts regarding the Burns murder, which should have cast doubt on his testimony."  A. Gallegos Motion at 20.  Moreover, A. Gallegos contends that the jury "obviously believed Billy Cordova in spite of the error in his

facts, inability to actually identify Andrew Gallegos in court, and his stated motives to lie." A. Gallegos Motion at 20.

Last, A. Gallegos argues that "[t]he overwhelming volume of [enterprise] evidence . . . exceeded the scope and became highly prejudicial." A. Gallegos Motion at 20. According to A. Gallegos, much of the enterprise evidence was irrelevant as to him and "would not have been admitted in a separate trial against" him, because "[t]he prejudice was unsurmountable." A. Gallegos Motion at 20. A. Gallegos contends that, because he is "accused of an incident that occurred outside the prison walls, [] the incredible volume of violent incidents" that occurred inside the penitentiary walls would not have been admitted against him in a separate trial. A. Gallegos Motion at 21. First, A. Gallegos argues that testimony pertaining to "tattooing and sodomizing of the inmate librarian, Jimmie Rae Gordon," would not have been admitted against him, because it described horrific events at a place where A. Gallegos was not present. A. Gallegos Motion at 21. A. Gallegos avers that Gordon's "very emotional and heartbreaking testimony was irrelevant and highly prejudicial." A. Gallegos Motion at 21. A. Gallegos argues that M. Rodriguez' attack of another prison inmate, which A. Gallegos maintains did not pertain to him, would not have been admitted against him at a separate trial. See A. Gallegos Motion at 21. A. Gallegos also argues that his own cross-examination of M. Rodriguez was "antagonistic to the co-defendants," because A. Gallegos tried to show that not all SNM members are violent, which directly contradicted J. Gallegos', Troup's, B. Garcia's, and A. Garcia's trial strategies. A. Gallegos Motion at 22. A. Gallegos avers that he did not want to harm his co-Defendants' defense, so he "tampered down his defense to avoid being antagonistic to the other co-defendants," because he might have to share a prison cell with one of them. A. Gallegos Motion at 22. A. Gallegos next argues that repeated testimony that Frankie Gallegos, A. Gallegos' younger

brother, is an SNM leader "was not relevant and was prejudicial," because the United States "failed to draw an enterprise nexus between" A. Gallegos and his younger brother other than their biological connection.  A. Gallegos Motion at 22-23 (citing United States v. Singleterry, 646 F.2d 1014, 1018 (5th Cir. 1981)).  According to A. Gallegos, although it is relevant whether he is an SNM member, it is not relevant whether his brother, F. Gallegos, is an SNM member, and stating the fact that the two are brothers in the absence of any other "nexus" was "prejudicial." A. Gallegos Motion at 23.

A. Gallegos next argues that a conversation -- admitted through J. Armijo's testimony -- between J. Armijo and Angel Munoz was "highly prejudicial and irrelevant," and "would not have been allowed in a separate trial against" him.  A. Gallegos Motion at 24.  According to A. Gallegos, there was "no nexus" between himself and A. Munoz.  A. Gallegos Motion at 24.  A. Gallegos also argues that Acee's testimony "about the planned murder on Gregg Merchantel [sic] and Deputy Director Santsivan [sic]" should not have been admitted against him.  A. Gallegos Motion at 24.  A. Gallegos contends that, in a separate trial against only him, "Agent Acee's testimony would be limited to his researching of cold cases that might have been gang related."  A. Gallegos Motion at 25 (internal quotation marks omitted).  A. Gallegos also argues that, because he was out of custody when Burns was murdered, evidence that he was in prison before Burns' murder and that he returned to prison after the murder constitutes "propensity character evidence against him" in violation of rule 404 of the Federal Rules of Evidence.  A. Gallegos Motion at 25 (citing United States v. Moran, 503 F.3d 1125, 1145 (10th Cir. 2007); United States v. Avarello, 592 F.2d 1339, 1346 (5th Cir. 1979)).  Last, A. Gallegos avers that J. Gallegos' admission of committing a previous murder in prison was "highly prejudicial" and "would have never occurred in a trial unique to Andrew Gallegos."  A. Gallegos NTM at 25-26.  A. Gallegos contends that limiting

instructions "are insufficient in avoiding the 'spillover' of Joe Gallegos['] statements," and that it would "be wholly unreasonable for a jury to 'perform the intellectual feat in a joint trial' of using such proof against some defendants and ignoring it as to others.'"  A. Gallegos Motion at 26 (quoting United States v. Praetorius, 462 F. Supp. 924, 928 (E.D.N.Y. 1978)).

### 8.    **The A. Gallegos Motion Response.**

The United States filed its response to A. Gallegos' Motion on November 26, 2018. See United States' Response to Andrew Gallegos' Motion for Judgment of Acquittal or in the Alternative, Motion for New Trial Doc. 2418, filed November 26, 2018 (Doc. 2450)("A. Gallegos Motion Response").  The United States responds to A. Gallegos' two arguments by asserting that (i) "judgment of acquittal should be denied as there was sufficient evidence to convict Andrew Gallegos"; and (ii) A. Gallegos "should not be granted a new trial because he was not prejudiced during trial with co-defendants."  A. Gallegos Motion Response at 4, 13.  The United States makes each argument in turn.

The United States argues that the Court should deny A. Gallego's motion for acquittal based on insufficient evidence to convict.  See A. Gallegos Motion Response at 4.  The United States supports this argument with two reasons: (i) that "there was sufficient evidence to convict [A.] Gallegos of a VICAR offense"; and (ii) there was a demonstrated "nexus between the murder of Adrian Burns and the VICAR conspiracy."  A. Gallegos Motion Response at 5, 10.  The United States addresses each reason separately.

First, the United States argues that there was sufficient evidence to convict A. Gallegos of a VICAR offense.  See A. Gallegos Motion Response at 5.  In support, the United States describes each piece of evidence presented that supported convicting A. Gallegos of a VICAR offense.  First, the United States establishes through testimony from J. Armijo, F. Munoz, M. Rodriguez, and

B. Cordova that SNM had a rule that, if someone disrespected you, you needed to "hurt" or "kill" that person.  A. Gallegos Motion Response at 5-7.  The United States concluded that SNM rules required that J. Gallegos respond to the disrespect which Burns showed to him.  See Gallegos Motion Response at 8.  Next, the United States argues that evidence showed that SNM "bulldogged" people for drugs and that testimony showed that, on the night of Burns' murder, the Gallegos brothers were in possession of what appeared to be Burns' drugs.  A. Gallegos Motion Response at 7.  The United States also notes that B. Cordova's testimony that A. Gallegos discussed the murder with B. Cordova also supported the conviction.  See A. Gallegos Motion Response at 7.  The United States contends that A. Gallegos told B.  Cordova, "'even though we did it, we got off,'"  A. Gallegos Motion Response at 7 (quoting Transcript of Excerpt of Testimony of Billy Cordova (taken May 9-10, 2018) at 57:12 (Castellano), filed May 23, 2018 (Doc. 2312)("Cordova Tr.")).  The United States argues that A. Gallegos provided details of the murder and motives for the murder to B. Cordova.  See A. Gallegos Motion Response at 7 (quoting Cordova Tr. at 57:14-16 (Castellano)(describing A. Gallegos' possible motives for murdering Burns: "Some people say bulldogging for dope.  Some people say we owed him money.")).  The United States next mentions two pieces of testimony related to J. Gallegos that it asserts support A. Gallegos' conviction: (i) A. Sutton's testimony that Burns disrespected J. Gallegos in a conversation with another SNM member; and (ii) J. Gallegos' statement to Romero to "mind his own business" when Romero asked about Burns' death.  A. Gallegos Motion Response at 8.  Finally, the United States reiterates testimony from several witnesses establishing A. Gallegos as an SNM member and noting that he had more money than he normally would have the night of Burns' death.  See A. Gallegos Motion Response at 9.

Second, the United States argues that there is sufficient evidence to show a "nexus between the murder of Adrian Burns and the VICAR conspiracy." A. Gallegos Motion Response at 10. The United States reiterates the three elements necessary to convict A. Gallegos of a VICAR conspiracy to murder: (i) that J. Gallegos and A. Gallegos "by words or acts agreed together to commit murder"; (ii) that J. Gallegos and A. Gallegos "intended to commit murder"; and (iii) that "this happened in New Mexico on or about November 12, 2012." A. Gallegos Motion Response at 10. The United States then lists testimony that it alleges supports a finding of each of these elements. See A. Gallegos Motion Response at 10-11. First, the United States cites A. Sutton's testimony to support that Burns disrespected J. Gallegos to another SNM member and went to J. Gallegos' house the evening of Burns' death to execute a drug deal. See A. Gallegos Motion Response at 11. Next, the United States cites Michael Sutton's testimony that J. Gallegos carried drugs that night packaged in the manner that Burns packaged drugs. See A. Gallegos Motion Response at 11. The United States also cites evidence that J. Gallegos and A. Gallegos fled after Burns' murder. See A. Gallegos Motion Response at 11. The United States further cites admissions from J. Gallegos and A. Gallegos to law enforcement that place Burns at J. Gallegos' home for a drug deal that night, but the United States notes that J. Gallegos and A. Gallegos gave contradicting answers when asked whether Burns entered J. Gallegos' home. See A. Gallegos Motion Response at 11-12. The United States cites testimony from Jason Van Veghel, who removed carpet and firearms from J. Gallegos' home at his direction, and observed A. Gallegos throw away a set of car keys and a watch at J. Gallegos' direction. See A. Gallegos Motion Response at 12. The United States cites Ramirez' testimony that J. Gallegos told her they shot "'Babylon,'" referring to Burns, A. Gallegos Motion at 12 (quoting Transcript of Excerpt of Testimony of Morgan Ramirez at 24:25-25:1 (taken April 30, 2018)(Ramirez), filed May 23, 2018

(Doc. 2305)("Ramirez Tr.")), that a bone behind an ear was capable of stopping a bullet, and that a motive for killing Burns was his "'big mouth,'" A. Gallegos Motion Response at 12 (quoting Ramirez Tr. at 28:7 (Ramirez)). Finally, the United States reiterates A. Gallegos' admissions to B. Cordova. See A. Gallegos Motion Response at 12.

The United States addresses A. Gallegos' argument that the joint trial prejudiced him by first stating that the Court already "considered and rejected some of [A. Gallegos'] arguments." A. Gallegos Motion Response at 13. See Severance MOO, 2017 WL 3054511. The United States contends that the Court, in its Severance MOO, "concluded that the 'risk of spillover prejudice does not warrant severance of any individual counts in this case.'" A. Gallegos Motion Response at 13-14 (quoting Severance MOO at 193, 2017 WL 3054511, at *111). The United States asserts that the Court implemented "numerous safeguards and redactions," and also changed pronouns "to eliminate references to a named Defendant." A. Gallegos Motion Response at 14 (citing Severance MOO at 188, 2017 WL 3054511, at *108). The United States urges the Court again to reject A. Gallegos' severance arguments. See A. Gallegos Motion Response at 14.

The United States counters A. Gallegos' argument that the defenses were so antagonistic that the jury was required to disbelieve E. Martinez' testimony. See A. Gallegos Motion Response at 14. According to the United States, "numerous witnesses testified that they either did not know Andrew Gallegos or did not know him prior to being charged in this case." A. Gallegos Motion Response at 14 (citing examples). The United States notes that, with respect to Ramirez' testimony of J. Gallegos' confession, "the Court went through [Ramirez'] anticipated testimony and made pretrial rulings on each statement and its admission," and also gave three limiting instructions. A. Gallegos Motion Response at 14. The United States asserts that, in each of the three disputed Ramirez statements, Ramirez did not mention A. Gallegos and used pronouns where necessary

and as permitted under United States v. Bruton.  See A. Gallegos Motion Response at 14-15.  The

United States also argues that J. Gallegos' audio recordings, which were played during Gutierrez'

testimony, did not prejudice A. Gallegos, because the audio recordings were not used against J.

Gallegos.  See A. Gallegos Motion Response at 15.  The United States avers that A. Gallegos "was

not indicted or charged with these Counts, and the jury ultimately acquitted Joe Gallegos of this

conduct."  A. Gallegos Motion Response at 15.  Moreover, the United States asserts that the Court

gave limiting instructions when the audio recordings were played during Gutierrez' testimony.[9]

See A. Gallegos Motion Response at 15.

As to A. Gallegos' assertion that B. Cordova testified falsely, the United States counters

that B. Cordova "testified truthfully to the facts that [A. Gallegos] conveyed to him regarding the

murder of Adrian Burns."  A. Gallegos Motion Response at 15.  The United States avers that

A. Gallegos "is simply trying to discredit Cordova because Cordova told the jury about his

confession."  A. Gallegos Motion Response at 15.  The United States recounts several statements

from B. Cordova's testimony that pertain to A. Gallegos, and the United States argues that

B. Cordova's testimony was "credible and accurate," and that A. Gallegos "should not be awarded

a new trial simply because he does not think the jury should have believed Billy Cordova."

A. Gallegos Motion Response at 16.  According to the United States, "[t]he verdict was not

contrary to the weight of the evidence such that a miscarriage of justice may have occurred."

A. Gallegos Motion Response at 16.

---

[9]When the United States played J. Gallegos' audio recordings during Gutierrez' testimony,
the Court gave the following limiting instruction: "On the calls, let me just remind the jury that
they can't use any of the calls against any other defendant, other than Mr. Joe Gallegos, and they
can't be used against any of the -- discussion of the charges against any of the other defendants."
Transcript of Excerpt of Testimony of Shauna Gutierrez (taken May 3, 2018) at 45:2-7 (Court),
filed May 16, 2018 (Doc. 2289)("Gutierrez Tr.").

Last, the United States argues that A. Gallegos is "mistaken" that much of the enterprise evidence was irrelevant to him.  A. Gallegos Motion Response at 16.  According to the United States, the United States and the Defendants tried to reach a stipulation before and during trial as to three of the five VICAR elements, including that an enterprise existed.  See A. Gallegos Motion Response at 17.  Because the Defendants would not commit to any stipulation as to the existence of an enterprise, "the government was required to prove [all of the] elements to the jury."  A. Gallegos Motion Response at 17.  The United States avers that it took many steps to "minimize[] the amount of enterprise evidence it introduced."  A. Gallegos Motion Response at 17.  For example, the United States contends that it "reduced its number of witnesses it planned to call regarding enterprise evidence, and even cut some direct and redirect examinations short."  A. Gallegos Motion Response at 17.  The United States argues that "[t]he enterprise evidence presented to the jury was relevant and would have been admitted in a separate trial against Andrew Gallegos alone," and that, accordingly, the Court should reject A. Gallegos' request for a new trial.  A. Gallegos Motion Response at 17.  The United States also argues that the Court should not hold an evidentiary hearing, asserting that an evidentiary hearing is necessary "'only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law.'"  A. Gallegos Motion Response at 17-18 (quoting United States v. Velarde, 485 F.3d at 559).

### 9.    **The J. Gallegos Motion.**

J. Gallegos filed the J. Gallegos Motion on October 15, 2018, renewing his motion for judgment of acquittal pursuant to rule 29 of the Federal Rules of Criminal Procedure and, in the alternative, requesting a new trial as to Count 1 pursuant rule 33 of the Federal Rules of Criminal Procedure.  See J. Gallegos Motion at 1.  First, J. Gallegos renews his "objection to the admission of the surprise testimony of Michael Jaramillo," whose testimony, J. Gallegos argues, "was

admitted improperly and caused extreme prejudice to the Count 1 defendants." J. Gallegos Motion at 1. J. Gallegos contends that Jaramillo "was not on the Government's witness list" and that Jaramillo "was improperly influenced to testify." J. Gallegos Motion at 2. J. Gallegos argues that the admission of Jaramillo's testimony violated his due process rights. See J. Gallegos Motion at 2. J. Gallegos asserts that his own investigator interviewed Jaramillo in the summer of 2016, and Jaramillo professed that he "did not have any knowledge of the events" to which he would later testify at trial. J. Gallegos Motion at 2. Following trial, J. Gallegos states that he attempted "to investigate the claim that Michael Jaramillo was improperly influenced and was unable to interview him." J. Gallegos Motion at 2. See Affidavit of Charles Asbury ¶¶ 1-2, at 1-2 (executed October 15, 2018), filed October 15, 2018 (Doc. 2419-1). According to J. Gallegos, at trial, the Defendants provided testimony "that the defense was unable to subpoena Michael Jaramillo as there was no trial setting when he was interviewed and denied involvement." J. Gallegos Motion at 2-3. J. Gallegos requests an evidentiary hearing and "the opportunity to subpoena Michael Jaramillo." J. Gallegos Motion at 2. Last, J. Gallegos moves to "join the other defendants' motions under rule 29 and rule 33." J. Gallegos Motion at 3.

### 11.    The J. Gallegos Motion Response.

The United States responds. See United States' Response to Joe Gallegos' Rule 29 Motion for Judgment of Acquittal or in the Alternative, Motion for New Trial on Count 1 (Doc. 2419), filed November 30, 2018 (Doc. 2453)("J. Gallegos Motion Response"). The United States first recounts that, "[f]ollowing the close of the government's case [at trial], the Court heard Joe Gallegos' oral motion for judgment of acquittal regarding all Counts" and that the Court denied the motion. J. Gallegos Motion Response at 1-2. The United States argues that Jaramillo's testimony was properly admitted for several reasons: (i) although "Jaramillo's name was

inadvertently omitted from the United States' filed witness list[,] [] the United States announced Jaramillo as a witness when it read its witness list during *voir dire*"; (ii) "[t]he United States [] referred to Jaramillo as a witness it intended to call in open court and on the record several times during the second full week of trial"; and (iii) "Jaramillo was a witness whom the Defendants knew may be involved from the very first discovery disclosure in this case." J. Gallegos Motion Response at 4-5.

The United States asserts that it attempted to interview Jaramillo several times during the case's investigation, but that "Jaramillo was uncooperative and maintained that he didn't remember what happened," which led the United States to subpoena Jaramillo for trial in March, 2018. J. Gallegos Motion Response at 5. Subsequently, the United States asserts that it "requested in open court that the Court issue an arrest warrant for Jaramillo for contempt of court for violation of the subpoena on Monday, April 16, 2018." J. Gallegos Motion Response at 5. When Jaramillo did appear in court, the United States contends that he was "cooperative," and that, although the United States did not expect Jaramillo to provide inculpatory statements, "things went differently, and the United States learned of the significance of Jaramillo's role in the offense after the trial began." J. Gallegos Motion Response at 5. The United States argues that Jaramillo's earlier refusal to "come forward with the truth . . . is understandable," because Jaramillo "feared for his life and feared prosecution for what he did on the SNM's behalf." J. Gallegos Motion Response at 5.

The United States maintains that the Court suggested that, as a remedy for the United States' previous failure to disclose Jaramillo's name of its witness list, the United States "'push this evidence down so the defendant[s] have more time to deal with Mr. Jaramillo.'" J. Gallegos Motion Response at 5 (quoting Transcript of Testimony at 95-96 (taken April 23, 2018), filed

November 30, 2018 (Doc. 2453-1)). According to the United States, Jaramillo testified "34 days after [his] name was mentioned as a possible United States witness during *voir dire*." J. Gallegos Motion Response at 6. The United States argues that the "defense counsel had time to prepare for his testimony." J. Gallegos Motion Response at 6. Accordingly, the United States avers that "[t]he Court correctly concluded that exclusion of Michael Jaramillo's testimony was not appropriate." J. Gallegos Motion Response at 6. Last, the United States contends that "[t]he Court should deny the defendant's motion without the need for rehearing," because an evidentiary hearing is required "'only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law.'" J. Gallegos Motion Response at 6 (quoting United States v. Velarde, 485 F.3d at 559).

12.     **The A. Garcia Motion.**

A. Garcia filed the A. Garcia Motion on October 16, 2018. See A. Garcia Motion at 1. A. Garcia makes three arguments for acquittal: (i) VICAR "is unconstitutional on its face with respect for violent crimes committed 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity,'" A. Garcia Motion at 1-2 (quoting 18 U.S.C. § 1959(a)); (ii) VICAR is unconstitutional as applied to A. Garcia; and (iii) the Court lacks subject-matter jurisdiction "over this case." A. Garcia Motion at 2.[10]

_____

[10]The Court notes that A. Garcia raised similar arguments in an oral motion, under rule 29 of the Federal Rules of Criminal Procedure, to dismiss Count 3 of the Second Superseding Indictment. The Court addressed and rejected that oral motion in its Memorandum Opinion and Order, filed August 28, 2018 (Doc. 2378)("Aug. 28 MOO"). The Court states in the Aug. 28 MOO that A. Garcia is "free to argue that the Court should reconsider its determination that an as-applied Commerce Clause challenge is a contradiction in terms," and that he could "argue that 18 U.S.C. § 1959(a) is facially unconstitutional vis-à-vis violent crimes committed 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.'" Aug. 28 MOO at 16 (quoting 18 U.S.C. § 1959(a)). A. Garcia renewed these arguments, as well as his jurisdictional argument, in his Motion for Acquittal, so the Court treats

A. Garcia begins with a facial challenge to VICAR's constitutionality, and first argues that VICAR "exceeds congressional power under the Necessary and Proper Clause and the Commerce Clause [to the Constitution of the United States of America] with respect to violent crimes committed to enhance one's position in a racketeering enterprise." A. Garcia Motion at 3. A. Garcia notes that the Commerce Clause limits Congress's power, in part, to regulating commerce "among the several states." A. Garcia Motion at 3 (quoting U.S. Const. art. I, § 8, cl. 3). A. Garcia also asserts that National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012)("Sebelius"), stands for the proposition that a valid exercise of Commerce Clause powers requires Congress to: "(1) regulate, (2) commerce, (3) that possesses significant interstate effects." A. Garcia Motion at 3-4. A. Garcia avers that "federal courts have consistently recognized 'that the power to regulate commerce, though broad indeed, has limits.'" A. Garcia Motion at 4 (quoting Maryland v. Wirtz, 392 U.S. 183, 196 (1968)).

A. Garcia then turns to the Necessary and Proper, noting that it gives "Congress great latitude in exercising its powers." A. Garcia Motion at 6. A. Garcia notes, however, that "'[t]he powers of legislature are defined and limited.'" A. Garcia Motion at 6 (quoting Marbury v. Madison, 1 Cranch 137, 176 (1803)). A. Garcia further notes that, while the Necessary and Proper Clause affords Congress great latitude in exercising its enumerated powers, it is not in itself a source of Congressional power. See A. Garcia Motion at 7. A. Garcia argues that, in determining whether an act of Congress is constitutional, it is "'of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under

---

the Motion for Acquittal as a motion to reconsider. Sanchez and Herrera joined A. Garcia in this motion at the hearing. See Transcript of Hearing (held December 18, 2018), filed January 4, 2019 (Doc. 2480)("Dec. 18 Tr.").

the Necessary and Proper Clause.'"  A. Garcia Motion at 8 (quoting United States v. Comstock, 560 U.S. 126, 153 (2010)(Kennedy, J., concurring)).  A. Garcia argues that certain government functions, like "'punishing street crime, running public schools, and zoning property for development,'" are powers typically reserved to the states, and not to Congress.  A. Garcia Motion at 5 (quoting Sebelius, 567 U.S. at 535-36).

Turning to this case, A. Garcia notes that Count 3 of the Second Superseding Indictment requires proof beyond a reasonable doubt that "'the enterprise engaged in, or its activities affected, interstate commerce.'"  A. Garcia Motion at 8 (quoting Court's Final Jury Instructions, Instruction No. 25, at 39, filed May 23, 2018 (Doc. 2303)).  A. Garcia also notes that the jury was instructed that the indictment alleges that A. Garcia, "for the purpose of gaining entrance to or maintaining or increasing position in the Syndicato de Nuevo Mexico Gang (SNM) . . . did unlawfully, knowingly, and intentionally murder Freddie Sanchez, in violation of NMSA 1978, Sections 30-2-1 and 30-1-13."  A. Garcia Motion at 8-10 (quoting Court's Final Jury Instructions, Instruction No. 23, at 34).  For the enterprise element, A. Garcia notes that the jury was instructed that "'the enterprise is engaged in interstate commerce if it directly engaged in the distribution or acquisition of goods or services in such commerce.  The enterprise's conduct affected interstate commerce if the conduct had a demonstrated connection or link with such commerce.'"  A. Garcia Motion at 9 (quoting Court's Final Jury Instructions, Instruction No. 25, at 42).  Garcia avers that the Court "construed broadly" this element, and points to the Court's instruction that the

> "government must prove that the enterprise engaged in interstate commerce or that its activities affected interstate commerce in any way, no matter how minimal.  It is not necessary to prove that the acts of . . . Mr. Arturo Garcia . . . affected interstate commerce as long as the acts of the enterprise had such effect."

A. Garcia Motion at 9 (quoting Court's Final Jury Instructions, Instruction No. 27, at 45)(omission in A. Garcia Motion). A. Garcia argues that, "[b]y broadening the reach of this prosecution, the government and/or the Court trample [sic] on state power to prosecute street crime." A. Garcia Motion at 9.

A. Garcia argues that this jury instruction allowed the jury to convict him upon proof that he acted in concert with others to murder F. Sanchez, "even though the . . . Sanchez murder[] had no measurable effect on interstate commerce and was entirely non-commercial in nature." A. Garcia Motion at 10. A. Garcia asserts that the F. Sanchez murder "had nothing to do with trafficking in drugs or trafficking in other contraband." A. Garcia Motion at 10. On this point, A. Garcia notes that he was in PNM North when F. Sanchez was murdered at PNM South, and so "the conduct at issue took place entirely within the borders of New Mexico." A. Garcia Motion at 10. Because SNM ordered F. Sanchez' murder for cooperating with law enforcement, "this is a garden-variety state murder, with insufficient nexus to interstate commerce to merit prosecution in federal court." A. Garcia Motion at 11. If Congress has the authority to regulate such a crime, Garcia avers, "it is difficult to conceive of any limitation on federal power." A. Garcia Motion at 11. According to A. Garcia, such unfettered power would upset the Framers' delicate balance of power between the states and the federal government, and thereby threaten the personal liberty that balance guarantees. See A. Garcia Motion at 12 (citing United States v. Lopez, 514 U.S. 549, 576 (1995)).

A. Garcia also notes that, initially, the state authorities exclusively investigated the F. Sanchez murder. See A. Garcia Motion at 12. "It was not until federal law enforcement agencies stepped into the investigation in 2015 that federal charges in this case arose." A. Garcia

Motion at 12-13.  Garcia argues that, accordingly, the federal charges represent an "intrusion into the exclusive realm of the states."  A. Garcia Motion at 13.

A. Garcia argues that he was not a drug dealer, and so the F. Sanchez murder was not related to drugs or economic activity.  See A. Garcia Motion at 13.  According to A. Garcia, "the only connection to congressional power is the notion that the murder was for the purpose of gaining entrance to or maintaining or increasing position within the SNM gang."  A. Garcia Motion at 14.  A. Garcia argues that, because the murder was not economic in nature, and because it was planned, ordered, and executed entirely within the state of New Mexico, Congress' Commerce Clause powers do not extend to his involvement in F. Sanchez' murder.  See A. Garcia Motion at 14-15.  A. Garcia then concludes his allegedly facial challenge to VICAR: "This case illustrates the fact that Congress exceeded its powers under the Commerce Clause and Necessary and Proper Clause in enacting VICAR."  A. Garcia Motion at 15.

Turning to his second argument, A. Garcia asserts that VICAR is unconstitutional as applied to him.  A. Garcia begins this argument by noting the Court's conclusion that an as-applied Commerce Clause challenge is self-contradictory.  See A. Garcia Motion at 16.  A. Garcia counters that the cases upon which the Court relies for this conclusion are distinguishable from this matter.  See A. Garcia Motion at 16.  A. Garcia notes that United States v. Farnsworth, 92 F.3d 1001 (10th Cir. 1996), involves a statute, 18 U.S.C. § 922(g), which prohibits felons from possessing firearms that had traveled in interstate commerce.  See A. Garcia Motion at 16.  United States v. Farnsworth, A. Garcia argues, is distinguishable, because, here, there "is no interstate activity by Mr. Arturo Garcia at all."  A. Garcia Motion at 16.  A. Garcia continues, arguing that "Farnsworth does not invalidate all as-applied Commerce Clause challenges per se; it only precludes a challenge that does not take into account the aggregate effect on interstate commerce of an individual's activity."

A. Garcia Motion at 17.  A. Garcia argues that the important distinction here is that A. Garcia's crime of murder, in the aggregate, would not affect interstate commerce, while aggregating possession of guns that have been trafficked in interstate commerce would affect interstate commerce.  See A. Garcia Motion at 18.  Accordingly, A. Garcia requests the Court enter a judgment of acquittal on Count 3.  See A. Garcia Motion at 18.

Last, A. Garcia argues that dismissal is proper under rule 12(b)(2), because the Court lacks subject-matter jurisdiction over the conduct that the Second Superseding Indictment alleges in Count 3.  See A. Garcia Motion at 18.  A Garcia argues that the evidence introduced at trial "shows no more than a state crime that is already prohibited" under state law.  A. Garcia Motion at 19.  According to A. Garcia, the F. Sanchez murder "was only federalized when the government chose to apply a federal racketeering statute to prosecute this state crime in federal court."  A. Garcia Motion at 19.  Accordingly, A. Garcia argues that "the Court lacks jurisdiction over the conduct at issue in Count 3 of the Indictment, and dismissal of Count 3 is warranted."  A. Garcia Motion at 19.

13.     **The A. Garcia Motion Response.**

The United States filed a response to the A. Garcia Motion.  See United States' Response to Arturo Arnulfo Garcia's Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2) (Doc. 2422) at 1, filed October 30, 2018 (Doc. 2435)("A. Garcia Motion Response").  The United States notes that the Court previously denied a rule 29 motion that pertained to an as-applied challenge to VICAR and argues that the Court again should reject A. Garcia's argument.  See A. Garcia Motion Response at 1-2.

First, the United States argues that VICAR is facially constitutional.  See A. Garcia Motion Response at 2.  The United States analogizes to Racketeer Influenced and Corrupt Organizations

Act, 18 U.S.C. § 1961-68 ("RICO"), caselaw, in which "courts have held that only a de minimis effect on interstate or foreign commerce is required in each particular case, and have rejected challenges that Section 1959 exceeds Congress' authority under the Commerce Clause."  A. Garcia Motion Response at 2-3 (citing United States v. Crenshaw, 359 F.3d 977, 983-87 (8th Cir. 2004); Tse v. United States, 290 F.3d 462, 465-66 (1st Cir. 2002); United States v. Marino, 277 F. 3d 11, 34-35 (1st Cir. 2002); United States v. Vasquez, 267 F.3d 79, 86-89 (2d Cir. 2001); United States v. Riddle, 249 F.3d 529, 535-38 (6th Cir. 2001); United States v. Feliciano, 223 F.3d 102, 117-19 (2d Cir. 2000); United States v. Torres, 129 F.3d 710, 717 (2d Cir. 1997)).  The United States then quotes at length from United States v. Torres:

> Section 1959 incorporates a jurisdictional element requiring a nexus between the offense in question and interstate commerce. *See* [*United States v. Lopez*, 514 U.S. 549, 559–62 1995].  Specifically, § 1959 prohibits the commission of a violent crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity," and defines "enterprise" as an entity which is "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(a)& (b)(2).

A. Garcia Motion Response at 3 (quoting United States v. Torres, 129 F.3d at 717).  The United States then requests that the Court reject A. Garcia's facial challenge to VICAR.  See A. Garcia Motion Response at 3.

The United States next argues that VICAR is constitutional as applied to A. Garcia.  The United States focuses this argument on the Court's previous ruling on this issue.  See A. Garcia Motion Response at 3-4.  The United States quotes from the Court's previous ruling, which noted that "Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is 'necessary and proper for carrying into execution' Congress' Commerce Clause Power."  A. Garcia Motion

Response at 3 (quoting Aug. 28 MOO at 9, 2018 WL 4100949, at *4, and citing U.S. Const. art. I, § 8, cl. 18, M'Culloch v. Maryland, 17 U.S. (4 Wheat) 316, 421 (1819)).  The United States also cites to United States v. Farnsworth, which rejected an as-applied Commerce Clause challenge to 18 U.S.C. § 922(g), because the "'*de minimis* effect of [the defendant's] own actions on interstate commerce does not invalidate his conviction.'"  A. Garcia Motion Response at 4 (quoting United States v. Farnsworth, 92 F.3d at 1006).  The United States thus requests that the Court reject A. Garcia's as-applied challenge to VICAR.  See A. Garcia Motion Response at 4.

Finally, the United States argues that the Court has jurisdiction over this case.  See A. Garcia Motion Response at 4.  The United States begins this argument by summarizing the VICAR statute.  See A. Garcia Motion Response at 4.  The VICAR statute defines "enterprise" as "an entity which 'is engaged in, or the activities or which affect, interstate or foreign commerce."  A. Garcia Motion Response at 4 (quoting 18 U.S.C. § 1959(b)(2)).  Continuing its analogy to RICO, the United States notes that RICO, which also contains a jurisdictional Commerce Clause element, has been upheld by "a number of circuits . . . post-[United States v. Lopez]" which did not require the government to show the defendant's activities had a substantial effect on interstate commerce.  A. Garcia Motion Response at 4 (citing United States v. Riddle, 249 F.3d 529, 537 (6th Cir. 2001); United States v. Miller, 116 F.3d 641, 674 (2d Cir. 1997)).  Turning to VICAR, the United States observes that VICAR has a similar jurisdictional element.  See A. Garcia Motion Response at 5.  According to the United States, "the statute applies only to those defendants whose violent acts are 'as consideration for' payment from, or in hopes of 'gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.'"  A. Garcia Motion Response at 5 (quoting 18 U.S.C. § 1259(a)).  So long as the enterprise is engaged in activities that affect interstate commerce, the United States asserts, VICAR's jurisdictional

element is satisfied.  See A. Garcia Motion Response at 5.  The United States notes, accordingly, that it must prove such that it must prove SNM's impact on interstate commerce, because doing so is an element of the VICAR offense.  See A. Garcia Motion Response at 5.  The United States also points to United States v. Mapp, 170 F.3d 328, 336 (2d. Cir. 1999), which affirmed a § 1959 murder conviction even though the murder did not impact interstate commerce, because the murder bore "'a strong relationship to racketeering activity that affects interstate commerce.'"  A. Garcia Motion Response at 7 (quoting United States v. Riddle, 249 F.3d at 538).

The United States asserts that the interstate commerce requirement is thus an element of the crime and not a jurisdictional component, and so A. Garcia's challenge goes to the sufficiency of the United States' evidence against him rather than to the Court's jurisdiction.  See A. Garcia Motion Response at 7.  The United States argues: "Pursuant to *Riddle*, the defendant's claim 'is therefore best understood as a facial challenge to the constitutionality of § 1959 . . . and an as-applied challenge to the sufficiency of the government's evidence in the § 1959' conviction."  A. Garcia Motion Response at 7 (quoting United States v. Riddle, 249 F.3d at 536)(alterations in A. Garcia Motion Response).  The United States then asserts that A. Garcia does not challenge the sufficiency of the evidence "and would be unable to do so, given the high burden he would have to overcome."  A. Garcia Motion Response at 7.

### 14.    **The Troup NTM.**

Troup filed his motion for a new trial on October 15, 2018.  See Troup NTM at 1. J. Gallegos and B. Garcia both filed notices of joinder.  See Defendant Billy Garcia's Notice to Join Motion for New Trial [Doc. No. 2420] and Motion for Acquittal or, in the Alternative, Dismissal Pursuant to Rule 12(b)(2) [Doc. No. 2422], filed October 15, 2018 (Doc. 2425); Defendant Joe Gallegos' Notice to Join Motion for New Trial [Doc 2420], filed December 13,

2018 (Doc. 2463). Troup requests a new trial as to Counts 1 and 3 pursuant to rule 33 of the Federal Rules of Criminal Procedure and the Due Process Clause of the Fifth Amendment. See Troup NTM at 1. Troup identifies three grounds why the Court should grant a new trial: (i) the "jury instructions, individually and cumulatively, worked to deprive Mr. Troup of a fair trial"; (ii) "the government's eleventh-hour introduction of Michael Jaramillo into the trial deprived Mr. Troup of a fair trial"; and (iii) "trying Counts 1 and 3 together, particularly when joined with Counts 4 and 5[,] deprived Mr. Troup of a fair trial." Troup NTM at 2.

Troup describes "multiple errors in the jury instructions," which, he contends, "result[ed] in constitutional error and requir[e] a new trial." Troup NTM at 2. Troup admits that, "[t]o the extent any issue regarding jury instructions was not preserved, counsel for Mr. Troup were ineffective in not raising an appropriate objection." Troup NTM at 2 n.2. Troup avers that the instructions refer to the Defendants on trial collectively, rather than individualizing each instruction with respect to each defendant, and that this "failure to individualize the instructions resulted in a constitutionally unacceptable risk of jury confusion." Troup NTM at 2. Troup contends that the jury instructions "repeatedly" referred to the Defendants in a collective manner by listing out all of the Defendants' names a total of "*66 times*." Troup NTM at 3 (emphasis in original). Troup cites several examples, such as Jury Instruction No. 16, which reads: "'The government must prove, beyond a reasonable doubt, that the offenses charged in this case were actually committed and that it was Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos who committed them.'" Troup NTM at 3 (quoting Court's Final Jury Instructions (without citations), Instruction No. 16, at 21, filed May 23, 2018 (Doc. 2302)("Jury Instructions (without citations)")).

According to Troup, the "repeated reference to the defendants on trial as a group sent an unmistakable signal that the Court considered these men to be affiliated." Troup NTM at 4. For example, Troup asserts, language in Jury Instruction No. 7 suggests that the Defendants "collectively decided not to testify" by referring to "'*their* decision not to testify'" and stating that jurors should not draw any inferences from the fact that the Defendants "'did not take the witness stand and testify or whether *they* called any witnesses.'" Troup NTM at 4 (quoting Jury Instructions (without citations), Instruction No. 7, at 10)(emphasis in Troup NTM). Troup next states that "[a]n essential element of a VICAR offense is that there was in fact an enterprise," and he argues that the collective reference to the Defendants suggests that "the Court believed the defendants all shared a common purpose." Troup NTM at 4. For example, Troup argues that Jury Instruction No. 27 "told the jury that the Court considered these men on trial to all have a unitary purpose." Troup NTM at 5. Jury Instruction No. 27's relevant portion specifically reads: "It is not necessary to prove that the acts of Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos affected interstate commerce as long as the acts of the enterprise had such effect." Jury Instructions (without citations), Instruction No. 27, at 40. Troup notes, however, that "[o]ne of the final instructions did tell the jury to separately consider the *evidence* against each defendant." Troup NTM at 5 (citing Jury Instructions (without citations), Instruction No. 40, at 59)(emphasis in original). Nevertheless, Troup maintains that "no instruction told the jury to separately consider the law or the proof requirements with regard to each defendant." Troup NTM at 5. In sum, Troup argues that the Court "'put its thumb on the scales,'" Troup NTM at 5 (quoting United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 844125, at *10 (D.N.M. March 5,

2012)(Browning, J.)) by providing jury instructions containing "repeated reference[s] to each of [the defendants]."  Troup NTM at 5.

Next, Troup argues that the jury instruction pertaining to aiding and abetting is erroneous. See Troup NTM at 6.  Troup states that "[a]iding and abetting liability was central to the allegations against Mr. Troup."  Troup NTM at 6.  Troup recognizes, however, that "the instruction given generally tracked the 10th Circuit pattern instruction" but stresses that "pattern instructions are not the law, and they can be erroneous."  Troup NTM at 6 n.4 (citing United States v. Sierra-Ledesma, 645 F.3d 1213, 1220-21 (10th Cir. 2011)).  Troup contends that, while the "essence of aiding and abetting liability . . . is the coupling of conduct with intent," Jury Instruction No. 34 reduced aiding-and-abetting liability to a mental state.  Troup NTM at 7.  According to Troup, Jury Instruction No. 34's relevant portion states that "the government must prove the following elements for the jury to convict on a theory of aiding and abetting":

> "First: someone else committed the charged crime, and
>
> Second: Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. *This means that the government must prove that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos consciously shared the other person's knowledge of the underlying criminal act and intended to help him.*"

Troup NTM at 6-7 (quoting Jury Instructions (without citations), Instruction No. 34, at 53)(emphasis in Troup NTM).  Troup avers that the italicized sentence "erroneously redefined and restricted the preceding sentence in a way that limited what the government was required to prove to solely a mental state -- sharing knowledge and intending to help."  Troup NTM at 7.  According to Troup, "the italicized limiting language . . . told the jury that it need not find that Mr. Troup committed an act to further the offense.  Rather, he need only have had the required intent."  Troup

NTM at 8.  Recognizing that the sentence preceding the italicized sentence "may have mirrored the classic formulation of aiding and abetting law," Troup asserts that this sentence alone does "not cure the error in eliminating the required coupling of an affirmative act in furtherance of the crime with the requisite mens rea."  Troup NTM at 8.

Troup also argues that the aiding-and-abetting instruction was erroneous, because it "told the jury that aiding and abetting was itself a crime."  Troup NTM at 9.  Troup asserts that, while "'[a]iding and abetting . . . is not a separate federal crime,'" Troup NTM at 9 (quoting United States v. Deiter, 890 F.3d 1203, 1215 (10th Cir. 2018)), Jury Instruction No. 34 misstates the law by stating that "'[t]he law *makes it a crime* to intentionally help someone else commit a crime.  To find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty *of this crime*, you must be convinced that the government has proved each of the following . . . .'"  Troup NTM at 9 (quoting Jury Instructions (without citations), Instruction No. 34, at 53)(emphasis in Troup NTM).  The problem with this statement of the law, according to Troup, is that it may have "confused the jury whether proof beyond a reasonable doubt of the principles of aiding and abetting was necessary to convict Mr. Troup of the crimes charged in Counts 1 and 3."  Troup NTM at 9.

Troup asserts that the aiding-and-abetting instruction does not specify the crime or crimes to which it applies.  See Troup NTM at 10.  According to Troup, "[a]n element of the charged VICAR offenses was that Mr. Troup committed an enumerated crime of violence."  Troup NTM at 10.  Troup contends that the crime for Counts 1 and 3 is murder under New Mexico state law; however, "Troup was not charged with murder."  Troup NTM at 10.  Meanwhile, Jury Instruction No. 34 at one point "referred to 'this crime' as the 'crime' of aiding and abetting," and at another point referred to "'the charged crime'" without specifying said crime.  Troup NTM at 10 (quoting

Jury Instructions (without citations), Instruction No. 34, at 53).    According to Troup, this discrepancy led to "confusion."  Troup NTM at 10.  Troup then concludes that "[t]his is not a case where the harm from an erroneous aiding and abetting instruction is only hypothetical. . . .  The interest of justice [] requires a new trial."  Troup NTM at 10.

Next, Troup alleges that Court told the jury to "'determine what actually happened,'" Troup NTM 10-11 (quoting Jury Instructions (without citations), Instruction No. 2, at 3), and that this instruction contravenes the jury's role, which is to "determine whether the government has proven each and every element of the charged offense(s) beyond a reasonable doubt," Troup NTM at 10-11.  Troup points to Lanigan v. Maloney, 853 F.2d 40 (1st Cir. 1988), as support, in which the United States Court of Appeals for the First Circuit held erroneous an instruction because it "suggest[ed] that the jury's task is to figure out which side is 'right' rather than to determine whether the government proved guilt beyond a reasonable doubt."  853 F.2d at 48.  By telling the jury that "it had to determine 'what actually happened,'" Troup argues that the jury instruction "erroneously alleviated the government of its burden to convince each juror that the government had proved all the elements of the offenses beyond a reasonable doubt."  Troup NTM at 11 (quoting Jury Instructions (without citations), Instruction No. 2, at 3).

Troup argues that references to the grand jury in some of the jury instructions "lent an inappropriate sheen of legitimacy to the charges and undermined the presumption of innocence."  Troup NTM at 11.  Jury Instruction Nos. 23 and 24 both indicate that a grand jury had brought an indictment against the defendants.  See Jury Instructions (without citations), Nos. 23-24, at 29-34.  Troup asserts that the Court did not define "grand jury" for the jury, and that the jury only knew that "another jury (a 'grand' one) had heard evidence and made a determination against these defendants."  Troup NTM at 12.  According to Troup, references to the grand jury "undermined

the presumption of innocence," and thus, the "interest of justice [] requires a new trial." Troup NTM at 12.

Troup next asserts that several jury instructions told jurors not to draw inferences from the fact that other defendants named in the indictment were not on trial, and that this instruction undermined the "question of the possible guilt of the government's cooperating witnesses[, which] was central to the credibility determinations the jury was required to make in this case." Troup NTM at 13. In particular, Troup quotes Jury Instruction No. 24, which states: "'[Y]ou are not to draw any inferences from the fact that other Defendants named in the indictment are not on trial before you today,'" Troup NTM at 12 (quoting Jury Instructions (without citations), Instruction No. 24, at 34), and Jury Instruction No. 39, which states: "'The question of the possible guilt of others *should not enter your thinking* as you decide whether Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos have been proved guilty of the crimes charged, unless you are expressly instructed otherwise.'" Troup NTM at 13 (quoting Jury Instructions (without citations), Instruction No. 39, at 58)(emphasis in Troup NTM). According to Troup,

> the jury was given conflicting instructions on how to evaluate the testimony of crucial government witnesses, [and therefore,] there is a reasonable likelihood that the jury applied the instructions in a way that limited their determination of the credibility of those witnesses and violated Mr. Troup's rights to due process and a fair trial.

Troup NTM at 13.

Troup also identifies several errors with the jury instructions on murder under New Mexico law. See Troup NTM at 14-15. Troup quotes from Jury Instruction No. 31, which states that "'[t]he essential elements of first degree murder under New Mexico law are provided below *to aid you* in deciding if the government has proved the fourth element'" of the VICAR counts. Troup

NTM at 14 (quoting Jury Instructions (without citations), Instruction No. 31, at 46)(emphasis in Troup NTM). According to Troup, "whether a murder under New Mexico law has been committed [is] an essential element of the VICAR counts," and, thus, the elements of murder under New Mexico law are "essential elements" rather than an "'aid' to the jury in deciding whether the government had proven the fourth element of the VICAR counts." Troup NTM at 14 (quoting Jury Instructions (without citations), Instruction No. 31, at 46). Next, Troup argues that the Jury Instructions erroneously "told the jury that it had to find the defendants guilty or not guilty of murder." Troup NTM at 14. See Jury Instructions (without citations), Instruction No. 31, at 48. According to Troup, he was not charged with murder, and murder is only an element of a count; therefore, "the Court gave an impression that finding the elements of New Mexico murder was sufficient to convict of Count[s] 1 and 3." Troup NTM at 14-15. Troup also avers that the Jury Instructions pertaining to New Mexico murder "gave an indication of a preference for a verdict of guilt." Troup NTM at 15. Troup argues that, while Jury Instruction No. 31 tells jurors to "'discuss the reasons why there is disagreement'" if the jurors could not unanimously agree that the Defendants were guilty, "there was no counterbalancing instruction to the jurors to discuss their reasons if they did find the defendants to be guilty." Troup NTM at 15 (quoting Jury Instructions (without citations), Instruction No. 31, at 48). Thus, according to Troup, the "instruction impermissibly suggested that if the jurors were in favor of murder, they should proceed expeditiously to return a guilty verdict." Troup NTM at 15.

The final jury instruction error which Troup alleges is that Jury Instruction No. 33, which defines the fifth VICAR element, "improperly gave a judicial imprimatur to the government's evidence." Troup NTM at 15. Jury Instruction No. 33 provides several examples of evidence that could satisfy the fifth VICAR element. See Jury Instructions (without citations), Instruction

No. 33, at 51-52.  Troup asserts that this Jury Instruction is "problematic" for two reasons: "First, it suggested that this sort of evidence existed. Second, it gave the Court's imprimatur to this being the quality of evidence that could establish the fifth VICAR element."  Troup NTM at 16. According to Troup, "[b]y including these portions in Instruction 33, the Court put its thumb on the government's side of the scale, thus relieving the government of its burden."  Troup NTM at 16.

The second ground for a new trial that Troup avers is that the United States' late introduction of a "surprise witness," Michael Jaramillo, deprived Troup of a fair trial.  Troup NTM at 17.  Troup states that, "[w]ith respect to Mr. Troup, Jaramillo became the most important Count 1 witness."  Troup NTM at 17.  Moreover, Troup asserts that Jaramillo's "testimony was devastating to Mr. Troup."  Troup NTM at 17.  Troup states that, "[a]t trial, Jaramillo suggested that Edward Troup was somehow able to influence other inmates to stay in their cells while Jaramillo killed Castillo."  Troup NTM at 17-18.  Troup argues that, because Jaramillo was introduced as a witness so late and "because of the extreme delay in indicting Mr. Troup on Count 1 (a 2001 homicide indicted 14 years later), defense counsel lost the ability to investigate and bring to bear information that could have undermined Jaramillo's credibility."  Troup NTM at 18.  As a result, Troup asserts, "the cross-examination [of Jaramillo] was not [as] thorough" as it might have otherwise been.  Troup NTM at 18.

Troup states that his earlier motion to dismiss "foreshadowed this sort of problem."  Troup NTM at 19 (citing Defendant Edward Troup's Motion to Dismiss (Preindictment Delay), filed October 5, 2017 (Doc. 1284)).  According to Troup, the Court had "indicated that it was going to deny" Troup's motion to dismiss, in which Troup argued "that the defense was unable, as a practical matter, to investigate this very old homicide."  Troup NTM at 20.  Troup characterizes

the United States' strategy as "insert[ing] the old 2001 homicide into the Marcantel/Santistevan indictment . . . because it strategically concluded that the Marcantel/Santistevan charges might buttress, and be buttressed by, the old homicides." Troup NTM at 19. Moreover, Troup contends that, before Jaramillo appeared as a witness, the Troup defense team prepared to cross-examine Lawrence Torres, because the United States' case was based on Torres. See Troup NTM at 19. Thus, Troup states that his defense team "was not prepared for the introduction of Jaramillo into the government's case." Troup NTM at 19. Furthermore, Troup argues that, "[b]ecause Jaramillo was the actual murderer, the jury may have been more inclined to believe his testimony because jurors tend not to believe that an innocent person would ever implicate himself *or another* in a murder." Troup NTM at 19 (emphasis in original).

Troup's third reason why the Court should grant a new trial is that trying Counts 1 and 3 with Counts 4 and 5 deprived him of a fair trial, and that the Court should have severed further the case. See Troup NTM at 20. Troup notes that he twice previously filed motions to sever different counts in the case. See Troup NTM at 21 (citing Motion to Sever Counts Based on Practical Grounds, filed February 5, 2018 (Doc. 1743); Motion to Bifurcate Counts 4 and 5 from Counts 1-3 and 13-16, filed March 16, 2018 (Doc. 1948)). Troup acknowledges that the Court denied both of these earlier motions. See Troup NTM at 21. Troup describes the indictment for the prosecution as "an unwieldly and almost incomprehensible document." Troup NTM at 21. According to Troup, "[t]he defendants in Counts 1-3 tried vigorously to get away from the grisly Adrian Burns homicide which was more heinous, and more recent in time, than the old prison homicides set forth in Counts 1-3." Troup NTM at 21. As a result, Troup argues, the "vulgar nature of the Adrian Burns murder . . . crept into the trial of the 2001 and 2007 homicides," and Troup's "presumption of innocence dissipated when both the 2001 and 2007 homicides were joined

together." Troup NTM at 21. Accordingly, Troup requests that the Court order a new trial. <u>See</u> Troup NTM at 22.

        **15.**    <u>**The Troup NTM Response.**</u>

       The United States responds to the Troup NTM. <u>See</u> United States' Response to Edward Troup's Motion for New Trial (Doc. 2420), filed November 30, 2018 (Doc. 2460)("Troup NTM Response"). The United States first argues that the Court should deny Troup's request for a new trial, because Troup did not object to any Jury Instructions at trial. <u>See</u> Troup NTM Response at 4. According to the United States, "'when a party fails to lodge an objection at trial to purported errors -- be they instructional or otherwise -- . . . he cannot prevail unless he could successfully run the gauntlet created by the rigorous plain-error standard of review.'" Troup NTM Response at 4 (quoting <u>United States v. Faust</u>, 795 F.3d 1243, 1251 (10th Cir. 2015)). The United States argues that, under the plain error standard, "the defendant must demonstrate that the jury instructions contain 1) error, 2) that was plain, 3) and that the error affects substantial rights." Troup NTM Response at 4 (citing <u>United States v. Visinaiz</u>, 428 F.3d 1300, 1308 (10th Cir. 2005)). The United States further asserts that "'[o]nly where the reviewing court has substantial doubt that the jury was fairly guided will the judgment be disturbed.'" Troup NTM Response at 5 (citing <u>United States v. Smith</u>, 13 F.3d 1421, 1424 (10th Cir. 1994)). The United States cites a number of additional facts that make it difficult for Troup to overcome the plain error standard: "the Court largely used pattern jury instructions; the defendant had the benefit of studying the Trial 1 jury instructions and numerous drafts of the Trial 2 instructions before they were finalized; the Court was accommodating and made changes to instructions where it properly could at defense teams' request." Troup NTM Response at 5.

Next, the United States addresses Troup's specific arguments that the jury instructions were erroneous.  See Troup NTM Response at 4.  According to the United States, "[t]he Court individualized the [jury] instructions and specifically named each defendant in order to force the jury to consider each defendant individually."  Troup NTM Response at 5.  Moreover, the United States argues, "the juror questionnaires asked jurors if they could consider the guilt of each defendant individually, and the Court provided individual verdict forms for each defendant."  Troup NTM Response at 6 (citing Court's Final Jury Instructions (with citations) at 72-76, filed May 23, 2018 (Doc. 2303)("Jury Instructions (with citations)")).  The United States also notes that the Court's Jury Instruction pertaining to aiding and abetting replicates the "Tenth Circuit pattern jury instruction and only modified the instruction by adding the defendants' individual names."  Troup NTM Response at 6 (citing Jury Instructions (with citations), Instruction No. 34, at 59). The United States argues that Jury Instruction No. 23's mention of the grand jury indictment "did not lend an inappropriate sheet [sic] of legitimacy to the charges" because the same instruction is "given in every case."  Troup NTM Response at 6.  The United States further asserts that Jury Instruction Nos. 24 and 39 -- which tell the jury not to draw inferences from the fact that other Defendants are not on trial and not to consider other Defendants' or witnesses' possible guilt -- are proper and follow the Tenth Circuit pattern jury instructions.  See Troup NTM Response at 6 (citing Jury Instructions (with citations), Instruction No. 24, at 38; id., Jury Instruction No. 39, at 66).  In addition, the United States contends that Jury Instruction No. 31, which "told the jury that the government had to prove the fourth element of the crime charged (murder) beyond a reasonable doubt," was proper, because "the jury was required to find the defendant committed a murder in order to satisfy the fourth [VICAR] element."  Troup NTM at 6-7 (citing Jury Instructions (with citations), Instruction No. 31, at 52-54).  According to the United States, a

"guilty finding on murder was the same thing as finding the defendant committed that element beyond a reasonable doubt." Troup NTM at 7. Finally, the United States argues that Jury Instruction No. 33, which provides examples of evidence that could satisfy the fifth VICAR element, is proper, because it is "taken from the Fifth Circuit pattern jury instructions and is an instruction taken from caselaw, including Tenth Circuit law." Troup NTM Response at 7 (citing United States v. Smith, 413 F.3d 1253, 1277 (10th Cir. 2005), overruled on other grounds by United States v. Hutchinson, 573 F.3d 1011 (10th Cir. 2009)). Finally, the United States argues that the Court should deny Troup's request for a new trial, because Troup "cannot meet his burden under the plain error standard as he can point to no error that affects substantial rights." Troup NTM Response at 7.

The United States next addresses Troup's arguments pertaining to Jaramillo's testimony. See Troup NTM Response at 7. The United States argues that the Court properly allowed Jaramillo to testify. See Troup NTM Response at 7-9. According to the United States, "Jaramillo's name was inadvertently omitted from the United States' filed witness list. However, the United States announced Jaramillo as a witness when it read its witness list during *voir dire* on April 10, 2018." Troup NTM Response at 7. Moreover, the United States contends, Troup "knew [Jaramillo] may be involved from the very first discovery disclosure in this case." Troup NTM Response at 8. The United States asserts that, after several failed attempts to interview Jaramillo and an unsuccessful subpoena, it "requested in open court that the Court issue an arrest warrant for Jaramillo for contempt of court for violation of the subpoena on Monday, April 16, 2018." Troup NTM Response at 8. The United States says that Jaramillo appeared on Wednesday, April 18, 2018, and the United States argues that, although it did not expect Jaramillo to provide the inculpatory statements that he provided, that Jaramillo's silence before that time was "understandable,"

because "[h]e feared for his life and feared prosecution for what he did on the SNM's behalf." Troup NTM Response at 8.  The United States explains that, because it did not disclose Jaramillo's name on its witness list, "the Court suggested that the government 'push this evidence down so the defendants have more time to deal with Mr. Jaramillo.'"  Troup NTM Response at 8 (quoting Transcript of Excerpt of Testimony of Leonard Lujan at 95:24-96:1 (Court)(taken April 23, 2018), filed May 16, 2018 (Doc. 2282)("Lujan Tr.")).  Thus, the United States argues, because Jaramillo testified "34 days after his name was mentioned as a possible United States witness during *voir dire*[,] . . . defense counsel had time to prepare for his testimony."  Troup NTM Response at 9. Finally, the United States contends that Troup's defense team had enough time to prepare for Jaramillo's testimony, because "[t]he evidence at trial established that a defense investigator interviewed Jaramillo long before the government."  Troup NTM Response at 9.

Last, the United States addresses Troup's argument "that the Court's refusal to sever his trial from his codefendants prejudiced him."  Troup NTM Response at 9.  The United States notes that the Court "already considered and granted a partial severance of the case" by separating the Defendants into trial groups.  Troup NTM Response at 10 (citing Severance MOO at 3, 2017 WL 3054511, at *1).  The United States explains that, in the Severance MOO, "the Court concluded that the 'risk of spillover prejudice does not warrant severance of any individual counts in this case.'"  Troup NTM Response at 10 (quoting Severance MOO at 193, 2017 WL 3054511, at *111). The United States also contends that Troup is not entitled to an evidentiary hearing.  See Troup NTM at 10.  The United States concludes by arguing that "[t]he verdict in this case is not contrary to the weight of the evidence such that a miscarriage of justice may have occurred, nor does justice require a new trial."  Troup NTM Response at 11.

16.    **The Troup New Trial Motion Reply.**

Troup replies.  <u>See</u> Edward Troup's Reply in Support of His Motion for New Trial (Doc. 2420), filed December 14, 2018 (Doc. 2466)("Troup NTM Reply").  Troup first contends that the jury instructions were erroneous, because the use of the "singular possessive . . . does nothing to dispel the common-sense and obvious interpretation that the defendants are being referred to collectively."  Troup NTM Reply at 3.  In addition, Troup asserts that the jury instructions "repeatedly use the plural possessive pronoun 'their' to refer to the defendants in the collective[, which] . . . demonstrates an inappropriate aggregating of defendants who are supposed to be judged individually."  Troup NTM Reply at 3 (citing examples).  Troup argues that the United States' assertion that "the Court provided individual verdict forms for each defendant . . . is not accurate."  Troup NTM Reply at 3.  Rather, according to Troup, "[t]he Court provided a single verdict form for all defendants, with separate places for different verdicts."  Troup NTM Reply at 3 (citing Jury Instructions (without citations) at 64-68).  Last, Troup asserts that the United States lacks support for its contention that juror questionnaires "asked the jurors if they could consider the guilt of each defendant individually."  Troup NTM Reply at 3.

Troup contends that the United States does not dispute that the aiding-and-abetting instructions were erroneous, instead relying "on its own usage of the pattern instruction in drafting the instruction given."  Troup NTM Reply at 5.  According to Troup, "the fact that something may be contained in a pattern instruction does not mean that it is legally correct."  Troup NTM Reply at 5 (citing cases).  Furthermore, Troup argues that the "errors in the aiding and abetting instruction are plain, thus satisfying the 'error' aspect of the plain-error test," and that "the errors also affected [Troup's] substantial rights."  Troup NTM Reply at 6 (quoting <u>United States v. Visinaiz</u>, 428 F.3d at 1308).

Next, Troup notes that the United States does not respond to Troup's argument that the jury instructions erroneously misstated the jury's role.  See Troup NTM Reply at 6 (citing Troup NTM at 10-11).  Troup argues that the United States does not dispute that a jury instruction referencing a grand jury's indictment is inappropriate -- "just that it is done all the time."  Troup NTM Reply at 6.  According to Troup, "even if this instruction is regularly given, it does not make it legally proper."  Troup NTM Reply at 6.  Troup additionally argues that the United States does not refute that Jury Instruction Nos. 24 and 39 undermined the instruction to consider the credibility and possible guilt of others not on trial.  See Troup NTM Reply at 7.  Whereas the United States contends that the jury instructions are Tenth Circuit pattern jury instructions, Troup argues that modification of the instructions is necessary "where, as here, the guilt of others is relevant."  Troup NTM Reply at 7.

As to Jury Instruction No. 31, Troup contends that "the instruction was flawed in that it erroneously utilized the definition of murder under New Mexico state law rather than the generic definition of murder."  Troup NTM Reply at 8.  According to Troup, "Congress meant the VICAR statute to cover only those violations of state law involving conduct 'generically defined' as one of the predicate offenses, including 'murder.'"  Troup NTM Reply at 8 (quoting United States v. Le, 316 F. Supp. 2d 355, 359-62 (E.D. Va. 2004)(Ellis, J.)).  Troup argues that Jury Instruction No. 31 did not incorporate the "elements of generic murder," and that, "'[a]ccording to Tenth Circuit case law, generic murder is defined as intentional killing; killing during the commission of a felony; and killing that, although unintentional, occurs in the course of dangerous conduct that demonstrates a reckless or malignant disregard for serious risks posed to human life.'"  Troup NTM Reply at 10-11 (quoting United States v. Watts, No. 14-CR-20118-002, 2017 WL 411341, at *10 & n.83 (D. Kan. Jan. 31, 2017)(Robinson, J.)).  Troup states that, whereas Jury Instruction

No. 29 "correctly defined murder under the *third* VICAR element," Jury Instruction No. 31, "which defined murder for the fourth [VICAR] element," incorrectly defines murder. Troup NTM Reply at 11 (emphasis in original). Troup further reiterates his argument that Jury Instruction No. 31 erroneously "told jurors that the elements of murder were merely an aid to determine if the government proved the fourth element of a VICAR offense." Troup NTM Reply at 12 (internal quotation marks omitted). Moreover, Troup asserts that the United States "confuses the murder *element* of the VICAR offense with the *crime* charged," which "left the impression that a finding of the elements of murder was sufficient to convict Mr. Troup of the crime charged[, which] . . . was VICAR, not murder." Troup NTM Reply at 12. Finally, Troup avers that the United States does not respond to his argument that Jury Instruction No. 31 indicates "a preference for a verdict of guilt." Troup NTM Reply at 12.

Troup counters the United States' position that Jury Instruction No. 33 was taken from the United States Court of Appeals for the Fifth Circuit's pattern jury instruction and from caselaw. See Troup NTM Reply at 13. According to Troup, the "Fifth Circuit instruction says nothing about the trial court providing examples of evidence that may support the government's theory." Troup NTM Reply at 13 (citing Pattern Crim. Jury Instr. 5th Cir. 2.78 (2015)). Troup argues that, by explaining the United States' "theory to the jury with a judicial indication of a belief in the existence of the evidence and that the evidence supported the contested element," Jury Instruction No. 33 "erroneously put the Court's thumb on the scales and violated Mr. Troup's constitutional rights." Troup NTM Reply at 14.

Troup next counters that the United States' position that Jaramillo's name was "'inadvertently omitted from the United States' filed Witness List' . . . is not true." Troup NTM Reply at 14 (quoting Troup NTM Response at 7). According to Troup, Jaramillo's name was not

on the filed witness list because "Jaramillo hadn't 'flipped' yet." Troup NTM Reply at 15. Troup contends that Acee instructed the United States to "mention[] Jaramillo's name during *voir dire* . . . [because] Acee was thinking that he still had a chance to flip Jaramillo." Troup NTM Reply at 15. Troup argues that the "defense was not required to intuit that, seventeen (17) years after Jaramillo killed Castillo, the FBI would finally begin its efforts to interview him." Troup NTM Reply at 16. Moreover, Troup asserts that "[p]ushing Jaramillo's testimony down the road during the trial itself did not allow the defense to prepare an adequate cross-examination of Jaramillo." Troup NTM Reply at 16. Troup also insists that, because the United States did not comply with the rules relating to witness lists, "striking Jaramillo was the [proper] remedy" and "allowing the Government to use Jaramillo as a witness resulted in a manifestly unfair trial." Troup NTM Reply at 16.

Last, Troup recounts that the Court divided the case into two trials. See Troup NTM Reply at 16-17. Troup avers that, after several Defendants in the second trial reached plea agreements, "there were still 7 people in Trial II, involving 9 counts, commencing on April 10, 2018. It was too many." Troup NTM Reply at 17. According to Troup, Counts 1-3 in the second trial pertain to "old prison homicides," which "were different in kind, and different in time, from the more recent crimes in Trial II, particularly the heinous Burns homicide." Troup NTM Reply at 17. Troup argues that "[t]here was no logical link between Counts 1-3 on the one hand, as opposed to Counts 4-5/13-16 on the other," and thus, the "interest of justice requires that Edward Troup be given a new, separate trial on Counts 1 and 3." Troup NTM Reply at 18.

### 17.    __The December 17, 2018, Hearing__.

The Court held an evidentiary hearing on December 17, 2018, in which it heard the B. Garcia Motion. See Transcript of Motion Proceedings (held December 17, 2018), filed

January 4, 2019 (Doc. 2479)("Dec. 17 Tr."). The Court noted that all Defendants join the B. Garcia Motion. See Dec. 17 Tr. at 6:2-4 (Court). The Court and B. Garcia agreed that the Defendants should mark exhibits according to each motion's document number and exhibit letter, and thus B. Garcia offered his "Exhibits A and B" for "Document 2416," which are "stipulations with the Government." Dec. 17 Tr. at 7:1-13 (Court, Castle). The United States and other Defendants did not object, so the Court admitted "Exhibits A and B for Document 2416 . . . into evidence." Dec. 17 Tr. at 7:21-22 (Court). B. Garcia then called Acee to the witness stand. See Dec. 17 Tr. at 7:25-8:1 (Castle). Acee testified that he knows Lucero and that he first had a conversation with Lucero in 2016. See Dec. 17 Tr. at 8:20-9:1 (Castle, Acee). Acee said that he communicated with Lucero by text message and telephone in 2018, and that the telephone records produced in discovery reflect all telephone calls between himself and Lucero. See Dec. 17 Tr. at 9:9-19 (Castle, Acee). Acee testified that he has seen the B. Garcia Motion and the B. Garcia Motion Reply. See Dec. 17 Tr. at 10:2-11 (Castle, Acee). Acee also said that he has received "what's known as a Touhy letter."[11] Dec. 17 Tr. at 10:12-14 (Castle, Acee). B. Garcia asked Acee whether "92 text messages and 41 phone calls" is "an accurate calculation of the number of calls and text messages" that Acee and Lucero exchanged, Dec. 17 Tr. at 10:20-23 (Castle), and Acee responded: "I presume," Dec. 17 Tr. at 10:25 (Acee). B. Garcia directed Acee's attention to a telephone call between Acee and Lucero on February 15, 2018, and Acee testified that he used a telephone number that is no longer operational when the call occurred. See Dec. 17 Tr. at 11:17-12:5 (Castle, Acee, Bhalla). Acee testified that his telephone number at the time of the call was "(505) 231-2844," Dec. 17 Tr. at 12:10 (Acee), and that his telephone was an "FBI

---

[11]A "Touhy letter" refers to the request a party must make, under United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), to compel testimony by FBI agents.

cellphone," Dec. 17 Tr. at 12:13 (Acee).  Acee testified that the FBI has policies for the retention

of telephone records, and that the FBI's policies recognize three types of records: "[n]ontransitory,

transitory, and nonrecord."  Dec. 17 Tr. at 13:23 (Acee).  Acee explained that "a nontransitory

record would be something that would maybe be the highest level . . . in terms of retention.

Nontransitory records are typically something that we would upload into Sentinel, which is our

report database."  Dec. 17 Tr. at 14:2-6 (Acee).

      Acee testified that he often had multiple cellular telephones at one time, with six cellular

telephones being the most he had at a time.  See Dec. 17 Tr. at 14:16-19 (Acee).  Acee said that

Lucero had only one telephone number with which to contact him.  See Dec. 17 Tr. at 14:22-15:1

(Acee).  Acee testified that he occasionally made telephone calls -- and, more rarely, sent text

messages -- that were "investigatory in nature."  Dec. 17 Tr. at 15:2-13 (Castle, Acee).  Acee said

that he believes the FBI "destroyed" the cellular telephone that he used to communicate with

Lucero.  Dec. 17 Tr. at 16:21 (Acee).  According to Acee, when the FBI collects "our phones,

because of the security features, they're not wiped clean and sold at a used cellphone store.

They're destroyed, because of the security features that are on them."  Dec. 17 Tr. at 17:2-5 (Acee).

Acee testified that he asked FBI Information Technology ("IT") personnel three times whether his

cellular telephone's data "was downloaded and retained," Dec. 17 Tr. at 17:9-11 (Acee, Castle),

and the IT personnel told him "that unless there had been a preservation letter sent to Verizon or a

litigation hold placed on [his] communications, that [the data] wouldn't be retained," Dec. 17 Tr.

at 17:22-24 (Acee).  Acee testified that, although Verizon retains text messages only for three to

seven days, Verizon retains records of telephone numbers to which text messages are sent for

"months" or "maybe a year."  Dec. 17 Tr. at 18:21-22 (Acee).  Acee said that he also carries a

recorder that he can attach to his cellular telephones to record telephone calls.  See Dec. 17 Tr.

at 19:14-21 (Castle, Acee).  Acee testified that, although he recorded an in-person interview with Lucero, he never recorded a telephone conversation with Lucero.  See Dec. 17 Tr. at 20:7-11 (Castle, Acee).  Acee confirmed that most of his telephone calls and text messages with Lucero occurred between February 15, 2018, and May 3, 2018.  See Dec. 17 Tr. at 21:7-20 (Castle, Acee).  Acee testified that he knew that an attorney was appointed for Lucero during the time period in which they exchanged telephone calls and text messages, but Acee said that he had the attorney's permission to make telephone calls and send text messages. See Dec. 17 Tr. at 21:21-22:7 (Castle, Acee).  Acee also stated that the prosecutors knew about these telephone calls and text messages. See Dec. 17 Tr. at 22:8-10 (Castle, Acee).  Acee said that one of his responsibilities is to record telephone conversations in which a witness gives him "substantive information or pertinent information."  Dec. 17 Tr. at 22:17-18 (Acee).

Acee testified that he did not know that some of his telephone calls and text messages occurred during the time period in which Lucero asserted his right to remain silent.  See Dec. 17 Tr. at 23:11-24 (Castle, Acee).  B. Garcia read from the B. Garcia Motion that "Lucero asserted his rights in court on March 13, 2018, and reasserted that right during a March 16, 2018, appearance," that Acee and Lucero had a fifteen-minute telephone call on March 13, 2018, and that Acee and Lucero exchanged eleven text messages on March 16, 2018.  Dec. 17 Tr. at 24:6-14 (Castle).  B. Garcia asked Acee: "Did you ever look to see if that was an accurate statement?" Dec. 17 Tr. at 24:15-16 (Castle).  Acee responded: "I believe you.  I did not look at it, though." Dec. 17 Tr. at 24:17-18 (Acee).

B. Garcia then asked Acee whether he normally contacted witnesses when they have asserted their Fifth Amendment rights, see Dec. 17 Tr. at 24:19-25 (Castle), and Acee responded: "I don't know that I've been faced with that exact predicament before," Dec. 17 Tr. at 25:1-2

(Acee).  Acee confirmed that he would not contact a witness or defendant whom counsel represents

"without the consent of counsel or the permission of the Court," unless he wanted to ask about a

"completely different offense."  Dec. 17 Tr. at 25:3-11 (Castle, Acee).  Acee testified that he talked

to Lucero about only "travel, safety issues, and . . . [two matters] unrelated to the charged

offenses."  Dec. 17 Tr. at 25:24-26:3 (Acee).  Acee said that the two unrelated matters involve "an

SNM member killed in Las Vegas.  It turned out to be a domestic issue over a female, so he was

helping us with that.  And then he was helping us capture Eddie Archuleta, a federal SNM

member."  Dec. 17 Tr. at 26:14-18 (Acee).  Acee elaborated:

> The SNM member that was murdered I'd never heard of, and so I was looking for
> some background information on the guy.  He didn't seem to know much about
> him, either.  I think he'd come through the state system and they were generations
> apart.
>
>     As far as Eddie Archuleta, he knew a little bit about his family, so he was
> able to  provide, I think, a mom and an aunt's general location.
>
> . . . .
>
>     He'd run into [E. Archuleta] in town somewhere and seen him, because he
> was able to tell us what kind of car he was driving.  And at the time, Archuleta had
> two arrest warrants: One from the marshals and one from us.  And the FBI arrest
> warrant was the result of him providing a location to either the marshals or the FBI,
> and then Archuleta got arrested with some crack cocaine, and that's how we
> adopted that case.  So he had some background information on Archuleta's
> whereabouts.

Dec. 17 Tr. at 34:17-35:5 (Acee); id. at 35:8-17 (Acee).  Acee added that Lucero did not have

"significant contact" with E. Archuleta.  Dec. 17 Tr. at 35:24 (Acee).

Acee testified that Lucero had "concerns about his safety" during the time period in which

he and Lucero communicated.  Dec. 17 Tr. at 27:16 (Acee).  Acee explained that Lucero was

concerned about

> what travel looked like. How long he would stay, where he would stay. How he
> would get to and from the courthouse. He still lived up in the Las Vegas area.
> There was some discussion about per diem issues and then eventual relocation,
> although most of those conversations were with his attorney being part of the phone
> call, as well.

Dec. 17 Tr. at 27:20-28:1 (Acee). Acee said that he thinks Lucero "was in the presence of his

attorney" during most of his telephone calls with Lucero. Dec. 17 Tr. at 28:5-6 (Acee). B. Garcia

asked Acee whether Lucero contacted Acee about per diem issues, because "he wanted the

Government to pay him some money for his time in court." Dec. 17 Tr. at 29:4-5 (Castle). Acee

responded: "I don't think that's fair. I think I was his liaison. I guess he could have called you

directly, but he chose to text me." Dec. 17 Tr. at 29:6-8 (Acee).

B. Garcia next asked Acee if he has confirmed whether "what Mr. Lucero had told [him]

about receiving [] threatening phone calls was true or accurate." Dec. 17 Tr. at 30:10-13 (Castle).

Acee responded that he was unsure whether Lucero had received the telephone calls, but that FBI

Agent Nancy Stemo might know the answer. See Dec. 17 Tr. at 30:14-15 (Acee). Acee testified

that "none of the cooperating defendants have my phone number anymore. So when I got rid of

my phone, I have had no telephone contact with any of the cooperating defendants." Dec. 17 Tr.

at 31:9-13 (Acee). Acee said that he thinks that Stemo had less contact with Lucero than he had

with Lucero between February, 2018, and the end of the second trial. See Dec. 17 Tr. at 41:15-18

(Castle, Acee). Acee testified that Lucero told him during their conversations about

> annoying and harassing phone calls. Almost like what I'd expect a teenager to do
> where you're prank-calling people, stuff like that. He would just get phone calls at
> odd hours and he would just -- no one would express a threat to him. It would just
> be like they were listening momentarily and then they'd hang up.

Dec. 17 Tr. at 31:25-32:6 (Acee). Acee said that, although Lucero expressed fear, because of the

"annoying or harassing phone calls" which he received, Lucero did not indicate that he was

"hesitant" to testify or to cooperate with the United States. Dec. 17 Tr. at 32:18-33:2 (Acee, Castle). Acee said that "[l]ess than a dozen" of his telephone calls and text messages with Lucero "had to do with him expressing concern." Dec. 17 Tr. at 33:16-17 (Acee). Acee testified that, when Lucero asked him about money, Lucero primarily asked him how to obtain reimbursement for gas and other expenses. See Dec. 17 Tr. at 34:7-10 (Acee).

Acee testified that he was unsure if Lucero testified at trial that he left SNM in 2008. See Dec. 17 Tr. at 36:16-21 (Castle, Acee). B. Garcia noted that he argued at trial that Lucero "was continuing to be a member of the SNM for quite some time," Dec. 17 Tr. at 36:24-37:1 (Castle), and Acee responded that he is aware of B. Garcia's argument at trial, see Dec. 17 Tr. at 37:2 (Acee). Acee testified that it is "not unusual" for former SNM members "to keep tabs on" SNM. Dec. 17 Tr. at 37:10-11 (Acee). Acee said that he believes the FBI produced all 302s related to Lucero. See Dec. 17 Tr. at 38:18-23 (Castle, Acee). Acee indicated that he has not seen a 302 by Stemo concerning her interview of Lucero and that he tried to familiarize himself with the discovery produced in the case. See Dec. 17 Tr. at 38:24-39:5 (Castle, Acee). According to Acee, if the FBI produced a Stemo 302, he would be aware of the production. See Dec. 17 Tr. at 39:6-8 (Castle, Acee).

B. Garcia asked Acee if it is correct that his telephone conversations with Lucero totaled almost three hours between February 15, 2018, and May 3, 2018, see Dec. 17 Tr. at 39:12-14 (Castle), and Acee responded that he "find[s] that hard to believe," Dec. 17 Tr. at 39:18 (Acee). B. Garcia directed Acee to review the Call Records for PTN 5057186325, filed October 15, 2018 (Doc. 2416-2), and Acee admitted that he did not confirm whether the telephone records are accurate, see Dec. 17 Tr. at 40:21-22 (Acee). Acee testified that he recalls having a telephone call with Lucero that lasted approximately twenty-five minutes. See Dec. 17 Tr. at 40:23-41:1 (Castle,

Acee).  Acee explained that the telephone conversation was about Lucero's car accident, which occurred during one of Lucero's trips home from the Las Cruces courthouse.  See Dec. 17 Tr. at 41:3-7 (Acee).  Acee said that Lucero did not ask the United States or FBI to reimburse him for the expenses that he incurred as a result of his car accident.  See Dec. 17 Tr. at 41:8-20 (Castle, Acee).  Acee testified that, during his telephone conversations with Lucero, Lucero did not mention that he was asserting his Fifth Amendment rights.  See Dec. 17 Tr. at 41:21-23 (Castle, Acee). Acee added that Lucero's attorney told him: "You can talk to him about his travel and his safety." Dec. 17 Tr. at 42:2-3 (Acee).  Acee said that Lucero's attorney would not let him talk to Lucero about other matters outside the attorney's presence.  See Dec. 17 Tr. at 42:4-6 (Castle, Acee).

Acee testified that Lucero's "attorney directed the majority" of the conversations that Acee had with Lucero.  Dec. 17 Tr. at 43:1-2 (Acee).  Acee confirmed that Lucero never expressed "a concern about whether he was going to be charged in this case during" their telephone conversations between February 15, 2018, and May 3, 2018.  Dec. 17 Tr. at 43:9-12 (Castle, Acee). Acee admitted, however, that he thinks Lucero was concerned about facing possible charges when Acee "first met him" in 2016.  Dec. 17 Tr. at 43:20-25 (Acee, Castle).  Acee testified that, when he first met Lucero, Lucero knew that the FBI was investigating SNM.  See Dec. 17 Tr. at 44:18-24 (Castle, Acee).  Acee said that it is "[n]ot at all" uncommon for him to receive telephone calls and text messages from witnesses testifying in the SNM trials.  Dec. 17 Tr. at 45:25 (Acee).  Acee testified that he received some telephone calls and text messages from witnesses who are in prison and whom counsel represent.  See Dec. 17 Tr. at 46:1-11 (Castle, Acee).  Acee also testified that, for every conversation with a witness, he would discuss the limits of the telephone conversation with the witness' attorney.  See Dec. 17 Tr. at 46:12-19 (Castle, Acee).  Acee said that, during this telephone conversations with witnesses,

> [w]hat I communicated was that if their families had problems on the outside, rather
> than go through the attorney, they were welcome to call me.  And I made that offer
> in front of the Government and their attorneys so everyone knew.  And then if the
> witnesses were on the outside, I would just get permission to coordinate travel and
> security for the witnesses and the attorneys, to a T, were all agreeable to that.

Dec. 17 Tr. at 47:3-11 (Acee).  Acee added that he "was the lead point of contact for all of the

witnesses out of custody communicating, coming to the court in response to the subpoenas."

Dec. 17 Tr. at 48:6-9 (Acee).

Acee testified that witness Sammy Griego sent him text messages in the months preceding

Griego's testimony.  See Dec. 17 Tr. at 48:11-14 (Castle, Acee).  Acee said that his conversations

with Griego pertained to the same topics as his conversations with Lucero.  See Dec. 17 Tr.

at 48:17-21 (Acee).  Acee noted that, although Griego did not "report getting weird phone calls or

people, you know, driving by his house or squealing tires, . . . he had a healthy fear of the SNM in

general."  Dec. 17 Tr. at 49:6-9 (Acee).  Acee testified that Griego "cooperated right away" in the

case.  Dec. 17 Tr. at 49:14 (Acee).  Acee also testified that he had conversations by telephone and

by text message with Armijo, who was out of custody when he testified against B. Garcia.  See

Dec. 17 Tr. at 50:2-12 (Castle, Acee).  Acee said that Armijo expressed concerns about testifying,

so he gave Armijo "money to purchase surveillance cameras for his house."  Dec. 17 Tr. at 50:18-

19 (Acee).

Acee testified that, to his knowledge, neither he nor anyone who works for the United

States or for the FBI communicated with Lucero after the B. Garcia Motion's filing.  See Dec. 17

Tr. at 51:7-13 (Castle, Acee).  Acee said that the FBI has not attempted to retrieve text messages

from Lucero's cellular telephone and that he does not know whether Lucero destroyed his cellular

telephone.  See Dec. 17 Tr. at 51:14-25 (Castle, Acee).  Acee noted that he also does not know

whether Armijo and Griego still have the content of their text messages with Acee on their cellular

telephones.  See Dec. 17 Tr. at 52:1-5 (Castle, Acee).  B. Garcia recalled that Romero was another witness not in custody when he testified, see Dec. 17 Tr. at 52:6-8 (Castle), and Acee testified that most of his telephone conversations with Romero "went through his wife because he didn't have his own phone.  She was kind of the keeper of the phone in their family."  Dec. 17 Tr. at 52:16-18 (Acee).

B. Garcia returned to the "annoying calls and prank calls" which Acee earlier testified that Lucero received during the trial.  Dec. 17 Tr. at 53:2 (Castle).  Acee explained that,

> in addition to the phone calls, like screeching tires around his house, like people peeling out -- and again, I thought that's kind of -- maybe you don't want my thoughts on it.  But -- so the phone calls, the screeching tires.  And then his wife had her purse stolen from their car, and he was concerned about that, because it had their checkbook and her identifying documents.

Dec. 17 Tr. at 53:8-15 (Acee).  Acee testified that he never examined Lucero's cellular telephone and that he is unsure if anyone else ever examined it.  See Dec. 17 Tr. at 54:3-4 (Castle, Acee). Acee also testified that Lucero did not provide him the telephone numbers of the concerning telephone calls that Lucero received.  See Dec. 17 Tr. at 54:12-15 (Castle, Acee).  Acee added that, based on a subpoena that Stemo filed, he thinks the telephone calls came from "different numbers or blocked numbers."  Dec. 17 Tr. at 54:24-25 (Acee).  See id. at 55:1-7 (Castle, Acee).  After B. Garcia completed his direct examination of Acee, no other Defendants conducted a direct examination.  See Dec. 17 Tr. at 55:10-15 (Court).

The United States began its cross-examination by asking about the "three different types of recordings," which Acee earlier identified during the direct examination.  Dec. 17 Tr. at 56:3-4 (Armijo).  Acee said that the FBI defines a "nontransitory record" as a record that is "needed for no more than 180 days."  Dec. 17 Tr. at 67:5-6 (Acee).  Acee gave an example:

> Like my interactions with the FBI laboratory, when I have something sent to the lab. This is the most frequently used example of this. So I send an item to undergo fingerprinting or DNA testing. The lab responds with an email, and that email response is their findings as well as their official report. So that, to me, is a nontransitory record that I then flag with the case number and it goes into Sentinel, which is our report system. So that's to give you a real life application of a nontransitory record.

Dec. 17 Tr. at 57:20-58:5 (Acee). Acee testified that none of his text messages with Lucero between February 15, 2018, and May 3, 2018, constitutes a "nontransitory record." Dec. 17 Tr. at 58:10-12 (Armijo, Acee).

Acee said that the FBI defines a "transitory record" as a "record that has minimal documentary or evidentiary value and is needed for 180 days or less." Dec. 17 Tr. at 58:15-18 (Acee). Acee added that he has never categorized a record as a transitory record, because he tends to "err on the side of caution" by categorizing a record as a nontransitory record, and letting "someone else . . . determine whether it's important or not." Dec. 17 Tr. at 58:20-23 (Acee). Acee said that the FBI defines a "nonrecord" as "any material that does not meet the statutory definition of a record as set forth in 44 USC Section 3301." Dec. 17 Tr. at 59:8-12 (Armijo, Acee). Acee testified that the FBI does not require agents to save nonrecords. See Dec. 17 Tr. at 59:14-16 (Armijo, Acee). Acee further testified that his communications by text message with Lucero are "all nonrecord[s]." Dec. 17 Tr. at 59:21 (Acee).

Acee testified that, when he first met Lucero, he believed that Lucero would be a potential witness in the case. See Dec. 17 Tr. at 60:2-6 (Armijo, Acee). Acee confirmed that, when he first met Lucero, Lucero had an attorney who was concerned about Lucero's safety and testimony. See Dec. 17 Tr. at 60:12-14 (Armijo, Acee). Acee said that he was present when Lucero initially invoked his Fifth Amendment rights. See Dec. 17 Tr. at 60:15-18 (Armijo, Acee). Acee testified that, after Lucero invoked his Fifth Amendment rights, discussions continued regarding whether

Lucero would testify as a witness, but Acee noted that he was not involved in the discussions. See Dec. 17 Tr. at 60:19-61:3 (Armijo, Acee). Acee stated that, after Lucero decided to testify, Lucero called him because of a car accident. See Dec. 17 Tr. at 61:14-21 (Armijo, Acee). Acee testified that "civilian witnesses" receive a per diem from the United States Marshal Service. Dec. 17 Tr. at 61:24-62:2 (Armijo, Acee). Acee testified that page twenty-five of the FBI's Records Management Policy Guide -- "[w]hich is 'Exhibit A, for the record,'" Dec. 17 Tr. at 62:17 (Armijo) -- "talks about nonrecord emails," Dec. 17 Tr. at 62:19 (Acee). See "Records Management Policy Guide" (dated June 4, 2015), Federal Bureau of Investigation, Records Management Division, available at https://vault.fbi.gov/records-management-policy-guide-0769pg-part-01-of-01/Records%20Management%20Policy%20Guide%200769PG%20Part%200 1%20of%2001/view (last accessed January 1, 2020). Acee explained that the "policies are a little dated" and that he believes the policy applies to text messages as well as emails. Dec. 17 Tr. at 62:19 (Acee). According to Acee, his text messages with Lucero about "how to get to court, what day to be here, and at what time are . . . clearly nonrecord emails or communication." Dec. 17 Tr. at 2-4 (Acee). Acee confirmed that he bases his determination on section 4.8.19 of Exhibit A. See Dec. 17 Tr. at 63:5-8 (Armijo, Acee).

    The United States next offered into evidence the "Government's Exhibit 1 to Document 2416," Dec. 17 Tr. at 65:24-25 (Court), which is the United States "Department of Justice Office of the Inspector General Report of Investigation Recovery of Text Messages from Certain FBI Mobile Devices," Dec. 17 Tr. at 66:15-18 (Acee). Acee explained that page five of the policy outlines "what substantive communications include," and "talks about FBI policy regarding the collection and retention of text messages." Dec. 17 Tr. at 68:1, 6-8 (Acee). According to Acee, "substantive communications" refers to records

that we need to preserve, and then upload into Sentinel, so that they're in the report database or factual information about investigative activity. Factual information obtained during interviews or interactions with victims, including victims, potential witnesses, experts, informants, or cooperators; factual discussions related to the merits of evidence; factual information or opinions relating to the credibility or bias of a witness, informant, or potential witness; and other factual information that's potentially discoverable under Brady, Giglio [v. United States, 405 U.S. 150 (1972)("Giglio")], Rule 16, or Rule 26.2, which is the Jencks Act.

Dec. 17 Tr. at 68:13-25 (Acee). Acee testified that, during the time period in which he communicated with Lucero, Acee's first cellular telephone was a "Galaxy S5," which the FBI destroyed, and his second cellular telephone was a "Galaxy S7," which the FBI also destroyed. Dec. 17 Tr. at 72:9-12 (Armijo, Acee). Acee noted that the FBI instructed him to produce any documents requested in the case and that, while E. Archuleta was involved in the "overall SNM investigation," he faced charges "not related" to the Defendants in the case. Dec. 17 Tr. at 73:1-14 (Armijo, Acee).

Acee testified that the FBI's Records Management Policy Guide includes several examples of a nonrecord, such as "[l]ibrary materials made or acquired and preserved solely for reference or exhibition purposes; stocks of publications or unprocessed blank forms; extra copies of documents preserved only for convenience or reference." Dec. 17 Tr. at 75:1-5 (Acee). B. Garcia asked whether the policy "give[s] an example of a nonrecord that is in the form of either an email or a text message." Dec. 17 Tr. at 75:7-8 (Castle). Acee responded that emails and text messages are "covered" by the policy's statement that a "nonrecord is any material that does not meet the statutory definition of a record." Dec. 17 Tr. at 75:10-16 (Acee, Caslte). Acee added that the nonrecord examples that the policy lists do not "cover all examples." Dec. 17 Tr. at 75:19 (Acee). Acee confirmed that 44 U.S.C. § 3301 defines a record as "all recorded information, regardless of form or characteristics, made or received by a federal agency." Dec. 17 Tr. at 76:8-10 (Castle,

Acee).  B. Garcia asked Acee whether his text messages with Lucero are "recorded information" that was "made or received by the FBI," and Acee responded affirmatively.  Dec. 17 Tr. at 76:13-17 (Castle, Acee).  B. Garcia next asked Acee why a text message is a nonrecord, see Dec. 17 Tr. at 76:23-24, and Acee responded: "That is a question for the policymaker, sir, not me," Dec. 17 Tr. at 76:25-77:1 (Castle, Acee).  Acee testified that he made a "conscious decision" not to retain text messages with Lucero, Griego, Armijo, and Romero, because the text messages did not contain substantive information warranting a report.  Dec. 17 Tr. at 77:5-10 (Castle, Acee).  Acee reiterated that substantive communications include "[f]actual information obtained during interviews or interactions with witnesses."  Dec. 17 Tr. at 78:8-9 (Acee).  Acee confirmed that FBI agents are "required to retain substantive communications that might relate to the bias of a witness."  Dec. 17 Tr. at 78:10-12 (Castle, Acee).  Acee also confirmed that, "in this case, various parties, but mainly the Government, brought forth evidence before the jury concerning the fear of certain witnesses in this case."  Dec. 17 Tr. at 78:14-18 (Castle, Acee).  Acee then stepped down from the witness stand.  See Dec. 17 Tr. at 78:23-24 (Court).

B. Garcia then asked the Court for permission to argue his motion "in a writing within a reasonable period of time," so that he can "go back and reference some of the discovery materials." Dec. 17 Tr. at 79:13-15 (Castle).  The United States and the other Defendants did not object.  See Dec. 17 Tr. at 79:16-25 (Court, Armijo, Castle).  The Court stated: "It doesn't look like there is, A, anything to be produced; and B, it doesn't look like there is anything for in camera review.  So it looks to me like this is mostly a Jencks violation motion.  Am I characterizing things correctly?" Dec. 17 Tr. at 80:12-16.  B. Garcia responded: "To some extent, yes, and no."  Dec. 17 Tr. at 80:17 (Castle).  B. Garcia explained that, after a "cursory review," it appears that the United States did not produce a 2016 interview of Lucero.  Dec. 17 Tr. at 80:22-81:4 (Castle).  The United States

offered that it "can find out about it," Dec. 17 Tr. at 81:7-8 (Armijo), and Acee stated that he

"recorded Mr. Lucero and I believe we played portions of it during the trial. I though it was 2016,"

Dec. 17 Tr. at 81:11-13 (Acee). The Court then asked B. Garcia to confirm whether, other than

the 2016 Lucero interview, he is not asking the United States to produce anything. See Dec. 17

Tr. at 81:16-20 (Court). B. Garcia responded affirmatively and agreed that he is dropping his

request for in camera review. See Dec. 17 Tr. at 81:21-25 (Castle, Court). B. Garcia also

confirmed that his main argument is that the United States violated the Jencks Act. See Dec. 17

Tr. at 82:1-9 (Court, Castle).

### 18.    The December 18, 2018, Hearing.

The Court held an evidentiary hearing on December 18, 2018, in which the Court heard

the new trial motions. See Transcript of Motion Proceedings (held December 18, 2018), filed

January 4, 2019 (Doc. 2480)("Dec. 18 Tr."). First, the Court asked Baca if he wanted to argue his

motion for new trial, and Baca responded that he would "do it on paper" by submitting a brief

supporting his new trial motion. Dec. 18 Tr. at 4:21-22 (Court). The Court and Baca agreed that

Baca would file the additional briefing by January 4, 2019. See Dec. 18 Tr. at 163:15-17 (Lowry,

Court). The Court then turned to the Troup NTM, and Troup began by recognizing that "he was

a free man for almost three years" before "his arrest on the indictment in this case." Dec. 18 Tr.

at 8:5-8 (Burke). Troup noted that he married, found employment, reconnected with his family,

and became a "contributing member of society" before his arrest. Dec. 18 Tr. at 8:15 (Burke).

Troup said that he was "going through Suboxone treatment" with Dr. Valerie Carrejo at the time

of his arrest. Dec. 18 Tr. at 8:24-25 (Burke). Troup asserted that, in the three years and two weeks

since his arrest, he has not had a "dirty urine or incident report for any other kind of behavior,

thereby distinguishing himself from almost every one of the Government's informants in this

case." Dec. 18 Tr. at 9:10-13 (Burke).  Troup also thanked the Court for its respect throughout the

case.  See Dec. 18 Tr. at 10:3-8 (Burke).

Troup argued that law enforcement found DeLeon's and Jaramillo's DNA on a "knotted

white cord" used to kill Castillo, which indicates that DeLeon and Jaramillo likely killed Castillo

on March 26, 2001, at Southern New Mexico.  See Dec. 18 Tr. at 10:19 (Burke).  According to

Troup, law enforcement issued an arrest warrant but did not pursue the warrant.  See Dec. 18 Tr.

at 10:21-23 (Burke).  Troup said that Lorenzo Torres testified "that he saw Edward Troup in the

upper pod that day of the Castillo homicide," because Torres wanted to "make a deal" with

prosecutors.  Dec. 18 Tr. at 11:1-3 (Burke).  Troup argued that "it would be very difficult for

anyone to believe a single word that Torres said in this courtroom under oath."  Dec. 18 Tr.

at 11:5-7 (Burke).  Troup then read parts of Torres' testimony in which Torres said that he was

"up early on March 26, 2001," he was looking for heroin, and he did not see Castillo's killer.

Dec. 18 Tr. at 11:8 (Burke).  According to Troup, the "three inmates that Torres mentioned" in his

testimony were DeLeon, J. Gallegos, and Troup, and, "from that moment on, that's who the

Government stuck with."  Dec. 18 Tr. at 11:21-25 (Burke).  Troup noted that Torres refused to

give a statement or DNA after the Castillo homicide in March, 2001.  See Dec. 18 Tr. at 12:3-12

(Burke).  Troup argued that Torres lied by testifying that DeLeon, J. Gallegos, and Troup used a

laundry bag string to strangle Castillo.  See Dec. 18 Tr. at 12:13-23 (Burke).  Troup also argued

that the United States ignored that Jaramillo's DNA was found on the laundry bag string.  See

Dec. 18 Tr. at 12:24-13:1 (Burke).

Troup asserted that the charges in the case "are based solely on the statements of

Government informants."  Dec. 18 Tr. at 13:21-23 (Burke).  Troup argued that he is "suffering

prejudice because he is being victimized by one of the most pernicious features of modern

prosecutions: The Government's use of informants who are seeking benefits."  Dec. 18 Tr. at

13:24-14:2 (Burke).  Troup also said that the United States refused to produce Jencks material until

two weeks before trial, and did not produce Brady and Giglio material "in good faith."  Dec. 18

Tr. at 14:12 (Burke).  Troup averred that: (i) the United States' delays prejudiced him; (ii) the

United States' decision to include homicides from 2001 in the indictment was "tactical"; and

(iii) "'impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove,

because time's erosion of exculpatory evidence and testimony can rarely be shown.'"  Dec. 18 Tr.

at 14:23-15:3 (Burke)(quoting Doggett v. United States, 505 U.S. 647, 655 (1992)).  Troup then

recounted events from "the timeline on Jaramillo" according to his theory: (i) on March 26, 2001,

Jaramillo killed Castillo; (ii) on August 8, 2007, Lujan admitted in an interview that he directed

Jaramillo and other inmates to kill Castillo; (iii) on April 10, 2018, Troup's counsel "conducted

voir dire based on the understanding that Jaramillo would not be a witness"; (iv) on April 12, 2018,

Troup "gave the defense's opening statement based on the understanding that Jaramillo would not

be a witness"; (v) on April 18, 2018, the United States gave Jaramillo a "Kastigar letter"[12]; and

(vi) on April 19, 2018, the United States produced a 302 "for the first time."  Dec. 18 Tr.

at 15:13-16:9 (Burke).  Troup noted that the Defendants charged with Count 2 understood early

---

[12]Both the United States and the Defendants repeatedly refer to the letters immunizing the United States' witnesses as Kastigar letters, named from Kastigar v. United States, 406 U.S. 441 (1972)("Kastigar").  That term is apparently a misnomer, because the Kastigar letters do not afford the United States' witnesses the immunity that Kastigar requires.  Calling the documents Kastigar letters is accurate in a limited sense, however; the documents explain that permitting the United States to make derivative use of information and pursue investigative leads is necessary "to eliminate the necessity for a Kastigar hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted."  Letter from Maria Armijo to John Samore Cordova Letter ¶ 2, at 1 (dated June 9, 2016), filed May 10, 2018 (Doc. 2246).  See Kastigar Hearing, Black's Law Dictionary (10th ed. 2014)("A hearing at which the prosecution must establish by a preponderance of the evidence that the government's evidence derives from proper, nonimmunized sources.").

on "that the Government's approach was to put E. Martinez, the killer, on the stand," and thus had time to prepare to impeach E. Martinez and receive not-guilty verdicts. Dec. 18 Tr. at 16:13-14 (Burke). Troup said that the "interests of justice suggest that a new trial should be granted on Count 1." Dec. 18 Tr. at 17:5-6 (Burke).

The Court stated that it had previously decided whether Jaramillo had to be on the United States' witness list a "certain number of days before trial," because this matter is a "death penalty eligible case." Dec. 18 Tr. at 17:15-18 (Court). Troup agreed that the Court had decided that "the three-day requirement for a death penalty case did apply." Dec. 18 Tr. at 18:24-19:1 (Burke). The Court recounted that, "on the day of venire," which was "two full days ahead of opening statements," the swearing in of the jury, and the beginning of the trial, the United States read its witness list, which included Jaramillo. Dec. 18 Tr. at 19:10-12 (Court). Troup conceded that the Court was correct, and he argued that Jaramillo should not have been allowed to testify, "because the Government had not complied with any of the rules relating to producing Jencks statements." Dec. 18 Tr. at 19:24-25 (Burke). The Court said that one remedy was to have Jaramillo testify later in the case to give the Defendants more time to prepare. See Dec. 18 Tr. at 20:4-9. The Court then asked: "What do you do with a witness that won't talk, and then finally talks?" Dec. 18 Tr. at 20:10-11 (Court). Troup maintained that the United States "had remedies to force Mr. Jaramillo to come forward," such as a subpoena or offering immunity. Dec. 18 Tr. at 20:3-4 (Burke).

Troup then turned to severance, and he said that the Court instructed the United States and the Defendants at the February 7, 2017, hearing to figure out how to divide the trial into "three single-digit defendant trials." Dec. 18 Tr. at 21:23-24 (Burke)(citing Transcript of Motion Proceedings (held February 7, 2017) at 141:16-142:6 (Court), filed February 24, 2017 (Doc. 923)). Troup said that the defense teams convened and struggled to reach a consensus. See Dec. 18 Tr.

at 21:25-22:10 (Burke). Troup argued that it was "not fair" to him to combine Counts 1 and 3 in the same trial. Dec. 18 Tr. at 22:12 (Burke). Troup asserted that the United States "def[ied]" the Court by proposing two trials instead of three trials. Dec. 18 Tr. at 22:21 (Burke). Troup noted that there were ultimately two trials, and he argued that there "should have been smaller trials." Dec. 18 Tr. at 23:19-20 (Burke). Troup argued that he had to, "in effect, defend against the Adrian Burns homicide," and thus the jury had to see photographs of Burns' "burned body" at his trial, even though the murder "was not of the same type" as Castillo's murder. Dec. 18 Tr. at 23:23-24:3 (Burke). Troup noted that he had suggested a "bifurcation procedure" and that the Court had considered having "two juries in the first trial," but that these proposals never materialized. Dec. 18 Tr. at 24:6-10 (Burke). Troup argued that "the interests of justice would be served if there was a new trial based on the inadequate severance." Dec. 18 Tr. at 24:15-17 (Burke).

Troup characterized the United States' approach as a "win at all costs" approach. Dec. 18 Tr. at 26:9 (Burke). Troup noted that the United States accused Troup's counsel of "suborning perjury" based on "the false statements of Daffy Garcia," whom the United States later admitted was a "liar." Dec. 18 Tr. at 25:9-25 (Burke). Next, Troup said that "every night during trial or in the morning of trial we would get a new statement" from one of the United States' witnesses, which would "fill[] the gap in the prosecution's case." Dec. 18 Tr. at 26:4-9 (Burke). Troup then stated:

> "The United States Attorney is the representative not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all. A prosecutor can prosecute with earnestness and vigor, indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods as it is to use legitimate means to bring about a just one."

Dec. 18 Tr. at 26:13-23 (Burke)(quoting Berger v. United States, 295 U.S. 78, 88 (1935)).  Troup

also quoted one of the Court's opinions, stating: "'The United States' goal in all cases is to do

justice and not to just secure a conviction.'"  Dec. 18 Tr. at 27:3-5 (Burke)(quoting United States

v. Ballou, 59 F. Supp. 3d 1038, 1069 (D.N.M. 2014)(Browning, J.)).  Troup argued that the United

States' "'win at all costs' attitude trumps Brady, it trumps Jencks, and it trumps every other

constitutional requirement."  Dec. 18 Tr. at 27:19-21 (Burke).

Turning to the jury instructions, Troup argued that he had "raised the issue of misprision,"

but that misprision instruction was not included.  Dec. 18 Tr. at 28:25 (Burke).  Troup then

explained his rationale for including a misprision instruction:

> [T]he theory that we were advancing was, particularly with regard to Count 1,
> because the most that was ever said about Edward Troup is that he may have been
> on the steps, and Torres said: Don't come up here.
>
> And then Jaramillo said: Well, when I left, I saw Troup downstairs, and he
> was, you know, magically keeping everybody else in their cells.
>
> And I said, what that fits is not telling people, misprision; not conceding.
> And I said the facts support that.

Dec. 18 Tr. at 28:20-29:5 (Burke).  The Court asked Troup how this jury instruction would have

helped him.  See Dec. 18 Tr. at 29:8 (Court).  Troup responded that the jury instruction would have

given the jury "the option of finding him not guilty as to VICAR murder, but then proceeding to

say on that offense he is guilty of misprision."  Dec. 18 Tr. at 29:17-20 (Burke).  Troup added that

the Court "had the discretion to give the misprision instruction. . . .  And I believe you should have

given it."  Dec. 18 Tr. at 30:7-10 (Burke).  The Court responded that misprision would be an

"unindicted free-standing felony to throw into the case," and it asked Troup whether there was

authority for the Court to "pick another crime" to put before the jury.  Dec. 18 Tr. at 30:11-14

(Court).  Troup stated that he included authority in Defendant Edward Troup's Motion for an

Instruction on the Offense of Misprision, 18 U.S.C. § 4, filed May 17, 2018 (Doc. 2291)("Misprision Motion"), but that the Court had not written on that motion. See Dec. 18 Tr. at 30:24-31:4 (Burke, Court).

> The Court then stated its understanding of Troup's argument:
>
> It seemed to me there was an internal inconsistency -- and correct me if I'm wrong -- in your argument.  On one side it seemed to me you were saying later in your briefing that there should have been no instruction on murder given at all; that just the inclusion of that at all was wrong, and that I should have followed the Fifth Circuit pattern instructions.  And they do not include that, and therefore, I shouldn't include it at all.  And in another place earlier in the briefing you say I gave the wrong murder charge.  I shouldn't have looked at New Mexico law either for first degree or second degree, and I should have given some generic murder charge. Isn't there a tension between those two?

Dec. 18 Tr. at 31:9-23 (Court).  Troup responded by arguing that: (i) the jury instruction cannot be based on "the murder statutes of 50 different states," and that there should be a "general recognized murder instruction"; (ii) the jury instruction cannot include the elements for second-degree murder under New Mexico law, because the six-year statute of limitations had run; and (iii) New Mexico's second-degree murder statute mentions "probability," and "probability is a bad statute to use in VICAR."  Dec. 18 Tr. at 32:3-33:1 (Burke).  The Court noted that Troup never made the second argument at trial, and, thus, the argument "is going to be judged by plain error."  Dec. 18 Tr. at 33:7 (Court).  The Court asked Troup whether there was any authority for his argument not from a federal district court.  See Dec. 18 Tr. at 33:9-12 (Court).  Troup said that, in United States v. Frumento, 563 F.2d 1083 (3d Cir. 1977), the United States Court of Appeals for the Third Circuit said: "'The federal statute does not punish the same conduct as that reached by state law.  Rather, reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage.'"  Dec. 18 Tr. at 33:16-33 (quoting United States v. Frumento, 563 F.2d at 1088 (quoting United States v. Cerone, 452 F.2d 274, 286-87 (7th Cir. 1971)))(alteration

in Dec. 18 Tr.).  Troup admitted that he was unaware of any authority from the Supreme Court of the United States of America or the Tenth Circuit.  See Dec. 18 Tr. at 33:24-34:1 (Court, Burke).

The Court then explained that there has been "vigorous debate" amongst courts about sentencing, and that the Supreme Court has supplied a "generic definition" for crime of violence. Dec. 18 Tr. at 34:8-10 (Court).  The Court asked whether the older cases which Troup cites are "good law," because arguing that VICAR "doesn't incorporate the state law" and that courts must use a "generic" definition for a crime might be "adding something to the statute."  Dec. 18 Tr. at 34:25-35:5 (Court).  The Court further asked why Troup's position "is a good separation of powers issue."  Dec. 18 Tr. at 35:22 (Court).  Troup responded that the VICAR statute requires a life sentence for committing murder, which he argued "makes some sense" for first-degree murder, but not for second-degree murder, because the New Mexico statute uses "language such as 'probability.'"  Dec. 18 Tr. at 35:25-36:4 (Burke).  The Court noted that the VICAR statute says murder without differentiating between first-degree and second-degree murder, and it asked Troup why the Court should interpret the statute as saying: "No, a state murder means not New Mexico murder, but it means some model penal code or some restatement or some other definition.  It doesn't really mean state, it means some model generic code."  Dec. 18 Tr. at 36:17-21 (Court). Troup argued that incorporating each state's definition of murder would result in different treatment for "defendants who engaged in the same conduct in different states."  Dec. 18 Tr. at 37:4-5 (Burke)(citing United States v. Le, 316 F. Supp. 2d at 359-62).  The Court asked Troup why such a result is "wrong" when Congress wrote the VICAR statute to reference "state law." Dec. 18 Tr. at 37:6-7 (Court).  Troup argued that, like with capital defendants, punishment for defendants under the VICAR statute "should be uniform."  Dec. 18 Tr. at 37:18 (Burke).  Troup also stated that he believes his statute-of-limitations argument is his best argument.  See Dec. 18

Tr. at 37:20-22 (Burke, Court). Troup again argued that the "interests of justice" require a new trial. Dec. 18 Tr. at 39:22-23 (Burke). Troup asserted that courts should not consider the amount of work and funding constraints when deciding whether to grant a new trial. See Dec. 18 Tr. at 40:6-17 (Burke). Last, Troup requested that he receive a new trial separate from the Defendants charged in Counts 4 and 5. See Dec. 18 Tr. at 41:3-7 (Burke). B. Garcia said that he joins all of Troup's arguments and that he has nothing to add. See Dec. 18 Tr. at 13-20 (Cooper).

Next, J. Gallegos argued in support of the J. Gallegos Motion and the Troup NTM, which he joins. See Dec. 18 Tr. at 41:23-42:3 (Benjamin); id. at 42:16-20 (Benjamin). J. Gallegos noted that his investigator tried to talk to Jaramillo in the Summer, 2016, but Jaramillo refused to talk. See Dec. 18 Tr. at 42:25-43:17 (Benjamin, Court). J. Gallegos argued that the United States has "the ability to issue [an] unlimited number of Grand Jury subpoenas," and, thus, the United States, unlike the Defendants, could have compelled Jaramillo to testify. Dec. 18 Tr. at 44:13-14 (Benjamin). The Court asked J. Gallegos: "Isn't it a dangerous doctrine for the Court to try to fashion something that puts pressure on the Government to indict more people?" Dec. 18 Tr. at 45:5-7 (Court). J. Gallegos responded that he agrees with the Court, and he asserted that, when the United States "produced its witness list, [it] omitted a star person who was going to testify." Dec. 18 Tr. at 45:17-18 (Benjamin). J. Gallegos argued that the United States "blindsided" him by calling Jaramillo to testify, because the United States chose not to call Jaramillo "prior to the Jencks deadline." Dec. 18 Tr. at 47:4-6 (Benjamin). The Court asked J. Gallegos how it should deal with a witness "that's come in and raises their right hand and swears to tell the truth . . . other than just dealing with it?" Dec. 18 Tr. at 13-17 (Court). J. Gallegos responded that "the Court's remedy is exclusion of that witness," because the United States did not add the witness to its witness list. Dec. 18 Tr. at 47:23 (Benjamin). J. Gallegos averred that he thinks the United States

talked to Jaramillo after 2016, because his DNA was on the murder weapon, but decided to exclude Jaramillo as a witness so that it would not have to produce <u>Jencks</u> material.  <u>See</u> Dec. 18 Tr. at 48:7-19 (Benjamin, Court).

The Court summarized its understanding of J. Gallegos, Troup, and B. Garcia's position, which is that they knew Jaramillo "was out there," but they made a "professional decision" not to prepare for Jaramillo testifying, because he "may never show up."  Dec. 18 Tr. at 49:21-50:4 (Court).  J. Gallegos responded that he disagrees, because the United States "knew he was out there.  And their position is that they didn't do anything knowing he was out there."  Dec. 18 Tr. at 50:7-9 (Benjamin).  J. Gallegos argued that he must rely on the United States' witness list and the <u>Jencks</u> statements that the United States provides, but that, when things change "at the very last second," he cannot rely on the witness list and <u>Jencks</u> statements.  Dec. 18 Tr. at 51:1-2 (Benjamin).  J. Gallegos maintained that he did not have enough time to prepare for Jaramillo's testimony, even though the Court moved Jaramillo's testimony to later in the trial.  <u>See</u> Dec. 18 Tr. at 51:4-17 (Benjamin).  A. Garcia added that none of the United States' witness lists include Jaramillo's name.  <u>See</u> Dec. 18 Tr. at 52:12-16 (Davidson).  A. Garcia argued that the Court's remedy should be adjournment or exclusion.  <u>See</u> Dec. 18 Tr. at 53:2-8 (Davidson).

B. Garcia argued that the issue comes down to "what is fair."  Dec. 18 Tr. at 53:21 (Castle).  B. Garcia emphasized that the "last-minute" introduction of Jaramillo as a witness put the Defendants at a "disadvantage."  Dec. 18 Tr. at 54:1 (Castle).  According to B. Garcia, having a few extra days to prepare for Jaramillo's testimony could not "cure" the "unfairness," because it "takes a lot of time" to prepare for a "witness who comes forward some 15-17 years later."  Dec. 18 Tr. at 54:3-7 (Castle).  B. Garcia characterized Jaramillo as a "super witness, because he was one of a few, if not the only witness, who didn't have a vigorous cross-examination against him."

Dec. 18 Tr. at 54:13-16 (Castle). B. Garcia argued that the United States did not exhaust its options to call or interview Jaramillo. <u>See</u> Dec. 18 Tr. at 54:19-55:6 (Castle). B. Garcia conceded, however, that for the Court to prevent a witness with relevant information from testifying would be "a raw use of judicial power." Dec. 18 Tr. at 55:14-15 (Castle). B. Garcia argued that, if the Court grants a new trial, "Jaramillo would be subject to the kind of vigorous cross-examination that the Constitution anticipates." Dec. 18 Tr. at 56:7-9 (Castle).

The Court explained that, when the United States added Jaramillo as a witness, adjournment was not proper, because the Defendants had been trying to contact Jaramillo for two years. <u>See</u> Dec. 18 Tr. at 56:12-18 (Court). The Court said that "the only thing I could really do for the defendants is tell the Government: Don't put him on as witness one" to give the Defendants "some time to prepare." Dec. 18 Tr. at 56:20-23 (Court). The Court noted that, because the Defendants could not prepare from their own investigation into Jaramillo, they could prepare only "from what Mr. Jaramillo was telling Mr. Acee." Dec. 18 Tr. at 56:25-57:1 (Court). B. Garcia responded that, "if a new trial in this case were to be granted, the defense would be doing background investigation on Mr. Jaramillo that went beyond just talking to him." Dec. 18 Tr. at 57:7-10 (Castle). B. Garcia maintained that he and the Defendants would resort to the "investigative tools" that they used to learn about other witnesses who would not talk to them, such as obtaining prison records and mental health records. Dec. 18 Tr. at 57:25-58:1 (Castle). Last, B. Garcia said that the Defendants needed a "longer adjournment," because Castillo's murder happened many years ago. Dec. 18 Tr. at 58:21 (Castle).

The United States responded to Troup's and J. Gallegos' arguments for a new trial by arguing that "[n]ew trials are disfavored." Dec. 18 Tr. at 61:19 (Castellano). The United States noted that the Defendants "have a right to appeal," and thus asking for a new trial is not "the last

chance they have at any remedy." Dec. 18 Tr. at 61:20-22 (Castellano). The United States said

that the Court had already denied Troup's Restricted Motion *In Limine* to Exclude Statements by

Michael Jaramillo, filed May 3, 2018 (Doc. 2202). See Dec. 18 Tr. at 62:4-5 (Castellano)(citing

Memorandum Opinion and Order, 2018 WL 4184222, filed May 4, 2018

(Doc. 2207)(D.N.M. May 4, 2018)(Browning, J.)). The United States said that the Court has

already ruled on severance, and the United States maintained that it did not violate the Court's

order when it came up with three possible ways to sever the case. See Dec. 18 Tr. at 63:1-19

(Castellano). Next, the United States said that Jaramillo "didn't debrief ultimately until April 18,

[2018,] which is when we learned that he would be willing to testify in the case." Dec. 18 Tr.

at 64:24-65:1 (Castellano). The United States said that it disclosed Jaramillo's Security Threat

Intelligence Unit ("STIU") file on April 13, 2018, and his location history on April 16, 2018, and

thus the Defendants had evidence with which to impeach Jaramillo, which they did. See Dec. 18

Tr. at 65:4-15 (Castellano). The United States quoted from the April 23, 2018, hearing in which

the Court determined the proper remedy for the United States' late introduction of Jaramillo as a

witness:

> "As we know from the face of the statute [18 U.S.C. § 3432] there is no remedy to
> the violation. And I therefore have to consider what remedy should be. I concluded
> that exclusion is not an appropriate remedy in this case. I think that's too Draconian
> in this case. I know the defendants have made arguments that they would have
> approached certain things in the case differently. But I don't think they would have
> approached it differently. Because even if the Government had put Mr. Jaramillo
> on a witness list as a may call, they still at that time didn't know what his testimony
> would be. So I don't think that they would have done anything than much
> differently than what they had, in fact, done.
>
>      I think the remedy that is appropriate here is what I've done so far, and what
> I will continue to do, if that's necessary and the defense requests it, is push this
> evidence down so the defendants have more time to deal with Mr. Jaramillo. I don't
> think we're probably to the point that we've done all we can. But I think that the
> situation is that this is too high of a cost to the [truth-]seeking function to exclude

> this witness, and that the violation of the statute can be dealt with by pushing the testimony down to make sure that the defendants are fully prepared to deal with it. And I think we've probably dealt with that situation. If the defendants think they need more time or want more time, I'll probably bend over backwards to try to accommodate that. But I don't think exclusion is the appropriate remedy."

Dec. 18 Tr. at 66:4-67:9 (Castellano)(quoting Lujan Tr. at 95:6-96:12 (Court))(alterations in Dec. 18 Tr.). The United States also argued that "the Court bent over backwards to accommodate the defendants," such as delaying Jaramillo's testimony by almost a month. Dec. 18 Tr. at 67:10-11 (Castellano). The United States also stated that Acee had testified that the murder weapon was tested for DNA, and none of the reports indicated that the murder weapon contained Jaramillo's DNA. See Dec. 18 Tr. at 67:17-21 (Castellano). The United States also conceded that, over its objection, Troup admitted into evidence a DNA analyst's field notes that indicated that the murder weapon contained "trace evidence" of Jaramillo's DNA. Dec. 18 Tr. at 68:1 (Castellano).

The Court then asked the United States whether it thinks the jury instructions contained errors. See Dec. 18 Tr. at 68:22-23 (Court). The Court further asked whether the United States intends to argue to the Tenth Circuit that some jury instructions contained errors, but the errors were "plain error[s]," or whether the United States intends to argue that every jury instruction was correct. Dec. 18 Tr. at 69:9 (Court). The United States responded that it likely will not concede any errors. See Dec. 18 Tr. at 69:13-15 (Castellano). The United States also argued that the Court's jury instruction for murder is correct under United States v. Pearson, 203 F.3d 1243 (10th Cir. 2000). See Dec. 18 Tr. at 69:16-70:19 (Castellano). The United States also argued that the VICAR statute requires that the Court use a state murder statute that meets the "generic definition of murder," and that first-degree and second-degree murder under New Mexico law both satisfy that requirement. Dec. 18 Tr. at 71:11-12 (Castellano). The United States admitted that it did not respond in much detail to Troup's and J. Gallegos' jury instructions arguments, because the

"burden is on the defense" under a plain error analysis. Dec. 18 Tr. at 72:13-14 (Castellano). The

Court then asked the United States to ask the attorney handling the appeal

> to look now at this jury instruction, the reply, and see if he's going to confess error
> on any one of those instructions and then just rely on plain error review, or whether
> he's going to defend substantively each one of those jury instructions, and then just
> send me a letter and tell me how the Government is going to proceed.

Dec. 18 Tr. at 73:7-13 (Court).

The United States averred that giving a misprision jury instruction was not an option,

because "misprision not only requires not reporting the crime, it requires an affirmative act to

cover up that crime." Dec. 18 Tr. at 73:17-18 (Castellano). According to the United States, there

is no "evidence in the record where that happened." Dec. 18 Tr. at 73:19-20 (Castellano). The

Court said that it remembers the United States indicating that it "wanted a conviction on VICAR

or nothing at all" and thus objected to a misprision jury instruction. Dec. 18 Tr. at 73:25-74:1

(Court). The United States said that it does not recall taking that exact position, and it agreed with

the Court that misprision is not a "lesser included offense" in relation to murder. Dec. 18 Tr.

at 74:2-9 (Castellano, Court).

Troup then argued that he did not have enough time to prepare for Jaramillo's testimony,

because he did not obtain files from the NM Corrections Department until May 8, 2018. See

Dec. 18 Tr. at 74:20-25 (Burke). Troup said, however, that the Defendants' cross-examination of

Jaramillo "was not terribly effective." Dec. 18 Tr. at 75:2-3 (Burke). Troup argued that there were

several documents that he was unable to obtain, such as video footage referenced in the NM

Corrections Department files which the Defendants could have used to show that Jaramillo is

dishonest. See Dec. 18 Tr. at 75:8-15 (Burke). Troup then expressed that he did not understand

the United States' DNA argument, and Troup emphasized again that Jaramillo's DNA was found

on the murder weapon.  See Dec. 18 Tr. at 76:8-18 (Burke).  Troup also argued that United States v. Pearson does not involve a statute containing language about "probability, which is very loose, and not the sort of thing that goes with a general idea of murder."  Dec. 18 Tr. at 76:23-24 (Burke).

The Court then said that, "while there was a violation of the statute [18 U.S.C. § 3432], [Jaramillo] should not be excluded."  Dec. 18 Tr. at 77:13-14 (Court).  The Court noted that it did everything that it could do by delaying Jaramillo's testimony until later in the trial.  See Dec. 18 Tr. at 77:21-23 (Court).  The Court reflected that it believes it adequately severed the case into two trials.  See Dec. 18 Tr. at 78:3-79:18 (Court).  The Court also said that it is "inclined to think" that the jury instructions do not contain errors.  Dec. 18 Tr. at 79:19-22 (Court).  The Court added that "it's a little hard to say [there is] plain error, given as hard as we worked on those instructions."  Dec. 18 Tr. at 80:12-13 (Court).

The Court then moved to the A. Garcia Motion.  See Dec. 18 Tr. at 80:18-19 (Court).  The Court noted that the A. Garcia Motion refers to the Aug. 28 MOO, which addresses A. Garcia's challenges to VICAR under the Commerce Clause of the Constitution.  See Dec. 18 Tr. at 81:3-8 (Court).  The Court recalled that, at trial, it told A. Garcia that it wanted to "think more about whether advancing yourself in an enterprise without any sort of drug connection" would satisfy as interstate commerce.  Dec. 18 Tr. at 82:16-18 (Court).   The Court then asked A. Garcia whether the Aug. 28 MOO addressed the interstate commerce issues that A. Garcia raised at trial or whether the Aug. 28 MOO left the issues open.  See Dec. 18 Tr. at 82:21-22 (Court).  A. Garcia responded that the Aug. 28 MOO addresses only his oral motion and did not address anything he "had submitted in writing."  Dec. 18 Tr. at 82:24-25 (Davidson).  A. Garcia said that his oral motion argued for "three things": (i) "dismissal under Ruler 12(b)(2) for lack of jurisdiction"; (ii) "a facial challenge to the constitutionality of VICAR's exceeding Congress' authority under the Commerce

Clause"; and (iii) "an applied challenge." Dec. 18 Tr. at 83:7-11 (Davidson). A. Garcia said that

he will "stand on the briefing that we already have with respect to the 12(b)(2) lack of jurisdiction

and the facial challenge to VICAR, and focus on the as applied." Dec. 18 Tr. at 83:14-17

(Davidson). The Court asked A. Garcia what the Aug. 28 MOO says about his as-applied

challenge, given the United States' theory that A. Garcia "did the crime to advance his position in

the SNM organization." Dec. 18 Tr. at 83:23-24 (Court). A. Garcia responded that the Court did

not address the issue "in depth," but he recalled that the Aug. 28 MOO said: "[A]n as applied

challenge on Commerce Clause grounds to VICAR is a contradiction in terms." Dec. 18 Tr.

at 84:2-3 (Davidson). The Court asked: "[W]asn't I rejecting the argument that . . . the VICAR

statute was unconstitutional as applied?" Dec. 18 Tr. at 84:7-11 (Court). The Court added that

"[t]here is not a doctrine out there that really allows you to make this argument." Dec. 18 Tr.

at 84:17-18 (Court). A. Gallegos then requested that the Court "reconsider that line of reasoning"

and let him convince the Court "that there is an opening for an as applied challenge to VICAR,

particularly with the facts regarding Count 3 for Arturo Garcia in the Freddie Sanchez murder."

Dec. 18 Tr. at 84:21-25 (Davidson).

    A. Garcia argued that "the murder of Freddie Sanchez is unlike the types of activities" in

the cases discussed in the Aug. 28 MOO. Dec. 18 Tr. at 85:2-3 (Davidson). First, A. Garcia said

that the Aug. 28 MOO cited Perez v. United States, 402 U.S. 146 (1971), which "involved a statute

that criminalized loan sharking, extortion in credit transactions." Dec. 18 Tr. at 85:5-7 (Davidson).

A. Garcia argued that "loan sharking is obviously a form of economic activity," and therefore the

Supreme Court rejected an as-applied challenge. Dec. 18 Tr. at 85:7-8 (Davidson). Second,

A. Garcia said that the Aug. 28 MOO cites Taylor v. United States, 136 S. Ct. 2074 (2016), which

involves stolen drugs. See Dec. 18 Tr. at 85:11-14 (Davidson). According to A. Garcia, the

Supreme Court concluded that "the market for illegal drugs is commerce over which the federal

government has jurisdiction." Dec. 18 Tr. at 85:15-17 (Davidson). Third, A. Garcia said that the

Aug. 28 MOO cites United States v. Farnsworth, 92 F.3d 1001 (10th Cir. 1996), which involves

felony possession of a firearm under 18 U.S.C. § 922(g). See Dec. 18 Tr. at 85:19-22 (Davidson).

According to A. Garcia,

> Congress chose to . . . regulate interstate commerce in firearms, and wanted to
> exclude felons from that. And the way they did that under the necessary and proper
> clause was to then ban possession as well. And courts have held that banning
> possession, even though possession pe se is not commerce, [] was an effective way
> for Congress to regulate the market in firearms, and exclude felons from that.

Dec. 18 Tr. at 85:22-86:5 (Davidson). A. Garcia argued that the activities from these three cases

are "much more connected to economic activity than the Freddie Sanchez homicide." Dec. 18 Tr.

at 86:8-9 (Davidson).

A. Garcia asserted that the United States does not dispute "the noneconomic nature of the

Freddie Sanchez homicide" and "tacitly concedes that Freddie Sanchez was not involved in drug

trafficking." Dec. 18 Tr. at 86:14-18 (Davidson)(citing A. Garcia Motion Response). According

to A. Garcia, the A. Garcia Motion Response argues "that the SNM itself engaged in drug

trafficking, not that Freddie Sanchez did." Dec. 18 Tr. at 86:22-23 (Davidson). A. Garcia argued

that the F. Sanchez homicide has "less of a connection" to economic activity than a hypothetical

that the Aug. 28 MOO poses. Dec. 18 Tr. at 87:4 (Davidson). The Aug. 28 MOO hypothetical

states: "'Imagine a small group of people become stranded in a remote location, Alaska perhaps,

with no realistic possibility of escape. Bartered transactions with that group would qualify as

purely intrastate commerce.'" Dec. 18 Tr. at 87:11-15 (Davidson)(quoting Aug. 28 MOO at 8

n.4). A. Garcia contended that, while bartering is "obviously economic activity," the F. Sanchez

homicide is "noneconomic" Dec. 18 Tr. at 87:22-24 (Davidson). A. Garcia then handed the Court

a copy of <u>United States v. Garcia</u>, 68 F. Supp. 2d 802 (E.D. Mich. 1999)(Edmunds, J.), an opinion from the United States District Court for the Eastern District of Michigan, which states that the Supreme Court, in <u>United States v. Lopez</u>, "'rejected the Government's argument that crime in general has a negative effect on interstate commerce, and cautioned against piling inference upon inference in a manner that would bid fair to convert Congressional authority under the Commerce Clause to a general police power of the sort retained by the states.'"  Dec. 18 Tr. at 88:18-24 (Davidson)(quoting <u>United States v. Garcia</u>, 68 F. Supp. 2d at 811 (citations and quotation marks omitted in Dec. 18 Tr.)).  A. Garcia noted that there was no appeal in <u>United States v. Garcia</u> and that he believes that the defendant in that case was convicted on other charges.  <u>See</u> Dec. 18 Tr. at 96:11-97:6 (Davidson).

　　　　A. Garcia argued that the "only way you can connect the Freddie Sanchez homicide to interstate commerce is by engaging in that sort of inferential piling upon inference that the U.S. Supreme Court in Lopez forbade."  Dec. 18 Tr. at 88:25-89:4 (Davidson).  A. Garcia said that the three cases which the Court "could rely on in getting to the relief we're requesting are": (i) <u>United States v. Lopez</u>; (ii) <u>United States v. Morrison</u>, 529 U.S. 598 (2000); and (iii) <u>United States v. Garcia</u>.  Dec. 18 Tr. at 89:6-7 (Davidson).  A. Garcia contended that the United States is "arguing that only a minimal or de minimis effect on interstate commerce is needed" to satisfy the Commerce Clause.  Dec. 18 Tr. at 89:22-23 (Davidson).  A. Garcia argued that the United States believes "they don't need to show any connection between the F. Sanchez homicide and any economic interstate activity" as long as they show that A. Garcia killed Freddie Sanchez to maintain "his position within the gang."  Dec. 18 Tr. at 90:2-6 (Davidson).  A. Garcia added that the United States views its prosecution's "jurisdictional hook" as A. Garcia's desire to maintain

his position within SNM, which "was involved in drug trafficking activity." Dec. 18 Tr. at 90:8-9 (Davidson).

The Court asked A. Garcia how he responds to the argument that "you just can't raise an as applied challenge . . . in an interstate commerce clause." Dec. 18 Tr. at 90:19-21 (Davidson). A. Garcia responded that he thought that, in Gonzales v. Raich, 545 U.S. 1 (2005)("Raich"), the majority wrote that "as applied challenges are available to statutes regulating an economic class of activities, because when a general regulatory statute bears a substantial relation to the commerce, the de minimis character of individual[] instances arising out of that statute is of no consequence." Dec. 18 Tr. at 91:3-9 (Davidson). The Court said that "you can't pick out one defendant and say: I get to raise an as applied. You just don't have that ability with the Commerce Clause." Dec. 18 Tr. at 91:21-23 (Court). A. Garcia responded: "Except they did that in the Raich case." Dec. 18 Tr. at 91:24-25 (Davidson). The Court expressed that it is "not sure they did." Dec. 18 Tr. at 92:1 (Court). A. Garcia responded that, while the Supreme Court rejected the respondents' facial challenge in Gonzales v. Raich, the majority "then went on to look at the as applied challenge." Dec. 18 Tr. at 92:12-13 (Davidson). A. Garcia then argued that the Tenth Circuit has noted that, "'[i]f a statute regulates an activity which the repetition in aggregate has a substantial effect on commerce, then the de minimis character of individual instances arising under the statute is of no consequence.'" Dec. 18 Tr. at 93:1-5 (Davidson)(quoting United States v. Bolton, 68 F.3d 396, 399 (10th Cir. 1995)). A. Garcia argued that this condition does not apply, because VICAR does not regulate an activity which, through repetition, in aggregate has a substantial effect on interstate commerce under United States v. Lopez. See Dec. 18 Tr. at 93:5-9 (Davidson). A. Garcia said that the Supreme Court held in United States v. Lopez that allowing Congress "to regulate crime because crime in aggregate has a negative impact on the economy . . . destroys Federalism" and is

"against the structure of the Constitution." Dec. 18 Tr. at 93:12-18 (Davidson). A. Garcia argued

that the de minimis condition discussed in United States v. Bolton does not apply "unless you're

talking about a statute that already regulates economic activity" and that "murder that occurs within

a state is not economic activity." Dec. 18 Tr. at 93:25-94:3 (Davidson). A. Garcia further argued

that United States v. Lopez does not support the United States' theory, which is that A. Garcia

"was trying to maintain or increase his position in the SNM by ordering the hit on Freddie Sanchez.

And because that was the gang-related act, and then the gang itself is involved in something that

impacts the economy, that via those inferences that gets you to interstate commerce." Dec. 18 Tr.

at 94:12-17 (Davidson). A. Garcia asserted that the United States is "punish[ing]" A. Garcia for

"a local crime that has no interstate commerce nexus." Dec. 18 Tr. at 95:6-7 (Davidson). After

A. Garcia concluded, B. Garcia told the Court that "the same arguments that are made with regard

to the Freddie Sanchez murder are applicable . . . to the Castillo/Garza murders alleged in Counts

1 and 2." Dec. 18 Tr. at 95:25-96:3 (Cooper). The Court recognized that A. Garcia is moving for

an acquittal and not a new trial, and it said that this legal issue is "headed to the Tenth Circuit . . .

regardless." Dec. 18 Tr. at 97:16-17 (Court).

      The United States argued that United States v. Garcia and this case are distinguishable.

See Dec. 18 Tr. at 98:6-12 (Castellano). The United States noted that, in United States v. Garcia,

the Honorable Nancy Edmunds, Senior United States District Judge for the District of Eastern

Michigan, wrote:

> "In this case the enterprise's connection to interstate commerce is weak. The
> government merely alleges that some of its members drove within the state on an
> interstate highway in order to commit acts of murder. It also alleges that the gun
> used in connection with the Racketeering Act alleged in Count 1 may have crossed
> state lines."

Dec. 18 Tr. at 98:15-22 (Castellano)(quoting United States v. Garcia, 68 F. Supp. 2d at 811). The United States emphasized that the focus in United States v. Garcia is different, because the focus is "on the enterprise" and the enterprise's effect on interstate commerce. See Dec. 18 Tr. at 98:23-25 (Castellano). The United States argued that the "case law says that only a de minimis amount or effect on commerce is necessary." Dec. 18 Tr. at 99:1-3 (Castellano). The United States then referenced a case in the A. Garcia Motion Response, which states: "Courts have also held that where the racketeering 'enterprise's business is narcotics trafficking, the enterprise must be viewed as substantially affecting interstate commerce.'" Dec. 18 Tr. at 99:6-9 (Castellano)(quoting United States v. Miller, 116 F.3d at 674). The United States reiterated that, because the SNM traffics narcotics, SNM's activities have a "substantial effect on commerce," even though all that the caselaw requires is a de minimis effect. Dec. 18 Tr. at 99:13 (Castellano). The United States also argued that there is evidence that: (i) A. Garcia personally was involved in drug trafficking; (ii) SNM members traveled between states when they transferred to another state's corrections department; and (iii) SNM members sent drugs to people in other states, such as to Archuleta, "who received drugs in Tennessee from New Mexico." Dec. 18 Tr. at 100:7 (Castellano). The United States asserted that, whereas, in United States v. Garcia, the evidence of the enterprise's effect on interstate commerce was "pretty thin," in this case, there is "much more evidence" of SNM's effect on interstate commerce. Dec. 18 Tr. at 100:11 (Castellano).

The Court then asked the United States about the argument that a defendant cannot raise an as-applied challenge to VICAR. See Dec. 18 Tr. at 100:13-17 (Court). The United States admitted that it has not researched the Court's question in much detail, and it argued that VICAR's language refers to an enterprise's activity, so "it makes sense . . . that you can't take a piecemeal approach to a gang" by determining whether each member's actions affected interstate commerce.

Dec. 18 Tr. at 101:9-11 (Castellano)(citing <u>United States v. Torres</u>, 129 F.3d at 717). The United States added that, even if an as-applied challenge is available, it can prove that A. Garcia's individual actions affected interstate commerce. <u>See</u> Dec. 18 Tr. at 101:15-19 (Castellano).

A. Garcia countered that, although the United States argues that VICAR presupposes an "interstate connection," the Supreme Court in <u>United States v. Morrison</u> noted that "the question whether interstate activity affects interstate commerce sufficiently to come under the commerce clause power is a judicial determination. Congress can't just evade judicial review by the judiciary by just putting whatever it wants to in the statute." Dec. 18 Tr. at 102:7-12 (Davidson). A. Garcia also clarified that he is not arguing that gang activity and drug trafficking do not "have an interstate commerce element." Dec. 18 Tr. at 102:20-21 (Davidson). A. Garcia argued that the evidence at trial "regarding the murder of Freddie Sanchez" and his "involvement in it" does not have a "connection to interstate commerce." Dec. 18 Tr. at 102:22-103:1 (Davidson). A. Garcia also contended that <u>United States v. Garcia</u> is not easily distinguishable from this case, because Judge Edmunds wrote in <u>United States v. Garcia</u> that "the Government needs to show a substantial connection between the individual conduct and the interstate commerce." Dec. 18 Tr. at 103:14-16 (Davidson). A. Garcia said that Judge Edmunds wrote that VICAR "'has no jurisdictional element which ties either the violent act or the conduct of the defendant to interstate commerce.'" Dec. 18 Tr. at 103:18-20 (Davidson)(quoting <u>United States v. Garcia</u>, 68 F. Supp. 2d at 811). A. Garcia added that most cases cited by the United States are distinguishable, because most of the cases come under RICO, which, unlike VICAR, contains an "express connection to interstate activity" in relation to "the individual's conduct." Dec. 18 Tr. at 104:4-6 (Davidson). According to A. Garcia, VICAR "allows" the United States, "in a way that's unconstitutional[,] to criminalize a purely state activity that's criminal in nature, without there being a sufficient interstate commerce

connection." Dec. 18 Tr. at 105:7-11 (Davidson). A. Garcia also added that "as applied challenges under the Commerce Clause are definitely allowed." Dec. 18 Tr. at 105:12-14 (Davidson).

Sanchez, Baca, and Herrera each asked for the Court's permission to join the A. Garcia Motion. See Dec. 18 Tr. at 106:5-12 (Jacks, Lowry, Bhalla). The Court noted that it is "really tough" for the Defendants who have trafficked drugs for SNM to argue that they did not affect interstate commerce, but that it is "an interesting issue" for the Defendants who were "only committing a crime to advance their position in the organization." Dec. 18 Tr. at 106:22-107:1 (Court). The Court concluded that it is

> inclined to deny the motion, just leave it in place, and let the Tenth Circuit deal with it. Because it's not really a new trial issue. It's more of a legal issue, that we have a nice robust record for them to look at. If they're going to decide this issue, this might be a good one for them to decide it, rather than me not giving them an opportunity, or me saying something that really doesn't make any difference, because it's probably an issue for the appellate courts.

Dec. 18 Tr. at 107:21-108:5 (Court). A. Garcia asserted that, if the Court rules in his favor, then "there may not be an appeal, because it would have to . . . go through the Solicitor General's Office to approve an appeal by the Government." Dec. 18 Tr. at 108:12 (Davidson). The Court stated that "it may help" A. Garcia if the Court "just leave[s] it in place rather than setting it aside." Dec. 18 Tr. at 109:22-24 (Court).

The Court turned next to the A. Gallegos Motion. See Dec. 18 Tr. at 109:1-3 (Court). The Court first admitted into evidence "Defendant A. Gallegos Exhibit A," Dec. 18 Tr. at 109:20 (Court), which is a "trial transcript from Morgan Ramirez," Dec. 18 Tr. at 109:14 (Torraco); see generally Ramirez Tr., and "A. Gallegos Exhibit B," Dec. 18 Tr. at 110:10 (Court), which is a

"partial transcript of Richard Williamson,"[13] Dec. 18 Tr. at 110:1 (Torraco); see generally Transcript of Excerpt of Testimony of Richard Williamson, filed November 30, 2018 (Doc. 2455). A. Gallegos argued that Ramirez' statements "came in as a violation of" United States v. Bruton. See Dec. 18 Tr. at 110:23-24 (Torraco). According to A. Gallegos, "'[e]ven if the trial court finds that a statement falls within a hearsay statement, that does not mean that that particular statement can still be admitted against a co-defendant.'" Dec. 18 Tr. at 111:9-12 (Torraco)(citing Lilly v. Virginia, 527 U.S. 116 (1999)). The Court asked whether it could rely on Lilly v. Virginia or whether the law is "just totally different after" Crawford v. Washington, 541 U.S. 36 (2004), and United States v. Smalls, 605 F.3d 765 (10th Cir. 2010). The Court said that Ramirez' statements "were not testimony" and therefore "fall outside of the Confrontation Clause." Dec. 18 Tr. at 112:5-8 (Court). A. Gallegos responded that Ramirez testified about "everything that Joe Gallegos had told her." Dec. 18 Tr. at 112:16-17 (Torraco).

The Court asked: "[H]ow is anything that Joe Gallegos said to her testimonial? I mean, she was not preparing for trial. She wasn't taking those statements as a police officer. Those were not made in anticipation of a VICAR trial." Dec. 18 Tr. at 112:19-23 (Court). The Court also noted that courts "weren't even using the word[] 'testimonial' back in 1999," when the Supreme Court decided Lilly v. Virginia. Dec. 18 Tr. at 113:6-7 (Court). A. Gallegos responded that Ramirez testified about what "Joe Gallegos had told her," and thus A. Gallegos was "denied the Sixth Amendment confrontation right to confront Joe about those statements and to test their veracity." Dec. 18 Tr. at 113:16-19 (Torraco). The Court asked whether it gave "a limiting

---

[13]Richard Williamson is a "sergeant for the New Mexico State Police Department of Public Safety." Transcript of Excerpt of Testimony of Richard Williamson (taken April 27, 2018) at 3:21-22 (Williamson), filed November 30, 2018 (Doc. 2455).

instruction on that under the hearsay rules" whenever A. Gallegos requested one, Dec. 18 Tr. at 113:24-25 (Court), and A. Gallegos responded that the Court gave limiting instructions, see Dec. 18 Tr. at 114:4 (Torraco). The Court added that United States v. Smalls "indicate[s] that limiting instructions can be enough" to avoid violating the Constitution. Dec. 18 Tr. at 114:8-9 (Court). A. Gallegos responded that he is concerned that some of the Court's limiting instructions were "insufficient." Dec. 18 Tr. at 114:14 (Torraco). A. Gallegos noted that the Court did not give a limiting instruction when Ramirez testified about J. Gallegos' statements, which Ramirez' 302 did not contain. See Dec. 18 Tr. at 114:22-115:19 (Torraco). According to A. Gallegos, Ramirez' statements were "so damaging" that the lack of a limiting instruction resulted in more than "harmless error." Dec. 18 Tr. at 115:22-23 (Torraco). A. Gallegos argued that "we can either say it's plain error because I didn't object, or we can say it's plain error because the statement shouldn't have come in against Andrew Gallegos." Dec. 18 Tr. at 116:13-16 (Torraco). A. Gallegos also argued that two witnesses testified about "supposed confessions," Dec. 18 Tr. at 117:4 (Torraco) -- one by A. Gallegos and the other by J. Gallegos -- which were inconsistent and came in without a limiting instruction, see Dec. 18 Tr. at 117:2-118:18 (Torraco).

A. Gallegos next argued that his defense conflicted with the other Defendants' defenses in the trial, and he noted that many of the other Defendants did not want to be tried with A. Gallegos and J. Gallegos, "because of the horrific murder and all of the pictures." Dec. 18 Tr. at 119:21-22 (Torraco). A. Gallegos said that his defense, which "has always been that he is not a member of the SNM," Dec. 18 Tr. at 120:12-13 (Torraco), conflicts with other Defendants' defenses, "who admitted that they were members of the gang," Dec. 18 Tr. at 121:2-3 (Torraco). Next, A. Gallegos averred that the United States falsely stated in the A. Gallegos Motion Response that "Andrew Gallegos stated that he knew that Adrian Burns was upset at him." Dec. 18 Tr.

at 121:13-14 (Torraco).  A. Gallegos also argued that the trial moved "so fast," and Ramirez testified about many statements that "were different than in the 302," and that the United States and the Defendants did not anticipate.  Dec. 18 Tr. at 123:21 (Torraco).  The Court stated that, at "best," A. Gallegos may have "a hearsay argument that more should have been done to give [a] limiting instruction of hearsay," but the Court added that it is "not seeing" a problem under United States v. Bruton.  Dec. 18 Tr. at 124:21-23 (Court).  A. Gallegos requested permission to file an additional brief on the matter, which the Court granted.  See Dec. 18 Tr. at 125:14-17 (Torraco, Court).  A. Gallegos and the Court agreed that A. Gallegos would file his motion by January 15, 2019.  See Dec. 18 Tr. at 163:7-9 (Court, Torraco).

The United States conceded that it misstated in the A. Gallegos Motion Response that A. Gallegos knew that Burns was upset at him, and the United States attributed the mistake to the incompleteness of the draft transcript on which it relied.  See Dec. 18 Tr. at 128:4-13 (Armijo).  The United States agreed with the Court's analysis that A. Gallegos is challenging the admission of statements that were not testimonial, and the United States added that the Court provided a limiting instruction when Ramirez testified.  See Dec. 18 Tr. at 129:1-131:9 (Armijo, Court).  The United States also confirmed that it is "not seeing any error" in how Ramirez testified or in how the Court gave limiting instructions.  Dec. 18 Tr. at 131:16-17 (Armijo).  The United States said that the Court did not deny any limiting instructions without closely analyzing the statements, except for statements regarding J. Gallegos' puns about burning Burns' body.  See Dec. 18 Tr. at 132:13-133:1 (Armijo, Court).  The Court then concluded:

> I don't think -- and I didn't think at the time -- there was any confrontation problem.  We just had to be careful with the rules of hearsay.  And I thought we handled those with, my instructions well.  You know, I made a decision pretrial that if I were going to try people together, I could rely on limiting instructions.  And we'll see if that holds up at the Tenth [Circuit].  I assume that's going to be an issue that

somebody might raise with them.  And if they do, that's something that they'll have
to wrestle with.  But I think, given the structure that I put in place going into trial,
I think it worked pretty well for your clients.  I'll take a look at it.  But I'm inclined
to deny the motion, at least on a review that we've done so far.

Dec. 18 Tr. at 133:17-134:6 (Court).

The Court next turned to the Gallegos Joint Motion.  See Dec. 18 Tr. at 134:7-8 (Court).

J. Gallegos argued that the Court's limiting instruction was insufficient when witness A. Sutton

testified that Burns told Orndorff to tell J. Gallegos "to stop being a bitch and call me."  Dec. 18

Tr. at 137:8-9 (Benjamin).  J. Gallegos argued first that the limiting instruction is insufficient,

because the United States offered the statement to show that Burns disrespected J. Gallegos and

thus "offered" the statement "for the truth" of the matter asserted, and "a statement can't be offered

for the truth and not offered for the truth at the same time."  Dec. 18 Tr. at 138:15-17 (Benjamin).

J. Gallegos noted that, although "'testimony is not hearsay when it's offered only to prove that the

statement was made,'" Dec. 18 Tr. at 138:4-6 (Benjamin)(quoting Skyline Potato Co., Inc. v.

Hi-Land Potato Co., Inc., No. CIV 10-0368 JB/RHS, 2013 WL 311846, at *19 (D.N.M. Jan. 18,

2013)(Browning, J.)(modifications in Dec. 18 Tr.)), the United States did not offer the statement

"to prove that Adrian had a statement with Daniel," but rather, "to show that Joe Gallegos was

being disrespected by Adrian Burns," Dec. 18 Tr. at 138:7-10 (Benjamin).  The Court asked:

"[H]ow can that be hearsay?"  Dec. 18 Tr. at 139:6 (Court).  J. Gallegos responded that the

statement is "an out-of-court statement to prove that Joe Gallegos is being a bitch."  Dec. 18 Tr.

at 139:8-10 (Benjamin).  J. Gallegos clarified that, "[i]f that statement carries weight, and is

disrespect, [sic] then it has to be for the truth of the matter."  Dec. 18 Tr. at 139:17-19 (Benjamin).

J. Gallegos also argued that the United States has not provided "any other statement that linked

that VICAR murder to a federal jurisdiction."  Dec. 18 Tr. at 141:2-4 (Benjamin).  According to

J. Gallegos, many of the United States' statements "don't help the Government at all" and are "very prejudicial" to the Defendants.  Dec. 18 Tr. at 141:12-13 (Benjamin).  The Court asked: "Isn't your argument on nexus ultimately [about] sufficiency of the evidence?"  Dec. 18 Tr. at 142:4-5 (Court).  J. Gallegos disagreed and argued that this statement "is the only statement" that goes toward the nexus argument, adding "this is either in or out."  Dec. 18 Tr. at 142:21-25 (Benjamin).  A. Gallegos informed the Court that he "joined in writing on this motion."  Dec. 18 Tr. at 143:11 (Torraco).

The United States countered that the statement from A. Sutton's testimony was "not being offered to show whether Joe Gallegos is a bitch or not."  Dec. 18 Tr. at 144:1-2 (Armijo).  The United States clarified that it was offered "to show the impact that it had on him."  Dec. 18 Tr. at 144:10 (Armijo).    The United States argued that J. Gallegos is making a sufficiency-of-the-evidence argument, and it said that there is other evidence tying J. Gallegos to SNM. <u>See</u> Dec. 18 Tr. at 145:3-24 (Armijo).  The United States asserted that "there was significant evidence" tying both J. Gallegos and A. Gallegos to SNM -- "We had jail calls.  We had letters.  We had several people come in and talk about their ties to the SNM."  Dec. 18 Tr. 146:12-14 (Armijo).  The United States recalled that J. Gallegos' attorney, Brock Benjamin, went "up to jurors after the verdict in this case" and asked them: "'What was your nexus?'"  Dec. 18 Tr. at 146:22-24 (Armijo).  According to the United States, the jury foreman responded: "'What do you mean?  There was plenty of evidence.'"  Dec. 18 Tr. at 146:26-147:1 (Armijo).  The United States then concluded by stating that "[t]here was plenty of evidence in this case.  And the Court made the correct ruling at the time on these statements coming in."  Dec. 18 Tr. at 147:11-13 (Armijo).

In rebuttal, J. Gallegos averred that the United States "talks about a great deal of evidence, but [it] has done a very good job of not pointing any of that out." Dec. 18 Tr. at 148:2-4 (Benjamin). J. Gallegos argued that showing the impact of the contested statement does not show a nexus between him and SNM, and he added that he does not "understand how" evidence that he stole drugs "becomes an SNM crime." Dec. 18 Tr. at 148:12-13 (Benjamin). J. Gallegos said that he asked the United States for evidence connecting him and A. Gallegos to SNM, which he never received; he concluded: "I think we respectfully just need to disagree that there is any evidence that connects them to the nexus." Dec. 15 Tr. at 149:8-10 (Benjamin).

The Court concluded that the statement from A. Sutton's testimony is a command and not hearsay. See Dec. 18 Tr. at 149:14-18 (Court). The Court noted that, before trial, it was "concerned . . . about the nexus issue," Dec. 18 Tr. at 149: 19-20 (Court), and therefore wrote an opinion addressing the issue, see March 26 MOO, 2018 WL 1388462. The Court said that it "thought there was some more and sufficient evidence for [the charges against J. Gallegos and A. Gallegos] to go to the jury." Dec. 18 Tr. at 150:7-8 (Court). The Court said that it is "inclined to think I got that right. And I'm inclined to think that, as the trial developed, there was more evidence than what I knew about pretrial." Dec. 18 Tr. at 11-14 (Court). J. Gallegos asked the Court if it would clarify in its opinion which evidence connected J. Gallegos and A. Gallegos to SNM, and the Court responded that it would do "the best [it] can from a review of the transcript." Dec. 18 Tr. at 151:13-15 (Court).

Next, the United States said that it "wanted to put on the record" that B. Garcia had raised an issue about when the United States "disclosed an item," and the United States asserted that it told B. Garcia that it disclosed the item on February, 6, 2018. Dec. 18 Tr. at 10-13 (Armijo). The United States added that B. Garcia "wanted to put something in writing saying he had not ever

received it before. And we actually had supplied it and gave him the date that we supplied it." Dec. 18 Tr. at 152:16-19 (Armijo). B. Garcia then explained that, in 2016, Acee conducted an interview with Leroy Lucero, and B. Garcia said that he never "received anything from 2016, or 2017." Dec. 18 Tr. at 153:9-10 (Castle). B. Garcia argued that the document from February 6, 2018, to which the United States refers, is "essentially a cover letter for discovery" related to an interview with Lucero from January, 2018, and not the 2016 interview with Lucero. Dec. 18 Tr. at 153:13-14 (Castle). B. Garcia asserted that the United States is "mistaken" that the February 6, 2018, document contains "any statement that Mr. Lucero made in 2016." Dec. 18 Tr. at 154:2-3 (Castle). The United States countered that: (i) there is nothing more to produce; (ii) "[i]f there is an issue as to any other statements, it's just that we had the wrong date"; and (iii) it "will work with" B. Garcia. Dec. 18 Tr. at 154:6-13 (Armijo). B. Garcia then said that he wanted "to put on the record" that he believes there is more evidence that the United States must produce, because

> in 2016, Mr. Lucero was arrested on a probation violation for matters which often are considered technical: Urinalysis. That was one of the tactics the FBI used in their matters in which to try to get cooperation of individuals who were SNM members. Mr. Lucero, it turns out -- we reviewed the transcripts last night -- in 2017 -- in which it was indicated that Agent Acee, in 2017, before Your Honor at sentencing, was ready and able to take the stand and testify that Mr. Lucero's life was in danger because of his cooperation.

> So it's pretty clear there was some communications and statements made in 2016, and perhaps continuing in 2017. So those are the 302s that we need to have produced. And certainly there was at least information during that, in which Mr. Lucero indicated he was afraid of being charged in the RICO after the first wave of indictments.

Dec. 18 Tr. at 154:17-155:9 (Castle). B. Garcia added that he will "file a written motion" outlining his arguments. Dec. 18 Tr. at 155:19-20 (Castle). B. Garcia and the Court agreed that B. Garcia will file his motion by January 2, 2019. See Dec. 18 Tr. at 164:20-23 (Court, Castle).

Baca also said that he "wanted to clear up the record," because he did not "move in evidence the exhibits that were attached to the reply brief." Dec. 18 Tr. at 156:6-11 (Lowry). Baca then moved to admit: (i) Defendant Baca Exhibit O, which is "the Prisoner Location History for Anthony Ray Baca," Dec. 18 Tr. at 156:17-18 (Lowry); (ii) Defendant Baca Exhibit P, which is "a partial transcript of the Lupe Urquizo testimony that was quoted and cited in the reply brief," Dec. 18 Tr. at 157:2-4 (Lowry); (iii) Defendant Baca Exhibits Q, R, and S, which are "three audio files of telephone jailhouse recordings between Lupe Urquizo and various friends and family members regarding his viewing of the tablets," Dec. 18 Tr. at 157:14-17 (Lowry); and (iv) Defendant Baca Exhibit T, see Dec. 18 Tr. at 158:7-8 (Lowry). Neither the United States nor the Defendants objected, and the Court admitted all of Baca's exhibits. See Dec. 18 Tr. at 156:16-158:14 (Lowry, Court, Armijo). A. Garcia next informed the Court that he joins the Troup NTM and Defendant Carlos Herrera's Motion for New Trial and Notice of Joinder, filed October 15, 2018 (Doc. 2413). See Dec. 18 Tr. at 158:24-159:2 (Davidson).

The Court then concluded that, after reviewing the motions, it probably will not grant any new trials or any acquittals. See Dec. 18 Tr. at 159:14-17 (Court). The Court noted that the Defendants have prepared some new arguments that the Court has not considered, but the Court said that it is "not seeing anything that gives [it] a sense that fundamentally new trials" should be granted or that "convictions need to be set aside." Dec. 18 Tr. at 159:22-24 (Court). The Court indicated that "it makes sense" for the United States to "go ahead and start" the sentencings. Dec. 18 Tr. at 160:10-11 (Court). The Court then expressed "appreciation for everybody's hard work and good nature." Dec. 18 Tr. at 162:7-8 (Court).

19.     **The A. Gallegos Supplement**.

A. Gallegos filed a supplement to the A. Gallegos Motion on January 15, 2019.  See
A. Gallegos Supplement at 1.  A. Gallegos contends that the A. Gallegos Supplement serves two
purposes: (i) to explain how "co-defendant confession admissibility" in Bruton v. United States,
Crawford v. Washington, and United States v. Smalls differs from "the admissibility or
inadmissibility of Morgan Ramirez testifying as to Joe Gallegos['] confession"; and (ii) "to
supplement Andrew Gallegos' record on the inadmissibility of testimony regarding his brother
Frankie Gallegos and the presentation of all unrelated counts as to Joe Gallegos."  A. Gallegos
Supplement at 1-2.  A. Gallegos asserts that, under the "*Bruton* doctrine," "a defendant's Sixth
Amendment right of confrontation is violated by admitting the confession of a non-testifying
codefendant that implicates the defendant, regardless of any limiting instruction given to the jury."
A. Gallegos Supplement at 2 (citing Bruton v. United States, 391 U.S. 123).  A. Gallegos argues
that "*Crawford* does not overrule the *Bruton* doctrine, and the *Bruton* doctrine continues to cover
nontestimonial hearsay."  A. Gallegos Supplement at 2.  A. Gallegos maintains that, whereas
Crawford v. Washington "sets forth a test for constitutional reliability," Bruton v. United States
"sets forth a test for constitutional harmfulness."  A. Gallegos Supplement at 2.  A. Gallegos
therefore argues that J. Gallegos' nontestimonial statements, to which Ramirez testified, "are not
beyond the scope of the *Bruton* doctrine and should have been suppressed in a trial against Andrew
Gallegos."  A. Gallegos Supplement at 2.  A. Gallegos argues that, under Bruton v. United States,
J. Gallegos' statements are admissible only against him, "which is why a court arguably could
admit Joe Gallegos' confession along with a limiting instruction telling jurors to ignore the
confession in determining Andrew Gallegos' guilt or innocence."  A. Gallegos Supplement at 3
(citing Bruton v. United States, 391 U.S. 123).

A. Gallegos avers that, although the Supreme Court held in Crawford v. Washington that "the Confrontation Clause covers testimonial hearsay, [] it did not hold that the Clause **only** covers testimonial hearsay." A. Gallegos Supplement at 3 (bold in original). According to A. Gallegos, J. Gallegos' statement to Ramirez is nontestimonial, and "the Confrontation Clause is violated when testimony **or** testimonial hearsay is admitted against a defendant and he is not given the chance to cross-examine the declarant." A. Gallegos Supplement at 3 (bold in original). A. Gallegos argues that, in Crawford v. Washington, the Supreme Court "provided reasons why the *Bruton* doctrine should continue to apply to nontestimonial hearsay." A. Gallegos Supplement at 3. According to A. Gallegos, Crawford v. Washington "had nothing to say about the inadmissibility of co-defendant confessions under the *Bruton* doctrine, meaning that courts should find that even nontestimonial co-defendant statements can violate the doctrine. Defense asserts that there should be some level of Sixth Amendment Constitutional scrutiny for nontestimonial hearsay." A. Gallegos Supplement at 4.

A. Gallegos contends that, in United States v. Smalls, the Tenth Circuit "renders *Bruton* a dead letter." A. Gallegos Supplement at 4. See id. ("'[T]he *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.'" (quoting United States v. Smalls, 605 F.3d at 768 n.2)). A. Gallegos notes that the Court is bound by the Tenth Circuit, but he argues that "there is still room under the *Crawford* holding for the non-testimonial *Bruton* analysis." A. Gallegos Supplement at 5. A. Gallegos asks the Court to "consider another analysis," because of the "*Smalls* precedent." A. Gallegos Supplement at 5. A. Gallegos argues that Ramirez' statements about what J. Gallegos told her are "unfairly prejudicial against Andrew Gallegos" and "violate" rule 403 of the Federal Rules of Evidence and rule 14 of the Federal Rules of Criminal Procedure. A. Gallegos Supplement at 4-5. A. Gallegos

avers that J. Gallegos' statements are prejudicial, because A. Gallegos could not cross-examine

J. Gallegos.  See A. Gallegos Supplement at 5.  A. Gallegos suggests that

> [p]erhaps Joe Gallegos was lying to impress Morgan Ramirez, or perhaps he was lying to threaten, intimidate and control Morgan Ramirez.  It is difficult to know because Andrew Gallegos will never be afforded the opportunity to cross examine Joe Gallegos about these statements.  Moreover, the jury was denied the opportunity to observe Joe Gallegos' demeanor when confronted about these statements, and the jury should be able to test the credibility and veracity of his answers.  For these reasons, Andrew Gallegos prays this court will afford him a new trial absent the Joe Gallegos statements on the basis of a Fed. Rule 403 analysis.

A. Gallegos Supplement at 6.

A. Gallegos also argues that the United States introduced a "multitude of violent gang

evidence" at trial "that had no direct link" to him.  A. Gallegos Supplement at 7.  A. Gallegos

admits that "gang evidence must be admitted in this Racketeering trial."  A. Gallegos Supplement at 7.

A. Gallegos notes, however, that much of the trial evidence involves gang activity within prisons,

and he asserts that he "was not charged with gang activity inside the prisons."  A. Gallegos

Supplement at 7.  A. Gallegos argues that the introduction of evidence involving SNM activity

inside prisons is "highly prejudicial," violates rule 403, and "implie[s] guilt by association."

A. Gallegos Supplement at 7.  A. Gallegos cites several cases in which "courts uphold the

admission of gang evidence as more probative than prejudicial."  A. Gallegos Supplement at 7

(citing United States v. Santiago, 643 F.3d 1007 (7th Cir. 2011); United States v. King, 627 F.3d

641, 649 (7th Cir. 2010); United States v. Montgomery, 390 F.3d 1013, 1018 (7th Cir. 2004); Clark

v. O'Leary, 852 F.2d 999 (7th Cir. 1998); United States ex rel. Garcia v. Lane, 698 F.2d 900 (7th

Cir. 1993)).  A. Gallegos argues that testimony about F. Gallegos and J. Gallegos -- both brothers

of A. Gallegos -- is "highly prejudicial," because the jury may imply "guilt by association" and

find that A. Gallegos is a "violent gang member" because his brothers are SNM members.

A. Gallegos Supplement at 8 (citing Uphaus v. Wyman, 360 U.S. 72, 79 (1959); Mercer v. United States, 724 A.2d 1176, 1185 (D.C. 1999)).

    20.    **The A. Gallegos Supplement Response.**

    The United States responded to the A. Gallegos Supplement on February 19, 2019.  See United States' Response to Andrew Gallegos' Supplement to His Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2) (Doc. 2491), filed February 19, 2019 (Doc. 2515)("A. Gallegos Supplement Response").  The United States argues that "admission of a nontestifying codefendant's redacted statements [does] not violate the Confrontation Clause."    A. Gallegos Supplement Response at 3 (citing United States v. Verduzco-Martinez, 186 F.3d 1208 (10th Cir. 1999)).  See A. Gallegos Supplement Response at 3 ("'Where a defendant's name is replaced with a neutral pronoun or phrase there is no *Bruton violation*, providing that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury.'" (quoting United States v. Verduzco-Martinez, 186 F.3d at 1214)(emphasis in A. Gallegos Supplement Response)).  The United States gives two reasons why Ramirez' testimony about what J. Gallegos told her does not violate the Confrontation Clause: (i) the statements are not "formal statements . . . akin to statements given to law enforcement, so those statements were non-testimonial"; and (ii) the statements did not include A. Gallegos' name, "so it was not necessary for the prosecution to make redactions."  A. Gallegos Supplement Response at 3.

    The United States contends that additional evidence "tied" A. Gallegos to the Burns homicide, such as A. Gallegos' admissions to B. Cordova.  A. Gallegos Supplement Response at 3.  The United States thus argues that admitting J. Gallegos' statements was "proper when given with a limiting instruction, and the Court provided the necessary instruction to the jury."

A. Gallegos Supplement Response at 3 (citing <u>Richardson v. Marsh</u>, 481 U.S. 200, 208 (1987); <u>United States v. Green</u>, 115 F.3d 1479, 1484 (10th Cir. 1997)). The United States avers that A. Gallegos "asks this Court to take a hindsight view of the trial." A. Gallegos Supplement Response at 4. The United States notes that A. Gallegos "objected to the anticipated testimony of Morgan Ramirez prior to her testimony, and the Court went through her anticipated testimony and made pretrial rulings on each statement and its admission." A. Gallegos Supplement Response at 4 (citing Ramirez Tr. at 13:21-22:6 (Court, Torraco, Beck, Mickendrow, Benjamin)). The United States also notes that the Court gave three limiting instructions during Ramirez' testimony. <u>See</u> A. Gallegos Supplement Response at 4 (citing Ramirez Tr. at 26:15-20 (Court); <u>id.</u> at 29:8-11 (Court); <u>id.</u> at 32:18-23 (Court)). The United States argues that the "Court conducted the necessary balancing and allowed [Ramirez'] testimony, so the Court should not now reconsider its decision on the admissibility of that evidence." A. Gallegos Supplement Response at 4. The United States adds that the Defendants were able to test Ramirez' possible prejudice or bias by cross-examining her "about her thoughts and feelings about Joe Gallegos, as well as her recollection of the events surrounding his statements and what her understanding was of the statements Joe Gallegos told her." A. Gallegos Supplement Response at 4-5.

The United States argues that the Court already has "considered and rejected" arguments similar to A. Gallegos' argument that "'a multitude of violent gang evidence [] had no direct link to'" him. A. Gallegos Supplement Response at 5 (quoting A. Gallegos Supplement at 7 and citing Severance MOO, 2017 WL 3054511). The United States recounts that the Court concludes in the Severance MOO that the "'risk of spillover prejudice does not warrant severance of any individual counts in this case.'" A. Gallegos Supplement Response at 5 (quoting Severance MOO at 193, 2017 WL 3054511, at *111). The United States notes the Court's "numerous safeguards and

redactions," such as "changing pronouns to eliminate references to a named defendant." A. Gallegos Supplement Response at 5 (citing Severance MOO at 188-90, 2017 WL 3054511, at *108). The United States urges the Court again to reject A. Gallegos' arguments. See A. Gallegos Supplement Response at 5.

The United States also argues that A. Gallegos' argument that "much of the enterprise evidence was not relevant to him . . . is clearly mistaken." A. Gallegos Supplement Response at 5. The United States asserts that it is required to prove five elements to attain a VICAR conviction, including "that the enterprise existed," because the Defendants would not stipulate to "the existence of the SNM enterprise and the first three elements." A. Gallegos Supplement Response at 5-6 (citing Jury Instructions (without citations), Instruction No. 25, at 35). The United States argues that whether SNM's activities occurred inside a prison is irrelevant, because the "elements of the offense focused on the gang's activities, not where they occurred." A. Gallegos Supplement Response at 5. The United States adds that B. Cordova "testified that he was in the same pod as Andrew Gallegos when the defendant confessed his part in the Adrian Burns homicide, so even part of the defendant's role in the case focused on statements made while he was incarcerated and on his interactions with other gang members." A. Gallegos Supplement Response at 5-6. The United States also recounts that B. Cordova testified that J. Gallegos, A. Gallegos, and F. Gallegos were SNM members, and it argues that A. Gallegos "was not guilty by association; he was part of a guilty association." A. Gallegos Supplement Response at 6. The United States maintains that it "proved its case against [A. Gallegos] in his individual capacity," without regard to A. Gallegos' association with his brothers. A. Gallegos Supplement Response at 6.

## LAW REGARDING MOTIONS FOR JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure provides:

**(a)    Before Submission to the Jury**.  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  The court may on its own consider whether the evidence is insufficient to sustain a conviction.  If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

**(b)    Reserving Decision**.  The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

**(c)    After Jury Verdict or Discharge**.

> **(1)    Time for a Motion**.  A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.

> **(2)    Ruling on the Motion**.  If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.  If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

> **(3) No Prior Motion Required**.  A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

**(d)    Conditional Ruling on a Motion for a New Trial**.

> **(1)    Motion for a New Trial**.  If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination.

> **(2)    Finality**.  The court's order conditionally granting a motion for a new trial does not affect the finality of the judgment of acquittal.

> **(3)    Appeal.**

> **(A)     Grant of a Motion for a New Trial**.  If the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise.

> **(B)     Denial of a Motion for a New Trial**.  If the court conditionally denies a motion for a new trial, an appellee may assert that the denial was erroneous.  If the appellate court later reverses the judgment of acquittal, the trial court must proceed as the appellate court directs.

Fed. R. Crim. P. 29 (bold in original).  In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court noted that the long-settled practice of allowing federal courts to enter judgments of acquittal when evidence is insufficient to sustain a conviction "only . . . highlight[s] the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion."  443 U.S. at 317 n.10.  A judgment of acquittal thus enables a federal district court to protect a defendant's due process rights by removing from jury consideration a charge with respect to which no rational trier of fact could find guilt beyond a reasonable doubt.  See 443 U.S. at 317-19.

In deciding a motion for judgment of acquittal, courts are not permitted to weigh the evidence or assess witness credibility, see Burks v. United States, 437 U.S. 1, 16 (1978), but instead must "ask only whether taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt," United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000)(internal quotation marks omitted)(quoting United States v. Hanzlicek, 204 F.3d 1282, 1289 (10th Cir. 1999)).  Entry of a judgment of

acquittal is thus "confined to cases where the prosecution's failure is clear." Burks v. United States, 437 U.S. at 17.

Courts must "rely on the jury, as the fact finder, 'to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented,'" United States v. Radcliff, 331 F.3d 1153, 1157-58 (10th Cir. 2003)(quoting United States v. McKissick, 204 F.3d at 1289-90), and "must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason,'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996)(quoting Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)). The district court's role is to "determine 'whether [the] evidence, if believed, would establish each element of the crime.'" See United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004)(quoting United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001))(alteration in United States v. Vallo). Moreover, "the evidence necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'" United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(quoting United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999)). A court should not overturn a jury's finding unless no reasonable juror could have reached the verdict, see United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997)(citations omitted); however, a court should not uphold a conviction "obtained by piling inference upon inference. 'An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning,'" United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998)(internal citation omitted)(first citing United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995); and then quoting United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997)). The Tenth Circuit has stated:

> The rule that prohibits the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion.

> In other words, "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one."

United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005)(quoting United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1975)).  See United States v. Neha, No. CR 04-1677 JB, 2006 WL 1305034, at *2-3 (D.N.M. April 19, 2006)(Browning, J), aff'd, 301 F. App'x 811 (10th Cir. 2008)(unpublished).  Hence, a court must examine the record to determine whether a guilty verdict rests on inferences reasonably drawn from the evidence, rather than on "conjecture" or "speculation."  United States v. Aponte, 619 F.3d 799, 804 (8th Cir. 2010).  See United States v. Bowers, 811 F.3d 412, 424 (11th Cir. 2016)(stating that "reasonable inferences" rather than "mere speculation" must support a verdict based on circumstantial evidence (citing United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005))); United States v. Long, 905 F.2d 1572, 1576 (D.C. Cir. 1990)(same).

## LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a) Defendant's Motion.**  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

> **(1) Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

> **(2) Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bold in original). Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)("Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial if required by the interests of justice."). The decision whether to grant a new trial is committed to the sound discretion of the trial court. See United States v. Sutton, 767 F.2d 726, 728 (10th Cir. 1985). "[A] defendant may not invoke rule 33 when he or she has pled guilty." United States v. Christy, 883 F. Supp. 2d 1040, 1044 (D.N.M. 2012)(Browning, J.)(citing United States v. Lambert, 603 F.2d 808, 809 (10th Cir. 1979)).

"The Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" United States v. Thomas, No. 13-CR-01874 MV, 2016 WL 9819560, at *8 (D.N.M. Aug. 5, 2016)(Vázquez, J.)(alteration added by United States v. Thomas)(quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)(Seymour, C.J.)). "The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Guzman-Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10, 2004)(Brack, J.).

The Court previously has addressed motions for new trials under rule 33 in various cases. See, e.g., United States v. Baca, No. CR 16-1613 JB, 2019 WL 2649835, at *44-54 (D.N.M. June 27, 2019)(Browning, J.)(denying a motion for a new trial where the defendant argued the witnesses were unreliable and the verdict was against the weight of the evidence, because the Court determined that the trial evidence supports the verdict); United States v. Folse, No. CR 15-2485

JB, 2018 WL 6047415, at \*20-22 (D.N.M. Nov. 19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant did not produce evidence that, with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at \*2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complained of the United States' brief references to his criminal history and of the United States' comment to the jury that the Court altered a co-conspirator's statement, because the weight of the evidence supported the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of a guilty verdict. See Fed. R. Crim. P. 33(b)(1). Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997). The defendant must show that:

> "(1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal."

United States v. Sinclair, 109 F.3d at 1531 (quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992)). See United States v. Quintanilla, 193 F.3d at 1147 (discussing United States v. Sinclair's rule 33 test). See also United States v. Velarde, No. CR 98-391 JB, 2008 WL 5993210, at \*31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the alleged victim had accused other individuals of sexual assault). "Under Sinclair, a court cannot grant a new trial on the discovery

of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931,

at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1531).

## LAW REGARDING VICAR AND RICO

RICO prohibits specific activities when they are committed in connection with a pattern of

racketeering activity. See, e.g., 18 U.S.C. § 1962(b) ("It shall be unlawful for any person through

a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain,

directly or indirectly, any interest in or control of any enterprise which is engaged in, or the

activities of which affect, interstate or foreign commerce."). RICO defines a "pattern of

racketeering activity" such that it "requires at least two acts of racketeering activity, one of which

occurred after the effective date of this chapter and the last of which occurred within ten years

(excluding any period of imprisonment) after the commission of a prior act of racketeering

activity." 18 U.S.C. § 1961(5). Racketeering activity includes "any act or threat involving murder,

kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in

a controlled substance" that is a state-law felony, 18 U.S.C. § 1961(1)(A), and "any act which is

indictable under any" one of myriad federal statutes, § 1961(1)(B)-(G).

A VICAR violation requires an underlying state-law offense, i.e., someone "murders,

kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily

injury upon, or threatens to commit a crime of violence against any individual in violation of the

laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a).

The underlying state-law offense becomes a federal VICAR violation only when it is committed:

(i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay,

anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the

purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in

racketeering activity." 18 U.S.C. § 1959(a). VICAR employs RICO's definition of racketeering

activity. See 18 U.S.C. § 1961(1) (defining racketeering activity for RICO purposes); 18 U.S.C.

§ 1959(b)(1) (stating that, under VICAR, racketeering activity "has the meaning set forth in section

1961 of this title").

RICO states that an enterprise "includes any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact although

not a legal entity." 18 U.S.C. § 1961(1). VICAR employs a slightly narrower definition of the

term "enterprise" such that it "includes any partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity, which

is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C.

§ 1959(b)(2). "An association-in-fact requires: (1) a purpose, (2) relationships among those

associated with the enterprise, and (3) longevity sufficient to permit those associated with the

enterprise to pursue the enterprise's purpose." United States v. Kamahele, 748 F.3d 984, 1003

(10th Cir. 2014). See Boyle v. United States, 556 U.S. 938, 948 (2009)("[A]n association-in-fact

enterprise is simply a continuing unit that functions with a common purpose."); id. ("While the

group must function as a continuing unit and remain in existence long enough to pursue a course

of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity

punctuated by periods of quiescence.").

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE

The Due Process Clause requires that the United States disclose to the defendant any

evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad

faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court has extended the

prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [government's] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

1.     **Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . [including] whether the defendant should testify." Case v. Hatch, 731 F.3d 1015, 1041 (10th Cir. 2013)(alteration in Case v. Hatch)(internal quotation marks omitted)(quoting United States v. Burke, 571 F.3d at 1054).

"To be material under *Brady*, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(internal quotation marks omitted)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See *Kyles*, 514 U.S. at 437 . . . ("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no

obligation to first point out that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. March 14, 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder *Brady*, the good or bad faith of government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

### 2.    Timing of the Disclosure Under Brady.

"The obligation of the prosecution to disclose evidence under *Brady v. Maryland* can vary depending on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland*."  United States v. Burke, 571 F.3d at 1053.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."  United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of

impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For instance, the prosecutor's obligation to disclose Brady material can arise during trial.  See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although *Brady* claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway.").  The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819-20 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.  We conclude that it does not.").  The Supreme Court has recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."  United States v. Ruiz, 536 U.S. at 629 (emphasis in original).  The Supreme Court has acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 629.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court has explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice."  United States v. Ruiz, 536 U.S. at 631.  The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in *United States v. Ruiz*, . . . by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  *Ruiz* emphasized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances -- even though the defendant may not know the *specific detailed* consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(per curiam)(unpublished)(alteration in United States v. Johnson, emphasis in United States v. Ruiz)(quoting United States v. Ruiz, 546 U.S. at 630).[14]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> *Ruiz* is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in *Ruiz* that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a *Brady* violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit

---

[14]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Dahl, 597 F. App'x 489 (10th Cir. 2015)(unpublished), United States v. Madsen, 614 F. App'x 944 (10th Cir. 2015)(unpublished), United States v. Embry, 452 F. App'x 826 (10th Cir. 2011)(unpublished), United States v. Arrington, 409 F. App'x 190 (10th Cir. 2010)(unpublished), United States v. Johnson, 369 F. App'x 905 (10th Cir. 2010)(unpublished), United States v. Beltran-Garcia, 338 F. App'x 765 (10th Cir. 2009)(unpublished), United States v. Bowling, 343 F. App'x 359 (10th Cir. 2009)(unpublished), United States v. Pike, 292 F. App'x 108 (2d Cir. 2008)(unpublished), United States v. Bullock, 130 F. App'x 706 (6th Cir. 2005)(unpublished), United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), United States v. Brown, 50 F. App'x 970 (10th Cir. 2002)(unpublished), and United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table opinion), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The Courts of Appeals "have split on the issue whether *Brady v. Maryland*'s restrictions apply to suppression hearings." United States v. Harmon, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether Brady applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. See United States v. Johnson, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table opinion). Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a *Brady* violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the *Brady* line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(quoting Brady, 373 U.S. at 87). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie. See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the

suppression hearing might have come out the other way, however, is of questionable relevance to the *Brady* issues at stake here."). The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "*Brady* disclosures are required prior to suppression hearings." United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).

Before the Supreme Court issued its United States v. Ruiz decision, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings. See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965 (5th Cir. 1990)("Timing is critical to proper *Brady* disclosure, and objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing." (citations omitted)), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "*Brady* rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished)(internal quotation marks omitted)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")). Although the Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in *United States v. Ruiz* that a prosecutor does not have to disclose

impeachment evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp.

2d at 1151.  The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded

that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of *United States v. Ruiz* to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In *United States v. Ruiz*, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." *United States v. Ruiz*, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169.  Accordingly, Brady does not require the United

States to disclose impeachment evidence before suppression hearings.  See United States v.

Harmon, 871 F. Supp. 2d at 1165-67.

## LAW REGARDING THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a jury convicted Debra Milke of murdering her four-year-old son, Christopher,

and the judge sentenced her to death.  See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The

Honorable Alex Kozinski, then Chief Judge for the United States Court of Appeals for the Ninth

Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective

Armando Saldate, Jr." Milke v. Ryan, 711 F.3d at 1000.  At the trial, Saldate testified that Milke

confessed to the murder; Milke vehemently protested her innocence and denied confessing.  See

Milke v. Ryan, 711 F.3d at 1000.  With no other witnesses, the judge and jury believed Saldate.

They were unaware, however, of one fact that might have changed their minds: Saldate had a "long

history of lying under oath and other misconduct."  Milke v. Ryan, 711 F.3d at 1000-01.

Specifically, Saldate had lied to a grand jury or a judge in four cases, requiring state judges to

throw out indictments or confessions.  See Milke v. Ryan, 711 F.3d at 1004.  In another four cases,

"judges threw out confessions or vacated convictions because Saldate had violated suspects'

Miranda and other constitutional rights during interrogations, often egregiously."  Milke v. Ryan,

711 F.3d at 1004.  Finally, Saldate's personnel file documented a five-day suspension "for taking

sexual liberties with a motorist he stopped and then lying to his supervisors about it."  Milke v.

Ryan, 711 F.3d at 1011.  The file revealed that his "supervisors had caught him in a lie and

concluded that his credibility was compromised."  Milke v. Ryan, 711 F.3d at 1006, 1012

(describing the report as showing that "Saldate has no compunction about lying during the course

of his official duties" and that he has "a willingness to abuse his authority to get what he wants").

The information about Saldate's misconduct was in the hands of the party responsible for ensuring

that justice is carried out -- the state.  Unfortunately, the state did not disclose this information,

despite its requirements under Brady and Giglio.  See Milke v. Ryan, 711 F.3d at 1005 (describing

how the state did not mention the evidence, even though a critical question in Milke's case was

whether Saldate ignored Milke's request for an attorney).  "This error resulted in a 'one-sided

presentation of evidence' and 'impeded [the jury's] ability to fully and fairly assess the credibility

of both [Milke] and Saldate."  Milke v. Ryan, 711 F.3d at 1005 (alterations in the original).  More

than that, however, the error resulted in Milke's death sentence and imprisonment on death row

for twenty-two years.  See <u>Milke v. Ryan</u>, 711 F.3d at 1001.[15]

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant <u>Brady</u> violations.  See Daniel S. Medwed, <u>Brady's Bunch of Flaws</u>, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., <u>The Myth of Prosecutorial Accountability After Connick v. Thompson: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct</u>, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  See <u>United States v. Stevens</u>, No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. April 7, 2009)(Sullivan, J.).  See Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in <u>In re Special Proceedings</u>, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report").  Special prosecutor Henry F. Schuelke III's blistering report found that the United States concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.  See Stevens Report at 12.  Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.

---

[15]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  See <u>Arizona: No Retrial for Woman Freed from Death Row</u>, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.  The Court of Appeals described the "long course of *Brady/Giglio* violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  <u>Milke v. Mroz</u>, 339 P.3d 659, 665-66, 668 (Ariz. App. Ct. 2014).

See Carrie Johnson, Report: Prosecutors Hid Evidence in Ted Stevens Case, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case. Schuelke based his 500-page report on a review of 128,000 documents and interviews with prosecutors and FBI agents. See Stevens Report at 12. United States Attorney General Eric Holder moved to vacate Stevens' conviction. See Jerry Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The Washington Times (March 15, 2012). The Department of Justice ("DOJ") subsequently "instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery training mandatory." Mark Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News (March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-sen-stevens-prosecutors.

As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount of power in criminal prosecutions, often more than the jury. See Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold more power "than jurors because most cases don't go to trial"). They are the ones with access to the evidence, both inculpatory and exculpatory. They can disclose it easier than anyone else can. See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015), http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/. As one illustration, in Milke v. Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a team of approximately ten researchers in post-convictions proceedings spent nearly 7,000 hours sifting through court records." Milke v. Ryan, 711 F.3d at 1018. The team worked eight hours a day for three and a half months searching through the clerk of court's records for Saldate's name in every criminal case file from 1982 to 1990. See Milke v. Ryan, 711 F.3d at 1018. It took

another researcher another month to review motions and transcripts from each of those cases to

find examples of Saldate's misconduct.  See Milke v. Ryan, 711 F.3d at 1018.  The Ninth Circuit

concluded: "A reasonably diligent lawyer couldn't possibly have found these records in time to

use them at Milke's trial."  Milke v. Ryan, 711 F.3d at 1018.  The prosecutor was in the best

position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she

had a fair trial.  Although Brady and Giglio require prosecutors to disclose exculpatory evidence

to the defense, it is often extremely difficult for criminal defendants to know whether the

prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control

over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to
> testify.  This includes providing sweetheart plea deals to alleged co-conspirators
> and engineering jail-house encounters between the defendant and known
> informants.  Sometimes they feed snitches non-public information about the crime
> so that the statements they attribute to the defendant will sound authentic.  And, of
> course, prosecutors can pile on charges so as to make it exceedingly risky for a
> defendant to go to trial.  There are countless ways in which prosecutors can
> prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, supra, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law

enforcement representatives, and information technology professionals to improve the DOJ's

discovery practices.  See Hearing on the Special Counsel's Report on the Prosecution of Senator

Ted Stevens at 3-4, Committee on the Judiciary United States Senate (March 28,

2012)("Hearing").  The DOJ then issued guidelines that federal prosecutors must follow in

complying with their discovery obligations in criminal cases.  See Memorandum for Department

Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance

and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal

Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-department-prosecutors. These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office. See Hearing at 4-5. Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys likely will have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations. Later in January 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices. See Hearing at 4.

Many courts have determined, however, that training prosecutors is insufficient to fully combat discovery abuse. Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations. See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations). Chief Judge Kozinski has asserted that "[t]here is an epidemic of Brady violations abroad in the land.

Only judges can put a stop to it."[16]     United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the "epidemic of _Brady_ violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec. 2013), available at     http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct. pdf.  Accordingly, he proposed some additional reforms, such as requiring open-file discovery. See Kozinski, supra, at xxvi-vii.  North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant."  N.C. Gen. Stat. § 15A-903(a)(1) (2011).  The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense. See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the _Stevens_ case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . .  In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age, Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012).  Chief Judge Kozinski contends that

---

[16]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see it.  The Assistant United States Attorneys for the District of New Mexico appear to take their duties very seriously.

effectively deterring <u>Brady</u> and <u>Giglio</u> violations means that prosecutorial offices across the

country must establish firm open-file policies to ensure compliance.[17]  <u>See</u> Kozinski, <u>supra</u>, at

---

[17]The New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor has the United States Department of Justice.  <u>See</u> David W. Ogden, Deputy Attorney General, <u>Criminal Resource Manual</u> § 165 (2010)("Prosecutors should never describe the discovery being provided as 'open file.'").  The United States Attorney's Office for the District of New Mexico has, however, previously represented to the Court that it operates under such a policy.  <u>See</u> <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12 (stating that the United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'").  The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise."  <u>United States v. Rodella</u>, 2015 WL 711931, at *39 n.12.

> These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more.  In <u>United States v. Roybal</u>, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps.  <u>See</u> 2014 WL 4748136, at *1.  The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents.  <u>See</u> 2014 WL 4748136, at *4.  Again in <u>United States v. Folse</u>, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information.  <u>See</u> <u>United States v. Folse</u>, No. CR 14–2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . .  By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice.  In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice.  Defendants are often left in the dark, not knowing what information the United States has in its possession.  While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation.  Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment.  The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required.  After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- <u>i.e.</u> the appearance of justice.  The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed.  By refusing to disclose all

xxviii.

While these reforms may indeed decrease the number of Brady and Giglio violations that occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with Brady and Giglio in the District of New Mexico.  First, while the Court must rely heavily on the prosecutors to do their job under Brady and Giglio, the Court does more than rely solely on the prosecutors to comply with their obligations.  See Kozinski, supra, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); Imbler v. Pachtman, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence).   The Court enters orders at the beginning of the case directing prosecutors to comply with those obligations by

---

available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, i.e., through sharp practices, and not through the pursuit of truth and justice.  This perception undermines the pillars of our criminal justice system.  The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose.  The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt.  That representation, which is not completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

United States v. Rodella, 2015 WL 711931, at *39.  It appears that the United States has finally abandoned its representations that it has an open-file policy.

disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that <u>Brady</u> and <u>Giglio</u> require. If courts do not enter an order requiring prosecutors to comply with <u>Brady</u> and <u>Giglio</u>, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations. <u>See</u> Henry F. Schuelke III, <u>supra</u>, at 507-510. By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

Second, when prosecutors hide <u>Brady</u> and <u>Giglio</u> material, courts can name the offending prosecutors in their judicial opinions. One author terms this technique "public shaming." Adam M. Gershowitz, <u>Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct</u>, 42 U.C. Davis L. Rev. 1059 (2009). Stating prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations. Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues. <u>See</u> Jenia Iontcheva Turner, <u>Policing International Prosecutors</u>, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation."). While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings. <u>See</u> Jason Kreag, <u>The Brady Colloquy</u>, 67 Stan. L. Rev. Online 47 (2014); Kozinski, <u>supra</u>, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, <u>Don't Ask, Must Tell -- And Other Combinations</u>, 103 Cal. L. Rev. 919, 984 n.296 (2015). Kreag suggests that trial

judges routinely ask a series of questions such as:

1.  Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2.  Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3.  Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that the defense is already aware of the information or the information is not material?

4.  Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5.  Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted). Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations. See Kreag, supra, at 49. He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light. See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio. Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary but also somewhat impractical for district judges that see hundreds of criminal cases a year. Because the District of New Mexico sees more felony cases

than any other federal district in the country,[18] and more criminal cases than most courts in the country, the Court has developed professional relationships with the United States Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation).  Asking United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors Should Follow Law.  Prosecutors Revolt., The Wash. Post. (March 7, 2014), http:// www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he claimed he would do as a matter of course).  Kreag concedes that

---

[18]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country.  See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending September 30, 2018 and 2019, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/caseload-tables ("Criminal Filings").  Between September 30, 2018, and September 30, 2019, 3,993 criminal cases were filed in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 4,956, California's Southern District, with 5,546, and Texas' Southern and Western Districts, with 5,891 and 8,409, respectively, saw more criminal filings.  See Criminal Filings at 1.  In comparison, 73 criminal cases were filed in the District of Delaware, 152 were filed in the District of Rhode Island, 136 were filed in the District of Vermont, 140 were filed in the Northern District of Mississippi, 151 were filed in the Western District of Wisconsin, and 100 were filed in the Eastern District of Oklahoma.  See Criminal Filings at 1.

"some prosecutors might be insulted by having to answer these or similar questions from the court, believing that the questions themselves amount to an accusation." Kreag, supra, at 56. The Court agrees with this assessment.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty. Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues and what has been produced heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[19] The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady* obligations" by holding a hearing or pretrial conference and asking about discovery issues, without running through a standardized and potentially insulting checklist. Kreag, supra, at 54. Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation. Like the colloquy, it also personalizes the prosecutor's decision not to disclose. A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision and that they are responsible for providing an explanation for that non-disclosure. Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material. This accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end

---

[19]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does. See Kozinski, supra; Kreag, supra. The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts. A formal colloquy is not always practical in this context.

without the need for "public shaming" on the back end if the Court later discovers a <u>Brady</u> or <u>Giglio</u> violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb <u>Brady</u> and <u>Giglio</u> violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under <u>Brady</u> and <u>Giglio</u> the system is in trouble. The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is disclosing officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  18 U.S.C. § 3500(e). <u>See</u> <u>United States v. Harry</u>, No. CR 10-1915 JB, 2013 WL 684671, at *1 (D.N.M. Feb. 6, 2013)(Browning, J.).  As explained above, some courts -- including this Court -- have concluded that an officer's interview notes may be "statement[s]" that the Jencks Act requires the United

States to disclose.  18 U.S.C. § 3500.  See United States v. Harry, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); United States v. Tarango, 760 F. Supp. 2d 1163, 1167 (D.N.M. 2009)(Browning, J.)(requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993)("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).  Officers then maintain these notes pursuant to various standards and protocols.  See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d 1224, 1267 (D.N.M. 2008)(Brack, J.)(stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500).  Officers then use their notes as the basis for their reports.  When officers write their reports, however, they may exclude certain information that does not help the prosecution.  These reports are then placed in a prosecutor's file, but the notes are not.  To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the government witness testifies at trial.  This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence.  The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure

that their reports reflect their notes and accurately summarize the events leading to an arrest. Even if some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d at 1266, cases are randomly assigned to different judges. The threat of being assigned to a judge who requires disclosure may incentivize officers to include all exculpatory and impeachment evidence in their formal report. Additionally, even if a prosecutor's file omits the officer's notes, courts must require prosecutors to disclose exculpatory information in officers' notes under Brady. See Kyles v. Whitley, 514 U.S. at 437 (placing an affirmative obligation on prosecutors to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL 1103876, at *5 (D.N.M. March 14, 2011)(Browning, J.)("The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt").

## LAW REGARDING RULE 8 JOINDER

Rule 8 of the Federal Rules of Criminal Procedure is the vehicle for joinder of offenses and of defendants in a criminal proceeding. Rule 8 provides:

> (a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged --whether felonies or misdemeanors or both -- are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8. In the Tenth Circuit, rule 8(b) governs the propriety of joinder of multiple

defendants and their alleged offenses into one indictment.  See United States v. Eagleton, 417 F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in cases where more than one defendant is joined in the same indictment.  Such joinder [of offenses] is governed by Rule 8(b)."), overruled on other grounds, United States v. Lane, 474 U.S. 438 (1986).  See also United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012)("Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)."); United States v. Walker, 657 F.3d 160, 169 (3d Cir. 2011)("Rule 8(a) applies only to prosecutions involving a single defendant, and in a multi-defendant case such as this, the tests for joinder of counts and defendants is merged in Rule 8(b).").  "Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)).

Under rule 8(b), multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Rule 8(b) and its phrase "same series of acts or transactions," Fed. R. Crim. P. 8(b), "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980).  In light of rule 8(b)'s broad construction, courts conclude that a conspiracy count is sufficient to warrant joinder of all defendants charged in that conspiracy, regardless whether each defendant is charged in each count or with each substantive act.  See United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015).

## LAW REGARDING RULE 14(A) SEVERANCE

Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure, a court may "order

separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if joinder "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). Rule 14(a) envisions situations where a joint trial would be inappropriate and harmful to the accused's constitutional rights even though joinder is proper under rule 8, which is liberally and broadly applied in the interest of efficiency. See Zafiro v. United States, 506 U.S. at 538 (using rule 14 as the standard for a severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance). The decision to sever is "within the sound discretion of the trial court." United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)). See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting severance "is peculiarly within the discretion of the trial court")(citations omitted).

"Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case." United States v. Hall, 473 F.3d at 1302 (quoting United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984)). "Joint trials of defendants who are indicted together are preferred, because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537). Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial." Cummings v. Evans, 161 F.3d at 619 (citing United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir. 1993)). The prejudice standard envisioned by rule 14 thus requires a showing of actual prejudice, and not merely a showing that a defendant "may have a better chance of acquittal in separate trials." United States v. Pursley, 474 F.3d at 766. To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'"

United States v. Pursley, 474 F.3d at 766 (quoting Zafiro v. United States, 506 U.S. at 539).

Significantly, "[r]ule 14 does not require severance even if prejudice is shown; rather, it leaves the

tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro v. United

States, 506 U.S. at 538-39.

In interpreting rule 14, United States Courts of Appeals have explored the risk of "mutually

antagonistic" or "irreconcilable" defenses may supply the prejudice needed in some circumstances

as to warrant severance. Zafiro v. United States, 506 U.S. at 538 (citing, e.g., United States v.

Benton, 852 F.2d 1456, 1469 (6th Cir. 1988); United States v. Smith, 788 F.2d 663, 668 (10th Cir.

1986); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir. 1984); United States v.

Berkowitz, 662 F.2d 1127, 1133-1134 (5th Cir. 1981); United States v. Haldeman, 559 F.2d 31,

71-72 (D.C. Cir. 1976)). The Tenth Circuit, in United States v. Pursley, provided that, in such a

scenario, where a defendant seeks severance because of mutually antagonistic defenses as

compared to co-defendants,

> a trial court engages in a three step inquiry. First, it must determine whether the
> defenses presented are "so antagonistic that they are mutually exclusive." *United
> States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989). Second, because "[m]utually
> antagonistic defenses are not prejudicial per se," a defendant must further show "a
> serious risk that a joint trial would compromise a specific trial right . . . or prevent
> the jury from making a reliable judgment about guilt or innocence." *Zafiro v.
> United States*, 506 U.S. [at] 539[]. Third, if the first two factors are met, the trial
> court exercises its discretion and "weigh[s] the prejudice to a particular defendant
> caused by joinder against the obviously important considerations of economy and
> expedition in judicial administration." *Peveto*, 881 F.2d at 857.

United States v. Pursley, 474 F.3d at 765. In a court's consideration of such a scenario, "defenses

are mutually antagonistic if 'the conflict between codefendants' defenses [is] such that the jury, in

order to believe the core of one defense, must necessarily disbelieve the core of the other.'" United

States v. Pursley, 474 F.3d at 765 (quoting United States v. Linn, 31 F.3d 987, 992 (10th Cir.

1994)).  The Defendants must show that "'the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.'"  United States v. Pursley, 474 F.3d at 765-66 (quoting United States v. Peveto, 881 F.2d at 857 (holding mutually exclusive defenses where one defendant said he was preparing to be an informant and invited the other defendant, a purported drug dealer, to his house to gather information, and the other defendant said he was innocently at the house and the first defendant held the second defendant against his will)).

Ultimately, a trial court that denies a request for severance will be reversed only where a defendant demonstrates that the court abused its discretion.  See United States v. Pursley, 474 F.3d at 765.  In exercising its discretion, however, the court should "weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  United States v. Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-68 (10th Cir. 1989)).  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Bailey, 952 F.2d at 365 (citation omitted).  A defendant seeking severance bears the "heavy burden" of demonstrating a risk of prejudice from continued joinder.  United States v. Bailey, 952 F.2d at 365 n.4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)).  The Supreme Court has stated:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.  When many defendants are tried together in a complex case

and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh*, [481 U.S. 200 (1987)] less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Zafiro v. United States, 506 U.S. at 539 (emphasis added)(citations omitted).

With respect to a district court's application of rule 14 in practice, particularly in the context of multi-count and multi-defendant RICO, VICAR, or conspiracy indictments, one district court has explained:

Most often, severance of defendants will be required to protect the rights of defendants against undue prejudice resulting from joinder. In other situations, severance may be required, or at least the argument for severance will be bolstered, by the physical limitations of the courthouse and the logistical difficulties of attempting to conduct a complex multi-defendant trial.

United States v. Gray, 173 F. Supp. 2d 1, 7-8 (D.D.C. 2001)(Lamberth, J.). Another district court addressed the possibility of prejudicial joinder of the defendants

deriving from the number of defendants and the number of counts, the complexity of the indictment, estimated length of the trial, disparities in the amount or type of proof offered against the defendants, disparities in the degrees of involvement by defendants in the overall scheme, possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)(Weinstein, C.J.). The United States v. Gray court explained that, in United States v. Gallo:

After weighing the potential prejudice against defendants, the court decided that the dispositive factor counseling severance was judicial efficiency. [United States v. Gallo, 668 F. Supp.] at 753 ("[T]he prejudices to the defendants are not clearly dispositive . . . , we might be reluctant to grant such severances on Rule 14 alone.

. . . [W]e question the traditional assumption that denial of severance . . . promotes efficiency.").

United States v. Gray, 173 F. Supp. 2d at 8-9 (alterations in original).  Indeed, the United States v. Gray court stated that "[m]any of the factors that counseled against complete joinder of defendants [in United States v. Gallo] are also persuasive in the instant case," and so it concluded

> that despite the general presumption favoring joinder, some form of severance is necessary because of the physical limitations of the courtroom and hardship on the jurors, the defendants, and the Court.  Severance, however, should be of the most limited form necessary to satisfy those interests, because the Court finds that joinder of defendants, to the extent possible, will preserve judicial resources and permit the jury to have as complete a view of the evidence as possible.

United States v. Gray, 173 F. Supp. at 10.  Accordingly, the United States v. Gray court severed a "158-count [Indictment]" charging "seventeen defendants" into two trial groupings based on logistical concerns alone.  United States v. Gray, 173 F. Supp. at 1, 10.  The United States v. Gray court also considered that

> [s]everal defendants have moved for complete severance or other joint trial configurations based on Rule 14 concerns of prejudice against defendants.  In order to prevail upon a claim for severance, [those] defendant[s] must show that joinder would violate that defendant's constitutional fair trial rights, or would "prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. [at] 539[].

United States v. Gray, 173 F. Supp. at 10.  Although the United States v. Gray court had already severed the indictment in that case into two trial groupings to alleviate the risk of prejudice to the defendants by logistical inefficiency and impracticality, the court was still open to further requests for severance of individual defendants upon a specific showing that joinder in either of the trial groupings still ran afoul of Zafiro v. United States and rule 14.  See United States v. Gray, 173 F. Supp. at 10.  The rule 14 inquiry regarding the propriety of joinder is ongoing, and as the United States v. Gray court concluded in severing that case's indictment into two trial groupings, its

chosen "arrangement of the defendants appears to be, at least on the information now available, the most efficacious in preserving judicial resources, preventing duplicitous testimony and evidence, and reaching an expeditious resolution for all defendants." United States v. Gray, 173 F. Supp. at 18.

## LAW REGARDING THE COMMERCE CLAUSE

The Commerce Clause permits Congress to regulate three categories: "First, Congress can regulate the channels of interstate commerce.  Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." Raich, 545 U.S. at 16-17 (citations omitted).[20]  Notwithstanding that pronouncement and others

---

[20]Over a decade ago, Justice Scalia wrote a scathing critique of this formulation:

Since Perez v. United States, 402 U.S. 146 (1971), our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. Id. at 150. The first two categories are self-evident, since they are the ingredients of interstate commerce itself. The third category, however, is different in kind, and its recitation without explanation is misleading and incomplete.

It is *misleading* because, unlike the channels, instrumentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone. Rather, as this Court has acknowledged since at least United States v. Coombs, 37 U.S. (12 Pet.) 72 (1838), Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause. And the category of "activities that substantially affect interstate commerce," is *incomplete* because the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws governing intrastate activities that substantially affect interstate commerce. Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do

like it, common sense dictates that Congress' power under the Commerce Clause cannot extend to every activity that affects interstate commerce. As an illustration, many economists contend that the Second World War ended the Great Depression,[21] but suggesting that the Commerce Clause permits Congress to stimulate the national economy by sending millions of Americans soldiers overseas would be inaccurate.

The Supreme Court's latest Commerce Clause decision, <u>Sebelius</u>, 567 U.S. 519, confirms that common-sense insight. Five Supreme Court Justices concluded that the individual mandate in the Affordable Care Act, Pub. L. No. 111-148, 123 Stat. 119 (2010) -- which requires individuals to obtain health insurance or else to pay a penalty to the Internal Revenue Service -- cannot be

---

not themselves substantially affect interstate commerce.

<u>Raich</u>, 545 U.S. at 33-35 (Scalia, J., concurring in judgment)(footnote and citations omitted)(emphasis in the original).

[21]"What ended the Great Depression? In the traditional view, the answer is World War II, a conclusion that appears in the works of numerous economists and historians." J.R. Vernon, <u>World War II Fiscal Policies and the End of the Great Depression</u>, 54 J. Econ. Hist. 850, 850 (1994). That traditional view is not universally accepted, however:

> The conventional wisdom is that the U.S. economy remained depressed for all of the 1930s and only returned to full employment following the outbreak of World War II[, but] declines in real output in the early 1930s, and again in 1938, were so large that it took many years of unprecedented growth to undo them and return real output to normal levels.
>
> . . . . Between 1929 and 1933, real GNP declined 35 percent; between 1933 and 1937, it rose 33 percent. In 1938 the economy suffered another 5 percent decrease in real GNP, but this was followed by an even more spectacular increase of 49 percent between 1938 and 1942. By almost any standard, the growth of real GNP in the four-year periods before and after 1938 was spectacular.

Christina D. Romer, <u>What Ended the Great Depression?</u>, 52 J. Econ. Hist. 757, 759-60 (1992); <u>id.</u> at 758 ("'[I]t is hard to attribute any of the pre-1942 catch-up of the economy to the war.'" (quoting J. Bradford de Long, Lawrence H. Summers et al., <u>How Does Macroeconomic Policy Affect Output?</u>, 1988 Brookings Papers on Economic Activity 433, 467).

justified on Commerce Clause grounds, even though the individual mandate has immense effects on interstate commerce. See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.). Sebelius thus reveals that a valid exercise of Congress' Commerce Clause power requires more than a substantial effect on interstate commerce. See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).

The Court's survey of Supreme Court precedent indicates, instead, that three requirements apply when Congress seeks to exercise its power "to regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. Congress must: (i) regulate; (ii) commerce;[22] (iii) that possesses significant interstate effects. The Court addresses each requirement in turn.

First, according to Chief Justice John Marshall, the "power to regulate" an activity is the power "to prescribe the rule by which" the activity "is to be governed." Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 196 (1824)(Marshall, C.J.). Under that broad definition, many laws qualify as regulations, including laws: (i) prohibiting shipment of goods made under certain labor conditions, see United States v. Darby, 312 U.S. 100, 113 (1941); (ii) imposing production limitations, see Wickard v. Filburn, 317 U.S. 111 (1942); (iii) affirmatively authorizing navigation and trade, see Gibbons v. Ogden, 22 U.S. (9 Wheat) at 212-13; (iv) proscribing racial discrimination in particular industries, see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 261 (1964)(hotels);

---

[22]"[T]hus far in our nation's history, our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." United States v. Morrison, 529 U.S. at 613. Congress can reach noneconomic activity that affects interstate commerce, if at all, by supplementing its power to regulate interstate commerce with its Necessary and Proper Clause power "[t]o make all laws which shall be necessary and proper for carrying" other powers "into execution." U.S. Const. art. I, § 8, cl. 18. See infra (describing the scope of Congress' power under the Necessary and Proper Clause).

Katzenbach v. McClung, 379 U.S. 294, 304-05 (1964)(restaurants); and (v) prohibiting extortionate lending practices, Perez v. United States, 402 U.S. at 156-57. The only restriction that the Supreme Court has articulated regarding congressional actions that qualify as regulations is that regulating an activity does not encompass requiring people to engage in that activity. See Sebelius, 567 U.S. at 550 (opinion of Roberts, C.J.)("The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." (emphasis in original)); id. at 649 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[O]ne does not regulate commerce that does not exist by compelling its existence."). While the Supreme Court's capacious understanding of regulation means that almost any congressional action qualifies, Congress must still satisfy the Commerce Clause's less-than-demanding regulation requirement. See Sebelius, 567 U.S. at 550 (opinion of Roberts, C.J.)("The Framers gave Congress the power to *regulate* commerce, not to *compel* it . . . ." (emphasis in original)); id. at 690 (joint opinion of Scalia, Kennedy, Thomas, Alito, JJ.)(denying that "failure to enter the health insurance market . . . is an *activity* that Congress can 'regulate'" (emphasis in original)).

Second, again according to Chief Justice Marshall, "commerce" refers to more than just "traffic, to buying and selling, or the interchange of commodities." Gibbons v. Ogden, 22 U.S. at 189-90. Commerce, instead, means "intercourse[,] . . . the commercial intercourse between nations, and parts of nations, in all its branches," so commerce comprehends both "navigation" and "the admission of vessels of one nation into the ports of the other." Gibbons v. Ogden, 22 U.S. at 189-90. More recently, the Supreme Court defined "'[e]conomics'" as "'the production, distribution, and consumption of commodities.'" Raich, 545 U.S. at 25 (quoting Webster's Third New International Dictionary 720 (1966)). Importantly, the Supreme Court has discarded the antiquated notion that production is not commerce. Compare Raich, 545 U.S. at 26 (concluding

that the Controlled Substances Act is a permissible exercise of Congress' Commerce Clause power, because it "regulates quintessentially economic activities: the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"), with Hammer v. Dagenhart, 247 U.S. 251, 272 (1918)("The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof."). Commerce thus includes, among other things: (i) coal mining; (ii) lending money; (iii) restaurant operation; (iv) providing hospitality; and (v) growing wheat for personal use. See United States v. Lopez, 514 U.S. at 559-60 (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 542 U.S. 264 (1981); Perez v. United States; Katzenbach v. McClung; Heart of Atlanta Motel, Inc. v. United States; and Wickard v. Filburn).

Recent years have supplemented that litany with counterexamples, i.e., activities that are not commerce: (i) "mere gun possession," United States v. Lopez, 514 U.S. at 585 (Thomas, J., concurring); see id. at 562 (Rehnquist, C.J.)(faulting a federal statute for lacking an "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with" commerce); (ii) "[g]ender-motivated crimes of violence," United States v. Morrison, 529 U.S. at 613 (Rehnquist, C.J.)(declaring that such crimes "are not, in any sense of the phrase, economic activity"); (iii) simple possession -- as opposed to possession with intent to distribute -- of drugs, see Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment); and (iv) "the failure to enter the health insurance market," Sebelius, 567 U.S. at 660 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.); see id. at 550-51 (opinion of Roberts, C.J.). While commerce -- like regulation -- takes a myriad of forms, the Supreme Court has been clear that Congress must satisfy the commerce requirement to validly exercise its power under the

Commerce Clause.  See Sebelius, 567 U.S. at 557 (opinion of Roberts, C.J.)("We have said that Congress can anticipate the *effects* on commerce of an economic activity.  But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce."  (emphasis in original)(citations omitted)); id. ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions."); id. at 648 (joint opinion of Scalia, Kennedy, Thomas, Alito)("[T]o say the *failure* to grow wheat (which is *not* an economic activity, or any activity at all) nonetheless affects commerce and therefore can be federally regulated, is to make mere breathing in and out the basis for federal prescription and to extend federal power to virtually all human activity."  (emphasis in original)).  See also United States v. Morrison, 529 U.S. at 617 ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."); United States v. Lopez, 514 U.S. at 560 (Rehnquist, C.J.)("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.").

Third, yet again according to Chief Justice Marshall, Congress cannot use the Commerce Clause to authorize commercial regulation regarding "the exclusively internal commerce of a State."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 195.  "The completely internal commerce of a State" encompasses only commerce that is "carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194-95.  In our modern, interconnected world, it is difficult to imagine activity that both qualifies as commerce and that does not affect "more States than one."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194.  Further, whether commerce produces interstate effects is a factual issue -- and not a legal issue -- and the Supreme Court is willing to defer to Congress'

judgment on that issue as long as that judgment is rational.  See Raich, 545 U.S. at 22 ("We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."); Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. at 276 ("The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding.").

Notwithstanding those three limits, Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is "necessary and proper for carrying into execution" Congress' Commerce Clause power.  U.S. Const. art. I, § 8, cl. 18.  See M'Culloch v. Maryland, 17 U.S. (4 Wheat) at 421 ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").  For example, in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, Congress decided to regulate the interstate firearms market by excluding felons from it.  See 92 Stat. at 231, § 922(f) (prohibiting any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce"); id. at 236, § 1202(a) (declaring that a felon "who receives, possesses or transports in commerce or affecting commerce . . . any firearm" commits a criminal offense).  The Commerce Clause -- taken alone -- permits Congress to regulate the interstate firearms market, but it does not permit Congress to regulate simple firearm possession near a school, because possession is not commerce.  See Lopez v. United States, (holding that legislation regulating firearm possession in school zones exceeded Congress'

Commerce Clause power); id. at 551 (commenting that "[t]he Act" does not "regulate[] a commercial activity"). See also United States v. Morrison, 529 U.S. at 610 ("[A] fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case."); United States v. Dorris, 236 F.3d 582, 585 (10th Cir. 2000)("In *Lopez,* the Supreme Court struck down the 'Gun-Free School Zone Act,' 18 U.S.C. § 922(q)(1)(a), holding it exceeded Congressional power under the Commerce Clause because the Act did not regulate a commercial activity (possession of a gun near a school) . . . .").

Nevertheless, Congress acted constitutionally when it made it a crime for a felon to possess a firearm "in or affecting commerce," 18 U.S.C. § 922(g), because doing so was "necessary and proper for carrying into execution" congressional regulation excluding felons from the interstate firearm market, U.S. Const. art. I, § 8, cl. 18. "Prohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Prohibiting felons from receiving or transporting firearms in or affecting commerce without criminalizing possession would "significantly impede enforcement efforts." Scarborough v. United States, 431 U.S. 563, 576 (1977)(Marshall, J.). Forbidding felons to acquire firearms without forbidding them to possess firearms would be well-nigh unenforceable, because "[t]hose who do acquire guns after their conviction obviously do so surreptitiously and . . . it is very difficult as a practical matter to prove that such possession began after the possessor's felony conviction." Scarborough v. United States, 431 U.S. at 576. That sort of enforcement difficulty explains why "[p]rohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Similarly, forbidding people to buy or otherwise acquire marijuana but permitting marijuana possession "would leave a gaping hole in the CSA [Controlled Substances Act, Pub. L No. 91-

513, 84 Stat. 1236 (1971)]," so "Congress was acting well within its authority to 'make all laws which shall be necessary and proper' to 'regulate Commerce . . . among the several states'" when it prohibited marijuana possession.  Raich, 545 U.S. at 22 (quoting U.S. Const. art. I, § 8)(second alteration in the original).  See id. (commenting that "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere" justify Congress' decision "to regulate the intrastate manufacture and possession of marijuana . . . when it enacted comprehensive legislation to regulate the interstate market" in marijuana").

> That simple possession is a noneconomic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation.  Rather, Congress's authority to enact all of these prohibitions of intrastate controlled-substance activities depends only upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from interstate commerce.

Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment).  On the other hand, Congress, could not have prohibited felons from possessing firearms or people from possessing marijuana if it enacted those prohibitions in isolation, i.e., without tying the prohibition to a regulation of commerce that affects more states than one, because the Necessary and Proper Clause presupposes an exercise of another congressional power.  See, e.g., United States v. Kebodeaux, 570 U.S. 387, 394-95 (observing that, while the Constitution "makes few explicit references to federal criminal law," the Necessary and Proper Clause "authorizes congress in the implementation of other explicit powers, to create federal crimes").

Determining whether Commerce Clause legislation is a regulation of commerce that affects more states than one -- as opposed to a law that is necessary and proper for carrying such a regulation into execution -- is more than an academic inquiry.  When Congress exercises its naked Commerce Clause power, Congress can do whatever it likes as long as it does not violate express constitutional prohibitions.  See Gibbons v. Ogden, 22 U.S. (9 Wheat) at 196 (declaring that the

Commerce Clause power, "like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution").  Thus, it is constitutionally proper for Congress to exercise its Commerce Clause power with some ultimate purpose in view that Congress could not pursue directly even if it steps on the toes of the States' traditional police power while doing so.

> The thesis of the opinion [in Hammer v. Dagenhart] that the motive of the prohibition or its effect to control in some measure the use or production within the states of the article thus excluded from the commerce can operate to deprive the regulation of its constitutional authority has long since ceased to have force.

United States v. Darby, 312 U.S. at 116.  Cf. Hammer v. Dagenhart, 247 U.S. at 271-72 (invalidating a statute denying "the facilities of interstate commerce to those manufacturers in the states who employ children within the prohibited ages," because the statute "in its effect does not regulate transportation among the states, but aims to standardize the ages at which children may be employed in mining and manufacturing within the states").

When Congress clothes the Commerce Clause with Necessary and Proper Clause vestments, on the other hand, resulting legislation is subject to two additional limitations: the legislation must be both necessary and proper.  Necessity does not mean "an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other."  M'Culloch v. Maryland, 17 U.S. at 203.  Instead, necessity "frequently imports no more than that one thing is convenient, or useful, or essential to another."  M'Culloch v. Maryland, 17 U.S. at 203.  In more recent years, the Supreme Court has translated M'Culloch v. Maryland's necessity analysis into modern vocabulary such that "a particular federal statue" is constitutionally necessary if it "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  United States v. Comstock, 560 U.S. at 134 (2010).  See

Sabri v. United States, 541 U.S. 600, 605 (2004)(referring to this necessity relationship as "means-ends rationality").[23]

_____

[23]When the Supreme Court speaks precisely, it cleaves close to the Necessary and Proper Clause's text, and requires legislation to be necessary "for carrying into execution" Congress' enumerated powers, U.S. Const. art. I, § 8, cl. 18, as opposed to being necessary for achieving the public policy goals that Congress pursues by exercising its enumerated powers, see Sebelius, 567 U.S. at 560 (opinion of Roberts, C.J.)("Each of our prior cases upholding laws under [the Necessary and Proper] Clause involved exercises of authority derivative of, and in service to, a granted power."); id. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("The lesson of these cases is that the Commerce Clause, even when supplemented by the Necessary and Proper Clause, is not *carte blanche* for doing whatever will help achieve the ends Congress seeks by the regulation of commerce."). For example, in Sabri v. United States, Justice Souter carefully articulates the connection between Congress' Spending Clause power, see U.S. Const. art. I, § 8, cl. 1, and a statute that makes it a federal crime to bribe state, local, or tribal officials if the state, locality, or tribe receives federal funds:

> Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars. Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity. Section 666(a)(2) addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars.

Sabri v. United States, 541 U.S. at 605 (citations omitted). The Supreme Court has not, however, always been careful to restrict its analysis to Necessary and Proper Clause legislation's relationship to Congress' enumerated powers -- and not its relationship to Congress' public policy goals. As an illustration, in United States v. Kebodeaux, 570 U.S. 387 (2013), Justice Breyer quickly outlines the source of Congress' power to impose registration requirements on military sex offenders:

> [U]nder the authority granted to it by the Military Regulation and Necessary and Proper Clauses, Congress could promulgate the Uniform Code of Military Justice. It could specify that the sex offense of which Kebodeaux was convicted was a military crime under that Code. It could punish that crime through imprisonment and by placing conditions upon Kebodeaux's release. And it could make the civil registration requirement at issue here a consequence of Kebodeaux's offense and conviction.

United States v. Kebodeaux, 570 U.S. at 395 (Breyer, J.). Justice Breyer follows that analysis with a long discussion regarding how "registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety

Propriety, unlike necessity, has largely escaped judicial scrutiny.  See Gary Lawson & Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267, 287 (1993)("The word 'proper' has generally been treated as a constitutional nullity or, at best, as a redundancy.").  In recent years, however, the Supreme Court has begun to take seriously the notion that laws -- no matter how necessary -- are improper if they

_____

concerns."  United States v. Kebodeaux, 570 U.S. at 395.  As Chief Justice Roberts recognized, that discussion regarding "the general public safety benefits of the registration requirement" is entirely "beside the point."  United States v. Kebodeaux, 570 U.S. at 399 (Roberts, C.J., concurring in judgment).  In the Chief Justice's view, it was enough to say that

> [t]he Constitution gives Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces."  And, under the Necessary and Proper Clause, Congress can give those rules force by imposing consequences on members of the military who disobey them.  A servicemember will be less likely to violate a relevant military regulation if he knows that, having done so, he will be required to register as a sex offender years into the future.

United States v. Kebodeaux, 570 U.S. at 400 (Roberts, C.J., concurring in judgment)(alteration in the original)(citations omitted)(quoting U.S. Const. art. I, § 8, cl. 14).  See id., 570 U.S. at 400 ("The majority says, more or less, the same thing.").  According to the Chief Justice, the public policy "consequences of the registration requirement are irrelevant for our purposes," because

> [p]ublic safety benefits are neither necessary nor sufficient to a proper exercise of the power to regulate the military.  What matters -- all that matters -- is that Congress could have rationally determined that "mak[ing] the civil registration requirement at issue here a consequence of Kebodeaux's offense" would give force to the Uniform Code of Military Justice adopted pursuant to Congress's power to regulate the Armed Forces.
>
> Ordinarily such surplusage might not warrant a separate writing.  Here, however, I worry that incautious readers will think they have found in the majority opinion something they would not find in either the Constitution or any prior decision of ours: a federal police power.

United States v. Kebodeaux, 570 U.S. at 401-02 (Roberts, C.J., concurring in judgment)(second alteration in the original)(citation omitted)(quoting United States v. Kebodeaux, 570 U.S. at 395 (Breyer, J.)).  Chief Justice Roberts' analysis persuades the Court that Justice Breyer's discussion regarding public safety is a non sequitur, and not an indication that Congress can enact legislation under the Necessary and Proper Clause just because that legislation furthers public safety or some other worthy policy goal.

undermine the nation's constitutional structure. See Printz v. United States, 521 U.S. 898 (1997)(concluding that a law carrying the Commerce Clause into execution is not proper, for Necessary and Proper Clause purposes, if it "violates the principles of state sovereignty" that various other constitutional provisions reflect); Sebelius, 567 U.S. at 559 (opinion of Roberts, C.J.)(declaring that "laws that undermine our structure of government established by the Constitution" are not a proper means for carrying Congress' enumerated powers into execution); id. 567 U.S. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[T]he scope of the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of the States but also when it violates the background principle of enumerated (and hence limited) federal power."). Laws that undermine constitutional structures do not "consist with the . . . spirit of the constitution," so Congress' Necessary and Proper Clause power does not permit it to adopt such laws. M'Culloch v. Maryland, 17 U.S. (4 Wheat) at 421.

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. at 59. In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They

> are testimonial when the circumstances objectively indicate that there is no such
> ongoing emergency, and that the primary purpose of the interrogation is to establish
> or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 748 F.3d 1024, 1048 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of a sworn affidavit by a forensic chemist, who testified in the affidavit that the substance which police seized from the defendant was cocaine of a certain amount, violated the Confrontation Clause.  See Melendez-Diaz v. Massachusetts, 557 U.S. at 307.  The Supreme Court first found that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and because, under Massachusetts law, the sole purpose of the affidavit was to provide prima facie evidence of the content of the substance seized. Melendez-Diaz v. Massachusetts, 557 U.S. at 310.  The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement
> that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner
> did not know what tests the analysts performed, whether those tests were routine,

and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed. While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs[.]" At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

Melendez-Diaz v. Massachusetts, 557 U.S. at 320 (citation omitted). Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause. See Melendez-Diaz v. Massachusetts, 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error."). The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011). See id. at 661("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz v. Massachusetts, 557 U.S. at 319-23 n.6)).

The importance of the Confrontation Clause's application is further delineated by the Supreme Court's consideration of the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face, which -- except in rare cases -- will violate a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness. See United States v. Sandoval, No. 04-2362 JB, 2006 WL 1228953, *7-9 (D.N.M. March 7, 2006)(Browning, J.). In Maryland v.

Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant.  See Maryland v. Craig, 497 U.S. at 860.  While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  Maryland v. Craig, 497 U.S. at 845.[24]

The Supreme Court in Maryland v. Craig recognized that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings."  Maryland v. Craig, 497 U.S. at 846.  The Supreme Court in Maryland v. Craig also acknowledged the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent person," Maryland v. Craig, 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

---

[24]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Crawford v. Washington, 541 U.S. at 61.

The Supreme Court explained in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case." Maryland v. Craig, 497 U.S. at 849 (internal quotation marks omitted). The Supreme Court emphasized that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Maryland v. Craig, 497 U.S. at 850.

While the issue is decidedly less clear, it is unlikely that a violation of a defendant's Confrontation Clause rights occurs when the defendant calls one of his or her own witnesses who is aligned with him or her by videoconference or telephonically. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). The need for "adversariness" is not present when the witness is aligned with the defendant. Maryland v. Craig, 497 U.S. at 845. The Supreme Court spoke in Crawford v. Washington about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant. Crawford v. Washington, 541 U.S. at 58. The Federal Rules of Evidence, for example, generally do not permit a party to ask a witness aligned with the party calling the witness leading questions  -- a key tool of cross examination. See Fed. R. Evid.

611(c).[25]   A defendant might also waive a Confrontation Clause challenge by calling his own witness by videoconference or telephonically.  See United States v. Lopez-Medina, 596 F.3d 716, 730-734 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule.").

Like many constitutional rights, a defendant may choose to waive his Confrontation Clause rights.  In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty.  See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit has recognized that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial.  See United States v. Lopez-Medina, 596 F.3d at 730-734 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit stated: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule."  United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy."

---

[25]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.     Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  Fed. R. Evid. 611(c) (bold in original).

Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999). The Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting one of its witnesses' videotaped deposition. See Earhart v. Konteh, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition. In Bailey, we held that a criminal defendant waived his right to confrontation by entering into a quid pro quo agreement with a state prosecutor. Id. at 657. The petitioner in Bailey had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance. Id. Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape. Id.

Earhart v. Konteh, 589 F.3d at 344. Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court. See United States v. Lopez-Medina, 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson."). See United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 400727, *17 (D.N.M. Jan. 23, 2012)(Browning, J.).

## LAW REGARDING COCONSPIRATOR STATEMENTS

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay evidence usually is not admissible. See Fed. R. Evid. 802. Some out-of-court statements, however, are not hearsay even when they are offered for proof of the matter asserted. See Fed. R. Evid. 801(d). Statements that are "offered against an opposing party" and were "made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay. Fed. R. Evid. 801(d)(2)(E).

To admit out-of-court statements by coconspirators under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051 JB, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)). The Court may consider the statements themselves, as well as independent evidence, to determine whether the conspiracy existed. See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy."). While the statement itself "does not by itself establish . . . the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), "there need only be some independent evidence linking the defendant to the conspiracy." United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotations and citations omitted). This "independent evidence may be sufficient even when it is not 'substantial.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal citation omitted). The Tenth Circuit has noted: "We have defined independent evidence as evidence other than the proffered coconspirator statements themselves." United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks and alterations omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1451 (10th Cir. 1987)).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948))("With the conspiracy thus fully established, the declarations and acts of the various

members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.")). Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy. See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(holding one who joins and participates in a conspiracy "adopt[s] the previous acts and declarations of his fellow co-conspirators").

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a hearing "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994). A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'" United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995)). The Tenth Circuit affords trial courts this flexibility, because it recognizes that it is not always practical for the United States to demonstrate that a conspiracy existed before admitting specific evidence at trial. See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

In United States v. Vigil, the Court did not hold a James hearing, because the defendant's first trial ended in a hung jury, and the Court concluded that the evidence that the Honorable James

A. Parker, Senior United States District Judge for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony."  2006 WL 4109681, at *4.  Vigil was charged, among other charges, with being a member of a conspiracy to commit RICO violation, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial.  See 2006 WL 4109681, at *1.  The Court noted that it had previously found, in deciding Vigil's rule 29 motion for acquittal, that "'a reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy.'"  2006 WL 4109681, at *4 (citing United States v. Vigil,  No. CR 05-2051 JB, Memorandum Opinion, filed Aug. 7, 2006 (Doc. 268)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Garcia, an alleged coconspirator, "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the SLOM contract from Everage."  2006 WL 4109681, at *4 (internal quotation marks and citations omitted).  The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence."  2006 WL 4109681, at *5.  The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial co-conspirator statements made in furtherance of the conspiracy charged."  2006 WL 4109681, at *6.

## LAW REGARDING CODEFENDANT STATEMENTS

In <u>Bruton v. United States</u>, the Supreme Court held that, in a multiple-defendant trial, admitting a non-testifying defendant's confession that implicates a codefendant violates the Confrontation Clause even if the court instructs the jury to only use the confession against the defendant who made it.  <u>See</u> 391 U.S. at 128-29.  George Bruton and William Evans were jointly tried for robbery, and, upon his arrest, Evans gave a confession to a postal inspector in which he admitted that he and Bruton had committed the robbery.  <u>See</u> <u>Bruton v. United States</u>, 391 U.S. at 124.  At trial, the prosecution was allowed to introduce Evans' confession, and the trial court -- perhaps recognizing that this evidence might pose a problem -- gave a limiting instruction charging the jury that it was not to consider Evans' confession "in any respect to the defendant Bruton." <u>Bruton v. United States,</u> 391 U.S. at 125.  Both Bruton and Evans were convicted, but the Supreme Court held that the trial court erroneously admitted Evans' confession implicating Bruton and that the court's limiting instruction did not cure the error.  <u>See</u> 391 U.S. at 128-29.  The Supreme Court observed: "If it were true that the jury disregarded the reference to the codefendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor."  319 U.S. at 126.  <u>See</u> <u>id.</u> at 128 n.3 ("We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence, . . . the problem arising only because the statement was . . . admissible against the declarant.").  The Supreme Court discounted that possibility, because

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.  Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect

. . . . The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36. The Supreme Court also stated:

If it is a denial of due process to rely on a jury's presumed ability to disregard an involuntary confession, it may also be a denial of due process to rely on a jury's presumed ability to disregard a codefendant's confession implicating another defendant when it is determining that defendant's guilt or innocence.

391 U.S. at 130-31. Ultimately, the Supreme Court determined: (i) there is a substantial risk that, if a defendant's confession implicates codefendants, the jury will use that confession against the codefendants notwithstanding a limiting instruction to the contrary; and (ii) that substantial risk means a defendant's confession implicating codefendants is inadmissible unless the defendant who made the confession is subject to cross-examination. See 391 U.S. at 137.

The Supreme Court elaborated on its Bruton v. United States decision in Richardson v. Marsh, 481 U.S. 200 (1987). See 481 U.S. at 202. Marsh and Williams were tried jointly, and Williams did not testify. See 481 U.S. at 202, 204. The prosecution introduced evidence of Williams' confession, which implicated both Williams and Marsh. See 481 U.S. at 203-04. The trial court redacted the confession to remove references to Marsh, and "omitted all indication that anyone other than [a third party] and Williams participated in the crime." 481 U.S. at 203. The trial court also instructed the jury not to use Williams' confession against Marsh. See 481 U.S. at 204. The Supreme Court concluded that the trial court properly admitted Williams' redacted confession, because, vis-à-vis Marsh, the redacted confession "was not incriminating on its face." 481 U.S. at 208. The Supreme Court explained that, because it did not implicate Marsh, Williams' confession fell "outside the narrow exception we created" in Bruton v. United States, to the general rule that "a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."

481 U.S. at 206, 208.

In Gray v. Maryland, 523 U.S. 185 (1998), Anthony Bell and Kevin Gray were tried jointly for murder. See 523 U.S. at 188. After Bell was arrested, Bell confessed, and, in his confession, he said that Gray and a third person were also responsible for the victim's death. See Gray v. Maryland, 523 U.S. at 188. At Bell and Gray's joint trial, the court admitted a redacted version of Bell's confession into evidence. See 523 U.S. at 188. The detective who testified about Bell's confession said "deleted" or "deletion" whenever the name of Gray or the third participant appeared. 523 U.S. at 188. Immediately thereafter, however, the detective testified that the police arrested Gray only upon Bell's confession. See 523 U.S. at 189. The prosecution introduced a written copy of Bell's confession Gray's and the third person's names replaced with blank spaces separated by commas. See 523 U.S. at 189. The trial court instructed the jury that Bell's confession could not be used as evidence against Gray. See 523 U.S. at 189.

The Supreme Court acknowledged that, in Richardson v. Marsh, it had, indeed, held that the admission of co-defendant confessions that are redacted to remove any reference to the existence of the other defendants will not violate Bruton v. United States. See Gray v. Maryland, 523 U.S. at 190-91. The Supreme Court noted, however, that, unlike the redacted confession in Richardson v. Marsh, the confession in Gray v. Maryland referenced the existence of the non-confessing defendant, because the government merely replaced Gray's name with the word "deleted" or a blank space. Gray v. Maryland, 523 U.S. at 192. The Supreme Court concluded that a redaction which replaced a defendant's name with an obvious indication of deletion falls within Bruton v. United States' purview, because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton [v. United States*'] unredacted statements that, in our

- 177 -

view, the law must require the same result." Gray v. Maryland, 523 U.S. at 189.

Six years after Gray v. Maryland, Crawford v. Washington upended the Supreme Court's Confrontation Clause jurisprudence. See Crawford v. Washington, 541 U.S. at 36. In Crawford v. Washington, the Supreme Court held that that the Confrontation Clause prohibits testimonial hearsay's introduction against a criminal defendant if the hearsay declarant does not testify at trial, unless: (i) the declarant is unavailable for trial; and (ii) the defendant had an opportunity to cross-examine the declarant before trial. See 541 U.S. at 59-61. Crawford v. Washington held that the Confrontation Clause is violated only when testimonial hearsay is admitted against a defendant and the defendant is not given the opportunity to cross-examine the declarant. See U.S. at 59-61. Crawford v. Washington does not, however, indicate how courts should determine whether a particular statement is testimonial; it instead noted that "various formulations," "articulations," or "definitions" of "testimonial" could be posited, and identified statements that would qualify as testimonial under any definition, but it specifically declined to define the term "testimonial." 541 U.S. at 51-53, 68. After Crawford v. Washington, the Supreme Court indicated "statements made unwittingly to a Government informant and statements from one prisoner to another" are clearly nontestimonial. Davis v. Washington, 547 U.S. at 825.

The Supreme Court's decision in Crawford v. Washington undermines Bruton v. United States, because it indicates that introducing a non-testifying defendant's confession and using that confession against a codefendant does not offend the Confrontation Clause so long as the confession is nontestimonial. See 541 U.S. at 59-61. See also United States v. Clark, 717 F.3d 790, 816 (10th Cir. 2013)(concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*."); United States v. Dale, 614 F.3d 942, 956 (8th Cir. 2010)(holding that defendant's statements to prisoner were not testimonial and

that their admission, therefore, did not violate a codefendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010)(holding that defendant's recorded telephone statements to his mother were non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because Bruton v. United States is based on the Confrontation Clause, then it also only applies to testimonial statements, and any non-testimonial statement is not subject to it); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008)(unpublished)("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Courts deem hearsay generally unreliable and untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross examination quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein

& Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence").  The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination.  See Weinstein's Federal Evidence § 802.02[2][a], at 802-5.  Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination, see, e.g., United States v. Console, 13 F.3d at 656; it is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable, see Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.

"'[T]estimony is not hearsay when it is offered to prove only that a statement was made and not the truth of the statement.'"  Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., 2013 WL 311846, at *19 (original alterations omitted)(quoting Creaghe v. Iowa Home Mut. Cas. Co., 323 F.2d 981, 984 (10th Cir. 1963)).  Statements offered not to prove the truth of the statements, but rather "offered for the effect on the listener . . . are generally not hearsay." Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993).  See United States v. Smalls, 605 F.3d at 785 n.18 ("[S]tatements offered for their effect on the listener are not hearsay.").  Thus, "[l]egally operative statements -- statements [that] have legal effect by the mere fact of their statement -- are generally not for the 'truth of the matter asserted,' but rather to show the fact of the statement being made and for the effect of the statement on the hearer."  Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., 2013 WL 311846, at *19 (original alterations omitted)(internal quotation marks omitted)(quoting Barner v. City of Harvey, No. 95 C 3316, 1998 WL 664951, at *2 (N.D. Ill. Sept. 18, 1998)(Coar, J.)).

In Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., the plaintiffs objected to the defendants' use of documents relating to third parties' bankruptcy proceedings, asserting that the

statements that the defendants wished to use were inadmissible hearsay statements. See 2013 WL 311846, at *19. The defendants asserted, however, that they intended to offer the bankruptcy proceedings to show that the plaintiffs had notice of the third parties' bankruptcy filings and did not assert claims against the third parties in the third parties' bankruptcy proceedings; the defendants were also offering the proceedings, including settlement stipulations, to show that the plaintiffs failed to mitigate their damages. See 2013 WL 311846, at *19. The Court concluded that, to the extent that the defendants were offering the documents to show that the plaintiffs had notice of the third parties' bankruptcy filings, the defendants were offering the statements for the non-hearsay purpose "to show the effect that the documents had upon the listener -- or in this case, the reader." 2013 WL 311846, at *19. The Court additionally concluded:

> [T]o the extent that [the defendants] are offering the documents to show that the parties to this action reached a legally binding agreement to discharge any claims against the [the third parties] that they might have for less than the full amount of money owed to them by the [third parties], the statements are not being offered for the truth of the matter asserted, but rather as evidence of the legal effect of the agreement, the statements are "legally operative statements" and are thus not hearsay.

2013 WL 311846, at *19 (citing Barner v. City of Harvey, 1998 WL 664951, at *2).

"Hearsay within hearsay" is admissible only "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting, after concluding that rule 803(8) provides an exception for law enforcement reports, that a hearsay issue remains regarding the statements within the reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(stating that witness statements in police reports, to which rule 803(8) applies, may be admissible under hearsay exclusions other than rule 803(8)); Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31,

2012)(Browning, J.)(excluding medical records, which themselves were inadmissible hearsay, although the statements within the medical records were opposing party statements). A statement that is otherwise hearsay, however, may be admissible for a purpose, such as impeachment, other than to prove the truth of the matter asserted. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Likewise, "'[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.'" Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001)(quoting Fed. R. Evid. 801 advisory committee's note). Statements in the latter category include verbal acts --

> "statement[s] offered to prove the words themselves because of their legal effect (e.g., the terms of a will)." Black's Law Dictionary (10th ed. 2014). "A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992). *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010).

Farley v. Stacy, No. 14-CV-0008-JHP-PJC, 2015 WL 3866836, at *5 (N.D. Okla. June 23, 2015)(Payne, J.), aff'd, 645 F. App'x 684 (10th Cir. 2016)(unpublished). See Earhart v. Konteh, 589 F.3d at 344. Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court. See United States v. Lopez-Medina, 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

## LAW REGARDING THE ADEQUACY OF THE JURY INSTRUCTIONS

The standard of review on appeal for timely challenges to a jury instruction is de novo, and the Tenth Circuit reviews the instructions "to determine whether, considering the instructions as a

whole, the jury was misled." United States v. Winchell, 129 F.3d 1093, 1096 (10th Cir. 1997)(citing United States v. Smith, 13 F.3d at 1424). The Tenth Circuit has stated that it will reverse the decision only where there is substantial doubt the jury was fairly guided:

> If, as a whole, the instructions correctly state the law and provide the jury with an "intelligent, meaningful understanding of the applicable issues and standards," we will not reverse. *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994). In other words, reversal is not appropriate unless we have "substantial doubt that the jury was fairly guided." *United States v. Mullins*, 4 F.3d 898, 900 (10th Cir. 1993).

United States v. Winchell, 129 F.3d at 1096. In United States v. Winchell, the Tenth Circuit instructed that, rather than provide juries with a separate instruction about specific intent, the Tenth Circuit prefers instructions that inform juries of the mens rea element for the particular offense and define each element clearly and accurately:

> [A]s we have previously noted, "instructing in terms of 'specific intent' has been disfavored by the courts because of the confusing and ambiguous nature of such an instruction." *Laughlin*, 26 F.3d at 1527 (citing *Liparota v. United States*, 471 U.S. 419, 433 n. 16 . . . (1985)). Instead, we have endorsed instructions which adequately "apprise the jury of the mens rea element of the offense," *id.* at 1527, and which "define each element of the offense clearly and accurately." *Id.* at 1528.

United States v. Winchell, 129 F.3d at 1096-97. "Even when the district court fails to include an element of the crime in the instruction (including a mens rea element), we still apply the harmless error rule." United States v. Sorensen, 801 F.3d 1217, 1229 (10th Cir. 2015).

Although "[a] defendant charged with a specific-intent, federal criminal tax offense can negate the element of willfulness necessary to prove the violation, thereby providing a defense to the conduct charged, if the defendant establishes that he or she sought in good faith to comply with the relevant law," United States v. Lindsay, 184 F.3d 1138, 1140 (10th Cir. 1999)(citing Cheek v. United States, 498 U.S. at 201), "a theory of defense instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate," United States v.

Bowling, 619 F.3d 1175, 1183 (10th Cir. 2010)(quoting United States v. Williams, 403 F.3d 1188,

1195 (10th Cir. 2005)).  "While a defendant is entitled to an instruction on his theory of defense

where some evidence and the law supports the theory, such an instruction is not required if it would

'simply give the jury a clearer understanding of the issues.'"  United States v. Bowling, 619 F.3d

at 1183-84 (quoting United States v. Williams, 403 F.3d at 1195).  The Tenth Circuit has held that

a "separate good faith instruction [i]s not necessary" where an element of the crime with which

the defendant is charged, and on which the jury is instructed, " 'necessarily implies that there was

no good faith.'"  United States v. Bowling, 619 F.3d at 1184-85 (quoting United States v. Chavis,

461 F.3d 1201, 1209 n.1 (10th Cir. 2006)).  In United States v. Bowling, a jury found the defendant

guilty of bank fraud, a specific intent crime, and the Tenth Circuit initially reversed the defendant's

conviction and remanded for a new trial, because the judge failed to include a separate good-faith

defense instruction.  See United States v. Bowling, 343 F. App'x 359, 364-67 (10th Cir.

2009)(unpublished).  The Tenth Circuit reasoned that, while a theory-of-defense instruction is

usually required only if the instructions otherwise are erroneous or inadequate, "[i]n fraud cases ...

we treat a defendant's request for a good faith instruction with some differences.  A 'defendant is

entitled to a good faith instruction when he has interposed the defense of good faith, has requested

the instruction, and when there is sufficient evidence to support it.'"  United States v. Bowling,

343 F. App'x at 364-65 (quoting United States v. Overholt, 307 F.3d 1231, 1247 (10th Cir. 2002)).

The United States then filed a petition for rehearing en banc, asking the Tenth Circuit to review its

holding in United States v. Hopkins, 744 F.2d 716 (10th Cir. 1984), which requires an additional

good-faith defense instruction if sufficient evidence supports the good-faith defense.  The Tenth

Circuit, sitting by panel, but circulating the opinion to all active members of the Tenth Circuit,

granted the United States' request and overturned United States v. Hopkins.  See United States v.

Bowling, 2009 WL 6854970, at *1 n.* (10th Cir. Dec. 23, 2009). In United States v. Bowling, the

Tenth Circuit explained its reasoning for departing from its decision in United States v. Hopkins

requiring a separate good-faith defense instruction in bank fraud cases:

> [W]ith the unanimous concurrence of all our active judges, [ ] our prior decision in *United States v. Hopkins*, 744 F.2d 716 (10th Cir. 1984)(en banc) is overruled for two reasons. First, in the twenty-five years since we issued Hopkins, every one of our sister circuits has come to reject the idea that district courts must give a separate "good faith" jury instruction in fraud cases. As they have explained, and we agree, a separate good faith instruction is not necessary "because a finding of the intent to defraud . . . necessarily implies that there was no good faith." *United States v. Chavis*, 461 F.3d 1201, 1209 n.1 (10th Cir. 2006)(cataloguing the views of every other circuit). Second, while we indicated in Hopkins that failure to give a good faith instruction was per se reversible error, the Supreme Court has since explained that a "trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." *Mitchell v. Esparza*, 540 U.S. 12, 16 . . . (2003)(per curiam); *See also Neder v. United States*, 527 U.S. 1, 9 . . . (1999)("[A]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."); Fed. R. Crim. P. 52(a).

United States v. Bowling, 2009 WL 6854970, at *1 n.*. The Tenth Circuit's holding in United

States v. Bowling, 619 F.3d at 1175, in which it concluded that the instructions provided the jury

as to the defendant's charge of bank fraud did not require an additional, separate good-faith defense

instruction, was the Tenth Circuit's first application of this new position in bank fraud cases.

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the

proffered evidence's probative value against its potential for unfair prejudice. See United States

v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially

outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly

prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. at 180-81. In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." Old Chief v. United States, 519 U.S. at 182.

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognized that the rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice

is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.  Jencks v. United States, 353 U.S. at 671.  Congress later codified the Jencks v. United States into 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

(a)    In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b)    After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**     a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**     a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**     a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d at 1086.  At least one district court within the Tenth Circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act.  United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense."  530 F. Supp. 2d at 1266.  Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500.  530 F. Supp. 2d at 1267.  See United States v. Cooper, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the

Jencks Act); <u>United States v. Jackson</u>, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  <u>See United States v. Smaldone</u>, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); <u>United States v. Harry</u>, 2013 WL 684671, at *10.  To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry."  <u>United States v. Smith</u>, 984 F.2d at 1086 (quoting <u>Ogden v. United States</u>, 303 F.2d 724, 733 (9th Cir. 1962)).  <u>See United States v. Burton</u>, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. Jan. 26, 2015)(Browning, J.).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  <u>See United States v. Smith</u>, 984 F.2d at 1086.  For example, in <u>United States v. Smith</u>, the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a statement of a witness existed that may be producible under the Jencks Act when a government witness testified during the United States' case in chief that she had been interviewed by a government agent before testifying, and the defense counsel moved for production of the notes.  <u>See United States v. Smith</u>, 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  <u>See United States v. Smith</u>, 984 F.2d at 1086.

## LAW REGARDING RULE 608 EVIDENCE

"Rule 608 of the Federal Rules of Evidence provides certain mechanisms for attacking witnesses' character for truthfulness or untruthfulness." Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 5476882, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.). See United States v. Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 3834061, at *7 (D.N.M. Aug. 12, 2010)(Browning, J.)(same). In the criminal context, the Tenth Circuit has stated that "'defense counsel should ordinarily be given wide latitude when cross examining a witness about credibility or bias.'" United States v. Rosario Fuentes, 231 F.3d 700, 704 (10th Cir. 2000)(alteration omitted)(quoting United States v. DeSoto, 950 F.2d 626, 629 (10th Cir. 1991)). Nevertheless, "[o]ne key aspect of this rule is that its application is explicitly within the discretion of the district court." Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1114 (10th Cir. 2001). See United States v. Rosario Fuentes, 231 F.3d at 704 (10th Cir. 2000)("The trial court . . . retains discretion to reasonably limit cross-examination.")(internal quotations omitted)(quoting United States v. DeSoto, 950 F.3d at 629).

Rule 608(a) states:

A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a). The truthfulness or untruthfulness of a witness may be attacked by opinion or reputation evidence without proffering evidence of a good character for truthfulness. See United States v. Holt, 486 F.3d 997, 1002 (7th Cir. 2007)(noting that, while it is within the trial court's discretion to prohibit cross-examination of a police officer as to whether he had been suspended to call into question his credibility, the plaintiff "could have used Rule 608(a) and called a member

of the department to testify directly about his opinions or reputation of [the credibility of the officer]"). To establish a proper foundation for the opinion or reputation testimony, a witness must show: "such acquaintance with the person under attack, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." United States v. Ruiz-Castro, 92 F.3d 1519, 1529 (10th Cir. 1996), overruled on other grounds by, United States v. Flowers, 464 F.3d 1127 (10th Cir. 2006)(quoting United States v. Bedonie, 913 F.2d 782, 802 (10th Cir. 1990)).

> Rule 608(b) provides the rule for admission of specific instances of conduct:
>
> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> > **(1)** the witness; or
> >
> > **(2)** another witness whose character the witness being cross-examined has testified about.

Fed. R. Evid. 608(b) (bold in original). "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness." United States v. Beltran-Garcia, 338 F. App'x 765, 770 (10th Cir. 2009)(unpublished). "Though Rule 608 does not explicitly specify how the trial court should exercise its discretion, the discretion must be exercised within the ambit of the other rules of evidence, including Rules 401, 402, and 403, which address the relevance and probative value of possible evidence." United States v. Beltran-Garcia, 338 F. App'x at 770. The United States Court of Appeals for the District of Columbia Circuit has noted:

> Although 608(b) of the Federal Rules of Evidence does state that specific instances of misconduct may be admissible to impeach a witness, that rule does not require or imply that every negative bit of evidence existing concerning a witness may be dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d 1102, 1106 (D.C. Cir. 1993).

Rule 608 was amended in 2003 "to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness," and not "to bar extrinsic evidence for bias, competency and contradiction impeachment." Fed. R. Evid. 608 advisory committee's note to 2003 amendment. The rule precluding the

> admission of extrinsic evidence of specific instances of conduct of the witness when offered for the purpose of attacking credibility . . . does not apply, however, when extrinsic evidence is used to show that a statement made by a defendant on direct examination is false, even if the statement is about a collateral issue.

United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(citing 27 Charles A. Wright & Victor J. Gold, Fed. Practice and Procedure: Evidence § 5096, at 546-47 (1990)). This doctrine, "known as 'specific contradiction,'" allows such impeachment "even if the evidence elicited . . . ordinarily might be collateral or otherwise inadmissible." United States v. Crockett, 435 F.3d 1305, 1313 (10th Cir. 2006). See United States v. Cerno, 529 F.3d 926, 944 (10th Cir. 2008)("If there is evidence that specifically contradicts a witness's testimony, impeachment evidence is admissible to demonstrate that the witness lacks credibility and has a propensity for lying.").[26]

---

[26]Professors Charles Alan Wright and Victor James Gold recognize that, before the 2003 amendment, the "greater weight of authority" held that "Rule 608 regulates only the admissibility of character evidence and that subdivision (b) should not be read literally." 28 Charles A. Wright & Victor J. Gold, Fed. Practice and Procedure § 6117, at 86 (1993 & Supp. 2011). Professors Wright and Gold confirm that, as a result of the 2003 amendment, rule 608(b) "has been amended to make clear that it applies only to extrinsic evidence of conduct offered for the purpose of proving character for truthfulness or untruthfulness." 28 Wright & Gold, supra § 6117, at 14 (supp. 2011).

It is generally true that "a party may inquire into specific instances of conduct by extrinsic evidence only on cross-examination of a witness in challenging the truthfulness of his testimony." See Bennet v. Longacre, 774 F.2d 1024, 1027 (10th Cir. 1985).  Where a party has already attacked a witness' credibility by cross-examination on specific instances of conduct and the witness made a false statement on the stand, however, the party may provide extrinsic evidence to impeach that witness on re-direct or during a later direct examination.  See United States v. Embry, 452 F. App'x 826, 835 (10th Cir. 2011)(unpublished)(noting that "Rule 608(b)(1) . . . allows impeachment testimony . . . on direct or redirect examination . . . where a party already has attacked the credibility of a witness by referring to specific instances of conduct").  When a witness makes a false statement while providing testimony, the opposing party is allowed to prove that lie by presenting rebuttal witnesses.  See United States v. Crockett, 435 F.3d at 1313 ("[W]hen a defendant makes a false statement during direct testimony, the prosecution is allowed to prove, either through cross-examination or by rebuttal witnesses, that the defendant lied as to that fact.").

It is "permissible impeachment to expose a witness's bias."  United States v. Baldridge, 559 F.3d 1126, 1135 (10th Cir. 2009)(citing United States v. Abel, 469 U.S. 45, 51 (1984)).  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  United States v. Abel, 469 U.S. at 52.  Thus, because bias is never collateral, "it is permissible to [prove bias] by extrinsic evidence."  Montoya v. City of Albuquerque, No. CIV 03-0261 JB/RHS, 2004 WL 3426435, at *4 (D.N.M. May 18, 2004)(Browning, J.).  The Tenth Circuit describes bias, based on its definition at common law, as "the relationship between a

witness and a party which might cause the witness to slant his testimony for or against the party."

United States v. Baldridge, 559 U.S. F.3d at 1135 (citing United States v. Abel, 469 U.S. at 52).[27]

## ANALYSIS

The Court concludes that: (i) a rational factfinder could find J. Gallegos, Troup, and A. Gallegos guilty beyond a reasonable doubt, because the three Defendants had a fair trial and no miscarriage of justice occurred; (ii) combining Counts 1-5 and 13-16 did not unfairly prejudice J. Gallegos, Troup, B. Garcia, and A. Gallegos, because the Court took measures to minimize spillover prejudice, and the Court properly severed the case into two trials under rules 8 and 14 of the Federal Rules of Criminal Procedure; (iii) VICAR does not violate the Commerce Clause, because the statute punishes crimes committed to further the purposes of an enterprise engaged in interstate commerce; (iv) the Court has subject-matter jurisdiction, because VICAR contains a jurisdictional element, and the United States satisfied this element by offering evidence of the enterprise's effect on interstate commerce; (v) the admission of Jaramillo's testimony did not prejudice unfairly J. Gallegos, Troup, and B. Garcia, because the three Defendants do not show how they would have prepared differently had Jaramillo been included on the United States'

---

[27]Prejudice is defined as "[a] preconceived judgment formed with little or no factual basis; a strong bias." Black's Law Dictionary 1229 (B. Garner ed., 9th ed. 2009). See New Oxford American Dictionary 1378 (3d ed. 2010) ("[P]reconceived opinion that is not based on reason or actual experiences . . . dislike, hostility. . . ."). Bias is defined as: "Inclination; prejudice; predilection." Black's Law Dictionary, supra, at 183. Although bias and prejudice in contemporary discourse may be used interchangeably, with courts and lawyers both asserting that one has bias for something and bias against, they historically have been and are often distinguished by saying that there may be "bias or prejudice." E.g., Nev. Comm'n on Ethics v. Carrigan, 564 U.S. 117, 123-24 (2011)(quoting 28 U.S.C. § 144, which makes "any 'personal bias or prejudice' a basis for recusal"). Bias is associated more with an informed reason for favoring a person and prejudice with an uninformed hostility toward a class of persons. Bias now appears to be all inclusive, covering prejudice, too, and prejudice covers bias if the preposition "for" follows. The terms have thus apparently lost any distinction.

Pretrial Witness List, and the United States did not act in bad faith; (vi) the Court's admission of A. Sutton's and Ramirez' testimonies did not violate J. Gallegos' and A. Gallegos' rights under the Confrontation Clause, because A. Sutton's testimony does not contain hearsay, J. Gallegos' statements in Ramirez' testimony were not testimonial, and Bruton v. United States, does not apply to non-testimonial statements; (vii) the jury instructions do not contain plain errors, because the Court had justification for each challenged jury instruction, nearly all of which mirror the United States Court of Appeals for the Tenth Circuit's pattern jury instructions; and (viii) the destruction of records of Acee's and Lucero's telephone calls and text messages does not entitle B. Garcia to a judgment of acquittal or a new trial, because Acee destroyed the records according to the FBI's policies, and the United States did not suppress the records in bad faith.  Accordingly, the Court denies the B. Garcia Motion, the Gallegos Joint Motion, the A. Gallegos Motion, the J. Gallegos Motion, the Troup NTM, the A. Garcia Motion, and the requests in the A. Gallegos Supplement.

I.    **J. GALLEGOS, A. GALLEGOS, AND TROUP ARE NOT ENTITLED TO A JUDGMENT OF ACQUITTAL OR A NEW TRIAL, BECAUSE A REASONABLE JURY COULD FIND J. GALLEGOS AND A. GALLEGOS GUILTY BEYOND A REASONABLE DOUBT, AND BECAUSE THEIR GUILTY VERDICTS ARE NOT AGAINST THE WEIGHT OF THE EVIDENCE.**

J. Gallegos, Troup, and A. Gallegos assert that their convictions rest on the testimony of cooperating witnesses who expect benefits in return for their testimony and whose testimony lacks credibility.  See Gallegos Joint Motion at 3; Dec. 18 Tr. at 13:10-14:12 (Burke).  J. Gallegos and A. Gallegos further assert that there is insufficient evidence to support their convictions for Counts 4 and 5.  See Gallegos Joint Motion at 2.  In deciding a motion for a judgment of acquittal, the Court cannot assess witness credibility or weigh the evidence.  See Burks v. United States, 437 U.S. at 16.  The Court therefore examines the evidence in the light most favorable to the United States to determine whether a reasonable jury could find J. Gallegos and A. Gallegos -- who argue

that the Court should grant them a new trial for Counts 4 and 5, see Gallegos Joint Motion at 4 -- guilty beyond a reasonable doubt, see United States v. McKissick, 204 F.3d at 1289 (quoting United States v. Hanzlicek, 187 F.3d at 1228).  In contrast, when courts decide motions for a new trial, courts "'may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'"  United States v. Thomas, 2016 WL 9819560, at *8 (alteration added by United States v. Thomas)(quoting United States v. Evans, 42 F.3d at 593).  Troup argues that the Court should grant a new trial, because the United States' witnesses were not credible.  See Dec. 18 Tr. at 13:10-14:12 (Burke).  The Court therefore must determine whether Troup's guilty verdicts are against the weight of the evidence.  After carefully reviewing this case's record, the Court concludes that a reasonable jury could find J. Gallegos and A. Gallegos guilty of Counts 4, and 5, and that Troup's guilty verdicts for Counts 1 and 3 are not against the weight of the evidence.  The Court addresses J. Gallegos and A. Gallegos' arguments together, and then addresses Troup's arguments.

> **A.    A REASONABLE JURY COULD, BASED ONLY ON THE EVIDENCE ADMISSIBLE AGAINST J. GALLEGOS AND A. GALLEGOS AT TRIAL AND WITHOUT SPECULATION OR UNREASONABLE INFERENCES, FIND J. GALLEGOS AND A. GALLEGOS GUILTY OF CONSPIRING TO MURDER AND MURDERING BURNS.**

J. Gallegos and A. Gallegos argue that, as to Counts 4 and 5,[28] acquittal is appropriate, because "the evidence was insufficient to sustain a conviction under VICAR" without any evidence that J. Gallegos and A. Gallegos entered into an agreement with SNM to commit murder. Gallegos Joint Motion at 2.  They aver that the United States produced no evidence to show that

---

[28] J. Gallegos does not argue that there is insufficient evidence to convict him of murdering Castillo (Count 1).  See J. Gallegos Motion at 1-3; Gallegos Joint Motion at 1-6.

the "members of the SNM hierarchy approved or even knew that" J. Gallegos and A. Gallegos were going to murder A. Burns. Gallegos Joint Motion at 3. Moreover, J. Gallegos and A. Gallegos argue that the United States did not present sufficient evidence that SNM's goals were "furthered by the murder, or that either men [sic] committed the murder to gain status in the organization." A. Gallegos Motion at 5. According to them, "the jury could have just as easily concluded that the murder was the result of a drug deal gone bad or an argument over money." A. Gallegos Motion at 6.

The United States counters that "there was sufficient evidence to sustain a VICAR conviction." Gallegos Joint Motion Response at 4. The United States reasons that, according to SNM rules, J. Gallegos and A. Gallegos did not need SNM members' approval to murder Burns. See Gallegos Joint Motion Response at 5. The United States further argues that J. Gallegos and A. Gallegos were following SNM rules for how to respond to disrespect when they murdered Burns. See Gallegos Joint Motion Response at 6. The United States also presents J. Gallegos' and A. Gallegos' admissions that they were at Burns' house the night of his murder as further evidence of the VICAR violation. See Gallegos Joint Motion Response at 6-7.

Supreme Court precedent forbids the Court from reassessing the credibility of witnesses in the context of a motion for acquittal. See Burks v. United States, 437 U.S. at 16. The jury has evaluated the credibility of these witnesses, and the Court defers to their evaluation. See United States v. Brown, 50 F. App'x 970, 977 (10th Cir. 2002)(unpublished)(concluding that the trial court had applied the incorrect standard of review when it substituted its judgment of witness' credibility instead of relying on the jury's judgment). Courts must "rely on the jury, as the fact finder, 'to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented,'" United States v. Radcliff, 331 F.3d at 1157-58 (quoting United States v. McKissick,

204 F.3d at 1289-90), and "must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason,'" Messer v. Roberts, 74 F.3d at 1013 (quoting Grubbs v. Hannigan, 982 F.2d at 1487).  Entry of a judgment of acquittal is thus "confined to cases where the prosecution's failure is clear."  Burks v. United States, 437 U.S. at 17.

    The Court concludes that there is sufficient evidence for a reasonable jury to find J. Gallegos and A. Gallegos guilty and to convict them.  See Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)(finding the sufficiency standard to obligate the court to "accept the jury's resolution of the evidence as long as it is within the bounds of reason"); United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir. 1999)(holding that the evidence necessary to support a verdict "need not negate all possibilities except guilt").  For example, the jury could reasonably conclude that Burns disrespected J. Gallegos.  See Transcript of Excerpt of Testimony of Amber Sutton at 91:23-92:2 (taken April 27, 2018)(Torraco, A. Sutton), filed November 30, 2018 (Doc. 2456)("A. Sutton Tr.")(testifying that Burns called J. Gallegos a "bitch"); Transcript of Excerpt of Testimony of Morgan Ramirez at 28:7-8 (taken April 30, 2018), filed May 23, 2018 (Ramirez)(Doc. 2305)("Ramirez Tr.")(testifying that J. Gallegos said he shot Burns, "[b]ecause motherfuckers with big mouths, that's what happened").  Moreover, the jury could reasonably conclude that J. Gallegos and A. Gallegos were following SNM's rules by killing Burns, because it is not uncommon for SNM members to injure or kill individuals who disrespect SNM or its members.  See Transcript of Excerpt of Testimony of Mario Rodriguez at 38:21-25 (taken April 16, 2018, and April 17, 2018)(M. Rodriguez), filed May 9, 2018 (Doc. 2235)("M. Rodriguez Tr.")("If someone disrespects the SNM or one individual from the SNM, they disrespect the whole ride.  You have to take them out, you have to stab them, you have to represent the SNM to the fullest."); Transcript of Excerpt of Testimony of Jake Armijo at 106:8-11 (taken April 26, 2018,

and April 27, 2018)(Castle, Armijo), filed May 16, 2018 (Doc. 2284)("Armijo Tr.")(testifying that he "often" responds to "disrespect[]" by "inflict[ing] violence on people"); Transcript of Excerpt of Testimony of Frederico Munoz at 221:6-8 (taken May 8, 2018, and May 9, 2018)(F. Munoz), filed June 1, 2018 (Doc. 2321)("F. Munoz Tr.")(testifying that, when an SNM member is disrespected, he must respond "by checking them, hurting them, and in some cases killing them"); B. Cordova Tr. at 10:5-6 (B. Cordova)(testifying that SNM members respond to disrespect by committing "assault or murder. The intent is to try to kill the person if they disrespect you"). There was also evidence that J. Gallegos and A. Gallegos were SNM members. See M. Rodriguez Tr. at 150:5-7 (Armijo, M. Rodriguez); id. at 151:17-19 (Armijo, M. Rodriguez); Clark Tr. at 66:5-17 (Clark); Transcript of Excerpt of Testimony of Lawrence Torres at 55:24-56:1 (Armijo, Torres)(taken April 24, 2018, and April 25, 2018), filed May 16, 2018 (Doc. 2283)("Torres Tr."); Transcript of Excerpt of Testimony of Paul Rivera at 17:24-18:1 (Rivera)(taken May 3, 2018), filed May 23, 2018 (Doc. 2306)("Rivera Tr."); id. at 32:15-33:1 (Castellano, Rivera); B. Cordova Tr. at 44:11-14 (Castellano, B. Cordova); id. at 62:24-63:2 (Castellano, B. Cordova); Transcript of Excerpt of Testimony of Jose Gomez at 4:25-8:21 (Armijo, Gomez, Court, Benjamin)(taken May 2, 2018, and May 3, 2018), filed May 16, 2018 (Doc. 2287)("Gomez Tr.").

Aside from the testimony that Burns disrespected J. Gallegos, and that SNM members injure or kill people who disrespect SNM or its members, the jury could reasonably conclude that J. Gallegos and A. Gallegos killed Burns based on their admissions, respectively, to Ramirez and B. Cordova. Ramirez testified that J. Gallegos told her that "they shot" Burns, but the bullet "got stopped . . . by the bone in his ear." Ramirez Tr. at 25:18-21 (Ramirez). Ramirez also testified that she once asked J. Gallegos about a room in his house that "used to creep [her] out a lot" and that J. Gallegos responded: "Don't worry. No one has actually died in here. Someone may have

got shot in here, but they didn't die." Ramirez Tr. at 26:5-9 (Ramirez). Because of J. Gallegos'
admissions to Ramirez, a jury could reasonably conclude that J. Gallegos had confessed to killing
Burns. Similarly, B. Cordova testified that, when he was facing a pending murder trial,
A. Gallegos told him: "Don't plead out; fight it. Look at us. We got charged for Adrian Burns
and were released a few months later. . . . Even though we did it, we got off." B. Cordova Tr.
at 57:1-13 (Castellano, Cordova, Court). B. Cordova also testified that A. Gallegos told him that
"[t]hey shot him, bound him, and burned him up." B. Cordova Tr. at 58:5-7 (Castellano, Cordova).
B. Cordova added that he understands "they" to refer to J. Gallegos and A. Gallegos. B. Cordova
Tr. at 58:8-13 (Castellano, Cordova). Because of A. Gallegos' admissions to B. Cordova, a jury
could reasonably conclude that A. Gallegos had confessed to killing Burns. There was, therefore,
sufficient evidence, when viewed in the light most favorable to the United States, for a reasonable
jury to infer guilt and convict J. Gallegos and A. Gallegos.

### B. A REASONABLE JURY COULD, BASED ONLY ON THE EVIDENCE ADMISSIBLE AGAINST TROUP AT TRIAL AND WITHOUT SPECULATION OR UNREASONABLE INFERENCES, FIND TROUP GUILTY OF MURDERING CASTILLO AND F. SANCHEZ.

Troup argues that the "question of the possible guilt of the government's cooperating
witnesses was central to the credibility determinations the jury was required to make in this case,"
which was "built largely on the testimony of cooperating witnesses, many of whom were named
defendants." Troup NTM at 12-13. Troup asserts that he has been "victimized by one of the most
pernicious features of modern prosecutions: The Government's use of informants who are seeking
benefits." Dec. 18 Tr. at 13:24-14:2 (Burke). Troup contends that the United States' witnesses
are not credible and that a new trial is warranted, because the United States "can provide
inducements to informants if they make statements that are consistent with the theory selected by

the prosecution." Dec. 18 Tr. at 14:2-5 (Burke). The United States does not respond directly to Troup's arguments.

Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States v. Quintanilla, 193 F.3d at 1146. "The Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" United States v. Thomas, 2016 WL 9819560, at *8 (alteration added by United States v. Thomas)(quoting United States v. Evans, 42 F.3d at 593). "The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." United States v. Guzman-Martinez, 2004 WL 7338099, at *1.

The Court concludes that there is sufficient evidence to support Troup's guilty verdicts for murdering Castillo and F. Sanchez, and that the cooperating witnesses who testified against Troup are credible. For example, several cooperating witnesses testified that Troup participated in Castillo's murder. See Transcript of Excerpt of Testimony of Michael Jaramillo at 174:11 (taken May 14, 2018), filed May 23, 2016 (Doc. 2316)("Jaramillo Tr.")(Jaramillo)(testifying that Troup participated in Castillo's murder by serving as "lookout"); Lujan Tr. at 83:23-84:12 (testifying that, although Troup volunteered to help with Castillo's murder, Lujan did not trust Troup and thus did not want Troup's help); Transcript of Excerpt of Testimony of Benjamin Clark at 63:4-6 (taken May 4, 2018), filed May 23, 2018 (Doc. 2307)("Clark Tr.")(Clark)(testifying that Troup told him that he closed Castillo's cell door when several other SNM members killed Castillo); Torres Tr. at 34:17 (Torres)(testifying that he saw Troup "holding the door" to Castillo's cell when Castillo

was murdered).  Several cooperating witnesses also testified that Troup participated in F. Sanchez'
murder.  See B. Cordova Tr. at 36:11-13 (B. Cordova)(testifying that Troup told him that he killed
F. Sanchez, because Brian Rascon and Raymond Rascon, two other SNM members, "were taking
too long to handle business on Fred Dawg [F. Sanchez], so him and another brother took it upon
themselves and assassinated him"); Clark Tr. at 57:13-25 (Clark)(explaining how Troup and
Alonso killed F. Sanchez).

    The cooperating witnesses who testified against Troup were credible.  As Troup
emphasizes, many of the cooperating witnesses are also named Defendants in the case who pled
guilty.  See Troup NTM at 12.  The Tenth Circuit has noted, however, that a "guilty plea does not
automatically make a witness incredible."  United States v. Dewberry, 790 F.3d 1022, 1029 (10th
Cir. 2015)(rejecting an argument that "the witnesses testified out of self-interest because they were
offered plea deals," because "this is common in criminal prosecutions and does not necessarily
render testimony incredible," and stating that the Tenth Circuit implies the same in United States
v. Whitney, 229 F.3d 1296, 1306 (10th Cir. 2000)).  Here, the cooperating witnesses' plea
agreements and Kastigar letters draw their credibility into question, but they do not automatically
render incredible the witnesses' testimony.  In United States v. Baca -- another case in which
former SNM members testified against another SNM member -- the Court noted that the
cooperating witnesses "took considerable risk in testifying.  Throughout the trial, the
SNM-member witnesses testified that, for the SNM, cooperating with law enforcement opens a
door to . . . kill the cooperator."  United States v. Baca, No. CR 16-1613 JB, 2019 WL 4596661,
at *44 (D.N.M. April 26, 2019)(Browning, J.).

    The same reasoning applies in this case.  See M. Armijo Tr. at 13:8-11 (Castellano,
Armijo)(testifying that, if a person "ratted or cooperated with law enforcement," SNM members

"either stabbed, assaulted, or killed" the cooperator); Lujan Tr. at 12:18-19 (Lujan)(testifying that "the biggest [rule] is what I'm doing right now, is: You don't snitch."); id. at 12:22-23 (Lujan)(testifying that, if an SNM member cooperates with law enforcement, the SNM member is "either going to get stabbed or get killed"). Moreover, Torres testified that he is "risking my life, probably my family," by testifying against SNM members. Torres Tr. at 102:1-2 (Torres). Similarly, B. Cordova testified that he is "an FBI informant, rat, so due to prison politics, prison gangs, I'm considered the worst." B. Cordova Tr. at 210:3-15 (Cordova). He added that he was "raised to be a gangster. My family despises what I'm doing here today [by testifying]." B. Cordova Tr. at 285:13-15 (Cordova). The Court concludes that the cooperating witnesses who testified at trial were credible. See United States v. Baca, 2019 WL 4596661, at *44 ("These cooperators were motivated to avoid further contact with the SNM, and not to jeopardize their sentencing reductions and the protection that the United States promised by lying."). Accordingly, the Court determines that the verdict is not "against the weight of the evidence" and that the cooperating witnesses' credibility does not require a new trial in the interest of justice. United States v. Guzman-Martinez, 2004 WL 7338099, at *1.

## II.     COMBINING COUNTS 1-5 AND 13-16 IN ONE TRIAL DID NOT PREJUDICE J. GALLEGOS, TROUP, B. GARCIA, AND A. GALLEGOS.

J. Gallegos, Troup, B. Garcia, and A. Gallegos argue that trying Counts 1-5 and 13-16 in a single trial prejudiced them by weakening their defense arguments. See Troup NTM at 20; A. Gallegos Motion at 9. Troup argues in the Troup NTM, which B. Garcia joins, that trying Counts 1 and 3, with Counts 4 and 5, deprived him of a fair trial, and that the Court should have severed further the case. See Troup NTM at 20. Troup asserts that his "presumption of innocence dissipated," because Counts 1-3 were joined together with Counts 4-5, which allege the Burns

homicide.  Troup NTM at 21.    According to Troup, "[t]he defendants in Counts 1-3 tried vigorously to get away from the grisly Adrian Burns homicide which was more heinous, and more recent in time, than the old prison homicides set forth in Counts 1-3."  Troup NTM at 21.  As a result, Troup argues, the "vulgar nature of the Adrian Burns murder . . . crept into the trial of the 2001 and 2007 homicides."  Troup NTM at 21.  At the December 18, 2018, hearing, Troup argued that the combined trial forced him to "defend against the Adrian Burns homicide" and thus the jury had to see photographs of Burns' "burned body" at his trial, even though the murder "was not of the same type" as Castillo's murder.  Dec. 18 Tr. at 23:23-24:3 (Burke).  According to Troup, there "should have been smaller trials."  Dec. 18 Tr. at 23:19-20 (Burke).

A. Gallegos similarly argues in the A. Gallegos Motion, which J. Gallegos joins, that the Court should grant a new trial in which Counts 4-5 are severed from the other charges, because the co-Defendants' defenses were "antagonistic" with his own defense.  A. Gallegos Motion at 9.  According to A. Gallegos, his defense strategy was the "polar opposite" of B. Garcia's and Patterson's defense strategies.  A. Gallegos Motion at 11-12 (citing United States v. Carpentier, 689 F.2d at 27-28).  A. Gallegos asserts in the A. Gallegos Supplement, which J. Gallegos also joins, that testimony about F. Gallegos and J. Gallegos -- both brothers of A. Gallegos -- is "highly prejudicial," because the jury may imply "guilt by association" and find that A. Gallegos is a "violent gang member" because his brothers are SNM members.  A. Gallegos Supplement at 8 (citing Uphaus v. Wyman, 360 U.S. at 79; Mercer v. United States, 724 A.2d at 1185).  A. Gallegos also argues that the United States introduced a "multitude of violent gang evidence" at trial "that had no direct link" to him.  A. Gallegos Supplement at 7.  A. Gallegos notes that he was not tried for crimes committed inside a prison and that the introduction of evidence involving SNM activity inside prisons thus was "highly prejudicial."  A. Gallegos Supplement at 7.

The United States counters that trying Counts 1-5 and 13-16 together in one trial did not prejudice the Defendants.  See Troup NTM Response at 9.  The United States notes that the Court "already considered and granted a partial severance of the case" by separating the Defendants into two trial groups.  Troup NTM Response at 10 (citing Severance MOO at 3, 2017 WL 3054511, at *1).  The United States contends that the Court, in its Severance MOO, "concluded that the 'risk of spillover prejudice does not warrant severance of any individual counts in this case.'" A. Gallegos Motion Response at 13-14 (quoting Severance MOO at 193, 2017 WL 3054511, at *111).  See Troup NTM Response at 10.  The United States asserts that the Court implemented "numerous safeguards and redactions," such as changing pronouns "to eliminate references to a named Defendant."  A. Gallegos Motion Response at 14 (citing Severance MOO at 188, 2017 WL 3054511, at *108).  See A. Gallegos Supplement Response at 5.  The United States urges the Court again to reject J. Gallegos, Troup, B. Garcia, and A. Gallegos' severance arguments.  See Troup NTM Response at 10; A. Gallegos Motion Response at 14; A. Gallegos Supplement Response at 5; Dec. 18 Tr. at 63:1-19 (Castellano).

The Court concludes that it adequately severed the case into two trials.  Rule 8 of the Federal Rules of Criminal Procedure states that offenses may be joined together in an indictment if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Moreover, defendants may be joined together in an indictment if they "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  In the Severance MOO, the Court determined that rule 8 authorizes joinder of the offenses and the Defendants, because "the joined offenses are 'connected with or constitute parts of a common scheme or plan' under rule 8(a)," Severance MOO at 166,

2017 WL 3054511, at *97 (citing Fed. R. Crim. P. 8(a)), and because "the Defendants 'are alleged to have participated in the same act or transactions constituting an offense or offenses,' namely violent crimes in aid of a racketeering enterprise," Severance MOO at 167, 2017 WL 3054511, at *97 (citing Fed. R. Crim. P. 8(b)).

Although the Court held that the Second Superseding Indictment does not misjoin the offenses or the Defendants, the Court decided to divide the case into two trials by severing Counts 6-12 from Counts 1-5 and 13-16.  See Severance MOO at 162, 2017 WL 3054511, at *96.  Under rule 14 of the Federal Rules of Criminal Procedure, if joinder "appears to prejudice a defendant or the government," a "court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  In the Severance MOO, the Court also noted that, despite

> "the general presumption favoring joinder, some form of severance is necessary because of the physical limitations of the courtroom and hardship on the jurors, the defendants, and the Court.  Severance, however, should be of the most limited form necessary to satisfy those interests, because the Court finds that joinder of defendants, to the extent possible, will preserve judicial resources and permit the jury to have as complete a view of the evidence as possible."

Severance MOO at 169, 2017 WL 3054511, at *99 (quoting United States v. Gray, 173 F. Supp. 2d 1, 10 (D.D.C. 2001)(Lamberth, J.)).  The Court concluded that a joint trial of nineteen Defendants would "prevent the jury from making a reliable judgment."  Severance MOO at 172, 2017 WL 3054511, at *100.  The Court also held that the "most logical, efficient, and manageable way to try this case is to sever . . . Counts 6-12 from Counts 1-5 and 13-16."  Severance MOO at 177, 2017 WL 3054511, at *103.

The Court determines that the interests of justice do not require a new trial for J. Gallegos, Troup, B. Garcia, or A. Gallegos, because combining Counts 1-5 and 13-16 did not unfairly

prejudice the Defendants.  As noted above, under rule 33, the district court has discretion to grant a new trial if the interests of justice require one.  See Fed. R. Crim. P. 33(a).  See also United States v. Quintanilla, 193 F.3d at 1146.  "A motion for a new trial is not," however, "regarded with favor and should only be granted with great caution."  United States v. Sinclair, 109 F.3d at 1531 (citing United States v. Chatman, 994 F.2d at 1518).  The Court first addresses A. Gallegos' arguments, which J. Gallegos joins, and then addresses Troup's arguments, which B. Garcia joins.

The Court concludes that none of A. Gallegos' arguments is persuasive enough to merit a new, separate trial.  A. Gallegos argues that his trial should have been severed, because (i) Ramirez' testimony that J. Gallegos confessed to killing Burns implicated A. Gallegos and thus prejudiced him, see A. Gallegos Motion at 17-18; (ii) the jurors were "unable to disregard irrelevant or questionable testimony" that B. Cordova, who testified that A. Gallegos confessed to helping kill Burns, provided, A. Gallegos Motion at 20; and (iii) the "[t]he overwhelming volume of [enterprise] evidence . . . exceeded the scope and became highly prejudicial," A. Gallegos Motion at 20.  As discussed above, the Court determines that the cooperating witnesses were credible.  Many of the cooperating witnesses risked their safety and their family's safety by testifying.  For instance, Torres testified that he is "risking my life, probably my family," by testifying against SNM members.  Torres Tr. at 102:1-2 (Torres).  Moreover, some cooperating witnesses jeopardized their relationships with their friends and families by testifying.  B. Cordova testified that he is "an FBI informant, rat, so due to prison politics, prison gangs, I'm considered the worst."  B. Cordova Tr. at 210:3-15 (Cordova).  He added that he was "raised to be a gangster.  My family despises what I'm doing here today [by testifying]."  B. Cordova Tr. at 285:13-15 (Cordova).

Throughout the trial, the Court gave many limiting instructions to reduce spillover prejudice. During the Court's statement of the case before the trial began, the Court explained to the jury the limiting instructions' purpose:

> The Court also has what we call limiting instructions. And limiting instructions are instructions that will be given that primarily arise because there are so many people on the left side of the room. So there may be some evidence that the Government believes and the Court determines is admissible against one defendant -- Mr. Troup, Mr. Garcia, Mr. Gallegos -- but not admissible against another.
>
> That's not always easy to do, to build up that tent, that wall, so that there is no spillover. But the Court, again, will give you that instruction.

Transcript of Jury Trial at 25:4-15 (Court)(held on April 11, 2018), filed July 25, 2018 (Doc. 2356)("April 11 Tr.").

The Court gave several limiting instructions during Ramirez' testimony to reduce the likelihood that her testimony would prejudice A. Gallegos. When Ramirez testified, A. Gallegos requested that the Court give a "limiting instruction" for portions of Ramirez' testimony that do not relate to him. Ramirez Tr. at 7:4-6 (Torraco). The Court responded:

> I think everything comes in against Joe Gallegos. I think some or all of these are probably going to come in against Andrew, statements against interests made by Mr. Joe Gallegos. . . . [T]here might be a statement or two that are not against interests that I still think probably should come in against Mr. Joe Gallegos. And if you decide you want the limiting instruction on one or two of those statements -- but I think a large part of his statements are going to be against interests. So I'll dissect, make sure that if you want a ruling, I'll tell you which it is.

Ramirez Tr. 7:7-25 (Court, Torraco). Nevertheless, the Court gave several limiting instructions throughout Ramirez' testimony. For example, the Court gave a limiting instruction[29] upon

---

[29]The Court gave the following instruction: "I'm going to instruct on that last statement that Ms. Ramirez made that that's admissible only against Mr. Joe Gallegos, but you may not

A. Gallegos' request when Ramirez testified that she was in a room in J. Gallegos' house and J. Gallegos told her: "Don't worry.  No one has actually died in here.  Someone may have got shot in here, but they didn't die."  Ramirez Tr. at 26:5-9 (Ramirez).  The Court gave a limiting instruction[30] upon A. Gallegos' request when Ramirez testified that J. Gallegos told her that, after he killed Burns, he "rolled up the carpet" in one of his house's rooms with "Jason['s]" help. Ramirez Tr. at 28:22-30:1 (Ramirez, Beck).  The Court also gave a limiting instruction[31] upon A. Gallegos' request when Ramirez testified that, soon after J. Gallegos told her about rolling up the carpet in his house, J. Gallegos told her that "he was unsure if he -- what to do; that if he had to tie off loose ends, because -- well, apparently, Jason was loose ends."  Ramirez Tr. at 31:20-22 (Ramirez).  During B. Cordova's testimony, the Court also considered several limiting instructions that J. Gallegos requested.  The Court explained that, for "statements that are against interest," it would not give limiting instructions.  B. Cordova Tr. at 51:17-18 (Court).  Although A. Gallegos now argues that much of B. Cordova's testimony was "irrelevant," A. Gallegos Motion at 20, A. Gallegos never objected to any of B. Cordova's testimony based on relevance, see generally B. Cordova Tr.  The Court struck some of B. Cordova's statements, however, because they were

---

consider it in any way in your deliberation of the charges against Andrew Gallegos."  Ramirez Tr. at 26:15-20 (Court).

[30]The Court gave the following instruction: "This statement can only be used against Joe Gallegos.  It cannot be used against any of the other defendants in the courtroom."  Ramirez Tr. at 29:8-11 (Court).

[31]The Court gave the following instruction: "I will, though, give a limiting instruction as to anything that Mr. Joe Gallegos told Ms. Ramirez about tying up loose ends.  Anything along those lines, you can only use that against Mr. Joe Gallegos.  You cannot use it against any other defendants in the courtroom."  Ramirez Tr. at 32:18-23 (Court).

"nonresponsive to the question."[32]   B. Cordova Tr. at 194:10 (Court).  The only Defendant to object to testimony based on relevance was A. Garcia, who once objected to the United States' questioning on the basis that the United States was eliciting "irrelevant" testimony.  B. Cordova Tr. at 288:6 (Blackburn).   A. Gallegos does not argue with particularity how B. Cordova's testimony otherwise prejudiced him.

The Court concludes that Ramirez' and B. Cordova's testimonies were not so prejudicial that the interests of justice require a new trial.  The Court acknowledges that prejudice "always exists when more than one defendant or offense are tried together."  United States v. Gould, 2007 WL 1302587, at *2.  This case is no exception.  The Court is cognizant, however, of rule 8(b)'s import and Congress' choice to incriminate VICAR conduct in the manner that it has chosen.  J. Gallegos and A. Gallegos have not demonstrated, however, that joinder in this case violated their constitutional fair trial rights, or "prevent[ed] the jury from making a reliable judgment about guilt or innocence."  Zafiro v. United States, 506 U.S. at 539.  Moreover, both the Supreme Court and the Tenth Circuit routinely have rejected defendants' complaints of prejudicial spillover where limiting instructions may minimize the risk of undue prejudice, see Zafiro v. United States, 506 U.S. at 539 (limiting instructions often will suffice to cure any risk of prejudice); United States v. Jones, 530 F.3d 1292, 1303 (10th Cir. 2008)(establishing that mere allegations that evidence against one defendant would have a "spillover effect" against another defendant does not demonstrate prejudice (internal quotations omitted); United States v. Lane, 883 F.2d 1484, 1498

---

[32]For example, when B. Garcia asked B. Cordova about SNM's rule that members of a rival gang should be killed, B. Cordova responded that "those rules were made by your client, Wild Bill Garcia."  B. Cordova Tr. at 194:5-6 (Cooper).  The Court then stated: "I'll strike.  It's nonresponsive to the question.  The jury will not consider that additional response."  B. Cordova Tr. at 194:9-11 (Court).

(10th Cir. 1989)("As a general rule, we presume that juries follow [limiting] instructions.")).  Here, the Court thoughtfully considered each of J. Gallegos' and A. Gallegos' requests for limiting instructions, and the Court gave limiting instructions when appropriate.  The Court sees no reasons why the jury did not or could not follow the Court's limiting instructions.   J. Gallegos and A. Gallegos make general assertions of spillover prejudice, but they do not show how, despite the Court's limiting instructions, joinder of their trials -- as well as joinder of the other Defendants charged in Counts 1-5 and 13-16 -- prevented the jury from being able to make a reliable judgment about their guilt or innocence.  See Zafiro v. United States, 506 U.S. at 539.  The Court concludes that J. Gallegos and A. Gallegos' mere assertions of spillover prejudice are insufficient to warrant a new trial.

The Court also concludes that the multitude of enterprise evidence did not prejudice A. Gallegos, because the United States would have to prove the existence of an enterprise by presenting much of the same evidence in a new, separate trial.  The United States notes that the Defendants would not stipulate to "the existence of the SNM enterprise and the first three [VICAR] elements."  A. Gallegos Supplement Response at 6.  Thus, the Court agrees with the United States that the United States had to prove all five VICAR elements to attain a conviction, including "that the enterprise existed."  A. Gallegos Supplement Response at 5-6.  Although A. Gallegos does not specify which evidence about the existence of an enterprise is irrelevant and prejudicial, the Court determines that the United States' enterprise evidence did not prejudice unfairly J. Gallegos and A. Gallegos.  Were the Court to grant J. Gallegos and A. Gallegos new, separate trials, the United States' evidence likely would be no different, because the "same evidence would have been admissible against all of the[] defendants even if each had been tried separately."  United States v. Diaz, 176 F.3d 52, 104 (2d Cir. 1999).  The United States still would have to prove the existence

of an enterprise by presenting evidence about SNM's nature, operations, and other activities. Accordingly, the Court concludes that the interests of justice do not warrant a new trial.

The Court also concludes that none of Troup's arguments is persuasive enough to merit a new, separate trial. Troup and B. Garcia argue that the joinder of Counts 1-3 and 4-5 prejudiced them. See Troup NTM at 21. Troup and B. Garcia were not charged in Counts 4-5, which are charges for the Burns homicide. Troup and B. Garcia assert that the "vulgar nature of the Adrian Burns murder . . . crept into the trial of the 2001 and 2007 homicides," for which Counts 1-3 bring charges. Troup NTM at 21. At the December 18, 2018, hearing, Troup argued that the combined trial forced him to "defend against the Adrian Burns homicide," and thus the jury had to see photographs of Burns' "burned body" at his trial, even though the murder "was not of the same type" as Castillo's murder. Dec. 18 Tr. at 23:23-24:3 (Burke).

The Court determines that joinder of Counts 1-3 and 4-5 did not prejudice Troup and B. Garcia such that the interests of justice require a new trial. The key witnesses who testified about the Burns homicide are Ramirez and B. Cordova, and the Court determines that both witnesses were credible. As discussed above, the Court gave several limiting instructions throughout Ramirez' and B. Cordova's testimony when they testified about the Burns homicide. See Ramirez Tr. at 26:15-20 (Court); Ramirez Tr. at 29:8-11 (Court); Ramirez Tr. at 32:18-23 (Court); B. Cordova Tr. at 194:10 (Court); B. Cordova Tr. at 194:9-11 (Court). Troup and B. Garcia also had opportunities to cross-examine and impeach B. Cordova during his testimony. See B. Cordova Tr. at 87:7-208:23 (Burke, B. Cordova, Cooper, Court, Castellano). The Court thus concludes that these safeguards minimized the risk of spillover prejudice toward Troup and B. Garcia. See Zafiro v. United States, 506 U.S. at 539 (suggesting that jury limiting instructions can effectively eliminate prejudice in a joint trial).

Troup and B. Garcia also argue that the fact that the Burns homicide was "more recent in time" prejudiced their defense against charges for homicides which occurred in 2001 and 2007. Troup NTM at 21. The Court addresses this argument in its Severance MOO, and again concludes that the remoteness of time between the crimes charged in Counts 1-3 and those charged in Counts 4-5 does not warrant severance, and therefore the interests of justice do not require new trials. In the Severance MOO, the Court reasoned:

> Troup's reliance on an assertion of spillover prejudice rooted in remoteness of time and flux regarding SNM leadership is not sufficient to warrant severance, particularly in the context of the Second Superseding Indictment's allegations regarding the inherent nature of the SNM criminal enterprise. It is not surprising that an organization -- criminal or otherwise -- changes and evolves over time, particularly as leadership changes. Organizations' cultures change. . . . The Court, further, has already severed the trial into two distinct trial groupings, alleviating a lot of Troup's concerns regarding prejudice by the jury's failure to compartmentalize. . . . The Court reiterates that these trial groupings will alleviate the burden on the jury to compartmentalize the discrete conduct that each Count charges, and, with the help of limiting instructions -- which will charge the jury to consider each Defendant in the abstract of the others -- will ensure that the jury tests the United States' case in a manner that is fair to each individual Defendant.

Severance MOO at 197, 2017 WL 3054511, at *111 (citations omitted). The Court again rejects Troup's arguments for severance. Troup and B. Garcia's arguments primarily articulate general assertions of prejudice, and they do not identify specific and compelling reasons why joinder of Counts 1-3 and 4-5 prejudice them. Moreover, Troup and B. Garcia have not demonstrated how joinder prevented the jury from making a reliable judgment about their guilt or innocence. See Zafiro v. United States, 506 U.S. at 539. Accordingly, the Court concludes that the interests of justice do not require a new trial.

### III.    VICAR DOES NOT VIOLATE THE COMMERCE CLAUSE, AND THE COURT HAS JURISDICTION.

A. Garcia argues that VICAR violates the Commerce Clause and the Court lacks jurisdiction.  See A. Garcia Motion at 1.  In the A. Garcia Motion, which J. Gallegos, Troup, and B. Garcia join, A. Garcia asks that the Court grant a judgment of acquittal for three reasons: (i) VICAR "is unconstitutional on its face with respect for violent crimes committed 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity,'" A. Garcia Motion at 1-2 (quoting 18 U.S.C. § 1959(a)); (ii) VICAR is unconstitutional as applied to A. Garcia; and (iii) the Court lacks subject-matter jurisdiction "over this case."  A. Garcia Motion at 2.  The Court addresses each argument in turn.

### A.    VICAR IS CONSTITUTIONAL ON ITS FACE.

A. Garcia asserts that Congress overstepped its authority under the Commerce Clause when it enacted VICAR.  See A. Garcia Motion at 1.  A. Garcia contends that the Commerce Clause limits Congress' power, in part, to regulating commerce "'among the several states.'"  A. Garcia Motion at 3 (quoting U.S. Const. art. I, § 8, cl. 3).  A. Garcia also asserts that Sebelius limited Congress' Commerce Clause powers, because passing legislation under the Commerce Clause requires Congress to: "(1) regulate, (2) commerce, (3) that possesses significant interstate effects." A. Garcia Motion at 3-4.  A. Garcia further argues that, under the Necessary and Proper Clause, "'[t]he powers of legislature are defined and limited.'"  A. Garcia Motion at 6 (quoting Marbury v. Madison, 1 Cranch at 176).  A. Garcia avers that, in determining whether an act of Congress is constitutional, it is "'of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause.'"    A. Garcia Motion at 8 (quoting United States v. Comstock, 560 U.S. at 153

(Kennedy, J., concurring)).  A. Garcia also emphasizes that the regulation of "'street crime'" is a task traditionally reserved to the states and not to Congress.  A. Garcia Motion at 5 (quoting Sebelius, 567 U.S. at 535-36).

The United States counters that VICAR is facially constitutional.  See A. Garcia Motion Response at 2.  The United States argues that, like in RICO caselaw, "courts have held that only a de minimis effect on interstate or foreign commerce is required in each particular case, and have rejected challenges that Section 1959 exceeds Congress' authority under the Commerce Clause." A. Garcia Motion Response at 2-3 (citing United States v. Crenshaw, 359 F.3d at 983-87; Tse v. United States, 290 F.3d at 465-66; United States v. Marino, 277 F. 3d at 34-35; United States v. Vasquez, 267 F.3d at 86-89; United States v. Riddle, 249 F.3d at 535-38; United States v. Feliciano, 223 F.3d at 117-19; United States v. Torres, 129 F.3d at 717).  According to the United States, VICAR is constitutional on its face, because it regulates conduct that has at least a de minimis effect on interstate commerce.  See A. Garcia Motion Response at 2-3.

The Commerce Clause permits Congress to regulate three categories: "First, Congress can regulate the channels of interstate commerce.  Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." Raich, 545 U.S. at 16-17 (citations omitted).  The Court's survey of Supreme Court precedent indicates that three requirements apply when Congress seeks to exercise its power "to regulate commerce . . . among the several states."  U.S. Const. art. I, § 8, cl. 3.  Congress must: (i) regulate;

(ii) commerce[33]; (iii) that possesses significant interstate effects.  See Aug. 28 MOO at 4, 2018
WL 4100949, at *2.

     First, according to Chief Justice John Marshall, the "power to regulate" an activity is the
power "to prescribe the rule by which" the activity "is to be governed."  Gibbons v. Ogden, 22
U.S. (9 Wheat) at 196.  Under that broad definition, many laws qualify as regulations, including
laws: (i) prohibiting shipment of goods made under certain labor conditions, see United States v.
Darby, 312 U.S. at 113; (ii) imposing production limitations, see Wickard v. Filburn, 317 U.S.
111; (iii) affirmatively authorizing navigation and trade, see Gibbons v. Ogden, 22 U.S. (9 Wheat)
at 212-13; (iv) proscribing racial discrimination in particular industries, see Heart of Atlanta Motel,
Inc. v. United States, 379 U.S. at 258, 261 (hotels); Katzenbach v. McClung, 379 U.S. at 304-05
(restaurants); and (v) prohibiting extortionate lending practices, Perez v. United States, 402 U.S.
at 156-57.  Second, "commerce" means "the commercial intercourse between nations, and parts of
nations, in all its branches," so commerce comprehends both "navigation" and "the admission of
vessels of one nation into the ports of the other."  Gibbons v. Ogden, 22 U.S. at 189-90.  More
recently, the Supreme Court defined "'[e]conomics'" as "'the production, distribution, and
consumption of commodities.'"  Raich, 545 U.S. at 25 (quoting Webster's Third New International
Dictionary 720 (1966)).  Third, Congress cannot use the Commerce Clause to authorize
commercial regulation regarding "the exclusively internal commerce of a State."  Gibbons v.
Ogden, 22 U.S. (9 Wheat) at 195.  "The completely internal commerce of a State" encompasses

---

[33]"[T]hus far in our nation's history, our cases have upheld Commerce Clause regulation
of intrastate activity only where that activity is economic in nature."  United States v. Morrison,
529 U.S. at 613.  Congress can reach noneconomic activity that affects interstate commerce, if at
all, by supplementing its power to regulate interstate commerce with its Necessary and Proper
Clause power "[t]o make all laws which shall be necessary and proper for carrying" other powers
"into execution."  U.S. Const. art. I, § 8, cl. 18.

only commerce that is "carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194-95. Notwithstanding those three limits, Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is "necessary and proper for carrying into execution" Congress' Commerce Clause power. U.S. Const. art. I, § 8, cl. 18. See M'Culloch v. Maryland, 17 U.S. (4 Wheat) at 421.

The Court concludes that VICAR is facially constitutional. To establish murder under VICAR, the United States must show:

(1)     that there was an enterprise engaged in racketeering activity;

(2)     that the enterprise's activities affected interstate commerce;

(3)     that the defendant committed murder; and

(4)     that the defendant, in committing murder, acted in response to payment or a promise of payment by the enterprise or "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise."

United States v. Umaña, 750 F.3d 320, 334-35 (4th Cir. 2014)(quoting 18 U.S.C. § 1959(a)(1)). In United States v. Lopez, the Supreme Court reiterated that "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." 514 U.S. at 558-59. Specifically, the Supreme Court held that Congress overstepped its Commerce Clause powers by prohibiting "'any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school.'" United States v. Lopez, 514 U.S. at 551 (quoting 18 U.S.C. 922(q)(1)(A)). The Supreme Court based its conclusion on the fact that the statute in question "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." United States

v. Lopez, 514 U.S. at 551.  In the aftermath of United States v. Lopez, however, the Courts of Appeals repeatedly have held that "Lopez did not alter the principle that where the type of activity at issue has been found by Congress to have a substantial connection with interstate commerce, the government need only prove that the individual subject transaction has a de minimis effect on interstate commerce."  United States v. Miller, 116 F.3d at 674.  See United States v. Castleberry, 116 F.3d 1384, 1386 (11th Cir. 1997), as amended (July 25, 1997).

A. Garcia's reliance on United States v. Morrison is misplaced.  In United States v. Morrison, the Supreme Court rejected the argument that § 13981 of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1941, regulated activity substantially affecting interstate commerce.  See United States v. Morrison, 529 U.S. at 611.  The Supreme Court noted that, "[l]ike the Gun-Free School Zones Act at issue in Lopez, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce."  529 U.S. at 614.  VICAR contains such a jurisdictional element, reaching only those violent crimes that are linked to the defendant's position in an enterprise engaged in racketeering that affects interstate commerce.  See 18 U.S.C. § 1959(b)(2).  Courts have repeatedly held that where a statute contains such a jurisdictional element, "the government need only show a minimal effect on interstate commerce."  United States v. Suarez, 893 F.3d 1330, 1334 (11th Cir. 2018).  See United States v. Mann, 701 F.3d 274, 275 (8th Cir. 2012).

A. Garcia argues that F. Sanchez' murder had nothing to do with SNM's economic activities, such as drug trafficking.  See A. Garcia Motion at 10-15; Indictment at 4 ("One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking.").  A. Garcia contends that "the homicide of Freddie Sanchez was purely intrastate activity, and

without any connection to drug trafficking whatsoever." A. Garcia Motion at 15. As A. Garcia asserts: "There is no factual nexus between this homicide and the drug activity of the gang. He was not a hitter (drug dealer). The murder was not about a drug debt. It was not connected to a drug dispute. His being a 'snitch' was not connected with drug[ ]trafficking activity." A. Garcia Motion at 13.

The Court disagrees with A. Garcia's argument. According to the Indictment, A. Garcia murdered F. Sanchez "for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM)" in violation of VICAR. Indictment at 10-11. In United States v. Umaña, the United States Court of Appeals for the Fourth Circuit held that VICAR is constitutional under the Commerce Clause. See United States v. Umaña, 750 F.3d at 337. The Fourth Circuit reasoned that "Congress could rationally have concluded that proscribing reputation-enhancing violence committed by members of a criminal enterprise would disrupt the interstate commerce that the enterprise itself engages in." United States v. Umaña, 750 F.3d at 337 (citing United States v. Crenshaw, 359 F.3d at 986). See United States v. Nascimento, 491 F.3d at 43. The Fourth Circuit added that "Commerce Clause analysis . . . does not focus on whether particular conduct under the statute had an impact on interstate commerce, but rather on whether the class of acts proscribed had such an impact." United States v. Umaña, 750 F.3d at 337 (internal quotations omitted)(citing United States v. Gilbert, 677 F.3d 613, 627 (4th Cir. 2012); United States v. Lopez, 514 U.S. at 558).

VICAR punishes violent crimes committed in connection to a criminal enterprise engaged in interstate racketeering activity. See 18 U.S.C. § 1959(a)-(b). Specifically, to obtain a murder in aid of racketeering under VICAR conviction, the United States must prove that the defendant committed: (i) "murder," 18 U.S.C. § 1959(a)(1); (ii) "for the purpose of gaining entrance to or

maintaining or increasing position in an enterprise engaged in racketeering activity," 18 U.S.C. § 1959(a); and (iii) for an enterprise engaged in "interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).   The second element represents VICAR's status nexus requirement -- or the connection between each Defendants' conduct and SNM's activities -- whereas the third element represents VICAR's interstate commerce nexus requirement.  The United States also satisfies the status nexus requirement by proving that the defendant committed a crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  In the Aug. 28 MOO, the Court held that VICAR is constitutional, and the Court elaborated on the statute's status nexus requirement:

> Whether VICAR is constitutional insofar as it imposes punishment for violent crimes that are committed "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity" is not at issue in this case.  18 U.S.C. § 1959(a).  If the issue were, however, the Court would conclude that the statute is constitutional in that respect.  Commerce includes exchanging goods and services, so Congress regulates commerce when it forbids particular kinds of exchanges, such as performing specific service -- committing violent crimes -- "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  Prohibiting that sort of transaction would not constitute a regulation of purely intrastate commerce, because an enterprise engaged in racketeering activities must -- by definition -- engage in interstate or foreign commerce or have activities that affect interstate or foreign commerce.  See 18 U.S.C. § 1959(b)(2).  Consequently, that prohibition is a valid exercise of Congress' Commerce Clause power, and using a criminal law to enforce valid commercial regulations is both necessary and proper.  See McCulloch v. Maryland, 17 U.S. 316 (1819)("The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, and may be exercised, whenever the sovereign has a right to act, as incidental to his constitutional powers.").

Aug. 28 MOO at 16 n.6, 2018 WL 4100949, at *6 n.6.  The Court again concludes that, to the extent that VICAR punishes crime that a defendant commits to further his or her status in a racketeering organization that affects interstate commerce, the statute is constitutional.

The Court concludes that VICAR is facially constitutional, because it punishes crimes committed to further the purposes of an enterprise engaged in interstate commerce.  See United States v. Crenshaw, 359 F.3d at 977.  Unlike the statutes in United States v. Lopez and United States v. Morrison, VICAR contains an express jurisdictional element, confining its scope to include only crimes related to racketeering enterprises that affect interstate commerce.  See 18 U.S.C. § 1959(b)(2); United States v. Torres, 129 F.3d at 717.  In United States v. Bolton, 68 F.3d 396 (10th Cir. 1995), the Tenth Circuit analyzed 18 U.S.C. 922(g), which prohibits a convicted felon from "possess[ing] in or affecting commerce, any firearm or ammunition."  18 U.S.C. 922(g).  The Tenth Circuit reasoned that, unlike 18 U.S.C. 922(q), which the Supreme Court invalidated in United States v. Lopez, 18 U.S.C. 922(g) contains a jurisdictional element that limits its scope only to actions affecting commerce.  See United States v. Bolton, 68 F.3d at 400; 18 U.S.C. 922(g).  The Tenth Circuit thus held that "[s]ection 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause.'"  United States v. Bolton, 68 F.3d at 400 (quoting United States v. Hanna, 55 F.3d 1456, 1462 n.2 (9th Cir. 1995)).  Furthermore, the Tenth Circuit has held that drug trafficking affects interstate commerce.  See United States v. Garcia, 793 F.3d 1194, 1211 (10th Cir. 2015)(rejecting the defendants' argument that drug trafficking has no effect on interstate commerce, because "drug trafficking is undoubtedly economic activity").  See United States v. Crenshaw, 359 F.3d at 977 ("It is well-established . . . that drug trafficking and other forms of organized crime have a sufficient effect on interstate commerce to allow for regulation by

Congress."). The Court determines that SNM members' "reputation-enhancing violence," such as murder and assault, generally "would disrupt the interstate commerce that [the SNM] itself engages in." United States v. Umaña, 750 F.3d at 337. See United States v. Crenshaw, 359 F.3d at 977 ("The regulation of violent acts committed as an aspect of membership in RICO enterprises therefore represents one method for Congress to exercise its power under the Commerce Clause to regulate the enterprises themselves."). The Court therefore rejects A. Garcia's argument that VICAR violates the Commerce Clause.

### B.    VICAR IS CONSTITUTIONAL AS APPLIED TO J. GALLEGOS, TROUP, B. GARCIA, AND A. GARCIA, AND THE COURT HAS SUBJECT-MATTER JURISDICTION.

A. Garcia next argues that VICAR is unconstitutional "as applied to this case with respect to violent crimes committed to enhance one's position in a racketeering enterprise." A. Garcia Motion at 16 (bold omitted). A. Garcia argues that VICAR is unconstitutional as applied to him, because the evidence at trial "regarding the murder of Freddie Sanchez" and his "involvement in it" does not have a "connection to interstate commerce." Dec. 18 Tr. at 102:22-103:1 (Davidson). A. Garcia concedes that he is not arguing that gang activity and drug trafficking do not "have an interstate commerce element." Dec. 18 Tr. at 102:20-21 (Davidson). Rather, A. Garcia asserts that the United States is "punish[ing]" him for "a local crime that has no interstate commerce nexus." Dec. 18 Tr. at 95:6-7 (Davidson). A. Garcia asserts that the United States does not dispute "the noneconomic nature of the Freddie Sanchez homicide" and "tacitly concedes that Freddie Sanchez was not involved in drug trafficking." Dec. 18 Tr. at 86:14-18 (Davidson)(citing A. Garcia Motion Response at 3-7). According to A. Garcia, the United States argues only "that the SNM itself engaged in drug trafficking, not that Freddie Sanchez did." Dec. 18 Tr. at 86:22-23 (Davidson). A. Garcia argues that, even though other SNM-related crimes, such as drug

trafficking, affect interstate commerce, the F. Sanchez murder has little or no connection to interstate commerce, and thus charging him under VICAR for the murder violates the Commerce Clause.  See A. Garcia Motion at 16-18.

A. Garcia also argues that dismissal is proper under rule 12(b)(2) of the Federal Rules of Criminal Procedure, because the Court lacks subject-matter jurisdiction over the conduct that the Second Superseding Indictment alleges in Count 3.  See A. Garcia Motion at 18.  A Garcia argues that the evidence introduced at trial "shows no more than a state crime that is already prohibited" under state law.  A. Garcia Motion at 19.  Accordingly, A. Garcia argues that "the Court lacks jurisdiction over the conduct at issue in Count 3 of the Indictment, and dismissal of Count 3 is warranted."  A. Garcia Motion at 19.  Similarly, J. Gallegos and A. Gallegos argue that the "issue of sufficiency of evidence [] is at the very heart of the inquiry concerning this Court's jurisdiction." Gallegos Joint Motion at 2.  Thus, J. Gallegos and A. Gallegos assert that the Court should have held an evidentiary hearing before the trial "to determine if the government could establish a nexus between a murder and VICAR conspiracy to commit murder as alleged in counts four (4) and five (5) of the indictment," such that the Court has jurisdiction.  Gallegos Joint Motion at 3.

The United States counters that VICAR is constitutional as applied to A. Garcia.  See A. Garcia Motion Response at 3.  The United States quotes from the Court's previous ruling and argues that "Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is 'necessary and proper for carrying into execution' Congress' Commerce Clause Power."  A. Garcia Motion Response at 3 (quoting Aug. 28 MOO at 9, 2018 WL 4100949, at *4 (quoting U.S. Const. art. I, § 8, cl. 18, and M'Culloch v. Maryland, 17 U.S. (4 Wheat) at 421)).  The United States also cites to United States v. Farnsworth, which rejected an as-applied Commerce Clause

challenge to 18 U.S.C. § 922(g), because the "'*de minimis* effect of [the defendant's] own actions on interstate commerce does not invalidate his conviction.'"   A. Garcia Motion Response at 4 (quoting United States v. Farnsworth, 92 F.3d at 1006).  The United States maintains that the Court should focus "on the enterprise" and the enterprise's effect on interstate commerce.  See Dec. 18 Tr. at 98:23-25 (Castellano).  The United States further argues that, because the SNM traffics narcotics, its activities have a "substantial effect on commerce," even though all that the caselaw requires is a de minimis effect.  Dec. 18 Tr. at 99:13 (Castellano).  According to the United States, the evidence supports that: (i) A. Garcia personally was involved in drug trafficking; (ii) SNM members traveled between states when they transferred to another state's corrections department; and (iii) SNM members sent drugs to people in other states, such as to Archuleta, "who received drugs in Tennessee from New Mexico."  Dec. 18 Tr. at 100:7 (Castellano).

As to subject-matter jurisdiction, the United States asserts that the interstate commerce requirement is an element of the crime and not a jurisdictional component, and so A. Garcia's challenge goes to the sufficiency of the United States' evidence against him rather than to the Court's jurisdiction.  See A. Garcia Motion Response at 7.  The United States argues: "Pursuant to *Riddle*, the defendant's claim 'is therefore best understood as a facial challenge to the constitutionality of § 1959 . . . and an as-applied challenge to the sufficiency of the government's evidence in the § 1959' conviction."  A. Garcia Motion Response at 7 (quoting United States v. Riddle, 249 F.3d at 536)(alterations in A. Garcia Motion Response).

A. Garcia's arguments primarily rely on the holding of one district court.  See United States v. Garcia, 68 F. Supp. 2d 802 (E.D. Mich. 1999)(Edmunds, J.).  In United States v. Garcia, Judge Edmunds held that, even though an enterprise's activities affect interstate commerce, the VICAR count -- murder in aid of racketeering -- must also have a connection to interstate commerce.  See

United States v. Garcia, 68 F. Supp. 2d at 811-12.  Judge Edmunds reasoned that VICAR lacks a "jurisdictional element which ties either the violent act or the conduct of the defendant to interstate commerce; the only jurisdictional element relates to the activities of the enterprise."  United States v. Garcia, 68 F. Supp. 2d at 811.  See United States v. Garcia, 68 F. Supp. 2d at 812 ("The act of murder . . . was a local shooting -- a despicable act, but one with no interstate connection whatsoever.").  Judge Edmunds thus concluded that "a stronger and more substantial connection or impact on interstate commerce is required" to charge a defendant with murder in aid of racketeering under VICAR.  United States v. Garcia, 68 F. Supp. 2d at 811.

The Court, like many other courts, finds United States v. Garcia unpersuasive.  See United States v. Fernandez, 388 F.3d 1199, 1250 (9th Cir. 2004); United States v. Kee, No. S1 98 CR 778(DLC), 2000 WL 863117, at *2-3 (S.D.N.Y. June 27, 2000)(Cote, J.); United States v. Mills, 378 F. Supp. 3d 563, 573 (E.D. Mich. 2019)(Goldsmith, J.); Castro v. United States, 993 F. Supp. 2d 332, 346 (E.D.N.Y. 2014)(Spatt, J.); Tse v. United States, 112 F. Supp. 2d 189, 195 (D. Mass. 2000)(Gorton, J.), aff'd in part and vacated in part on other grounds, 290 F.3d 462 (1st Cir. 2002).  Since United States v. Garcia, the Sixth Circuit has held that, "if the Government establishes a connection between the crime of violence under VICAR and RICO enterprise, and the enterprise 'has a de minimis interstate commerce connection,' then VICAR's interstate-commerce requirement is satisfied."  United States v. Mills, 378 F. Supp. 3d at 573 (quoting United States v. Riddle, 249 F.3d 529, 538 (6th Cir. 2001)).  See United States v. Mills, 378 F. Supp. 3d at 573 (concluding that, after United States v. Riddle, "[i]t is fair to say that this portion of Garcia is a dead letter").  The Court thus determines that "it is the effect on interstate commerce of the enterprise, not the violent crime itself, that must be evaluated."  United States v. Kee, 2000 WL 863117, at *2.  See United States v. Mills, 378 F. Supp. 3d at 573 ("Thus, the focus is on whether

the enterprise, not the act of violence, had a sufficient connection interstate commerce."). The

Honorable Robert W. Sweet, former United States District Judge for the Southern District of New

York, explains that

> [the defendants'] contention -- that the violent acts criminalized by Section 1959
> do not have a substantial effect on interstate commerce -- fails to recognize that
> Section 1959, like RICO, is not primarily directed at the activities of the individual
> perpetrator; instead, both Section 1959 and RICO are efforts to regulate and hinder
> enterprises engaged in racketeering activity.

United States v. Perez, 940 F. Supp. 540, 545 (S.D.N.Y. 1996)(Perez, J.). Similarly, the Honorable

M. Christina Armijo, now Senior United States District Judge for the District of New Mexico,

reasons that

> [VICAR's] interstate nexus requirement is satisfied by establishing a connection
> between the § 1959 act of violence and a RICO enterprise which has a de minimis
> interstate commerce connection. . . . The interstate-nexus requirement applies to
> the activities of the enterprise as a whole; there is no requirement that the violent
> crimes in aid of that enterprise have their own specific connection to interstate or
> foreign commerce apart from the enterprise.

United States v. Dally, No. CR 07-748 MCA, 2009 WL 10708281, at *5 (D.N.M. April 2,

2009)(Armijo, J.). The Court agrees that the United States "need not show a nexus to interstate

commerce for each predicate act underlying" a VICAR conviction. United States v. Fernandez,

338 F.3d at 1250. Accordingly, all the United States must show is: (i) a connection between SNM

and the Defendants' acts of violence; and (ii) that SNM's activities have a de minimis impact on

interstate commerce. See United States v. Dally, 2009 WL 10708281, at *5; United States v. Gray,

137 F.3d 765, 772-73 (4th Cir. 1998); United States v. Riddle, 249 F.3d at 538; United States v.

Aquart, 912 F.3d 1, 17 (2d Cir. 2018).

Because SNM's effect on interstate commerce and the connection between

A. Garcia's -- and every other Defendant's -- conduct and his status in SNM are elements that the

United States was required to prove beyond a reasonable doubt, see Court's Final Jury Instructions, Instruction Nos. 23, 25, 27, at 34, 39, 45, the Court regards A. Garcia's as-applied challenge and jurisdictional argument as going to the sufficiency of the evidence, see United States v. Crenshaw, 359 F.3d at 984 (concluding that the defendants' argument that the alleged crimes had an insufficient effect on interstate commerce was a sufficiency-of-the-evidence argument, because "the connection to interstate commerce was explicitly presented to the jury as one of the elements in the government's case"). The interstate-commerce nexus and the status nexus, "like other similar nexuses in the context of federal crimes, [have each] been called a 'jurisdictional element' but it is 'jurisdictional only in the shorthand sense that without that nexus, there can be no federal crime.'" United States v. Tony, 637 F.3d 1153, 1158-59 (10th Cir. 2011)(quoting United States v. Martin, 147 F.3d 529, 531-32 (7th Cir. 1998)). The Court concludes that, by arguing that the Court lacks subject-matter jurisdiction because of an insufficient connection to interstate commerce, A. Garcia "mistakes an essential element of the crime with a jurisdictional requirement." United States v. Tush, 287 F.3d 1294, 1297 (10th Cir. 2002). As the Tenth Circuit has explained:

> That a court may not adjudicate a criminal prosecution without subject matter jurisdiction is beyond doubt. Courts' recurring reference to the elements of a crime as "jurisdictional" to justify dismissal of an indictment which fails to allege an element, however, is misplaced. *E.g.*, *United States v. Tran*, 234 F.3d 798, 805-810 (2d Cir. 2000); *United States v. Spinner*, 180 F.3d 514, 515-17 (3d Cir. 1999). An indictment's failure to allege an element of a crime "is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, *i.e.*, a court's constitutional or statutory power to adjudicate a case . . . ." *United States v. Martin*, 147 F.3d 529, 532 (7th Cir. 1998). As Judge Easterbrook aptly explained: "Subject matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231. . . . That's the beginning and the end of the 'jurisdictional' inquiry." *Hugi v. United States*, 164 F.3d 378, 380 (7th Cir. 1999).

United States v. Prentiss, 256 F.3d 971, 982 (10th Cir. 2001).  The Court thus determines that it

has jurisdiction under 18 U.S.C. § 3231.[34]

    The Court also concludes that A. Garcia's "as applied" challenge is not a constitutional

challenge, but rather a sufficiency-of-the-evidence challenge.  United States v. Crenshaw, 539 F.3d

at 984 ("We [] note that the 'as applied' constitutional challenge raised by [the defendants] is really

---

    [34]The Court notes that, in the March 16 MOO, the Court held that it has jurisdiction over
Counts 4 and 5, and that its jurisdiction does not depend on the extent to which the Burns murder
relates to the SNM.  In the March 16 MOO, the Court addressed J. Gallegos' argument that "the
murder of Adrian Burns and the associated conspiracy, as alleged in Counts 4 and 5[,] . . . had
[nothing] to do with [SNM]. . . .  It follows, according to J. Gallegos, that the Court lacks a
'jurisdictional basis for the prosecution of Counts 4 and 5.'"  March 16 MOO at 1-2, 2018 WL
1388462, at *1.  The Court rejects this argument for the same reasons it provided in the March 16
MOO:

> [T]he Court's jurisdiction over Counts 4 and 5 does not depend on whether Burns'
> murder or the conspiracy to commit that murder was SNM related.  The Court has
> "original jurisdiction, exclusive of the courts of the States, of all offenses against
> the laws of the United States."  18 U.S.C. § 3231.  Counts 4 and 5 allege offenses
> against the United States, specifically 18 U.S.C. § 1959 ("VICAR") violations.
> Consequently, the Court has jurisdiction over Counts 4 and 5.  See United States v.
> Perea, 413 F.2d 65, 67 (10th Cir. 1969)("The indictment charged offenses against
> the United States in language similar to that of the statutes.  Subject matter
> jurisdiction was vested in the district court upon the filing of the indictment.").

>     J. Gallegos is correct, however, that the United States can prove the VICAR
> offenses that Counts 4 and 5 allege only if they introduce evidence indicating that
> Burns' murder and the conspiracy to commit that murder were either:
> (i) "consideration for the receipt of, or as consideration for a promise or agreement
> to pay, anything of pecuniary value from" the SNM; or (ii) committed "for the
> purpose of gaining entrance to or maintaining or increasing position in" the SNM.
> 18 U.S.C. § 1959.  If the United States fails to introduce such evidence at trial, then
> "a judgment of acquittal" would be appropriate, because "the evidence [would be]
> insufficient to sustain a conviction" on Counts 4 and 5, because there would be no
> evidence regarding an element of the charged offenses.  Fed. R. Crim. P. 29(a).
> Consequently, J. Gallegos' arguments about the connection, or the lack thereof,
> between the SNM, and Burns' murder and the conspiracy to commit that murder,
> go to the sufficiency of the United States' evidence and not the Court's jurisdiction.

March 16 MOO at 2-4, 2018 WL 1388462, at *2.

not a constitutional objection at all, but is a challenge to the sufficiency of the evidence supporting

the jury verdict."). See United States v. Riddle, 249 F.3d at 536 (concluding that the defendants'

"as-applied" challenges to their VICAR convictions are "challenge[s] to one of the elements of the

government's case and therefore considered a claim about the sufficiency of the evidence").

A. Garcia argues:

> The jury was [] instructed that the indictment alleged that Mr. Arturo Garcia
> "for the purpose of gaining entrance to or maintaining or increasing position in the
> Syndicato de Nuevo Mexico Gang (SNM) . . . did unlawfully, knowingly, and
> intentionally murder Freddie Sanchez, in violation of NMSA 1978, Sections 30-2-1
> and 30-1-13." [Court's Final Jury Instructions, Instruction No. 23, at 34].

> With respect to the enterprise element, the jury was instructed that "[t]he
> enterprise is 'engaged in interstate commerce' if it directly engaged in the
> distribution or acquisition of goods or services in such commerce. The enterprise's
> conduct 'affected' interstate commerce if the conduct had a demonstrated
> connection or link with such commerce." [Court's Final Jury Instructions,
> Instruction No. 25, at 39]. This element was construed broadly by the Court, which
> also instructed that the "government must prove that the enterprise engaged in
> interstate commerce or that its activities affected interstate commerce in any way,
> no matter how minimal. It is not necessary to prove that the acts of . . . Mr. Arturo
> Garcia . . . affected interstate commerce as long as the acts of the enterprise had
> such effect." Court's Final Jury Instructions, Instruction No. 27. By broadening
> the reach of this prosecution, the government and/or the Court trample on state
> power to prosecute street crime.

A. Garcia Motion at 9. According to A. Garcia, there is an insufficient connection between

F. Sanchez' murder and interstate commerce, see A. Garcia Motion at 10-11, but, as explained

above, the Commerce Clause inquiry focuses on the enterprise's effect on interstate commerce,

and not on the violent act's effect on interstate commerce, see United States v. Dally, 2009 WL

10708281, at *5. The Court disagrees with A. Garcia's contention that Jury Instruction Nos. 23,

25, and 27, see Jury Instructions (with citations), Instructions Nos. 23, 25, 27, at 33-45, "broaden[]

the reach of [the] prosecution," A. Garcia at 9, because these instructions directly map onto the

statutory elements which the United States must prove to attain a conviction, see 18 U.S.C.

§ 1959(a)-(b).  Thus, it is irrelevant whether F. Sanchez' homicide affected interstate commerce, because "there is no requirement that the violent crimes in aid of that enterprise have their own specific connection to interstate or foreign commerce apart from the enterprise." United States v. Dally, 2009 WL 10708281, at *5.  To satisfy the interstate commerce nexus, the United States must establish that SNM's activities affected interstate commerce, see 18 U.S.C. § 1959(b)(2), and to satisfy the status nexus, the United States must establish that the Defendants committed each crime in the indictment "for the purpose of gaining entrance to or maintaining or increasing position in" SNM, 18 U.S.C. § 1959(a).

The Court concludes that there is sufficient evidence connecting SNM's drug trafficking to interstate commerce.  First, A. Garcia does not argue that SNM's activities do not affect interstate commerce.  At the December 18, 2018, hearing, A. Garcia conceded that he is not arguing that gang activity and drug trafficking do not "have an interstate commerce element." Dec. 18 Tr. at 102:20-21 (Davidson).  The Court nevertheless determines that there is ample evidence that SNM and its members engage in drug trafficking.  For example, Archuleta "received drugs in Tennessee from New Mexico." Dec. 18 Tr. at 100:7 (Castellano).  See Clark Tr. at 16:11-21:14 (Clark, Beck)(discussing SNM's drug-trafficking activities).  The Court therefore concludes that SNM, which traffics drugs, is an enterprise engaged in activity affecting interstate commerce, satisfying 18 U.S.C. § 1959(b)(2).

The Court also determines that there was sufficient evidence at trial connecting SNM, and J. Gallegos', Troup's, B. Garcia's, and A. Garcia's violent acts.  VICAR punishes violent acts committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).  The Tenth Circuit has held that

the Government need only prove that the crime was committed as an integral aspect of membership in the enterprise to establish this element of a § 1959(a) offense, not that the defendant's sole or principal motive for conspiring to murder . . . was to maintain or increase his position in the enterprise in order for it to convict [the defendant] under § 1959(a).

United States v. Kamahele, 748 F.3d at 1012 (internal quotation marks and citations omitted). See United States v. Smith, 413 F.3d at 1277-78 (same). There is ample evidence that violence is an "integral aspect of [SNM] membership." United States v. Kamahele, 748 F.3d at 1012. At trial, several witnesses testified that individuals must commit violent acts -- and sometimes even murder -- to join SNM and "earn your bones" -- meaning to carry out SNM's activity to remain a member. Transcript of Excerpt of Testimony of Bryan Acee at 30:19-21 (Acee)(taken April 12, 2018, April 13, 2018, and April 16, 2018), filed May 9, 2018 (Doc. 2234)("First Acee Tr.")(testifying about the "violent acts that you would have to commit to make your bones, earn your bones" to "becom[e] a member" of SNM); M. Rodriguez Tr. at 254:4-9 (M. Rodriguez, Sindel)(confirming that M. Rodriguez murdered a person who disrespected him "on behalf of the SNM," because, "if you're disrespected, you have only one choice, and that's [] murder or serious assault"); Transcript of Excerpt of Testimony of Roy Paul Martinez at 27:22-24 (R.P Martinez)(taken April 20, 2018, and April 23, 2018), filed May 9, 2018 (Doc. 2238)("R.P. Martinez Tr.")(testifying that, "[w]henever a mission comes up and your name is called, you've got to do it"); Clark Tr. at 10:5-11 (Beck, Clark)(testifying that "[y]ou have to hurt somebody real bad . . . to become a fully respected SNM member"). Witnesses further testified that, according to SNM's rules, if an SNM member disobeys an order to kill a person, then that SNM member is likely to be killed. See Lujan Tr. at 87:8-17 (Beck, Lujan). Moreover, several witnesses testified that A. Garcia was an SNM leader who, in the past, ordered SNM members to kill people. See M. Rodriguez Tr. at 385:15-16 (M. Rodriguez)("[A. Garcia] was the

driving force on the tabla [the SNM's group of leaders]. He was a leader, SNM leader."); R.P. Martinez Tr. at 78:2-9 (R.P. Martinez, Castellano)(testifying that A. Garcia was an SNM leader); Clark Tr. at 29:1-4 (Clark)(testifying that A. Garcia ordered in 2005 that a man named John Bruner be killed, because Bruner was an "Aryan" and the SNM was "at war with these guys"); Transcript of Excerpt of Testimony of Javier Alonso at 69:10-11 (Beck, Alonso)(taken May 7, 2018), filed May 23, 2018 (Doc. 2310)("Alonso Tr.")(testifying that A. Garcia is a "high-ranking member of the SNM"). Clark also testified that, when he received "paperwork" ordering him to kill F. Sanchez, Kyle Dwyer, another SNM member, told him that A. Garcia said to "take care of this." Clark Tr. at 45:1-2 (Clark). See id. at 42:21-24 (Beck, Clark).

Evidence at trial also establishes that the SNM members were aware that F. Sanchez and Castillo had cooperated with law enforcement, and that the SNM routinely kills individuals who cooperate with law enforcement. See, e.g., Alonso Tr. at 90:4-9 (Alonso); Lujan Tr. at 78:20-21 (Lujan); R.P. Martinez Tr. at 26:13-20 (R.P. Martinez); B. Cordova Tr. at 195:1-5 (B. Cordova, Cooper). First, evidence showed that SNM members knew that F. Sanchez had been cooperating with law enforcement, which motivated SNM members to murder him. See, e.g., Alonso Tr. at 90:4-9 (Alonso). See also A. Garcia Motion at 10-11 ("The theory of the case, and the evidence at trial, was that Freddie Sanchez was murdered because he was a 'snitch,'" or a person cooperating with law enforcement). The same rationale existed for Castillo's murder. See Lujan Tr. at 78:20-21 (Lujan)(testifying that B. Garcia told him that Castillo had to be killed, because Castillo "was a rat"). Witnesses also testified that, "if you tell on people, snitch, . . . SNM had a rule that . . . you get killed." R.P. Martinez Tr. at 26:13-20 (R.P. Martinez). See id. at 26:17-20 (R.P. Martinez, Castellano)(testifying that reporting to law enforcement about an SNM member is an "unforgiven sin"); B. Cordova Tr. at 195:1-5 (B. Cordova, Cooper)(testifying that SNM kills

"snitches").  The Court thus concludes that the jury could properly find that the United States satisfied the status nexus requirement.   Based on the evidence at trial, the jury could have concluded that: (i) J. Gallegos, Troup, and B. Garcia murdered Castillo (Count 1), because Castillo cooperated with law enforcement; (ii) Troup and A. Garcia murdered F. Sanchez (Count 3), because F. Sanchez cooperated with law enforcement; and (iii) murdering individuals who cooperate with law enforcement is "an integral aspect of [SNM] membership."  United States v. Kamahele, 748 F.3d at 1012 (concluding that the "jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise *or* that he committed it in furtherance of that membership" (internal quotation marks and citations omitted)(emphasis in original)).   Accordingly, the Court concludes that VICAR is constitutional as applied to J. Gallegos, Troup, B. Garcia, and A. Garcia, and the Court has subject-matter jurisdiction.

IV.  **THE ADMISSION OF JARAMILLO'S TESTIMONY DOES NOT ENTILTE J. GALLEGOS, TROUP, AND B. GARCIA TO JUDGMENT OF ACQUITTAL OR A NEW TRIAL, BECAUSE THE COURT PROPERLY ADMITTED JARAMILLO'S TESTIMONY.**

J. Gallegos renews the Count 1 Trial Defendants' earlier oral motion asking the Court to prevent Jaramillo from testifying, because Jaramillo's "surprise testimony" caused prejudice to the Count 1 Trial Defendants.[35]  See J. Gallegos Motion at 1.  J. Gallegos argues that the Court should grant a judgment of acquittal or, in the alternative, a new trial, because Jaramillo's testimony "was admitted improperly and caused extreme prejudice to the Count 1 defendants."  J. Gallegos Motion at 1.  J. Gallegos contends that Jaramillo "was not on the Government's witness list" and that

---

[35]On April 19, 2018, the Count 1 Trial Defendants -- J. Gallegos, Troup, and B. Garcia -- orally moved the Court to prevent Jaramillo from testifying.  See Transcript of Jury Trial at 130:21-132:7 (Burke)(taken April 19, 2018), filed November 18, 2019 (Doc. 2979).

Jaramillo "was improperly influenced to testify." J. Gallegos Motion at 2. J. Gallegos argues that the admission of Jaramillo's testimony violated his due process rights. See J. Gallegos Motion at 2. J. Gallegos asserts that his own investigator interviewed Jaramillo in the summer of 2016, at which time Jaramillo professed that he "did not have any knowledge of the events" to which he would later testify at trial. J. Gallegos Motion at 2. Following trial, J. Gallegos states that he attempted "to investigate the claim that Michael Jaramillo was improperly influenced and was unable to interview him." J. Gallegos Motion at 2. See Affidavit of Charles Asbury ¶¶ 1-2, at 1-2. According to J. Gallegos, at trial, the Defendants were "unable to subpoena Michael Jaramillo as there was no trial setting when he was interviewed and denied involvement." J. Gallegos Motion at 2-3. J. Gallegos argues that the United States has "the ability to issue [an] unlimited number of Grand Jury subpoenas," and, thus, the United States, unlike the Defendants, could have compelled Jaramillo to testify. Dec. 18 Tr. at 44:13-14 (Benjamin). Even though the Court moved Jaramillo's testimony to later in the trial, J. Gallegos maintains that he did not have enough time to prepare for Jaramillo's testimony. See Dec. 18 Tr. at 51:4-17 (Benjamin). Finally, J. Gallegos requests an evidentiary hearing and "the opportunity to subpoena Michael Jaramillo." J. Gallegos Motion at 2.

Troup and B. Garcia request a new trial, arguing that the United States' late introduction of a "surprise witness," Jaramillo, deprived the Count 1 Trial Defendants of a fair trial. Troup NTM at 17. Specifically, Troup asserts that Jaramillo's "testimony was devastating to Mr. Troup." Troup NTM at 17. Troup states that, "[a]t trial, Jaramillo suggested that Edward Troup was somehow able to influence other inmates to stay in their cells while Jaramillo killed Castillo." Troup NTM at 17-18. Troup argues that, because Jaramillo was introduced as a witness so late, and "because of the extreme delay in indicting Mr. Troup on Count 1 (a 2001 homicide indicted

14 years later), defense counsel lost the ability to investigate and bring to bear information that could have undermined Jaramillo's credibility." Troup NTM at 18. For example, Troup maintains that he did not obtain files from the NM Corrections Department until May 8, 2018, see Dec. 18 Tr. at 74:20-25 (Burke), and that there were several documents that he was unable to obtain, such as video footage referenced in the NM Corrections Department files which the Defendants could have used to show that Jaramillo is dishonest, see Dec. 18 Tr. at 75:8-15 (Burke). As a result, Troup asserts, "the cross-examination [of Jaramillo] was not [as] thorough" as it might have otherwise been. Troup NTM at 18. Moreover, Troup contends that, before Jaramillo appeared as a witness, Troup prepared to cross-examine Torres, because the United States' case was based on Torres. See Troup NTM at 19. Thus, Troup states that he "was not prepared for the introduction of Jaramillo into the government's case." Troup NTM at 19.

B. Garcia similarly emphasizes that the "last-minute" introduction of Jaramillo as a witness put the Defendants at a "disadvantage." Dec. 18 Tr. at 54:1 (Castle). According to B. Garcia, having a few extra days to prepare for Jaramillo's testimony could not "cure" the "unfairness," because it "takes a lot of time" to prepare for a "witness who comes forward some 15-17 years later." Dec. 18 Tr. at 54:3-7 (Castle). B. Garcia argues that, if the Court grants a new trial, "Jaramillo would be subject to the kind of vigorous cross-examination that the Constitution anticipates." Dec. 18 Tr. at 56:7-9 (Castle). Moreover, B. Garcia contends that, "if a new trial in this case were to be granted, the defense would be doing background investigation on Mr. Jaramillo that went beyond just talking to him." Dec. 18 Tr. at 57:7-10 (Castle).

The United States counters that Jaramillo's testimony was properly admitted for several reasons: (i) although "Jaramillo's name was inadvertently omitted from the United States' filed witness list[,] [] the United States announced Jaramillo as a witness when it read its witness list

during *voir dire*"; (ii) "[t]he United States [] referred to Jaramillo as a witness it intended to call in open court and on the record several times during the second full week of trial"; and (iii) "Jaramillo was a witness whom the Defendants knew may be involved from the very first discovery disclosure in this case." J. Gallegos Motion Response at 4-5. The United States asserts that it attempted to interview Jaramillo several times during the case's investigation, but that "Jaramillo was uncooperative and maintained that he didn't remember what happened," which led the United States to subpoena Jaramillo for trial in March, 2018. J. Gallegos Motion Response at 5. The United States asserts that, subsequently, it "requested in open court that the Court issue an arrest warrant for Jaramillo for contempt of court for violation of the subpoena on Monday, April 16, 2018." J. Gallegos Motion Response at 5. The United States contends that, when Jaramillo appeared in court, he was "cooperative," and that, although the United States did not expect Jaramillo to provide inculpatory statements, "things went differently, and the United States learned of the significance of Jaramillo's role in the offense after the trial began." J. Gallegos Motion Response at 5. Because Jaramillo did not testify until "34 days after [his] name was mentioned as a possible United States witness during *voir dire*," J. Gallegos Motion Response at 6, the United States argues that the "defense counsel had time to prepare for his testimony," J. Gallegos Motion Response at 6. The United States also says that it disclosed Jaramillo's STIU file on April 13, 2018, and his location history on April 16, 2018, and thus the Defendants had evidence with which to impeach Jaramillo, which they did. See Dec. 18 Tr. at 65:4-15 (Castellano). Accordingly, the United States avers that "[t]he Court correctly concluded that exclusion of Michael Jaramillo's testimony was not appropriate." J. Gallegos Motion Response at 6. See Memorandum Opinion and Order at 68, 2019 WL 1780092, *30, filed April 23, 2019 (Doc. 2619)("April 23 MOO")(declining to exclude Jaramillo's testimony).

The Court concludes that the admission of Jaramillo's testimony did not prejudice J. Gallegos, Troup, and B. Garcia such that they are entitled to judgment of acquittal or a new trial. In the April 23 MOO, the Court acknowledged that the United States violated 18 U.S.C. § 3432 by not including Jaramillo on the United States' Sealed Supplemental Witness List for Trial II at 1-2, filed March 23, 2018 (Doc. 1968)("United States' Pretrial Witness List"). See April 23 MOO at 68, 2019 WL 1780092, at *30. Section 3432 provides that a "person charged with treason or other capital offense shall at least three entire days before commencement of trial, excluding intermediate weekends and holidays, be furnished with a . . . list of the . . . witnesses to be produced on the trial for proving the indictment." 18 U.S.C. § 3432. Although the Court determined that the United States violated § 3432, the Court noted that § 3432 "does not specify a remedy for a violation, so it falls to the Court to determine 'an appropriate remedy for violation of the statute by supplementing a timely presented list with' Jaramillo's name after trial began." April 23 MOO at 69, 2019 WL 1780092, at *30 (quoting United States v. Young, 533 F.3d 453, 462 (6th Cir. 2008)). The Court concluded that excluding Jaramillo's testimony is not an appropriate remedy, and instead the Court decided to "push back the United States' introduction of Jaramillo's testimony as much as possible, as to allow the Defendants more time to prepare their defense against Jaramillo's expected testimony." April 23 MOO at 71, 2019 WL 1780092, at *31.

The Court again concludes that it properly admitted Jaramillo's testimony. The interests of justice do not require a new trial for J. Gallegos, Troup, and B. Garcia, and J. Gallegos is not entitled to a judgment of acquittal. "As a general matter, where a statute does not specifically provide for the exclusion of evidence in the event of a violation, federal courts disfavor exclusion as a judicially-fashioned remedy." United States v. Young, 533 F.3d at 461. See United States v. Moffett, 84 F.3d 1291, 1294 (10th Cir. 1996)(agreeing with United States v. Thompson, 936 F.2d

1249 (11th Cir. 1991), which held that exclusion of evidence allegedly obtained in violation of pen register statute is improper, "because the statute does not provide the remedy of exclusion"); United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, at *55 (D.N.M. May 15, 2013)(Browning, J.); United States v. Harmon, 785 F. Supp. 2d 1146, 1170 n.4 (D.N.M. 2011)(Browning, J.)("Both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves.").

Jaramillo's testimony did not prejudice J. Gallegos, Troup, and B. Garcia, because they do not show how they would have prepared differently had Jaramillo been included on the United States' Pretrial Witness List. See, e.g., Troup NTM at 19 (implying that Troup might have prepared differently had he known that Jaramillo would testify, because, before Jaramillo appeared as a witness, the United States' case was based on Torres, and Troup thus prepared to cross-examine Torres and not Jaramillo). First, J. Gallegos, Troup, and B. Garcia knew early in this case that Jaramillo might be involved. J. Gallegos asserts that his own investigator interviewed Jaramillo in the summer of 2016, at which time Jaramillo professed that he "did not have any knowledge of the events" to which he would later testify at trial. J. Gallegos Motion at 2. Similarly, the United States maintains that it did not expect Jaramillo to provide inculpatory statements when Jaramillo finally decided to cooperate and appeared at the trial. See J. Gallegos Motion Response at 5. The United States avers, however, that it "attempted to interview Jaramillo several times, but Jaramillo was uncooperative and maintained that he didn't remember what happened." J. Gallegos Motion Response at 5. Second, although J. Gallegos', Troup's, and B. Garcia's trial strategies may have differed had they known the substance of Jaramillo's testimony before the trial began, § 3432 does not entitle them to the substance of Jaramillo's

testimony.  Jaramillo's testimony did not prejudice J. Gallegos, Troup, and B. Garcia, <u>see</u> April 23 MOO at 71, 2019 WL 1780092, at *31, because they suspected that Jaramillo participated in Castillo's murder and could have prepared for his testimony, <u>see</u>, <u>e.g.</u>, Troup NTM at 19 (arguing that Jaramillo's testimony was especially significant, "[b]ecause Jaramillo was the actual murderer, [and] the jury may have been more inclined to believe his testimony because jurors tend not to believe that an innocent person would ever implicate himself *or another* in a murder" (emphasis in original)).  Thus, as with the United States, the Court concludes that J. Gallegos, Troup, and B. Garcia knew that Jaramillo "was out there," but they made a "professional decision" not to prepare for Jaramillo testifying, because he "may never show up."  Dec. 18 Tr. at 49:21-50:4 (Court).

The United States did not violate the Due Process Clause by not including Jaramillo's name on the United States' Pretrial Witness List.  Under § 3432, the Defendants are entitled only to the name and places of abode "of the witnesses to be produced on the trial for proving the indictment."  18 U.S.C. § 3432.  The Due Process Clause requires the United States to disclose information in its possession that is exculpatory or that could be used to impeach the United States' witnesses.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999).  The Due Process Clause does not, however, require the United States to disclose the names of its witnesses who will testify unfavorably against the Defendants.  <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977).  Thus, the United States had a duty to disclose only Jaramillo's name under § 3432, and a duty to disclose the substance of Jaramillo's testimony to the defense before trial under the Due Process Clause only if the United States possessed information that is exculpatory or useful for impeachment.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. at 281.  The United States asserts "that it did not expect Jaramillo to provide the inculpatory statements that he did on Wednesday, April 18[, 2018]."  J. Gallegos Motion Response

at 5.  See April 23 MOO at 71, 2019 WL 1780092, at *31 ("[T]he United States did not possess

the substance of Jaramillo's testimony until it interviewed him on April 18, 2018, after trial had

begun, and provided to the Defendants the interview notes the same day and Jaramillo's 302 the

day after.").  Although J. Gallegos argues that the United States decided to exclude Jaramillo as a

witness so that it would not have to produce Jencks material, see Dec. 18 Tr. at 48:7-19 (Benjamin,

Court), J. Gallegos, Troup, and B. Garcia offer no evidence supporting that the United States acted

in bad faith.  Indeed, under the Jencks Act, the United States did not have a duty to produce

Jaramillo's Jencks material until after he testified.  Accordingly, while the omission of Jaramillo's

name on the United States' Pretrial Witness List violates § 3432, it does not violate the Due Process

Clause.

The Court concludes that its decision to admit Jaramillo's testimony was proper and that

its decision to schedule Jaramillo's testimony for later in the trial was an appropriate remedy that

did not prejudice J. Gallegos, Troup, and B. Garcia.  The Supreme Court has "repeatedly

emphasized that the [exclusionary] rule's 'costly toll' upon truth-seeking and law enforcement

objectives presents a high obstacle for those urging application of the rule."  Pa. Bd. of Prob. and

Parole v. Scott, 524 U.S. 357, 364 (1998)(quoting United States v. Payner, 447 U.S. 727, 734

(1980)).  Moreover, the Supreme Court has observed that it "applie[s] the exclusionary rule

primarily to deter constitutional violations."  Sanchez-Llamas v. Oregon, 548 U.S. 331, 348

(2006).  As the Court has noted, "although the exclusionary rule provides some redress for

improper law enforcement, it also places a large burden on society and on the truth-seeking role

courts play in society by exacting as payment the exclusion of probative, reliable evidence."

United States v. Alabi, No. CR 11-2292 JB, 2013 WL 2284956, *55 (D.N.M. May 15,

2013)(Browning, J.).  While the exclusionary rule primarily applies to constitutional violations,

here, the Court determines that the United States did not violate the Due Process Clause or any other constitutional provision. Despite violating § 3432, the United States did not act improperly by not including Jaramillo on the United States' Pretrial Witness List, because Jaramillo did not agree to cooperate or testify until the time of trial, and because the United States did not know that Jaramillo would provide inculpatory statements. See J. Gallegos Motion Response at 4-6. Indeed, although the Tenth Circuit has not indicated the proper remedy for a § 3432 violation, "'virtually every court to have directly addressed the question of after-discovered witnesses has determined that § 3432 does not categorically preclude such witnesses from testifying at trial.'" United States v. Young, 533 F.3d at 462 (quoting United States v. Fulks, 454 F.3d 410, 423 (4th Cir. 2006), and citing United States v. Chandler, 996 F.2d 1073, 1098-99 (11th Cir. 1993); United States v. Greene, 497 F.2d 1068, 1082 (7th Cir. 1974); United States v. Rosenberg, 195 F.2d 583, 599-600 (2d Cir. 1952); United States v. Fernandez, 172 F. Supp. 2d 1265, 1279-80 (C.D. Cal. 2001)(Carter, J.); United States v. Gregory, 266 F. Supp. 484, 487 (D.D.C. 1967)(Gasch, J.)). Although Jaramillo was not a newly discovered witness, he did not agree to testify until after the trial began, when his testimony's value to the case become evident. The Court thus concludes that excluding Jaramillo's testimony was not an appropriate remedy.

> The Tenth Circuit has explained that
>
> [t]he purpose of [§ 3432] has been variously described as "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense," *United States v. Chandler*, 996 F.2d 1073, 1098 n.6 (11th Cir. 1993), "to eliminate any element of surprise," *United States v. Greene*, 497 F.2d 1068, 1082 (7th Cir. 1974), and "to prevent trial by ambush where a defendant's life is at stake." *Fulks*, 454 F.3d at 422.

United States v. Barrett, 496 F.3d 1079, 1116 (10th Cir. 2007). Based on § 3432's purpose, the Fourth Circuit has identified three factors for courts to balance in deciding whether to exclude

testimony when the United States violates § 3432: (i) whether the United States' "failure to list the witness was a good faith omission"; (ii) whether the United States' "failure to discover the witness . . . was due to a lack of reasonable diligence in conducting its pretrial investigation"; and (iii) whether, "if a defendant can demonstrate that permitting an after-discovered witness to testify would cause him actual prejudice in the form of unfair surprise, . . . a brief adjournment to allow the defendant to meet the witness' testimony would eliminate the prejudice caused by the surprise." United States v. Fulks, 454 F.3d at 423-24 (internal quotations and citations omitted). The Court determines that all three factors weigh in favor of not excluding Jaramillo's testimony. First, the United States did not act in bad faith, because Jaramillo refused to cooperate or testify for almost two years, and when Jaramillo finally agreed to testify, the United States did not know that he would provide inculpatory statements. Second, the United States exhibited reasonable diligence by making several attempts to contact Jaramillo. When Jaramillo indicated that he did not remember anything, the United States could have reasonably concluded that he did not possess information that is valuable to its pre-trial investigation. Third, as the Court concluded in its April 23 MOO and reiterates here, Jaramillo's testimony did not prejudice J. Gallegos, Troup, and B. Garcia unfairly. See April 23 MOO at 71, 2019 WL 1780092, at *31. The Court further explained at the December 18, 2018, hearing that adjournment was not a proper remedy, because the Defendants had been trying to contact Jaramillo for two years. See Dec. 18 Tr. at 56:12-18 (Court). Instead, the Court decided to postpone Jaramillo's testimony until later in the trial. The Court concludes that the interests of justice do not require a new trial for J. Gallegos, Troup, and B. Garcia, and that a reasonable jury could have found that J. Gallegos is guilty beyond a reasonable doubt, and thus he is not entitled to a judgment of acquittal.

## V.    A. SUTTON'S AND RAMIREZ' TESTIMONY DO NOT VIOLATE J. GALLEGOS' AND A. GALLEGOS' RIGHTS UNDER THE CONFRONTATION CLAUSE.

J. Gallegos and A. Gallegos both argue that the Court should grant a judgment of acquittal or a new trial, because the Court improperly admitted hearsay evidence when A. Sutton testified about a statement that Burns made to Orndorff.  See Gallegos Joint Motion at 3.  According to J. Gallegos and A. Gallegos, their confrontation rights were violated, because the "hearsay exception of unavailability" does not apply to Burns' statement.  Gallegos Joint Motion at 4. A. Gallegos also argues that his confrontation rights were violated when Ramirez testified about three statements by J. Gallegos, because A. Gallegos could not cross-examine J. Gallegos -- a non-testifying co-Defendant -- about these statements.  See A. Gallegos Motion at 12-13.  The Court addresses A. Sutton's and Ramirez' statements separately.

### A.    THE COURT PROPERLY ADMITTED A. SUTTON'S TESTIMONY.

J. Gallegos and A. Gallegos argue that A. Sutton's testimony includes a statement that Burns made and that the Court should have excluded, because the statement was addressed to Orndorff, who did not testify at trial, rather than to A. Sutton, who did testify at trial.  See Gallegos Joint Motion at 4.  J. Gallegos and A. Gallegos argue that the United States used Burns' statement to Orndorff -- "[t]ell him if he doesn't have my money to stop being a bitch and give me a call," A. Sutton Tr. at 59:23-25 (Castellano) -- to demonstrate that Burns "disrespected" J. Gallegos, and that the jury relied on this statement "in its decision to convict the Gallegos brothers," Gallegos Joint Motion Reply at 2.  According to J. Gallegos and A. Gallegos, although the Court instructed the jury not to consider the statement for the truth of the matter asserted, the limiting instruction was insufficient, and, consequently, the jury relied upon it to convict them.  See Gallegos Joint Motion Reply at 2; Dec. 18 Tr. at 137:8-9 (Benjamin).  J. Gallegos and A. Gallegos argue that,

because the United States offered the statement to show that Burns disrespected J. Gallegos, the United States "offered" the statement "for the truth" of the matter asserted. Dec. 18 Tr. at 139:8-10 (Benjamin). Thus, they contend that the limiting instruction[36] -- which advised the jury not to consider the statement for the truth of the matter asserted -- was insufficient, because "a statement can't be offered for the truth and not offered for the truth at the same time." Dec. 18 Tr. at 138:15-17 (Benjamin). J. Gallegos noted that, although "'testimony is not hearsay when it's offered only to prove that the statement was made,'" Dec. 18 Tr. at 138:4-6 (Benjamin)(quoting Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc., 2013 WL 311846, at *19), the United States did not offer the statement "to prove that Adrian had a statement with Daniel," but rather, "to show that Joe Gallegos was being disrespected by Adrian Burns," Dec. 18 Tr. at 138:7-10 (Benjamin).

J. Gallegos and A. Gallegos further argue that A. Sutton's testimony was unreliable. According to them, "since Ms. Sutton had no direct knowledge about whether Mr. Orndorff relayed the remarks of Adrian Burns to the Gallegos brothers, the hearsay statement of Ms. Sutton has no indicia of reliability." Gallegos Joint Motion at 5. J. Gallegos and A. Gallegos further argue that, "[b]ecause Mr. Orndorff did not testify it was impossible for the defense to challenge whether this statement was made for the truth of the matter the government asserts," the "hearsay exception of unavailability should not apply." Gallegos Joint Motion at 4.

The United States counters that A. Sutton's testimony "was properly admitted, and the defendants' Sixth Amendment rights were not violated." Gallegos Joint Motion Response at 6. The United States notes that the statement from A. Sutton's testimony was "not being offered to

---

[36]The Court gave the following limiting instruction: "You can only consider the statement by Mr. Burns, that it was made. You can't consider it for the truth of the matter. You can only consider it in your deliberations in determining whether Mr. Burns made that statement, and that statement was made, and for no other purpose." A. Sutton Tr. at 60:8-14 (Court).

show whether Joe Gallegos is a bitch or not." Dec. 18 Tr. at 144:1-2 (Armijo). The United States asserts that it was "offering it to show the impact that it had on him." Dec. 18 Tr. at 144:10 (Armijo). The United States recounts the Court's limiting instruction that the statement is admissible only to "determin[e] whether Mr. Burns made that statement," and the statement could show that Burns disrespected J. Gallegos. Gallegos Joint Motion Response at 9 (citing A. Sutton Tr. at 60:8-14 (Court)).

The Court concludes that Burns' statement to Orndorff was not hearsay, and thus its admission through A. Sutton's testimony did not violate J. Gallegos' and A. Gallegos' confrontation rights.[37] Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A. Sutton testified that Burns said to Orndorff: "Tell him if he doesn't have my money to stop being a bitch and give me a call," A. Sutton Tr. at 59:23-25 (Castellano). Burns' statement is a command, because Burns told Orndorff to tell J. Gallegos to "stop being a bitch" and to call him. A. Sutton Tr. at 59:23-25 (Castellano). The statement therefore does not assert any facts. In United States v. Ballou, the Court explained that, for commands,

> [t]heir value as evidence is not in the truthfulness of any representations they make about some external condition in the world -- in the way that a statement that "John killed Dave," "I saw John kill Dave," or "I think John killed Dave," assert the fact that John killed Dave, and that fact, not the statement about the fact, is the relevant evidence -- but, rather, their relevance as evidence comes from the words themselves. "Statements offered as evidence of commands or threats or rules

---

[37]J. Gallegos and A. Gallegos also argue that A. Sutton's testimony is the "only evidence of the substance of the . . . conversation between Mr. Burns and Mr. Orndorff." Gallegos Joint Motion at 4. The Court determined at the December 18, 2018, hearing that their argument criticizes the sufficiency of the evidence with which the jury convicted them. The Court addresses above their sufficiency-of-the-evidence arguments, and addresses here only their Confrontation Clause and hearsay arguments.

directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."

United States v. Ballou, 59 F. Supp. 3d at 1073 (quoting United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999)(Noonan, J.)(citation omitted)).

The Court determines that Burns' statement was not offered for the truth of the matter asserted. J. Gallegos and A. Gallegos mistakenly insist that, "[i]f that statement carries weight, and is disrespect, [sic] then it has to be for the truth of the matter." Dec. 18 Tr. at 139:17-19 (Benjamin). The United States explains, however, that the statement from A. Sutton's testimony was "not being offered to show whether Joe Gallegos is a bitch or not." Dec. 18 Tr. at 144:1-2 (Armijo). The Court's limiting instruction -- which occurred immediately following the statement -- made this clear. The Court instructed the jury: "You can only consider the statement by Mr. Burns, that it was made. You can't consider it for the truth of the matter. You can only consider it in your deliberations in determining whether Mr. Burns made that statement, and that statement was made, and for no other purpose." A. Sutton Tr. at 60:8-14 (Court). Hence, contrary to J. Gallegos and A. Gallegos' argument, that a statement is significant or "carries weight" does not mean that the statement "has to be for the truth of the matter." Dec. 18 Tr. at 139:17-19 (Benjamin). Statements may be offered for reasons other than the truth that they assert. See Fed. R. Evid. 801(c). Under rule 801(c), "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801 advisory committee note to 1972 proposed rules, subdivision (c) (citing Emich Motors Corp. v. General Motors Corp., 181 F.2d 70 (7th Cir. 1950), rev'd on other grounds 340 U.S. 558 (1951)). Accordingly, the "evidence of [Burns'] statement is not being used to prove the truth of some assertion but 'merely to show that it was actually made.'" United States

v. Iverson, 818 F.3d 1015, 1020 (10th Cir. 2016)(quoting Weinstein's Federal Evidence §
801.11[3]).   The Court therefore concludes that Burns' statement was not hearsay, and its
admission through A. Sutton's testimony did not violate J. Gallegos and A. Gallegos'
confrontation rights.

### B.    THE COURT PROPERLY ADMITTED RAMIREZ' TESTIMONY.

A. Gallegos argues that his confrontation rights also were violated when J. Gallegos'
confession was admitted through Ramirez' testimony.  See A. Gallegos Motion at 12.  A. Gallegos
argues that Ramirez testified what "Joe Gallegos had told her," and thus A. Gallegos was "denied
the Sixth Amendment confrontation right to confront Joe about those statements and to test their
veracity."  Dec. 18 Tr. at 113:16-19 (Torraco).  A. Gallegos cites three admissions of J. Gallegos'
statements through Ramirez that violated his confrontation rights, because he could not
cross-examine J. Gallegos, a non-testifying co-Defendant, about his confession.  See A. Gallegos
Motion at 12-13 (citing Bruton v. United States, 391 U.S. 123).  First, according to A. Gallegos,
Ramirez testified that she could not remember whether J. Gallegos told her "I" shot Burns or "we"
shot Burns.  A. Gallegos Motion at 14.  A. Gallegos contends that, although Ramirez did not testify
that the "we" includes or might include A. Gallegos, "the damage . . . had been done," and "the
implication remained" that A. Gallegos participated with J. Gallegos.  A. Gallegos Motion at 15.
A. Gallegos argues that, although the Court provided a limiting instruction, the limiting instruction
did not cure the alleged Sixth Amendment violations.  See A. Gallegos Motion at 12, 15 (citing
Pointer v. Texas, 380 U.S. 400, 400-07 (1965)).  Second, A. Gallegos asserts that, following the
Court's limiting instruction, Ramirez testified that J. Gallegos told her that no one died in his
house, but that he may have shot someone in his house.  See A. Gallegos Motion at 16.  Third,
A. Gallegos describes that, without a limiting instruction, Ramirez testified that J. Gallegos told

her that "they shot" Adrian Burns, but Ramirez did not specify to whom "they" refers.  A. Gallegos Motion at 16.  A. Gallegos asserts that "Ramirez' testimony was so prejudicial as to be incurable by any instruction" and that the jury was "more prone" to convict him, because it knew that J. Gallegos had confessed to killing Burns -- a confession that A. Gallegos contends implicated him.  A. Gallegos Motion at 17-18.  A. Gallegos thus argues that the "potential 'prejudicial impact' [of admitting J. Gallegos' confession through Ramirez' testimony] warrants a new trial to guarantee [that he] has a fair trial."  A. Gallegos Motion at 18 (quoting United States v. Gabaldon, 91 F.3d at 93-94).

The United States counters that the statements that A. Gallegos challenges are not testimonial, and thus their admission did not violate his confrontation rights.  See A. Gallegos Motion Response at 1.  The United States added that the Court provided a limiting instruction when Ramirez testified.  See Dec. 18 Tr. at 129:1-131:9 (Armijo, Court).  The United States also confirmed that it is "not seeing any error" in how Ramirez testified or in how the Court gave limiting instructions.  Dec. 18 Tr. at 131:16-17 (Armijo).  The United States said that the Court did not deny any limiting instructions without closely analyzing the statements, except for when statements came into evidence regarding J. Gallegos' puns about burning Burns' body.  See Dec. 18 Tr. at 132:13-133:1 (Armijo, Court).

At the December 18, 2018, hearing, the Court asked: "[H]ow is anything that Joe Gallegos said to her testimonial?  I mean, she was not preparing for trial.  She wasn't taking those statements as a police officer.  Those were not made in anticipation of a VICAR trial."  Dec. 18 Tr. at 112:19-23 (Court).  The Court also noted that courts "weren't even using the word[] 'testimonial' back in 1999," when the Supreme Court decided Lilly v. Virginia, 527 U.S. 116.  Dec. 18 Tr. at 113:6-7 (Court).  A. Gallegos requested permission to file an additional brief on the

matter, which the Court granted.  See Dec. 18 Tr. at 125:14-17 (Torraco, Court); A. Gallegos Supplement at 1.

In the A. Gallegos Supplement, A. Gallegos asserts that, under the "*Bruton* doctrine," "a defendant's Sixth Amendment right of confrontation is violated by admitting the confession of a non-testifying codefendant that implicates the defendant, regardless of any limiting instruction given to the jury."  A. Gallegos Supplement at 2 (citing Bruton v. United States, 391 U.S. 123). A. Gallegos argues that "*Crawford* does not overrule the *Bruton* doctrine, and the *Bruton* doctrine continues to cover nontestimonial hearsay."  A. Gallegos Supplement at 2.  A. Gallegos therefore argues that J. Gallegos' nontestimonial statements, to which Ramirez testified, "are not beyond the scope of the *Bruton* doctrine and should have been suppressed in a trial against Andrew Gallegos." A. Gallegos Supplement at 2.

A. Gallegos avers that, although the Supreme Court held in Crawford v. Washington that "the Confrontation Clause covers testimonial hearsay, [] it did not hold that the Clause **only** covers testimonial hearsay."  A. Gallegos Supplement at 3 (bold in original).  According to A. Gallegos, J. Gallegos' statement to Ramirez is nontestimonial, and "the Confrontation Clause is violated when testimony **or** testimonial hearsay is admitted against a defendant and he is not given the chance to cross-examine the declarant."  A. Gallegos Supplement at 3 (bold in original). According to A. Gallegos, Crawford v. Washington "had nothing to say about the inadmissibility of co-defendant confessions under the *Bruton* doctrine, meaning that courts should find that even nontestimonial co-defendant statements can violate the doctrine.  Defense asserts that there should be some level of Sixth Amendment Constitutional scrutiny for nontestimonial hearsay." A. Gallegos Supplement at 4.  A. Gallegos contends that, in United States v. Smalls, the Tenth Circuit "renders *Bruton* a dead letter."  A. Gallegos Supplement at 4.  See id. ("'[T]he *Bruton* rule,

like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements.'" (quoting United States v. Smalls, 605 F.3d at 768 n.2)).  A. Gallegos notes that the Tenth Circuit's cases bind the Court, but he argues that "there is still room under the *Crawford* holding for the non-testimonial *Bruton* analysis."  A. Gallegos Supplement at 5.  A. Gallegos asks the Court to "consider another analysis," because of the "*Smalls* precedent."  A. Gallegos Supplement at 5.  A. Gallegos argues that Ramirez' testimony regarding what J. Gallegos told her is "unfairly prejudicial against Andrew Gallegos," and "violates" rule 403 of the Federal Rules of Evidence and rule 14 of the Federal Rules of Criminal Procedure.  A. Gallegos Supplement at 4-5.  A. Gallegos avers that J. Gallegos' statements are prejudicial, because A. Gallegos could not cross-examine J. Gallegos.  See A. Gallegos Supplement at 5.

The United States argues that "admission of a nontestifying codefendant's redacted statements [does] not violate the Confrontation Clause."  A. Gallegos Supplement Response at 3 (citing United States v. Verduzco-Martinez, 186 F.3d 1208 (10th Cir. 1999)).  See A. Gallegos Supplement Response at 3 ("'Where a defendant's name is replaced with a neutral pronoun or phrase there is no *Bruton violation*, providing that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury.'" (quoting United States v. Verduzco-Martinez, 186 F.3d at 1214)).  The United States gives two reasons why Ramirez' testimony about what J. Gallegos told her does not violate the Confrontation Clause: (i) the statements are not "formal statements . . . akin to statements given to law enforcement, so those statements were non-testimonial"; and (ii) the statements did not include A. Gallegos' name, "so it was not necessary for the prosecution to make redactions."  A. Gallegos Supplement Response at 3.

The United States counters that admitting J. Gallegos' statements was "proper when given with a limiting instruction, and the Court provided the necessary instruction to the jury." A. Gallegos Supplement Response at 3 (citing Richardson v. Marsh, 481 U.S. at 208; United States v. Green, 115 F.3d at 1484). The United States notes that the Court gave three limiting instructions during Ramirez' testimony. See A. Gallegos Supplement Response at 4 (citing Ramirez Tr. at 26:15-20 (Court); id. at 29:8-11 (Court); id. at 32:18-23 (Court)). The United States argues that the "Court conducted the necessary balancing and allowed [Ramirez'] testimony, so the Court should not now reconsider its decision on the admissibility of that evidence." A. Gallegos Supplement Response at 4. The United States adds that the Defendants were able to test Ramirez' possible prejudice or bias by cross-examining her "about her thoughts and feelings about Joe Gallegos, as well as her recollection of the events surrounding his statements and what her understanding was of the statements Joe Gallegos told her." A. Gallegos Supplement Response at 4-5.

The Court concludes that admitting J. Gallegos' statements through Ramirez' testimony with limiting instructions did not violate A. Gallegos' confrontation rights. First, the Court determines that J. Gallegos' statements were not testimonial. In Bruton v. United States, the Supreme Court held that, in a multiple-defendant trial, admitting a non-testifying defendant's confession that implicates a codefendant violates the Confrontation Clause even if the court instructs the jury to only use the confession against the defendant who made it. See 391 U.S. at 128-29. While A. Gallegos argues that "Crawford does not overrule the Bruton doctrine, and the Bruton doctrine continues to cover nontestimonial hearsay," A. Gallegos Supplement at 2, the Court disagrees. In Crawford v. Washington, the Supreme Court undermined Bruton v. United States, because the Supreme Court indicated that introducing a non-testifying defendant's

confession and using that confession against a codefendant does not offend the Confrontation Clause so long as the confession is nontestimonial. See 541 U.S. at 59-61. See also United States v. Clark, 717 F.3d at 816 (concluding that nontestimonial statements "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*."); United States v. Dale, 614 F.3d 942, 956 (8th Cir. 2010)(holding that defendant's statements to prisoner were not testimonial and that their admission, therefore, did not violate a codefendant's Confrontation Clause rights); United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010)(holding that the defendant's recorded telephone statements to his mother were non-testimonial); United States v. Smalls, 605 F.3d at 768 n.2 ("[T]he *Bruton* rule, like the Confrontation Clause on which it is premised, does not apply to nontestimonial hearsay statements."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)(holding that, because Bruton v. United States is based on the Confrontation Clause, it also applies only to testimonial statements and that any non-testimonial statement is not subject to the Bruton v. United States rule); United States v. Pike, 292 F. App'x at 112 ("[B]ecause the statement was not testimonial, its admission does not violate either *Crawford* or *Bruton*.").

If J. Gallegos' statements were testimonial, "this would be an easy case," because J. Gallegos invoked his Fifth Amendment right to remain silent and was unavailable to testify. United States v. Smalls, 605 F.3d at 776. As Crawford v. Washington explains, "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution prescribes: confrontation." Crawford v. Washington, 541 U.S. at 68-69. If J. Gallegos' statements were testimonial, then his statements implicating A. Gallegos would be inadmissible, because A. Gallegos would be unable to cross-examine J. Gallegos. Although the Supreme Court did not "spell out a comprehensive definition of 'testimonial,'" Crawford v. Washington, 541 U.S. at 68, it "distinguished the 'formal statement to government officers,' which

is testimonial, from the 'casual remark to an acquaintance,' which is nontestimonial." United States v. Smalls, 605 F.3d at 776. J. Gallegos' statements to Ramirez fall into the latter category. A. Gallegos objects to three of J. Gallegos' statements to which Ramirez testified: (i) Ramirez' testimony that she could not remember whether J. Gallegos told her "I" shot Burns or "we" shot Burns, see Ramirez Tr. at 24:22-25:2 (Ramirez); (ii) Ramirez' testimony that J. Gallegos told her that "they shot" Burns, but the bullet "got stopped . . . by the bone in his ear," Ramirez Tr. at 25:18-21 (Ramirez); and (iii) Ramirez' testimony that she once asked J. Gallegos about a room in his house that "used to creep [her] out a lot," and J. Gallegos responded: "Don't worry. No one has actually died in here. Someone may have got shot in here, but they didn't die," Ramirez Tr. at 26:5-9 (Ramirez). At the December 18, 2018, hearing, the Court asked: "[H]ow is anything that Joe Gallegos said to her testimonial? I mean, she was not preparing for trial. She wasn't taking those statements as a police officer. Those were not made in anticipation of a VICAR trial." Dec. 18 Tr. at 112:19-23 (Court). J. Gallegos' conversation with Ramirez about Burns took place inside the home where J. Gallegos and Ramirez lived when they were dating. See Ramirez Tr. at 22:19-24 (Beck, Ramirez). The Court concludes that the three statements are not testimonial, because none of the statements is "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'" United States v. Morgan, 748 F.3d at 1048 (alteration in original)(quoting United States v. Smalls, 605 F.3d at 777-78).

The Court determines that Bruton v. United States does not apply to nontestimonial statements, and, thus, it no longer matters, for Confrontation Clause purposes, whether limiting instructions restrain how juries use nontestimonial confessions in joint trials. See Whorton v. Bockting, 549 U.S. at 420 (stating that "the Confrontation Clause has no application to

[nontestimonial] statements"). Although A. Gallegos concedes that the Confrontation Clause does not apply to nontestimonial hearsay statements, see A. Gallegos Supplement at 4 (citing United State v. Smalls, 605 F.3d at 768 n.2), he contends that "there should be some level of Sixth Amendment Constitutional scrutiny for nontestimonial hearsay," A. Gallegos Supplement at 4. A. Gallegos acknowledges that the Tenth Circuit binds the Court, but he argues that "there is still room under the *Crawford* holding for the non-testimonial *Bruton* analysis." A. Gallegos Supplement at 5. A. Gallegos asks the Court to "consider another analysis" and find a workaround to avoid the "*Smalls* precedent." A. Gallegos Supplement at 5.

The Court is not, however, free to ignore Tenth Circuit precedent stating that Bruton v. United States does not apply to nontestimonial statements. See, e.g., United States v. Clark, 717 F.3d at 816 (concluding that statements which a coconspirator made in furtherance of the conspiracy are nontestimonial, and therefore "fall outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*"); United States v. Patterson, 713 F.3d at 1247 ("The admission of these two statements violated neither *Crawford* nor *Bruton* because both statements were made in furtherance of a conspiracy and were therefore nontestimonial."). A careful examination of Tenth Circuit precedent shows that the Tenth Circuit's statements are dicta, because no cases analyze a defendant statement that was nontestimonial and not admissible, under the Federal Rules of Evidence, against a codefendant whom the statement implicated. The defendant in United States v. Smalls was not convicted in a joint trial. See 605 F.3d at 768 ("The district court severed the trials of Defendant Smalls and Cook as a result of an out-of-court statement Cook made to a confidential informant (CI), also an inmate at the detention center, implicating both himself and Defendant Smalls in the murder."). Further, the nontestimonial statements at issue in United States v. Smalls were admissible for their truth as declarations against interest by an unavailable declarant

no matter against whom those statements were offered.  See 605 F.3d at 785-86 (applying rule 804(3) of the Federal Rules of Evidence).  On the other hand, a coconspirator made the out-of-court statements at issue in United States v. Clark and United States v. Patterson in furtherance of the conspiracy, which rendered them both nontestimonial and admissible -- under rule 801(d)(2)(E) -- for their truth against all the defendants they implicated.  See United States v. Clark, 717 F.3d at 816; United States v. Patterson, 713 F.3d at 1247.

Although the Court concludes that J. Gallegos' statements are nontestimonial, the Court notes that it gave several limiting instructions.  For example, when Ramirez testified that J. Gallegos told her that no one died in his house but that he may have shot someone in his house, see Ramirez Tr. at 26:5-9 (Ramirez), the Court told the jury: "I'm going to instruct on that last statement that Ms. Ramirez made that that's admissible only against Mr. Joe Gallegos, but you may not consider it in any way in your deliberation of the charges against Andrew Gallegos." Ramirez Tr. at 26:15-20 (Court).  When Ramirez testified, however, that J. Gallegos told her that "they shot" Burns -- without specifying to whom "they" refers -- but the bullet "got stopped . . . by the bone in his ear," Ramirez Tr. at 25:18-21 (Ramirez), A. Gallegos did not request and the Court did not give a limiting instruction, see A. Gallegos Motion at 16.  A. Gallegos contends that these statements were "incurable by any instruction," A. Gallegos Motion at 17-18, and that the limiting instructions that the Court gave did not cure the alleged violations to his confrontation rights, see A. Gallegos Motion at 12, 15.  Having determined that the statements did not violate A. Gallegos' confrontation rights, the Court concludes that the limiting instructions were not deficient, and that they reduced any prejudice toward A. Gallegos.  Moreover, the Court agrees with the United States that, because the statements did not include A. Gallegos' name, "it was not necessary for the prosecution to make redactions."  A. Gallegos Supplement Response at 3.

In the Court's Memorandum Opinion and Order, 287 F. Supp. 3d 1187, filed March 7, 2018 (D.N.M.)(Browning, J.)("March 7 MOO"), the Court concluded that, under Tenth Circuit precedent, "Bruton v. United States does not apply to nontestimonial statements." March 7 MOO, 287 F. Supp. 3d at 1262.  The Court noted, however:

> If the issue comes squarely before it, perhaps via an appeal taken by the Defendants in this case, the Tenth Circuit may decide that the Court took United States v. Clark, United States v. Patterson, and United States v. Smalls too literally, and instead apply Supreme Court precedent to limit their unnecessarily overbroad pronouncements regarding the application of Bruton v. United States to nontestimonial statements.  See EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 488 (10th Cir. 2006)("[T]he district court in this case seems to have taken the 'rubber stamp' metaphor too literally, requiring that an explicit recommendation must cross the desk of the decisionmaker . . . ."); English v. Colo. Dep't of Corrections, 248 F.3d 1002, 1011 (10th Cir. 2001)(Ebel, J.)(stating that a plaintiff can recover on a rubber-stamp theory only if "'the decisionmaker followed [a] biased recommendation . . . without independently investigating the complaint against the employee'" (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999)).  Unless the Tenth Circuit does so, however, the Court must obey those pronouncements:
>
>> [J]urisdiction is about *who* gets to decide.  It's about choosing the group of people who get to choose the judges, to write the rules of procedure and evidence, to supply the jury -- that is, to dispose of "all [the defendants'] worldly goods," and often their liberty to boot.  In particular, because jurisdiction includes the power to come to the *wrong* judgment, it's about choosing the people who have power to make the *wrong* choices on all these counts and who have the right to see their choices enforced anyway.
>
> Stephen E. Sachs, Pennoyer Was Right, 95 Texas L. Rev. 1249, 1324 (2017)(emphasis and second alteration in the original)(footnotes omitted)(quoting Burnham v. Superior Court, 495 495 U.S. 604, 623 (1990)(Scalia, J., plurality opinion)).

March 7 MOO, 287 F. Supp. 3d at 1263.  The Court agrees with its earlier conclusion that, under Tenth Circuit precedent, Bruton v. United States does not apply to nontestimonial statements, and, accordingly, the Court determines that the interests of justice do not require that the Court grant a

new trial.[38]

## VI. THE INTERESTS OF JUSTICE DO NOT REQUIRE THE COURT TO GRANT A NEW TRIAL FOR J. GALLEGOS, TROUP, AND B. GARCIA, BECAUSE THE JURY INSTRUCTIONS CONTAIN NO PLAIN ERRORS AFFECTING THEIR <u>SUBSTANTIAL RIGHTS</u>.

In the Troup NTM, which J. Gallegos and B. Garcia join, Troup argues that the Court should grant him a new trial pursuant to rule 33 and the Due Process Clause, because the "jury instructions, individually and cumulatively, worked to deprive Mr. Troup of a fair trial." Troup NTM at 2. Because Troup did not raise any of the Troup NTM's jury instruction objections during trial, he contends that, "[t]o the extent any issue regarding jury instructions was not preserved, counsel for Mr. Troup were ineffective in not raising an appropriate objection." Troup NTM at 2 n.2. The Tenth Circuit reviews jury instructions "'to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and the applicable standards.'" <u>United States v. Visinaiz</u>, 428 F.3d at 1308 (quoting <u>United States v. Smith</u>, 413 F.3d at 1273). Moreover, "[w]hen no objection to a jury instruction was made at trial, the adequacy of the instruction is reviewed de novo for plain error." <u>United States v. Visinaiz</u>, 428 F.3d at 1308 (citing <u>United States v. Marshall</u>, 307 F.3d 1267, 1270 (10th Cir. 2002)). <u>See</u> Fed. R. Crim. P. 30(d) ("A party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection before the

---

[38]A. Gallegos also argues that, even if admitting J. Gallegos' statements through Ramirez' testimony did not violate his confrontation rights, Ramirez' testimony was "unfairly prejudicial against Andrew Gallegos," and "violate[s]" rule 403 of the Federal Rules of Evidence and rule 14 of the Federal Rules of Criminal Procedure. A. Gallegos Supplement at 4-5. The Court addresses above these issues. The Court concludes that joining J. Gallegos' and A. Gallegos' trials did not prevent the jury from being able to make a reliable judgment about their guilt or innocence. <u>See</u> <u>Zafiro v. United States</u>, 506 U.S. at 539. The Court gave several limiting instructions to counteract the risk of spillover prejudice. The Court concludes that A. Gallegos' mere assertions of spillover prejudice, without more specific, detailed allegations, are insufficient to warrant a new trial.

jury retires to deliberate. . . .  Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).”); Fed. R. Crim. P. (52)(b) (“A plain error that affects substantial rights may be considered even though it was not brought to the court’s attention.”); United States v. Madsen, 614 F. App’x 944, 949 (10th Cir. 2015)(unpublished)(“Indeed, we have previously concluded that the errors alleged in this case -- relating to . . . flaws in the jury instructions or verdict form -- are precisely the kinds of issues that must be raised during or even before trial to give the trial court the opportunity to prevent the error.”); Atencio v. City of Albuquerque, 911 F. Supp. 1433, 1438 (D.N.M. 1995)(Vázquez)(“Because of Defendant’s failure to object on [a] specific basis . . . , or to move for a mistrial or to strike the testimony, the Court will not grant a new trial unless there is ‘plain error.’”).

To establish “plain error,” Troup must show that the jury instructions contain “(1) error, (2) that is plain, and (3) that the error affects substantial rights.”  United States v. Visinaiz, 428 F.3d at 1308.  Jury “instructions must be read and evaluated in their entirety.  We must then determine whether the instructions, examined in the light of the record as a whole, fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of law and factual issues confronting them.”  United States v. Denny, 939 F.2d 1449, 1454 (10th Cir. 1991)(internal citations omitted).  Moreover, the Tenth Circuit “will correct the error only if it ‘seriously affects the fairness, integrity, or public reputation of judicial proceedings.’”  United States v. Visinaiz, 428 F.3d at 1308 (quoting United States v. Smith, 413 F.3d at 1274).

Troup identifies seven jury instruction errors in the Troup NTM: (i) the jury instructions refer to the Defendants collectively, rather than individually, and thus confused the jurors, see Troup NTM at 2-5; (ii) the aiding-and-abetting jury instruction misstates the law and erroneously

indicates that the United States must prove only that Troup had the required mental state and not that Troup committed an act which furthered the offense, see Troup NTM at 6-9; (iii) Jury Instruction No. 2 tells the jury to "'determine what actually happened,'" which contravenes the jury's proper role, Troup NTM 10-11 (quoting Jury Instructions (without citations), Instruction No. 2, at 3); (iv) several jury instructions' references to the grand jury undermined the Defendants' presumption of innocence, Troup NTM at 11-12; (v) several jury instructions tell jurors not to draw inferences from the fact that many defendants named in the indictment were not on trial, which hindered the jury's ability to determine witness' credibility, see Troup NTM at 12-13; (vi) Jury Instruction No. 31 contains erroneous and confusing language about murder under New Mexico law and how it relates to the VICAR charges, see Troup NTM at 14-15; and (vii) Jury Instruction No. 33 gives outside examples of evidence that would satisfy VICAR's fifth element, and thus placed a "judicial imprimatur" on the United States' evidence, Troup NTM at 15. At the December 18, 2018, hearing, Troup also argues that the Court should have given a misprision jury instruction, an argument which he previously made during trial. See Dec. 18 Tr. at 28:25 (Burke); Misprision Motion at 1. The Court addresses each alleged error and determines that none of the alleged errors constitutes error or plain error affecting J. Gallegos', Troup's, or B. Garcia's substantial rights. Accordingly, the Court concludes that the interests of justice do not require that the Court grant J. Gallegos, Troup, and B. Garcia a new trial.

### A. COLLECTIVE REFERENCES TO THE DEFENDANTS DID NOT AFFECT THE FAIRNESS OR INTEGRITY OF THE TRIAL.

Troup first argues that the instructions refer to the Defendants on trial collectively, rather than individualizing each instruction with respect to each Defendant, and that this "failure to individualize the instructions resulted in a constitutionally unacceptable risk of jury confusion."

Troup NTM at 2.  For example, Jury Instruction No. 16 reads: "The government must prove, beyond a reasonable doubt, that the offenses charged in this case were actually committed and that it was Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos who committed them."  Jury Instructions (without citations), Instruction No. 16, at 21.  According to Troup, the "repeated reference to the defendants on trial as a group sent an unmistakable signal that the Court considered these men to be affiliated."  Troup NTM at 4.  For example, Troup asserts, language in Jury Instruction No. 7 suggests that the Defendants "collectively decided not to testify" by referring to "'*their* decision not to testify'" and stating that jurors should not draw any inferences from the fact that the Defendants "'did not take the witness stand and testify or whether *they* called any witnesses.'"  Troup NTM at 4 (quoting Jury Instructions (without citations), Instruction No. 7, at 10)(emphasis in Troup NTM).  Troup next states that "[a]n essential element of a VICAR offense is that there was in fact an enterprise," and he argues that the collective references to the Defendants suggest that "the Court believed the defendants all shared a common purpose."  Troup NTM at 4.  The United States counters that "[t]he Court individualized the [jury] instructions and specifically named each defendant in order to force the jury to consider each defendant individually."  Troup NTM Response at 5.  Moreover, the United States argues, "the juror questionnaires asked jurors if they could consider the guilt of each defendant individually, and the Court provided individual verdict forms for each defendant."  Troup NTM Response at 6 (citing Jury Instructions (with citations) at 72-76).

The Court concludes that the jury instructions' references to all Defendants by name were not erroneous.  First, each time that a jury instruction refers to the Defendants in the plural form, the jury instruction enumerates the specific names of the Defendants to whom it refers.  None of the jury instructions refers generally to the Defendants without including each Defendant's name.

Second, the jury instructions, taken as a whole, directed the jurors to consider each Defendant

separately.  See United States v. Smith, 13 F.3d at 1424 ("The appropriate standard of review for

challenges to jury instructions is whether the jury, considering the instructions as a whole, was

misled." (citing United States v. Mullins, 4 F.3d 898, 900 (10th Cir. 1993))).  Jury Instruction

No. 40 made clear to the jurors that they are to consider each Defendant separately:

> A separate crime is charged against Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos in each count of the indictment.  You must separately consider the evidence against Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos on each count and return a separate verdict for Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos.
>
> Your verdict as to any one defendant or count, whether it is guilty or not guilty, should not influence your verdict as to any other defendants or counts.

Jury Instructions (with citations), Instruction No. 40, at 67.  Jury Instruction No. 5 also reminded

the jurors that, "throughout the trial," they "heard evidence that was admitted . . . as to a particular

defendant, only. . . .  You are not to consider any limited evidence . . . concerning any defendant

against whom the evidence was not admitted."  Jury Instructions (with citations), Instruction No. 5,

at 7.  Furthermore, the second jury instruction told the jurors that "it is [their] sworn duty to follow

all of the rules of law as I explain them to you."  Jury Instructions (with citations), Instruction

No. 2, at 3.

There are several other reasons why Troup's argument is misplaced.  First, as the United

States highlights, "the juror questionnaires asked jurors if they could consider the guilt of each

defendant individually, and the Court provided individual verdict forms for each defendant."

Troup NTM Response at 6 (citing Jury Instructions (with citations) at 72-76, filed May 23, 2018

(Doc. 2303)("Jury Instructions (with citations)")).  The Court agrees.  Question No. 54 of the

Supplemental Juror Questionnaire asks: "In a trial with multiple defendants who are alleged to be members of a gang, do you believe the charges against each defendant should be judged individually?" Supplemental Juror Questionnaire, Question No. 54, at 16, filed January 10, 2019 (Doc. 2487). The Verdict also directs jurors to indicate "guilty or not guilty" for each count charged against each individual Defendant. Verdict at 1-5, filed May 25, 2018 (Doc. 2332). Although there are not individual verdict forms for each Defendant, the verdict form contained separate spaces for each Defendant and the charges against him. See Verdict at 1-5; Troup NTM Reply at 3. Moreover, that the jury acquitted some of the Defendants and not others indicates that the jury individually assessed each Defendant's guilt. Whereas Patterson and Chavez were found not guilty for Count 2, B. Garcia was found guilty. See Verdict at 3-4. Taking Troup's argument to its logical conclusion, if the jury failed to assess individually each Defendant's guilt, then it would not have returned a verdict in which one Defendant is convicted and two other Defendants are acquitted for the same count. The Court thus concludes that the jury was aware of and followed its obligation to assess individually each Defendant's guilt.

Troup invites the Court to presume that the jurors did not or could not assess each Defendant separately in accordance with the jury instructions. The Court sees no reason -- and Troup provides no support -- why the jury did not or could not follow the Court's instructions. See United States v. Jones, 530 F.3d at 1303 ("'That juries can and will follow the instructions they are given is fundamental to our system of justice.'" (quoting United States v. Cardall, 885 F.2d at 668). The Court used individual names in the jury instructions, rather than the word "Defendants," and it used the Tenth Circuit's pattern jury instructions. The Court notes, however, that the Tenth Circuit's pattern jury instructions frequently refer to "defendants." E.g., Tenth Circuit Pattern Jury Instructions Criminal Nos. 1.01, 1.21, 1.22, at 2, 33, 34. There was no reason

to provide the jury with individual jury instructions that repeat each instruction for each Defendant. Moreover, the jury acquitted two Defendants, which indicates that the jurors individually assessed each Defendant's guilt.  Accordingly, the Court concludes that there is no error in the jury instructions' references to all Defendants by name.

### B.     JURY INSTRUCTION NO. 34 IS NOT ERRONEOUS, AND DOES NOT MISSTATE THE LAW FOR AIDING-AND-ABETTING LIABILITY.

Troup argues that Jury Instruction No. 34, which pertains to aiding and abetting, is erroneous and misstates the law.  See Troup NTM at 6; Jury Instructions (with citations), Instruction No. 34, at 59.  Jury Instruction No. 34 reads in full:

> The law makes it a crime to intentionally help someone else commit a crime. To find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: someone else committed the charged crime, and
>
> Second: Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the government must prove that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos consciously shared the other person's knowledge of the underlying criminal act and intended to help him.
>
> Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos need not perform the underlying criminal act, be present when it is performed, or be aware the details of its commission to be guilty of aiding or abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

Jury Instructions (with citations), Instruction No. 34, at 59.  Troup contends that, while the "essence of aiding and abetting liability . . . is the coupling of conduct with intent," Jury Instruction

No. 34 reduces aiding-and-abetting liability to a mental state. Troup NTM at 7. Troup avers that the last sentence in the third paragraph quoted above "erroneously redefined and restricted the preceding sentence in a way that limited what the government was required to prove to solely a mental state -- sharing knowledge and intending to help." Troup NTM at 7. According to Troup, the "limiting language . . . told the jury that it need not find that Mr. Troup committed an act to further the offense. Rather, he need only have had the required intent." Troup NTM at 8.

Troup also argues that the jury instruction was erroneous, because it "told the jury that aiding and abetting was itself a crime." Troup NTM at 9. According to Troup, Jury Instruction No. 34 misstates the law by stating that "'[t]he law *makes it a crime* to intentionally help someone else commit a crime. To find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty *of this crime*, you must be convinced that the government has proved each of the following . . . .'" Troup NTM at 9 (quoting Jury Instructions (without citations), Instruction No. 34, at 53)(emphasis in Troup NTM). Troup argues, however, that "'[a]iding and abetting . . . is not a separate federal crime.'" Troup NTM at 9 (quoting United States v. Deiter, 890 F.3d at 1215). Troup contends that the crime for Counts 1 and 3 is murder under New Mexico state law; however, "Troup was not charged with murder." Troup NTM at 10. Meanwhile, according to Troup, Jury Instruction No. 34 at one point "refer[s] to 'this crime' as the 'crime' of aiding and abetting," and at another point refers to "'the charged crime'" without specifying the crime. Troup NTM at 10 (quoting Jury Instructions (without citations), Instruction No. 34, at 53). According to Troup, this discrepancy led to "confusion . . . [and] [t]he interest of justice [] requires a new trial." Troup NTM at 10.

The United States counters that Jury Instruction No. 34 is not erroneous and correctly states the law. See Troup NTM at 6. The United States notes that the Jury Instruction No. 34 replicates

the "Tenth Circuit pattern jury instruction and only modified the instruction by adding the defendants' individual names." Troup NTM Response at 6 (citing Jury Instructions (with citations), Instruction No. 34, at 59). Troup recognizes, however, that, although the jury instruction "track[s] the 10th Circuit pattern instruction, pattern instructions are not the law, and they can be erroneous." Troup NTM at 6 n.4 (citing United States v. Sierra-Ledesma, 645 F.3d at 1220-21). The United States also reiterates that Troup did not object to this jury instruction at trial and that the jury instruction is not plain error. See Troup NTM Response at 4.

The Court concludes that Jury Instruction No. 34 is an accurate statement of the law and is thus not erroneous. The Court notes that Jury Instruction No. 34 closely mirrors the Tenth Circuit's pattern jury instruction for aiding and abetting. Compare Jury Instructions (with citations), Instruction No. 34, at 59, with Tenth Circuit Pattern Jury Instructions Criminal No. 2.06, at 79 (2011). Jury Instruction No. 34 deviates from the Tenth Circuit's pattern jury instruction only in two minor ways: (i) it substitutes "Each count of the indictment" in the Tenth Circuit's pattern jury instructions with the specific count numbers; and (ii) it substitutes "the defendant" in the Tenth Circuit's pattern jury instructions with the names of each Defendant. Tenth Circuit Pattern Jury Instructions Criminal No. 2.06, at 79 (2011). See Jury Instructions (with citations), Instruction No. 34, at 59.

Although the Tenth Circuit has not analyzed directly whether the Tenth Circuit's pattern jury instruction for aiding and abetting accurately states the law, in United States v. Falkner, No. 13-20056-CM, 2014 WL 1571683 (D. Kan. April 17, 2014)(Murguia, J.), the Honorable Carlos Murguia, United States District Judge for the District of Kansas, held that a jury instruction that was "nearly identical to Tenth Circuit Pattern Instruction 2.06 . . . reflected a correct statement of the law." 2014 WL 1571683, at *3. For the reasons discussed below, the Court agrees with

Judge Murguia. "To be guilty of aiding and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own." United States v. Leos-Quijada, 107 F.3d 786, 764 (10th Cir. 1997)(internal citations omitted). Jury Instruction No. 34 specifically states that, to be guilty of aiding and abetting, each Defendant must have "intentionally participated in" another person's crime "as he would in something he wished to bring about." Jury Instructions (with citations), Instruction No. 34, at 59. This language accounts for both the requisite mental state and act for finding a defendant guilty of a crime under an aiding-and-abetting theory of liability. See United States v. Leos-Quijada, 107 F.3d at 764.

Troup's argument that the jury instruction reduces aiding and abetting to a mental state is unconvincing. The jury instruction requires the jury to find that each Defendant "participated" in some act that helped "someone else" commit the charged crime. Jury Instructions (with citations), Instruction No. 34, at 59. The jury instruction's statement that the "government must prove that" each Defendant "consciously shared the other person's knowledge of the underlying criminal act and intended to help him" merely clarifies the mental state with which a Defendant must act to be guilty of a crime committed by "someone else" under an aiding-and-abetting theory of liability. Jury Instructions (with citations), Instruction No. 34, at 59. This clarification does not erase the act requirement present in Jury Instruction No. 34's preceding sentence. Moreover, "[p]articipation in the criminal venture may be established by circumstantial evidence and the level of participation may be of 'relatively slight moment.'" United States v. Leos-Quijada, 107 F.3d at 794 (quoting United States v. McKneely, 69 F.3d 1067, 1072 (10th Cir. 1995)). The last paragraph of Jury Instruction No. 34 emphasizes that, to be guilty of aiding and abetting, each

Defendant must take some action that helps another person succeed in committing the underlying crime:

> Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos need not perform the underlying criminal act, be present when it is performed, or be aware the details of its commission to be guilty of aiding or abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

Jury Instructions (with citations), Instruction No. 34, at 59.

Finally, Troup's argument that he "was not charged with murder" is misplaced. Troup NTM at 10. Contrary to Troup's contention that Jury Instruction No. 34 does not define the "charged crime" for which the aiding and abetting instruction applies, Troup NTM at 10, the first sentence of the jury instruction specifies that it applies to "Counts 1, 2, 3, 5, 13, 15, and 16," Jury Instructions (with citations), Instruction No. 34, at 59. Counts 1 and 3 of the Second Superseding Indictment charge Troup, and several other Defendants, with murder under 18 U.S.C. § 1959(a)(1) (VICAR) and 18 U.S.C. § 2 (aiding and abetting). See Indictment at 1, 9-11. The Court notes, however, that an aiding-and-abetting jury instruction is appropriate "even when [aiding and abetting is] not charged in the indictment." United States v. Mirabal, 2010 WL 3834264, at *3 (D.N.M. Aug. 7, 2010)(Browning, J.). See United States v. Lewis, 594 F.3d 1270, 1286 (10th Cir. 2010)("This circuit's law is settled that the trial court can give an aiding-and-abetting instruction, and the jury can convict on that theory, even if the indictment does not allege aiding and abetting."). By arguing that the indictment does not charge him with murder, Troup not only belies the Second Superseding Indictment's own text -- which charges Troup for the "Murder of F.C." in Count 1 and the "Murder of F.S." in Count 3, Indictment at 9-10 -- but also reveals a misunderstanding of aiding and abetting liability. The Tenth Circuit has explained that "'a

defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the underlying offense and not as an aider and abettor, provid[ed] that the commission of the underlying offense is also proven.'"  United States v. Lewis, 594 F.3d at 1286 (quoting United States v. Cooper, 375 F.3d 1041, 1049 (10th Cir. 2004)).  Furthermore,

> "[t]he reason for this rule is that aiding and abetting simply describes the way in which a defendant's conduct resulted in the violation of a particular law.  The federal criminal statute dealing with the subject speaks simply of agency and causation principles, providing that a person is punishable "as a principal" if he "aids, abets, counsels, commands, induces or procures" the commission of a federal offense or "willfully causes" another to do an act that would be criminal if he performed it himself.  18 U.S.C. § 2.  Because the aiding and abetting provision does not set forth an essential element of the offense with which the defendant is charged or itself create a separate offense, aiding and abetting liability need not be charged in an indictment.  See United States v. Thirion, 813 F.2d 146, 151 (8th Cir. 1987)."

United States v. Mirabal, 2010 WL 3834264, at *3 (quoting United States v. Ashley, 606 F.3d 135, 143 (4th Cir. 2010)).  Jury Instruction No. 34 asks the jurors to determine whether Troup and the other Defendants helped one of their co-Defendants commit a charged crime, such as murder in Counts 1 and 3, not whether Troup and his co-Defendant themselves committed the charged crime. Jury Instruction No. 34 properly instructed the jurors that they could find Troup guilty of murder under an aiding-and-abetting theory of liability.  The Court concludes that Jury Instruction No. 34 accurately states the law and is not so confusing that the interests of justice entitle J. Gallegos, Troup, and B. Garcia to a new trial.

## C. JURY INSTRUCTION NO. 2 DOES NOT MISCHARACTERIZE THE JURY'S ROLE.

Jury Instruction No. 2 instructs the jury to "determin[e] what actually happened," Jury Instructions (with citations), Instruction No. 2, at 3, and Troup argues that this instruction contravenes the jury's role, which is to "determine whether the government has proven each and

every element of the charged offense(s) beyond a reasonable doubt," Troup NTM at 10-11. According to Troup, in Lanigan v. Maloney, the First Circuit held erroneous an instruction, because it "suggest[s] that the jury's task is to figure out which side is 'right' rather than to determine whether the government proved guilt beyond a reasonable doubt." 853 F.2d at 48. Troup argues that, by telling the jury that "it had to determine 'what actually happened,'" the jury instruction "erroneously alleviated the government of its burden to convince each juror that the government had proved all the elements of the offenses beyond a reasonable doubt." Troup NTM at 11 (quoting Jury Instructions (without citations), Instruction No. 2, at 3). The United States does not respond to this argument. See Troup NTM Response at 1-11.

Because Jury Instruction No. 2 did not misguide the jury or impair Troup's substantial rights, the interests of justice do not require the Court to grant a new trial. The Tenth Circuit reviews jury instruction challenges "to determine whether, considering the instructions as a whole, the jury was misled." United States v. Winchell, 129 F.3d 1093, 1096 (10th Cir. 1997). Furthermore, the Tenth Circuit will not reverse a conviction "[i]f, as a whole, the instructions correctly state the law and provide the jury with an 'intelligent, meaningful understanding of the applicable issues and standards.'" United States v. Winchell, 129 F.3d at 1096 (quoting United States v. Laughlin, 26 F.3d 1523, 1528 (10th Cir. 1994)). Jury Instruction No. 2 reads:

> You, as jurors, are the judges of the facts. But in determining what actually happened -- that is, in reaching your decision as to the facts -- it is your sworn duty to follow all of the rules of law as I explain them to you.
>
> You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy.  That was the promise you made and the oath you took.

Jury Instructions (with citations), Instruction No. 2, at 3.  This jury instruction is a verbatim recitation of Tenth Circuit Pattern Jury Instruction 1.04 (Duty to Follow Instructions).  Compare Jury Instructions (with citations), Instruction No. 2, at 3, with Tenth Circuit Pattern Jury Instructions Criminal No. 1.04, at 8 (2011).

Reading Jury Instruction No. 2 as a whole and in conjunction with the other jury instructions, the Court concludes that the jury instruction did not mislead the jurors or misstate the law.  The Court notes that Jury Instruction No. 2 mirrors word-for-word the Tenth Circuit's pattern jury instruction for the jury's duty to follow instructions.  Compare Jury Instructions (with citations), Instruction No. 2, at 3, with Tenth Circuit Pattern Jury Instructions Criminal No. 1.04, at 8 (2011).  The Tenth Circuit has explained that "'[t]he instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.'"  United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir. 2003)(quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).  Troup argues that Jury Instruction No. 2 "erroneously alleviated the government of its burden to convince each juror that the government had proved all the elements of the offenses beyond a reasonable doubt."  Troup NTM Response at 11.  Troup's reliance on Lanigan v. Maloney is misplaced.  In Lanigan v. Maloney, the First Circuit held that the trial court's reasonable doubt jury instruction was erroneous, because "the entire thrust of the reasonable doubt charge was to de-emphasize the strength of what is supposed to be a very strong standard, potentially depriving petitioner of perhaps his most important protection against an improper verdict."  Lanigan v. Maloney, 853 F.2d at 48.  Troup does not demonstrate, however, that Jury Instruction No. 2 -- with

its clause, "in determining what actually happened" -- reduced the United States' burden. Jury Instructions (with citations), Instruction No. 2, at 3. The purpose of Jury Instruction No. 2 is not to clarify or define the beyond-a-reasonable-doubt standard. Rather, the jury instruction emphasizes to the jury its "sworn duty to follow all of the rules of law as I explain them to you." Jury Instructions (with citations), Instruction No. 2, at 3.

The subsequent jury instructions elucidate the United States' beyond-a-reasonable-doubt burden. On thirty-one occasions, the jury instructions state that the jury should not convict a Defendant unless it concludes that the United States proved that the Defendant was guilty beyond a reasonable doubt. See, e.g., Jury Instructions (with citations), Instruction No. 3, at 4. The jury instructions break down each VICAR element into separate instructions to make the jury's job more straightforward and less confusing, and each instruction reiterates to the jury that, to convict, it must conclude that the United States has proven guilt beyond a reasonable doubt. See Jury Instructions (with citations), Instruction Nos. 25-37, at 39-63. Jury Instruction No. 3 reminds the jury that "[t]he government has the burden of proving [each Defendant] guilty beyond a reasonable doubt, and if it fails to do so, you must find [each Defendant] not guilty." Jury Instructions (with citations), Instruction No. 3, at 4. Jury Instruction No. 3 also defines "proof beyond a reasonable doubt":

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia,

Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos is guilty of the crime charged, you must find him guilty.  If on the other hand, you think there is a real possibility that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos is not guilty, you must give Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, and Mr. Arturo Garcia, and Mr. Andrew Gallegos the benefit of the doubt and find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos not guilty.

Jury Instructions (with citations), Instruction No. 3, at 4-5.  The Tenth Circuit has held that "'no particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law.'"  Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1248 (10th Cir. 1998)(quoting Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1365 (10th Cir. 1994)).

The Court determines that the jury instruction's explanation of proof beyond a reasonable doubt is accurate.  See Tillman v. Cook, 215 F.3d 1116, 1121-25 (10th Cir. 2000)(defining the beyond-a-reasonable-doubt standard, and stating that, "'taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury'" (quoting Victor v. Nebraska, 511 U.S. 1, 5 (1994))).  Jury Instruction No. 2 does not distract the jury from the importance of this burden.  The Court concludes that, based on a holistic reading of the jury instructions, the jury's duty to convict each Defendant only if the United States has proven each Defendant guilty beyond a reasonable doubt is clear and unmistakable.   Jury Instruction No. 2 is not erroneous.  Accordingly, the interests of justice do not entitle J. Gallegos, Troup, and B. Garcia to a new trial.

D.    REFERENCES TO THE GRAND JURY DO NOT UNDERMINE THE DEFENDANTS' PRESUMPTION OF INNOCENCE.

Troup argues that references to the grand jury in some of the jury instructions "lent an inappropriate sheen of legitimacy to the charges and undermined the presumption of innocence." Troup NTM at 11.  Jury Instruction Nos. 23 and 24 both indicate that a grand jury had brought an indictment against the defendants.  See Jury Instructions (without citations), Nos. 23-24, at 29-34.

Troup asserts that the jury was not informed of what a grand jury is, and that the jury only knew that "another jury (a 'grand' one) had heard evidence and made a determination against these defendants." Troup NTM at 12. According to Troup, references to the grand jury "undermined the presumption of innocence," and thus, the "interest of justice [] requires a new trial." Troup NTM at 12. The United States counters that mentions of the grand jury indictment "did not lend an inappropriate sheet [sic] of legitimacy to the charges" because the same instruction is "given in every case." Troup NTM Response at 6.

Troup's argument does not persuade the Court. As discussed above, the jury instructions repeatedly told the jurors that the United States carries the burden of proving guilt beyond a reasonable doubt. See, e.g., Jury Instructions (with citations), Instruction Nos. 3, 27, 29, at 4, 45, 47. The jury instructions also define and explain that burden. See Jury Instructions (with citations), Instruction No. 3, at 4-5. When the Defendants conducted direct voir dire examination, the Court confirmed with potential jurors that they can "put aside how we got [to the trial], and anything about the grand jury, just put that aside and just focus on the evidence here." Transcript of Jury Trial at 15:17-20 (taken April 10, 2018)(Court), filed July 25, 2018 (Doc. 2355)("April 10 Tr."). Although the jury instructions do not distinguish between the beyond-a-reasonable-doubt standard and the standard for a grand jury's decision to indict, the Court concludes that this omission did not impair the Defendants' substantial rights.

The Tenth Circuit has not addressed this issue, but several other Courts of Appeals have. For example, in United States v. Conley, 186 F.3d 7 (1st Cir. 1999), the First Circuit reasoned:

> [The defendant's] claims of unfair prejudice stem from the district court's failure to explicitly instruct the jury with respect to the different standards of proof governing the grand jury's decision to indict and a petit jury's decision to convict. We find no unfair prejudice. Any risk of juror confusion concerning the appropriate standard of proof was minimized by the district judge's thorough instructions

concerning the presumption of innocence and the government's burden to prove its case beyond a reasonable doubt.  In addition, the district judge made it abundantly clear to the jurors on several different occasions that the indictment returned by the grand jury is in no sense a part of the evidence that you will consider as you consider whether the government has met its heavy burden of proof of guilt beyond a reasonable doubt.

186 F.3d at 17 (internal citations and quotes omitted)(footnotes omitted).  In United States v. Fields, 483 F.3d 313 (5th Cir. 2007), the Fifth Circuit also held that references to the grand jury's decision to indict are not erroneous, because

> [t]he jury venire was repeatedly instructed that the grand jury's indictment could not be considered as evidence.  Additionally, the court instructed that Fields maintained the presumption of innocence.  It advised that the Government bore the burden of proving guilt beyond a reasonable doubt and gave a correct definition of that standard of proof.  The petit jury never was instructed to apply the preponderance standard.

483 F.3d at 353-54.  Here, the Court repeatedly instructed the jury that it may convict the Defendants only if the United States proves the Defendants guilty beyond a reasonable doubt.  See, e.g., Jury Instructions (with citations), Instruction Nos. 3, 27, 29, at 4, 45, 47.  These instructions were thorough, and Jury Instruction No. 7 further advised the jurors of the Defendants' presumption of innocence.  See Jury Instructions (with citations), Instruction No. 7, at 11.  Moreover, although Jury Instruction Nos. 23 and 24 are not exact mirror versions of any of the Tenth Circuit's pattern jury instructions, the Tenth Circuit's pattern jury instructions contain several examples of other jury instructions that mention a grand jury.  See Tenth Circuit Pattern Jury Instructions Criminal Nos. 2.08, 2.62, 2.63, 2.66, at 81, 197, 199, 204 (2011).  Furthermore, during the Court's statement of the case on April 10, 2018, and during the voir dire on April 11, 2018, neither the Court nor the United States mentioned the grand jury.  See April 10 Tr. at 21:7-29:4 (Court); April 11 Tr. at 1-247.  The Court concludes that the interests of justice do not require the Court to grant J. Gallegos, Troup, and B. Garcia a new trial.

**E.    JURY INSTRUCTIONS TELLING JURORS NOT TO DRAW INFERENCES FROM THE FACT THAT OTHER DEFENDANTS ARE NOT ON TRIAL AND NOT TO CONSIDER OTHER DEFENDANTS' POSSIBLE GUILT ARE NOT ERRONEOUS.**

Several jury instructions tell jurors not to draw inferences from the fact that many Defendants named in the indictment were not on trial, which Troup argues hindered the jury's ability to determine witness' credibility.  See Troup NTM at 12-13.  In particular, Troup quotes Jury Instruction No. 24, which states: "'[Y]ou are not to draw any inferences from the fact that other Defendants named in the indictment are not on trial before you today,'" Troup NTM at 12 (quoting Jury Instructions (without citations), Instruction No. 24, at 34), and Jury Instruction No. 39, which states: "'The question of the possible guilt of others *should not enter your thinking* as you decide whether Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos have been proved guilty of the crimes charged, unless you are expressly instructed otherwise,'" Troup NTM at 13 (quoting Jury Instructions (without citations), Instruction No. 39, at 58)(emphasis in Troup NTM).  According to Troup,

> the jury was given conflicting instructions on how to evaluate the testimony of crucial government witnesses, [and therefore,] there is a reasonable likelihood that the jury applied the instructions in a way that limited their determination of the credibility of those witnesses and violated Mr. Troup's rights to due process and a fair trial.

Troup NTM at 13.  The United States counters that Jury Instruction Nos. 24 and 39 are proper, and follow Tenth Circuit pattern instructions.  See Troup NTM Response at 6 (citing Jury Instructions (with citations), Instruction Nos. 24, 39, at 38, 66).

The Court concludes that Jury Instruction Nos. 24 and 39 are not erroneous.  Jury Instruction No. 24, which advises jurors to base their "verdict solely on the evidence received in this trial" and "not to draw any inferences from the fact that other Defendants named in the

indictment are not on trial" does not directly mirror any Tenth Circuit pattern jury instructions. Jury Instructions (with citations), Instruction No. 24.  In contrast, Jury Instruction No. 39, which advises that the "question of the possible guilt of others should not enter your thinking as you decide whether Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos have been proved guilty of the crimes charged, unless you are expressly instructed otherwise" mirrors Tenth Circuit Pattern Jury Instruction 1.19 (Caution -- Consider Only Crime Charged), at 31, with the only exception that Jury Instruction No. 39 inserts each Defendant's name.  See Jury Instructions (with citations), Instruction No. 39, at 66.

Troup argues that these jury instructions conflict with other jury instructions "on how to evaluate the testimony of crucial government witnesses."  Troup NTM at 13.  The Court does not agree with Troup's argument.  Several jury instructions insist that the jurors consider each witness' credibility.  See, e.g., Jury Instructions (with citations), Instruction No. 7, 10, 16 at 10, 14, 25.  For example, Jury Instruction No. 16 instructs: "You should evaluate the credibility of any witness making an identification in the same manner as you would any other witness."  Jury Instructions (with citations), Instruction No. 16, at 25.  Jury Instruction No. 24 does not contradict other jury instructions telling jurors to consider a witness' credibility, because it does not prevent jurors from making credibility determinations.  Jury Instruction No. 24 instructs jurors to "base your verdict solely on the evidence received in this trial" and not on the fact that only some Defendants are being tried in the trial.  Jury Instructions (with citations), Instruction No. 24, at 39.  Similarly, Jury Instruction No. 39 does not contradict other jury instructions telling jurors to consider a witness' credibility.  Read as a whole, these jury instructions are consistent with the jury instructions about witness credibility.  First, Jury Instruction No. 39 permits jurors to consider a witness' possible

guilt if instructed, such as by another jury instruction.  Thus, Jury Instruction No. 39 does not rule out considerations of a witness' possible guilt in all circumstances.  Second, Jury Instruction Nos. 24 and 39, read in combination, require jurors not to consider a witness' possible guilt when deciding whether the Defendants are guilty, which is different from considering a witness' possible guilt to determine if the witness is credible.  In sum, these jury instructions tell jurors that one Defendant's guilt does not depend on that of another Defendant, because the jury should assess each Defendant individually.  These jury instructions thus "focused jurors on the task at hand," which was to determine whether the United States had proven each Defendant guilty beyond a reasonable doubt.  United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998)(upholding a jury instruction telling the jury "not to concern themselves with the guilt of anyone except" the defendant, because, "[r]ead in combination with the instruction requiring the jury to find guilt 'beyond a reasonable doubt,' it focused jurors on the task at hand: determining whether [the defendant] was guilty of . . . robbery").  Jury Instruction No. 39 states that jurors should not consider the "possible guilt of others" when determining each Defendant's guilt, "unless you are expressly instructed otherwise."  Jury Instructions (with citations), Instruction No. 39, at 66.  There were situations in this case where the actions of others were relevant.  For example, the aiding-and-abetting instruction required the jury to consider actions of people not on trial.  Some cooperating witnesses were not on trial but were Defendants in this case; it was important for both the United States and the Defendants to have the jury and the Court consider other Defendants' actions.  Accordingly, the jury could consider the actions of a person not on trial -- SNM members -- in determining whether the United States proved VICAR's enterprise and racketeering activity elements.  The Court concludes that Jury Instruction Nos. 24 and 39, read in combination with the other jury instructions, are not "equivocal and ambiguous."  Troup NTM at 13.  The

interests of justice therefore do not require the Court to grant J. Gallegos, Troup, and B. Garcia a new trial.

### F.    JURY INSTRUCTION NO. 31 STATES THAT ESTABLISHING A VIOLENT CRIME UNDER STATE LAW, SUCH AS MURDER, IS A NECESSARY ELEMENT TO ESTABLISH A VICAR VIOLATION, AND THE COURT DID NOT INDICATE A PREFERENCE THAT THE JURY RETURN A GUILTY VERDICT.

Troup argues that Jury Instruction No. 31 contains erroneous and confusing language about murder under New Mexico law, and how it relates to the VICAR charges.  See Troup NTM at 14-15.  Troup quotes from Jury Instruction No. 31, which states that "'[t]he essential elements of first degree murder under New Mexico law are provided below *to aid you* in deciding if the government has proved the fourth element'" of the VICAR counts.  Troup NTM at 14 (quoting Jury Instructions (without citations), Instruction No. 31, at 46)(emphasis in Troup NTM).  According to Troup, "whether a murder under New Mexico law has been committed [is] an essential element of the VICAR counts," and, thus, the elements of murder under New Mexico law are "essential elements" rather than an "'aid' to the jury in deciding whether the government had proven the fourth element of the VICAR counts."  Troup NTM at 14 (quoting Jury Instructions (without citations), Instruction No. 31, at 46).  According to Troup, he was not charged with murder, and murder is only an element of a count; therefore, "the Court gave an impression that finding the elements of New Mexico murder was sufficient to convict of Count[s] 1 and 3."  Troup NTM at 14-15.  Troup also avers that the Jury Instruction No. 31 "gave an indication of a preference for a verdict of guilt."  Troup NTM at 15.  Troup argues that, while Jury Instruction No. 31 tells jurors to "'discuss the reasons why there is disagreement'" if the jurors could not unanimously agree that the Defendants were guilty, "there was no counterbalancing instruction to the jurors to discuss their reasons if they did find the defendants to be guilty."  Troup NTM at 15

(quoting Jury Instructions (without citations), Instruction No. 31, at 48).  The United States counters that Jury Instruction No. 31 was proper, because "the jury was required to find the defendant committed a murder in order to satisfy the fourth [VICAR] element."  Troup NTM at 6-7 (citing Jury Instructions (with citations), Instruct No. 31, at 52-54).  According to the United States, a "guilty finding on murder was the same thing as finding the defendant committed that element beyond a reasonable doubt."  Troup NTM at 7.

Troup also argues that Jury Instruction No. 31 "erroneously utilized the definition of murder under New Mexico state law rather than the generic definition of murder."  Troup NTM Reply at 8.  According to Troup, "Congress meant the VICAR statute to cover only those violations of state law involving conduct 'generically defined' as one of the predicate offenses, including 'murder.'"  Troup NTM Reply at 8 (quoting United States v. Le, 316 F. Supp. 2d at 359-62).  Troup argues that Jury Instruction No. 31 did not incorporate the "elements of generic murder," and that, "'[a]ccording to Tenth Circuit case law, generic murder is defined as intentional killing; killing during the commission of a felony; and killing that, although unintentional, occurs in the course of dangerous conduct that demonstrates a reckless or malignant disregard for serious risks posed to human life.'"  Troup NTM Reply at 10-11 (quoting United States v. Watts, 2017 WL 411341, at *10 & n.83).  At the December 18, 2018, hearing, Troup clarified that: (i) the jury instruction should not include the elements for murder under New Mexico law, because VICAR cannot be based on "the murder statutes of 50 different states," and that there should be a "general recognized murder instruction"; (ii) the jury instruction cannot include the elements for second-degree murder under New Mexico law, because the six-year statute of limitations had run; and (iii) New Mexico's second-degree murder statute mentions "probability," and "probability is a bad statute to use in VICAR."  Dec. 18 Tr. at 32:3-33:1 (Burke).

None of Troup's arguments persuades the Court. Taken as a whole, the jury instructions indicate that whether the Defendants committed a violent crime, such as murder, is only one of five VICAR elements that the United States must prove beyond a reasonable doubt to attain a guilty verdict. Jury Instruction No. 25 says:

> For you to find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty of [18 U.S.C. § 1959(a)], as charged in Counts 1, 2, 3, 4, 5, 13, 14, and 15, you must be convinced that the government has proved each of the following beyond a reasonable doubt.

Jury Instructions (with citations), Instruction No. 25, at 39. The remainder of Jury Instruction No. 25 lists out the five VICAR elements, using the conjunction "and" to indicate that the United States must prove all five elements. Jury Instructions (with citations), Instruction No. 25, at 40. The Court notes that Instruction No. 25 closely mirrors the Tenth Circuit's pattern jury instruction for the RICO Act. See Tenth Circuit Pattern Jury Instructions Criminal No. 2.74.2, at 230 (2011). VICAR's fourth element requires the United States to prove that each of the Defendants committed a crime of violence, and Jury Instruction No. 25 lists out the violent crimes alleged in each count of the Indictment. See Jury Instructions (with citations), Instruction No. 25, at 39-40. Last, Jury Instruction No. 25 informs jurors that the Court "will instruct you on what the government must prove to establish that [the Defendants] committed any of these acts." Jury Instructions (with citations), Instruction No. 25, at 40. In turn, Jury Instruction No. 31 explains what the United States "must prove" to establish that the Defendants charged in Counts 1, 2, 3, and 5 committed murder, such that VICAR's "fourth element" is satisfied. Jury Instruction No. 31, at 52.

Troup argues that Jury Instruction No. 31 is erroneous, because: (i) the elements of murder under New Mexico law are "essential elements" rather than an "'aid' to the jury in deciding whether the government had proven the fourth element of the VICAR counts," Troup NTM at 14

(quoting Jury Instructions (without citations), Instruction No. 31, at 46); (ii) "the Court gave an impression that finding the elements of New Mexico murder was sufficient to convict of Count[s] 1 and 3," Troup NTM at 14-15; (iii) the Court "gave an indication of a preference for a verdict of guilt," Troup NTM at 15; (iv) it incorrectly defines VICAR murder using the elements of first-degree and second-degree murder under New Mexico law, see NTM Reply at 8; Dec. 18 Tr. at 32:3-33:1 (Burke).    The Court disagrees.    First, Jury Instruction No. 31 states that the enumerated elements of "first degree murder under New Mexico law" and "second degree murder under New Mexico law" are "essential elements" for the jurors to assess.  Jury Instructions (with citations), Instruction No. 31, at 52-53.  Reading the jury instructions as a whole, it is clear that, for the jury to find that VICAR's fourth element is satisfied, it must find that Troup satisfies each element of either first-degree murder or second-degree murder.  That Jury Instruction No. 31 provides the "essential elements" for each crime "to aid you [the jurors] in deciding if the government has proven the fourth element" does not mean that the elements are optional considerations.  Jury Instructions (with citations), Instruction No. 31, at 52.  To the contrary, Merriam-Webster defines "aid" as "to provide with what is useful or necessary in achieving an end" when it is used as a transitive verb, as it is here.  "Aid," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/aid (last visited Dec. 16, 2019).  Jury Instruction No. 31 instructs jurors that they "must prove" murder, and it lists the "essential elements" that are necessary to establish first-degree and/or second-degree murder.  Jury Instructions (with citations), Instruction No. 31, at 52.  The Court determines that the jury followed this instruction by assessing each element.

Second, Jury Instruction No. 31 does not indicate that establishing murder under New Mexico law is "sufficient" to establish that Troup and his co-Defendants violated VICAR.  Rather,

establishing murder is necessary to establishing a VICAR violation, because, as the jury instructions make clear, establishing murder satisfies only one of VICAR's five elements. The first sentence of Jury Instruction No. 31 states: "The fourth element which the government must prove beyond a reasonable doubt as to Count 1 is that Mr. Joe Gallegos, Mr. Troup, and Mr. Billy Garcia murdered Mr. Castillo; . . . [and] as to Count 3 is that Mr. Troup and Mr. Arturo Garcia murdered Mr. Sanchez." Jury Instructions (with citations), Instruction No. 31, at 52. At no point do the jury instructions indicate that establishing that Troup committed murder would satisfy all five VICAR elements. Jury Instruction No. 25 instructs that the United States must satisfy all five VICAR elements for the jury to convict a Defendant under 18 U.S.C. § 1959(a), and Jury Instruction No. 31 makes clear the elements of murder under New Mexico law that, if proven, satisfy VICAR's fourth element that the Defendant committed a violent crime.

Third, Jury Instruction No. 31 does not indicate that the Court preferred the jury to deliver a guilty verdict. The relevant portion of Jury Instruction No. 31 reads:

> If you unanimously agree that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos is guilty of murder in the first degree, you can return a verdict of guilty of murder in the first degree. If you do not agree, you should discuss the reasons why there is a disagreement.
>
> If, after reasonable deliberation, you do not agree that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos is guilty of murder in the first degree you should move to a discussion of murder in the second degree. If you unanimously agree that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos is guilty of murder in the second degree, you can return a verdict of guilty of murder in the second degree. If you do not agree you should discuss the reasons why there is a disagreement.

Jury Instructions (with citations), Instruction No. 31, at 53-54. Troup argues that, while Jury Instruction No. 31 tells jurors to "'discuss the reasons why there is disagreement'" if they disagree

about guilt, it does not tell "jurors to discuss their reasons if they did find the defendants to be guilty."  Troup NTM at 15 (quoting Jury Instructions (without citations), Instruction No. 31, at 48).  Troup's argument is unconvincing.  First, the jury instruction does not indicate a preference for a guilty verdict, because the last paragraph instructs:

> If you have a reasonable doubt as to whether Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos committed any one of the crimes, you must determine that he is not guilty of that crime.  If you find him not guilty of all of these crimes, you must return a verdict of not guilty.

Jury Instructions (with citations), Instruction No. 31, at 54.  Reading the jury instructions as a whole, the Court instructed several times that, if the United States fails to prove that a Defendant is guilty beyond a reasonable doubt, then the jury must find that Defendant not guilty.  See, e.g., Jury Instructions (with citations), Instruction No. 3, at 4 ("The government has the burden of proving Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty beyond a reasonable doubt, and if it fails to do so, you must find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos not guilty.").  Thus, the jury instructions -- as a whole -- are neutral and do not indicate a preference for a particular verdict.  Second, Jury Instruction No. 31 does not tell the jurors not to discuss whether the Defendants are guilty.  The jury instruction states:

> You should be sure that you fully understand the elements of each crime before you deliberate further.  You will then discuss and decide whether Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos are guilty of murder in the first degree.

Jury Instructions (with citations), Instruction No. 31, at 53.  Troup's argument that "there was no counterbalancing instruction to the jurors to discuss their reasons if they did find the defendants to be guilty" is mistaken, Troup NTM at 15, because Jury Instruction No. 31 tells jurors to "discuss

and decide whether [each Defendant is] guilty of murder," Jury Instructions (with citations), No. 31, at 53. It is, therefore, not plausible that the jury could arrive at a unanimous guilty verdict without first discussing guilt, because that it is what the jury instruction requires jurors to do. Third, even if Jury Instruction No. 31 contains an error, Troup has not articulated how such an error affects his substantial rights in a way that entitles him to a new trial.

Fourth, Jury Instruction No. 31 correctly provides the elements of first-degree and second-degree murder under New Mexico law. Troup raises three points to support his argument: (i) the jury instruction should not include the elements for murder under New Mexico law, because VICAR cannot be based on "the murder statutes of 50 different states," and that there should be a "general recognized murder instruction"; (ii) the jury instruction cannot include the elements for second-degree under New Mexico law, because the six-year statute of limitations had run; and (iii) New Mexico's second-degree murder statute mentions "probability," and "probability is a bad statute to use in VICAR." Dec. 18 Tr. at 32:3-33:1 (Burke). Whereas Troup raised the first two arguments at trial, see Memorandum Opinion and Order at 1-5, 2018 WL 2323236, at *1-3, filed May 22, 2018 (Doc. 2301)("May 22 MOO"), Troup raises the third argument for the first time, see Dec. 18 Tr. at 33:2-8 (Court, Burke).

VICAR punishes individuals who, "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a). A plain reading of the statute indicates that VICAR punishes individuals who commit violent crimes "in violation of the laws of any State." 18 U.S.C. § 1959(a). Nevertheless, Troup argues that the Court should have supplied a generic definition for murder, because, "[w]hen Congress enacted VICAR, it made clear

that it did not want 'the applicability . . . to be subject to the drafting whims of fifty state legislatures.'"  Troup NTM Reply at 8 (quoting United States v. Le, 316 F. Supp. 2d at 360).  Troup notes that, in the May 22 MOO, the Court addressed the Defendants' objections to incorporating the elements of murder under New Mexico law, and he argues that, in one portion of the May 22 MOO, the Court cites cases that indicate that Congress "did not intend to incorporate elements of state crimes into federal offenses like RICO and VICAR."  Troup NTM Reply at 9 (emphasis omitted).  The relevant portion of the May 22 MOO states:

> References to state law in federal racketeering statutes like VICAR -- "in violation of the laws of any State," 18 U.S.C. § 1959(a) -- and RICO -- "which is chargeable under State law," 18 U.S.C. § 1961(1)(A) -- define the conduct that violates federal law; those references do not incorporate state procedural or evidentiary rules.  See United States v. Crenshaw, 359 F.3d 977, 988 n.4 (8th Cir. 2004)(commenting that a state procedural rule providing that "a conviction cannot be based upon uncorroborated accomplice testimony" does not apply in a VICAR prosecution); United States v. Shryock, 342 F.3d 948, 987 (9th Cir. 2003)(applying the principle that a "state accomplice-corroboration rule does not apply with respect to predicate acts for RICO prosecutions because the accomplice-corroboration rule is procedural, rather than an element of the offense" to a VICAR prosecution); United States v. Kehoe, 310 F.3d 579 (8th Cir. 2002)(drawing conclusions about VICAR from the fact that "'Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute'" (quoting United States v. Carillo, 229 F.3d 177, 183 (2d Cir. 2000)).  See also United States v. Paone, 782 F.2d 386, 393 (2d Cir. 1986)("We are satisfied that Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute.  The statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge."); United States v. Licavoli, 725 F.2d 1040, 1047 (6th Cir. 1984)("The reference to state law in the statute is simply to define the wrongful conduct, and is not meant to incorporate state procedural law."); United States v. Frumento, 563 F.2d 1083, 1087 n.8A (3d Cir. 1977)("Section 1961 requires, in our view, only that the conduct on which the federal charge is based be typical of the serious crime dealt with by the state statute, not that the particular defendant be 'chargeable under State law' at the time of the federal indictment."  (quoting 18 U.S.C. § 1961)).

May 22 MOO at 3, 2018 WL 2323236, at *1.  The Court maintains that VICAR does not incorporate state procedural and evidentiary rules, because VICAR "criminalizes 'the furthering

of the enterprise, not the predicate acts,'" and thus it "'supplement[s] rather than replace[s] the existing predicate crimes and penalties.'"  United States v. Kehoe, 310 F.3d 579, 588 (8th Cir. 2002)(quoting United States v. Crosby, 20 F.3d 480, 484 (D.C. Cir. 2004)).

While it is true that VICAR does not incorporate state procedural and evidentiary rules, a plain language reading of the statute and a close reading of the caselaw indicate that the United States still must prove the elements of the predicate state-law offense.  See, e.g., United States v. Carrillo, 229 F.3d at 183 ("[T]he proposition that the indictment need not recite all elements of the state-law offense constituting a racketeering act does not, without further explanation, lead to the conclusion that the government is excused from proving those elements.").   Although an indictment need allege only that the defendant's conduct violates a generic definition of a violent crime under federal or state law, the United States must, at trial, prove all elements of the violent crime under federal or state law.  See United States v. Carrillo, 229 F.3d at 183 ("The[] purposes and requirements of the indictment are irrelevant to whether the government must prove, and the jury must be charged on, the elements of the offense."); United States v. Fernandez, 288 F.3d 1199, 1219 (9th Cir. 2004); United States v. Mills, 378 F. Supp. 3d at 576 (holding that the United States "must still prove that the crime of violence violated all of the elements of the predicate state-law offense beyond a reasonable doubt at trial, and that the jury must be instructed on those elements as well," but noting that it "is not necessary" for the indictment to allege the elements required to prove the underlying state-law predicate); United States v. Weaver, No. 2:09-cr-00222, 2010 WL 1633319, at *2 (S.D. W. Va. April 20, 2010)(Johnston, J.)("The elements of the predicate acts are not themselves elements of the RICO or VICAR charge.  Therefore, the elements of the predicate acts need not be specifically alleged in the indictment, notwithstanding that they must be proved

at trial."). Moreover, the United States Department of Justice's Organized Crime and Racketeering

Section recommends the same interpretation:

> [W]hen a Section 1959 charge is based upon a violation of state or federal law that satisfies the generic definition of the predicate violent crimes listed in Section 1959, the government must prove, and the jury must be instructed on, all the requisite elements of that state or federal offense. However, it remains good law under Section 1959 and RICO that references in the indictment to the state law predicate violations do not incorporate state procedural and evidentiary rules, such as requiring corroboration for witness accomplices, discovery, statute of limitations, etc.

Violent Crimes in Aid of Racketeering 18 U.S.C. § 1959: A Manual for Federal Prosecutors at 25,

United States Department of Justice (Dec. 2006)(footnotes omitted).

Troup relies on United States v. Le for the proposition that "Congress meant the VICAR

statute to cover only those violations of state law involving conduct 'generically defined' as one

of the predicate offenses, including 'murder.'" Troup NTM at 8 (quoting United States v. Le, 316

F. Supp. 2d at 362-63). United States v. Le does not help Troup or his co-Defendants. In United

States v. Le, the indictment alleged: "(i) violent crimes in aid of racketeering activity, in violation

of 18 U.S.C. § 1959 (VICAR), and (ii) the use and carrying of a firearm during and in relation to

a violent crime in aid of racketeering, in violation of 18 U.S.C. § 924(c)." United States v. Le, 316

F. Supp. 2d at 356. These counts further charged the defendants "with assault with a dangerous

weapon in violation of Virginia's malicious or unlawful wounding statute . . . or brandishing

statute . . . in aid of racketeering." 316 F. Supp. 2d at 356-57. The defendants argued that the

court should dismiss the indictment, because the "elements of malicious or unlawful wounding

and brandishing under Virginia law do not match -- element-by-element -- with the elements of

assault with a dangerous weapon, as defendants contend is required by § 1959." United States v.

Le, 316 F. Supp. 2d at 357. The Honorable Thomas Selby Ellis III, Senior United States District

Judge for the Eastern District of Virginia, disagreed with the defendants, holding that an indictment "need not be dismissed simply because" it alleges that the defendant violated a state law where the state law's elements do not match the elements of the crime under federal law or as the crime is "generically defined."  United States v. Le, 316 F. Supp. 2d at 362-63.  Judge Ellis reasoned that "Congress, not wishing to unnecessarily create new crimes, sought to craft § 1959 so that it reached generic conduct described therein, whatever label a particular state might use to criminalize that conduct."  United States v. Le, 316 F. Supp. 2d at 360.

United States v. Le is inapposite, however, because its analysis applies only to the sufficiency of an indictment.  It says nothing about what the United States must prove at trial or what instructions the jury should receive to establish that a defendant committed a violent crime under VICAR.  As Troup notes, Congress did not intend "'the applicability . . . to be subject to the drafting whims of fifty state legislatures.'"  Troup NTM Reply at 8 (quoting United States v. Le, 316 F. Supp. 2d at 360).  Judge Ellis explained, however, that this is the rule, because, where "an indictment alleges a § 1959 violation based on [a violent crime] in violation of [state] law, it is not necessary that [state] law include an offense with precisely that label or title."  United States v. Le, 316 F. Supp. 2d at 360.  Otherwise, state legislatures could draft laws that criminalize acts with different names than those enumerated in § 1959(a)(1)-(6), therefore reducing VICAR's applicability "to the drafting whims of fifty state legislatures."  United States v. Le, 316 F. Supp. 2d at 559.  Although Congress "craft[ed] § 1959 so that it reached the generic conduct described" in 18 U.S.C. § 1959(a)(1)-(6), United States v. Le, 316 F. Supp. 2d at 559, VICAR's broad scope does not relieve the United States of its obligation to prove each element of the predicate state-law offense and to have the jury instructed of such elements, see United States v. Carrillo, 229 F.3d at 183.

The Tenth Circuit, in an unpublished opinion, held that the United States must prove that the defendant's underlying, predicate act violates a statute to establish VICAR's violent crime element. See United States v. Arrington, 409 F. App'x 190, 195 (10th Cir. 2010)(unpublished). In United States v. Arrington, the Tenth Circuit explains:

> Under 18 U.S.C. § 1959(a), the government must satisfy each element of the predicate offense under state or federal law. *See* 18 U.S.C. § 1959(a) (prohibiting certain acts as well as the "attempt[ ] or conspir[acy]" to commit acts that are "in violation of the laws of any State or the United States" (emphasis added)); *United States v. Marino*, 277 F.3d 11, 30 (1st Cir. 2002)("[F]or a crime to be chargeable under state law, it must at least exist under state law."); *see also United States v. Pimentel*, 346 F.3d 285, 302 (2d Cir. 2003)("[VICAR] and RICO seem to require of a predicate act based on state law that the act include the essential elements of the state crime." (quoting *United States v. Carrillo*, 229 F.3d 177, 186 (2d Cir. 2000))(internal quotation marks omitted)).    Although we have not previously addressed the need to establish the elements of the predicate offense under VICAR, we have indicated that "'predicate acts[ ]' must be violations of certain statutes," such as a state statute, under the analogous RICO statute. *Hall v. Witteman*, 584 F.3d 859, 867 (10th Cir.2009); *see* 18 U.S.C. § 1961(1) (defining prohibited racketeering activity only as those acts prohibited by enumerated federal statutes or "any act or threat involving murder . . . *which is chargeable under State law*" (emphasis added)).

409 F. App'x at 195. The Court determines that instructing the jury on the elements of first-degree and second-degree murder was necessary, because without such instructions, the jury could not find that the Defendants violated a state law. In United States v. Carrillo -- which the Tenth Circuit cites approvingly in United States v. Arrington -- the United States Court of Appeals for the Second Circuit reasons:

> If the conduct proved at trial did not satisfy the elements of the offense as defined by state law, a jury could not find that the defendant had committed the state law offense charged as a predicate act of racketeering.  Likewise, even assuming evidence from which a jury could find a violation of state law, if the defendant's acts as found by the jury did not include all the essential elements of the state law offense, by definition, no state offense would have been found.  It is difficult to see . . . how the defendant could be properly convicted if the conduct found by the jury did not include all the elements of the state offense since RICO requires that the defendant have committed predicate acts "chargeable under state law." If a district

judge failed to charge a jury on the state law elements of the crime constituting a racketeering act, neither we nor the district judge could know what were the factual determinations on which the jury based its verdict. Thus, we would be unable to determine what the jury decided the defendant actually did, and whether, under the jury's findings, the defendant committed the state law offense charged as a racketeering act.

. . . .

Moreover, both the text of RICO and VICAR demand that predicate acts constitute state law crimes. . . . VICAR includes in its prohibition only enumerated acts that are "in violation of the laws of any State or the United States," or the "attempt[ ] or conspir[acy]" to so act (in violation of state or federal law). 18 U.S.C. § 1959(a) (emphasis added). Those statutes therefore seem to require of a predicate act based on state law that the act include the essential elements of the state crime.

United States v. Arrington, 229 F.3d at 183-85 (footnotes omitted). The Court agrees with the

Second Circuit's reasoning. Accordingly, it was not error for the Court to instruct the jury on the

elements of first-degree and second-degree murder under New Mexico law.

Troup next argues that instructing the jury about the elements of second-degree murder

was erroneous, because the six-year statute of limitations had run. See Dec. 18 Tr. at 32:3-33:1

(Burke). The Court concludes that the second-degree murder's six-year statute of limitations under

New Mexico law, see N.M. Stat. Ann. § 30-1-8, is inapplicable to bringing charges under VICAR.

First, as noted above, VICAR "criminalizes 'the furthering of the enterprise, not the predicate

acts,'" and thus it "'supplement[s] rather than replace[s] the existing predicate crimes and

penalties.'" United States v. Kehoe, 310 F.3d at 588 (quoting United States v. Crosby, 20 F.3d

at 484). Second, under VICAR, murder can be punished "by death or life imprisonment,"

18 U.S.C. § 1959(a)(1), and "[a]n offense punishable by death may be found at any time without

limitation," 18 U.S.C. § 3281. Third, VICAR does not incorporate states' procedural and

evidentiary rules. See May 22 MOO at 3, 2018 WL 2323236, at *1 (citing United States v.

Crenshaw, 359 F.3d at 988 n.4; United States v. Shryock, 342 F.3d at 987; United States v. Kehoe,

310 F.3d 579; United States v. Carillo, 229 F.3d at 183; United States v. Paone, 782 F.2d at 393;

United States v. Licavoli, 725 F.2d at 1047; United States v. Frumento, 563 F.2d at 1087 n.8A.).

State statutes of limitations are among the procedural rules that federal racketeering statutes do not

incorporate.  See United States v. Licavoli, 725 F.2d at 1046-47 ("Courts have held that regardless

of the running of the state statute the defendant is still 'chargeable' with the state offense within

the meaning of 18 U.S.C. § 1961(1)(A)." (quoting 18 U.S.C. § 1961(1)(A))); United States v.

Davis, 576 F.2d 1065, 1066-67 (3d Cir. 1978)(rejecting an argument that "Congress intended to

borrow state statutes of limitations for the predicate state offenses"); United States v. Brown, 555

F.2d 407, 418 n.22 (5th Cir. 1977)("'[T]he reference to state law in the federal statute is for the

purpose of defining the conduct prohibited' and is not meant to incorporate the state statute of

limitations or procedural rules." (quoting United States v. Revel 493 F.2d 1, 3 (5th Cir. 1974))).

Incorporating states' procedural rules "would lead to 'the nonsensical result' of treating

differently defendants who engaged in the same conduct in different states" -- an outcome that

Troup asks the Court to avoid.  Troup NTM at 9 (quoting United States v. Le, 316 F. Supp. 2d

at 361).  The same restriction does not, however, apply to substantive state-law defenses.  In the

May 22 MOO, the Court explained that, although

> a state statute-of-limitations defense does not apply in a federal VICAR
> prosecution, state-law defenses that mean that a defendant did not violate state law
> do apply.  See Memorandum Opinion and Order at 4, 2018 WL 1175086, at *2,
> filed March 5, 2018 (Doc. 1870)("Establishing that Baca violated VICAR . . .
> requires the United States to prove: (i) that Baca's conduct constitutes generic
> conspiracy to commit assault resulting in serious bodily injury; and (ii) that Baca's
> conduct also violated New Mexico law.").  For example, a defendant who
> intentionally kills another person does not commit murder under New Mexico law
> if the killing is "committed in the necessary defense of his life."  N.M. Stat. Ann.
> § 30-2-7(A).  See id. § 30-2-7 (enumerating circumstances when "[h]omicide is
> justifiable").  See id. § 30-2-8 ("Whenever any person is prosecuted for a homicide,
> and upon his trial the killing shall be found to have been excusable or justifiable,
> the jury shall find such person not guilty and he shall be discharged.").

> Consequently, New Mexico law regarding self-defense provides a defense to both a state-law murder prosecution and a VICAR murder prosecution. Defenses that mean only that a defendant cannot be prosecuted for violating state law do not, however, bar a federal VICAR prosecution. See United States v. Coonan, 938 F.2d 1553, 1563-64 (2d Cir. 1991)(concluding that "the fact that Kelly was acquitted in state court . . . did not preclude the federal authorities from charging that very same offense as a predicate act in the subsequent RICO action" even though "further state prosecution would be barred by the double jeopardy clause").

May 22 MOO at 4-5, 2018 WL 2323236, at *2 (footnotes omitted). A murder can, thus, qualify as a VICAR offense, even if a state's statute of limitations would bar a state-court prosecution for that murder. The Court concludes that second-degree murder's six-year statute of limitations under New Mexico law does not prevent the United States from bringing VICAR charges for which the predicate crime of violence is second-degree murder.

Last, Troup argues that Jury Instruction No. 31 should not have included New Mexico's second-degree murder elements, because the state statute mentions "probability," and because "probability is a bad statute to use in VICAR." Dec. 18 Tr. at 32:3-33:1 (Burke). The Court notes that this argument "was never argued at trial" and "is going to be judged by plain error." Dec. 18 Tr. at 33:2-7 (Burke, Court). New Mexico law provides:

> B.     Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

N.M. Stat. Ann. § 30-2-1(B). Jury Instruction No. 31 provided the jury with the statute's elements. See Jury Instructions (with citations), Instruction No. 31, at 53. According to Troup, the jury should not have been instructed of second-degree murder's elements, because "strong probability of death or great bodily harm," N.M. Stat. Ann. § 30-2-1(B), is "not the sort of thing that goes with

a general idea of murder," Dec. 18 Tr. at 76:23-24 (Burke)(citing United States v. Pearson, 203 F.3d 1243).

The Court disagrees with Troup's argument. The Tenth Circuit instructs that the "generic definition of murder requires a killer's conduct to at least evince a 'reckless and depraved indifference to serious dangers posed to human life.'" United States v. Castro-Gomez, 792 F.3d 1216, 1216-17 (10th Cir. 2015)(quoting United States v. Marrero, 743 F.3d 389, 401 (3d Cir. 2014)). See United States v. Watts, 2017 WL 511341, at *10 ("According to Tenth Circuit case law, generic murder is defined as intentional killing; killing during the commission of a felony; and killing that, although unintentional, occurs in the course of dangerous conduct that demonstrates a reckless or malignant disregard for serious risks posed to human life."). Troup argues that "[g]reat bodily harm is not death," but the generic definition of murder does not require that a defendant intend to kill. Troup NTM at 11. It requires only that the defendant's conduct "at least evince a 'reckless and depraved indifference to serious dangers posed to human life.'" United States v. Castro-Gomez, 792 F.3d at 1216-17 (quoting United States v. Marrero, 743 F.3d at 401). Moreover, "malice aforethought" is established by showing a "depraved-heart," United States v. Pearson, 159 F.3d 480, 486 (10th Cir. 1998), and it "may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" United States v. Wood, 207 F.3d at 1228 (quoting United States v. Soundingsides, 820 F.2d 1232, 1242 (10th Cir. 1987)).

The Court determines that, although VICAR does not expressly require that the Court use a generic murder definition, New Mexico second-degree murder corresponds with murder's generic definition. Second-degree murder under New Mexico law requires that the defendant's

acts kill another person, and the defendant "knows that such acts create a strong probability of death or great bodily harm to that individual or another." N.M. Stat. Ann. § 30-2-1(B). "Depraved indifference" is synonymous with "depraved heart." Carrie L. Maylor, Recalibrating Depravity in a Feingold Regime: Why New York Courts Should Maintain Register's Approach to Depraved Indifference in Cases of Murder by Abuse, Cardozo L. Rev. 405, 405 n.2 (2007)("The phrases 'depraved indifference,' 'extreme indifference,' 'depraved mind' and 'depraved heart' are used interchangeably to describe crimes involving depraved indifference, such as depraved indifference murder."). The Tenth Circuit has noted that, in the context of second-degree murder, the "concepts of 'depraved heart' and 'reckless and wanton, and a gross deviation from a reasonable standard of care' are functionally equivalent." United States v. Wood, 207 F.3d at 1228. The Court thus concludes that second-degree murder under New Mexico law -- with its requirement that the defendant "knows that [his or her] acts create a strong probability of death or great bodily harm to that individual or another," N.M. Stat. Ann. § 30-2-1(B), corresponds with the Tenth Circuit's generic murder definition, which requires that the defendant's conduct "at least evince a 'reckless and depraved indifference to serious dangers posed to human life,'" United States v. Castro-Gomez, 792 F.3d at 1216-17 (quoting United States v. Marrero, 743 F.3d at 401). Accordingly, Jury Instruction No. 31's inclusion of the elements of second-degree murder under New Mexico law was not erroneous, and J. Gallegos, Troup, and B. Garcia are not entitled to a new trial.

### G.    JURY INSTRUCTION NO. 33 DOES NOT GIVE A JUDICIAL IMPRIMATUR TO THE UNITED STATES' EVIDENCE.

Troup alleges that Jury Instruction No. 33, which defines the fifth VICAR element, "improperly gave a judicial imprimatur to the government's evidence." Troup NTM at 15. Jury

Instruction No. 33 provides several examples of evidence that could satisfy the fifth VICAR element.  See Jury Instructions (with citations), Instruction No. 33, at 57-58.  Troup objects to the following language:

> For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' position in the enterprise.  If Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance his position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position he already held, this element would be established.
>
> These examples are only meant by way of illustration.  They are not exhaustive.

Jury Instructions (with citations), Instruction No. 33, at 57-58.  Troup asserts that this Jury Instruction is "problematic," because: (i) "it suggested that this sort of evidence existed"; and (ii) "it gave the Court's imprimatur to this being the quality of evidence that could establish the fifth VICAR element."  Troup NTM at 16.

The Court concludes that Jury Instruction No. 33 is not erroneous.  First, the jury instruction's examples do not "suggest[] that this sort of evidence existed," Troup NTM at 16, because the last paragraph of the jury instructions states: "These examples are only meant by way of illustration," Jury Instructions (with citations), Instruction No. 33, at 58. Jury Instruction No. 33 is clear that it is providing examples of activities that the jury might consider in determining whether the Defendants' "purpose in committing the underlying crime of violence was to maintain [their] position in the enterprise."  Jury Instructions (with citations), Instruction No. 33, at 57. Second, the Defendants never objected to the examples.  Although the United States initially

proposed a jury instruction with examples of maintaining one's status in the enterprise, see Proposed Jury Instructions, Instruction No. 29, at 44, filed March 23, 2018 (Doc. 1966), the examples did not appear in the Court's proposed jury instructions until the Court's fourth set of jury instructions, see Court's Fourth Proposed Jury Instructions (with citations), Instruction No. 33, at 53 (Doc. 2225). The examples remained in each of the Court's subsequent proposed jury instructions. See Court's Fifth Proposed Jury Instructions (with citations), Instruction No. 34, at 54, filed May 10, 2018 (Doc. 2254); Court's Sixth Proposed Jury Instructions (with citations), Instruction No. 34, at 56, filed May 14, 2018 (Doc. 2264); Court's Seventh Proposed Jury Instructions (with citations), Instruction No. 34, at 56, filed May 15, 2018 (Doc. 2274); Court's Eighth Proposed Jury Instructions (with citations), Instruction No. 34, at 56, filed May 16, 2018 (Doc. 2290); Court's Ninth Proposed Jury Instructions (with citations), Instruction No. 34, at 56, filed May 17, 2018 (Doc. 2292); Court's Tenth Proposed Jury Instructions (with citations), Instruction No. 33, at 57, filed May 17, 2018 (Doc. 2294); Jury Instructions (with citations), Instruction No. 33, at 57. The Court filed ten separate sets of jury instructions before filing the final set of jury instructions, and the Defendants never objected to the inclusion of the examples. The lack of objections -- from any Defendant -- suggests that the jury instruction's examples did not prejudice the Defendants. Third, the Court concludes that, even if providing such examples was an error, the error did not affect the Defendants' substantial rights. The Tenth Circuit has held that a

> jury instruction, even if erroneous, is not constitutionally defective "unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense or is otherwise constitutionally objectionable as, for example, by transgressing the constitutionally rooted presumption of innocence."

Webber v. Scott, 390 F,3d 1169, 1180 (10th Cir. 2004)(quoting Brinlee v. Crisp, 608 F.2d 839, 854 (10th Cir. 1979)).  The Court determines that Jury Instruction No. 33's examples did not make the trial fundamentally unfair and did not prejudice the Defendants.  The Court further concludes that Jury Instruction No. 33 is not constitutionally defective and does not misstate the law. Accordingly, J. Gallegos, Troup, and B. Garcia are not entitled to a new trial on this ground.

### H.    THE COURT DID NOT ERR BY NOT GIVING THE JURY A MISPRISION INSTRUCTION.

At the December 18, 2018, hearing, Troup argued that the Court should have given the jury a misprision instruction.  See Dec. 18 Tr. at 28:20-29:5 (Burke).  Troup notes that he had "raised the issue of misprision" during the trial, but the Court decided not to give the jury a misprision instruction.  Dec. 18 Tr. at 28:25 (Burke).  See Misprision Motion at 1.  Troup explains his rationale for including a misprision instruction:

> [T]he theory that we were advancing was, particularly with regard to Count 1, because the most that was ever said about Edward Troup is that he may have been on the steps, and Torres said: Don't come up here.
>
> And then Jaramillo said: Well, when I left, I saw Troup downstairs, and he was, you know, magically keeping everybody else in their cells.
>
> And I said, what that fits is not telling people, misprision; not conceding. And I said the facts support that.

Dec. 18 Tr. at 28:20-29:5 (Burke).  Troup argues that the misprision instruction would have given the jury "the option of finding him not guilty as to VICAR murder, but then proceeding to say on that offense he is guilty of misprision."  Dec. 18 Tr. at 29:17-20 (Burke).  The United States avers that giving a misprision jury instruction was not an option, because "misprision not only requires not reporting the crime, it requires an affirmative act to cover up that crime."  Dec. 18 Tr. at 73:17-18 (Castellano).  According to the United States, there is no "evidence in the record where

that happened." Dec. 18 Tr. at 73:19-20 (Castellano). The United States also argues that misprision is not a "lesser included offense" in relation to murder. Dec. 18 Tr. at 2-9 (Castellano, Court).

The Supreme Court has held that it is "beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208 (1973). "At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged." Beck v. Alabama, 447 U.S. 625, 633 (1980). Rule 31(c) of the Federal Rules of Criminal Procedure "is the most recent derivative of the common-law practice that permitted a jury to find a defendant 'guilty of any lesser offense necessarily included in the offense charged.'" Schmuck v. United States, 489 U.S. 705, 718-19 (1989)(quoting Beck v. Alabama, 447 U.S. at 633). See Keeble v. United States, 412 U.S. at 208 n.6 ("The rule codified pre-existing law."). Rule 31(c) provides:

> (c)     Lesser Offense or Attempt.  A defendant may be found guilty of any of the following:
>
> > (1)     an offense necessarily included in the offense charged;
> >
> > (2)     an attempt to commit the offense charged; or
> >
> > (3)     an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offense in its own right.

Fed. R. Crim. P. 31(c).

In Schmuck v. United States, the Supreme Court analyzed both rule 31(c)'s history and text, emphasizing that "prevailing practice at the time of the Rule's promulgation informs our understanding of its terms, and, specifically, its limitation of lesser included offense to those 'necessarily included in the offense charged.'" Schmuck v. United States, 489 U.S. at 719 (quoting

Fed. R. Crim. P. 31(c)).   The Supreme Court ultimately adopted an "elements approach" to rule 31(c).   Schmuck v. United States, 489 U.S. at 716.   Under the elements test, "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense.   Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)."   Schmuck v. United States, 489 U.S. at 716 (quoting Fed. R. Crim. P. 31(c)).   The Supreme Court noted that the elements test "in no way alters the independent prerequisite for a lesser included offense instruction that the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater."   Schmuck v. United States, 489 U.S. at 716 n.8.   While this prerequisite ensures that there is sufficient evidence to convict a defendant of a lesser offense, the Supreme Court's elements test requires more than sufficient evidence.

> Because the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial, the elements approach permits both sides to know in advance what jury instructions will be available and to plan their trial strategies accordingly.   The objective elements approach . . . permit[s] appellate courts to decide whether jury instructions were wrongly refused without reviewing the entire evidentiary record for nuances of inference.

Schmuck v. United States, 489 U.S. at 720-721.   Thus, in applying the elements test, the Supreme Court instructs:

> [T]he comparison to be drawn is between *offenses*.   Since offenses are statutorily defined, that comparison is appropriately conducted by reference to the statutory elements of the offenses in question, and not . . . by reference to conduct proved at trial regardless of the statutory definitions.   Furthermore, the language of Rule 31(c) speaks of the necessary inclusion of the lesser offense in the greater.

Schmuck v. United States, 489 U.S. at 718-19 (emphasis in original).

In United States v. Powell, 982 F.2d 1422 (1992), the Tenth Circuit applied Schmuck v. United States' elements test and held that misprision's elements "are in no way related to the

elements" for conspiracy to distribute marijuana under 21 U.S.C. § 846. United States v. Powell, 982 F.2d at 1434. The defendant argued "that the district court erred in refusing to instruct the jury on the offense of misprision as a lesser included offense of conspiracy to distribute controlled substances." United States v. Powell, 982 F.2d at 1434. The Tenth Circuit noted that a "defendant is entitled to an instruction on a lesser included offense 'if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" United States v. Powell, 982 F.2d at 1434 (quoting United States v. Horn, 946 F.2d 738, 743 (10th Cir. 1991)). The Tenth Circuit held, however, that the defendant was not entitled to the misprision instruction. See United States v. Powell, 982 F.2d at 1434.

> The test set forth by the Supreme Court for determining whether one offense is "necessarily included" in another is whether the elements of the lesser offense are a subset of the elements of the charged offense. *Schmuck v. United States*, 489 U.S. 705, 715-22 . . . (1989); *Horn*, 946 F.2d at 744 (the offenses of possession, possession with intent to distribute and distribution are not lesser included offenses of conspiracy to distribute controlled substances). The elements of the offense of misprision are in no way related to the offense charged, and appellant Cale was not entitled to a lesser included offense instruction.

United States v. Powell, 982 F.2d at 1434.

The Court similarly concludes that the "elements of the offense of misprision are in no way related to the offense charged," and thus Troup is not entitled to a misprision instruction. United States v. Powell, 982 F.2d at 1434. Compare 18 U.S.C. § 4, with 18 U.S.C. § 1959(a)(1) & (2). Troup argues that the Court should have given the jury a misprision instruction, because then the jury would have had "the option of finding him not guilty as to VICAR murder, but then proceeding to say on that offense he is guilty of misprision." Dec. 18 Tr. at 29:17-20 (Burke). "The offense of misprision punishes the failure to report the commission of a felony." United States v. Powell, 982 F.2d at 1434 (citing 18 U.S.C. § 4). The federal statute for misprision states:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4. The Tenth Circuit's pattern jury instruction for misprision states:

The defendant is charged in count ___ with a violation of 18 U.S.C. section 4.

This law makes it a crime to conceal from the authorities the fact that a federal felony has been committed. [Predicate offense] is a federal felony.

To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: a federal felony was committed, as charged in count of the Indictment;

Second: the defendant had knowledge of the commission of that felony;

Third: the defendant failed to notify an authority as soon as possible. An "authority" includes a federal judge or some other federal civil or military authority, such as a federal grand jury, Secret Service or FBI agent; and

Fourth: the defendant did an affirmative act, as charged, to conceal the crime.

Mere failure to report a felony is not a crime. The defendant must commit some affirmative act designed to conceal the fact that a federal felony has been committed.

Tenth Circuit Pattern Jury Instructions Criminal No. 2.08, at 98 (2011).

In Counts I and III, Troup is charged with murder in aid of racketeering. See Indictment

at 9-11 (citing 18 U.S.C. § 1959(a)(1) & (2)). The relevant VICAR provisions state:

(a)     Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence

against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished --

> (1)    for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

> (2)    for maiming, by imprisonment for not more than thirty years or a fine under this title, or both.

18 U.S.C. § 1959(a)(1)-(2).  The Court gave the following jury instruction for the VICAR offenses:

> Title 18, United States Code, Section 1959(a), makes it a crime for anyone to commit, threaten to commit, attempt to commit, or conspire to commit a violent crime in aid of an enterprise engaged in racketeering activity.

> For you to find Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos guilty of this crime, as charged in Counts 1, 2, 3, 4, 5, 13, 14, and 15, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

> First:    The existence of an "enterprise" as alleged in the Indictment and defined in 18 U.S.C. § 1959 (b)(2);

> Second:    That the charged enterprise engaged in, or its activities affected, interstate commerce;

> Third:    That the charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1);

> Fourth:    That Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos committed one of the following crimes of violence as alleged in the indictment or conspired or attempted to commit one of these crimes -- which crime violated state or federal law: murder, kidnaping, maiming, assault with a dangerous weapon, assault resulting in serious bodily injury, threatening to commit a crime of violence;

>> Count 1: (Mr. Joe Gallegos, Mr. Troup, and Mr. Billy Garcia) Murder of Mr. Castillo;

>> Count 2: (Mr. Billy Garcia, Mr. Chavez, and Mr. Patterson) Murder of Mr. Garza;

Count 3: (Mr. Troup and Mr. Arturo Garcia) Murder of Mr. Sanchez;

Count 4: (Mr. Joe Gallegos and Mr. Andrew Gallegos) Conspiracy to Murder Mr. Burns;

Count 5: (Mr. Joe Gallegos and Mr. Andrew Gallegos) Murder of Mr. Burns;

Count 13: (Mr. Joe Gallegos) Assault with a Dangerous Weapon upon Mr. Gomez;

Count 14: (Mr. Joe Gallegos) Conspiracy to Murder Mr. Gomez; and

Count 15: (Mr. Joe Gallegos) Attempted Murder of Mr. Gomez, Assault with a Dangerous Weapon Upon Mr. Gomez, Resulting in Serious Bodily Injury to Mr. Gomez.

I will instruct you on what the government must prove to establish that Mr. Joe Gallegos, Mr. Troup, Mr. Billy Garcia, Mr. Patterson, Mr. Chavez, Mr. Arturo Garcia, and Mr. Andrew Gallegos committed any of these acts; and

Fifth:    Mr. Joe Gallegos', Mr. Troup's, Mr. Billy Garcia's, Mr. Patterson's, Mr. Chavez', Mr. Arturo Garcia's, and Mr. Andrew Gallegos' purpose in committing, threatening to commit, attempting to commit, conspiring to commit the crime of violence was to gain entrance to, or to maintain or increase position, in the charged enterprise.

Jury Instructions (with citations), Instruction No. 25, at 39-40.

The Court provides the following chart listing the elements of the misprision and the

VICAR offenses.

| Misprision | | VICAR Offenses | |
|---|---|---|---|
| (i) | "[A] federal felony was committed, as charged in count of the Indictment"; | (i) | "The existence of an 'enterprise' as alleged in the Indictment and defined in 18 U.S.C. § 1959 (b)(2)"; |
| | | (ii) | "[t]hat the charged enterprise engaged in, or its activities affected, interstate commerce"; |
| (ii) | "the defendant had knowledge of the | | |

| | |
|---|---|
| commission of that felony"; <br><br> (iii)  "the defendant failed to notify an authority as soon as possible"; and <br><br> (iv)  "the defendant did an affirmative act, as charged, to conceal the crime." <br><br> Tenth Circuit Pattern Jury Instructions Criminal No. 2.08, at 98 (2011). | (iii)  "[t]hat the charged enterprise engaged in 'racketeering activity' as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1)" <br><br> (iv)  "[t]hat [the defendant] committed one of the following crimes of violence as alleged in the indictment or conspired or attempted to commit one of these crimes -- which crime violated state or federal law: murder, kidnaping, maiming, assault with a dangerous weapon, assault resulting in serious bodily injury, threatening to commit a crime of violence"; and <br><br> (v)  [the defendants's] "purpose in committing, threatening to commit, attempting to commit, conspiring to commit the crime of violence was to gain entrance to, or to maintain or increase position, in the charged enterprise." <br><br> Jury Instructions (with citations), Instruction No. 25, at 39-40. |

The Court concludes that misprision is not a lesser included offense for murder in aid of racketeering, because the misprision elements are not a "subset" of the VICAR elements. Schmuck v. United States, 489 U.S. at 716. "Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." Schmuck v. United States, 489 U.S. at 716. The fourth element of the misprision statute requires that the defendant "conceals" the commission of a felony and "does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States." 18 U.S.C. § 4. Under the elements test, this element is not "necessarily included" in the VICAR statute, Fed. R. Crim. P. 31(c), and thus misprision is not a lesser included offense of murder in aid of racketeering. Troup argues that, at trial, the evidence about his conduct "fits [] not telling people, misprision; not [concealing]. And . . . the facts support that." Dec. 18 Tr. at 28:20-29:5 (Burke). That there may be evidence at trial that indicates that Troup committed each element of misprision does not entitle Troup to a misprision instruction. The elements test "does not depend on inferences that

may be drawn from evidence introduced at trial." Schmuck v. United States, 489 U.S. at 720.  At

the hearing, the Court noted that a misprision instruction would be an "unindicted free-standing

felony to throw into the case."  Dec. 18 Tr. at 30:11-14 (Court).  The law does not permit such

free-range discretion, for "[i]t is ancient doctrine of both the common law and of our Constitution

that a defendant cannot be held to answer a charge not contained in the indictment brought against

him." Schmuck v. United States, 489 U.S. at 717.

        In the Misprision Motion, Troup concedes that, "under the strict elements test, misprision

is a lesser-related, not a lesser-included, offense."  Misprision Motion at 4.  Troup argues that "the

evidence with respect to Count III supports an instruction on the lesser-related offense of

misprision" to effectuate his "right to have the jury informed of his theory of defense and to

promote verdict reliability."   Misprision Motion at 7.   Troup avers that the Supreme Court

addresses lesser related offense instructions in Hopkins v. Reeves, 524 U.S. 88 (1998).  In Hopkins

v. Reeves, the Supreme Court considered whether the Constitution requires "state trial courts to

instruct juries on offenses that are not lesser included offenses of the charged crime under state

law." Hopkins v. Reeves, 524 U.S. at 90.  The Supreme Court held that such instructions are not

required, thus affirming the Supreme Court of Nebraska's determination that, because

second-degree murder is not a lesser included offense of felony murder under Nebraska law, a

defendant charged with felony murder is not entitled to a second-degree murder instruction in that

state.  See Hopkins v. Reeves, 524 U.S. at 95-96.

        The Court concludes that Hopkins v. Reeves does not support Troup's argument for two

reasons.   First, this case is a federal criminal case, and Hopkins v. Reeves reviewed the

constitutionality of a Nebraska court's jury instructions for a state-law crime.  See Hopkins v.

Reeves, 524 U.S. at 95-96.  The Supreme Court noted that federal courts "cannot override state-law

determinations of when instructions on lesser included offenses are permissible and when they are not." Hopkins v. Reeves, 524 U.S. at 100. In a footnote, the Supreme Court observed that, "[i]n determining *whether* an offense is a lesser included offense of a particular crime, the States have adopted a variety of approaches." Hopkins v. Reeves, 524 U.S. at 96 n.6 (emphasis in original). The Supreme Court notes that it "adopt[ed] [the] statutory elements test for federal criminal law" in Schmuck v. United States, but that "Nebraska has alternated between use of the statutory elements test" and another test for state criminal law. Hopkins v. Reeves, 524 U.S. at 96 n.6. Because Troup's Counts are federal criminal violations, the Court will apply the Supreme Court's elements test to determine if misprision is a lesser offense of murder in aid of racketeering. Accordingly, Hopkins v. Reeves does not control this case.

Second, Hopkins v. Reeves -- or any other Supreme Court or Tenth Circuit opinion -- contains no language suggesting that a Court may give a lesser related jury instruction without satisfying the elements test. While Hopkins v. Reeves applies to state criminal law, its reasoning suggests that giving jury instructions for lesser related offenses would be "unworkable." Hopkins v. Reeves, 524 U.S. at 97. Before the case arrived at the Supreme Court, the United States Court of Appeals for the Eighth Circuit had affirmed the district court's grant of a petition for a writ of habeas corpus. See Hopkins v. Reeves, 524 U.S. at 94, 101. The Supreme Court reversed the Eight Circuit's opinion, reasoning that the Eighth Circuit "required in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some *other* offense -- what could be called a 'lesser related offense' -- when no lesser included offense exists." Hopkins v. Reeves, 524 U.S. at 97. The Supreme Court concluded that "[s]uch a requirement is not only unprecedented, but also unworkable. Under such a scheme, there would be no basis for determining the offenses for which instructions are warranted." Hopkins v. Reeves,

524 U.S. at 97. The Court also determines that requiring federal district courts to give jury instructions on lesser related crimes -- regardless whether lesser included crimes are available -- would be unworkable and is not supported by the caselaw. Because the Court concludes that Troup was not entitled to a misprision instruction, the interests of justice do not require the Court to grant Troup a new trial.

## VII.  ALTHOUGH THE JENCKS ACT REQUIRED THE UNITED STATES TO PRODUCE RECORDS OF TELEPHONE CALLS AND TEXT MESSAGES BETWEEN ACEE AND LUCERO, THE RECORDS' GOOD-FAITH DESTRUCTION DOES NOT ENTITLE THE DEFENANDANTS TO A JUDGMENT OF ACQUITTAL OR A NEW TRIAL.

In the B. Garcia Motion, which all Defendants join, B. Garcia asks the Court to order the United States "to produce materials to the defense which may be the basis of a motion for post-conviction relief under Fed. Crim. P. 32." B. Garcia Motion at 1. B. Garcia notes that, "throughout the case," the Defendants "asserted their rights under the Jencks Act in regard to Leroy Lucero and all testifying witnesses." B. Garcia Motion at ¶ 4, at 2. According to B. Garcia, the United States possesses "statements of at least one testifying witness, Leroy Lucero, for which they did not provide a copy to the defense during trial nor utilized the mandatory statutory in camera review process." B. Garcia Motion ¶ 5, at 2. B. Garcia contends that the telephone call recordings and text messages "would have been important for the jury to assess when Mr. Lucero testified." B. Garcia Motion ¶ 9, at 4. Although the United States asserts that the telephone calls and text messages are not substantive in nature or relevant, B. Garcia asks that the Court order the United States to "deliver any statement" which the United States "asserts does not relate to the subject matter of the testimony of the witness for the inspection of the court in camera." B. Garcia Motion ¶ 12, at 4. B. Garcia notes that, if the United States cannot produce the communications, then he

will file a "motion for new trial . . . based on destruction of evidence." B. Garcia Motion Reply ¶ 14, at 6.

The United States counters that the Jencks Act "requires the United States to produce statements made by a government witness or prospective government witness (other than the defendant), after that witness testifies at trial which relate to the subject matter as to which the witness has testified." B. Garcia Motion Response at 1. The United States avers that it disclosed "Lucero's statements that were in the government's possession during trial." B. Garcia Motion Response at 1. The United States reiterates that the communications between Acee and Lucero to which B. Garcia refers are "not substantive in nature and not related to the subject matter of Lucero's testimony." B. Garcia Motion Response at 2. According to the United States, the "topics included Lucero's safety concerns, Lucero's relocation, a vehicle accident that Lucero was in on Lucero's way home from testifying following a motions hearing, a burglary in which the victim was Lucero's wife, and the logistics of Lucero's travel to Las Cruces to testify." B. Garcia Motion Response at 2. The United States argues that "Acee was careful not to have discussions with Lucero pertaining to his anticipated or prior testimony." B. Garcia Motion Response at 2. The United States further argues that B. Garcia "has not shown good cause for the discovery he now seeks" and that B. Garcia is engaging in a "fishing expedition." B. Garcia Motion Response at 2. The United States adds that the communications between Acee and B. Garcia are not in the United States' "control and custody," because Acee acquired a new cellular telephone in May, 2018, and thus "all text messages to and from his prior cellular number were lost." B. Garcia Motion Response at 2-3.

At the December 17, 2018, hearing, Acee testified in great detail about his communications with Lucero. See Dec. 17 Tr. at 8:13-78:24. Acee testified that he talked to Lucero about only

"travel, safety issues, and . . . [two matters] unrelated to the charged offenses." Dec. 17 Tr. at 25:24-26:3 (Acee). Acee testified that Lucero had "concerns about his safety" when they communicated. Dec. 17 Tr. at 27:16 (Acee). Acee explained that Lucero was concerned about

> what travel looked like. How long he would stay, where he would stay. How he would get to and from the courthouse. He still lived up in the Las Vegas area. There was some discussion about per diem issues and then eventual relocation, although most of those conversations were with his attorney being part of the phone call, as well.

Dec. 17 Tr. at 27:20-28:1 (Acee). Acee also testified that Lucero told him about

> annoying and harassing phone calls. Almost like what I'd expect a teenager to do where you're prank-calling people, stuff like that. He would just get phone calls at odd hours and he would just -- no one would express a threat to him. It would just be like they were listening momentarily and then they'd hang up.

Dec. 17 Tr. at 31:25-32:6 (Acee). During cross-examination, Acee said that he thinks Lucero "was in the presence of his attorney" during most of his telephone calls with Lucero. Dec. 17 Tr. at 28:5-6 (Acee). Acee said that he believes the FBI "destroyed" the cellular telephone that he used to communicate with Lucero, Dec. 17 Tr. at 16:21 (Acee), because, when the FBI collects "our phones, because of the security features, they're not wiped clean and sold at a used cellphone store. They're destroyed, because of the security features that are on them," Dec. 17 Tr. at 17:2-5 (Acee). Acee said that he believes, however, that the FBI produced all 302s related to Lucero. See Dec. 17 Tr. at 38:18-23 (Castle, Acee). Acee testified that he made a "conscious decision" not to retain text messages with Lucero, because the text messages did not contain substantive information warranting a report. Dec. 17 Tr. at 77:5-10 (Castle, Acee). According to Acee, his communications by text message with Lucero are "all nonrecord[s]," [39] Dec. 17 Tr. at 59:21

---

[39]Acee testified that a "nonrecord" is "any material that does not meet the statutory definition of a record as set forth in 44 USC Section 3301." Dec. 17 Tr. at 59:8-12 (Armijo, Acee). Section 3301 defines records:

_____

**(a)**     **Records Defined.** --

    **(1)**     **In general.** -- As used in this chapter, the term "records" --

        **(A)**     includes all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them; and

        **(B)**     does not include --

            **(i)**     library and museum material made or acquired and preserved solely for reference or exhibition purposes; or

            **(ii)**     duplicate copies of records preserved only for convenience.

    **(2)**     **Recorded information defined.** --

        For purposes of paragraph (1), the term "recorded information" includes all traditional forms of records, regardless of physical form or characteristics, including information created, manipulated, communicated, or stored in digital or electronic form.

**(b)**     **Determination of Definition.** --

    The Archivist's determination whether recorded information, regardless of whether it exists in physical, digital, or electronic form, is a record as defined in subsection (a) shall be binding on all Federal agencies.

44 U.S.C. § 3301 (bold in original).

(Acee), and that the FBI does not require agents to save nonrecords, see Dec. 17 Tr. at 59:14-16 (Armijo, Acee).

After Acee's testimony, the Court stated: "It doesn't look like there is, A, anything to be produced; and B, it doesn't look like there is anything for in camera review.  So it looks to me like this is mostly a Jencks violation motion.  Am I characterizing things correctly?"  Dec. 17 Tr. at 80:12-16.  B. Garcia responded: "To some extent, yes, and no."  Dec. 17 Tr. at 80:17 (Castle). B. Garcia explained that, after a "cursory review," it appears that the United States did not produce a 2016 interview of Lucero, although B. Garcia conceded that the interview "may very well have been produced."  Dec. 17 Tr. at 80:22-81:4 (Castle).  The United States offered that it "can find out about it," Dec. 17 Tr. at 81:7-8 (Armijo), and Acee stated that he "recorded Mr. Lucero and I believe we played portions of it during the trial.  I thought it was 2016," Dec. 17 Tr. at 81:11-13 (Acee).  The Court then asked B. Garcia to confirm whether, other than checking to see if the United States has produced the 2016 Lucero interview, he is asking the United States to produce anything else.  See Dec. 17 Tr. at 81:16-20 (Court).  B. Garcia responded that he is not asking the United States to produce anything, and he asserted that he is dropping his request for in camera review.  See Dec. 17 Tr. at 81:21-25 (Castle, Court).  B. Garcia explained:

> Yes.  We didn't know whether the phone calls had been recorded.  The response said that the text messages had no longer been kept, so I wasn't going to ask for anything about the text messages.  But now that we've heard that the phone calls weren't recorded, I don't think there is anything that the Court can look at in camera.

Dec. 17 Tr. at 82:3-9 (Castle).  B. Garcia also confirmed that his main argument is that the United States violated the Jencks Act by not producing records of the telephone calls and text messages between Acee and Lucero.  See Dec. 17 Tr. at 82:1-9 (Court, Castle).

Rather than orally argue the B. Garcia Motion, B. Garcia asked the Court for permission to argue his motion "in a writing within a reasonable period of time," so that he can "go back and reference some of the discovery materials." Dec. 17 Tr. at 79:13-15 (Castle). The United States and the other Defendants did not object. See Dec. 17 Tr. at 79:16-25 (Court, Armijo, Castle). Although B. Garcia filed three motions for extensions of time to file additional briefing, see Unopposed Motion for Extension of Time to File Further Motions for Discovery and/or Motion for New Trial, filed December 28, 2018 (Doc. 2475); Second Unopposed Motion for Extension of Time to File Further Motions for Discovery and/or Motion for New Trial, filed January 10, 2019 (Doc. 2485); Third Unopposed Motion for Extension of Time to File Further Motions for Discovery and/or Motion for New Trial, filed February 11, 2019 (Doc. 2504) -- all of which the Court granted, see Order, filed December 31, 2018 (Doc. 2476); Order Re Second Unopposed Motion for Extension of Time to File Further Motions for Discovery and/or Motion for New Trial, filed January 14, 2019 (Doc. 2489); Order, filed February 13, 2019 (Doc. 2506) -- B. Garcia never filed a motion for new trial or any other briefings. Based on the briefings, Acee's testimony, and B. Garcia's concessions that he is not seeking production of any documents, that he is not seeking in camera review, and that he would work with the United States to determine if it had produced Acee's 2016 Lucero interview, the Court must decide only whether the United States violated the Jencks Act, because it did not produce records of Acee and Lucero's telephone calls and text messages between February 15, 2018, and May 3, 2018.

Although B. Garcia never filed an additional motion asking for a new trial or a judgment of acquittal, the Court determines that neither of these sanctions would be appropriate, even though the United States' non-disclosure of the telephone calls and text messages violated the Jencks Act. Section 3500 of Title 18 of the United States Code provides:

**(a)**      In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**      After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a)-(b) (bold in original).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. § 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. at 349.  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d at 460 (citing Palermo v. United States, 360 U.S. at 352).

The Court determines that the text messages and telephone calls constitute "statement[s]" subject to disclosure under the Jencks Act.  18 U.S.C. § 3500.  The Jencks Act defines statements as:

**(1)**      a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**      a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**      a statement, however taken or recorded, or a transcription thereof, if any,

made by said witness to a grand jury.

18 U.S.C. § 3500(e) (bold in original).  The Tenth Circuit has held that "[i]nterview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."  United States v. Smith, 984 F.2d at 1086.  The Court concludes that records of telephone calls and text messages are statements under the Jencks Act, because telephone call records are "substantially verbatim recital[s] of an oral statement made by said witness," 18 U.S.C. § 3500(e)(2), and text messages are "written statement[s] made by said witness," 18 U.S.C. § 3500(e)(1).

The United States did not preserve records of Acee and Lucero's telephone calls and text messages between February 15, 2018, and May 3, 2018.  See Dec. 17 Tr. at 80:12-16 (Court); id. at 82:1-9 (Court, Castle).  "Thus the issue is whether full sanctions for non-disclosure ought to be invoked absolutely, or whether imposition of sanctions ought to depend upon the circumstances of the material's disappearance."  United States v. Bryant, 439 F.2d 642, 651 (D.C. Cir. 1971), abrogated on other grounds by United States v. Vega, 826 F.3d 514 (D.C. Cir. 2016).  The Court determines that United States v. Augenblick, 393 U.S. 348 (1969), is instructive for how district courts should address the loss or destruction of evidence that the Jencks Act covers.  See United States v. Bryant, 439 F.2d at 651.  In United States v. Augenblick, the Supreme Court held that, when the United States is unable to produce evidence that the Jencks Act covers, the United States bears the "burden of . . . explaining why it could not do so."  United States v. Augenblick, 393 U.S. at 356.  There, the United States recorded tapes of a witness interrogation.  See 393 U.S. at 355.  The Supreme Court determined that the "tapes were covered by the Jencks Act; and an earnest effort was made to locate them."  United States v. Augenblick, 393 U.S. at 355.  Ultimately, the United States could not produce the tapes -- "the record indeed shows that they were not found; and their ultimate fate remains a mystery."  United States v. Augenblick, 393 U.S. at 355.  The

Supreme Court noted that the United States introduced testimony on the "routine in handling and using of such recordings," and that the United States made "an earnest effort" to locate the tapes. 393 U.S. at 355. The Supreme Court also concluded that the "record [was] devoid of credible evidence that they were suppressed." 393 U.S. at 356. The Supreme Court held that, although the Jencks Act covered the evidence, the tapes' non-production did not violate the Constitution, and thus the Supreme Court upheld the conviction. See United States v. Augenblick, 393 U.S. at 356.

In United States v. Bryant, the United States Court of Appeals for the D.C. Circuit concluded that United States v. Augenblick

> not only makes clear that the circumstances of [evidence's] disappearance . . . should be relevant to the question of proper sanctions. It also suggests that, while sanctions should be imposed in cases of bad faith suppression of evidence, an exception will be made for good faith loss. . . . [C]riminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made.

United States v. Bryant, 439 F.2d at 651 (quoting United States v. Augenblick, 393 U.S. at 355). The Fifth Circuit follows the same approach:

> Because the evidence is no longer available we have no idea whether it would have been favorable to the Defendant. . . . [United States v. Bryant] held that Jencks Act sanctions should be imposed in cases of bad faith and negligent suppression of evidence but not in the case of good faith loss by the government. . . . We have adopted this approach when deciding lost and destroyed evidence cases.

United States v. Ramirez, 174 F.3d 584, 589 (5th Cir. 1999). The Tenth Circuit has not addressed the proper sanctions for the United States' inability to produce destroyed or lost evidence that the Jencks Act covers. The Court concludes, however, that United States v. Bryant and United States v. Ramirez are persuasive, because the Tenth Circuit similarly has held that,

> absent bad faith or fraudulent purpose on the part of the government, the destruction of evidence prior to trial does not necessitate reversal of a criminal conviction. Chandler v. United States, 318 F.2d 356 (10th Cir. 1963). When evidence has been

lost or destroyed, courts engage in a "case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in the light of its nature, its bearing upon critical issues in the case and strength of the government's untainted proof." United States v. Grammatikos, 633 F.2d 1013, 1019-20 (2d Cir. 1980).

United States v. Baca, 687 F.2d 1356, 1359 (10th Cir. 1982).  "[C]ourts concentrate on both the fault of the government and the prejudice to a defendant when evidence is lost or destroyed." United States v. Baca 687 F.2d at 1359 n.1.  Accordingly, under United States v. Augenblick, the Court will uphold the Defendants' conviction, unless the United States is unable to satisfy its burden of demonstrating good-faith reasons why it is unable to produce records of Acee's and Lucero's telephone calls and text messages.  See United States v. Augenblick, 393 U.S. at 356.

The Court concludes that, although the Jencks Act requires that the United States produce records of Acee's and Lucero's telephone calls and text messages, a new trial and a judgment of acquittal are not warranted, because: (i) the United States has shown that the FBI followed "routine in handling and using of such recordings," United States v. Augenblick, 393 U.S. at 355; and (ii) the "record is devoid of credible evidence that they were suppressed," United States v. Augenblick, 393 U.S. at 356.  The Court also notes that a "new trial would be pointless," because a "new trial would be simply a repetition of the first trial, similarly infected by non-disclosure of discoverable evidence." United States v. Bryant, 439 F.2d at 653.  At the December 17, 2018, hearing, Acee testified in great detail about the FBI's record retention policies.  Acee said that he believes the FBI "destroyed" the cellular telephone that he used to communicate with Lucero. Dec. 17 Tr. at 16:21 (Acee).  According to Acee, when the FBI collects "our phones, because of the security features, they're not wiped clean and sold at a used cellphone store.  They're destroyed, because of the security features that are on them." Dec. 17 Tr. at 17:2-5 (Acee).  Acee further testified that the FBI's record retention policies recognize three categories of records:

"[n]ontransitory, transitory, and nonrecord."  Dec. 17 Tr. at 13:23 (Acee).  Acee said that the FBI defines a "nonrecord" as "any material that does not meet the statutory definition of a record as set forth in 44 USC Section 3301."  Dec. 17 Tr. at 59:8-12 (Armijo, Acee).  Acee testified that the FBI's policies do not require agents to save nonrecords.  See Dec. 17 Tr. at 59:14-16 (Armijo, Acee).

Although B. Garcia does not argue or offer evidence that the United States destroyed records in bad faith, the Court concludes that Acee followed the FBI's record retention policies in good faith when he destroyed records of his telephone calls and text messages with Lucero.  The Supreme Court's reference in United States v. Augenblick to the United States' "routine in handling and using such recordings," United States v. Augenblick, 393 U.S. at 355, and its references in Killian v. United States, 368 U.S. 231 (1961), to the United States' "'good faith'" and adherence to "'normal practice' suggest[] the importance of regularity in the preservation of vital evidence," United States v. Bryant, 439 F.2d at 652 (quoting Killian v. United States, 368 U.S. at 242).  The Court determines that the FBI's policies are "rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation." United States v. Bryant, 439 F.2d at 652.  The United States argues that the communications between Acee and Lucero are "not substantive in nature and not related to the subject matter of Lucero's testimony."  B. Garcia Motion Response at 2.  According to the United States, the "topics included Lucero's safety concerns, Lucero's relocation, a vehicle accident that Lucero was in on Lucero's way home from testifying following a motions hearing, a burglary in which the victim was Lucero's wife, and the logistics of Lucero's travel to Las Cruces to testify."  B. Garcia Motion Response at 2.  Acee testified that his communications with Lucero are "all nonrecord[s]," Dec. 17 Tr. at 59:21 (Acee), and that he did not retain text messages with Lucero, because the text messages

did not contain substantive information warranting a report, Dec. 17 Tr. at 77:5-10 (Castle, Acee).

Acee reiterated that substantive communications include "[f]actual information obtained during

interviews or interactions with witnesses."   Dec. 17 Tr. at 78:8-9 (Acee).   Acee added that,

according to the FBI's policies, "substantive communications" refers to records

> that we need to preserve, and then upload into Sentinel, so that they're in the report
> database or factual information about investigative activity.  Factual information
> obtained during interviews or interactions with victims, including victims, potential
> witnesses, experts, informants, or cooperators; factual discussions related to the
> merits of evidence; factual information or opinions relating to the credibility or bias
> of a witness, informant, or potential witness; and other factual information that's
> potentially discoverable under Brady, Giglio, Rule 16, or Rule 26.2, which is the
> Jencks Act.

Dec. 17 Tr. at 68:13-25 (Acee).  The Court determines that Acee followed the FBI's policies in

good faith by determining that his communications with Lucero were not substantive and thus

categorizing the communication records as nonrecords, which are subject to destruction.

The Court further concludes that there is no evidence that the records of Acee's and

Lucero's telephone calls and text messages were suppressed in bad faith.  Rather, as discussed

above, the records were destroyed in accordance with FBI policy.  At the December 17, 2018,

hearing, Acee confirmed that he would not contact a witness or defendant whom counsel represents

"without the consent of counsel or the permission of the Court," unless he wants to ask about a

"completely different offense."  Dec. 17 Tr. at 25:3-11 (Castle, Acee).  Acee testified that he talked

to Lucero about only "travel, safety issues, and . . . [two matters] unrelated to the charged

offenses."  Dec. 17 Tr. at 25:24-26:3 (Acee).  There is no evidence that any of Acee's and Lucero's

communications constituted substantive communications, or that the United States suppressed any

substantive communications in bad faith.  Furthermore, there is no indication that "the undisclosed

evidence 'might have affected the outcome of the trial.'"  United States v. Warhop, 732 F.2d 775,

778 (10th Cir. 1984)(quoting <u>United States v. Agurs</u>, 427 U.S. 97, 105 (1976)).  The Tenth Circuit has held that "a new trial is required 'if there was a reasonable possibility that the undisclosed evidence would have materially affected the verdict.'"  <u>United States v. Warhop</u>, 732 F.2d at 778 (quoting <u>Chavis v. North Carolina</u>, 637 F.2d 213, 223 (4th Cir. 1980)).  Acee testified, however, that his communications with Lucero primarily concerned "what travel looked like.  How long he would stay, where he would stay.  How he would get to and from the courthouse.  He still lived up in the Las Vegas area.  There was some discussion about per diem issues."  Dec. 17 Tr. at 27:20-28:1 (Acee).  Because there is no evidence that the United States suppressed evidence which, if the evidence had been disclosed, would have materially affected the verdict, the Court concludes that neither a new trial nor a judgment of acquittal is warranted.

**IT IS ORDERED** that: (i) Defendant Billy Garcia's Motion to Produce Post-Conviction Discovery and for In Camera Review, filed October 15, 2018 (Doc. 2416), is denied; (ii) Defendants Joe Gallegos and Andrew Gallegos' Rule 29 Motion for Judgment of Aquittal [sic] or in the Alternative Motion for New Trial With Regard to Counts Four and Five, filed October 15, 2018 (Doc. 2415), is denied; (iii) Andrew Gallegos' Motion for Judgment of Acquittal or in the Alternative Motion for New Trial, filed October 15, 2018 (Doc. 2418), is denied; (iv) Defendant Joe Gallegos' Rule 29 Motion for Judgment of Acquittal or in the Alternative Motion for New Trial on Count 1, filed October 15, 2018 (Doc. 2419), is denied; (v) Edward Troup's Motion for New Trial, filed October 16, 2018 (Doc. 2420), is denied; (vi) Defendant Arturo Arnulfo Garcia's Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2), filed October 16, 2018 (Doc. 2422), is denied; and (vii) the requests in Andrew Gallegos' Supplement to His Motion for Judgment of Acquittal or in the Alternative, Dismissal Pursuant to Rule 12(b)(2) (Doc 2422), filed January 15, 2019 (Doc. 2491), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

        *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

        *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

        *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

    *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

    *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

    *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

      *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

      *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

      *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

 *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

 *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

 *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

 *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

    *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

    *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*